1 | Douglas J. Rosner, ESQ., SBN 094466
  | rosnerlaw@earthlink.net
2 | LAW OFFICES OF DOUGLAS JOSEPH ROSNER
  | 2625 Townsgate Road, Suite 330
3 | Westlake Village, California 91361
  | Telephone No. (818) 501-8400
4 | Facsimile No.: (818) 880-4485

5 | Attorney for Defendant/Cross-Defendants,
  | Labrador Entertainment, Inc. dba Spider Cues Music Library,
6 | Labrador Entertainment, LLC, Noel Palmer Webb,
  | an individual and Webb Family Trusts

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | BEATBOX MUSIC, PTY, LTD.,                    ) Case No. 2:17-cv-6108-MWF (JPRx)
   |                                              ) *Assigned to the Hon. Michael W.*
12 |                   Plaintiff,                 ) *Fitzgerald*
   |          vs.                                 )
13 |                                              ) FIRST ANSWER TO FIRST
   | LABRADOR ENTERTAINMENT,                      ) AMENDED COMPLAINT OF
14 | INC., DBA SPIDER CUES MUSIC                  ) DEFENDANT LABRADOR
   | LIBRARY, a California corporation,           ) ENTERTAINMENT FOR:
15 | ET AL.,                                      )
   |                                              ) 1. BREACH OF CONTRACT;
16 |                   Defendants.                ) 2. EXPRESS INDEMNITY;
   | ─────────────────────────────               )
17 |                                              ) FOR DEFENDANTS LABRADOR
   | MICHAEL COHEN, an individual,                ) ENTERTAINMENT, LLC,
18 |                                              ) LABRADOR ENTERTAINMENT,
   |                   Cross-Complainant,         ) INC., NOEL WEBB AND THE
19 |          vs.                                 ) WEBB FAMILY TRUST FOR
   |                                              ) 1. ALTER EGO THEORY.
20 | LABRADOR ENTERTAINMENT                       )
   | INC., D/B/A SPIDER CUES MUSIC                ) **DEMAND FOR JURY TRIAL**
21 | LIBRARY, a California Corporation,           )
   | ET AL.                                       )
22 |                   Cross-Defendant.           )
   |                                              )
23

24

25

26

27

28 | FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 1 of 51

1
2
3
4
5
6
7
8
9
10
11
12

LABRADOR ENTERTAINMENT
INC., D/B/A SPIDER CUES MUSIC
LIBRARY, a California Corporation,
ET AL.

   Counterclaimant,

  vs.

BEATBOX MUSIC, PTY, LTD. AND

MICHAEL COHEN, an individual and

ROES 1-20, Inclusive,

   Counterdefendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FIRST AMENDED COUNTER

CLAIM FOR:

1.  BREACH OF CONTRACT;
2.  EXPRESS INDEMNITY;
3.  BREACH OF FIDUCIARY
DUTY AND;
4.  NEGLIGENCE.

**DEMAND FOR JURY TRIAL**

Action Filed: August 17, 2017

### FIRST AMENDED ANSWER

  Defendant, Labrador Entertainment, Inc. dba Spider Music Cues ("Labrador Inc."), Noel Palmer Webb, an individual ("Webb"), Labrador Entertainment, LLC ("Labrador LLC")  and Webb Family Trust ("Webb Trust")  (collectively "Defendants") answer Plaintiff Beatbox Music PTY, LTD's ("Beatbox") First Amended Complaint "FAC" and as follows:

  1.  Answering paragraph 1 of the FAC, Defendants admit the allegations contained in paragraph 1 of the FAC.

  2.  Answering paragraph 2 of the FAC, Defendants admit the allegations contained in paragraph 2 of the FAC.

  3.  Answering paragraph 3 of the FAC, Defendants admit the allegations contained in paragraph 3 of the FAC.

  4.  Answering paragraph 4 of the FAC, Defendants admit the allegations contained in paragraph 4 of the FAC.

///

5.  Answering paragraph 5 of the FAC, Defendants admit the allegations contained in paragraph 5 of the FAC.

6.  Answering paragraph 6 of the FAC, Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 6 of the FAC and on that basis denies each and every allegation contained therein.

7.  Answering paragraph 7 of the FAC, Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 7 of the FAC and on that basis denies each and every allegation contained therein.

8.  Answering paragraph 8 of the FAC,  Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 8 of the FAC and on that basis denies each and every allegation contained therein.

9.  Answering paragraph 9 of the FAC,  Defendants deny each and every allegation contained in paragraph 9 of the FAC.

10.  Answering paragraph 10 of the FAC,  Defendants deny each and every allegation contained in paragraph 10 of the FAC.

11.  Answering paragraph 10 of the FAC,  Defendants admit that Plaintiff is a citizen of Australia and that Defendants are citizens of California. Defendants lacks sufficient knowledge to admit or deny the remaining allegations contained in paragraph 11, and therefore denies same on information and belief.

12.  Answering paragraph 12 of the FAC,  Defendants deny each and every allegation contained in paragraph 12 of the FAC.

13.  Answering paragraph 13 of the FAC,  Defendants deny each and every allegation contained in paragraph 13 of the FAC.

14.  Answering paragraph 14 of the FAC, is a legal conclusion that Defendants are not required to admit or deny.

15.  Answering paragraph 15 of the FAC, is a legal conclusion that Defendants are not required to admit or deny.

16.  Answering paragraph 16 of the FAC,  Defendants admit the allegations contained in paragraph 16 of the FAC, except that Defendants deny that Exhibit A "Composer's Agreement" is attached as Exhibit A to the FAC.

17.  Answering paragraph 17 of the FAC, Defendants admit the allegations contained in paragraph 17 of the FAC.

18.  Answering paragraph 18 of the FAC,  Defendants deny that Exhibit B "is attached to the FAC, but otherwise admit the balance of the allegations contained in paragraph 18 of the FAC.

19.  Answering paragraph 19 of the FAC,  Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 19 of the FAC and on that basis denies each and every allegation contained therein.

20.  Answering paragraph 20 of the FAC,  Defendants admit that an Amendment to Sub-Publishing Contract was executed by Noel Webb, President for and on behalf of Labrador Entertainment Group and dba Spider Cues, but otherwise deny each and every allegation contained in paragraph 20 of the FAC.

21.  Answering paragraph 21 of the FAC,  Defendants admit the allegations contained in paragraph 21 of the FAC, except that Defendants deny that Exhibit A is attached to the FAC.

22.  Answering paragraph 22 of the FAC,  Defendants admit the allegations contained in paragraph 22 of the FAC, except that Defendants deny that Exhibit A is attached to the FAC.

23.  Answering paragraph 23 of the FAC,  Defendants admit the allegations contained in paragraph 23 of the FAC, except that Defendants deny that Exhibit A or any other exhibit is attached to the FAC.

24.  Answering paragraph 24 of the FAC, Defendants admit that on or about 2009, Labrador, Inc.periodically sent music to Beatbox for use by Beatbox consistent with the 2009 Agreement,  but otherwise deny each and every allegation contained in paragraph 24 of the FAC.

25.  Answering paragraph 25 of the FAC, Defendants admit the allegations contained in paragraph 25 of the FAC.

26.  Answering paragraph 26 of the FAC,  Defendants admit that on or about 2012, Defendant Labrador, Inc.emailed Beatbox stating that Labrador, Inc.is putting their music tracks into an album format, but otherwise deny each and every allegation contained in paragraph 26 of the FAC.

27.  Answering paragraph 27 of the FAC,  Defendants admit the allegations contained in paragraph 27 of the FAC, except for the phrase "However" and "this time;" Defendants  deny the implication that it had not previously so indicated.

28.  Answering paragraph 28 of the FAC,  Defendants admit the allegations contained in paragraph 28 of the FAC, except to the extent it implies that significant portions of the New Music Library had not already been sent and that Defendants were to send to Beatbox the music to be included in the New Music Library. At or about April 2012 Labrador, Inc.notified Beatbox that the music from the New Music Library was available for download from Labrador, Inc.'s cloud.

29.  Answering paragraph 29 of the FAC,  Defendants deny each and every allegation contained in paragraph 29 of the FAC.

30.  Answering paragraph 30 of the FAC,  Defendants deny each and every allegation contained in paragraph 30 of the FAC.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 5 of 51

31.  Answering paragraph 31 of the FAC,  Defendants deny each and every allegation contained in paragraph 31of the FAC.

32.  Answering paragraph 32 of the FAC,  Defendants admit that Labrador, Inc.sent Beatbox a "Fix List" of titles that needed to be removed and the "Fix List" contained a list of track title changes as well as composer name changes, but otherwise deny each and every allegation contained in paragraph 32 of the FAC.

33.  Answering paragraph 33 of the FAC,  Defendants deny each and every allegation contained in paragraph 33 of the FAC.

34.  Answering paragraph 34 of the FAC Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 34 of the FAC and on that basis denies each and every allegation contained therein.

35.  Answering paragraph 35 of the FAC,  Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 35 of the FAC and on that basis denies each and every allegation contained therein.

36.  Answering paragraph 36 of the FAC Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 36  of the FAC and on that basis denies each and every allegation contained therein.

37.  Answering paragraph 37 of the FAC, Defendants admit the allegations contained in paragraph 37 of the FAC.

38.  Answering paragraph 38 of the FAC Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 38  of the FAC and on that basis denies each and every allegation contained therein.

39.   Answering paragraph 39 of the FAC Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 39  of the FAC and on that basis denies each and every allegation contained therein.

40.   Answering paragraph 40 of the FAC, Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 40  of the FAC and on that basis denies each and every allegation contained therein.

41.   Answering paragraph 41 of the FAC,   Defendants admit the allegations contained in paragraph 41 of the FAC.

42.   Answering paragraph 42 of the FAC,   Defendants admit the allegations contained in paragraph 42 of the FAC.

43.   Answering paragraph 43 of the FAC,  Defendants deny each and every allegation contained in paragraph 43 of the FAC and deny that any indemnity obligations have yet arisen.

44.   Answering paragraph 44 of the FAC,  Defendants deny each and every allegation contained in paragraph 44 of the FAC.

45.   Answering paragraph 45 of the FAC,  Defendants hereby incorporate by this reference Defendants' responses to paragraphs 1 through 44 as though fully set forth herein.

46.   Answering paragraph 46 (mislabeled as paragraph 42) of the FAC, Defendants admit the allegations contained in paragraph 46 of the FAC, except that Defendants deny that Exhibit A "Composer's Agreement" is attached as Exhibit A to the FAC.

47.   Answering paragraph 47 (mislabeled as paragraph 43) of the FAC, Defendants deny each and every allegation contained in paragraph 47 of the FAC.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 7 of 51

48.  Answering paragraph 48 (mislabeled as paragraph 44) of the FAC, Defendants admit that the 2009 Agreement was enforceable and that part of the consideration was an advancement of $3,500, but otherwise deny each and every allegation contained in paragraph 48 of the FAC.

49.  Answering paragraph 49  (mislabeled as paragraph 45) of the FAC, Defendants admit that the contract contained indemnity clauses, but otherwise deny each and every allegation contained in paragraph 49 of the FAC.

50.  Answering paragraph 50  (mislabeled as paragraph 46) of the FAC, Defendants admit that Beatbox paid the advancement of $3,500, but otherwise deny each and every allegation contained in paragraph 50 of the FAC.

51.  Answering paragraph 51 (mislabeled as paragraph 47) of the FAC, Defendants deny each and every allegation contained in paragraph 51 of the FAC.

52.  Answering paragraph 52 (mislabeled as paragraph 48) of the FAC, Defendants are without sufficient knowledge, information or belief to admit or deny the allegations contained in paragraph 52  of the FAC and on that basis deny each and every allegation contained therein.

53.  Answering paragraph 53 (mislabeled as paragraph 49) of the FAC, Defendants admit that there are lawsuits/claims in Australia and New Zealand, and denies that it breached the 2009, but otherwise, Defendants are without sufficient knowledge, information or belief to admit or deny the remaining allegations contained in paragraph 53  of the FAC and on that basis deny each and every other allegation contained therein.

54.  Answering paragraph 54 (mislabeled as paragraph 50) of the FAC, Defendants deny each and every allegation contained in paragraph 54 of the FAC.

///

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 8 of 51

55.  Answering paragraph 63 (mislabeled as paragraph 59) of the FAC, Defendants hereby incorporate by this reference Defendants' responses to paragraphs 1 through 54 as though fully set forth herein.

56.  Answering paragraph 64 (mislabeled as paragraph 60) of the FAC, Defendants admit that there is an indemnity clause in the 2009, but otherwise, Defendants are without sufficient knowledge, information or belief to admit or deny the remaining allegations contained in paragraph 53 of the FAC and on that basis deny each and every other allegation contained therein.

57.  Answering paragraph 65 (mislabeled as paragraph 61) of the FAC, Defendants admit that there is an indemnity clause in Section 16(v) that states, "The Publisher agrees to indemnify and hold harmless the Sub Publisher, their successors and assigns of and from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Publishers guarantees, warranties, representations and undertakings contained in this Agreement, but otherwise deny each and every allegation contained in paragraph 65 of the FAC.

58.  Answering paragraph 66 (mislabeled as paragraph 62) of the FAC, Defendants admit the allegations contained in paragraph 66 of the FAC.

59.  Answering paragraph 67 (mislabeled as paragraph 63) of the FAC, Defendants deny each and every allegation contained in paragraph 67 of the FAC.

60.  Answering paragraph 68 (mislabeled as paragraph 64) of the FAC, Defendants admit that there is an indemnity clause in Section 16(v) that states, "The Publisher agrees to indemnify and hold harmless the Sub Publisher, their successors and assigns of and from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Publishers guarantees, warranties, representations and undertakings contained in this Agreement, but otherwise deny each and every allegation contained in paragraph 68 of the FAC.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 9 of 51

61.  Answering paragraph 69 (mislabeled as paragraph 65 of the FAC, Defendants admit that the 2009 Agreement provides for it to indemnify and hold harmless Beatbox for judgment against it for copyright infringement under some circumstances, but otherwise deny each and every allegation contained in paragraph 69 of the FAC.

62.  Answering paragraph 79 (mislabeled as paragraph 75 of the FAC, Defendants hereby incorporate by this reference Defendants' responses to paragraphs 1 through 61 as though fully set forth herein.

63.  Answering paragraph 80 (mislabeled as paragraph 76 of the FAC, Defendants deny each and every allegation contained in paragraph 80 of the FAC.

64.  Answering paragraph 81 (mislabeled as paragraph 77 of the FAC, Defendants deny each and every allegation contained in paragraph 80 of the FAC.

**AFFIRMATIVE DEFENSES**

As separate, independent, and affirmative defenses to the FAC, Defendants allege that:

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

65.  As a First and Separate Affirmative Defense, Defendants assert that the FAC and each purported claim alleged therein fail to state facts sufficient to constitute a claim against Defendants.

**SECOND AFFIRMATIVE DEFENSE**

**(Plaintiff's Conduct)**

66. As a Second and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC are barred, in whole or in part, by material breaches, negligence or other wrongful conduct by Plaintiff and by the conduct of their agents, attorneys, and representatives.

## THIRD AFFIRMATIVE DEFENSE

### (Breach of Contract)

67. As a Third and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC are barred, in whole or in part, by Plaintiff's breach of contract.

## FOURTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

68. As a Fourth and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC against Defendants are barred, in whole or in part, by the unclean hands of Plaintiff.

## FIFTH AFFIRMATIVE DEFENSE

### (Waiver)

69. As a Fifth and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC against Defendants are barred, in whole or in part, because, by Plaintiff's conduct and the conduct of their agents, attorneys, and representatives, Plaintiff has waived their rights, if any.

## SIXTH AFFIRMATIVE DEFENSE

### (Ratification and Waiver)

70. As a Sixth and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC against Defendants are barred, in whole or in part, because, Plaintiff, on their own behalf and through the actions of their agents, attorneys, and representatives, ratified the actions of Defendants, thereby waiving any and all claims against Defendants, if any.

///

///

///

**SEVENTH AFFIRMATIVE**

**(Estoppel)**

71.  As a Seventh and Separate Affirmative Defense, Defendants assert that some or all of the purported claims and causes of action in the FAC against Defendants are barred, in whole or in part, by the equitable doctrine of estoppel because of the conduct of Plaintiff and their agents, attorneys, and representatives.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Consent of Plaintiff)**

72.  As an Eighth and Separate Affirmative Defense, Defendants assert that Plaintiff gave consent both expressly and impliedly for any purported failure, breaches, or conduct of Defendants as alleged.

**NINTH AFFIRMATIVE DEFENSE**

**(Fault of Plaintiff)**

73. As a Ninth and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC are barred, in whole or in part, by the fault of Plaintiff and of their agents, attorneys, and representatives.

**TENTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

74. As a Tenth and Separate Affirmative Defense, Defendants assert that some or all of the purported claims in the FAC are barred, in whole or in part, by Plaintiff's failure to mitigate their alleged damages.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Negligence of Plaintiff and Others)**

75. As an Eleventh and Separate Affirmative Defense to the FAC, Defendants assert that Defendants are informed and believes and thereon allege that the injuries and damages alleged in the FAC, if any, without admitting any injury or damage to

Plaintiff, occurred, were proximately caused by either the sole negligence of or contributed to by the negligence of Plaintiff or third parties not within the control of Defendants.  Beatbox breached their duty of reasonable care by negligently, among other matters:

● Failing to perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● Failing to use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● Failing to comply with the Beatbox Agreement and assigned to AMCOS the benefits licensed to Beatbox to AMCOS, without first obtaining the written consent of Labrador, Inc.

● After Beatbox wrongly assigned to AMCOS the benefits Labrador, Inc. licensed to Beatbox, Beatbox failed to comply with its duties to AMCOS, including the duty to immediately notify AMCOS of each deletion from the list of music cues.

● Failing to comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

● Failing to provide an industry wide process to obtain from Labrador, Inc. the Library.

Defendants request, that to the extent Plaintiff's damages were caused by negligence, the negligence of all persons or parties, named and unnamed, served or unserved, and the degree to which said negligence contributed to the happening of the incident and the nature and extent of the injuries actually sustained, if any, be determined by the trier of fact. Plaintiff's recovery, if any, should be barred, or reduced in proportion to the amount by which the negligence of Plaintiff or others

contributed to the happening of the injuries and damages alleged.

## TWELFTH AFFIRMATIVE DEFENSE

### (Breach of Fiduciary of Plaintiff and Others)

76. As a Twelfth and Separate Affirmative Defense to the FAC, Defendants assert that Defendants are informed and believes and thereon allege that the injuries and damages alleged in the FAC, if any, without admitting any injury or damage to Plaintiff, occurred, were proximately caused by either the sole breach of fiduciary duties of or contributed to by the breach of fiduciary duties of Plaintiff or third parties not within the control of Defendants. Beatbox breached their fiduciary duties among other matters by failing to:

● Perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● To  use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● To comply with the Beatbox Agreement and assigned to AMCOS benefits licensed to it to AMCOS, without first obtaining the written consent of Labrador, Inc.

● To comply with its duties to AMCOS, including the duty to immediately notify AMCOS of each deletion from the list of music cues, after Beatbox wrongly assigned to AMCOS the benefits Labrador, Inc. licensed to Beatbox.

● To comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

● To provide an industry wide process to obtain from Labrador, Inc. the Library.

///

Defendants request, that to the extent Plaintiff's damages were caused by breach of fiduciary duties of all persons or parties, named and unnamed, served or unserved, and the degree to which said breach of fiduciary duties contributed to the happening of the incident and the nature and extent of the injuries actually sustained, if any, be determined by the trier of fact. Plaintiff's recovery, if any, should be barred, or reduced in proportion to the amount by which the breach of fiduciary duties of Plaintiff or others contributed to the happening of the injuries and damages alleged.

WHEREFORE, Labrador, Inc. prays for judgment as follows:

1. That Beatbox take nothing;

2. For costs of suit incurred herein;

3. If applicable, for attorney's fees incurred herein pursuant to California Civil Code § 1717; and

4. For such other, further or different relief as the Court may deem just and proper in the premises.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

## FIRST AMENDED COUNTERCLAIM

(BY LABRADOR ENTERTAINMENT, INC., DBA SPIDER CUES MUSIC LIBRARY, a California corporation, COUNTERCLAIMANT AGAINST BEATBOX MUSIC, PTY, LTD. , COUNTERDEFENDANT AND MICHAEL COHEN, an individual, COUNTERDEFENDANT.)

### NATURE OF COUNTER CLAIMS

1. These counterclaims against Beatbox request redress for breach of contract, breach of fiduciary duty, negligence, and against Cohen, if required, Indemnification arising out of agreements between Labrador Entertainment Inc., dba Spider Cues Music Library ("Labrador Inc.")  and Michael Cohen ("Cohen") ("Cohen Agreement") (Attached hereto as Exhibit A and herein incorporated herein by this reference is a true and correct copy of the agreement between Labrador, Inc. and Cohen.) and Labrador and Beatbox Music, PTY, LTD. ("Beatbox") ("Beatbox Agreement") (Attached hereto as Exhibit B and herein incorporated herein by this reference is a true and correct copy of the agreement between Labrador, Inc. and Beatbox.) for Labrador, Inc. to obtain from Cohen musical compositions for licensing on the one hand and for Labrador, Inc. to grant to Beatbox a license to sub-publish these musical compositions in a foreign territory, on the other hand.

2. Pursuant to the Cohen Agreement, Cohen granted Labrador Inc. worldwide rights, title and interest in a collection of his musical compositions listed in the agreement (the "Cohen Compositions") .

3. Pursuant to the Beatbox Agreement, Labrador Inc. appointed Beatbox as the exclusive Sub-Publisher of a list of compositions known as Spider Cues Music Library ("Library") for the territories of Australia, New Zealand and Fiji.

///

///

4.  On or about September 16, 2014, Eight Mile Style, LLC and Martin Affiliated, LLC ("New Zealand Plaintiffs") filed an action against the New Zealand National Party and their Secretary, Greg Hamilton in New Zealand. ("New Zealand Defendants") ("New Zealand Action").

5.  The New Zealand Plaintiffs claimed that from at about August 2014, the New Zealand Defendants knowingly infringed the New Zealand Plaintiffs' copyright in Eminem Esque.

6.  This Eminem Esque allegedly was one of the Cohen Compositions.

7.  In this herein action, Beatbox seeks to hold Labrador Inc., and Cohen liable for all damages they incurred as a result of the New Zealand Action.

8.  Labrador, Inc. asserts that it is free from fault in the New Zealand Action.

9.  That if there is any liability for damages in the New Zealand Action, it is due to Beatbox's failure to comply with their promises in the Beatbox Agreement and their total failure to maintain the integrity of the Library.

10.  In this Counterclaim, Labrador Inc. seeks to hold Beatbox liable for all of the damages it has incurred as a direct result of Beatbox's breach of contract, breach of indemnity, breach of fiduciary duties and negligence.

11.  Finally, if Labrador, Inc. is found to be responsible for any sum of damages to Beatbox - which it denies it should - then Labrador, Inc. seeks indemnification from Cohen.

## PARTIES

12.  At times herein relevant, Counterclaimant Labrador Entertainment, Inc. d/b/a as Spider Cues Music Library. ("Labrador Inc." or "Counterclaimant") is a California corporation with their central office located in Los Angeles, California.

///

///

13.  Counterdefendant Beatbox Music PTY, LTD ("Beatbox"), Plaintiff in this action, is a music publisher located at Suite 9, 7 Ramsay Road, Pennant Hills NSW 2120, Australia.

14.  Counterdefendant Michael Cohen ("Cohen") is an individual who resides, on information and belief, in Los Angeles, California and is a composer of musical compositions.

15.  Counterclaimant Labrador Inc. does not know the true names and capacities of the Counterdefendants sued herein as Does 1-20, inclusive, and therefore sues those counterdefendants by such fictitious names. Counterclaimant Labrador, Inc. will amend this Counterclaim to allege their true names and capacities when they are ascertained. Counterclaimant Labrador, Inc. is informed and believes and therefore alleges that each of the fictitiously named Counterdefendants is responsible in some manner for the occurrences herein alleged and that Counterclaimant Labrador, Inc's injuries as herein alleged were proximately caused by such Counterdefendants.

44. Counterclaimant Labrador, Inc. is informed and believes and therefore alleges that, at all times herein mentioned, each of the counterdefendants was the agent, employee, joint venturer or co-conspirator of each of the remaining counter-co-defendants, and in doing the things hereinafter alleged, was acting within the scope of said agency, employment, joint venture or conspiracy and with the permission and consent of their counter-co-defendants. Each counter-defendant has ratified and approved the acts of the remaining counterdefendants.

## JURISDICTION AND VENUE

This Court has supplemental jurisdiction pursuant to 28 U.S.C. 23 § 1367(a). Venue is also proper under 28 U.S.C. § 1391 because many of the acts and practices complained of herein incurred in a substantial part in this judicial district.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 18 of 51

# GENERAL ALLEGATIONS

**Noel Webb and Labrador, Inc.**

16.  At all times herein relevant, Noel Webb, an individual "Webb" was the president and principal of Labrador Inc.  At all relevant times Webb was responsible for the day to day operations of Labrador, Inc.

17.  Prior to owning Labrador, Inc., Webb was as a violinist and a composer of his own music.

18.  Webb had no previous association as a writer or violinist with the music library industry.

19.  In 2002, Webb met an audio engineer who worked at Universal Studios, that had experience in and connections with those individuals and companies involved in the business of  music licensing to the film trailer industry.

20.  At that time there were approximately 47 film trailer companies in Los Angeles, California.

21.  Film trailer production music end-users were, very different than television or cable end-users of production music.

22.  Webb began writing for the film trailers and learned from those with experience how to administer the music.

23.  Film trailer licensing solely involved acquiring an up-front sync/license fee.  There were no performance payments from the Performance Rights Organizations. (ASCAP, BMI, SESAC, SOCAN.) ("PRO".)

24.  At that time Webb had little experience with PROs and how they operated. The process with film trailer companies was simple - Labrador, Inc. supplied them with a music cue and they sent Labrador, Inc. a check.

25.  Starting from about 2004 forward, all the film trailer companies and major film studios requested Sound-A-Likes and Knock Offs from music libraries.

26.  Accordingly, Labrador, Inc. accommodated them.

**Sound-a-likes**

27.  Webb was introduced to the concept of sound-a-likes by a music coordinator at NBC/Universal Studios in or about 2006.

28.  A film director or TV show director uses a "temp track" to give a composer a specific direction or sound that the director wants in each section of his or her production.

29.  The temp tracks were well-known pieces identified by the film director or TV show director to give the direction. The temp tracks are actually laid into the visual at specific locations in the film.

30.  The music composer composes a music piece that has a similar feel, groove, and/or similar sound to the well-known music. This new composition is called a sound-a-like. It is expected to be composed such that it does not infringe the well-known composition. The sound-a-like is used in the published version of the film or TV show.

31.  With constant requests by music supervisors and production companies for sound-a-likes Labrador, Inc. would purposely title the cue with the name of the famous artist the music "sounded like". This was done to make the end user (and all parties in the chain towards the end user) aware of the composer's objective of having a similar feel, groove or sound without infringing the well-known composition.

**Spider Cues  Music Library**

32.  At all relevant times herein, Labrador, Inc. is a company in the United States that owns the Spider Cues  Music Library ("Library"). The Library is a production music catalogue that contains a vast collection of production music that is constantly updated.

///

33.  Labrador, Inc. has contracts with hundreds of composers whose music makes up the Library. The compositions are thought up, created, designed, and written by those composers.

34.  Labrador, Inc.'s contract with their composers recognizes a number of ownership or intellectual property rights in relation to a composition. These are writer rights, publishing rights, copyright rights, master ownership rights, and solicitation rights.

35.  The writer rights, may be referred to as moral rights in New Zealand, the copyright rights remain with the composer. The publishing and solicitation rights (and a number of other associated rights are assigned to Labrador, Inc. in perpetuity in exchange for acquiring a license fee.)

36.  Once Labrador, Inc. obtains compositions from composers it then either self licenses the music to production companies, or contracts with sub-publishers to do the same. For the most part, Labrador, Inc. contracts with sub-publishers to market and license the music in their territory.

37.  When music from the Library is used in films, film trailers, TV, commercials, etc. the production company concerned pays for that use by either or both of:

- an up front fee (referred to as a sync or license fee);
- a royalty fee through their PRO.

38.  Where a PRO, like AMCOS, is used, that PRO will negotiate, license, and receive the royalty paid by the production company for the music. The royalty paid to a PRO includes a "writer payment" and a "publisher payment (performance)".

39.  "Writer payment" money is always paid directly to the writer/composer by the PRO. Labrador, Inc. or their sub-publisher never sees the writer's money.

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM        Page 21 of 51

40. "Publisher payment" is paid to the publisher or the sub-publisher directly (who then pays the publisher their percentage) according to the publisher/sub-publisher negotiated split. Typically, the PRO money is paid many months, (if not years) later.

41. Contrary to all sub-publisher rules around the world, Labrador, Inc.'s sub-publisher for the New Zealand and Australian territories - BeatBox - had the Australian PRO (AMCOS) pay Labrador, Inc. their performance percentage. According to standards of the industry, that can and did cause financial problems and non-payment.

42. In 2014, Labrador, Inc. was finally able to get BeatBox to collect money due to Labrador, Inc. from the PRO, at least in Australia and New Zealand, though they continue to refuse to collect the PRO performance money in other territories where they represent Labrador, Inc.

43. Generally, Labrador, Inc. compiles the compositions into the Library.

44. The Library is a group of categorized and numbered albums with individual cues identified and numbered within those albums. These cues are marketed for syncing purposes in film, film trailers, TV, commercials, etc.

45. The term "cue" is used because many of the pieces are not actually songs or even music. A "cue" ranges from a sound effect of just a few seconds through to a complete song.

46. The cue at issue was a piece of music written by a composer, Michael Cohen.

47. "Syncing" is a reference to a music synchronization license . Such licenses are granted by the holder of the publishing rights and master of a particular composition, allowing the licensee to synchronize ("Sync") music with some kind of visual media output (film, television shows , advertisements, video games,

1  accompanying website music, movie trailers, etc.)

2      48.  On information and belief Labrador, Inc. manages and operates the Library

3  in substantially the same manner as other music libraries in the industry.

4      49.  The Sync license fee is negotiated prior to the contract signing and paid

5  months later by the production company directly to the music library. If a

6  sub-publisher licenses the music for the publisher, the production company pays the

7  Sync license fee to the sub-publisher, who then pays the publisher their percentage

8  according to the publisher/sub-publisher negotiated split.

9      50.  Music libraries like the Library can be found all over the world.  Based

10  upon information and belief, most music libraries seem to operate on a similar basis

11  to the Library.

12      51.  The music libraries supply thousands of cues to be used in films, TV

13  shows, promotional videos and advertisements every year. The music from the

14  Library and the other libraries is always applied to a visual product. The visual

15  product is the actual significant part of the presentation. The music is only supportive.

16      52.  This is different than a record company supplying music to a show where a

17  band plays, a streaming experience where that music is the purpose of the show, or a

18  live performance watched on TV whereby the music is the significant part of the

19  presentation. That is why all of the Library music cues is identified by the

20  Performance Rights Organizations as "background" music.

21      53.  Labrador, Inc. is paid a much lower rate because of the insignificance of

22  the music as it relates to the significant visual presentation itself.

23  ///

24  ///

25  ///

26

27

28  FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 23 of 51

**Beatbox and Peter Baker**

54. In sharp contrast to Webb and Labrador, Inc.'s limited experience in the music cue licensing industry, Beatbox has extensive experience and according to Beatbox, they "are the best at what we do."

55. Beatbox started their business in Australia and New Zealand in 1987 under the name Production Music Services. In 2007 the company name was changed to the current name.

56. Importantly, Peter Baker, the co-owner of BeatBox,  taught the licensing process in Australian schools prior to starting BeatBox.

57. Beatbox is a production music supplier to the media industry. The music supplied is used by broadcasters, freelance editors, studios, radio stations and production companies as background music in professional media productions, including TV and radio programs, commercials, promos and online videos.

58. Beatbox sources most of their music from overseas production music publishers who record and produce the music for use worldwide. The production music publishers issue the music in collections called music libraries for licence by users.

59. Since 1987 Beatbox had  grown to represent over 100 music libraries which include over 400,000 tracks. It is currently receiving approximately 1,000 tracks per week of new music from the production music publishers they represent.

60. The music is issued on their website, and on hard drives which it supplies for clients to access and use when they require it.

61. Beatbox enters into representation agreements with the production music publishers, or the owners of the music libraries, to acquire the rights to distribute production music and make it available to their client base for general non-exclusive use in professional media productions.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 24 of 51

**Australasian Mechanical Copyright Owners Society Limited "AMCOS"**

**(Not a party in this action.)**

62.   AMCOS is an Australian music publishers' organization that, among other things, licences production music on behalf of production music publishers/sub-publishers.

63.   AMCOS requires each publisher or sub-publisher to assign exclusive licensing rights to it in exchange for their services.

64.   Membership of AMCOS is open to any company representing music catalogues and there is no cost to join.

65.   AMCOS will take a commission for each licence it issues prior to distributing the royalties to their members.

66.   Beatbox is and has been a member of AMCOS since 1987.

67.   Beatbox entered an exclusive licence agreement with AMCOS on November 1, 2004 for the licensing by AMCOS of the production music in Beatbox's music libraries ("AMCOS Agreement"). (Attached hereto as Exhibit C and herein incorporated herein by this reference is a true and correct copy of the agreement between Beatbox and AMCOS.)

68.   In terms of the Beatbox and AMCOS Agreement, Beatbox was required, on a regular basis, to immediately register the music cues identified as being part of the Library as defined by the publisher.

69.   In this case Beatbox was required to license from the Library the contiguous album designs with use of an excel file, with the relevant PROs, namely AMCOS and APRA.

70.   Labrador, Inc. is informed and believed this was being done on a regular basis.

///

71.  Indeed, Beatbox was duty bound to immediately notify AMCOS of each addition to or deletion from that list that it obtained from the Library.

72.  In this, Beatbox failed and did not delete the cues it was required to.

**Michael Cohen/Eminem Esque**

73.  All contracts between Labrador, Inc. and their composers contain a warranty whereby the composer represents and warrants that the music they supply is their own work and the music and their performance of it does not infringe the copyright or any other right of another person.

74.  The contract also includes a comprehensive indemnity by the composer in favor of Labrador, Inc. in the event of a material breach of any of those representations or warranties.

75.  Occasionally, when a composer would ask Labrador, Inc. what style of music was successfully getting licensed - so they could mimic that style - or when a music supervisor would ask us for a style they needed, Labrador, Inc. would relay that information.

76.  Labrador, Inc. operated similar to the way a book library operates, thus the name library. An artist would bring his or her product to Labrador, Inc. and it would put it on their shelves.

77.  Labrador, Inc. never paid an artist to put their product on their shelves. The end user, music supervisor, would search Labrador, Inc.'s shelves, and then offer a fee to license it. When Labrador, Inc. received the license fee money months later, Labrador, Inc. would send the composer his or her percentage per contract.

78.  If the licensing involved the Performance Rights Organization (PRO), the PRO would pay the composer his or her writing fee many months later.

///

///

79.  On February 14, 2008, Labrador, Inc. entered into an agreement (see Exhibit A.) with Cohen, wherein Cohen granted Labrador, Inc. worldwide rights, title and interest in a collection the Cohen Compositions. (see Exhibit A.)

80.  Based upon information and belief Cohen, before the Cohen Agreement was signed, Cohen wrote music for film and television as a career by composing directly for those productions, and by contracting his music to many different music libraries.

81.  Cohen initially sent Labrador, Inc. a large group of music which Labrador, Inc. reviewed and accepted - via the Cohen Agreement - as part of the library.

82.  The Cohen Compositions included a track entitled "SQ me Eminem esque" which was 2 minutes 22 seconds long ("Eminem Esque").

83.  Cohen named the composition "eminem-esque".

84.  Labrador, Inc. decided whether it was good to keep the name so that all parties down the line would understand that the cue was a "sound-a-like", even if the composition was licensed individually (outside the album originally called "Sound A Likes).

85.   The other reason Labrador, Inc. continued with the name is as a marketing tactic for those end-users who wanted an inner-city sound and because it made a practice to honor the composers and not change what they have creatively decided.  Naming the cue is part of the creativity of the product.  Later, Labrador, Inc. realized the marketing mistake of associating itself with inner-sound rap music, and soon wanted to disassociate itself with that style.

86.  In terms of the Cohen Agreement, Cohen warranted that all of the Cohen compositions were his sole, exclusive and original work.

///

///

87.  Following the execution of the Cohen Agreement and the representations and warranties it contained, the Cohen Compositions, including Eminem Esque, were added to the Library and made available for license to music sub-publishers worldwide.

88.  Labrador, Inc. had no previous complaints about any Cohen or his music compositions.

**Labrador, Inc. and Beatbox Commencement of Relationship**

89.  At or around March 2009,  after discovering Labrador Inc.'s music library on the internet, Beatbox first approached Labrador, Inc. to explore becoming a sub-publisher for Labrador, Inc.'s music library.

90.  Beatbox had learned that another sub-publisher, West One Music, located in the United Kingdom, was an agent for Labrador Inc. - licensing Labrador, Inc.'s music library for trailers in movies.

91.  Beatbox knew that in Hollywood, California, there were companies that produced trailers for movies needed to license cues from music libraries.

92.  Motivated by large sums of money generated by these licenses, Beatbox wanted to become a sub-licensor and obtain the right to license that music in the Australian and New Zealand market.

93.  Beatbox had a reputation of representing big Hollywood trailer music companies and wanted to enter into an agreement with Labrador, Inc. before one of Beatbox's competitors - so - Beatbox contacted Labrador, Inc..

94.  On or about March 21, 2009, in response to an inquiry by Peter Baker "Baker" from Beatbox,  Webb on behalf of Labrador, Inc. indicated an interest to work with Beatbox.

95.  Webb explained to Baker that their internet site was incomplete. That it needed to upload more music up to their website.

96.  Webb requested Baker to send to Labrador, Inc. their contract.

97.  On or about March 22, 2009, Baker stated in an email that it had been in business over 20 years and indeed, "we are the best at what we do."

98.   Baker offered to meet with Webb in Los Angeles, California around April 14, 2009, to discuss:

- Labrador, Inc.'s distribution system.

- To assess and approve Labrador, Inc.'s music categories, including Sound-A-Likes.

- Ways they could work together.

99.  Baker attached to the email a draft of the contract, stating that the contract "is a fairly standard one for production music distributors."

100.  At that time Baker did state that the "licensing of music in Australia is done entirely by a copyright society (AMCOS/APRA) and as such [they] do not handle the synch or performing licensing directly. It works in a similar way to the UK and [their] expertise is used to make sure [your] music libraries get to the right clients who use and report to the societies."

101.  Importantly, absent from the Beatbox Agreement was Beatbox's arrangement with AMCOS.

102.  Instead, Beatbox promised it would introduce, exploit and grant non-exclusive licenses for the music in the Licensed Territory." (See Exhibit B ¶ ¶1 and 5.)

103.  Finally, the Beatbox Agreement states, "[t]his Agreement constitutes the entire agreement between the parties hereto at the date hereof and the parties hereto enter into it solely on the basis without reliance on any other representations whatsoever." (See Exhibit B ¶15.)

///

104.  In the March 22, 2009 email, Baker explained that:

- They distribute their music completely digitally and do not need CDs or DVDs.

- The market in their territory is very small when compared to the USA.

- The trailer industry was almost non-existent.

- Beatbox's client base is made up of every broadcasters and hundreds of freelance editors, studios, radio stations and production companies.

105.  Further, Labrador, Inc.'s music would be used by the TV promotion producers whose appetite for new music is immense. This is a lucrative area where Beatbox will exploit Labrador Inc.'s music to the full.

106.  Baker continues, "[w]e do not allow our low end users access to our premium trailer libraries to maintain an exclusivity for our high end clients. This ensures maximum returns from the TV networks."

107.  Finally, Baker describes their technology as advanced, "[w]e use our web download site and a technologically advanced hard drive search system which was developed completely in house. It is the No.1 way that clients use to search and audition music. We employ a full time IT professional and are at the cutting edge of delivery technology."

108.  On or about April 14, 2009, Labrador, Inc. executed the agreement with Beatbox Music Pty Ltd.  (See attached Exhibit B.)

109.  In the Beatbox Agreement, Labrador, Inc. appointed Beatbox as the exclusive Sub-Publisher of a list of compositions known as the Library, for the territories of Australia, New Zealand and Fiji. (See attached Exhibit B Preamble.)

110.  Beatbox agreed to import each of the recordings as required issued by the Labrador, Inc. on DVD, hard drive or other media. (See attached Exhibit B  ¶3.)

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM        Page 30 of 51

111.   Importantly, Beatbox further promised that "it w[ould] use their best commercial endeavors to exploit the recordings for the benefit of the parties concerned."(See attached Exhibit B  ¶ 7.)

112.   Foremost, Beatbox promised to adhere to the performing rights in the recording as set forth by the Copyright Societies in the USA (ASCAP, BMI and SESAC) and their affiliated societies in the licensed territory.

113.  This is important because, implicit in this Beatbox Agreement, to facilitate the performance payment to each writer, Beatbox was required to provide to the PRO excel file's listing:

- The name of the composer.
- The composer's PRO affiliation.
- The composer's rights percentage.
- The composer's ID number with their PRO.
- The publisher.
- The publisher's PRO affiliation.
- The publisher's rights percentage.
- The publisher's ID number with the PRO.
- The album title as it would be licensed.
- The album CODE as it would be licensed.
- The compositions title as it would be licensed.
- The duration (length) of the music composition.

114.  This protocol is the standard in the industry, and imperatively demanded by all PROs in order to license a composition to an end-user, and in order to have it registered with the PRO.

///

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 31 of 51

115.   Beatbox promised that prior to or assigning to any other person or party any of the benefits licensed to it under the terms of this Beatbox Agreement it would obtain the written consent of Labrador, Inc.

116.  Although Beatbox made numerous assignments, it did so without the written consent of Labrador, Inc.. (See attached Exhibit B  ¶12.)

117.   Starting on or about May 7, 2009 and continuing thereafter, to facilitate Beatbox's access to the  music cues, Labrador, Inc. provided to Beatbox a link to Labrador, Inc.'s website to allow Beatbox to download to Library.

118.  In addition, Labrador, Inc. sent via email to Beatbox excel files listing the composer information.

119.  On or about May 13, 2009, without Labrador, Inc. ever knowing, Barbara Baker, co-owner of Beatbox instructed an employee at Beatbox to remove from the Library, all  the Sound-A-Like album as an album and all artists referenced in the titles, such as  Beyonce Esque,  Eminem Esque and Rolling Stones-Esque, among others.

120.  Importantly, the Eminem Esque is the subject matter of the New Zealand Action.

121.  It is highly unlikely that there would be a New Zealand Action if  this cue had been actually removed from the Library in 2009 as directed by the co-owner of Beatbox.

122.   By June 2, 2009, it appeared that Beatbox was satisfied with the downloaded Library.

**Labrador, Inc. Sends to Beatbox Updated List Is Music Cues**

123.  On April 3, 2012, via email, Baker wrote to Webb informing him of his interest to adopt Webb's New Library list of compositions and library design and further that:

- Baker wanted to discuss with Web, Labrador, Inc.'s new albums and the reassigning of codes and indexes. The cues that were to remain in the library are the same cues.

- Beatbox could retitle them, or change the metatdata. Labrador, Inc. would be sending Beatbox 75 different jpgs pictures with 75 different CD covers to show the Albums.

- Included an excel file of the titles, new codes, and new indexes. The excel file had all the cues divided into their albums, proper new codes and proper new indexes.

- In his request to meet, Baker added that "it seems we have a lot to talk about and it will be easier for me to come to you and then we can also look at the website and album format you refer to. There are several things that your new format may help . . . "After the meeting, Baker said "I look forward to receiving the new Spider Cues tracks . . . "

124.  There were also cues that were deleted.  Because some cues were deleted, the codes and indexes of many of the albums and cues had been changed to improve the quality of the library.

125.  The organized visual excel file reflecting all the changes and the entire New Library in an easy to review manner gave BeatBox the very important title, code, and index information they needed to inform AMCOS of the New Library for licensing purposes.

126.  Without this proper transfer of excel file information from Labrador, Inc. to BeatBox to AMCOS, all parties were vulnerable to possible litigation.

127.  On or about April 6, 2012, Bakers and Webb met. The Baker's approved to replace the entire original Library with a New Library.

///

128.  On or about March 6, 2014, via email, Webb writes to Baker, Labrador, Inc. is  revamping to raise the quality and delivery process and that:

- Labrador, Inc. is hiring a composer who writes the best trailer music in Hollywood, "we're deleting questionable music, and we're re-arranging logos and presentation."

- Webb continues, Labrador, Inc. requested that Beatbox "upload to your site and use our new Spider Cues logo.

- It is being recognized around the world and it is important to use it. I've attached another tiff and jpg of the logo if you didn't get it a while back."

- Webb stated, attached "is an excel file that has music to remove from the library, or to simply review to ensure that the proper composers are listed." Still further in the email,

- Webb gave a link for Baker to download all new audio mixes of the compositions, including albums Spid001 to Spid077.

129.  Within that group is a filed named Spid039.

130.  Though a new file was named Spide039 it did not contain the "Eminem Esque" cue that had previously been removed along with the previously removed Sound-A-Like album in 2012.

131.  Instead, another album ("Television Bumpers") had already been given the code Spid039 in 2012, substituting the Sound-A-Like album that had been taken out of the Library in 2012.

132.  When opening and reviewing these codes and albums necessary for AMCOS licensing, Baker would have seen and given to AMCOS the changes herein described.

///

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM        Page 34 of 51

133.  Via email, Baker responds to Webb:

● It seems like a lot of changes are happening which will be beneficial to Spider Cues. I think we'll have to talk about the requested changes as there are several issue to work through from our end.

● We are coming over soon for NAB and wondered if you could meet with us to discuss on Friday 28th about 3.00pm in Studio City?

134.  On or about March 28, 2014, Webb met with Baker and Barbara Baker in Los Angeles, California.

135.  During the meeting Baker and Barbara Baker said they would definitely replace the entire original Library that was sent to them March 7, 2014.

136.  They promised to register the new Library with their Performance Rights Organization and start immediately using the new Library.

137.  A Labrador, Inc. associate who was at the meeting has signed a declaration stating that the Bakers said they would definitely replace the entire original Library that was sent to them on March 7, 2014.

138.  BeatBox neglected to immediately inform AMCOS of these changes requested by Labrador, Inc.

139.  The AMCOS Agreement requires that Beatbox, upon receipt of the New Library excel file that the Bakers agreed to implement in the March 28th meeting, to immediately inform AMCOS of those changes. (See Exhibit C ¶ 7.1.1 (c).).  *Again, Beatbox failed to notify AMCOS.*

140.  In this present action, BeatBox excuses their actions of failing to notify AMCOS, by wrongly asserting:

● Metadata from the excel file was not embedded into the new audio files in the manner that suits BeatBox.  On the contrary, Labrador, Inc. has no contractual obligation to embed metadata into the audio files.

1       ● The new audio files did not download properly. This is misleading because:

2          • The audio files themselves are irrelevant to AMCOS' licensing

3 information.

4          • Baker admits in his own email, only the excel file is important to

5 register with AMCOS.

6          • Further, the transfer of audio files was contractually the responsibility of

7 BeatBox by use of their own professional standard of the industry File Transfer

8 Protocol cloud site.

9          • Labrador, Inc. is not responsible because BeatBox has an inefficient

10 downloading system.

11       ● The excel file itself is only used to register music with AMCOS.

12       141.  Importantly Baker admits that the excel file should have immediately been

13 sent to register the New Library.

14 **Events in New Zealand That Led up to the Infringement by the New Zealand**

15 **Party**

16       142.  On or about September 16, 2014, Eight Mile Style, LLC and Martin

17 Affiliated, LLC filed an action against the New Zealand National Party and their

18 Secretary, Greg Hamilton in New Zealand.

19       143.  New Zealand Plaintiffs claimed that the New Zealand Defendants from at

20 least August 2014, knowingly infringed the New Zealand Plaintiffs' copyright in

21 Eminem Esque.

22       144.   The New Zealand Action alleged that in New Zealand, the New Zealand

23 Defendants caused to be broadcast without permission and in violation of the

24 copyright laws, the Eminem Esque ("New Zealand Broadcast") .

25 ///

26 ///

27

28 FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM     Page 36 of 51

145.  Prior to The New Zealand Action numerous entities and individuals in New Zealand participated in the production of the broadcast (the "Production"). They are not named as parties in this action, (collectively "New Zealand Production Team"). The identity of these entities and individuals include:

- Nigel Foster from Sales Street Studio.
- Glen from Anarchyads.
- Sue Worthington from Petticoat Junction.
- Greg Hamilton, General Manager New Zealand National Party.
- Jo Dejoux from New Zealand National Party.
- Peter Moore from Moore Brands.
- Bali Virk from Graffiti Media.

146.  Beginning around March 2014, Production Team wanted to license "Lose Yourself" by Eminem.  As discussions happened, the team thought his lyrics reflected hate speech.

147.  Beginning around May 2014 the Production Team exchanged many emails discussing the use of an instrumental tune that had the same feel, tempo, groove, vibe, and sound as Lose Yourself, and found the Eminem Esque in the Production for the New Zealand Broadcast.

148.  On or about May 27, 2014 Nigel Foster ("Nigel") sent an email to Sue Worthington at Petticoat Junction ("Sue") containing the Eminem Esque. There was a short discussion that identified the Eminem Esque being from Beatbox. They questioned whether the cue was cleared "of copyright". They agreed that further investigation would be required.

149.  By June 3, 2014, it was apparent that New Zealand National Party wanted to use in the Production, the Eminem Esque cue.

///

150.  On or about June 16, 2014, Sue requested all of the details on the Eminem Esque because the New Zealand Production Team was thinking about using it for the Production. The concern was raised that the use of Eminem Esque would come under "INTENSE SCRUTINY" as "we are using it for a political party and it was found in the Library in an album titled Sound-A-Likes. The Production Team needed a total reassurance it was not going to be legally challenged.

151.  On June 16, 2014, Bali Virk from Graffiti Media ("Bali")  sent an email to Amy Bodsworth at AMCOS/APRA ("Amy"), the licensing PRO, stating that he was unable to find eminem-esque registered in the AMCOS/APRA system.  Bali was seeking the assistance of Amy to help find the cue in the system.

152.  Amy immediately replied that she thought that "this is a new song that hasn't yet been registered in our system. It does happen every so often.".  (It appears that Graffiti Media or Sale Street had previously acquired the Eminem Esque from an external drive previously given to them by BeatBox.)

153.  On that same day, June 16, 2014, Bali wrote to his Production Team setting forth the results of an inquiry he had just previously made concerning the Eminem Esque.

154.  It appears that the Production Team had reached out to Martin Collins ("Collins"), a preeminent advertising agency producer, that had previously worked for New Zealand's largest advertisement agencies.

155.  The Production Team wanted "to use this music but [they] need[ed] to know [they] [sic] wont be sued."

156.  The Production Team asked Collins:

● That, if the cue was listed as "Eminem Esque", "how can we be confident that Eminem does not say we are ripping him off?"

///

● Is buying the music from Beatbox and paying APRA protection enough?

● In other words if Beatbox sold it are we going to assume the liability if there is an issue?

● How does the team ensure they have no liability?

157.   In a reply to the Production Team's request, Collins opined that it is standard common practice to use library music with an "APRA/AMCOS license and in doing so it comes with protection. This is the system that the entire advertising industry relies on."

158.   Further, Collins writes, "[t]hank [you] for the opportunity to look at this. My take on it is that you are paying for a license to use this music for a specific purpose, *if at any stage in the future the legality of the music was questioned, those liable would in the first instance be the composer not [you]. You and your client are removed from any liability because you [sic] havent composed the track but have paid to use it via APRA."*

159.   When APRA/AMCOS could not find the cue in its system, Graffiti Media sent an mp3 copy of Eminem Esque to APRA/AMCOS to seek assistance to locate the cue.

160.   BeatBox was notified by Graffiti Media and by APRA/AMCOS regarding the Eminem Esque cue.

161.   Now, BeatBox was required to initiate a new registration.

162.   Again, that same day, via email, Bali reached out to Lewis Mackenzie at Beatbox  ("Lewis") requesting assistance in locating the Eminem Esque. Bali requested that Lewis find the Eminem Esque in the Beatbox system.

163.   Immediately, Lewis was able to locate and provide access to Bali, the Eminem Esque.

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 39 of 51

164.  The AMCOS Agreement provides that in order to license a requested cue that is not in their system, the sub-publisher, BeatBox, is required to approve the new registration and supply to APRA/AMCOS the necessary rights information.

165.  Having the information and audio supplied by Graffit Media or Sale Street would not have allowed APRA/AMCOS to register or license the Eminem Esque cue.

166.  This would have required new approval and registration by the sub-publisher, Beatbox.

167.  Despite the communication that the Eminem Esque cue had previously been licensed in Australia or New Zealand, the cue was not in APRA/AMCOS' system.

168.  BeatBox was required to approve and register this cue before the Eminem Esque cue could be added to the APRA/AMCOS system.

169.  Lewis failed to investigate why APRA/AMCOS did not have the Eminem Esque cue in the system. Some explanations would have included:

- In 2009, the removal request by Barbara Baker, a co-owner of BeatBox.

- In 2012 the removal by Labrador, Inc..

- In 2014 the redesign of and forwarding the newly designed Library to BeatBox.

170.  It appears that Lewis sent to Bali the Eminem Esque.

171.  Lewis writes to Bali in an email, "[h]ey Bali, No worries, glad you got what you needed. Just to let you know, we're here to help you with any of your music requirements. We're more than happy to search for music on your behalf for whatever brief you may have, as well as handle all the licensing details. I can set you up for our online site if you guys like sourcing music yourself as well."

172.  On June 18, 2014, via email Lewis writes to Peter Moore at Moore Brand, Production Team member:

- Hey Peter, I have had a word with a couple of colleagues and basically there is really no further information that we can provide other than what you've already gathered from your call to AMCOS and from the fact that it has been licensed multiple times without any issue.

- All you can say to the client is that AMCOS license music in good faith based on the agreement that we have with them, which is in turn based on the agreement that we have with the publisher of the track.

- The agreement we have with the publisher gives us assurance that the music does not infringe on copyright and is free to be used for production purposes.

- *If any issues were to arise regarding copyright then the responsibility would fall 100% upon the publisher so there is no need for worry in this regard.*

- That's pretty much all I can say and if the client is still that worried about it then another track might be required.

173.  No contact was ever made with Labrador, Inc. to investigate the status of the Eminem Esque.

174.  *It appeared that as long as liability could be laid off on Labrador, Inc. or Cohen, Beatbox and the Production Team were going to make sure the Production would be used.*

175.  On June 26, 2014 and August 12, 2014, despite, the red flags and apparent issues raised concerning the Eminem Esque, Nigel Foster from Sales Street Studio, applied to and obtained from AMCOS licenses allowing for the New Zealand Broadcast.

176.  On or about August 20, 2014, via email, Lewis wrote to Baker, Barbara Baker and others at Beatbox, "[h]ey Peter [Baker], You might remember a couple of months back, that there was an Inquiry made about one of tracks that sounded very similar to the Eminem song "Lose Yourself". The track in question is from SPID039

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM        Page 41 of 51

titled "'Eminem Esque". Peter Moore, who ended up using the track for an electoral campaign for the National Party in NZ alerted me to an email (below) from Eminem's representation . . . *I've pretty much just told him that he doesn't have to worry, mainly to reassure him, and that if any legal action were to be taken that it would fail upon the publisher." [emphasis added.]*

177. On that same day, via email, Ashley Sewell from Beatbox wrote to Lewis, Baker and Barbara Baker, "[o]h man. Will be interesting. We have a lot of Soundalikes that fly far too close to the sun in my opinion, I but rarely are they so stupid to reference their knock-offs in the song title."

178. Immediately, via email, Barbara Baker replied to Amy, [w]e have warned him of this many times. Unfortunately this is one of the worst scenerios as it has been used in a political campaign and will be exploited by the political opposition and given as much publicity as pos which will definitely pose a problem . It 's how they used the music in the ad and the intent which makes the situation worse."

179. Labrador, Inc., had decided to remove the "Sound A Like" album from the Library in 2012. A company that Labrador, Inc. was working with at that time in the United States questioned titling an album "Sound A Likes" because they were concerned about attorney fees with regard to potential liability from advertising such a concept.

180. In 2012, Labrador, Inc. had decided to remove the "Sound A Likes" album from the Library.

181. "Sound A Likes" had never been identified or suggested as being as infringing.

182. Accordingly, in 2012, Labrador, Inc. decided to eliminate in each territory, from the Library, the Sound A Likes as an album concept.

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM     Page 42 of 51

183.  In 2012, in each territory where Labrador, Inc. was represented, the Eminem Esque cue along with another 138 music cues, were removed from the Library.

184.   Eminem Esque was an inner-city "bad boy" feel and did not fit the image of Labrador, Inc.

185.  Labrador, Inc. was a high quality trailer house library.

186.  When signing with Labrador, Inc., BeatBox listed Labrador, Inc.'s high quality film trailer sounds as one of the main reasons for wanting to be their sub-publisher in Australia and New Zealand.

Consequently, Labrador, Inc., seeks against Beatbox, redress for breach of contract, breach of indemnity, breach of fiduciary duty, negligence and against Cohen, if required, Indemnification.

## COUNT ONE

### (Breach of Express Contract against Beatbox)

187. Counterclaimant hereby incorporates by reference paragraphs 1 through 186 as if fully set forth herein.

188.  On or about April 14, 2009, Labrador, Inc. and Beatbox entered into a written contract referred to herein as Beatbox Agreement. (See Exhibit B.)

189.  Labrador, Inc. has performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the Beatbox Agreement.

190.  Beatbox made a series of promises regarding Beatbox's receipt, introduction, exploitation and granting of non-exclusive licenses of the of the Library, in Australia and New Zealand.

191.  These promises included, but are not limited to, representations and warranties and other terms set forth in paragraphs 3, 5, 7, 8, 9, 10, 12, 16 (vi) and 18.

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 43 of 51

192.  Beatbox breached the Beatbox Agreement by among, other matters:

● Failing to perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● Failing to use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● By assigning to AMCOS benefits licensed to Beatbox to AMCOS, without first obtaining the written consent of Labrador, Inc.

● Failing to comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

● Failing to  indemnify and hold harmless Labrador, Inc. from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Sub Publishers guarantees, warranties, representations and undertakings contained in the Beatbox Agreement.

● Failing to pay to Labrador, Inc. 50% (fifty per cent) of all fees accruing from such licenses relating to the use of the recordings, including mechanical/ synchronization royalties received by Beatbox as a result of exploitation of rights herein granted to Beatbox.

● Failing to provide an industry wide process to obtain from Labrador, Inc. the Library.

193.  As a result of these breaches, Plaintiff has suffered damage.
WHEREFORE Plaintiff prays for judgment as set forth below.

///

///

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM       Page 44 of 51

**COUNT TWO**

**(Indemnification against Beatbox)**

194.  Counterclaimant hereby incorporates by reference paragraphs 1 through 193 as if fully set forth herein.

195.  Counterclaimant and Counterdefendant Beatbox entered into a written agreement. (See Exhibit B.)  Pursuant to paragraph 16 (vi) Beatbox agreed to indemnify and hold harmless the Labrador, Inc. it's successors and assigns of and from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Sub Publishers guarantees, warranties, representations and undertakings contained in this Agreement.

196.  As a direct and proximate result of Beatbox's actions, Labrador, Inc. has incurred and continues to incur an undetermined amount of damages.

197.  By virtue of the Beatbox Agreement or applicable law, Beatbox is required to hold harmless and indemnify Labrador, Inc. for the amount of any judgment or settlement, and for expenses, costs, legal fees, and other damages and costs that Labrador, Inc. incurs in connection Beatbox's breach of guarantees, warranties, representations and undertakings contained in this Agreement.

198.  The total amount of Labrador, Inc.'s costs and attorneys' fees is not yet known, and Labrador, Inc. will ask leave of this Court to insert such amount at the time of trial.

WHEREFORE, Plaintiff Labrador, Inc. prays for judgment as set forth below.

**COUNT THREE**

**(Indemnification against Cohen)**

199.  Counterclaimant hereby incorporates by reference paragraphs 1 through 198 as if fully set forth herein.

///

200.  Counterclaimant and Counterdefendant Cohen entered into a written agreement. (See Exhibit A.)  Pursuant to paragraph 6.1 Cohen will indemnify and hold Labrador, Inc. and all entities associated with Labrador, Inc. free, safe, and harmless from and against any and all losses, damages, actions, causes of action, expenses or liabilities, including, without limitation, reasonable attorney's fees and costs, whether incurred before or after the entry of judgment, resulting from or by reasons of any material breach of any representation or warranty made herein by Cohen.

201.  Other parties have alleged that Labrador, Inc. is liable as a direct and proximate result of Cohen's actions.  Because of these allegations, Labrador, Inc. has incurred and continues to incur an undetermined amount of damages.

202.  By virtue of the Cohen Agreement or applicable law, Cohen is required to hold harmless and indemnify Labrador, Inc. for the amount of any judgment or settlement, and for expenses, costs, legal fees, and other damages and costs that Labrador, Inc. incurs in connection Cohen's breach of guarantees, warranties, representations and undertakings contained in this Agreement.

203.  The total amount of Labrador, Inc.'s costs and attorneys' fees is not yet known, and Labrador, Inc. will ask leave of this Court to insert such amount at the time of trial.

WHEREFORE, Plaintiff Labrador, Inc. prays for judgment as set forth below

## COUNT  FOUR

### (Negligence against Beatbox and Roes 1 through 20)

204. Counterclaimant hereby incorporates by reference paragraphs 1 through 203 as if fully set forth herein.

205.  Beatbox had a duty to use reasonable care to, among other matters to:

///

///

FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 46 of 51

● To perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● To use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● To not assign to AMCOS benefits licensed to it to AMCOS, without first obtaining the written consent of Labrador, Inc.

● To comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

● To provide an industry wide process to obtain from Labrador, Inc. the Library.

206.  Beatbox breached their duty of reasonable care by negligently, among other matters:

● Failing to perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● Failing to  use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● Assigning to AMCOS benefits licensed to it to AMCOS, without first obtaining the written consent of Labrador, Inc.

● After Beatbox wrongly assigned to AMCOS the benefits Labrador, Inc. licensed to Beatbox, Beatbox failed to comply with its duties to AMCOS, including the duty to immediately notify AMCOS of each deletion from the list of music cues.

///

● Failing to comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

● Failing to provide an industry wide process to obtain from Labrador, Inc. the Library.

207.  As a direct and proximate result of Beatbox's failure to use reasonable care, Labrador, Inc. suffered damages.

WHEREFORE Plaintiff prays for judgment as set forth below.

## COUNT FIVE

### (Breach of Fiduciary against Beatbox and Roes 1 through 20)

208.  Counterclaimant hereby incorporates by reference paragraphs 1 through 207 as if fully set forth herein.

209.  Beatbox is an agent to Labrador, Inc. by way of its designation as a sub-publisher to Labrador, Inc.

210.  As a sub-publisher of the Library of Labrador, Inc. Beatbox licenses to third parties the contents of the Library.

211.  Labrador, Inc. expected that Beatbox would assume all of the duties to properly maintain, update, exploit, protect and sub-license the contents of the Library.

212.  Beatbox was responsible to Labrador, Inc. for the accounting and payment of all fees accruing from such sub-licenses of the Beatbox Recordings.

213.  Beatbox was required to obtain from Labrador, Inc. prior written permission before parting with or assigning to any other person or party any of the benefits licensed to it under the terms of the Labrador Agreement.

214.  Further, Beatbox represented and warranted that it would use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

///

215.  Finally, Labrador, Inc. had the right to terminate the Labrador Agreement for failure of Beatbox to fully comply with any material terms or conditions of the Labrador Agreement.

216.  As an agent to Labrador, Inc., Beatbox owes to Labrador, Inc. a full spectrum of fiduciary duties.

217.  A fiduciary duty is the highest standard of trust and loyalty imposed by law, and a fiduciary relationship is one in which a party is duty bound to act with the utmost good faith for the benefit of the other party.

218.  Labrador, Inc. has relied upon the integrity of Beatbox and Beatbox may not act so as to take advantage of Labrador, Inc.'s interest.

219.  Some of the ways that Beatbox breached their fiduciary duties include:

● Failing to perform the licensing activities in granting non-exclusive licenses in the Licensed Territory in accordance with generally accepted music industry standards, and with thoroughness, competence, and care ordinarily exercised by other sub-publishers working with the licensing of similar rights.

● Failing to use its best commercial endeavors to exploit the recordings for the benefit of the parties concerned.

● Assigning to AMCOS benefits that were licensed to it to AMCOS, without first obtaining the written consent of Labrador, Inc.

● After Beatbox wrongly assigned to AMCOS the benefits Labrador, Inc. licensed to Beatbox, Beatbox failed to comply with the duties it owed to AMCOS, including the duty to immediately notify AMCOS of each deletion from the list of music cues.

● Failing to  comply with Performing Rights in the recordings subject to the Copyright Societies in the USA and its affiliated societies in the licensed territory.

///

1      ● Failing to provide an industry wide process to obtain from Labrador, Inc. the

2  Library.

3      220.  In breaching their fiduciary duties, Beatbox has caused Labrador, Inc.  to

4  incur substantial damages to be remedied at law.

5  WHEREFORE Plaintiff prays for judgment as set forth below.

6                              **PRAYER FOR RELIEF**

7      WHEREFORE, Labrador, Inc. prays for judgment and relief against Defendants

8  as follows:

9      (A) For compensatory damages that resulted from Defendants' violations of

10  law, as proved at trial;

11      (B) For consequential damages that proximately flowed from Defendants'

12  violations of law;

13      (C) For punitive damages based on Defendants' willful, malicious and

14  fraudulent conduct;

15      (D) For costs and fees incurred by Labrador, Inc. in commencing and

16  prosecuting this lawsuit; and

17      (E) For any and all other remedies that the Court believes are equitable and just.

18  March 7, 2020              LAW OFFICES OF DOUGLAS JOSEPH ROSNER

19                                  /s/ Douglas J. Rosner

20                      By:   DOUGLAS J. ROSNER
                              SBN 094466
21                            2625 Townsgate Road, Suite 330
                              Westlake Village, California 91302
22                            Telephone No. (818) 501-8400
                              email: rosnerlaw@earthlink.net
23                            Attorney for Defendant/Cross-Defendants,
                              Labrador Entertainment, Inc. dba Spider Cues Music
24                            Library, Labrador Entertainment, LLC, Noel Palmer
                              Webb, an individual and Webb Family Trusts

25

26

27

28  FIRST AMENDED ANS TO FIRST AMENDED FAC AND COUNTER CLAIM      Page 50 of 51

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

EXHIBIT A

LAB.01.0007



SPIDER CUES MUSIC STUDIO



# COMPOSER'S AGREEMENT

THIS COMPOSER'S AGREEMENT (**"Agreement"**) is made and entered into as of Feb. 14, 2008 by and between Michael Alan Cohen (**"Composer"**) located at 1537 S. Wooster St. #105  L.A., Ca. 90035 on the one hand, and Labrador Entertainment, Inc./Spider Cues (**"Owner"**) with office at 22400 Sentar Rd. Woodland Hills, CA. 91364, on the other hand, on the following terms and conditions:

## WITNESSETH

Composer is the sole author of musical compositions listed below (**"Compositions"**) written by Michael Alan Cohen (ASCAP).  Composer hereby assigns to Owner, exclusive publishing rights world wide of the Compositions for sale and/or exploitation.

| WORKING TITLE | TOTAL RUNNING TIME |
|---|---|
| SQ mc dungeon-lords | :32 |
| SQ mc walk-this-way  soundalike | 1:15 |
| SQ mc boogie baby | :42 |
| SQ mc boogie baby 2 | 1:17 |
| SQ mc funny | :34 |
| SQ mc stupid people | :48 |
| SQ mc eminem esque | 2:22 |
| SQ mc godsandheroes | :39 |
| SQ mc hiphop 7 | 1:42 |
| SQ mc wedding enya | 2:02 |
| SQ mc beyonce esque | 2:36 |
| SQ mc ballers hiphop | :30 |
| SQ mc samba vocal | 1:02 |
| SQ mc theme love | :45 |
| SQ mc sexy theme | :24 |
| SQ mc ok go 1 | 1:14 |
| SQ mc ok go 2 | 1:18 |
| SQ mc jazz angels we have heard on high | 56 |
| SQ mc jazz away in the manger 1 | 54 |
| SQ mc jazz away in the manger 2 | 39 |
| SQ mc jazz deck the halls 1 | 1 18 |
| SQ mc jazz deck the halls 2 | 43 |
| SQ mc jazz hark the herald angels | 1 02 |
| SQ mc jazz it came upon a midnight clear | 1 10 |
| SQ mc jazz jingle bells 1 | 52 |
| SQ mc jazz jingle bells 2 | 1 11 |
| SQ mc jazz joy to the world | 1 03 |
| SQ mc jazz nutcracker chinese dance | 1 14 |
| SQ mc jazz nutcracker march | 49 |
| SQ mc jazz nutcracker trepak | 1 16 |
| SQ mc jazz nutcracker waltz of the flowers part 2 | 1 16 |
| SQ mc jazz nutcracker waltz of the flowers part1 | 1 13 |
| SQ mc jazz o come all ye faithful | 56 |
| SQ mc jazz o little town of bethlehem | 52 |
| SQ mc jazz o tannenbaum 1 | 46 |
| SQ mc jazz o tannenbaum 2 | 56 |

94

LAB.01.0007

| | |
|---|---|
| SQ mc jazz over the river + thru the woods | 1_07 |
| SQ mc jazz silent night | 57 |
| SQ mc jazz sugar plum fairy | 1_18 |
| SQ mc jazz the first noel | 1_11 |
| SQ mc jazz the first noel 2 | 1_21 |
| SQ mc jazz twelve days of xmas | 50 |
| SQ mc jazz we wish you a merry xmas | 1_36 |
| SQ mc mod deck the halls | 38 |
| SQ mc mod got rest ye merry gentlemen | 1_13 |
| SQ mc mod hark the herald | 56 |
| SQ mc mod jingle bells | 1_17 |
| SQ mc mod joy to the world | 1_27 |
| SQ mc mod o tannenbaum | 1_24 |
| SQ mc mod silent night | 1_26 |
| SQ mc mod we wish you a merry xmas | 1_21 |
| SQ mc muzak deck the halls | 1_20 |
| SQ mc muzak hark the herald angels sing | 1_24 |
| SQ mc muzak jingle bells | 56 |
| SQ mc muzak we wish you a merry xmas | 56 |
| SQ mc muzak latin we wish you a merry xmas | 52 |
| SQ mc peaceful first noel | 1_09 |
| SQ mc peaceful god rest ye merry gentlemen | 39 |
| SQ mc peaceful it came upon a midnight clear | 44 |
| SQ mc peaceful joy to the world | 1_03 |
| SQ mc peaceful o come all ye faithful | 1_29 |
| SQ mc peaceful what child is this | 1_29 |
| SQ mc rock twelve days of xmas | 1_07 |
| SQ mc mod auldlangsyne | 47 |
| SQ mc garage modern rock 1 | 1_19 |
| SQ mc garage modern rock 2 | 1_33 |
| SQ mc garage modern rock 3 | 58 |
| SQ mc hard as hell | 58 |
| SQ mc driving hard rock | 1_08 |
| SQ mc driving hard rock 2 | 1_02 |
| SQ mc more driving hard rock 3 | 1_06 |
| SQ mc rage rock | 1_13 |
| SQ mc down and dirty hard rock | 1_38 |
| SQ mc inspirational coldplay-esque | 1_15 |
| SQ mc inspirational coldplay-esque 2 | 1_20 |
| SQ mc chillin light rock bluesy | 1_28 |
| SQ mc prog rock | 1_04 |
| SQ mc mid tempo hard rockin | 1_14 |
| SQ mc deep down dirty rock | 1_15 |
| SQ mc green punk rockin | 1_14 |
| SQ mc up tempo rockin | 1_11 |
| SQ mc down low toms rock | 1_43 |
| SQ mc tommin rock | 1_04 |
| SQ mc drivin' bass + drums | 33 |
| SQ mc reggae rock | 1_15 |
| SQ mc reggae mon rock | 55 |
| SQ mc bruce in the house rock | 1_37 |
| SQ mc heartland rock | 1_54 |
| SQ mc chill heartland rock | 58 |
| SQ mc chill light heartland rock | 55 |
| SQ mc rolling stones-esque | 1_12 |
| SQ mc bluesy rock organ | 1_03 |
| SQ mc bluesy rock piano | 50 |
| SQ mc rocking blues | 48 |
| SQ mc baad ass | 1_34 |



95

LAB.01.0007

| | |
|---|---|
| SQ mc one bad mofo | 53 |
| SQ mc the man is back | 56 |
| SQ mc sentimental piano & drums | 42 |
| SQ mc sports rock 1 | 1 54 |
| SQ mc sports rock 2 | 55 |
| SQ mc sports rock 3 | 1 11 |
| SQ mc sports rock 4 | 1 15 |
| SQ mc driving rock orch | 59 |
| SQ mc really driving orch | 50 |
| SQ mc really driving orch-no drums | 51 |
| SQ mc really dirving orch-no drums+mel | 50 |
| SQ mc inspirational-uplifting | 1 18 |
| SQ mc inspirational-uplifting 2 | 35 |
| SQ mc orch uplifting | 1 58 |
| SQ mc uplifting top gun-esque | 1 21 |
| SQ mc peaceful guitar & pad | 55 |
| SQ mc soft peaceful piano | 1 28 |
| SQ mc peaceful piano | 34 |
| SQ mc gentle piano | 1 08 |
| SQ mc high soft piano | 44 |
| SQ mc contemporary cool marimba | 1 01 |
| SQ mc contemporary marimba | 57 |
| SQ mc guitary fun | |
| SQ mc pretty chill | |
| SQ mc hard groovin' | |
| SQ mc funky scratchin' | |
| SQ mc come on now | |
| SQ mc look alive | |
| SQ mc really fun funky | |
| SQ mc punk | |
| SQ mc kick action dark | |
| SQ mc intense orchestral | |
| SQ mc driving orchestral | |
| SQ mc mid-tempo orchestral | |
| SQ mc something's on fire | |
| SQ mc more action | |
| SQ mc building heroics | |
| SQ mc steady beat | |
| SQ mc crazy anxious | |
| SQ mc crazy attack | |
| SQ mc dark quirky | |
| SQ mc dark uplifting | |
| SQ mc mid tempo romance | |
| SQ mc dark erotic | |
| SQ mc acoustic blues | |
| SQ mc rock shuffle | |
| SQ mc bluesy shuffle | |
| SQ mc bluesy piano | |
| SQ mc deep thoughtful | |
| SQ mc pop rock | |
| SQ mc 70's funky | |
| SQ mc street beatz | |
| SQ mc street beatz 3 | |
| SQ mc baaaddd asss | |
| SQ mc calypso | |
| SQ mc beyond good and evil | |
| SQ mc quests lords | |
| SQ mc main theme | |
| SQ mc quest action | |



96

LAB.01.0007



| | |
|---|---|
| SQ mc dark choir | |
| SQ mc gb theme | |
| SQ mc gb free at last | |
| SQ mc sf love theme | |
| SQ mc alex applachian | |
| SQ mc gb sneaky | |
| SQ mc comedy querky | |
| SQ mc fire em up 1 | |
| SQ mc fire em up 2 | |
| SQ mc fire em up 3 | |
| SQ mc gb techno | |
| SQ mc big river orch 1 | |
| SQ mc amaya strings 1 | |
| SQ mc amaya strings 2 | |
| SQ mc jennie's theme | |
| SQ mc underwater | |
| SQ mc cool orchestra | |
| SQ mc liquid orch | |
| SQ mc4 | |
| SQ mc dm ending | |
| SQ mc big river combo | |
| SQ mc uplifting drama | |
| SQ mc building orch beat | |
| SQ mc gl memories 1 | |
| SQ mc gl memories 2 | |
| SQ mc rakeda jazz | |
| SQ mc gl polka 1 | |
| SQ mc gl polka 2 | |
| SQ mc higher latin | |
| SQ mc sj Spanish 1 | |
| SQ mc sj Spanish 2 | |
| SQ mc higher r&b | |
| SQ mc hip hop rockin | |
| SQ mc halfway | |
| SQ mc tm hard rock 1 | |
| SQ mc tm hard rock 2 | |
| SQ mc tm hard rock 3 | |
| SQ mc tm hard rock 4 | |
| SQ mc tm hard rock 5 | |
| SQ mc tm hard rock 6 | |
| SQ mc tm hard rock 7 | |
| SQ mc tm hard rock 8 | |
| SQ mc tm hard rock 9 | |
| SQ mc d ambient drone 1 | |
| SQ mc d ambient drone 2 | |
| SQ mc bd ending | |
| SQ mc Indian uplifting | |
| SQ mc as end strings | |
| SQ mc bc planning | |
| SQ mc mid tempo sexy | |
| SQ mc hard drivin' pop | |
| SQ mc jl blues 1 | |
| SQ mc 80's pop 1 | |
| SQ mc 80's pop 2 | |
| SQ mc 80's pop 3 | |
| SQ mc 80's pop 4 | |
| SQ mc 80's pop 5 | |
| SQ mc 80's pop 6 | |
| SQ mc 80's pop 7 | |

97

LAB.01.0007



| | |
|---|---|
| SQ mc 80's pop 8 | |
| SQ mc 80's pop 9 | |
| SQ mc kick action | :35 |
| SQ mc spacey funky | 1:18 |
| SQ mc street beatz 2 | :37 |
| SQ mc spy crisis funk | :59 |
| SQ mc spy crisis techno | :42 |
| SQ mc mc3 | 2:05 |
| SQ mc dm before | 1:00 |
| SQ mc pensive 1 | 1:08 |
| SQ mc emotional 1 | :42 |
| SQ mc emotional 2 | :54 |
| SQ mc peaceful erotic | 1:30 |
| SQ mc tender emotional | :50 |
| SQ mc calypso beach | :56 |
| SQ mc jazzy chill 2 | :57 |
| SQ mc jazzy chill 1 | 1:27 |
| SQ mc lewis van | :19 |
| SQ mc jl blues 2 | :18 |
| SQ mc keep up the funk | :55 |
| SQ mc straight rock | :55 |
| SQ mc gr tension | 1:06 |
| SQ mc impending creepy 1 | :47 |
| SQ mc impending creepy 2 | 1:10 |
| SQ mc moody creepy | :42 |
| SQ mc creepy energy | 1:05 |
| SQ mc spooky build | :30 |
| SQ mc tension in the air | :40 |
| SQ mc what's going on | :51 |
| SQ mc gb james brown | 1:02 |
| SQ mc heavy octane | 1:36 |
| SQ mc heavy octane 2 | 1:54 |
| SQ mc sexy jazz | 1:14 |
| SQ mc piano bar | 2:16 |
| SQ mc piano bar intro | 2:16 |
| SQ mc heavy octane | 1:36 |
| SQ mc heavy octane 2 | 1:54 |
| SQ mc piano bar | 2:16 |
| SQ mc piano bar intro | 2:22 |
| SQ mc sexy jazz | 1:15 |
| SQ mc drive action | 0:51 |
| SQ mc horn march | 1:04 |
| SQ mc horn march trap | 1:04 |
| SQ mc proud orch | 1:58 |
| SQ mc proud orch 2 | 1:06 |
| SQ mc rock tense | 0:39 |
| SQ mc scare drum | 0:33 |
| SQ mc go raw with me | 1:04 |
| SQ mc still fallin for you | 0:36 |
| SQ mc growing orch | 1:06 |
| SQ mc irish orch | 0:56 |
| SQ mc waiting orch | 0:50 |
| SQ mc raw drive cellos | 0:25 |
| SQ mc challenge orch | 0:46 |
| | |
| | |
| | |

98

LAB.01.0007

MC

1.   ASSIGNING

1.1   Composer hereby grants to Owner, and its assigns, exclusive worldwide rights, title and interest throughout the world ("Territory") in and to the Composition(s) (except copyright) in perpetuity.  Owner's rights will include, but not be limited to:

(a)   The right to use or record new lyrics in connection with the melody of the Composition(s), or a new melody in connection with the lyrics thereof;

(b)   The right to use, publish, advertise, perform, produce, reproduce, disseminate and exploit the Composition(s) by any means now or hereafter known, or not do any of the foregoing;

(c)   Any and all rights to the performance of the composition(s).

(d)   The right to alter or change the title.

(e)   The right to alter, expand, adapt, and translate the Composition(s) in consultation with Composer, and

(f)   The right to license others to do any of the foregoing.

2.   PAYMENTS

2.1   Owner shall pay Composer a sum equal to fifty (50%) of any and all net monies received from any mechanical, license, and synchronization income received by Owner, less reasonable monitoring fees, which may be incurred only when individuals or entities have been found to have made unauthorized use of cues of Composition(s).  In the event that Owner obtains interest from a third party to license the Composition(s) outside of the film trailer market and Owner issues such license for the Composition(s) to such third party, Owner shall pay Composer a sum equal to fifty percent (50%) of any and all gross monies received from any mechanical, license, and synchronization income received by Owner.

2.2   Owner shall be entitled to receive a sum equal to fifty (50%) of any performing and broadcast fees, which shall be collected by ASCAP, BMI, or SESAC and their affiliated societies, so long as the performing rights society will pay such sums directly to Owner or it's publisher(s).  If not, Composer shall pay such sums to Owner directly.

2.3   In the event of the exploitation of any sheet music, Owner shall pay the Composer a royalty equal to twelve percent (12%) of the net proceeds of the retail selling price (or wholesale equivalent) on all copies sold of the sheet music embodying the Compositions(s) when the money is received by Owner.  Composer shall not be entitled to receive a royalty for any professional and complimentary sheet music copies of the Composition(s).

2.4   It is understood that should lyrics be added to the Composition(s), then the royalties and fees specified in clauses 2.2, 2.3, and 2.4 shall be divided between Composer and the new lyricist on terms and conditions to be mutually agreed upon between Composer, Owner, and the new lyricist.

2.5   Prior to the signing of this agreement, all performing and broadcast fees collected by ASCAP and any publishing royalties that will, in the future, be collected by ASCAP for prior licensing of the above listed music by sources other than Spider Cues/Labrador Entertainment, Inc. or it's sub-publishers and producers will be paid 100% to Michael Cohen.

3.   ACCOUNTING

3.1   Owner shall pay Composer any monies that may become due and payable to Composer under this Agreement within (30) days of receipt of royalties paid to Owner.  Any late payment of such royalties due and owing shall, at Composer's option, be subject to a charge of interest at 10% fixed interest

99

LAB.01.0007

rate. In the event that Owner is unable by reason of governmental restrictions to make payment to Composer in the U.S. in U.S. Dollars, Owner shall deposit to Composer's credit or account in a foreign depository selected by Composer and in Composer's name all sums payable to Composer hereunder and shall notify Composer of all relevant particulars of such deposit. Owner's deposit of such funds in the foreign depository shall satisfy its obligations to Composer under this Paragraph 3.

3.2    For royalty accounting and all other purposes, any versions of the Composition(s) will be deemed to include each shortage or longer version or edited altered version of the Composition(s).

3.3    In the event that Owner's rights hereunder are sold or assigned to a third person or entity (as opposed to any existing partner of Owner), Composer or a certified public accountant on Composer's behalf shall be entitled to examine Owner's books of account, but only for the sole purpose of verifying the accuracy of any statements rendered and monies due hereunder to Composer upon thirty (30) days written notice, during Owner's normal business hours and in no event more than once annually. In no event shall Composer or a certified public accountant on Composer's behalf be entitled to examine Owner's books of account regarding any sums received by Owner that do not relate to Composition(s) which is the subject matter of this Agreement. Composer shall be deemed to have consented to each royalty statement, and such statement shall become final and binding upon Composer sixty (60) days after the rendition thereof, unless Composer issues specific written objections to Owner within said sixty (60) day period. In the event that objection is received in sixty (60) days, statement will be deemed accurate.

3.4    All payments hereunder shall be subject to any withholding taxes or other deductions, which Owner may be required to make by law or governmental regulation. In the event Owner shall be obligated by the laws of the country in the Territory to deduct and withhold income or other like tax from advances and royalties payable to Composer hereunder. Owner shall use its best efforts to assist Composer in obtaining a foreign tax certificate setting forth the amount of tax which shall have been withheld, and any other necessary information to assist Composer in obtaining income tax credits in the United States or reimbursements from such foreign taxing authority.

3.5    Owner shall not cross-collateralize any unrecouped amounts hereunder against any royalties due to Composer under any other agreement with Owner.

4.    COMPOSER'S REPRESENTATIONS AND WARRANTIES

4.1    Composer represents and warrants that the Composition(s) is his sole, exclusive and original work, and is capable of copyright protection by Owner throughout the Territory.

4.2    Composer represents and warrants that no adverse claims exist or will exist with respect to the Composition(s), and the Composition(s) does not infringe upon or violate the copyrights or any other rights whatsoever of any person, firm, or entity.

4.3    Composer represents that the performance of the Composition(s) is owned and/or paid for in full by the Composer and that the Composer holds Owner and it's associates harmless to any claim thereof.

4.4    Composer represents and warrants that Composer has the full and exclusive right and authority to enter into this Agreement and to make the grant of rights contained herein to Owner.

5.    OWNER'S REPRESENTATIONS AND WARRANTIES

100

EXHIBIT B

**AN AGREEMENT made this first day of April 2009 between:**

Labrador Entertainment, Inc (and dba Spider Cues)
22400 Sentar Rd.
Woodland Hills, Ca. 91364
USA

(hereinafter referred to as "Publisher") of the first part, and

Beatbox Music Pty Ltd
Suite 9, 7 Ramsay Rd
Pennant Hills, NSW 2120
Australia
(hereinafter referred to as "Sub-Publisher") of the second part.

**WHEREAS:**
Publisher (a member of ASCAP, BMI, SESAC, and SOCAN) is the owner of the recordings known as the **Spider Cues Music Library** (published by Labrador Great Music ASCAP, Labrador Good Music BMI, Lab Good Music, SESAC, Red Great Music - SOCAN -) and wishes to appoint the Sub Publisher (a member of APRA) as sole Sub Publisher for the recordings in the territories of Australia, New Zealand, Fiji (hereinafter referred to as "the licensed territory").

**NOW THEREFORE** in consideration of the premises and of the respective covenants and conditions hereinafter contained **IT IS HEREBY AGREED** as follows:

1. Subject to the terms and conditions and limitation hereinafter mentioned the Publisher hereby appoints the Sub-Publisher as their sole Sub Publisher for the licensed territory for the introduction and exploitation as hereinafter mentioned of all recordings made to be issued during the term of this Agreement and any extensions thereto by the Publisher of musical compositions and sound recordings issued as part of the background music library catalogue known as **Spider Cues Music** (hereinafter referred to as "the recordings").

2. The term of this Agreement shall be for a period of 3 (three) years from the first day of April 2009 with automatic renewal for additional 1 year periods unless written notice that either part herein wishes to terminate this agreement is given by either party and delivered to the other party at least 3 months prior to the last termination.

3. The Sub Publisher agrees to import each of the recordings as required issued by the Publisher on DVD, hard drive or other media during the term of this Agreement or any extension thereto. The Sub-Publisher shall remit to the Publisher all monies due for any associated transport charges within sixty days of receipt of all such invoices.

4. The Sub Publisher agrees to supply the Recordings or copies thereof at its own expense to its clients for audition selection and use at their own place of business; such recordings may be supplied on compact disc or in any audio file format and on any carrier system devised or yet to be devised subject to the following terms and conditions:

The supply of the Recordings above shall include the dissemination of the Recordings for audition and re-recording (downloading) via the Agent's web site or any Internet or Intranet, local area network, hard disc drive or any other carrier or medium.

5. The Sub-Publisher shall have the right to grant non-exclusive licenses in the licensed territory authorising the dubbing only of the recordings on to soundtracks of motion picture films television films video tapes as well as the dubbing and mechanical reproduction for radio transcriptions and any audio or audio-visual soundcarrier and which productions may be exported to all countries of the world. The Sub-Publisher shall pay to Publisher 50% (fifty per cent) of all fees accruing from such licenses relating to the use of the recordings.

6. It is agreed that the recordings will not be sold as a BUY-OUT LIBRARY or as normal commercial records to the general public including retail sales, record club sales, or other commercial sales.

7. In consideration of the grant of rights hereinafter made by Publisher, Sub-Publisher represents and warrants that it will use its best commercial endeavours to exploit the recordings for the benefit of the parties concerned.

8. The Performing Rights in the recordings are subject to the rights of the Copyright Societies in the USA (ASCAP, BMI and SESAC) and its affiliated societies in the licensed territory. It is agreed that the full "publisher's share" (six twelfths) of performing fees accruing from such rights shall be paid as follows: $3/12^{th}$ to the Sub-Publisher and $3/12^{th}$ to the Owner directly by the societies.

9.  Sub-Publisher shall remit to Publisher 50% (fifty per cent) of all monies received for exploitation of the library, including mechanical/ synchronization royalties received by Sub-Publisher as a result of exploitation of rights herein granted to Sub-Publisher.

10. a) Royalty statements shall be rendered by the Sub-Publisher to the Publisher within 90 (ninety) days of each half yearly period ending 30th June and 31st December in each year showing all monies received for exploitation of the library, including mechanical/synchronisation royalties and licence fees earned.

  b) All payments made by the Sub-Publisher to the Publisher hereunder shall be in the currency of the Publisher (or such other currency as the Publisher may from time to time direct in writing) and the exchange rate to be utilised shall be that in effect on the date that payment is made.  All costs of converting from the currencies utilised by the Sub-Publisher to the currency of the Publisher shall be borne by the Sub-Publisher.

11. On the termination of this Agreement or any extension thereof all rights in the recordings shall revert to the Publisher and all compact disc or DVD copies of the recordings supplied by the Publisher held by the Sub-Publisher shall become the absolute property of the Publisher. Notwithstanding the foregoing, but only regarding the Recordings in which Sub-Publisher has obtained a license, Sub-Publisher shall continue to render statements to the Publisher in respect of royalties and other monies earned under the provisions of this Agreement for a period of not less than six (6) months but not more than one (1) year beyond the termination of this Agreement or any extensions thereof.

12. The Sub-Publisher shall not have the right to part with or assign to any other person or party any of the benefits licensed to it under the terms of this Agreement without the prior written consent of the Publisher.

13. Should the Sub-Publisher default in rendering any statement of account or in making any payments as hereinbefore provided or in fully complying with any material terms or conditions herein required of the Sub-Publisher to be performed, and should such default continue for 30 (thirty) days after the Publisher has sent notice of such default by registered mail and fax to the Sub-Publisher, the Publisher shall have the right to terminate and cancel this Agreement as of expiration of the said 30 (thirty) days, or should the Sub-Publisher make any assignment for the benefit of creditors or take the benefit of any bankruptcy act  (save for the purpose of reconstruction) or should the Sub-Publisher be petitioned into bankruptcy, then in each and every such event the Publisher shall be entitled to terminate and cancel this Agreement, and the Sub-Publisher shall account to the Publisher forthwith for any outstanding fees not accounted for up to the time of such cancellation.

14. All rights not herein expressly granted by the Publisher to Sub-Publisher are all hereby reserved to the Publisher without limitation whatsoever.

15. This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns. No amendment shall be made hereto except in writing by all parties hereto. This Agreement constitutes the entire agreement between the parties hereto at the date hereof and the parties hereto enter into it solely on that basis without reliance on any other representations whatsoever.

16. The Publisher hereby represents and warrants and undertakes that:

(i) The Publisher is free to enter into this Agreement;

(ii) during the term of this Agreement the Publisher not grant any rights in the Compositions to any person firm or company other than the Sub Publisher for the Territory or enter into any agreement or act in any way which would derogate from the rights granted to the Sub Publisher hereunder;

(iii) the Publisher is party to or has entered into good and valid contracts with the writers and composers of the Compositions and such contracts enable it to comply with all terms and conditions hereof and the Publisher will do all things necessary not to be in breach of the same during the term hereof.

(iv) the Compositions are original and that none of the Compositions infringes any other copyright work or the rights of any third party

(v) The Publisher agrees to indemnify and hold harmless the Sub Publisher, its successors and assigns of and from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Publishers guarantees, warranties, representations and undertakings contained in this Agreement. This indemnity shall not be adversely affected should exploitation of the recordings continue after notice of infringement of rights or other claim has been received by the Sub Publisher.

(vi) The Sub Publisher agrees to indemnify and hold harmless the Publisher, it's successors and assigns of and from any and all loss, liability and expense incurred by reason of any infringement of rights or other claim inconsistent with the Sub Publishers guarantees, warranties, representations and undertakings contained in this Agreement. This indemnity shall not be adversely affected should exploitation of the recordings continue after notice of infringement of rights or other claim has been received by the Publisher.

17. Sub-Publisher shall deduct or shall authorise the deduction from royalty payments of any sums which may be demanded from Sub-Publisher in respect of the remittance of such payments by the governments or other fiscal authorities of the licensed territory. In such event Sub-Publisher shall supply the Publisher such information or documentation as may be available to Sub-Publisher together with confirmation as to the sums so demanded and paid.

18. Sub-Publisher shall keep true and correct books of account as far as they relate to the royalties generated by the recordings which shall be (subject to at least 30 (thirty) days prior written notice) open to inspection at the Publisher's expense during regular business hours and at a mutually convenient time and at Sub-Publisher's normal place of business by the Publisher or his representative.

19. All notices, writs, legal process or any other documents served under or in respect of this Agreement shall be addressed to the party to be served at the address of that party hereinbefore appearing or at such other address for service as may be notified by each to the other in writing and shall only be delivered by hand or sent by registered letter or recorded delivery letter.

20. This agreement shall be binding and shall inure to the benefit of the parties hereto, their successors and assigns and shall be construed in accordance with the laws and exclusive jurisdiction of The State of California of the USA.

21.  Sub Publisher agrees to pay Publisher upon the signing of this contract, a non-refundable advance of US$3500.00 (Thirty-five hundred US dollars and no cents) against future royalties described in this contract.

22. Beatbox Music and its associates will not knowingly contact, commission, or employ any composer with whom Labrador Entertainment, Inc (and dba Spider Cues) has an agreement.

AS WITNESS the hands of the duly authorised representatives of the parties the day and year first above written.

For and on behalf of                                    For and on behalf of


Labrador Entertainment, Inc
(and dba Spider Cues)                                   Beatbox Music Pty Ltd

EXHIBIT C

AMC. 01. 0002

a m Ⓒ o s

# Opt Out Categories (Corporate Members)

Indicate below the areas where you want AMCOS to license and collect royalties for you or where you want to license and collect royalties direct (Opt Out^).  Please refer to the Exclusive Licence Agreement for relevant definitions and the documentation provided with this Application Form for further explanation on the options available to you.

^Opt Out means, in relation to a member, to revoke a licence granted to AMCOS under this agreement in relation to all of the member's Works or all of the member's Production Music Works;

**FOR EACH LICENCE CATEGORY, YOU MUST TICK EITHER:**
**- THE 'AMCOS BOX' TO INDICATE THAT YOU WANT AMCOS TO LICENSE THAT CATEGORY; OR**
**- THE 'OPT OUT BOX' IF YOU WANT TO LICENSE ALL YOUR WORKS IN THAT CATEGORY DIRECT.**

| Category | AMCOS | Opt Out |
|---|---|---|
| Clause 2.6.1(a) audio recordings – majors* | AMCOS | Opt Out ✓ |
| Clause 2.6.1(d) non-network TV productions* | AMCOS | Opt Out ✓ |
| Clause 2.6.1(g) audiovisual recordings – majors* | AMCOS | Opt Out ✓ |
| Clause 2.6.1(b) audio recordings – non-majors* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(c) digital downloads* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(e) ringtones* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(f) internet & other new media applications* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(h) audiovisual recordings – non-majors* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(i) imports* | AMCOS ✓ | Opt Out |
| Clause 2.6.1(k) schools print licences* | AMCOS ✓ | Opt Out |

**Only complete the following category if you are a Production Music supplier.**

| Category | AMCOS | Opt Out |
|---|---|---|
| Cl2.2 production music* | AMCOS ✓ | Opt Out |

* The licensing areas referred to above are for information only – you should refer to the relevant clause of the Exclusive Licence Agreement.

# Membership Status

**Tick one of the following (refer to relevant definition at page 3).**

| | | | |
|---|---|---|---|
| **Category A Member** (fewer than 500 recorded works) | | **Category B Member** (500 or more recorded works) | ✓ |

# Signature

Signed *Peter* ...............................   Witnessed *NRoberts* ...............................

Name *PETER BAKER* ...............................   Name *NIKKI ROBERTS* ...............................

Date *1/11/04* ...............................

**Once you have completed this form and read the Exclusive Licence Agreement, please complete and sign at page 2.**

Last updated: August 2004

44

# Exclusive Licence Agreement

**THIS AGREEMENT IS MADE ON**        **2004**

**BETWEEN**

**AUSTRALASIAN MECHANICAL COPYRIGHT OWNERS SOCIETY LIMITED** ABN 78 001 678 851 of 6-12 Atchison Street, St Leonards, New South Wales (**AMCOS**)

**and**

Name: *BEATBOX MUSIC Pty LTD*

Address: *PO Box 669*

*PENNANT HILLS NSW 2120*

SCHEDULE 1 – Member

**After reading the following terms and conditions carefully, please complete and sign below.**

**SIGNED AS AN AGREEMENT**

Signed by the **Member** in the presence of:

Signature of Member

Name of Member (PRINT) *PETER BAKER*

Signature of Witness

Name of Witness (PRINT) *NIKKI ROBERTS*

Signed for and on behalf of **Australasian Mechanical Copyright Owners Society Limited** in the presence of:

Signature of authorised person

Name of authorised person (PRINT) *SALLY HOWLAND*

Office held *DIRECTOR – MEMBER SERVICE*

Signature of Witness

Name of Witness (PRINT) *KAYE HAWLEY*

## BACKGROUND

A.     AMCOS is a mechanical right collecting society appointed by its members to administer certain rights, to license certain rights and to collect and distribute royalties and licence fees.

B.     The Member wishes to join AMCOS on the terms set out in this agreement.

**AGREEMENTS**

**1.**     **Definitions and Interpretation**

**1.1**     **Definitions**

1.1.1     Where commencing with a capital letter:

**Act** means the *Copyright Act 1968*;

**Advertisement** means an announcement designed to attract the attention of the public or any part of it to a product, service, person, organisation or line of conduct but excludes Music Videos;

**Audio-visual Carrier** means a device which embodies sounds and visual images and includes videos, CD-ROMs, laser discs, DVDs and digital files but excludes Premiums;

**Blanket Licence** means a licence granted by AMCOS of all the Works, Production Music Works and Production Music Recordings controlled by it or all of the Works or all of the Production Music controlled by it;

**Board** means the board of directors of AMCOS;

**Broadcast** means a communication to the public delivered by a Broadcaster by means of television, radio or subscription radio or television services;

**Broadcaster** means a broadcasting service within the meaning of the Broadcasting Services Act 1992 or the operator of a subscription radio or television channel;

**Category A Members** means all members that have 499 or fewer Works Reproduced on sound recordings for sale to the public, and Production Music Works registered with AMCOS;

**Category B Members** means all members that have 500 or more Works Reproduced on sound recordings for sale to the public, and Production Music Works registered with AMCOS;

**CF** means AMCOS' centralised electronic interface between record companies and Members, which is a sub-program of CMS, known as the clearance facility;

**Cinematograph Film** has the same meaning as in the Act;

**CMS** means AMCOS' electronic copyright management system;

**Control Account** means an account:

(a)     held by a licensee; and

(b)     containing money owed by the licensee to music copyright owners, who have not been identified, for the Reproduction of musical works;

**Communicate** has the same meaning as in the Act;

**Dispute Account** means an account:

(a)     held by a licensee; and

(b)     containing money owed by the licensee to music copyright owners, who are in dispute as to the ownership of the copyright in the works, for the Reproduction of musical works;

**GST** has the same meaning as in section 195.1 of *A New Tax System (Goods and services Tax) Act 1999*;

**License Back** means, in relation to a member, to take a non-exclusive licence from AMCOS for the purpose of granting a specific licence to a person in Australia in respect of one or more of the member's Works or Production Music;

**Music Video** means a Cinematograph Film produced for the primary purpose of promoting:

(a)     the performer of the sound recording; or

(b)     the sound recording,

of a musical work embodied in the soundtrack of the Cinematograph Film;

45

**Opt Out** means, in relation to a member, to revoke a licence granted to AMCOS under this agreement in relation to all of the member's Works or all of the member's Production Music Works;

**Premium** means:

(a) in relation to a Record, an article made for sale for a consideration not consisting wholly of money, or sale by a person not ordinarily carrying on the business of making or selling Records; and

(b) in relation to a Reproduction other than in a Record, a Reproduction of a Work that is associated with or promotes the sale or provision of other goods or services;

**Production Music** means the Production Music Works and the Production Music Recordings;

**Production Music Recordings** means all present and future sound recordings of Production Music Works that are made generally available to studios, broadcasters and other persons for general non-exclusive use in audio, audio-visual and other productions;

**Production Music Works** means all present and future musical works:

(a) in relation to which the sound recording is also owned or controlled by the Member; provided that

(b) the principal purpose of these works is not to be made available for retail sale but rather is to be made generally available to studios, broadcasters and other persons for general non-exclusive use in audio, audio visual and other productions;

**Program** means a television, radio, website, internet or audio-visual program;

**Quarter** means a period of 3 months ending on 31 March, 30 June, 31 September or 31 December;

**Record** has the same meaning as in the Act but excludes Premiums;

**Reproduce** has the same meaning as in the Act but excludes reproduction in a Premium and, except in relation to Production Music and Blanket Licences, excludes reproduction in synchronisation with Cinematograph Films;

**Revenue** means, in connection with a Work, all money received by AMCOS from a grant of rights for a Work;

**Sale or Rental** means, in relation to a Work, the electronic and non-electronic sale or rental to the public;

**Schedule 2 Record Company** means a company listed in schedule 2 as amended by AMCOS from time to time;

**School** means a primary or secondary school;

**Territory** means Australia, New Zealand, Fiji, Papua New Guinea, Solomon Islands, Christmas Island, Cocos (Keeling) Islands, Cook Islands, Irian Barat, Nuie (Savage) Island, Norfolk Island, Tokelau (Union) Islands and Western Samoa;

**Theme Music** means music:

(a) identified or associated with a Program; or

(b) used behind the main title or end credits of a Program; and

**Works** means all present and future musical works and associated lyrics owned or controlled by the Member, other than Production Music Works.

1.1.2 Where a word or phrase is given a defined meaning another part of speech or other grammatical form in respect of that word or phrase has a corresponding meaning.

**1.2 Presumptions of interpretation**

1.2.1 Unless the context otherwise requires a word which denotes:

(a) the singular denotes the plural and vice versa; and

(b) a person includes an individual, a body corporate and a government.

1.2.2 Unless the context otherwise requires a reference to:

(a) any legislation includes any regulation or instrument made under it and where amended, re-enacted or replaced means that amended, re-enacted or replacement legislation; and

(b) a thing or amount is a reference to the whole and each part of it.

**2. Grant**

**2.1 Works**

2.1.1 Subject to clauses 2.1.2 and 2.6, and subject to the terms of any publishing contract by which the Member is bound, the Member grants AMCOS an exclusive licence in the Territory to and to authorise others to:

(a) make Records embodying the Works for Sale or Rental:

    (i) by a Schedule 2 Record Company; or

    (ii) by a person that is not a Schedule 2 Record Company;

(b) make Records embodying the Works for Sale by means of digital download but excluding mobile telephone ringtones;

(c) Reproduce the Works in the Territory for Communication to the public:

    (i) by means of Broadcast where the Reproduction is made by the Broadcaster;

    (ii) by means of Broadcast where the Reproduction is not made by the Broadcaster;

    (iii) in the form of customised mobile telephone ringtones; and

    (iv) by other non Broadcast means;

(d) Reproduce the Works in Audio-visual Carriers:

    (i) by a Schedule 2 Record Company; or

    (ii) by a person that is not a Schedule 2 Record Company; and

(e) import into the Territory, Records and Audio-visual Carriers embodying the Works for:

    (i) the purpose of sale, hire or distribution to the public; and

    (ii) for any other purpose which would otherwise constitute an infringement of copyright under section 37 or 38 of the Act.

2.1.2 The Member's grant of licence under:

(a) clause 2.1.1(c) does not include Reproductions in Advertisements or Theme Music; and

(b) clause 2.1.1(d) does not include Reproduction in Advertisements.

**2.2 Production Music**

Subject to clause 2.6, the Member grants AMCOS an exclusive licence in the Territory to and to authorise others to:

(a) Reproduce the Production Music;

(b) Communicate, including by Broadcasting, the Production Music Recordings.

**2.3 Print music**

The Member grants AMCOS an exclusive licence in the Territory to authorise Schools to make *copies of Works in accordance with the limits set out in Schedule 4.*

**2.4 Sublicences**

The Member acknowledges that AMCOS may grant sublicences under this agreement:

(a) on a non-exclusive basis only; and

(b) on such terms as AMCOS sees fit.

**2.5 Advertisements, Premiums, synchronisations and other Reproductions**

2.5.1 The Member may, from time to time, authorise AMCOS to license persons to:

(a) Reproduce or synchronise Works in an Advertisement or as Theme Music;

(b) Reproduce Works in a Premium;

(c) synchronise Works with the moving images in a Cinematograph Film; or

(d) authorise a non print Reproduction in any other form,

on such terms as may be determined by the Member.

2.5.2 The Member may, from time to time, authorise AMCOS to license the rights granted under this agreement throughout the world by arrangements with AMCOS' affiliated collecting societies.

**2.6    Opting Out and Licensing Back**

2.6.1    Subject to this clause 2.6, the Member may at any time exercise its right to Opt Out or License Back the licences granted under:

(a)    clause 2.1.1(a)(i);

(b)    clause 2.1.1(a)(ii);

(c)    clause 2.1.1(b);

(d)    clause 2.1.1(c)(ii);

(e)    clause 2.1.1(c)(iii);

(f)    clause 2.1.1(c)(iv);

(g)    clause 2.1.1(d)(i);

(h)    clause 2.1.1(d)(ii);

(i)    clause 2.1.1(e);

(j)    clause 2.2; and

(k)    clause 2.3.

2.6.2    The Member may only Opt Out of all Works, all Production Music Works and Production Music Recordings or both. It is not permissible to Opt Out of individual Works, or Production Music Works, or Production Music Recordings.

2.6.3    The Member must give not less than 3 months' notice to AMCOS expiring on a 31 March, 30 June, 30 September or 31 December notifying AMCOS that it Opts Out of a licence listed in clause 2.6.1.

2.6.4    If the Member notifies AMCOS that it is Opting Out of a licence under this clause 2.6, the Member must comply with such reasonable preconditions, including as to payment of any costs, prescribed by the Board from time to time.

2.6.5    If the Member exercises its rights under this clause 2.6 to Opt Out, the Member may not grant an exclusive licence to AMCOS of the categories of the licence revoked by the Member until the expiry of 12 months after the date of the revocation.

2.6.6    The Member acknowledges that it may only License Back individual Works or Production Music for a specific purpose.

2.6.7    The Member must give not less than 14 days' notice to AMCOS notifying AMCOS that it wishes to exercise the right to License Back.

2.6.8    If the Member notifies AMCOS that it wishes to exercise the right to License Back under this clause 2.6, the Member must:

(a)    comply with such reasonable preconditions, including as to payment of any costs, prescribed by the Board from time to time; and

(b)    detail the specific purpose of the exercise of the right to License Back.

**3.    Agency**

**3.1    Receiving money**

Subject to clause 2.6, the Member appoints AMCOS as its exclusive agent to:

(a)    collect all money due to the Member under the licences contained in Parts VA, VB and VC of the Act;

(b)    collect all money due to the Member in respect of the Works and Production Music under any scheme, whether statutory or otherwise, anywhere in the world (other than territories notified by the Member) providing for the payment of any money:

(i)    on recording equipment, tape or any other medium of Reproduction; and

(ii)    intended as compensation or payment for the private Reproduction or rental of the Works;

(c)    collect:

(i)    from Control Accounts in the course of its conduct of audits; and

(ii)    from Dispute Accounts,

money due to the Member in respect of the Works; and

(d)    do all acts which AMCOS considers appropriate to ascertain and collect any money due under paragraphs (a), (b) and (c), including conducting audits of licensees.

**3.2    Indemnity**

The Member appoints AMCOS as its agent to indemnify each licensee against all damages, losses, costs and expenses (including legal costs) incurred by the licensee arising out of AMCOS wrongly claiming:

(a)    that the Member controls a Work; or

(b)    the percentage of the Work controlled by the Member.

**4.    AMCOS' obligations**

AMCOS must:

(a)    comply with the Code of Conduct for Copyright Collecting Societies in effect from time to time;

(b)    grant licences only in accordance with the rights granted under this agreement;

(c)    endeavour to maintain the CF and the CMS in working condition;

(d)    take all reasonable steps to collect all money due under this agreement in respect of the Works, Production Music Works and Production Music Recordings; and

(e)    separately identify the money collected under paragraph (d) in relation to each Member.

**5.    Payments to the Member**

**5.1    Payment**

Subject to:

(a)    clause 6;

(b)    any directions of the Board from time to time in relation to payments; and

(c)    the Member complying with its obligations under clause 7.1.1,

AMCOS must, within 60 days after the end of each Quarter, pay to the Member all of the Member's share under this agreement of the money collected by AMCOS in respect of the Member's Works and Production Music in that Quarter or the period specified by the Board, as the case may be.

**5.2    Statement**

AMCOS must, with each payment made under clause 5.1, provide the Member with a statement detailing each Work, Production Music Work or Production Music Recording for which money is included in the payment:

(a)    the extent and nature of use of the Work, Production Music Work or Production Music Recording; and

(b)    the money allocated by AMCOS in respect of each licensed use.

**5.3    GST**

In relation to any GST payable for a taxable supply (as defined under GST law) by a party under this agreement, the recipient of the supply must pay the GST subject to the supplier providing a tax invoice (as defined under GST Law).

**6.    Commission and charges**

**6.1    Charges**

The Board may from time to time determine, in accordance with AMCOS' Constitution, the amount of any fees payable by members, including administration fees and fees in relation to Opt Out and License Back.

**6.2    Deduction**

AMCOS is entitled to deduct from all moneys collected by it under this agreement commission in accordance with schedule 3, and any costs which are determined by the Board to be payable in relation to any Opt Out or License Back in accordance with AMCOS' Constitution.

**7.    Member's obligations**

**7.1    Reporting and assistance**

7.1.1    The Member must at its cost:

(a)    provide AMCOS with a list of its Works, Production Music Recordings and such other information concerning these as AMCOS may from time to time specify;

(b)    promptly register the titles and other details required by AMCOS of all Works in accordance with AMCOS' standard procedures and practices from time to time;

(c) immediately notify AMCOS of:

    (i) each addition to or deletion from that list;

    (ii) each sub-publishing agreement relating to those additions or deletions; and

    (iii) each change to the Member's business which would affect its entitlement to be a member of AMCOS; and

(d) provide such information and assistance as AMCOS may reasonably require from time to time in order to perform its obligations under this agreement.

7.1.2 The Member acknowledges that if it is or if it becomes a Category B Member it will be necessary for it to use and operate the CF and the CMS to fulfil its obligations under this clause 7.1 and warrants that:

(a) it has or, immediately on becoming a Category B Member will ensure that it has, familiarised itself with the CF and CMS and has or will ensure that prior to its use of the CF and CMS it has, the necessary skills and ability to use the CF and the CMS; and

(b) it will ensure that it does not damage or harm the CF or CMS in any way.

8. **Warranties**

The Member warrants that:

(a) the rights granted under this agreement do not infringe the intellectual property or other rights of any other person;

(b) each Work, Production Music Work and Production Music Recording is controlled by it;

(c) the Works, Production Music Works and Production Music Recordings are protected by copyright;

(d) if the Member represents itself to be the author of Works and Production Music Works, that it is the author of the Work as represented to AMCOS;

(e) it is entitled to be a member of AMCOS under AMCOS' constitution; and

(f) it has full power and authority to enter into and perform its obligations under this agreement.

9. **Indemnity**

9.1 **Member**

The Member indemnifies AMCOS against all damages, losses, costs and expenses (including legal costs) incurred by AMCOS arising out of:

(a) the performance of AMCOS' obligations under this agreement; or

(b) any breach by the Member of this agreement.

9.2 **AMCOS**

AMCOS indemnifies the Member against all damages, losses, costs and expenses (including legal costs) incurred by the Member arising out of any breach by AMCOS of this agreement.

10. **Legal proceedings**

10.1 **Restriction**

AMCOS must not commence any legal proceedings in respect of infringement of the copyright in:

(a) the Works;

(b) the Production Music Works; or

(c) the Production Music Recordings,

without the prior written consent of the Member.

10.2 **Assistance**

Subject to clause 10.1 the Member must provide AMCOS with all reasonable assistance required by AMCOS in any legal proceeding relating to this agreement, the Works, the Production Music Works or the Production Music Recordings.

11. **Term and Termination**

11.1 **Term**

This agreement commences:

(a) if the Member is a member of AMCOS prior to the date of this agreement, on 1 July 2004; or

(b) otherwise on the date the Member is admitted as a member of AMCOS.

and continues until terminated accordance with this clause 11.

11.2 **Termination by notice**

Either party (**Innocent Party**) may terminate this agreement:

(a) on 6 months' notice to the other terminating on 30 June or 31 December; or

(b) immediately by notice to the other party (**Defaulting Party**) if the Defaulting Party:

    (i) breaches any term of this agreement and fails to rectify the breach within 14 days after notice from the Innocent Party; or

    (ii) goes into liquidation, has a receiver or receiver and manager appointed to it or any part of its assets, enters into a scheme of arrangement with creditors or suffers any other form of external administration.

11.3 **Automatic termination**

This agreement terminates on the Member ceasing to be a member of AMCOS.

11.4 **Effect of termination**

The termination of this agreement does not affect any licence (other than a Blanket Licence) granted by AMCOS under this agreement prior to the date of termination of this agreement, nor will termination affect the rights and obligations of the parties to this agreement in respect of such licences.

12. **Dispute resolution**

12.1 **Dealing with disputes**

12.1.1 The parties must, without delay and in good faith, attempt to resolve any dispute that arises out of or in connection with this agreement prior to commencing any proceedings.

12.1.2 If a party requires resolution of a dispute it must do so in accordance with the provisions of this clause 12 and the parties acknowledge that compliance with these provisions is a condition precedent to any entitlement to claim relief or remedy whether by way of proceedings in a court of law or otherwise in respect of such disputes.

12.2 **Resolution by management**

12.2.1 If a party requires resolution of a dispute it must immediately submit full details of the dispute to the chief executive officer of the other party.

12.2.2 If the dispute is not resolved within 30 days of submission of the dispute to them, or such other time as they agree, the provisions of clause 12.3 will apply.

12.3 **Conciliation**

12.3.1 Disputes must be submitted to conciliation in accordance with and subject to the Institute of Arbitrators Australia Rules for the Conduct of Commercial Conciliations.

12.3.2 A party may not commence proceedings in respect of the dispute unless the dispute is not settled by conciliation within 30 days of submission to conciliation, or such other time as the parties agree.

13. **Miscellaneous**

13.1 **Notices**

13.1.1 A notice under this agreement:

(a) must be in writing; and

(b) may be given to the addressee by:

    (i) delivering it to the address of the addressee;

    (ii) sending it by pre-paid registered post to the address of the addressee; or

    (iii) sending it by facsimile to the facsimile number of the addressee,

and the notice or other communication will be deemed to have been received by the addressee on receipt.

13.1.2 A facsimile is deemed to have been received on production of a transmission report by the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the addressee.

13.2 **Amendment**

This agreement may only be varied by the written agreement of the parties.

**13.3     Assignment**

A party may only assign a right under this agreement with the prior written consent of the other parties.

**13.4     Entire agreement**

13.4.1    This agreement embodies the entire understanding and agreement between the parties as to the subject matter of this agreement, and replaces any earlier membership agreement between the Member and AMCOS.

13.4.2    All previous negotiations, understandings, representations, warranties, memoranda or commitments in relation to, or in any way affecting, the subject matter of this agreement are merged in and superseded by this agreement.

**13.5     Further assurance**

Each party must promptly execute all documents and do all things that another party from time to time reasonably requests to effect, perfect or complete this agreement and all transactions incidental to it.

**13.6     Governing law and jurisdiction**

13.6.1    This agreement is governed by and must be construed in accordance with the laws of New South Wales.

13.6.2    Each party:

(a)    irrevocably and unconditionally submits to the nonexclusive jurisdiction of the courts of New South Wales and all courts which have jurisdiction to hear appeals from them; and

(b)    waives any right to object to proceedings being brought in those courts for any reason.

**13.7     Severance**

Each of the agreements of the parties under this agreement is severable from the others and the severance of one agreement does not affect the other agreements.

**13.8     Waiver**

No waiver of any term of this agreement is binding on a party unless it is in writing and executed by or on behalf of that party. Any such waiver is not a waiver of any other term.

**13.9     Stamp duty and other charges**

The Member must promptly pay all stamp duty, fees and other taxes and charges payable in connection with this agreement or any document incidental to it.

---

**SCHEDULE 2 - Schedule 2 Record Companies**

**Australia**

BMG Australia Limited

Universal Music Australia Limited

Sony Music Entertainment (Australia) Limited

EMI Music Australia Pty Limited

Festival Records Pty Ltd

Warner Music Australia Pty Limited

Reader's Digest Services Limited

**New Zealand**

BMG New Zealand Limited

Universal Music Limited

Sony Music Entertainment (NZ) Limited

EMI Music NZ Limited

Warner Music NZ Limited

Reader's Digest New Zealand

---

**SCHEDULE 3 - Commission**

*Subject to any other lower rate determined by the Board from time to time on notice to the Member:*

(a)    In relation to licences granted under clauses 2.1.1(a), (b), (d) and (e):

(i)    Category A Members: 17.5% of Revenue; and

(ii)    Category B Members: 12% of Revenue;

(b)    in relation to licences granted under clauses 2.1.1 (c) and 2.3, and money collected under clause 3.1(a), 12% of Revenue;

(c)    subject to (b) above, in relation to licences granted under clause 2.2:

(i)    Category A Members: 17.5% of Revenue; and

(ii)    Category B Members: 12% of Revenue;

(d)    in relation to licences granted under clause 2.5 and money collected under clause 3.1(b):

(i)    Category A Members: 10% of Revenue arising out of the Advertisement; and

(ii)    Category B Members: 5% of Revenue arising out of the Advertisement.

(e)    in relation to monies collected under clause 3.1(c):

*(i)    Category A Members: 17.5% of Revenue; and*

*(ii)    Category B Members: 3% of Revenue.*

---

**SCHEDULE 4 - Print Music copying limits**

| TYPE OF WORK | PRIMARY SCHOOL [No. of copies per original owned by the School] | SECONDARY SCHOOL [No. of copies per original owned by the School] |
|---|---|---|
| Choral Sheet | 5 | 5 |
| Separately Published Musical Work | 30 | 15 |
| Collection of Musical Works | 39 (with a limit of 3 songs per collection) | 15 (with a limit of 3 songs per collection) |
| Transcription of a Musical Work | 30 | 15 |
| Transposition of a Musical Work | 30 | 15 |
| Orchestral/band set | 30 additional instrumental parts | 30 additional instrumental parts |

---