Daniel Lee Jacobson SBN 134978
JACOBSON & ASSOCIATES
1352 Irvine Blvd. Suite 205
Tustin, CA 92780
(714) 505-4872
dlj@jacobsonlawyers.com

Attorneys for Defendants
Michael Cohen and MCPC Holdings, LLC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEATBOX MUSIC PTY, LTD., | Case #: 2:17-cv-06108-MWF-JPR |
| Plaintiff | **Defendant/Crossclaimant Michael Cohen's and Defendant MCPC Holdings, LLC's Requests for Judicial Notice** |
| v. | Date: 11/16/20<br>Time: 10:00 a.m.<br>Courtroom: 5A<br>Trial date: 11/30/21 |
| LABRADOR ENTERTAINMENT, INC. D/B/A SPIDER CUES MUSIC LIBRARY, a California corporation; NOEL PALMER WEBB, an individual; MICHAEL COHEN, an individual; LABRADOR ENTERTAINMENT, LLC; MCPC HOLDINGS, LLC; WEBB FAMILY TRUST and DOES 1-20, inclusive, | Dist. Judge Michael W. Fitzgerald<br><br>Mag. Judge Jean P. Rosenbluth<br><br>Complaint Filed August 17, 2017 |
| Defendant | |

///

///

///

Defendants Michael Cohen ("Mr. Cohen") and MCPC Holdings, LLC ("MCPC") hereby requests that the Court take Judicial Notice pursuant to Federal Rule of Evidence 201 of the following.

1.    California has "retention elections" at which time the People are asked whether a particular Appellate Justice should be "retained." *Appellate Retention Elections*, California Courts (Apr. 21, 2020). https://www.courts.ca.gov/3154.htm.

2.    Chief Justice Rose Bird, and Associate Justice Cruz Reynoso, and Joseph Grodin were appointed by Governor Jerry Brown. Lloyd Billingsley, *When voters cleaned house at the state Supreme Court*, The Orange County Register, Oct. 2016, https://www.ocregister.com/2016/10/28/when-voters-cleaned-house-at-the-state-supreme-court/. Attached hereto as Exhibit "A" is a copy of the article.

3.    In 1986 Justices Bird, Reynoso, and Grodin lost their retention elections. Lloyd Billingsley, *When voters cleaned house at the state Supreme Court*, The Orange County Register, Oct. 2016, https://www.ocregister.com/2016/10/28/when-voters-cleaned-house-at-the-state-supreme-court/. Attached hereto as Exhibit "A" is a copy of the article.

4.    With the vacancies occassioned by Justices Bird, Reynoso, and Grodin

losing their retention elections, and with other vacancies then-Governor Deukmejian was able to appoint five out the seven Supreme Court justices, causing a dramatic change in judicial philosophy. George Skelton and Philip Hager, *Lucas Is Deukmejian's Choice to Replace Bird : Governor Picks His Ex-Law Partner, Fellow Conservative as California's New Chief Justice*, The Los Angeles Times, Nov. 1986, https://www.latimes.com/archives/la-xpm-1986-11-27-mn-13555-story.html. Attached hereto as Exhibit "B" is a copy of the article.

DATED: 10/15/20

       /s/ Dan Jacobson
Dan Jacobson, Jacobson & Associates,
Attorney for Defendant Michael Cohen
and MCPC Holdings, LLC

EXHIBIT "A"

**When voters cleaned house at the state Supreme Court**

By Lloyd Billingsley | Orange County Register
October 28, 2016 at 12:00 a.m.

Thirty years ago, on November 4, 1986, California voters ousted Rose Bird, chief justice of the California Supreme Court, by a margin of 67 to 33 percent. This landslide vote confirmed that, contrary to current rhetoric, a bipartisan ruling class out of touch with the people is not a new development.

Bird had been the first female public defender in Santa Clara County before serving as campaign chauffeur for Jerry Brown during his run for governor in 1974. Brown, son of former Gov. Edmund G. "Pat" Brown, won the election and appointed Bird secretary of agriculture, the state's first woman cabinet member.

In 1977 Bird was only 40 years old and without judicial experience. Even so, Gov. Brown, a Democrat, appointed his former chauffeur chief justice of the California Supreme Court. A key confirmation vote came from Evelle Younger, the state's Republican attorney general.

Bird was the first female justice of California's high court and thus the first female chief justice. She seemed to view the appointment as a promotion to aristocratic status, demanding that associate justices make appointments if they wanted to see her. Bird also proved that, like men, women are fully capable of elevating their own ideology above the law.

In 10 years as California's chief justice, Bird heard 64 capital cases and never voted to uphold a death sentence. Even for staunch death-penalty opponents, including those on the court, it defied belief to think that every case was unfounded. The cases included that of Theodore Frank, duly convicted of kidnaping, torturing, raping, murdering and mutilating two-year-old Amy Sue Seitz in 1978.

Bird had also been an enemy of big farmers and property-tax reformers, but as Patrick K. Brown wrote in "The Rise and Fall of Rose Bird," the voters cared only that she "did not care about victims of crime." She also had struck down a law, endorsed by Jerry Brown, requiring a prison term in any crime committed with a gun.

On November 4, 1986, as one headline put it, voters "flipped the Bird" by a two-to-one margin. The first woman to serve on the state Supreme Court became the only chief justice in state history to be removed by a vote of the people, who did not stop there.

California voters also ousted Justices Cruz Reynoso and Joseph Grodin, both Jerry Brown appointees, who sided with Bird on the death-penalty cases. Justice Stanley Mosk remained on the court because, as he explained, "I took an oath to support the law as it is and not as I might prefer it to be."

For all but the willfully blind the lessons here should be obvious. The people care about victims of crime, and the people dislike judges who elevate their social vision above the law. Judges who do that are out of touch with the people, and so are the politicians who appoint and confirm them.

In November 2016 the bipartisan ruling class is more out of touch than ever, and justices of the U.S. Supreme Court are appointed for life. They remain on the court even if they elevate their own social vision above the law, in the manner of Bird, Reynoso and Grodin.

Assigning justices of the U.S. Supreme Court a fixed term and giving the people a say in reconfirmation are reforms worth considering. As California's 1986 vote confirms, when the people wield reconfirmation power they can achieve the meaningful change that politicians fail to deliver.

EXHIBIT "B"

Lucas Is Deukmejian's Choice to Replace Bird : Governor Picks His Ex-Law Partner, Fellow Conservative as California's New Chief Justice

By GEORGE SKELTON AND PHILIP HAGER
NOV. 27, 1986 | 12 AM
SACRAMENTO — Gov. George Deukmejian on Wednesday selected state Supreme Court Associate Justice Malcolm M. Lucas, a former law partner and fellow conservative, to replace Rose Elizabeth Bird as California chief justice.

Lucas, 59, pledged to try to "heal some of the wounds" inflicted on the court during this year's bitter election campaigns that resulted in the voters' ouster of Bird and two associate justices, Cruz Reynoso and Joseph R. Grodin.

Deukmejian said he was "deeply sensitive to the great need to restore public confidence in and respect for (California's) highest court, and to help rebuild its stature."
By elevating a present court member to the coveted chief justice position, Deukmejian reserved three slots on the bench to fill with new associate justices as replacements for Reynoso, Grodin and Lucas. An aide said that the governor probably will offer names for those three positions by the first of the year.

Will Have Appointed 5

When all the vacancies are filled, Deukmejian will have appointed five of the seven members of the state Supreme Court, including his own chief justice, within the relatively short span of about four years. The Republican governor's dominant influence on the court's composition is widely expected to reshape its philosophy, bringing a rightward shift to a bench that has been one of the most liberal in the nation. Conservatives and moderates will be in control for the first time in decades.

Deukmejian's Democratic predecessor, Edmund G. Brown Jr., named a total of seven Supreme Court members during his eight years as governor. But, with the three ousters, only one remains, Allen E. Broussard. Two resigned and one died.

It was Brown's appointment of the liberal Bird, who never previously had been a judge, that ignited several years of court controversy, centered especially on its overturning of numerous death penalty sentences in a state where voters overwhelmingly favor capital punishment. Bird's unpopularity with the voters ultimately led not only to her downfall, but to that of two other Brown appointees, Grodin and Reynoso.

Deukmejian's selection of Lucas came as little surprise. His name had been regarded for months as being at the top of a list of potential successors to Bird as the embattled chief justice waged an uphill and ultimately unsuccessful campaign to win voter confirmation.

On Tuesday afternoon, as the justices convened in San Francisco for their weekly closed conference at the court, Bird, apparently alerted to Lucas' impending nomination,

presented him with a bouquet of flowers and a cake decorated with the words, "Congratulations, Malcolm."

Frequent Dissenter

The tall, slender, silver-haired Lucas, a resident of the Orange County city of Los Alamitos, is viewed as the most conservative justice on the court. He has been by far its most frequent dissenter, voting in the minority in 67 of about 191 decisions since he joined the court in 1984.

In relatively brief but often pointed opinions, he has expressed viewpoints that would please most conservatives--voting on the side of law enforcement, advocating a limited role for the courts and deferring to the Legislature on questions of policy. He also has indicated some willingness to vote to reconsider some of the more controversial decisions issued by the court under Bird.

Long Experience

A recent study showed that Lucas disagreed with Bird, the Supreme Court's most liberal member, more than any other justice during his first two years on the court.
Unlike Bird at the time she was appointed chief justice, Lucas has had long experience on the bench. After being a law partner of Deukmejian--who at the time was a state legislator--Lucas was appointed in 1967 by then-Gov. Ronald Reagan to the Los Angeles County Superior Court. Three years later, President Richard M. Nixon appointed him to a life term on the U.S. District Court in Los Angeles. He served there 12 years until he was named by Deukmejian to the state Supreme Court in 1984.
There is considerable speculation that Deukmejian next will nominate a woman and a member of a racial minority in the wake of the departure of Bird, the court's first and only female member, and Reynoso, its first and only Latino.

Possible Successors

Two potential candidates--U.S. District Judge Pamela Ann Rymer of Los Angeles and state Appellate Justice John A. Arguelles of Los Angeles--often have been mentioned. Both were among six candidates the governor considered last year as possible successors to Justice Otto M. Kaus, whom Deukmejian eventually replaced with thenstate Appellate Justice Edward A. Panelli.

Actually, the complicated Supreme Court selection process requires the governor first to submit one or more names to the California State Bar's Commission on Judicial Nominees Evaluation for a confidential review of the person's legal and personal background. This is what Deukmejian did with Lucas on Wednesday.

Appointment Process

But Deukmejian spokesman Larry Thomas said that the governor may submit several

names to the commission as he prepares to select three new associate justices. The commission's review, Thomas noted, serves as a double check on the governor's own study of potential nominees.

In the final two steps of the selection process, a governor formally nominates a justice and the person is considered for confirmation--usually routinely--by the state Commission on Judicial Appointments.

Deukmejian, in a prepared statement issued by his office, said he hoped that "the change of leadership in the court can be accomplished smoothly, expeditiously and professionally . . . as early as possible in January."

The terms of Bird, Grodin and Reynoso will expire on Jan. 5.

Deukmejian praised Lucas as "superbly qualified--in judicial experience and temperament, (in) administrative ability and personal integrity." The governor added that he is "absolutely confident" of Lucas' ability to perform "in a manner that will significantly enhance the stature of the court."

Lucas, in a statement issued at his office in San Francisco, said he was "deeply honored" by the governor's announcement. But he implicitly acknowledged that the court's stature had been damaged by the bitterly contested election and that one of his chief tasks would be to try to restore its stability and prominence.

"Recent events have placed considerable pressure upon our court as an institution, but in the coming months I will attempt to take steps to heal some of the wounds and restore public faith in our judicial system," he said. "I have confidence in the ability of the court to be one of the most respected courts in our nation."

The governor's announcement on Lucas was greeted by praise on several fronts, including the court itself.

Justice Stanley Mosk, the court's senior member who won confirmation handily on Nov. 4, said he thought Lucas would be a "fine chief justice."

"His major task, as I see it, will be to help reconcile the various forces that were polarized during the recent campaign," said Mosk, who was appointed 22 years ago by Jerry Brown's father, former Gov. Edmund G. (Pat) Brown.

Justice Panelli, who last month also won reconfirmation easily and was seen as a darkhorse candidate for chief justice, called Lucas an "excellent choice." Panelli said he was flattered by speculation that he had been a potential candidate but that he had taken himself out of the running in conversations with aides of the governor.

"The governor has picked the right person for the job," he said. "My contact with (Lucas) has indicated to me he is very good with people and has the qualities that will be

needed for the court at a difficult time."

Bird, in a statement, said: "I congratulate my colleague, Justice Lucas, on his elevation, and I wish him well as he prepares to undertake his new duties."

Democratic state Atty. Gen. John K. Van de Kamp, a member of the Commission on Judicial Appointments, noted that when he considered Lucas' confirmation as associate justice in 1984 he found him to be "a very competent, intelligent and well-respected judge."

An analysis by state Administrative Law Judge Barry Winograd showed that in 1984 Lucas and Bird voted the same way only 57% of the time. In the following year, they agreed only 46% of the time.

During his tenure, Lucas has written only 17 majority opinions, an indication of his largely minority role on a court that has been dominated for years by liberals.

In his first majority opinion in August, 1985, Lucas wrote for the court in a 6-1 decision upholding the conviction of a burglar he called "a classic example of a street-wise defendant doing everything possible to delay his conviction" or have it overturned on appeal.

Lucas has often issued sharp dissents in some of the court's most significant rulings.

When the justices last year swept aside decades of appellate rulings and found that public employee strikes were lawful, except when there was a threat to public safety, Lucas wrote that such employees "neither have the right to strike, nor should they have that right."

Lucas ridiculed the majority's suggestion that public strikes, as he put it, "may constitute a panacea for many of the social and economic ills which have long beset the public sector."

"One may wonder, as I do, why we kept that revelation a secret for all these years," he said.

When the court in 1984 upheld Berkeley's controversial rent-control ordinance, Lucas cited the importance of free competition in the marketplace and concluded that the city's plan constituted illegal price-fixing under federal antitrust law.

Lucas quoted from studies by economists concluding that rent control retards new construction and prevents landlords from charging enough to provide tenants with services or facilities they desire.

On one of the most important issues facing the court, the new chief justice has indicated he wants the bench to reconsider two key decisions it made that prosecutors contend could force dozens of retrials in death penalty cases.

In 1983 and 1984, the justices held that death sentences could not be imposed unless the jury had specifically found that the defendant intended to kill his victim. When he came on the court, Lucas adhered to court precedent, as judges ordinarily do, and joined with the rest of the justices in overturning a series of death judgments. But when Bird, under attack for her record of overturning every death sentence she had reviewed, noted in an interview that Lucas, too, was joining in the death penalty reversals, Lucas changed his stance.

And in a dissenting opinion he issued in November, 1985, Lucas announced he no longer would consider himself bound by the two decisions rendered before he joined the court--and would "join three of my colleagues in re-examining, and ultimately overruling, those decisions."

Since then, he has voted in dissent to uphold most of the death sentences that have come before the court. At this point, he has voted to affirm 13 of the 24 death sentences he has reviewed since joining the court.

Abortion is another politically charged issue in which Lucas and other Deukmejian appointees to the court could play pivotal roles.

In 1981, the state Supreme Court ruled that under the state Constitution, the Legislature could not refuse to provide funds for abortions for low-income women under the Medi-Cal program as long as it continued to pay for childbirth.

Since then, the Legislature has repeatedly passed measures refusing to pay for such abortions except in certain limited situations, such as when the pregnancy is the result of rape or incest. And each year the courts have ordered that abortion funding continue.

However, when Lucas came on the court, he was the only justice to vote for hearing the state's appeal of an order requiring continued abortion funding. Last week, the other Deukmejian appointee on the court, Justice Panelli, joined Lucas in voting to hear the latest state appeal on the issue. With two more votes from future court appointees of the Republican governor, there would be the required four votes to reconsider the issue--and perhaps overturn the controversial 1981 ruling.

Lucas also has demonstrated a reluctance to adopt the sweeping doctrines of the right to privacy and protection from police searches that were hallmarks of the court during Bird's tenure.

For example, when the court in December, 1985, reversed the conviction of an accused marijuana grower whose crop had been spotted by police flying overhead in an airplane, Lucas dissented, saying the majority's concern for protecting privacy was "entirely misplaced" in such cases.

At the height the plane was flying--1,600 feet--it would be virtually impossible to

observe legitimate personal activities in a person's backyard, Lucas said. On the other hand, he contended, a marijuana grower whose crop of contraband can readily be sighted from such heights has no "expectation of privacy" that would protect him from aerial surveillance.

The new chief justice-designate is scheduled to leave Friday for a world conference on patent law in Peking. Responding to an invitation from the Chinese government, Lucas and two patent lawyers, Don W. Martens of Newport Beach and Thomas F. Smegal of

San Francisco, are to present lectures to Chinese judges and lawyers from Dec. 1 through Dec. 19.

Lucas presided over a number of patent trials while he served on the federal bench as a district court judge before joining the state Supreme Court.