# GROUP EXHIBIT B

```
 1                    UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4     BEATBOX MUSIC, PTY, LTD.,        )

 5                     Plaintiff,       )

 6     vs.                              ) Case No.:

 7     LABRADOR ENTERTAINMENT, INC.,    ) 2:17-cv-6108-MWF (JPRx)

 8     DBA SPIDER CUES MUSIC LIBRARY,   )

 9     a California corporation,        )

10                     Defendants.      )
       _____ )
11     MICHAEL COHEN, an individual,    )

12                 Cross-Complainant,   )
       vs.                              )
13     LABRADOR ENTERTAINMENT, INC.,    )

14     D/B/A SPIDER CUES MUSIC          )
       LIBRARY, a California            )
15     Corporation,                     )
                   Cross-Defendant.     )
16     _____ )
                         DEPOSITION OF NOEL WEBB

17                       Tustin, California

18                   Monday, December 2, 2019

19                          Volume I

20

21

22     REPORTED BY:

23     JENNIFER STANLEY

24     CSR NO. 13740

25     JOB NO. 3798262
```

Veritext Legal Solutions
866 299-5127

```
 1                    UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4     BEATBOX MUSIC, PTY, LTD.,        )

 5                     Plaintiff,       )

       vs.                              )  Case No.:

 6     LABRADOR ENTERTAINMENT, INC.,    )  2:17-cv-6108-MWF (JPRx)

 7     DBA SPIDER CUES MUSIC LIBRARY,   )

 8     a California corporation,        )

 9                     Defendants.      )

       _____)

10     MICHAEL COHEN, an individual,    )

11               Cross-Complainant,    )

       vs.                              )

12     LABRADOR ENTERTAINMENT, INC.,    )

13     D/B/A SPIDER CUES MUSIC          )

14     LIBRARY, a California            )

15     Corporation,                     )

16                 Cross-Defendant.     )

       _____)

17

18

19          The deposition of NOEL WEBB, Volume I, taken on

20     behalf of the defendant/cross-complainant, at 1352 Irvine

21     Boulevard, Suite 205, Tustin, California, beginning at 11:27

22     a.m. and ending at 6:02 p.m. on Monday, December 2, 2019,

23     before JENNIFER STANLEY, Certified Shorthand Reporter No.

24     13740.

25
```

Page 2

```
 1    APPEARANCES:

 2

 3    For the Defendant and Cross-Defendant Labrador

 4    Entertainment, Inc.:

 5         BROWNE GEORGE ROSS LLP

 6         BY:  RAENA W. OHIRI

 7         Attorney at Law

 8         801 North Figueroa Street, Suite 2000

 9         Los Angeles, California 90017

10         213-725-9800

11         rohiri@bgrfirm.com

12

13    For the Defendant and Cross-Complainant Michael

14    Cohen:

15         JACOBSON & ASSOCIATES

16         BY:  DANIEL LEE JACOBSON

17         Attorney at Law

18         1352 Irvine Boulevard, Suite 205

19         Tustin, California 92780

20         714-505-4872

21

22

23

24

25
```

Page 3

```
 1    APPEARANCES CONTINUED:

 2

 3    For the Plaintiffs:

 4         BLAISE & NITSCHKE

 5         BY:  HEATHER L. BLAISE

 6         Attorney at Law

 7         123 N. Upper Wacker Drive, Suite 250

 8         Chicago, Illinois 60606

 9         323-637-3815

10         hblaise@blaisenitschkelaw.com

11

12    Also Present:

13    PETER BAKER

14    BARBARA BAKER

15    LANA NASSAR - BLAISE & NITSCHKE

16

17

18

19

20

21

22

23

24

25
```

Page  4

```
 1                          INDEX

 2                       EXAMINATION

 3    Witness Name                              Page

 4    NOEL WEBB

 5        BY: MR. JACOBSON                      7, 68

 6        BY: MS. BLAISE                        64, 69

 7


                          EXHIBITS

 8    Exhibit     Description                    Page

 9

10    Exhibit A   Amended Notice of Deposition.  9

11    Exhibit B   Amended Notice of Deposition.  10

12    Exhibit C   E-mail.                        20

13    Exhibit D   Tax Invoice Copy.              21

14    Exhibit E   Tax Invoice Copy.              23

15    Exhibit F   E-mail.                        25

16    Exhibit G   Composer's Agreement.          26

17    Exhibit H   Contract.                      46

18    Exhibit I   E-mail.                        56

19    Exhibit J   Labrador Entertainment Inc.'s Response.  59

20    Exhibit K   Complaint for Damages.         109

21    Exhibit L   Amended Answer to Complaint.   109

22    Exhibit M   Judgement.                     145

23    Exhibit N   Labrador Entertainment, Inc.'s Responses.  150

24    Exhibit O   E-mail.                        154

25


                                            Page 5
```

```
 1                TUSTIN, CALIFORNIA, MONDAY, DECEMBER 2, 2019

 2                     11:27 a.m.

 3

 4                     NOEL WEBB,

 5     having been administered an oath, was examined and testified

 6     as follows:

 7

 8                     EXAMINATION

 9

10     BY MR. JACOBSON:

11        Q    Could you please state your name and spell your last

12     name?

13        A    Noel Palmer Webb, Palmer is P-A-L-M-E-R, last name

14     is W-E-B-B.

15        Q    Thank you.  My name is Dan Jacobson, and I represent

16     Michael Cohen in this case.  Without going into -- into

17     details of what was said, have you had some time to talk to

18     your attorney about the deposition process?  Have you talked

19     to your attorney about the deposition process?

20        A    Somewhat, yeah.

21        Q    Okay.  Let me go through some things.  First of all,

22     if you ever need a break, if you ever need to speak with your

23     attorney, let me know and you can -- we'll find a room for

24     you or you can -- there's a bathroom and all -- we've got all

25     sorts of good facilities here.
```

```
 1        A    Good.  Thanks.

 2        Q    When this is completed, this being our conversation,

 3   it will be put into a notebook and the -- however we do it,

 4   the attorney will decide if you'll have a chance to review or

 5   not review what was in there.  And we may agree that she --

 6   that you can make changes.  If you make changes, I can -- I

 7   or another attorney in the case can comment on that and it

 8   can look funny.  So try to do your best to tell the truth

 9   today.

10        A    Okay.  Good.

11        Q    Have you taken any medication in the past 24 hours

12   that would affect your ability to tell the truth today?

13        A    No.

14        Q    Because there's a record, a written record of what

15   we are saying, verbatim written record that's being taken

16   down as I speak, it's important that only one of us speaks at

17   a time.  So you have to wait until I finish my question, and

18   I have to wait until you finish your answer.  And the reason

19   for that is just very simple logistical reason, the court

20   reporter can't take down two conversations at the same time.

21   We'd have to have two or three court reporters.  I was barely

22   able to rustle up this fine woman this morning.  So if you'll

23   do that, I'd appreciate it.  So with that, I'd just like to

24   get started.

25             I want to show you a document and ask -- and take
```

Page 7

```
 1    your time, I want to know if you've seen this.  And I'm going

 2    to give you that, give a copy to your lawyer, and give a copy

 3    to Ms. Blaise, to the court reporter, and to me.

 4             MS. BLAISE:  Are we marking this?

 5             MR. JACOBSON:  Yes.

 6             THE WITNESS:  Okay.

 7    BY MR. JACOBSON:

 8        Q    Have you seen this document before?

 9        A    Yes.

10        Q    And we've already established that you are Noel

11    Webb.

12        A    Mm-hm.

13        Q    I would like to mark this document, which is the

14    amended notice of deposition of Noel Webb and request for

15    production of documents, as Exhibit A.

16             (Deposition Exhibit A marked for identification by

17              the court reporter.)

18             MR. JACOBSON:  Can we please go off the record for

19    just a moment?

20             (Break in deposition.)

21             (Discussion off the record.)

22    BY MR. JACOBSON:

23        Q    In what we've now marked as Exhibit A, there is a

24    request that you bring with you any documents, records or any

25    materials that relate to any Labrador obligation,
```

Page 8

1    parenthetical, S, parenthetical, Michael Cohen, pursuant to

2    that, quote, consumer agreement, quote, dated -- excuse me,

3    that's composer agreement, dated 02/14/08 and is attached as

4    Exhibit A, that at all relate to Eminem-Esque.  And

5    Eminem-Esque is in quotations, and it's spelled with small

6    letters, E-M-I-N-E-M, hyphen, E-S-Q-U-E.

7         Do you have any documents that you brought regarding

8    that?

9       A    No.

10      Q    Okay.  Does that mean that you don't have any

11   documents or -- and this may be a question for your attorney,

12   actually, whichever way you want to take it, any documents

13   regarding that or do you feel that they've all been produced

14   or --

15        MS. OHIRI:  Documents that were in Mr. Webb's

16   custody, control or possession have already been produced.

17        MR. JACOBSON:  Thank you very much.  I'm going to

18   move on to what we'll mark as Exhibit B.  And I'll give you a

19   copy of that, your attorney the same, Ms. Blaise the same, a

20   copy to the court reporter, and a copy for me.

21        (Deposition Exhibit B marked for identification by

22          the court reporter.)

23   BY MR. JACOBSON:

24      Q    And take your time and look at that and let me know

25   if you know what that is.

                                                    Page  9

```
 1        A     What is the second half of it?

 2        Q     Exhibit B?

 3        A     Exhibit B.

 4        Q     Exhibit B to Exhibit B appears to be a cross

 5    claimant Michael Cohen's request for production to

 6    cross-defendant Labrador Entertainment, Inc.

 7        A     Is this the production -- request for production of

 8    documents or is it interrogating questions?

 9        Q     It's a request for production of documents.

10        A     Okay.  Thank you.

11        Q     Have you seen this --

12        A     Yes.

13        Q     And are you, in fact, the person most knowledgeable

14    from Labrador Entertainment, Inc. about any Labrador

15    obligation, parenthetical, S, parenthetical, Michael Cohen,

16    pursuant to that, quote, composer agreement, unquote, dated

17    02/14/08, and as attached -- and attached hereto as Exhibit A

18    that at all relate to, quote, Eminem-Esque, unquote.  Are you

19    that person?

20        A     Where did you get the date that you just referred

21    to?

22        Q     From the composer agreement.

23        A     Would you repeat the date again?

24        Q     02/14/08.

25        A     Okay.  Thank you.  Yes, I am.
```

                                                        Page 10

```
 1      Q    Okay.  Great.  And again, I think this is probably a
 2   question for your counsel, the request for production of
 3   documents that's attached hereto, has everything been
 4   produced?
 5           MS. OHIRI:  Yes, to the extent that it was in his
 6   possession, custody and control, those documents have been
 7   produced.
 8           MR. JACOBSON:  Thank you.
 9   BY MR. JACOBSON:
10      Q    Do you understand that we're deposing you today, at
11   this event today, both as your -- in your capacity as Noel
12   Webb and in the capacity as the person most knowledgeable for
13   those things that I just stated?
14      A    No.  What do you mean by that?
15      Q    Well, the -- you're certainly here as Noel Webb, do
16   you understand that?
17      A    Okay.  Yeah.
18      Q    But you're also here as Labrador Entertainment,
19   Inc.?
20      A    Yes.
21      Q    And the person most knowledgeable about those things
22   that I just said; is that right?
23      A    Right.  I'm not sure what you mean -- I know it
24   might be a ridiculous question, I'm here as Noel Webb, I'm
25   here as Labrador Entertainment's person most knowledgeable.
```

Page 11

```
 1        Q    Thank you.

 2        A    Okay.  Good.

 3        Q    What is Labrador Entertainment, Inc.?

 4        A    It's a corporation that has d/b/as that facilitate

 5   music in the music production industry.

 6        Q    Is it fair to say that Labrador is a music

 7   library?

 8        A    No.

 9        Q    How would you describe the business of Labrador?

10        A    Labrador Entertainment, Inc. has d/b/as that are --

11   that are music libraries.

12        Q    I see.  And Labrador controls all of those music

13   libraries; is that correct?

14        A    Yes.

15        Q    Just so that -- for your information, when I refer

16   to Labrador in general as we speak today, I'm referring to

17   the d/b/as also.

18        A    Got it.  Oh, okay.

19        Q    What is a music -- well, do you know what a music

20   library is?

21        A    Yes.

22        Q    What is a music library?

23        A    It's a entity that is defined by an Excel file that

24   delineates what is in -- different pieces, music pieces in

25   it, and that music library solicits or markets its music to
```

Page 12

1    end users or producers or it offers it to sub-publishers or

2    agents to do the same.

3         Q    What's a sub-publisher?  Do you know what a

4    sub-publisher is?

5              MS. BLAISE:  Hold on.  Off the record for a second.

6              (Break in deposition.)

7              (Discussion off the record.)

8    BY MR. JACOBSON:

9         Q    So do you know what a music library is?

10        A    Yes, I just answered that, yeah.

11        Q    And what is a music library?

12        A    Didn't I just answer that?

13        Q    Oh, yeah.  So excuse me, it's been -- I worked an

14   Thanksgiving, on Thanksgiving weekend, but so did your

15   counsel, and I explained to her that she's going to have to

16   continue to do that for the next 30 years.

17             So that's -- in any case, do you know who Pete baker

18   is?

19        A    Yes.

20        Q    And who is Peter Baker?

21        A    Peter Baker is either the owner or co-owner of

22   Beatbox Music, which is a sub-publisher of mine, representing

23   territories in Australia, New Zealand.

24        Q    Do you know what a sub-publisher is?

25        A    Yes.

Page 13

```
 1          Q     What is a sub-publisher?

 2          A     A sub-publisher really investigates -- a

 3    sub-publisher represents a publisher in territories that's

 4    designated.

 5          Q     Thank you.  Is it correct to say that Labrador is in

 6    the music industry?

 7          A     Yes.

 8          Q     How long -- and how long have you been associated

 9    with Labrador?

10          A     I think 19 years.

11          Q     Were you -- and for all that time, Labrador was in

12    the music industry?

13          A     Yes.

14          Q     Were you, yourself, in the music industry before

15    that?

16          A     Yes.

17          Q     What capacity were you in the music industry before

18    that?

19          A     I'm a violinist and I performed, and I was a

20    composer.

21          Q     Do you know what in the music industry is a cue,

22    C-U-E?

23          A     Yes.

24          Q     What is a cue?

25          A     It's a general term that refers to a music piece.
```

Page 14

```
 1          Q     Is a song an example of a cue?

 2          A     Yes.

 3          Q     Is a composition of sample -- an example of a music

 4    cue?

 5          A     Yes.

 6          Q     In the music industry, my understanding is that

 7    ASCAP is prominent in the United States; am I correct?

 8          A     Prominent?

 9          Q     Yes.

10          A     I don't know what that means.

11          Q     Do you know what ASCAP is?

12          A     Yes.

13          Q     What is ASCAP?

14          A     ASCAP is a performance rights organization who

15    collects -- debt collects monies from producers when they

16    utilize a broadcasting -- when they utilize music for an art

17    project.

18          Q     And does ASCAP limit its -- its jurisdiction to

19    certain territory, for instance, the United States?

20                MS. OHIRI:  Objection.  Form.  Vague.

21    BY MR. JACOBSON:

22          Q     You can answer, if you can.

23          A     What do you mean by limit?

24          Q     Does ASCAP only work, to which you described, in a

25    certain territory, like the United States?
```

Page 15

```
 1              MS. OHIRI:  Same objection.

 2              THE WITNESS:  Yeah, I don't know.

 3      BY MR. JACOBSON:

 4         Q    Okay.  What does ASCAP do with the money that it

 5      collects, if you know?

 6         A    I think --

 7              MS. OHIRI:  Wait, he didn't instruct earlier, but I

 8      don't want you to speculate or guess.

 9              THE WITNESS:  Okay.  I don't know.

10              MR. JACOBSON:  Yeah, I should probably do that.

11      BY MR. JACOBSON:

12         Q    Let me explain something.  We're certainly not

13      entitled to your guess, your speculation, we are entitled to

14      your knowledge and to your best estimate.  And the -- the

15      difference between a guess and an estimate is that for a

16      guess, you have no factual under opinion; for an estimate,

17      you do.  The example that lawyers often give is this, if I

18      were to ask you to estimate the length of the table in this

19      conference room, you could -- you could probably do that

20      without getting out a ruler because you can see it, you have

21      some factual under opinion for your answer; if I were to ask

22      you to -- to estimate the length of the table in my dining

23      room, you couldn't do that, because you've never been in my

24      dining room.  So that's the difference.

25              With that having been said, do you have an estimate
```

Page 16

1    of what ASCAP does with the money that it collects?

2         A    Yes.

3         Q    And what is that?

4         A    It keeps some of it for its own profit, some of it,

5    a percentage, and it distributes the rest to publishers and

6    composers.

7         Q    Okay.  Are you familiar with an organization called

8    AMCOS New Zealand?  A-M-C-O-S, all caps.

9         A    Familiar, yes.

10        Q    Is it sort of the -- does it do sort of the same

11   thing as ASCAP does in the United States, but for broadcasts

12   that are done in New Zealand?

13        A    My best estimate about this is that it does do some

14   of that, it's the same organization, and I don't know who

15   runs that, I have no idea.

16        Q    I understand that there's an organization called

17   AMCOS, spelled the same way, Australia, would your answer be

18   the same for AMCOS Australia?

19        A    Did you just ask about AMCOS, another AMCOS?

20        Q    AMCOS New Zealand.

21        A    Oh, I'm so sorry.  It's the same answer.

22        Q    It's the same answer for both New Zealand and

23   Australia?

24        A    Yes.

25        Q    Okay.  Thank you very much.  When we see the

Page 17

```
 1    initials capital P, capital R, capital O in relation to its

 2    industry in which you are engaged, what does that mean?

 3         A    Performance Rights Organization.

 4         Q    Like ASCAP; correct?

 5         A    Like ASCAP.

 6         Q    Thank you.  Are you familiar with an organization

 7    called Music Box MX?

 8         A    Mm-hm.

 9         Q    Is that a --

10         A    Yes.

11         Q    Oh, another thing, I keep --

12         A    Sorry.

13         Q    Your attorney probably told you this, try to say yes

14    or no.

15         A    Yes.

16         Q    And I'm not being, as -- I'm not being a school mom

17    if I say, now, is that a yes, I'm just trying to keep the

18    record straight.  So what is Music Box MX?

19         A    Music Box is a sub-publisher in the United States,

20    and perhaps elsewhere, but I'm not sure.

21         Q    Do you have a relationship with Music Box?

22         A    No.

23         Q    I'm sorry, I should be careful about this, is it

24    correct to say that neither you as Mr. Webb or you as

25    Labrador have no relationship with Music Box?
```

Page 18

1              MS. OHIRI:  Objection.  Form.  Compound.

2              THE WITNESS:  I don't know how to answer that.

3      BY MR. JACOBSON:

4         Q    Do you personally have a -- you personally as

5      Mr. Webb have a relationship with Music Box?

6         A    No.

7         Q    Does Labrador have a relationship with Music Box?

8         A    No.

9         Q    Thank you.  I'm going to mark something as Exhibit

10     C.  It is an e-mail from Noel Webb to Peter at -- yeah, at

11     beatboxmusic.com.  And I'll give you a copy.  It's very

12     short.  And I'll pass around copies to the usual suspects.

13             (Deposition Exhibit C marked for identification by

14              the court reporter.)

15     BY MR. JACOBSON:

16        Q    Does Exhibit C have anything to do with

17     Eminem-Esque?

18        A    I don't know.

19        Q    Okay.  Are you familiar with a composition called

20     Eminem-Esque?

21        A    Yes.

22        Q    Was that written by Michael Cohen, my client?

23        A    Yes.

24        Q    So the next document I'm going to hand is a one-page

25     document that appears to be on AMCOS stationary and it says,

                                                    Page 19

```
1    tax invoice copy.  If I could just take a look at that, and

2    let me hand this out to your lawyer, Ms. Blaise, to the court

3    reporter.

4             (Deposition Exhibit D marked for identification by

5              the court reporter.)

6             MS. BLAISE:  This is going to be Exhibit D?

7             MR. JACOBSON:  D, yes.  D, please.

8    BY MR. JACOBSON:

9        Q    Have you ever seen this before?

10       A    Yes.

11       Q    And what is it?

12       A    I think it's a license agreement between AMCOS and

13   the National Party, New Zealand.

14       Q    I see.  There are monies referenced -- it appears

15   that there are monies referenced because it says fees,

16   nontaxable wealth, which is zero, then it says fees, taxable,

17   and it has numbers down there.

18            Do you know if those are Australian dollars,

19   American dollars, New Zealand dollars?

20       A    No.

21       Q    Do you know if it, in fact, is money that's

22   referenced in the second to the last column or estimate that

23   it is?

24       A    Yes.

25       Q    So it looks like, if we look horizontally from
```

Page 20

```
 1    170.00, whatever monetary value that is, it appears that it's

 2    the fee for the license fee, do you see that?

 3         A    I see it.

 4         Q    And then under that, it says, processing fee, and

 5    that's 11.00 and whatever monetary value we're using here, do

 6    you see that?

 7         A    Yes.

 8         Q    And do you know what licensing fee is referenced?

 9    Is this the fee, for instance, charged by AMCOS to the

10    National Party, do you know what it references?

11         A    No, I don't.

12         Q    All right.  Did Labrador get any of the money that's

13    referenced in Exhibit D?

14         A    I don't know.

15         Q    Okay.  The next document is three pages, but -- and

16    take your time and take a look at that, it also appears to be

17    on AMCOS stationary.  And also says, tax invoice copy, but it

18    specifically does reference what you've described as a song,

19    Eminem-Esque, written by Mr. Cohen.

20         A    Can I ask my attorney something?

21         Q    Yeah.

22         A    It doesn't need to be --

23         Q    Yeah.  We can just go off the record, or if you'd

24    like to step outside.

25              MS. OHIRI:  Let's go off the record.
```

Page 21

```
 1              (Break in deposition.)

 2              (Discussion off the record.)

 3              MR. JACOBSON:  I'm marking this document as Exhibit

 4    E.  Off the record.

 5              (Deposition Exhibit E marked for identification by

 6               the court reporter.)

 7              (Break in deposition.)

 8              (Discussion off the record.)

 9              THE WITNESS:  I wanted to clarify you, when you have

10    continued to use the definition of a cue as being a song,

11    when it's other things besides a song.

12    BY MR. JACOBSON:

13        Q    Oh, what else is it?

14        A    It's something less than a song, it's simply just a

15    reference to a piece of music that can be anything.

16        Q    I see.  But it could be a song also?

17        A    Yes, it could, yes, it could.

18        Q    So -- and Eminem-Esque is a song; is that correct?

19        A    In my opinion, no.

20        Q    What is Eminem-Esque, in -- as you would describe it

21    in a category, like song or --

22        A    I think I'd like to correct myself, it could be a

23    song, I don't know.

24        Q    Can you think of any other category similar to song

25    that you would call it?
```

Page 22

```
 1        A     That's why the word cue is used just to refer it to

 2     a piece of music, that it's anything that you want it to

 3     be.

 4        Q     So if we could, then, look at Exhibit E, and again,

 5     there appears to be a licensing fee and a processing fee

 6     referenced or more than one, many, several, did Labrador get

 7     any of this money?

 8        A     I don't know.

 9        Q     Did Mr. Cohen get any of this money?

10        A     I don't know.

11        Q     Can you tell from this Exhibit E who was charged

12     this money?

13        A     To the best of my knowledge, it's the National Party

14     of New Zealand.

15        Q     And to the best of your knowledge, would the charged

16     party be charged by AMCOS?

17        A     Yes.  Now I'm seeing on the top left, a Sales Street

18     Studios, which may very well be the recipient or the

19     negotiator, the person that I was talking with.

20        Q     And Sales Street may have --

21        A     Facilitated.

22        Q     -- facilitated, and may have gotten some of this

23     money; correct?

24        A     I have no idea.  I don't know.

25        Q     Okay.  I'll give you another piece of paper and mark
```

Page 23

1      it as Exhibit F.

2              (Deposition Exhibit F marked for identification by

3              the court reporter.)

4      BY MR. JACOBSON:

5          Q    Take your time.  That's an e-mail -- well, it's an

6      e-mail string and the first one -- excuse me, the way these

7      things go, the last one, I guess, the one on the top of the

8      exhibit, which is a five-page exhibit.  I'm sorry, a

9      three-page exhibit.  Are you familiar with this string?

10     It's -- the top -- the top e-mail on the first page of the

11     exhibit is from Peter Baker, re: new music Spider Cues, and

12     it says, hi, Noel.

13             Are you familiar with that?

14         A    Yes.

15         Q    Are you -- did you receive the -- this -- this

16     e-mail that I just described?

17         A    Yes.

18         Q    My reason for bringing this up is on the second page

19     of the exhibit under 5C, it says, each cue needs

20     alternatives, and alternatives is in quotes.

21             Do you see that?

22         A    Yes.

23         Q    All right.  So my question is, very simple, did

24     Eminem-Esque, as provided by Mr. Cohen, have any

25     alternatives?

                                                        Page 24

1        A     No.

2        Q     Thank you.

3              MS. BLAISE:  Do you mean -- the word is alternates,

4     not alternatives.

5              MR. JACOBSON:  Excuse me, when one learns to read

6     the English language, as Ms. Blaise has, alternates as

7     opposed to alternatives.

8     BY MR. JACOBSON:

9        Q     So with that correction, is your answer the same?

10       A     Yes.

11       Q      In my household, we speak English, Vietnamese, and

12    a bit of Yiddish.  So we sometimes get a little confused.  He

13    says very defensively.  Off the record.

14             (Break in deposition.)

15             (Discussion off the record.)

16             (Ms. Nassar entered deposition proceedings.)

17             MR. JACOBSON:  Now, this next document, I'm going to

18    count the pages, excuse me for just a moment.  It's 10 pages,

19    and it is entitled, Composer's Agreement.  It has stamped on

20    it Exhibit A, but that's from some bygone -- for some bygone

21    reason that doesn't appear to be part of the original of

22    this.  Take your time and take a look at that, and I'll ask

23    you some specific questions about it for which I'll give you

24    of course as much time as you need.

25             (Deposition Exhibit G marked for identification by

                                                      Page 25

```
 1                 the court reporter.)

 2    BY MR. JACOBSON:

 3        Q    All right.  Do you recognize this document?

 4        A    Yes.

 5        Q    And what is this document in your understanding?

 6        A    This is a contract between Labrador Entertainment

 7    and Michael Cohen.

 8        Q    It says that it was entered into on February 14,

 9    2008, does that comport with your general understanding?

10        A    Yes.

11        Q    Each of these pages has, in handwriting, MC, and

12    then there's a mark underneath that.  Is the mark underneath

13    that yours?

14        A    Yes.

15        Q    And why did you mark that?

16        A    So that each page has its initials and then

17    approved.

18        Q    Was it a sign of a sent to or to -- what's on each

19    page?

20             MS. OHIRI:  Objection.  Mischaracterizes earlier

21    testimony.

22             THE WITNESS:  I think --

23    BY MR. JACOBSON:

24        Q    Why did you make the mark?

25        A    I think it says that that was viewed by the
```

Page 26

1    individuals who initialed it.

2        Q    Thank you.  What does it say, by the way, it looks

3    like a Z?

4        A    It's an NW, supposedly.

5        Q    When I write -- when I sign my name, in my view, I'm

6    writing Dan Jacobson, and no one but me would know that.  So

7    I understand.  Please look at page -- I'm not sure what page

8    it is because it's not -- the pages aren't numbered, but it's

9    about five or so.  Anyway, it's paragraph one, assigning.  Do

10   you see that?

11       A    Yes, I do.

12       Q    All right.  If you could, please read that to

13   yourself with -- and I'm going to ask you about 1.1E.  And

14   take your time.

15       A    Okay.

16       Q    Would you agree that A through E are enumerated

17   rights that this agreement allows to be assigned?

18            MS. BLAISE:  Objection.

19            MS. OHIRI:  Objection.  Calls for a legal

20   conclusion.

21            MS. BLAISE:  Same objection.

22   BY MR. JACOBSON:

23       Q    If you can --

24       A    I don't know what enumerate means.

25       Q    Okay.  What are A through E, what do they describe,

Page 27

1    in your mind, in your understanding?

2            MS. OHIRI:  Objection.  Compound.

3            MS. BLAISE:  Same objection.

4            THE WITNESS:  Partial --

5    BY MR. JACOBSON:

6        Q    If they describe any particular category.  So let me

7    start over.  If A through E, in your mind, describe any

8    particular category, what is that category?

9            MS. OHIRI:  Objection.  Form.  Vague.

10            MS. BLAISE:  Objection.  Compound question.  Same

11    objection.

12            MS. OHIRI:  Could we possibly break it up?

13            THE WITNESS:  Hold on.  A partial description of

14    rights.

15    BY MR. JACOBSON:

16        Q    Thank you.  You said partial, can you say -- do you

17    know what the other part of rights are, is?

18            MS. OHIRI:  Objection.  Form.  Vague.

19            MR. JACOBSON:  Well, that's a good point.

20    BY MR. JACOBSON:

21        Q    Why do you say partial?

22        A    Because there are other statements in the contract

23    that may qualify those particular sentences.

24        Q    Thank you.  So now I'm going to do what I said I was

25    going to do before, and that's talk about 1E -- or 1.1E.  And

                                                    Page 28

```
 1      I'll start with 1.1, which says, composer -- by the way, when

 2      we refer to composer, when you refer to -- when the -- when

 3      this document refers to composer, is that Michael Cohen?

 4           A    Yes.

 5           Q    And when the document refers to owner, is that

 6      Labrador?

 7           A    Yes.

 8           Q    Okay.  Composer hereby grants to owner and its

 9      assigns -- by the way, would a sub-publisher be an

10      assigned?

11           A    Yes.

12           Q    Exclusive worldwide rights, title and interest

13      throughout the world.  And then in parenthesis, it says,

14      quote, territory, unquote.  And -- in and to the composition,

15      parenthetical, S, parenthetical, parenthetical, except

16      copyright, parenthetical, in perpetuity, period.  Owner's

17      rights will include, but will not be limited to, colon.  And

18      then if we go down to E, it says, the right to alter, expand,

19      adapt, and translate the -- I believe the next word is

20      misspelled, but I believe it's composition, and then with an

21      S at the end in parenthesis, is that correct --

22           A    Yes.

23           Q    That word is composition?

24           A    Yes.

25           Q    In consultation with composer.  So let me repeat
```

Page 29

```
 1    that without the explanations of the punctuation.  Composer

 2    hereby grants to owner and its assigns exclusive worldwide

 3    rights, title and interest throughout the world, territory,

 4    in and to the composition, except copyright in perpetuity.

 5    Owner's rights will include but not be limited to, E, the

 6    right to alter, expand, adapt, and translate the compositions

 7    in consultation with composer.

 8            Did Labrador alter or adapt Eminem-Esque?

 9       A    No.

10       Q    By the way, is Eminem-Esque covered by this

11    exhibit?

12            MS. OHIRI:  Objection.  Form.  Vague.

13            THE WITNESS:  What do you mean by covered?

14            MR. JACOBSON:  That's a good point, by both of

15    you.

16    BY MR. JACOBSON:

17       Q    Is Eminem-Esque listed in the first few pages of

18    Exhibit G?

19       A    Yes.

20       Q    And what does -- what is the significance of having

21    a cue listed in the beginning pages of Exhibit G?

22       A    So that it can be -- so the list can be copied into

23    an Excel file to be part of the definition of a music

24    library, in this case Spider Cues, and to the best of what

25    one can do, had a name and a duration, how long it is.
```

Page 30

```
 1        Q    Is it correct that the terms of Exhibit G govern

 2   the -- what Labrador is allowed to do with the cues that are

 3   listed in the first few pages of Exhibit G?

 4             MS. OHIRI:  I'm going to object to the form as

 5   vague.

 6             THE WITNESS:  I don't know that it encompasses all

 7   the rights.

 8   BY MR. JACOBSON:

 9        Q    But the rights that are in there, the terms that are

10   in there, do govern those cues that are listed; is that

11   correct?

12             MS. OHIRI:  Objection to the term there.  Can you

13   clarify?

14             THE WITNESS:  I don't know what govern means.  Is

15   govern totality or is govern some aspect of it?

16   BY MR. JACOBSON:

17        Q    Some aspect of it.

18        A    Ask the question again, then.

19        Q    So with that understanding of govern, does the

20   listing of a cue in the first few pages of Exhibit G mean

21   that such cue is covered by the terms of Exhibit G?

22        A    Yes.

23        Q    And now I'm going to go back to 1.1E.  Do you want

24   to read it again or do you want me to read it again?

25        A    No, thank you.
```

Page 31

```
 1          Q    Okay.  Did Labrador alter or adapt Eminem-Esque?

 2          A    No.

 3          Q    Did Labrador inform its assigns that it had the

 4     right as stated in 1.1E that the -- that Labrador had the

 5     right to make the assignment as stated under the right, under

 6     the term, that's in 1.1E?

 7               MS. BLAISE:  Objection.  Form.  Vague.

 8               MS. OHIRI:  Same objection.

 9               THE WITNESS:  I don't understand what you're

10     asking.

11     BY MR. JACOBSON:

12          Q    Did Labrador inform any of its assigns of the

13     language or the meaning of 1.1E?

14          A    What do you mean by inform?

15          Q    E-mail, somehow communicate, talk, somehow

16     communicate?

17          A    Would inform also be -- is your meaning also that

18     with a standard contract between a publisher and a

19     sub-publisher or a library and a sub-publisher?

20               MS. OHIRI:  Wait, if you don't understand the

21     question, ask him to rephrase it.

22               THE WITNESS:  Yeah, I don't understand the

23     question.

24     BY MR. JACOBSON:

25          Q    So let me start with the basic question and then
```

                                                      Page 32

1    move on.  Did Labrador inform any of its assigns to whom it

2    assigned the rights pursuant to Exhibit G of the language or

3    the meaning of 1.1E?  With that having been said, would you

4    like me to explain what I mean by inform?

5        A    Yes.

6        Q    Somehow communicate, whether it be to give the

7    assign Exhibit G or to verbally, orally state the -- the

8    language or the meaning of 1.1E or to write it in a letter or

9    to write it in an e-mail, a text, somehow communicate?

10       A    Sometimes you can communicate a right or not having

11   a right by not stating it.

12       Q    Did that happen here?

13       A    What I just said?

14       Q    Yes.

15       A    Yes.

16       Q    And how did that happen?

17       A    A --

18       Q    I'm sorry, I apologize, how did that happen

19   specifically -- was Beatbox one of the assigns?

20       A    Yes.

21       Q    How did that happen specifically with Beatbox?

22            MS. BLAISE:  Objection as to form.  It's ambiguous.

23   I don't even know what you're asking.

24            MS. OHIRI:  Same objection.

25   BY MR. JACOBSON:

Page 33

1        Q    Whatever you said, was that done with Beatbox?

2        A    Yes.

3        Q    How was that done?

4        A    I did not give the right to Beatbox to alter,

5    expand, adapt, and transmit the composition -- to -- with my

6    best knowledge of what those words mean.

7        Q    Do you base that on your 2009 contract with --

8    excuse me, does -- when you say you, you mean Labrador; is

9    that correct?

10       A    Yes.

11       Q    Does Labrador base that non-giving of a right on its

12   2009 contract with Beatbox?

13       A    Yes.

14       Q    Thank you.

15       A    Can I ask you a question?

16            MS. OHIRI:  Can we go off the record for a minute?

17            MR. JACOBSON:  Yeah.

18            MS. OHIRI:  Sorry.  I need a restroom break.

19            (Break in deposition.)

20            (Discussion off the record.)

21   BY MR. JACOBSON:

22       Q    Mr. Webb, again referring to Exhibit G, under

23   paragraph two, payments, could you generally describe what

24   your understanding of what percentage of -- well, of what

25   Mr. Cohen would get paid for the publication of

                                                    Page 34

```
 1    Eminem-Esque?

 2        A    I want to go back to the previous question.

 3        Q    Please.

 4        A    You said something -- some design of a sentence

 5    about the Beatbox contract, and you used a word for -- it

 6    wasn't govern, but something else, sometimes you ask me

 7    things that are -- can be all encompassing or partial, and

 8    I'm not sure how to answer that.

 9        Q    So do you need to restate your answer?

10        A    What was the question, though?

11        Q    Was it the last question?

12        A    You said something like, if I may, are you referring

13    to the contract between Labrador and Beatbox as governing,

14    you didn't use the word governing, but governing what your

15    answer is and --

16            MS. OHIRI:  Can we just have the court reporter read

17    back the question, maybe?

18            MR. JACOBSON:  I think that would be great.

19            (Record read.)

20            THE WITNESS:  That's the question.  So whether it's

21    solely or not solely, the answer is yes, but it could be

22    based on other things as well.  That's all.

23            MR. JACOBSON:  Thank you.

24    BY MR. JACOBSON:

25        Q    Was it in -- was the non-assignment of the right
```

Page 35

```
 1   mentioned in 1.1E assigned to Beatbox in any or non-assigned

 2   to Beatbox in anything other than the 2009 Labrador, Beatbox

 3   contract?

 4           MS. BLAISE:  Objection.

 5           MS. OHIRI:  Objection.  Form.  Compound.  Vague.

 6           MS. BLAISE:  Legal conclusion.  Not established in

 7   the testimony.

 8   BY MR. JACOBSON:

 9       Q    To your knowledge.

10       A    Yes.

11       Q    And what was that or what were those things?

12       A    What I would call the standard of the industry.

13       Q    And you've been in this industry for decades; is

14   that correct?

15       A    I wouldn't say decades, but I've been in the

16   industry for a while.

17       Q    Certainly Beatbox has been around for about 19

18   years; is that right?

19           MS. BLAISE:  Objection.  Foundation.

20           THE WITNESS:  Did you mean Labrador?

21   BY MR. JACOBSON:

22       Q    I'm sorry, Labrador.

23       A    Yes.

24       Q    And you have been associated with Labrador for that

25   long; is that right?
```

Page 36

```
 1        A    Yes.

 2        Q    All right.  To which standard in the industry are

 3   you referring?

 4        A    First, that a sub-publisher or an agent cannot have

 5   any rights unless they are given to them explicitly.  And

 6   second, that all, unless otherwise stated, all reference to a

 7   cue is the totality of a cue without losing its integrity,

 8   that's the standard of the industry.

 9        Q    Okay.  Starting with the first of these standards

10   that you mentioned, when you say explicitly, does it have to

11   be in writing?

12        A    Does what have to be in writing?  What I just

13   explained?

14        Q    The giving of a right.

15             MS. OHIRI:  I'm going to object, that calls for a

16   legal conclusion.

17   BY MR. JACOBSON:

18        Q    I'm asking about the -- I'm asking for an

19   explanation under the standard in the industry.

20        A    Oh, the standard of the industry is an understanding

21   of an industry, the history of those actions, and then

22   actions within that industry.

23        Q    And the history or understanding within the music

24   industry regarding the giving of a right or the assigning of

25   a right explicitly, does explicitly mean that it has to be in
```

Page 37

1    writing?

2         A    I don't understand the question.

3         Q    I guess my question is, in your answer, you used the

4    word explicitly, what do you mean by the word explicitly?

5         A    That a right can only be had by -- a right cannot be

6    assumed, unless it's a standard of the industry.

7         Q    In order for it to be properly assigned, under the

8    standard of the industry, does it have to be assigned in

9    writing?  I don't mean to give legal advice, but I don't know

10   is a perfectly fine answer.

11        A    Yeah, that's what I'm going to say is I don't know.

12   Thank you.

13        Q    And under the standard of the industry, if a right

14   is to be assigned, can it be assigned orally?

15             MS. BLAISE:  Objection.  Calls for a legal

16   conclusion.  It's also very ambiguous as to the term assigned

17   and how it's being used here.  It is a term of art, and there

18   should be some clarification before.

19             MS. OHIRI:  Same objection.

20   BY MR. JACOBSON:

21        Q    If you can answer.

22        A    What was the question, then?

23        Q    So under the standard of the industry, the -- can a

24   right be assigned orally?  And I assume the same objections?

25             MS. BLAISE:  Same objections and form and

                                                    Page 38

1    ambiguity.

2            MS. OHIRI:  Same objections.

3            THE WITNESS:  I think it depends on the form of the

4    territory, doesn't it?

5            MS. OHIRI:  Don't speculate or guess.

6            THE WITNESS:  Then I don't know.

7    BY MR. JACOBSON:

8        Q    Does it depend on the form or the territory?

9        A    I don't know.

10       Q    Is there any difference in this type of standard of

11   the industry between Australia and other parts of the

12   world?

13           MS. OHIRI:  Objection.  Calls for a legal

14   conclusion.

15           MR. JACOBSON:  To your knowledge.

16           THE WITNESS:  With reference to what?

17   BY MR. JACOBSON:

18       Q    The -- the method of assignment and the

19   appropriateness of that method.

20           MS. OHIRI:  Objection.

21           MR. JACOBSON:  And under the standard of the

22   industry.

23           MS. OHIRI:  Objection.  Calls for a legal

24   conclusion.  Calls for an expert opinion.

25           THE WITNESS:  I don't know.

Page 39

```
 1    BY MR. JACOBSON:

 2        Q    Okay.  Same question as to the United States.

 3             MS. OHIRI:  Same objection.

 4             MS. BLAISE:  Join that objection.

 5    BY MR. JACOBSON:

 6        Q    Same answer, I don't know?

 7        A    Same answer.

 8        Q    So have we gone through the methods of assignment

 9    under the -- that the standard of industry -- the standard in

10    the industry requires for the assignment of the right to a

11    cue?

12             MS. OHIRI:  Objection.  Form.  Vague.  Calls for a

13    legal conclusion.  Calls for an expert opinion.  Vague as to

14    methods and assigns.

15             MR. JACOBSON:  To your knowledge.

16             MS. BLAISE:  Same objection, and foundation.

17             THE WITNESS:  I don't know.

18    BY MR. JACOBSON:

19        Q    We've gone through writing, orally, and standard of

20    the industry for methods of assigning rights to a cue, are

21    there any others?

22             MS. OHIRI:  Objection.  Form.  Vague.

23             MS. BLAISE:  Calls for a legal conclusion.

24    Foundation.

25             MS. OHIRI:  Calls for an expert opinion.
```

```
 1              THE WITNESS:  I don't know.

 2      BY MR. JACOBSON:

 3         Q    Thank you.  So back to the question that I had

 4      originally started with.  If you could look at paragraph two,

 5      and it talks about payments.  What was your general

 6      understanding of how Mr. Cohen would get paid and how much he

 7      would get paid, percentage-wise or any other -- any other

 8      way?

 9              MS. OHIRI:  Objection.

10              MR. JACOBSON:  And take your time to read paragraph

11      two.

12              MS. OHIRI:  Objection.  Form.  Compound.

13              THE WITNESS:  The money that Labrador received is in

14      two parts, a sync license monies, sometimes called sync,

15      sometimes called license, sometimes called mechanicals, and

16      payments for performance.  The sync license monies, this

17      states that I would pay the -- that Labrador would pay the

18      composer 50 percent of what any -- his net, out of his net

19      received.  And the performance monies would be collected

20      by -- in his circumstance, ASCAP and sent to him through

21      them.  There's a -- there's a cause here about -- about sheet

22      music, which was never part of in any of our activities.  And

23      there's a clause here about lyrics that speaks for itself,

24      and then there's a clause here, 2.5.

25              MS. OHIRI:  Just answer the question.
```

Page 41

```
 1                THE WITNESS:  Yes.  So the other payment -- what was

 2      your question again?

 3      BY MR. JACOBSON:

 4          Q    Well, I think you have answered talking about one,

 5      the sync or license or mechanics, or mechanical payments, and

 6      two, the performance payments?

 7          A    Yes.

 8          Q    That's -- that's what Labrador would get, for

 9      Eminem-Esque; is that correct?

10          A    One or the other or both.

11          Q    And then Mr. Cohen was to be paid the percentage

12      listed of what Labrador got for those -- those -- those two

13      things; is that correct?

14          A    Net, yes.

15          Q    Was Labrador paid a sync license or mechanical

16      payment or more than one for Eminem-Esque?

17                MS. OHIRI:  Objection.  Form.  Compound.

18                THE WITNESS:  I don't know.

19      BY MR. JACOBSON:

20          Q    Do you have any documents that would show whether

21      that was so or not?

22          A    Only what I gave her.

23                MS. OHIRI:  No.

24                THE WITNESS:  Only -- only e-mails from Peter Baker

25      stating that he has withheld money.
```

Page 42

1          MS. BLAISE:  For the record, when the witness was

2     answering, only what I gave her, he pointed to his attorney

3     sitting to his right.

4     BY MR. JACOBSON:

5          Q    What did Peter Baker say in any e-mail about

6     withholding money?

7          MS. BLAISE:  Objection.  Form.  Ambiguous as to

8     time.  If there's a document you'd like him to review?

9     BY MR. JACOBSON:

10         Q    Relating to Eminem-Esque.

11         MS. BLAISE:  Same objection.

12         THE WITNESS:  That AMCOS, AMCOS, was holding back

13    monies from him with regard to this lawsuit.

14    BY MR. JACOBSON:

15         Q    Okay.  Are there any other documents that would help

16    you to identify whether Labrador received any of the payments

17    that -- types of payments that we've discussed in reference

18    to Eminem-Esque?

19         A    No.

20         Q    Did Labrador pay Eminem-Esque anything, any money,

21    for -- excuse me, let me start over.

22         Did Labrador pay to Mr. Cohen any monies relative to

23    Eminem-Esque?

24         A    I don't know.

25         Q    Do you have any -- do you know of any documents that

                                                      Page 43

1      would be able to answer that question?

2           A     Yes.

3           Q     And what are those?

4           A     Sorry, for Eminem-Esque specifically, no, no, the

5      answer is no.

6           Q     When you said yes, were you referencing maybe a

7      general payment for several cues?

8           A     Yes.

9           Q     Is it possible, from any sort of documentary or any

10     other type of evidence, to be able to breakdown that such a

11     payment to its, let's say, five cues and they are named A, B,

12     and C, D, and F?

13          A     To some degree, yes.

14          Q     So is it -- do you know of any document that has

15     reference to a payment -- a general payment for more than one

16     cue that you could view and say, yes, Eminem-Esque was

17     included -- Eminem -- payment for Eminem-Esque was included

18     here?

19               MS. OHIRI:  Objection.  Form.  Vague.

20               THE WITNESS:  Yes.

21     BY MR. JACOBSON:

22          Q     How would one identify those -- is it more than one

23     document?

24          A     I don't know.

25          Q     How would one -- how would I reference that one or

Page 44

1    more document?  What is it?

2         A    A statement from Beatbox.

3         Q    Have you produced in this litigation that one or

4    more document, that one or more statement or statements from

5    Beatbox?

6         A    I think so.

7         Q    If such a statement or statements exist, they would

8    have -- they -- Labrador would have indeed produced such; is

9    that correct?

10        A    Yes.

11        Q    I'm going to give you a document marked -- which I'm

12   marking as Exhibit H.  And I'm going to pass it around to the

13   appropriate folks.

14             (Deposition Exhibit H marked for identification by

15              the court reporter.)

16   BY MR. JACOBSON:

17        Q    Take your time and look at that.  I'm just going to

18   ask you if you've seen this and what it is.

19        A    Yes.

20        Q    You have seen this; is that correct?

21        A    Yes.

22        Q    And what is it?

23        A    It's a contract between Labrador Entertainment, Inc.

24   and Beatbox Party Limited.

25        Q    Paragraph one says -- oh, by the way, in this

                                                        Page 45

```
 1    document is, for the most part, publisher Labrador?

 2        A    No.

 3        Q    Who is publisher?

 4        A    The various publishers are listed here, reflective

 5    of the performance rights organization they were associated

 6    with.

 7        Q    Really?  Do you want to go off the record for a

 8    moment?

 9            MS. OHIRI:  Yeah.

10            (Break in deposition.)

11            (Discussion off the record.)

12    BY MR. JACOBSON:

13        Q    Okay.  So other than the explanatory notes on the

14    top of the first page of H, is publisher in this document

15    Labrador?

16        A    Yes.

17        Q    And is sub-publisher Beatbox?

18        A    Yes.

19        Q    Paragraph one says, the publisher hereby appoints

20    the sub-publisher as their sole sub-publisher in the license

21    territory for the introduction and exploitation.  And then I

22    think it goes on to say of -- well, it does go on to say, of

23    a catalog known as Spider Cues Music.

24            Spider Cues music is owned by Labrador; is that

25    correct?
```

                                                      Page 46

```
1        A    Correct.

2        Q    What is the license territory referenced?

3        A    What do you mean?

4        Q    It says, in paragraph one, that the appointment is

5   for the license territory, on the second line.

6        A    That phrase refers back to what is in, whereas the

7   territories of Australia, New Zealand, Figi.

8        Q    Thank you.  When you agreed to this contract, what

9   did you mean by introduction, which is in -- which is on the

10  third line of paragraph one, or is that -- well, I'll let the

11  question stand as is.

12           MS. OHIRI:  Objection.  Calls for a legal opinion

13  and conclusion.

14  BY MR. JACOBSON:

15       Q    Just what your intent was.

16       A    To introduce the recordings as they stand without

17  any loss of integrity.

18       Q    What do you mean by integrity?

19       A    The music cue needs to stand as it is introduced

20  originally in the recordings as referred to here, it's called

21  recordings.

22       Q    I see.

23       A    To present to the producers and end users and anyone

24  who would like to license it in its territory, in Beatbox's

25  territory, and to facilitate the necessity licensing
```

Page 47

1    obligations and responsibilities for -- within that

2    territory.

3         Q    On the same line, the sentence goes on to say, and

4    exploitation.  What was your intent -- what was your

5    understanding at the time that you made this agreement of the

6    word exploitation?

7         A    The same explanation that I just gave for

8    introduction.

9         Q    I see.  Is it correct to say that, in your

10   understanding at the time that you -- that you agreed to this

11   contract, the phrase introduction and exploitation means what

12   you had -- what you have just stated?

13        A    Yes.

14             MS. BLAISE:  Objection.  Calls for a legal

15   conclusion.

16             MS. OHIRI:  Same objection.

17   BY MR. JACOBSON:

18        Q    And does exploitation include the use of a cue?

19             MS. OHIRI:  Objection.  Calls for a legal opinion, a

20   legal conclusion.

21             THE WITNESS:  No.

22   BY MR. JACOBSON:

23        Q    Does publication -- I'm not referring to the

24   document right now, I'm just asking you a question, does

25   publication refer to the use of a cue?

Page 48

```
 1              MS. OHIRI:  Same objection.  Calls for a legal
 2     conclusion.
 3              MS. BLAISE:  Same objection.
 4              THE WITNESS:  Perhaps.
 5     BY MR. JACOBSON:
 6        Q    Okay.  Does -- in your experience in the industry,
 7     does publication include the broadcast of a cue?
 8              MS. BLAISE:  Same objection.
 9              MS. OHIRI:  Same objection.
10              THE WITNESS:  Yes.
11     BY MR. JACOBSON:
12        Q    When a -- in your understanding of what the -- what
13     you intended when you made this agreement, when you talked
14     about introduction and exploitation, it's correct to say that
15     it was the introduction and exploitation of a cue as it was
16     written by the composer; is that correct?
17              MS. BLAISE:  Objection.  Assumes facts not in
18     evidence.  Seeks parol evidence.  Calls for a legal
19     conclusion.  And vague and ambiguous.
20              THE WITNESS:  Yes.
21     BY MR. JACOBSON:
22        Q    Okay.  And once the sub-publisher -- oh, once a
23     sub-publisher transmitted the rights for a cue, would you
24     call that transition an assignment, what would you call
25     that?
```

Page 49

1           MS. OHIRI:  Objection.  Calls for a legal

2    conclusion.

3           THE WITNESS:  Can you ask that again?

4    BY MR. JACOBSON:

5       Q    I'm just looking for your language so that I can use

6    it appropriately.  So the sub-publisher, in this case,

7    Beatbox specifically, when it transmits the -- any sort of

8    right to someone in New Zealand or Australia or Figi, what

9    would you call that?  Would you call that an assignment, or

10   is there another word that's better?

11      A    Usually it would be calling it a -- licensing it,

12   but with regard to Australia, New Zealand, and some other

13   locations, there's an agent in the middle, AMCOS.  So what

14   Beatbox does with the cue as it relates to the end user, I

15   don't know that -- those terms.

16      Q    Would you understand the -- was -- in your

17   understanding, was Eminem-Esque licensed by Beatbox to

18   AMCOS?

19           MS. BLAISE:  Objection.  Foundation.

20           THE WITNESS:  I don't know.

21   BY MR. JACOBSON:

22      Q    In your understanding of the music industry, if a

23   cue was licensed from Beatbox to AMCOS, would we call that a

24   license?

25           MS. BLAISE:  Objection.  Calls for a legal

                                                    Page 50

```
 1    conclusion.

 2            MS. OHIRI:  Same objection.

 3            THE WITNESS:  That's what I don't know.

 4    BY MR. JACOBSON:

 5        Q    Is there another word that's fair to use?

 6            MS. OHIRI:  Same objection.

 7            THE WITNESS:  Perhaps sublicensing, subpublishing.

 8    I don't know what the contract between -- fully what the term

 9    would be called between Beatbox and AMCOS, what exactly that

10    is legally.

11    BY MR. JACOBSON:

12        Q    Before I forget, please turn to the final page on

13    Exhibit H, is your signature above the words Labrador

14    Entertainment, Inc.?

15        A    Yes.

16        Q    And I apologize for this, but let me just go back to

17    Exhibit G and ask a similar question.  Is your -- on the last

18    page of Exhibit G, is your signature above the typed words

19    Noel Webb?

20        A    Yes.

21        Q    Why -- you mentioned from introduction and

22    exploitation in your intent in coming to this agreement with

23    Beatbox included that the cue, at least between Labrador

24    and -- strike that.  I apologize.

25            You mentioned that in your understanding of what was
```

Page 51

```
 1    intended by you when you agreed to Exhibit H, introduction

 2    and exploitation included that a cue would be as the composer

 3    wrote the cue; do I recall that testimony correctly?

 4        A    Yes.

 5        Q    Did you have a reason for wanting to or deciding to

 6    require that the cue remain as is?

 7        A    Say that again.

 8        Q    Did you have a reason for agreeing or requiring that

 9    the cue remain as the composer wrote it?

10        A    Yes.

11        Q    What was that reason?

12        A    The manipulation of a cue can change the -- it can

13    create a new cue; if you manipulate a cue, you can create

14    literally an entirely different piece of music.

15        Q    And can you want that to happen?

16        A    No.

17        Q    Why?

18        A    Exploitation possibilities, the -- for one thing,

19    the ownership of the cue that was created would be in

20    question, which of course is delineated in the contract here

21    saying that's the cue that he wrote.

22        Q    When you say, exploitation possibilities, what do

23    you mean by exploitation in this answer?

24        A    To answer and acquire monies or the monies for the

25    use of that cue in a performance.
```

Page 52

1      Q     You say that the music could be manipulated, what do

2    you mean by the word manipulate in this sentence?

3      A     In the sentence I just said?

4      Q     Yes, that's correct.

5      A     Cutting up the sound in any manner to change the

6    design.

7      Q     And I'll try to stop here, but what do you mean by

8    design?

9      A     The way the cue plays audibly.

10     Q     Thank you.  Ultimately Eminem-Esque, how ultimately

11   was Eminem-Esque published to the public, in what format?

12     A     I don't understand what you're asking.

13     Q     Was it in a commercial?

14           MS. BLAISE:  Objection as to form and the legal

15   conclusion of published as a term of art and time and are we

16   talking about initial publication, are we talking about --

17           MR. JACOBSON:  That's fair.  And let me break it

18   down.

19   BY MR. JACOBSON:

20     Q     Beatbox licensed, or whatever word we're using,

21   Eminem-Esque to AMCOS; is that correct?

22           MS. BLAISE:  Objection.  Foundation.  Form.

23   Ambiguity.

24           MR. JACOBSON:  In your understanding.

25           THE WITNESS:  When you say, or whatever, the answer

                                                      Page 53

1     is yes.

2     BY MR. JACOBSON:

3         Q     And there were a series, to your understanding, four

4     or five different entities that got some right to

5     Eminem-Esque; is that right?

6         A     I think so.

7         Q     Okay.  Ultimately the National Party, the New

8     Zealand National Party, played at least a version of

9     Eminem-Esque in a television advertisement; is that

10    correct?

11        A     I don't know.

12        Q     Was Eminem-Esque ever broadcast in New Zealand, to

13    your knowledge, or a version of Eminem-Esque?

14        A     What does a version mean?

15        Q     Something that may have been altered or adapted.

16            MS. BLAISE:  Objection.  Foundation.  Little

17    conclusion.

18            THE WITNESS:  If you're asking me if some entity in

19    New Zealand used the Eminem-Esque cue written by Michael

20    Cohen as a basis to create some music piece of their own

21    liking and new design, I think so, yes.

22    BY MR. JACOBSON:

23        Q     Much better question than I asked.  I confer a law

24    degree on you.  You can have mine.

25            Was that entity of which you speak the New Zealand

                                                    Page 54

1     National Party?

2          A    Yes.

3          Q    Was the medium for that a television commercial?

4          A    I don't -- I don't -- I don't know.

5          Q    Okay.  Do you know what it was?

6          A    A video.

7          Q    Do you know if there were other things other than a

8     television commercial?

9          A    I know of an Internet -- yeah.

10              MS. OHIRI:  Objection.  Form.  Vague.

11              THE WITNESS:  I know of an Internet performance.

12    BY MR. JACOBSON:

13         Q    Could you please describe that Internet

14    performance?

15         A    I think it was a 30 second campaign ad put on the

16    Internet in New Zealand.

17         Q    Thank you.  Do you know what the Funk Appreciation

18    Society is?

19         A    Yes.

20         Q    And what is that?

21         A    That's Michael Cohen's own publishing company.

22         Q    I'm going to give you a one-page document which

23    we'll mark as Exhibit I.

24              (Deposition Exhibit I marked for identification by

25               the court reporter.)

                                                      Page 55

```
 1    BY MR. JACOBSON:

 2        Q    It appears to be an e-mail from Noel Webb to Nikki

 3    Roberts.

 4             MS. BLAISE:  H or I?

 5             MR. JACOBSON:  I.

 6    BY MR. JACOBSON:

 7        Q    To your knowledge, did Nikki Roberts work at

 8    Beatbox?

 9        A    To my knowledge, yes.

10        Q    So the question I had about this Exhibit I is the

11    last sentence, Michael Cohen, and then in parenthesis, Funk

12    Appreciation Society should not be paid publishing on these

13    cues.

14             Did these cues include Eminem-Esque?

15        A    I don't know.

16        Q    What do you mean by be paid publishing?

17        A    The -- Michael Cohen assigned all publishing rights

18    to Labrador Entertainment, Inc., and so all the music we

19    have, which is called recordings, on which we have -- we have

20    the right to collect all publishing rights and what was your

21    exact question.

22        Q    I think you've answered it.  You've answered it.

23        A    Okay.

24        Q    And I think I understand now, that -- is it correct

25    to say that what you mean was that Mr. Cohen should not be
```

Page 56

1    paid directly, Labrador should be paid, and if Mr. Cohen is

2    supposed to be paid, then Labrador would pay Mr. Cohen?

3              MS. BLAISE:  Objection.

4              MS. OHIRI:  Objection.  Mischaracterizes earlier

5    testimony.

6              THE WITNESS:  If you mean his publishing company

7    and/or his own person, yes.

8    BY MR. JACOBSON:

9        Q    Okay.  For reasons that I don't understand, or

10   remember, the next document, which I'll mark as J, I only

11   have one copy.

12             MS. BLAISE:  What is it?

13             MR. JACOBSON:  It's -- it is cross-defendant

14   Labrador Entertainment, Inc.'s Response to Cross-claimant

15   Michael Cohen's Interrogatories, Set One.  And my only

16   interest is in pages four -- page four.

17             MS. BLAISE:  I have my own.

18             MR. JACOBSON:  Do you have one?

19             MS. BLAISE:  Yeah.

20             MR. JACOBSON:  Page four.  So what I would like to

21   do is first show it to your attorney and let her -- and if

22   you would like me to make a copy, I will.

23             MS. OHIRI:  We're looking at response number one?

24             MR. JACOBSON:  Yes, that's right.

25             MS. BLAISE:  And this is going to be Exhibit J?

Page 57

```
 1              MR. JACOBSON:  J, yes.

 2         (Deposition Exhibit J marked for identification by

 3          the court reporter.)

 4   BY MR. JACOBSON:

 5     Q    All right.  So now your attorney has given the

 6   document to you.  Take your time, please.

 7     A    Just the number one, is that what you said?

 8     Q    I'm just looking at page four, yes, the response to

 9   number one.

10     A    Okay.

11     Q    So there's a list of -- of monies there; is that

12   correct?

13     A    Yes.

14     Q    Is that a list of payments that were paid to

15   Mr. Cohen?

16     A    Yes.

17     Q    By Labrador?

18     A    Yes.

19     Q    Were any of those for Eminem-Esque?

20     A    I don't know.

21     Q    Would there be a way to find out?  Is there a way to

22   find out?

23     A    Beatbox may be able to help you with that.

24     Q    How?

25     A    Because the -- there's a configuration of money that
```

Page 58

```
 1     Beatbox has kept back because of the situation with AMCOS and

 2     possibly paying Labrador, I don't know what monies are what

 3     monies.

 4          Q    Thank you very much.  May I please have that?

 5          A    Oh, I thought you were going to shake my hand, I

 6     thought you were going to give me money.

 7          Q    No, but I am going to give this document to the

 8     court reporter.  And turn it over to Ms. Blaise.

 9               (Break in deposition.)

10               (Discussion off the record.)

11               MR. JACOBSON:  Mr. Webb, you mentioned that you had

12     brought notes with you, may I see those, please?

13               MS. OHIRI:  I would like to see them first, if

14     that's okay.

15               MR. JACOBSON:  Okay.

16               MS. OHIRI:  Are these the exhibits?

17               THE WITNESS:  That's are what you gave me.

18               MS. OHIRI:  Okay.  Let me see.

19               MR. JACOBSON:  Do you want these?

20               THE WITNESS:  Sure.

21               MR. JACOBSON:  For your memory book.

22               MS. OHIRI:  What are these?

23               THE WITNESS:  Those are all letters to your firm.

24               MS. OHIRI:  I'm going to have to withhold these ones

25     as privileged.
```

Page 59

```
 1                  MR. JACOBSON:  The letters?

 2                  MS. OHIRI:  E-mails.

 3                  MS. BLAISE:  They're all letters to the firm.

 4                  MS. OHIRI:  Yes, to my firm.

 5                  MS. BLAISE:  There's no other documents that are not

 6       letters to your firm?

 7                  MR. JACOBSON:  Or e-mails?

 8                  MS. BLAISE:  We're going to need to see that.

 9                  MS. OHIRI:  I need to withhold these, these are

10       privileged.

11                  MS. BLAISE:  So for the record, can you indicate

12       what they are so you will make a privilege log of them?

13                  MS. OHIRI:  There's an e-mail from Noel Webb to

14       myself, Raena Ohiri, dated November 21st, 2019.

15                  MS. BLAISE:  What was the date?

16                  MS. OHIRI:  November 21st, 2019.

17                  MS. BLAISE:  Is there anyone else on the e-mail or

18       is it --

19                  MS. OHIRI:  It's just to me.  There's a document

20       that reflects attorney/client privilege and work product.  I

21       don't mind sending a redacted version of it, but I can't

22       produce it right now.

23                  MS. BLAISE:  Okay.  What is it?

24                  MS. OHIRI:  A document, I mean, I --

25                  MS. BLAISE:  What is it dated?
```

Page 60

1          MS. OHIRI:  There's no date on the document.

2          MS. BLAISE:  And it was produced by your office?

3          MS. OHIRI:  It's not discovery, it was not produced,

4     no.

5          MR. JACOBSON:  Is there any other way to describe

6     it?  It's one page; right?

7          MS. OHIRI:  Yeah.

8          MR. JACOBSON:  From what I can see from the back.

9          MS. OHIRI:  Mm-hm.

10         MS. BLAISE:  And you're saying it's communication

11    and work product?

12         MS. OHIRI:  Yeah.

13         MS. BLAISE:  And is it your firm's work product?

14         MS. OHIRI:  Yeah, there are some aspects of it, but

15    I would have to redact it and produce the rest of it.

16         MS. BLAISE:  Okay.

17         MR. JACOBSON:  Could you please send that to both of

18    us?

19         MS. OHIRI:  Yeah, after I redact it.

20         MR. JACOBSON:  Thank you.

21         MS. BLAISE:  Okay.

22         MS. OHIRI:  Same for this document, which is --

23    appears to be -- one, two, three -- three-page document.

24         MS. BLAISE:  You'll be able to redact and produce?

25         MS. OHIRI:  Yes.

Page 61

```
 1              MR. JACOBSON:  Would a two-week time period be okay

 2     for that?

 3              MS. BLAISE:  Well, we have a discovery cutoff.

 4              MS. OHIRI:  On the 6th.

 5              MS. BLAISE:  Right.  So we need it by Friday.

 6              MS. OHIRI:  Okay.  By Friday.  There's another

 7     e-mail from Noel Webb to Guy Nicholson, who is an attorney at

 8     our firm.

 9              MS. BLAISE:  Dated?

10              MS. OHIRI:  November 29th, 2019.  And it's a

11     two-page.  And it appears -- I'm not sure if this is an

12     attachment to the e-mail, but this is also work product.  And

13     I can't produce this.

14              MR. JACOBSON:  How many pages is that?

15              MS. OHIRI:  One page.

16              MS. BLAISE:  Okay.  You will redact it and produce

17     it?

18              MS. OHIRI:  No.

19              MS. BLAISE:  Okay.  So there's two documents that

20     you're going to redact and produce by Friday?  Are there any

21     handwritten notes when you said you had notes?

22              MS. OHIRI:  No.

23              THE WITNESS:  No.

24              MR. JACOBSON:  Is there anything on your computer

25     that you consider notes?
```

Page 62

```
 1                  THE WITNESS:  No, and it wasn't even opened, it was

 2      opened up into --

 3                  MR. JACOBSON:  A blank page?

 4                  THE WITNESS:  Desktop area, and I never went into

 5      it.

 6                  MS. BLAISE:  But is there anything that exists on

 7      your computer that would be notes that are a part of this

 8      case, not whether or not it was opened during your

 9      deposition?

10                  THE WITNESS:  No.

11                  MS. BLAISE:  There's no document on your computer

12      that exists?

13                  THE WITNESS:  No.

14                  MR. JACOBSON:  Is there any document on your

15      computer that relates to the case?

16                  MS. OHIRI:  We need to lay a foundation.  First of

17      all, did you review any of these documents to prep for your

18      deposition today?

19                  THE WITNESS:  No, they're just in my possession.

20      BY MS. BLAISE:

21          Q    Well, we get to ask the questions, and our questions

22      are not based on whether or not he reviewed them, they're

23      based on whether or not he has documents in his possession

24      that are responsive to our discovery requests, including the

25      deposition rider that was attached to bringing documents to
```

Page 63

```
 1   this deposition.

 2          So my question is, are there any documents on your

 3   computer that are responsive to any of the discovery requests

 4   that either --

 5       A    No.

 6       Q    There are no documents on your computer that are

 7   responsive?

 8       A    No.

 9       Q    What efforts did you undertake to determine that

10   there were no documents responsive to our discovery requests?

11   Answer now.

12       A    The computer is just for me to take some notes here

13   if I wanted to, and I didn't.

14       Q    Okay.  So my --

15          MS. BLAISE:  Move to strike as nonresponsive to my

16   question.

17   BY MS. BLAISE:

18       Q    What efforts did you undertake to go through your

19   computer to determine if you had any documents on your

20   computer that were responsive to our discovery requests?

21          MS. OHIRI:  Assuming that he has documents.

22          MS. BLAISE:  Do you have an objection?

23          MS. OHIRI:  Responsive on his computer.

24          MS. BLAISE:  Do you have an objection?

25          MS. OHIRI:  Objection to -- vague, form, vague and
```

Page 64

1    ambiguous.

2    BY MS. BLAISE:

3        Q    What efforts did you undertake to determine if you

4    had any documents in your computer responsive to our

5    discovery requests?

6        A    Before I came here, I looked at my computer.

7        Q    How did you look at your computer?

8        A    I looked at folders that are titled.

9        Q    And what folders did you look at?

10       A    I don't know the names of them.

11       Q    Okay.  Do you have a Spider Cues folder?

12       A    Not on this computer.

13       Q    Do you have another computer that has a Spider Cues

14   folder?

15       A    Yes.

16       Q    Do you search that computer for documents responsive

17   to our discovery requests?

18       A    Yes.

19       Q    Okay.  And what efforts did you undertake to search

20   that computer?

21       A    Searching any possible relationship to this case,

22   names.

23       Q    What key words did you search?

24       A    Peter Baker, Beatbox, Robert Baker, Michael Cohen,

25   Eminem-Esque, unless I'm forgetting something, that was

                                                    Page 65

1    generally what I used.

2         Q    Does Eminem-Esque go by any other title?

3         A    As a longer version, SQ MC Eminem-Esque, and a

4    version that Beatbox gave it, SPID 039, underscore, 25,

5    that's how it was licensed.

6         Q    Did you search either of those key words?

7         A    Yes.

8         Q    Did you undertake the same searches on the laptop

9    that you have with you?

10        A    There's no folder on that.

11        Q    Did you search in documents generally?

12        A    I'm sorry?

13        Q    In your documents search function where you can

14   search just documents generally, did you undertake any search

15   component just to search the documents on this computer that

16   you have with you today?

17             MS. OHIRI:  Objection.  Form.  Vague.

18             THE WITNESS:  I didn't need to, it's not there,

19   there's no folders of that nature.

20   BY MS. BLAISE:

21        Q    When did you buy this computer?

22        A    I think 2016.

23        Q    And do you use this computer regularly?

24        A    No.

25        Q    Do you have any other computer hardware that would

Page 66

```
 1    have any documents responsive to any of our discovery

 2    requests?

 3         A    No.

 4         Q    Do you have any other electronic files on the

 5    computer that's in your possession that you think would be

 6    responsive to our discovery requests, the computer that's in

 7    your possession here today?

 8         A    No.

 9    BY MR. JACOBSON:

10         Q    Do you have any documents on the computer that's in

11    your possession today that relate to the -- to this

12    lawsuit?

13         A    No.

14         Q    Do you have any texts or other documents on your

15    Smartphone that you have with you today that relate to this

16    lawsuit?

17         A    It was off, first of all, until I just turned it on

18    just now.  So it was not a cell phone until I just turned it

19    on just a second ago.

20              MS. OHIRI:  Just answer the question.

21              THE WITNESS:  But it wasn't a cell phone until I

22    turned it on just now.

23              MS. BLAISE:  That doesn't matter.

24              MS. OHIRI:  Just answer the question.

25    BY MR. JACOBSON:
```

Page 67

```
 1        Q     The device you have in your hand, I would call it a

 2    Smartphone, did -- are there any documents on there, texts,

 3    whatever, that relate to Beatbox versus Labrador?

 4        A     Only attorney/client privileged e-mails.

 5        Q     By attorney/client privilege e-mails, you mean

 6    e-mails that were sent to you by your attorneys or that you

 7    sent to them?

 8        A     Yes.

 9        Q     Thank you.

10             MS. BLAISE:  On those privileged -- those e-mails

11    that you claim to be privileged, is there anything else CCed

12    on those e-mails besides your attorneys?

13             THE WITNESS:  No.

14             MS. BLAISE:  That's it.

15             (Lunch break taken.)

16    BY MS. BLAISE:

17        Q     Back on the record.  My name is Heather Blaise.  I'm

18    the attorney for Beatbox, the plaintiff in this matter.  I

19    just want to reiterate some of Dan's instructions to let me

20    finish asking the question before you answer; is that fair?

21        A     Yes.

22        Q     And that you answer audibly yes or no and -- because

23    we have a court reporter here, that she is unable to take

24    down your hand indications.  So any type of mannerisms, any

25    type of gesturing that you do with your hands, she will be
```

                                                      Page 68

1    unable to take that down.  So if you can keep your answers to

2    audible yes or no, not uh-huh or uh-uh; fair enough?

3         A    Yes.

4         Q    And then when I ask you a question, you know, it's

5    not designed to trip you up, if you don't understand the

6    question, ask me to rephrase it or say you don't know the

7    answer or you don't understand the question, but if you

8    answer the question, I'm going to assume that you understood

9    the question.  If you answer the question, I'm going to

10   assume that you understand the question; is that fair?

11        A    Yes.

12        Q    Okay.  Do you ever a middle name?

13        A    Yes.

14        Q    What is it?

15        A    Palmer, P-A-L-M-E-R.

16        Q    And what's your date of birth?

17        A    5/10/52.

18        Q    What's your home address?

19        A    22400 Sentar Road, S as in Sam, E-N, T as in Tom,

20   A-R, Road, Woodland Hills, Woodland is one word, California,

21   90364.

22        Q    Do you own that home?

23        A    Yes.

24        Q    Your name is on title?

25        A    Yes.

Page 69

```
 1        Q    Is your name along with anyone else on title?

 2        A    Yes.

 3        Q    Who is else is on title?

 4        A    Why are we --

 5        Q    I get to ask the questions.  So who else is on title

 6    of your house?

 7        A    My wife.

 8        Q    What's her name?

 9        A    Sharon Webb.

10        Q    Do you know how you hold that title?  Is it tendency

11    by the entirety or joint tendency?

12             MS. OHIRI:  Objection.  Calls for a legal

13    conclusion.

14    BY MS. BLAISE:

15        Q    If you know the answer, how it says on the title?

16        A    I don't know.

17        Q    Do you owe a mortgage?

18        A    Yes.

19        Q    What's the balance due on the mortgage?

20        A    Somewhere between 5- and $600,000.

21        Q    Do you have any other liens besides your mortgage on

22    your property?

23        A    No.

24        Q    Do you have any other real estate, do you own any

25    other real estate?
```

                                                        Page 70

```
 1        A    Yes.

 2        Q    What other real estate do you own?

 3        A    A home in West Hills, California.

 4        Q    What's the address?

 5        A    6700 Capistrano, C-A-P-I-S-T-R-A-N-O, Avenue, West

 6   Hills, I don't know the zip.

 7        Q    That's fine.  Do you own any other real estate?

 8        A    No.

 9        Q    Do you have any mortgage on the Capistrano Avenue

10   property?

11        A    Yes.

12        Q    Do you know how much you owe on it?

13        A    I think somewhere between -- under $400,000.

14        Q    Do you hold that on title with anyone else, other

15   than yourself?  Is your wife on title as well?

16        A    I don't know.

17        Q    Do you have tenants in that?

18        A    Yes.

19        Q    What are they paying a month in rent?

20        A    2,875, I think.

21        Q    Do you have an interest in any other entities other

22   than Labrador Entertainment, Inc.?

23        A    What does interest mean?

24        Q    Any type of interest, a stock ownership, a

25   partnership interest, a membership interest?
```

Page 71

```
1        A    No.

2        Q    Okay.  So only -- only Labrador Entertainment, Inc.?

3        A    As interest in them, yes.

4        Q    That you have an interest in?

5        A    Yeah.

6        Q    And you testified earlier that the Spider Cues is a

7    d/b/a under the Labrador Entertainment, Inc. entity; is that

8    correct?

9        A    Yes.

10       Q    Okay.  And you said that you had additional music

11   catalogs that had d/b/as in addition to Spider Cues; is that

12   correct?

13       A    Yes.

14       Q    What are the other d/b/as that you have?

15       A    Red Lab Records.

16       Q    Red Lab?

17       A    Red Lab, three words, Boston Bay Records, and Shock

18   Files, S-H-O-C-K, Files.

19       Q    And those are all d/b/as, registered d/b/as?

20       A    Yes.

21       Q    Okay.  Do you get any other K1s on your tax return

22   from any other entities?

23       A    I don't know.  I don't think so.  I'm not sure.

24       Q    Do you hold any other type of employment?

25       A    Sometimes I play the violin.
```

Page 72

1        Q     As an independent contractor?

2        A     Yeah.

3        Q     Okay.  Do you render those services under your

4   Labrador Entertainment, Inc., or do you just do it in your

5   name individually?

6        A     My name.

7        Q     Okay.  What did Labrador Entertainment, Inc. gross

8   in 2018?

9        A     How would I know that by memory?

10       Q     If you don't know it, then you can say you don't

11  know it.

12       A     In 2018?

13       Q     Yeah, the last tax year.

14       A     Close to zero.

15       Q     Do you remember for 2017?

16       A     Close to zero.

17       Q     2016?

18       A     I wish I could give you the exact figures, not a lot

19  of money is all I can say.

20       Q     How do you pay your mortgage if you don't have any

21  other employment outside of Red Lab Records?

22       A     My wife works.

23       Q     Okay.  What does she do?

24       A     She works at UCLA as a marketing person.

25       Q     And she primarily pays your household expenses?

Page 73

1      A    Mm-hm, yes.

2      Q    Okay.  What is your formal musical training?

3      A    I'm trained as a violinist.

4      Q    At what age did you start training?

5      A    At 10, and I trained as a pianist starting at five,

6  and I have a -- when I went to college, I have -- I took a

7  lot of courses in composition and in music -- music industry,

8  and -- what was the exact question, my experience.

9      Q    Your formal training?

10     A    Formal training, that would be it, I think.

11     Q    Where did you go to college?

12     A    Bowdin College, B-O-W-D-I-N.

13     Q    Where is that?

14     A    In main.

15     Q    What years did you attend?

16     A    1970 to 1974.

17     Q    Did you finish a bachelor's degree?

18     A    Yes.

19     Q    What's your bachelor's degree in?

20     A    History of political science.

21     Q    Do you have any degree or certification from music,

22  musicology?

23     A    No.

24     Q    Music production?

25     A    Certificates?

Page 74

```
 1        Q    Certificate or degree?

 2        A    Not a degree, no.

 3        Q    Any other formal --

 4        A    Yeah, I took lots of courses in Los Angeles in the

 5   music industry, music industry, business, and music

 6   composition.

 7        Q    Who offered those courses?

 8        A    Dick Grove was the name of the -- was one of them.

 9   And there were others, but I don't know if I can tell you the

10   names of them.  They're no certificate, just lots of

11   classes.

12        Q    So like a seminar?

13        A    No, more than that, just not a graduate -- not a

14   certificate.

15        Q    Okay.  Oh, what year was the last year that you took

16   such a program or classes?

17        A    1990 I'm going to say, I'm guessing.

18        Q    Did you ever take any courses specifically on --

19   legal courses on copyright?

20        A    Yes.  I'm not sure I can tell you what they were

21   called or -- yes.

22        Q    Do you remember the approximate year or who the

23   provider was?

24        A    No.

25        Q    Are you trained to record -- like, actually produce
```

Page 75

```
 1    music to do the recording as, like, a sound engineer?

 2        A    Trained?

 3        Q    Mm-hm.

 4        A    Formally, no.

 5        Q    You've done it professionally?

 6        A    Mm-hm.

 7        Q    You've recorded music professionally for others?

 8        A    Mm-hm.  What was that?

 9        Q    Recorded music professionally for others where you

10    were compensated?

11        A    No.

12        Q    Did you record the music for yourself --

13        A    Yes.

14        Q    -- like your own music?

15        A    Yes.

16        Q    Or your friends where you weren't compensated?

17        A    Yes.

18        Q    Do you understand the components of a copyright as

19    it relates to a song?

20        A    Yes.

21        Q    Can you explain your understanding to me?

22        A    The person who composed the song or cue or piece,

23    unless otherwise purchased or contracted out, owns its

24    copyright.

25        Q    Do you understand that there's two copyrights
```

Page 76

1    embodied in a song?

2        A    Do you mean lyrics and --

3        Q    I mean the composition and the sound recording.

4        A    Yes.

5        Q    Okay.  When did you become involved in licensing

6    production music?

7        A    I think in 2005, I think, '5 or '6.

8        Q    Okay.  When I say production music, what do you

9    understand that to mean?

10       A    Music that is -- music that is synced to a visual

11   product, S-Y-N-C, that's it.

12       Q    Okay.  And in order to grant a license for

13   production music to sync that music to a visual product, what

14   type of licenses must be granted to that user?

15       A    Say that again.

16       Q    I'll have the court reporter read it back.

17            MS. OHIRI:  Objection.  Calls for a legal

18   conclusion.

19            (Record read.)

20            THE WITNESS:  A mechanical sync license and a

21   master -- a master license.

22   BY MS. BLAISE:

23       Q    A mechanical sync license you said?

24       A    Yeah.

25       Q    Is that the -- as you understand it, is that the

Page 77

```
 1    full definition?

 2        A    That's my understanding, yeah, and use of the

 3    master.

 4        Q    And then a master use license.  What rights are

 5    being granted with a mechanical sync license as you

 6    understand it?

 7        A    The right to use the cue, the music cue, in the --

 8    to sync it to the visual product.

 9        Q    When you say cue in this context, do you mean the

10    sound recording and the musical composition, or do you mean

11    just the sound recording or do you mean just the musical

12    composition?

13        A    Do I mean the sound recording or the -- can you read

14    back to me?

15            (Record read.)

16            MS. OHIRI:  Objection.  Form.  Compound.

17            THE WITNESS:  One more time.

18            MS. BLAISE:  I'll rephrase the question.

19    BY MS. BLAISE:

20        Q    You testified earlier that the copyright embodied in

21    a song is the composition, one, and two, the sound recording,

22    I'm asking you when you are granting a mechanical sync

23    license, are you granting the rights of the composition or

24    are you granting the rights of the sound recording or are you

25    granting the rights of both?
```

Page 78

1         A    You're granting -- I don't know.

2         Q    Okay.  Is your answer any different for master use,

3    if you're granting a master use license, do you know what

4    rights you're granting?

5         A    I -- the master use is the use of the sound

6    recording.

7         Q    And not the musical composition; correct?

8         A    I don't know.

9         Q    Okay.  Your testimony earlier about cues, as I --

10   correct me if I'm wrong, as I recall from your earlier

11   testimony, you said a cue is a piece of music?

12        A    Okay.

13        Q    And that it can be a song?

14        A    Yes.

15        Q    But it doesn't -- it's not necessarily a song?

16        A    Yes.

17        Q    Are those all correct statements?

18        A    That's correct.

19        Q    Correct characterization of your testimony?

20        A    Yes.

21        Q    Would a cord progression be considered a cue?

22        A    Not just as a cord progression, no.

23        Q    What would make a cord progression a cue?

24        A    If it made musical sense.

25        Q    Who decides if it makes musical sense?

Veritext Legal Solutions
866 299-5127

1        A     The end user.

2        Q     Could lyrics be considered a cue?

3        A     Alone, you mean?

4        Q     Mm-hm.

5        A     No.

6        Q     Yes, I'm sorry, for the record, yes.

7              Lyrics alone could not be considered a cue?

8        A     No.

9        Q     Could a baseline be considered a cue?

10       A     A baseline, yes.

11       Q     If a cue is made shorter for the purposes of the end

12   user, is it still a cue?

13       A     When you say a, a is the important word, it is a

14   cue, it's not necessarily that cue.

15       Q     What's that?

16       A     You said a cue.

17       Q     Yeah, any cue, any given cue.

18       A     No, you said -- read it back, please.

19             (Record read.)

20             THE WITNESS:  It's still a cue.

21   BY MS. BLAISE:

22       Q     Are you saying that the cue, if it's made shorter is

23   no longer -- is no longer the original cue?

24       A     Correct.

25       Q     So it's your testimony that every cue that's made

                                                    Page 80

```
 1    shorter changes its -- it changes into a new copyright?

 2             MS. OHIRI:  Object.  Calls for a legal conclusion.

 3    Calls for an expert opinion.

 4             THE WITNESS:  I don't know.

 5             MR. JACOBSON:  I join.

 6    BY MS. BLAISE:

 7        Q    What was your answer?

 8        A    I don't know.

 9        Q    I'm sorry.  Do you still have your exhibits?

10        A    Do I have the what?

11        Q    Your exhibits.

12        A    Yeah, that he gave me?

13        Q    Can you get Exhibit F?

14        A    I don't have it, this one.

15        Q    No, it starts with the January 14th, 2018 e-mail.

16             MS. OHIRI:  Here, you can look at mine.

17             THE WITNESS:  Okay.  Thanks.

18    BY MS. BLAISE:

19        Q    Do you remember this?

20        A    Pardon?

21        Q    Do you remember this?

22        A    Yes.

23        Q    Okay.  Going to the second page of Exhibit F, which

24    is Bates-stamped LAB 207, paragraph 5C.

25        A    Do I look at my own?
```

Page 81

1          MS. OHIRI:  Yeah.

2          THE WITNESS:  So going to number what?

3     BY MS. BLAISE:

4     Q    5C.

5     A    Yes.

6     Q    This is -- this is an e-mail from you to Peter

7     Baker; correct?

8     A    You mean that one -- let's see, yes.

9     Q    And it's dated January 5, 2014?

10    A    Yes.

11    Q    And turning to 5C, can you read that?

12    A    Read it out loud or just read it?

13    Q    You can read it out loud.

14    A    The following is, each cue needs alternates, in a

15    film support cue you probably need --

16         THE REPORTER:  Slow down.  I still have to type it.

17         THE WITNESS:  Each cue needs alternates,

18    parenthesis, if it's a film score cue, you probably need

19    alternate of one.  Percussion, two.  The strings, three.  The

20    percussion and bass or percussion and bed track.  Four or

21    five alternates is plenty.  If it's a radio tune, you

22    probably need an alternate of one.  The groove with bass,

23    drums and guitar, two.  The lead instrument by itself, three.

24    Any others that made sense.  Again, four or five alternates

25    is plenty.  If it's an electro tune, you need alternates of

Page 82

1      almost everything.

2      BY MS. BLAISE:

3          Q    So here you're asking for alternates from your

4      composers; is that correct?  You're saying that that's what

5      you're asking your composers to provide you with?

6          A    That is a proposition.

7          Q    If you look at paragraph five, the beginning of it,

8      it says, from now on our composer instructions are.

9          A    Yeah.

10         Q    And then you list the things that the instructions

11     are, A, B, C; right?

12         A    Right.

13         Q    And C talks about alternates; correct?

14         A    Correct.

15         Q    So you are conveying that this is what you're asking

16     composers for; correct?

17         A    Your phrase asking doesn't make any sense to me.

18         Q    What did you mean by paragraph five, from now on our

19     composer instructions are?

20         A    From now on when I have -- when I am available to do

21     it, we will be asking these things of the composers.

22         Q    So you're reading into it, when I'm available to do

23     it, we will be asking these --

24         A    From now on.

25         Q    And so you are going to be asking from composers --

Page 83

```
 1    you'll be asking composers to provide Alternates, is that

 2    what you're saying?

 3        A    My intention is to do that, that's what I'm saying

 4    to Peter Baker at Beatbox.

 5        Q    Okay.  And so as you're explaining Alternates in

 6    paragraph C --

 7        A    Yes.

 8        Q    Is it your contention that each of those Alternates

 9    would create a new cue?

10            MS. OHIRI:  I'm going to object that it calls for an

11    expert opinion.

12            MR. JACOBSON:  I join.

13            THE WITNESS:  No.

14    BY MS. BLAISE:

15        Q    So the Alternates would still be a part of the same

16    cue; is that correct?

17            MS. OHIRI:  Same objection.

18            MS. BLAISE:  Join.

19            THE WITNESS:  You know, I don't know that -- I want

20    to take that back.  There are oftentimes licensed as their

21    own cue.

22    BY MS. BLAISE:

23        Q    So on your Excel spreadsheet that lists all of your

24    cues, we would find separate cues for each one of these

25    alternates, is that what you're saying?
```

Page 84

```
1          A     Yes, a separate rows, yes.

2          Q     And would that be the case for each of your catalogs

3     as they are now?

4          A     As they are now?

5          Q     Your Spider Cues and --

6          A     As they are now, yes, that's what you would find.

7          Q     Red Lab Records, Boston Bay Records and Shock Files,

8     each one of those would contain separate cues for each one of

9     those components?

10         A     No.

11         Q     So some of them would have those Alternates, but

12    they would be considered one cue; is that correct?

13         A     No.

14         Q     Okay.  So is your testimony that each -- each of

15    those Alternates would have a separate cue in each of those

16    catalogs?

17         A     No.

18         Q     Okay.  So what is your testimony --

19         A     You're grouping together all these libraries, I

20    don't know why you're doing that.  This is in reference to

21    Spider Cues.

22         Q     I'm asking you generally about music production

23    licensing.

24         A     Okay.

25         Q     That's what I'm asking you about, and your
```

Veritext Legal Solutions
866 299-5127

1    understanding of the custom and practice of the business

2    based on your experience.

3        A    All right.

4        Q    Okay.  So I'm asking you if -- if Alternates create

5    a new cue, does that mean that in each one of those catalogs,

6    each of your cues that has a separate breakdown, these

7    alternates, would be named differently as a different cue?

8        A    Yes.

9        Q    In each one of those categories?

10       A    Yes.

11       Q    Okay.  Does a cue remain the same if you mix it

12   without an element like, let's say, the drums for example?

13           MS. OHIRI:  Objection.  Calls for an expert

14   opinion.

15   BY MS. BLAISE:

16       Q    In your experience.

17       A    Say that again or have her read it.

18       Q    In your experience --

19       A    No, I got the question, the answer is no.

20       Q    It doesn't become a new cue or it does become a new

21   cue?

22       A    Read the question.

23           (Record read.)

24           MR. JACOBSON:  I object.  Calls for an expert

25   opinion.

Page 86

```
 1          THE WITNESS:  No, you said mean the same, mean the
 2     same with drums involved.
 3     BY MS. BLAISE:
 4          Q    So it creates a new cue?
 5          A    My understanding of the question is, if you take the
 6     drums out of a cue, does it remain the same cue, the answer
 7     is no.
 8          Q    If you're granting a license to an end user to use a
 9     cue for production and they elect to take the drums out, is
10     it your contention that they're creating a new copyright?
11          A    Yes.
12          MR. JACOBSON:  Objection.  Calls for expert
13     witness.
14          MS. OHIRI:  Same objection.  Give me a minute to
15     state my objections.
16          THE WITNESS:  I didn't know you were going to say
17     something, sorry.
18     BY MS. BLAISE:
19          Q    Are all of your Labrador contracts, like the one
20     that you have with Michael Cohen, which is Exhibit G, is this
21     the same agreement that you use with all of your composers?
22          A    No.
23          Q    Have you changed your agreement recently?
24          A    What does recently mean?
25          Q    When was the last time that you changed your
```

Page 87

1    agreement?

2         A    I don't know the answer to that.

3         Q    How many different types of composer agreements do

4    you have that you're currently rendering services for?

5         A    Many.

6         Q    That have different language?

7         A    Yes.

8         Q    Okay.  Did you have a lawyer draft this for you?

9         A    This contract?

10        Q    Yeah, Exhibit G.

11        A    They reviewed it.

12        Q    What lawyer?

13        A    Stuart Wallach, S-T-U-A-R-T, W-A-L-L-A-C-H.

14        Q    Do you know if Cohen had an attorney?

15        A    No.

16        Q    No, he didn't, or no, you don't know?

17        A    Unless there's something in here that I'm

18   forgetting.

19             MS. OHIRI:  Don't speculate or guess.

20             THE WITNESS:  No, I don't know.

21   BY MS. BLAISE:

22        Q    You don't know?

23        A    I don't know.

24        Q    Okay.  In your experience in licensing music for

25   production, is it common for the end user to need to shorten

Page 88

1    or elongate the music, the cue?

2         A    What does shorten mean?

3         Q    To make it a shorter induration.

4         A    Say -- ask the question again.

5         Q    Can you read the question?

6              (Record read.)

7              THE WITNESS:  To need to, I don't know.

8    BY MS. BLAISE:

9         Q    Turning to Exhibit G --

10        A    Which one is that, please?

11        Q    That's the composer's agreement.

12        A    Yes.

13        Q    It has a working title and a total running time, is

14   that correct, on the first page?

15        A    What is it?

16        Q    A working title and a total running time, and then

17   it has a chart for each of the cues.

18        A    You mean all of them?

19        Q    Yes.

20        A    Yes.

21        Q    Is that correct?

22        A    Yes.

23        Q    And the total running time is in the right-hand

24   column; is that correct?

25        A    Correct.

Page 89

1        Q    And it's, for instance, the first one is 32

2    seconds?

3        A    Correct.

4        Q    The next one is 115 seconds; is that correct?

5        A    Correct.

6        Q    How common is it for an end user of an audio visual

7    work to need -- to only have 32 seconds of an audio visual

8    work, and so they only need 32 seconds of Dungeon Lords, for

9    instance?

10            MR. JACOBSON:  Objection.  Ambiguous and calls for

11   expert opinion.

12            MS. OHIRI:  Same objection.

13            THE WITNESS:  It happens.

14   BY MS. BLAISE:

15       Q    It happens where it's exactly -- words exactly the

16   same with the audio visual user needs is the exactly the same

17   as what the -- the length of the cue, the duration of the

18   cue?

19       A    You better ask the question again.  Ask me a

20   question.

21       Q    I am asking you a question.

22       A    What's the question again?

23       Q    You just testified that it's common for -- or it

24   happens -- I'm sorry, your testimony was it happens where the

25   end user, the audio -- the person who is creating the audio

                                                    Page 90

1   visual work needs a cue that is exactly the same length as --

2   as your cues?

3       A    Yes.

4       Q    Your testimony is that it happens?

5       A    Yes.

6       Q    How common is it for that to happen?

7            MR. JACOBSON:  Same objections.

8            THE WITNESS:  I don't know.

9   BY MS. BLAISE:

10      Q    You don't know how common that is?

11      A    (Inaudible.)

12           MR. JACOBSON:  Same objections to the whole line.

13  BY MS. BLAISE:

14      Q    When issuing an end user license, do you show and

15  state the duration used on those licenses?

16      A    I don't issue end user licenses.

17      Q    To anyone, you don't issue any licenses?

18      A    Despite of this particular library.

19      Q    I'm asking you in -- as you understand production

20  licensing which may encompass your other businesses --

21           THE REPORTER:  Hold on, hold on.  Wait for her to

22  totally finish.

23  BY MS. BLAISE:

24      Q    Yeah, wait for me to finish talking.

25           Which may encompass your other cues and your other

Page 91

```
 1    catalogs that are all under Labrador.  So you don't -- you

 2    don't issue any licenses for any of those cues?

 3         A    I do.

 4         Q    You do.  Okay.  And on those licenses, do you

 5    specify the amount of time, the duration of the cue?

 6         A    I don't.

 7         Q    Okay.  Is it your contention that any of these cues

 8    owned by Cohen, that to the extent that any end user wanted

 9    to shorten or elongate the cue, that you went back to Cohen

10    and requested approval to do that?

11              MS. OHIRI:  Objection.  Form.  Vague.

12              THE WITNESS:  I don't know.  I don't know.

13    BY MS. BLAISE:

14         Q    During the term of your relationship with Cohen

15    during this -- during this composer agreement from the time

16    you executed it to the time -- during the time that you

17    administered his rights, did you ever go to Cohen and ask him

18    for approval to shorten or elongate or modify in any way any

19    of the cues that were subject to this agreement?

20         A    Yes.

21         Q    You did?  Do you have any correspondence relating to

22    that?

23         A    Not with me.  Yes, you have it.

24         Q    You provided it, you produced it?  Which cue was it

25    related to or cues?
```

Page 92

```
 1        A    I don't know that, I can tell you that.  It's an
 2   e-mail that you have.
 3        Q    Who was it to, if you recall?
 4        A    A music supervisor asked for a change of one of his
 5   cues, and I called him and he e-mailed and he responded.
 6        Q    What was the change?
 7        A    I think it was something to do with strings, that's
 8   all I can remember.
 9        Q    Is it your contention that that change created a new
10   copyright?
11        A    Nothing more happened.
12        Q    Did the change occur?
13        A    I don't think so.  I don't know.
14        Q    How many sub-publishers do you have for the Spider
15   Cues' library as of -- as of -- hold on, let me give you a
16   date.  As of 2014, January 2014, how many sub-publisher
17   across the world did you have for the Spider Cues' library?
18        A    Four.  Of what date?  I'm so sorry.
19        Q    Starting 2014 to current date.
20        A    Five.
21        Q    Who are they and for what jurisdictions?
22        A    I don't know about the jurisdiction, but Labrador
23   Great Music is ASCAP, Labrador Good Music is BMI, relates to
24   the ally, Lab Good Music relates to CSAC, Red Great Music
25   relates to SOCAN.  And after this contract, I think I started
```

Page 93

```
 1    another SOCAN publishing company because SOCAN has rules that

 2    I haven't discovered about something.

 3         Q    When you say publishing company, is that a new

 4    entity that is not Labrador, Inc., did you create a new

 5    entity?

 6         A    No, another d/b/a.

 7         Q    Another d/b/a?

 8         A    Yeah.

 9         Q    Okay.   Turning you back to Exhibit J, which is

10    Labrador's response to Cohen's interrogatories.

11         A    Okay.

12         Q    And your response to interrogatory number one, you

13    provided a breakdown of all the royalties that were made to

14    Mr. Cohen over the years from 2003 to 2014; is that

15    correct?

16         A    Royalties as they determine as monies owed to him.

17         Q    You said you made the following payments to

18    Mr. Cohen, what were the -- what were the payments related to

19    if not royalties?

20         A    Always syncing, but sometimes they're not royalties,

21    sometimes they refer to syncing or license money.

22         Q    Okay.   How were you able to answer this question on

23    interrogatory number one?   What records did you review in

24    order to calculate these numbers?

25         A    I'm not sure I can answer that properly, but -- just
```

Page 94

```
 1    give me a minute.  Checks, checks sent to him.

 2         Q    Checks sent to him by you?

 3         A    Yeah, by Labrador.

 4         Q    Did you turn over all of these checks in

 5    discovery?

 6         A    I don't think so.

 7         Q    To your attorney?

 8         A    I don't think I did.

 9         Q    Are you able to do that?

10         A    What do you mean by check?  I'm talking about a

11    checkbook.

12         Q    You told me that you reviewed checks, and I'm asking

13    you if --

14         A    I'm sorry, it was checkbook.

15         Q    Checkbook.  Were you able to turn over any document

16    that you reviewed, including your checkbook, to counsel?

17         A    Was I able to?  I was able to.

18         Q    But you didn't?

19         A    I didn't.

20         Q    But you will?

21         A    I will.

22         Q    And did you provide him with any statements to let

23    him know from where this money was being derived?

24         A    No.

25         Q    Did he ever ask you for a statement?
```

Page 95

1      A    No.

2      Q    Your agreement is 50/50 on synchronization; is that

3  correct?

4      A    Correct.

5      Q    And would you get a statement from the end user or

6  your sub-publisher that would tell you what the use of the

7  cue was for and what the license fee was?

8      A    Yes.

9      Q    Did you review those statements when you were

10  compiling your responses to our discovery requests?

11      A    No.

12      Q    Do you have those statements?

13      A    I might.  Maybe I don't, I'm not sure.

14      Q    Did you use those statements in preparing your tax

15  returns?

16      A    No.

17      Q    How do you go about reporting income on your tax

18  returns?

19      A    I calculate how much I have received, and my --

20  then commissions, which this is about, for example, and my

21  expenses, and I subtract it and I send that to the IRS.

22      Q    How do you know what cues are performing well in the

23  marketplace and what cues are not performing well in the

24  marketplace?

25      A    I don't.

Page 96

```
 1        Q     How do you know what money is owed to you for

 2    licenses that are granted?

 3        A     I don't.

 4        Q     You just take whoever is doing the licensing at

 5    their word?

 6        A     Yes.

 7        Q     Did you try to look for these statements in

 8    complying with our discovery requests?

 9        A     What statements?

10        Q     The statements from -- that would have allowed you

11    to determine the amounts that you collected back to 2003?

12        A     No.

13        Q     You did not look for the statements?  Are you able

14    to do that now?

15        A     I can try, yes.

16        Q     Do you understand that the -- your discovery

17    obligations require you to look for those documents?

18        A     Yes.

19        Q     Turning your attention to interrogatory number two.

20    The question in interrogatory number two from Mr. Cohen is,

21    explain in detail all efforts you undertook to enforce the

22    requirement under the composer's agreement that the person to

23    whom you licensed the license composition, read Eminem-Esque,

24    could not alter, expand, adapt or translate the license

25    composition without first consulting Cohen.  Your attorney
```

Page 97

```
 1    makes a number of objections, however, at the bottom of page

 2    five.  You respond, the interrogatory assumes a requirement

 3    not found in the composer agreement, which among other

 4    things, granted Labrador the right to record new structures,

 5    elements and arrangements in connection with Mr. Cohen's

 6    compositions.

 7            Do you still agreement with that statement?

 8    A    Where are you reading?  Okay.

 9    Q    The interrogatory assumes a requirement not found.

10    A    Okay.  Okay.

11    Q    Can you read my question back, please?

12         (Record read.)

13         THE WITNESS:  Yes.

14    BY MS. BLAISE:

15    Q    And turning to the next page at the top of page six,

16    starting with the sublicenses, can you read that?

17    A    Yeah.

18    Q    The sublicenses, aloud, please.

19    A    The sublicenses also expressly assumed that end

20    users of the compositions would limit the utilization of the

21    master recordings to dubbing or syncing some or all of the

22    compositions to video elements.

23    Q    Keep going.

24    A    The practice of using portions of music library

25    compositions, recordings to fit, sync, or dub to video
```

Page 98

```
 1    elements is standard in the television, film, and advertising
 2    industries.  Mr. Cohen was aware and approved this practice.
 3    In the present case, three portions of the subject
 4    composition from approximately zero to 10, from approximately
 5    22 to 33, and from approximately 108 to 115 were used without
 6    alteration.
 7         Q    So in reading that now, is it your contention that
 8    the composition was actually altered, creating a new cue?
 9         A    Yes.
10         Q    At what point was it altered to create a new cue in
11    the composition?
12         A    Sections of the cue were moved.
13         Q    Do you understand that a New Zealand Court found the
14    entire cue to be infringing?
15         A    What entire cue?
16         Q    The entire cue that was used.
17         A    Yes, as it was played out.  A cue is played from
18    beginning to end.
19         Q    Did you listen to the track, the cue, Eminem-Esque,
20    before you provided it to Beatbox?
21         A    At some point, yeah.
22         Q    How many of these cues would you say are
23    sound-alikes?
24         A    That's a very broad question.
25              MR. JACOBSON:  Objection.  Ambiguous.
```

Page 99

```
 1              THE WITNESS:  Yeah, really, I don't know.
 2     BY MS. BLAISE:
 3        Q    What is your understanding of what a sound alike
 4     is?
 5        A    A sound alike uses some facsimile of another piece
 6     of music, whether it's -- can be as simple as feel or a
 7     groove.
 8        Q    Have you had a musicologist compare the Eminem-Esque
 9     track to how it was used in the New Zealand audio visual work
10     and determine that it was not infringing?
11        A    Yes.
12        Q    Which musicologist, what's their name?
13        A    Robert Frink, in the UCLA Department of Music.
14        Q    Did he prepare a report?
15        A    Yes.
16        Q    Have you provided that in discovery?
17        A    Could you -- I'm sorry, I know we're beyond this.
18     Can you rephrase that question to me again that you just
19     asked, the first question?
20              MS. BLAISE:  I'll have the court reporter read it
21     back.
22              (Record read.)
23              THE WITNESS:  No, I have not.
24              MS. BLAISE:  You have not.
25     BY MS. BLAISE:
```

Page 100

```
 1        Q     So you'd like to change your earlier testimony

 2   saying that you had and that you had prepared a report?

 3        A     You asked if they compared the two.

 4        Q     I asked you that, and I also asked you if they

 5   prepared a report and you said that he had.

 6        A     Yes, I shouldn't have said that.

 7        Q     Okay.  So there has not been no report prepared?

 8        A     For what?

 9        Q     Comparing the two works.

10        A     Yes, there is no report on that -- that specific

11   thing.

12        Q     Has there been a report prepared in some other

13   way?

14        A     Yes.

15        Q     What way has a report been prepared?

16        A     Deciding whether the SQ MS MC Eminem-Esque cue was

17   infringing on "Lose Yourself."

18        Q     So you have had a report prepared to compare the two

19   songs?

20        A     You keep using the word compare, compare what?

21        Q     The copyright work at issue, "Lose Yourself," the

22   Eminem song.

23        A     Yes.

24        Q     And Eminem-Esque?

25        A     Yes.
```

Page 101

1        Q    You have a report for that?

2        A    Yes.

3        Q    Have you turned that over in discovery?

4        A    Yes.

5             MS. OHIRI:  Wait, objection, it misstates his

6    earlier testimony.

7             MS. BLAISE:  He just said that he had a report

8    prepared.

9             MS. OHIRI:  I know, but what he was trying to say is

10   that that report is not a report that compares the two works.

11   So what report do you have?

12   BY MS. BLAISE:

13       Q    What report do you have?

14       A    I just explained it to you.  You keep using the word

15   compare, then you use the word Eminem -- Cohen's cue compared

16   to "Lose Yourself," you said before compare Cohen's cue to

17   the cue used in the video.

18       Q    What report do you have?

19       A    I said again, two musicologists assessed whether the

20   Cohen original cue was infringing or not.

21       Q    And do you have the report?

22       A    Yeah, we've provided it.

23       Q    Okay.  And are you aware that a New Zealand judge

24   found for it to be infringing, found for the Eminem-Esque

25   track to be infringing on "Lose Yourself"?

                                                    Page 102

1        A     No, they did not.  They stated that the track used

2     in the video was infringing.

3        Q     And which -- in your answers to interrogatories, you

4     admit that from .00 to 10 seconds in, and from 22 seconds to

5     33 seconds in and from 108 to 115 that was used directly from

6     Eminem-Esque?

7        A     Yes.

8        Q     And so I'm asking you, you're aware that the New

9     Zealand Court found the Eminem-Esque track, including those

10    components, to be infringing of Eminem's "Lose Yourself"?

11       A     I'm not sure why you're not understanding that a

12    creation of music is sections of players playing sections and

13    putting them together.  If you had Paul McCartney singing a

14    tune and you took his verse and put it into the beginning,

15    you change the tune, you keep mixing that up.

16            MS. BLAISE:  Move to strike as nonresponsive to the

17    question.  Can you read the question back to him, please.

18            (Record read.)

19            THE WITNESS:  No, I'm not aware of that.

20    BY MS. BLAISE:

21       Q     You're not aware of it?

22       A     No.

23       Q     Did you participate in the proceeding in New

24    Zealand?

25       A     Yes.

Page 103

```
 1        Q    Up to what time did you participate?

 2        A    I don't know.  I'm not sure how to answer that.

 3        Q    You're saying you're unaware of the judge finding

 4   Eminem-Esque as being infringing of Eminem "Lose Yourself"?

 5        A    Yes.

 6        Q    And I'm wondering when you stopped following the

 7   case, if you're unaware of that fact?

 8        A    I never stopped following the case.

 9        Q    Okay.  So are you aware of the judge's ruling?

10        A    The judge ruled the video, the music used in the

11   video was infringing.  She or someone labeled it that, I did

12   not label that cue that -- that cue to be what you're

13   referring to.  She -- someone has labeled the cue different

14   than what it is.  The original cue was labeled SQ MC

15   Eminem-Esque.  It goes from 225 -- two minutes and 25

16   seconds, and it runs from beginning to the end accordingly.

17        Q    And you understand based on your answers to

18   interrogatories that it's a common practice of using portions

19   of music in production music licensing?

20        A    Yes.

21        Q    All right.  Turning to Exhibit H, which is the

22   Labrador and Beatbox music agreement.

23        A    The Labrador what?  I'm sorry.

24        Q    The Labrador and Beatbox --

25             MS. OHIRI:  This.
```

Page 104

```
 1              THE WITNESS:  Okay.

 2     BY MS. BLAISE:

 3        Q    And you've testified earlier today that you signed

 4     this -- this agreement, and that this is the operative

 5     agreement; is that correct?

 6        A    Yes.

 7        Q    Do you have amended answer to complaint, Labrador's

 8     amended answer to Beatbox's complaint perhaps?

 9              MR. JACOBSON:  Probably.  Can we take five minutes?

10              MS. BLAISE:  Yeah.

11              (Break in deposition.)

12              (Discussion off the record.)

13              THE WITNESS:  Okay.  You didn't let me fully answer

14     a question, and I'd like to answer that now.

15     BY MS. BLAISE:

16        Q    What question was that?

17        A    You asked what musicologists were assessed the

18     song.

19        Q    Okay.

20        A    Okay.  So Robert Frink from UCLA, head of the music

21     department at UCLA, and Robert Wallser, W-A-L-L-S-E-R, from

22     Case Western at his music department both assessed that the

23     original M SQ MC Eminem-Esque cue was not infringing on "Lose

24     Yourself."

25        Q    And did you hire either of these musicologists to
```

Veritext Legal Solutions
866 299-5127

```
 1    testify in the New Zealand case?

 2         A    I tried to, yes, I did.

 3         Q    How did you try to?

 4         A    I'm sorry, what does hire mean?

 5         Q    Did you pay them to come and render an opinion

 6    before the court in that New Zealand case?

 7         A    No, I asked other parties to do that.

 8         Q    What other parties did you ask to do that?

 9         A    The New Zealand election committee.

10         Q    I'm sorry?

11         A    The New Zealand National Party.

12         Q    You asked the National Party to hire either Frink

13    and/or Wallser?

14         A    Correct.

15         Q    How did you ask them?

16         A    On the phone with my attorney, my New Zealand

17    attorney.  And there's more.

18         Q    There's more what?

19         A    I also had an application called Shazam, which is

20    the most used audio recognition application in the world, to

21    the point where it actually has its own television program

22    now, Shazam.  And when Shazam played "Lose Yourself" and the

23    original Cohen cue back to back, it never recognized it to be

24    the "Lose Yourself" cue.

25         Q    Did you hire someone from Shazam to come in and
```

Page 106

```
 1    provide that testimony --

 2        A    No.

 3        Q    Please let me finish my question.

 4        A    Sorry.

 5        Q    Did you hire someone from Shazam to come in and

 6    testify before the New Zealand Court that the track was

 7    non-infringing?

 8        A    No.

 9        Q    Did you testify in the New Zealand court about the

10    non-infringement?

11        A    Yes.

12        Q    And the judge still found it to be infringing; isn't

13    that true?

14        A    What is it?

15        Q    Eminem-Esque.

16        A    No.

17        Q    Okay.  Turning --

18        A    I have something else to say, if I may.

19        Q    There's no question pending.  There's no question

20    pending.

21        A    I didn't answer the question fully.

22            MS. OHIRI:  Just answer her question.

23            THE WITNESS:  I didn't answer her question fully.

24    BY MS. BLAISE:

25        Q    What question didn't you answer fully?
```

Page 107

```
 1        A    You keep asking me about the standard of the

 2   industry of cutting up cues into sections, that's what you're

 3   asking me about.

 4        Q    I think your answer to discovery fully states

 5   your --

 6        A    I don't think it does.

 7        Q    Well, then you can amend your responses.

 8        A    Okay.

 9        Q    Okay.  Turning your attention to what we've marked

10   as K, which is the complaint.  Do you see the complaint?

11        A    Is this K?

12             (Deposition Exhibit K marked for identification by

13              the court reporter.)

14             (Deposition Exhibit L marked for identification by

15              the court reporter.)

16   BY MS. BLAISE:

17        Q    Yes.

18        A    Okay.

19        Q    And this is going to require you to look at K and L.

20   Which L will be your answer, amended answer.

21        A    Okay.

22        Q    Turning to paragraph 8.

23        A    Of?

24        Q    Of K.

25        A    Okay.  Moreover plaintiffs executed --
```

Page 108

```
 1        Q    Yes, that's the paragraph.  Read that.

 2        A    Out loud?

 3        Q    Please.

 4        A    Moreover plaintiff and defendants executed an

 5   agreement on April 1st, 2009 herein after the 2009 agreement,

 6   binding them to the laws and exclusive jurisdiction of the

 7   State of California, see attached Exhibit A.

 8        Q    Okay.  Now, looking at your answer on Exhibit L to

 9   paragraph 8.

10        A    I'm not sure where to go.

11        Q    Go to paragraph 8.

12        A    Okay.

13        Q    Do you see your answer there?

14        A    Yes.

15        Q    What is your answer?

16        A    Labrador denies the allegations contained in

17   paragraphs eight and nine.

18        Q    Why did you deny the allegations contained in

19   paragraph eight?

20        A    I think I read number nine to mean that the New

21   Zealand Court already has jurisdiction over the case.

22        Q    I'm asking about paragraph eight.

23        A    But my answer is with reference to eight and nine.

24        Q    And I'm asking you about paragraph eight.

25        A    Okay.
```

Page 109

1     Q    You denied both paragraph eight and paragraph nine,

2    and I'm asking you why you denied paragraph eight.

3     A    But they're combined here.

4     Q    It was your choice to combine them.

5     A    I did.

6     Q    Okay.  And so my question is, why did you deny the

7    allegations contained in paragraph eight?

8     A    The combination of the two is why I combined them.

9         MS. OHIRI:  Just answer her question.  If you don't

10   know the answer, just say you don't know.

11        THE WITNESS:  I don't know what to tell you.  I

12   cannot tell you, I don't know, but the two of them together

13   are why I answered that.

14   BY MS. BLAISE:

15    Q    Okay.  Please read paragraph eight from the

16   complaint again.

17    A    Moreover the plaintiff and defendants executed an

18   agreement on April 1st, 2009 herein after the 2009 agreement

19   binding them to the laws and exclusive jurisdiction of the

20   State of California, see attached, Exhibit A.

21    Q    Do you admit that you executed an agreement with the

22   plaintiff on April 1st, 2009?

23    A    Yes.

24    Q    Do you admit that the agreement previously marked

25   as -- I'll tell you what exhibit number it is.  That is the

Page 110

1    agreement, but yours isn't marked.  So I need to know what

2    the exhibit number was.  Do you know?

3            MR. JACOBSON:  I think it's H.  The 2009 agreement?

4            MS. BLAISE:  The 2009.

5            MS. OHIRI:  It's H.

6    BY MS. BLAISE:

7        Q    Yeah, Exhibit H.  You do admit that Exhibit H is the

8    agreement that was controlling with you and the plaintiff; is

9    that correct?

10       A    Yes.

11       Q    Okay.  In looking at Exhibit H, do you have it in

12   front of you?

13       A    Yes.

14       Q    Looking at paragraph 20, which is on page 5.

15       A    Yes.

16       Q    What does that say?

17       A    This agreement shall be binding and shall enter into

18   the benefit of the parties hereto, their successors and

19   assigns and shall be construed in the accordance with the

20   laws and exclusive jurisdiction in the State of California

21   with the USA.

22       Q    Now that you've had a chance to read that paragraph

23   and agree that this is the binding agreement, do you still

24   deny paragraph eight of the complaint?

25       A    I never did.

Page 111

1      Q    You did deny paragraph eight of the complaint in

2    your answer, in your amended answer that's signed by you.  So

3    do you admit the allegations contained in paragraph eight now

4    as you sit here today and you read paragraph eight, do you

5    admit those allegations?

6      A    I'm not sure what allegations means, but I admit

7    this to be true, yes.

8      Q    An allegation is the sentence that's contained in

9    the paragraph, that's called an allegation.

10     A    Mm-hm.

11     Q    Okay.  Turning to Exhibit G, which is the composer

12   agreement; correct?

13     A    Okay.

14     Q    Reading paragraph 3.2, under accounting.

15     A    Yes.

16     Q    Can you read that paragraph for me, please?

17     A    Owner shall pay composer my --

18     Q    3.2.

19     A    Oh, I'm so sorry.

20     Q    It's okay.

21     A    For royalty accounting and all the purposes, any

22   versions of the composition will be deemed to include each

23   short or longer version or edited, altered version of the

24   compositions.

25     Q    So this agreement contemplates a shorter or longer

```
1     versions or edited and altered versions; is that correct?

2          A     Yes.

3          Q     And in the composer's representations and warranties

4     in that same exhibit, Exhibit G, paragraph four.

5          A     Where are you going?

6          Q     It's Exhibit G, the composer agreement.

7          A     Yes.

8          Q     Paragraph four.

9          A     Four.

10         Q     So the next section underneath accounting.

11         A     Yes.  Okay.  Yes.

12         Q     And what is 4.1 say?

13         A     Composer represents and warrants that the

14    composition, with an S, if it is his sole exclusive and

15    original work and is capable of copyright protection by owner

16    throughout the territory.

17         Q     And 4.2.

18         A     Composer represents and warrants that no adverse

19    claims exist or will exist with respect to the composition,

20    with S, and the composition, with S, does not infringe upon

21    or violate copyrights or any other rights whatsoever of any

22    person, firm, or entity.

23         Q     And 4.3.

24         A     Composer represents that the performance of the

25    compositions is owned and/or paid for by the composer and
```

Veritext Legal Solutions
866 299-5127

```
1     that the composer holds owner and its associates harmless to

2     any claim thereof.

3          Q    In 4.3, who are its associates, what is that

4     referring to?

5          A    I don't know.

6               MR. JACOBSON:  Objection.  Calls for speculation.

7               THE WITNESS:  I don't know.

8     BY MS. BLAISE:

9          Q    And 4.4, what does that say?

10         A    Composer represents and warrants that composer has

11    the full and exclusive right and authority to enter into this

12    agreement and to make granting rights contained here and to

13    owner.

14         Q    Did you ever request for Michael Cohen to indemnify

15    Labrador as to relates to the claims against Eminem for the

16    use of Eminem-Esque?

17              MR. JACOBSON:  Objection.  Calls for a legal

18    conclusion.

19              MS. OHIRI:  Same objection.

20              THE WITNESS:  I don't know what that means.

21    BY MS. BLAISE:

22         Q    Did you ever make a demand on Cohen to pay for your

23    legal defense of this claim?

24              MR. JACOBSON:  Same objection for this line.

25              THE WITNESS:  I'm not sure.
```

```
 1     BY MS. BLAISE:

 2        Q    You're not sure if you did?  Is there anything that

 3     would refresh --

 4        A    Can I talk to her for a second?

 5        Q    Not while a question is pending.

 6             Is there anything that would refresh your

 7     recollection about whether or not you asked Michael Cohen --

 8        A    That's three different questions --

 9             THE REPORTER:  Hold on.

10             MS. OHIRI:  You have to let her finish.

11             MS. BLAISE:  It's not three different questions.

12     Can you read back --

13             THE REPORTER:  I'll read back what I got.  You just

14     have to give her a second to finish and your attorney to

15     object, and it really helps me out too.

16             THE WITNESS:  All right.

17             (Record read.)

18     BY MS. BLAISE:

19        Q    To defend you as it relates to Eminem's claims

20     against Eminem-Esque?

21        A    I'm sorry, I don't know the definitions of these

22     terms, defend me, pay me money, I don't mind telling you what

23     we did with -- in reference to Cohen and in regards to the

24     New Zealand election.

25        Q    Okay.  Why don't you then tell me what you did in
```

1    relation?

2        A    Good.  My attorney in the U.S. served Michael Cohen

3    paperwork for that matter, and he did not respond.

4        Q    Have you provided that paperwork in discovery?

5        A    Yes, yes.

6        Q    Has it been turned over to us?

7            MS. OHIRI:  I'm sorry, what paper are you referring?

8            THE WITNESS:  We served -- Stuart Wallach served

9    Michael Cohen when the New Zealand trial wasn't going on,

10   that's why I wasn't being mean, I don't know what it meant

11   for -- he was served and he didn't respond.

12           MS. OHIRI:  Whatever New Zealand documents,

13   pleadings that we had, we turned over.

14           THE WITNESS:  Okay.

15           MS. BLAISE:  I'm not asking about pleadings, I'm

16   asking about what was tendered -- he's saying that there was

17   a demand sent to Cohen by his attorney, and I'm wanting to

18   know --

19           MS. OHIRI:  I wasn't the attorney that did it.

20   So...

21   BY MS. BLAISE:

22       Q    So you'll re-provide those to your attorney and then

23   she'll provide them to me, to the extent that they haven't

24   already been provided?

25       A    If I have them, I'll do it again.

Page 116

```
 1              MS. OHIRI:  If they exist.

 2              MR. JACOBSON:  Although I'll reiterate same

 3      objection for this line.

 4              MS. BLAISE:  What's the objection?

 5              MR. JACOBSON:  Calls for a legal conclusion.

 6              MS. BLAISE:  Asking for documents that have been

 7      provided calls for a legal conclusion?

 8              MR. JACOBSON:  All right.  Maybe not that, but for

 9      the remainder of the -- those questions that called for --

10      that wasn't that one, that preceding that one.

11              MS. BLAISE:  One might say that your objection is

12      waived.

13              MR. JACOBSON:  No, I was reiterating that for one --

14              THE WITNESS:  I can't make notes.

15      BY MS. BLAISE:

16         Q    For the record, you're going to find those

17      documents?

18         A    I hope I remember.  I have no notes, but I probably

19      will remember, yeah.

20              MS. OHIRI:  To the extent they exist.

21      BY MS. BLAISE:

22         Q    But you have a relationship with the attorney

23      still?

24         A    Yes.

25         Q    So you can request the documents from your
```

Page 117

1    attorney?

2         A    Yes.

3         Q    And then your attorney can submit them to this

4    attorney?

5         A    Yes.

6         Q    Okay.  Thank you.

7         A    Have you finished the question, then?

8         Q    That question, yes.

9         A    Okay.  Can I talk to her for a second?

10        Q    Okay.  We can take a break.

11             (Break in deposition.)

12             (Discussion off the record.)

13   BY MS. BLAISE:

14        Q    While we were off the record, you had an opportunity

15   to speak with your attorney, was there something else you

16   wanted to add to your testimony based on that conversation?

17        A    Back in the question I was asking about for standard

18   of industry, the standard of the industry also, as I

19   understood it, was that the AMCOS agreement, the contract

20   with Beatbox, as I understand it, had set there can -- no

21   adaptations of any matter can happen, that was in the

22   contract.  So adaptations was part of what we were talking

23   about here.

24        Q    Did you read the AMCOS agreement before you entered

25   into the 2009 agreement that is marked as Exhibit H?

Page 118

```
 1        A    I had no -- Beatbox did not provide it to me, they

 2    simply wrote paragraphs saying -- saying, this is what we do,

 3    and you live with it, and so I did.

 4        Q    And so the answer to your question --

 5        A    No.

 6        Q    I'm trying to make a record.

 7             MS. OHIRI:  You have to wait, just give her some

 8    time to finish the question, give it a moment.

 9    BY MS. BLAISE:

10        Q    Okay.  Thank you.  Turning to Exhibit G, the

11    composer agreement.

12        A    Yes.

13        Q    Turning to paragraph 6, indemnification.

14        A    Okay.

15        Q    If you could just read the first part of that.

16        A    Composer will indemnify and hold owner and all

17    entities associated with owner free, safe, and harmless from

18    and against any and all losses, damages, actions, causes of

19    action, expenses or liabilities, including without

20    limitation, reasonable attorneys' fee and costs, whether

21    incurred before or after the entry of judgment resulting from

22    or by reasons of any material breach of any representation or

23    warrant to be made herein by composer.

24        Q    That's all I need you to read.  Do you contend that

25    Michael Cohen violated any of his representations and
```

Page 119

1    warranties in this agreement?

2            MR. JACOBSON:  Objection.  Calls for legal opinion

3    and conclusion.

4            THE WITNESS:  Do I contend that he --

5    BY MR. JACOBSON:

6        Q    Breached any of the representations and warranties

7    to refer you -- we went through the representations and

8    warranties previously.

9        A    No.

10       Q    That's paragraph four.

11       A    I don't think he did.

12       Q    You don't think he did?

13       A    I don't know.

14           MS. OHIRI:  I'm going to object it calls for a legal

15   conclusion.

16           THE WITNESS:  Yeah, I have to -- yeah, I don't know.

17   I don't know.

18   BY MS. BLAISE:

19       Q    Looking at paragraph seven, assignments, it says,

20   owner and its associates will have the right to assign this

21   agreement.

22       A    Yes.

23       Q    What does the term, its associates, mean in

24   paragraph 7.1?

25           MS. OHIRI:  Objection.  Calls for a legal

Page 120

1    conclusion.  Calls for an expert opinion.

2    BY MS. BLAISE:

3        Q    As you understand it.

4             MR. JACOBSON:  I join in the objection, and also

5    that it calls for speculation and for -- and that it's

6    ambiguous.

7             THE WITNESS:  I don't know.

8    BY MS. BLAISE:

9        Q    What is your definition of adaptation?

10            MS. OHIRI:  Objection.  Form.  Vague.

11            MR. JACOBSON:  I join, and calls for a legal

12   conclusion and opinion, considering -- in this context.

13            MS. BLAISE:  I'll rephrase.

14   BY MS. BLAISE:

15       Q    In your experience in music production licensing,

16   what is your definition of an adaptation?

17       A    It is about the widest defining word, it can't be

18   defined any wider.  To adapt something, it can mean almost

19   anything you want it to mean.

20       Q    Is using a segment of a track or an edited version,

21   does that qualify as an adaptation under your definition?

22       A    Yes.

23       Q    Have you spoken to or communicated with Cohen since

24   your attorney sent the documents to him that you referenced

25   earlier in your testimony?

                                                  Page 121

```
 1        A    No.

 2        Q    Have you continued to pay Cohen any -- any monies

 3   that have come in as a result of licensing his works under

 4   the term of your agreement?

 5        A    No.

 6        Q    When did you stop paying him?

 7        A    When the lawsuit started, and as soon as his next

 8   statement -- his next check was due after that.

 9        Q    Why did you stop paying him?

10        A    My attorney suggested I do.

11        Q    Why?

12             MR. JACOBSON:  Objection.  Calls for speculation.

13             THE WITNESS:  Yeah, I can't tell you the answer to

14   that.

15             MR. JACOBSON:  And that's it.

16   BY MS. BLAISE:

17        Q    Did Cohen send you a demand to pay him?

18        A    No.

19        Q    After that?  Have you ever told any of your other

20   sub-publishers to pull the track Eminem-Esque from being

21   licensed?

22        A    Yes.

23        Q    When did you do that?

24        A    Did you say other or --

25        Q    Any other sub-publisher.
```

Page 122

1       A    What does other mean, besides Beatbox or...

2       Q    You testified earlier that you had five

3   sub-publishers.

4       A    No, you don't -- I don't understand what you're

5   talking about.

6       Q    Okay.  Beatbox was your sub-publisher during --

7       A    Yes.

8       Q    Let me finish the question -- for Australia and New

9   Zealand; correct?

10      A    Yes.

11      Q    Okay.  Are there other jurisdictions, territories,

12  where you have other sub-publishers?

13      A    Yes.

14      Q    Okay.  Who are those other sub-publishers, for the

15  Spider Cues, from 2014 on?

16      A    Sub-publisher from France called CDM, sub-publisher

17  in -- from 2014 on or prior to that or what are you asking

18  me?

19      Q    Let's say from 2014 on.

20      A    This lawsuit was before that.

21      Q    Let's just start with 2014.

22      A    In 2014?

23      Q    Yeah, starting January 1, 2014, who were --

24      A    CDM for France, I believe Five Alarm in the United

25  States -- it might be after that date, I'm not sure, I'm not

Page 123

```
 1    sure of the date, if I can give you a proper answer about

 2    that date.

 3         Q    Do you have more than one sub-publisher in the U.S.?

 4         A    No.

 5         Q    Okay.  So who has been your U.S. Sub-publisher?

 6         A    Five Alarm.

 7         Q    Okay.  Germany?

 8         A    Sonoton, S-O-N-O-T-O-N, but I don't know when they

 9    started.

10         Q    Did you have any other before Sonoton?

11         A    In Germany, no; in Austria, the drum in Austria is

12    the combo.

13         Q    Sure.  Japan?

14         A    Again, I don't know about the date, but yes, Japan

15    is Sakura Notes, S-A-K-U-R-A, Notes, two words.

16         Q    Did you have someone before Sakura Notes?

17         A    No Japan, no.

18         Q    Okay.  Korea?

19         A    Modoocom, M-O-D-O-O-C-O-M, but I don't know the date

20    it started.

21         Q    Did you have someone before Modoocom?

22         A    In South Korea, no.

23         Q    Okay.  Eastern Europe?

24         A    Apollo, which is out of Denmark, A-P-O-L-L-O, had

25    owned -- had the territory of Poland as well.
```

Veritext Legal Solutions
866 299-5127

1       Q     Did you have anyone before them?

2       A     No.

3       Q     And then the U.K.?

4       A     I don't remember, I don't think so.

5       Q     Okay.  At any time after -- strike that.

6             Have you alerted any of these sub-publishers to pull

7       the Eminem-Esque cue from their catalogs for offering?

8       A     Labrador Entertainment, Inc. directed and requested

9       all of its sub-publishers, including Beatbox, to remove the

10      cue in 2012, 2014.  All the sub-publishers I had were

11      informed, directed and if Beatbox had, in fact, removed the

12      cue and changed the library design, according to using the

13      Excel file that Peter Baker had designed for us to use for

14      cues in 2009 as a format to use for defining a library, 2009,

15      as he designed all the Spider Cues, using that format to

16      change the library so that it removed the cue, if Beatbox had

17      done that, we would not be in this lawsuit, there would be no

18      litigation.

19      Q     Why was -- why do you contend that the Eminem-Esque

20      cue was removed -- you contend that it was removed in 2012;

21      is that correct?

22      A     I contend that I directed Beatbox and all the

23      sub-publishers to do that.

24      Q     Do you have any documentary evidence that says

25      remove the Eminem-Esque cue from circulation?

```
 1        A    Yes.

 2        Q    It says that expressly?

 3        A    It doesn't have to say that.

 4        Q    I'm asking, it's a question.

 5        A    What's the question?

 6        Q    Do you have any documentary evidence that expressly

 7   says remove the Eminem-Esque cue from circulation?

 8        A    Yes.

 9        Q    In 2012?

10        A    No.

11        Q    Okay.  But you do have documentary evidence that

12   says remove the Eminem-Esque cue?

13        A    Yes.

14        Q    When is that from?

15        A    In 2012, I explicitly sent an e-mail to Beatbox and

16   all sub-publishers, download in Excel file, follow the Excel

17   file, that's the definition of the library.

18        Q    Okay.  The question was, do you have any documentary

19   evidence that expressly states, remove the Eminem-Esque cue

20   from your catalog?  And your testimony initially was, not in

21   2012, and now I'm asking you, is there any time after that

22   expressly says remove the Eminem-Esque cue from our

23   catalog?

24        A    No.

25        Q    Do you understand that there's a difference in
```

1     changing the format in which your music goes out to possible

2     third-party users and in removing content that's already been

3     issued for licensing from third-party users?  Do you

4     understand that there's a difference or do you not

5     understand?

6              MS. OHIRI:  Objection.  Form.

7              MR. JACOBSON:  Objection.  Vague and ambiguous.

8              THE WITNESS:  I don't understand what the

9     question.

10              MS. BLAISE:  Okay.  I'm going to restate the

11     question.

12     BY MS. BLAISE:

13        Q    Do you understand how sub-publishers, such as

14     Beatbox, send music out to their potential clients?

15        A    Yes.

16        Q    How does that happen?

17        A    Ask him.

18        Q    No, I'm asking you, you said you understand, and I'm

19     asking you.

20        A    I understand that happens.

21        Q    Do you know how?

22        A    It happens different with different sub-publishers

23     I'm quite sure.

24        Q    I'm asking you about Beatbox, do you know how

25     Beatbox sends its music out to its --

                                                    Page 127

```
 1        A    My understanding.

 2        Q    Let me ask my question, please, before you start

 3   talking.

 4        A    Okay.

 5        Q    Do you understand how Beatbox sends out music to its

 6   potential clients?

 7        A    I have an understanding of it.

 8        Q    Okay.  What is your understanding?

 9        A    That Beatbox has external drives with their player

10   on it, and they also include in that external drive the

11   various libraries they represent and they send that out to

12   clients, I think that's what happens.

13        Q    Okay.  Did you also offer any of the cues from

14   Cohen, including Eminem-Esque, on your website?

15        A    No.

16        Q    No end user could come to your website and listen to

17   any of your cues at any time?

18        A    They could listen to them.

19        Q    Okay.  Can you still here Eminem-Esque on your

20   website?

21        A    No.

22        Q    When did you remove Eminem-Esque from your

23   website?

24        A    In 2014, I think.

25        Q    Why did you remove it?
```

Page 128

```
 1        A    I removed it because I hit buttons accidentally and

 2    was able -- almost accidentally hitting buttons to remove it.

 3    The site was designed by an Indian company, and I could never

 4    manipulate the site at all successfully to remove things,

 5    move them around, move anything around, or even work with it.

 6    Occasionally when I would hit a button, it would delete or

 7    even remove something.  The site was attacked with viruses,

 8    at least a half a dozen times, maybe more, and the only

 9    option I had was to call the host and use the very original

10    first zion and put it back up again.  The site never licensed

11    anything off of itself, no one ever licensed off the cue,

12    that I know of, no music advisor or editor or end user ever

13    even used or played anything on it, I have no reason to

14    believe anybody ever did that.  And it was a useless facade

15    of a cue of a site.

16          MS. BLAISE:  Move to strike all portions of that

17    answer that were nonresponsive to the question.

18    BY MS. BLAISE:

19        Q    When you accidentally deleted the Eminem-Esque track

20    from your website, did you accidentally delete any other

21    tracks?

22        A    I don't remember.

23        Q    Have you ever deleted any other tracks other than

24    Eminem-Esque from your website?

25        A    I don't remember.
```

Veritext Legal Solutions
866 299-5127

1      Q    Do you have any way of knowing if whether or not

2    Eminem-Esque was publicly performed through the player on

3    your website?

4      A    No.

5      Q    Do you have any tracking data for who visited your

6    website when Eminem-Esque was up?

7      A    No.

8      Q    Are you currently holding any money that belongs to

9    Cohen for the licensing of any of his cues under the terms of

10   your composer agreement, which is marked as Exhibit G?

11     A    Yes.

12     Q    How much money are you holding for him?

13     A    It's listed -- you already looked at it, it's listed

14   there on one of these forms, but yes.

15     Q    Do you know it off the top of your head?

16     A    No.

17     Q    Was it in your answers to discovery?

18     A    He can probably tell us where it is.

19          MR. JACOBSON:  Yep, there are numbers listed in

20   response to interrogatory's one.  And I don't know if those

21   are the right numbers.

22          MS. OHIRI:  No.

23          THE WITNESS:  We went over it many times, a couple

24   of times you both referred to it.

25          MS. OHIRI:  No, she asked is there any monies that

                                                    Page 130

```
 1    you're withholding.

 2             THE WITNESS:  That's the list.  Oh, I'm so sorry.

 3    I'm so sorry.  No, no, I'm so sorry, pardon me, pardon me.

 4    Yes, there's money I'm withholding, yes.

 5    BY MS. BLAISE:

 6        Q    Okay.  How much is it?  How much are you withholding

 7    that belongs to Cohen?

 8        A    I'm going to guess $4,000.

 9             MR. JACOBSON:  Is that an estimate?

10             THE WITNESS:  That's an estimate.

11             MS. OHIRI:  We don't want you to guess or

12    speculate.

13    BY MS. BLAISE:

14        Q    And why are you withholding it?

15        A    You asked me that question already, my attorney told

16    me to.

17        Q    Your current attorneys or your previous attorneys?

18        A    No, previous attorneys.

19        Q    The $4,000, approximately $4,000 that you're

20    withholding that belongs to Cohen, do you know what cues that

21    $4,000 relates to?

22        A    No.

23        Q    Would you be able to review documents that would

24    allow you to know what that $4,000 relates to?

25        A    Yes.
```

Page 131

1        Q     What documents are those?

2        A     Statements from sub-publishers.

3        Q     Do you have those statements?

4        A     I do have those statements.

5        Q     Can you send them to your lawyer, please?

6        A     Yes.  Again, I can't make notes, but I'll try and

7    remember that.

8        Q     How many composers do you currently have that you

9    pay semi annually?

10       A     That are actually paid or that -- that get paid?

11       Q     That get paid, mm-hm, approximately.

12       A     Approximately 30.

13       Q     And you said Labrador's gross income for 2019 was

14   approximately zero?

15       A     You said '18 before.

16       Q     2018?

17       A     Yeah, zero.

18       Q     Gross income?

19       A     Yeah.

20       Q     Do you understand the difference between gross and

21   net?

22       A     No, net -- net income.

23       Q     Okay.  What is Labrador's gross income for 2018?

24       A     I don't know the answer.

25       Q     Is there a document that you could refer to that

Page 132

```
 1      would allow you to answer that question?

 2         A    Yes.

 3         Q    What document is that, your tax return?

 4         A    A CPA, my certified accountant will prepare it for

 5      you.

 6         Q    And you'll get it to your lawyer?

 7         A    I'll get it to her, yes.  Can I make any notes with

 8      a pen on the top of it to make sure I deliver to you what I

 9      want?

10         Q    I think your attorney is making notes.

11         A    Okay.  Good.  Thanks.

12         Q    Okay.  Turning back to Exhibit G.

13         A    This one?

14         Q    Yes.  Turning to 10.2.

15         A    Yes.

16         Q    If you can read that.

17         A    If a claim is presented against owner or its

18      associates in which it is asserted -- it is -- I don't know

19      what that word is.

20         Q    Asserted.

21         A    That he, composition, meaning the -- I think it's a

22      typo -- the compositions infringe upon or violate or

23      interfere with the rights of any person, firm, or entity,

24      owner shall notify composer of such claim in writing and

25      composer may participate on the defenses of such claim;
```

```
 1    however, owners and its associates shall have the right to

 2    control the defense and to settle or otherwise dispose of

 3    such claim or action in any reasonable business manner.

 4        Q    Did you notify the composer, Michael Cohen, of such

 5    claim and in writing pursuant to this paragraph?

 6            MS. OHIRI:  Objection.  Form.  Vague.

 7            THE WITNESS:  Yes, I already answered that.

 8    BY MS. BLAISE:

 9        Q    You did notify him in writing?

10        A    Yes.

11        Q    And who is referred to as, its associates, in this

12    paragraph?

13        A    I don't know.

14        Q    How much money does Labrador earn in performance

15    royalties paid by ASCAP or BMI or SESAC?

16        A    What do you mean earn?

17        Q    How much is paid by ASCAP, BMI or SESAC?

18        A    In what term?

19        Q    To Labrador.

20        A    What moment?  What time are you talking about?

21        Q    Annually, for 2018.

22        A    Annually, how much -- I'll repeat the question, how

23    much performance rights monies is paid to Labrador -- last

24    year or...

25        Q    Yeah, 2018.
```

Page 134

```
 1        A    2018, just give me a minute, about $15,000.

 2        Q    Thank you.

 3        A    That's a guess.

 4        Q    Got it.  Okay.  Turning back to Exhibit H, which is

 5    the Labrador and Beatbox agreement.  Has the Eminem-Esque cue

 6    been retitled on that ASCAP database?

 7        A    I'm sorry?

 8        Q    The Eminem-Esque cue, was it retitled on the ASCAP

 9    database?

10        A    I don't know.

11        Q    Did you retitle it?

12        A    No.

13        Q    Have you made any changes to the Eminem-Esque cue on

14    the ASCAP database --

15        A    No.

16        Q    Hold on.  At any time since entering into the

17    agreement marked as Exhibit G?

18        A    I don't think so, no.  The answer I gave about

19    publishing monies, it's much less than that, but I can get

20    back to you on that.

21        Q    On the performance rates?

22        A    The performance rates.

23        Q    Okay.  Since entering into the agreement marked as

24    Exhibit H, have you ever sent Beatbox a written letter

25    stating that they're in default of any of the provisions of
```

```
 1    the agreement?

 2        A    I'm not sure what that means, to send a letter.  Is

 3    an e-mail a letter?

 4        Q    Looking at paragraph 13 of Exhibit H.

 5        A    13, yeah.

 6        Q    Paragraph 13.  Have you ever sent such a letter?

 7        A    I think this means that I terminate them with a

 8    letter, and I did, yes.

 9        Q    If you could just read the paragraph aloud to the

10    point -- it's just such a long sentence, I'm trying to not

11    make you read the whole thing, but hold on.

12        A    The publisher should have the right?

13        Q    No, should the sub-publisher default is where you

14    should start.

15        A    Should the sub-publisher default and render in any

16    statement of account or in making any payments as herein

17    before provided or in fully complying with any material terms

18    or conditions herein required of the sub-publisher to be

19    performed and should such default continue for 30 days after

20    the publisher has sent notice of such default by registered

21    mail and fax to the sub-publisher, the publisher shall have

22    the right to terminate and cancel the agreement as of

23    expiration -- slow down -- of the said 30 days or should the

24    sub-publisher make any assignment for the benefit of

25    creditors or take the benefit of any bankruptcy act, save the
```

Page 136

```
 1    purpose of reconstruction, or should the sub-publisher be

 2    petitioned into bankruptcy, then in each and every such

 3    event, the publisher shall be entitled to terminate and

 4    cancel this agreement, and the sub-publisher shall account to

 5    the publisher forthwith for any outstanding fees not

 6    accounted for up to the time of such cancellation.

 7        Q    So my question is, based on paragraph 13, did you

 8    ever send a notice of default by registered mail and fax to

 9    Beatbox at any time during the term of your relationship

10    under this agreement marked as Exhibit H?

11        A    I sent a letter.  You're saying registered

12    certified, I'm not sure whether it was or not, it might have

13    been, but I'm not sure.

14        Q    Do you remember the context of the letter?

15        A    That for performance failure, you're terminating

16    this agreement.

17        Q    And did you wait 30 days to terminate the agreement

18    after sending the letter that they were not in compliance --

19        A    I --

20        Q    Hold on, strike that.

21             When did you send this letter?

22        A    I think in 2016 or '17, I'm not sure.

23        Q    Okay.  And you said that the letter was for

24    non-performance?

25        A    Yes.
```

Page 137

```
 1        Q    And what was the non-performance that your letter

 2   spoke of?

 3        A    No payment was sent, and I don't know that I named

 4   the non-performance items.

 5        Q    Did you provide a copy of the letter to your

 6   attorney in this action?

 7        A    I think so.

 8        Q    Was it provided to us?

 9        A    I'll make a note and I'll get that to you.

10             MS. OHIRI:  I need to know what letter he's

11   referring to.

12             MS. BLAISE:  He's saying he sent it in 2016 or 2017,

13   that it was a letter of default or termination letter.

14             THE WITNESS:  Okay.  To Beatbox.

15   BY MS. BLAISE:

16        Q    Can you review Exhibit H?

17        A    What is that?

18        Q    Exhibit H is the agreement between Labrador and

19   Beatbox.

20        A    Okay.  Yes, yes.

21        Q    And let me know where it says that Labrador was

22   providing the rights of Cohen with the caveat that there

23   could be no adaptation without consultation from Cohen.

24             MS. OHIRI:  I'm going to object that it calls for a

25   legal conclusion.
```

Page 138

1          THE WITNESS:   Number 16, double I, you want me to

2     read it to you?

3     BY MS. BLAISE:

4          Q    Yes, please.

5          A    During the term of this agreement, the publisher,

6     not grant any rights in the compositions to any person, firm,

7     or company other than the sub-publisher for the territory, or

8     enter into any agreement or acts in any way which would

9     derogate from the rights, grants to the sub-publisher here

10    under.

11         Q    You recognize in this agreement, you're the

12    publisher; correct?

13         A    Yes.

14         Q    Would you please read the paragraph again and tell

15    me how that is a limitation on the sub-publisher, Beatbox?

16         MS. OHIRI:   I'm going to object, again, that that

17    calls for a legal conclusion.

18    BY MS. BLAISE:

19         Q    This is an exclusivity clause, is it not?

20         A    Yes.

21         Q    Okay.  So when you testified earlier that it put

22    Beatbox on notice that they weren't being granted the

23    complete rights to Eminem-Esque, that wasn't correct;

24    correct?

25         A    Could you say that again?

Veritext Legal Solutions
866 299-5127

1        Q     When you testified earlier that paragraph 16 II put

2     Beatbox on some limitation, some notice that there was a

3     limitation of the rights you were granting them in the cue,

4     Eminem-Esque, and you cited to this paragraph, that is not

5     what this paragraph says, is it?

6               MS. OHIRI:  Objection.  Mischaracterizes earlier

7     testimony.

8               THE WITNESS:  To me this says that I cannot -- the

9     publisher cannot offer to the sub-publisher and the

10    sub-publisher cannot follow through with anything that would

11    derogate anything written in the contract.

12    BY MS. BLAISE:

13       Q     You recognize that Labrador is the publisher;

14    correct?

15       A     Yes.

16       Q     And you recognize that Beatbox is the sub-publisher;

17    correct?

18       A     Yes.

19       Q     Okay.  And this paragraph says, during the term of

20    this agreement, you understand what that means?

21       A     Yes.

22       Q     That the publisher cannot grant any rights to the

23    compositions to any person or company other than its

24    sub-publisher?

25       A     Okay.

                                                    Page 140

```
 1        Q    Who is the sub-publisher?

 2        A    In this regard, Beatbox.

 3        Q    Right.  So this is saying that Labrador cannot grant

 4   rights to others in the territory, other than to Beatbox; is

 5   that correct?

 6        A    Okay.  That's what you're telling me this says,

 7   that's fine.

 8        Q    Okay.  And it also, to derogate, what does that mean

 9   to you, in the context of the way the rest of the sentence is

10   written?

11        A    That can't abuse any of the rights listed in the --

12   in the contract.

13        Q    That the publisher could not?

14        A    That the publisher cannot grant anyone else anything

15   that would derogate the -- yes, yes, that's right.

16        Q    So it's not a limitation on Beatbox, the

17   sub-publisher, correct, it's a limitation on the publisher?

18        A    Yes.

19        Q    Okay.  And looking at 16 four -- I'm sorry, strike

20   that.

21             Looking at 16 three, III.

22        A    Yes, okay.

23        Q    What does that say?

24        A    The publisher is party to or has entered into good

25   and valid contracts with the writers and composers of the
```

Page 141

```
 1    compositions and such contracts enable it to comply with all

 2    terms and conditions hereof, and the publisher will do all

 3    things necessary not to be in breach of the same during the

 4    term hereof.

 5         Q    And is it your contention that your agreement with

 6    Cohen required Cohen's approval before you could grant the

 7    rights that you're granting in this agreement?

 8              MS. OHIRI:  Objection.  Calls for a legal

 9    conclusion.

10              MR. JACOBSON:  Join.

11              THE WITNESS:  No.

12    BY MS. BLAISE:

13         Q    Can you look at 16 four?

14         A    Read it?

15         Q    Yes, please.

16         A    The compositions are original and that none of the

17    compositions infringes any other copyright work or the rights

18    of any other third party.

19         Q    Okay.  Do you believe that Labrador violated the

20    terms of that provision in this contract?

21         A    No.

22         Q    Even though a New Zealand Court found the

23    Eminem-Esque track to be infringing of "Lose Yourself" by

24    Eminem?

25         A    Can I just tell you, you keep saying that, I don't
```

Page 142

1    know why you keep saying that, that's not true.

2         Q    Do you recognize that there's a court order finding

3    Eminem-Esque to be infringing of "Lose Yourself"?

4         A    A court order?  What's a court order?  You mean you

5    suing me, is that what a court order is?

6              MS. OHIRI:  No, it's the New Zealand Court.

7              THE WITNESS:  Says -- says what?

8              MS. OHIRI:  What they say.  I'll let her ask the

9    question.

10   BY MS. BLAISE:

11        Q    Yeah, the New Zealand Court says that Eminem-Esque

12   infringed "Lose Yourself," do you disagree with that?

13        A    Yes, I do.

14        Q    Okay.  We're going to have to make copies of this if

15   everyone wants one.  This is the New Zealand judgment.

16             MR. JACOBSON:  I'm all set.

17             MS. BLAISE:  Okay.

18             MR. JACOBSON:  We probably have that.

19             MS. BLAISE:  Everyone has it, and I'm only going to

20   refer to one page.  I'm happy to let everyone see what this

21   page is.

22             MR. JACOBSON:  So do you want me to make copies of

23   that?

24             MS. BLAISE:  If everyone wants a copy to look at

25   while we're -- yes, here.

Page 143

```
 1              THE REPORTER:  Do you want to go off while he does

 2     that?

 3              MS. OHIRI:  Yeah.

 4              MS. BLAISE:  Yes.

 5              (Break in deposition.)

 6              (Discussion off the record.)

 7              (Deposition Exhibit M marked for identification by

 8               the court reporter.)

 9     BY MS. BLAISE:

10         Q    So referring to Exhibit M at 2.3, have you ever seen

11     this before?

12         A    I think so.

13         Q    Okay.  And --

14         A    I'm not sure.

15         Q    And do you understand that this means the New

16     Zealand Court did find Eminem-Esque to reproduce in whole or

17     in substantial part the Eminem song "Lose Yourself"?

18              MR. JACOBSON:  Objection.  Calls for legal

19     conclusion and legal opinion.

20              MS. OHIRI:  Same objections.

21              THE WITNESS:  I understand that the voice -- the

22     voice used to -- over the music was a substantial part of the

23     decision.  So I can't really conclude that the tune itself

24     was named as infringing.

25     BY MS. BLAISE:
```

Page 144

```
 1      Q     Looking at 2.2 -- I mean, sorry, 2 -- 2.3, 222, A

 2   through E, it's more than just the voice that was determined

 3   to be substantially similar to the Eminem-Esque was

 4   determined to be substantially similar to Eminem's "Lose

 5   Yourself"; is that true?

 6      A     Are you telling me that or asking me?

 7      Q     I'm asking you.

 8      A     And your question is?

 9      Q     Looking at A through E, E deals with the voice;

10   correct?

11      A     Correct.

12      Q     And A, B, C, D deal with all different other

13   components; is that correct?

14      A     Yes.

15      Q     And which of those components do you contend were

16   not contained in the Eminem-Esque cue?

17           MS. OHIRI:  Objection.  Calls for a legal

18   conclusion.  Calls for an expert opinion.

19           MR. JACOBSON:  Join.

20           THE WITNESS:  I don't know which part doesn't, it

21   was not part of it.  Are you asking me to separate the

22   reasons for a decision?

23   BY MS. BLAISE:

24      Q     No, I'm asking, based on your understanding of music

25   and your understanding of listening to the Eminem-Esque
```

Page 145

1    track, which of these identified reasons of similarity, A, B,

2    C, and D, are not contained -- do you contend are not

3    contained in Eminem-Esque?

4            MS. OHIRI:  Same objection.

5            MR. JACOBSON:  Join.

6            THE WITNESS:  The question is confusing to me.

7    BY MS. BLAISE:

8        Q    Okay.  Looking at A, the sonic bed which figures the

9    first two four-measured templates of the advertisement, do

10   you contend that the first two four-measured templates are

11   not actually embodied in the Eminem-Esque track?

12           MS. OHIRI:  Same objection to this line of

13   questioning.

14           MR. JACOBSON:  Join in all that.

15           THE WITNESS:  What is it you want me to answer?

16   What are you asking me?

17   BY MS. BLAISE:

18       Q    I want to know if you contend that Eminem-Esque has

19   a sonic bed that has two four-measure templates that are

20   similar to "Lose Yourself"?

21       A    To make things faster, you're referring to the --

22   their reference to Eminem-Esque -- or my reference to

23   Eminem-Esque, what I know to be Eminem-Esque, does it matter

24   to the question?  Am I out of line asking this?  Because

25   we're going on and on with the same thing.

                                                    Page 146

```
 1          Q     The track?

 2          A     The track.

 3          Q     Known as Eminem-Esque?

 4          A     Yeah.

 5          Q     You were named as a defendant in that lawsuit;

 6     correct?

 7          A     No.

 8          Q     In the New Zealand lawsuit, Labrador is not a

 9     defendant?

10          A     I don't think so.

11          Q     You did not object to the jurisdiction of the court

12     as a defendant in that lawsuit?

13          A     Which question do you want me to answer?

14          Q     Did you have an attorney defend you in the New

15     Zealand lawsuit?

16          A     For infringement?

17          Q     For infringement.

18          A     No.

19          Q     How did you participate in the New Zealand action?

20          A     I'm not sure what the capacity would be called.  It

21     was a participation.

22          Q     Okay.  As a party?

23          A     What does that mean?

24          Q     A individual involved in a lawsuit as a person who

25     has an interest in the lawsuit?
```

Veritext Legal Solutions
866 299-5127

1        A    I was on a video camera and they interviewed me in

2   court.

3        Q    Do you have a recollection of objecting to the

4   jurisdiction of the court for infringement?

5        A    Yes.  No, sorry, no.  For infringement?

6        Q    Yes.

7        A    I did not object to the jurisdiction for the

8   infringement trial.

9        Q    I need his answer.  After you became aware of the

10  New Zealand action, what action did you undertake at that

11  time?

12       A    In what regard?

13       Q    What did you do when you became aware that a lawsuit

14  by Eminem had been filed relating to Eminem-Esque?

15       A    Peter and I talked about it, he called me, some

16  e-mails went back and forth, I called Michael Cohen, he was

17  away, came back, he finally called me back, days later, I

18  told him what was going on.  What more -- what else are you

19  looking for?

20       Q    Did you apologize to Peter Baker?

21       A    I said I was sorry for whatever transpires,

22  transpired.

23       Q    Did you and Cohen agree that it was

24  non-infringing -- that the Eminem-Esque track was not

25  infringing of the Eminem "Lose Yourself" track?

Page 148

```
 1        A     We didn't talk about the specifics of the case.

 2        Q     Did you consult with anyone else who told you that

 3    the Eminem-Esque track was not infringing of "Lose

 4    Yourself"?

 5        A     It was not -- that it was not infringing.  The

 6    musicologist, I referred to him already, and Shazam, and I

 7    then called my -- my -- one of the CEOs of Olay, a friend,

 8    someone I work with, and he says, no way this is infringing.

 9    Other peers of mine, as it's just been talked about, there's

10    no one that I know of that thinks it's infringing.

11        Q     Except for the court; correct?

12        A     No, the court doesn't think that -- the court thinks

13    the video the music played on the video is infringing with

14    the voice over, that's a lot of components.  The cues that

15    you're referring to, SQ MC Eminem-Esque was removed -- was

16    directed to be removed when I directed it to Beatbox to

17    remove it in 2012 and 2014.  And that's when I --

18              MS. BLAISE:  There's no question pending.  So move

19    to strike.

20              THE WITNESS:  Oh, I thought it was in reference to

21    clarify the cue.

22              MS. BLAISE:  Move to strike.  Exhibit N.

23              (Deposition Exhibit N marked for identification by

24               the court reporter.)

25              MS. BLAISE:  This is the request to admit.  I don't
```

Page 149

```
 1    have additional copies, you guys both have them.

 2             MR. JACOBSON:  I'm sorry, which is it?

 3             MS. BLAISE:  Our answer to the request to admit.

 4    I'm just going to give him my copy.

 5    BY MS. BLAISE:

 6        Q    So turning your attention to request for admission

 7    number 15, this is your response, do you remember preparing

 8    these?

 9        A    You want me to look at this part here?

10        Q    Yeah, but the document title is on the front.

11        A    Okay.  Do you need to see it back to ask the

12    question?

13        Q    No, it's okay.  Do you see what the question number

14    15 is?

15        A    Oh, the question is over here?

16        Q    It might be on the back page because they're

17    double-sided.

18             MR. JACOBSON:  I'm sorry, which number is it?

19             MS. BLAISE:  This is N.

20             MR. JACOBSON:  No, no, no which --

21             MS. BLAISE:  Oh, 15.

22             MR. JACOBSON:  Thank you so much.

23             THE WITNESS:  Okay I see it, yes.  And I should look

24    at my 15 here?

25    BY MS. BLAISE:
```

Page 150

```
 1        Q     Well, just read what the request number 15 to admit
 2   is.
 3        A     Admit that you challenge the jurisdiction of the
 4   High Court of New Zealand in case CIV-2014-486-11220 to
 5   adjudicate the claim for copyright infringement against
 6   you.
 7        Q     Correct.  And you means Labrador; is that correct?
 8        A     Yes.
 9        Q     Okay.  And you don't have to read your objections, I
10   just want to know your answer there and if that refreshes
11   your recollection as relates to --
12        A     Well, my recollection -- are you finished with the
13   question?
14        Q     As it relates to the activities that you undertook
15   in the New Zealand case as a party?
16        A     My recollection is that the lawsuit between -- for
17   infringement was between Eight Mile and the National Party.
18   The lawsuit between Beatbox and Labrador was not about
19   infringement, I don't think.  I don't know what -- I actually
20   don't know what it was about, but the infringement case was
21   between the two of them.  This concerns the infringement
22   case, but the infringement case -- that's my understanding,
23   was it was just between the two of them.
24        Q     Okay.  And what action did you undertake as it
25   relates to that case?
```

```
 1        A     In what regard?

 2        Q     As a party, you participated in the case; correct?

 3        A     Do you mean the case Beatbox and Labrador or

 4   infringement case?

 5        Q     Do you know of any other case number other than the

 6   case number that's provided?

 7        A     No, I don't know.

 8        Q     Okay.  So then we're talking about one case;

 9   correct?

10        A     The infringement case between Eight Mile and

11   National Party.

12              MS. OHIRI:  Can we go off the record for a second?

13              MR. JACOBSON:  Yes, of course.

14              (Break in deposition.)

15              (Discussion off the record.)

16   BY MS. BLAISE:

17        Q     We can go back on the record.  You had an

18   opportunity to talk to your attorney about how you

19   participated in the New Zealand proceedings as a party, do

20   you have a better answer that you're able to provide now?

21        A     I have a better answer.  My understanding was that

22   the case that I was being sued by Beatbox for indemnity, it

23   had nothing to do with the infringement lawsuit, but she's

24   telling me that the number was the same number as the first.

25   So I don't mean to be a butthead about it, but if that's what
```

Page 152

```
 1    it is, yeah, if it refers to that, fine.  My challenge and

 2    jurisdiction to the High Court of New Zealand had nothing to

 3    do with infringement or the National Party, it was that

 4    Beatbox and I had signed a contract stating that it should be

 5    in Los Angeles, just between Beatbox and me, where we would

 6    discuss our indemnity disagreements.

 7         Q    I understand.  Do you recognize that the High Court

 8    found that it had jurisdiction over you because of the

 9    infringement claim of Eminem and because it didn't relate to

10    the contract with you and Beatbox, but it related to the

11    infringement claim of Eminem?

12         A    I didn't know that.

13         Q    Okay.  For the record, the exhibit that is the

14    judgment --

15         A    That's amazing, wow.

16         Q    -- the judgment, which I think is Exhibit N --

17              MS. OHIRI:  It was M, I think.

18              MS. BLAISE:  M, was from your discovery responses,

19    Beatbox Bates-stamp 200 through 231.

20              MS. OHIRI:  Thank you.

21              MS. BLAISE:  I'm going to show you what's been

22    previously marked as Exhibit O.

23              (Deposition Exhibit O marked for identification by

24               the court reporter.)

25    BY MS. BLAISE:
```

Page 153

1       Q     And which is Beatbox production response 382.  Let

2    me steal back the request to admit.  Sorry.  Thanks.

3           Did you have an opportunity to look at Exhibit O?

4       A     Is that what this is?  Yes.

5       Q     Do you recognize that e-mail?

6       A     Yes.

7       Q     Did you send it?

8       A     Yes.

9       Q     Whose Rigaud Frank or Franck?

10      A     He works for CDM in France and West Side

11   Publishers.

12      Q     Okay.  Is that your only French sub-publisher?

13      A     Yes.

14      Q     Okay.  And what are you asking him to do in this

15   e-mail?

16      A     You want me to read it?

17      Q     Sure.

18      A     Or do you want me to explain it?

19      Q     You can read it.

20      A     Hi Franck, please remove the cue SQ MC Eminem-Esque

21   from your library.  I don't know the title you might have

22   given the cue, but I attached the actual MP3 for it to be

23   clear.  It is written by Michael Alan Cohen.  Thank you.

24      Q     Why did you ask him to remove the cue?

25      A     It was precaution because in 2012, I directed

Page 154

```
 1    Beatbox and all my sub-publishers to remove the cue as it was
 2    listed on the Excel file, the Excel file that Peter Baker
 3    designed for all of the -- for us to -- for Labrador to
 4    understand its entity.  We utilized that in 2012, and I
 5    directed all sub-publishers in 2012 to remove the cue, that
 6    standard Excel pattern way, and if he had done that -- that
 7    was my assumption that he had done that, and if he had done
 8    that, we wouldn't be in this litigation.
 9         Q    Why --
10         A    I did the same thing in 2014 with using his designs
11    Excel file that defines in library, I gave that same Excel
12    design to Beatbox and all the sub-publishers in, I think,
13    January of 2014 to remove it.  This is a precautionary e-mail
14    to him to make sure, look, if you didn't do it, do it.  I
15    have an example here of someone who didn't do it.  So here I
16    am in 2014, August, being told by one of my sub-publishers
17    that he didn't do it.  So I would assume, as a smart
18    businessman, that I should caution all the others that they
19    didn't follow Beatbox's advice.
20              MS. BLAISE:  Move to strike as nonresponsive to the
21    question.
22    BY MS. BLAISE:
23         Q    You already testified earlier that you never
24    expressly in 2012 sent an e-mail to any of your
25    sub-publishers saying remove Eminem-Esque; isn't that
```

Page 155

1    correct?

2         A    What does explicitly mean?

3         Q    Explicitly means remove Eminem-Esque from your

4    library, just like this e-mail says, you never sent an e-mail

5    like this in 2012; correct?

6         A    That's correct.

7         Q    All right.  You sent an Excel spreadsheet that had

8    different track listings than what you had already authorized

9    to be sent to end users on the digital files or the physical

10   files by your sub-publishers; correct?

11        A    Yes.

12        Q    Okay.  And did any of those tracks on the new Excel

13   spreadsheet, how many were different from the previous one?

14        A    I can't tell you exactly that.

15        Q    Was it more than just Eminem-Esque?

16        A    Yes.

17        Q    Is there any reason why this e-mail doesn't include

18   every single cue that you contend you directed to be removed

19   in 2012 versus just directing --

20        A    Yes.

21        Q    What's the reason?

22        A    There's a lawsuit.

23        Q    Right.

24        A    Right, that's my answer.

25        Q    Okay.  And what do you contend now is -- do you

1    contend that Eminem-Esque is infringing now with "Lose

2    Yourself"?

3              MS. OHIRI:  Objection.  Calls for a legal

4    conclusion.  Calls for an expert opinion.

5              THE WITNESS:  What do you mean by Eminem-Esque?

6              MR. JACOBSON:  I join.

7    BY MS. BLAISE:

8         Q    Eminem-Esque -- okay.  So --

9         A    We don't have to keep going over this.

10        Q    On your Exhibit O, you direct your sub-publisher to

11   remove the cue, SQ MC Eminem-Esque from their library.

12        A    With an MP3.

13        Q    Do you contend that the cue you're referencing here

14   infringes Eminem's "Lose Yourself"?

15        A    No.

16        Q    So why did you decide to remove it?

17        A    Because I hadn't yet heard the video of the -- I

18   hadn't analyzed the video of -- the music that was used in

19   the video.

20        Q    So are you currently licensing cue SQ MC

21   Eminem-Esque?

22        A    No.

23        Q    Why not?

24        A    Because litigation being -- being claimed as

25   infringing is one matter, having litigation even being --

                                                    Page 157

```
1    even with being found non-infringing is another matter and

2    very expensive.

3         Q    So you admit that there is still a claim for

4    infringement, there's a third-party claim?

5         A    I don't know what that means.

6              MS. OHIRI:  Objection.  Misstates prior testimony.

7              MR. JACOBSON:  And calls for a legal opinion.

8    BY MS. BLAISE:

9         Q    You admit that Eminem has a claim for infringement

10   as it relates to SQ MC Eminem-Esque; correct?

11             MR. JACOBSON:  Same objection.

12             MS. OHIRI:  Objection.  Mischaracterizes earlier

13   testimony.

14             THE WITNESS:  I don't know.

15   BY MS. BLAISE:

16        Q    Do you think that if Eminem becomes aware of this

17   case that he'll become a party of this case and insert

18   infringement against --

19             MR. JACOBSON:  Objection.  Calls for speculation.

20             THE WITNESS:  I don't know.

21             MS. OHIRI:  Join.

22   BY MS. BLAISE:

23        Q    Who do you think is responsible for the damages that

24   have been incurred in the New Zealand case?

25             MR. JACOBSON:  Objection.  Calls for a legal
```

Page 158

1    conclusion.

2           THE WITNESS:  There are a number of parties.  The

3    major party is Beatbox who was directed in 2012 to remove the

4    cue per a design that he gave me to design to -- to define a

5    library by use of an Excel file.  He also acknowledged

6    earlier than that when we met at my office that he approved

7    of the sound like you.  He also claimed that he would be able

8    to decide his own -- what would be licensed or not.  He also

9    said he removed it in 2013 as we met in Las Vegas.  I sent

10   him another e-mail, or much more than that, another directive

11   to remove the cue in 2012 by use of an Excel file, held

12   titles, and to -- which is what he didn't do and he's

13   responsible for this litigation.  There may be other parties

14   as well.  He also apparently, as we -- was nervous about the

15   possibility of infringing and conspired with the National

16   Party to continue with the possible licensing of it knowing

17   himself and admitting later on that it was -- that they wish

18   the title would have given it away and that, in fact, they

19   were nervous, both the National Party and Beatbox were

20   nervous about the cue being found out.

21          MS. OHIRI:  Okay.  Just answer the question.

22          THE WITNESS:  Best I could.

23   BY MS. BLAISE:

24      Q    So is it your contention that when you sent an Excel

25   spreadsheet in 2012, that didn't contain certain cues that

Page 159

```
 1    you contend did not contain certain cues, that that was meant

 2    to revoke any of those cues that had already been sent into

 3    commerce for third-party end users to use?  Do you contend

 4    that that was to put everyone on notice, that you had removed

 5    those cues from being licensed?

 6        A    Yes, absolutely, including the album itself.

 7        Q    Did you accept any licensing fees from any of those

 8    cues that you contend should have been removed from

 9    circulation after 2012?

10        A    I don't know.

11        Q    Are there any documents that you could review that

12    would let you know if you received any licensing reviews from

13    those cues that you contend were removed in 2012?

14        A    Perhaps.

15        Q    From sending the Excel spreadsheet?

16        A    Perhaps.

17        Q    Can you do that and get those documents to your

18    lawyer?

19        A    Yes.

20        Q    Did you review any of those documents in response to

21    our discovery requests?

22        A    No, no.

23        Q    Did you get that?

24             MS. OHIRI:  What was that?

25             MS. BLAISE:  Documents that he reviewed or that he
```

                                                        Page 160

```
 1    could review in letting us know licensing fees that he

 2    accepted after 2012 for tracks that he contends -- or cues

 3    that he contends were removed from circulation and commerce.

 4    Where are we at with time?

 5            THE REPORTER:  5:48.

 6            MS. BLAISE:  Let me go off the record.

 7            (Break in deposition.)

 8            (Discussion off the record.)

 9            MR. JACOBSON:  Very quickly ask for an electronic

10    copy and for a dirty disc or whatever you young

11    whipper-snappers call it.

12            THE REPORTER:  A rough.

13            MS. BLAISE:  I'll take a copy and a rough.

14            THE REPORTER:  Did you need a rough too?

15            MS. OHIRI:  No, it's okay.

16    BY MS. BLAISE:

17        Q    Do you have a homeowner's insurance?

18        A    Yes.

19        Q    Did you tender this claim to your homeowner's

20    insurance?

21        A    No.

22        Q    Do you have any errors and omissions insurance for

23    your business?

24        A    What does that mean?

25        Q    Errors and omissions.
```

Veritext Legal Solutions
866 299-5127

```
 1        A    Ask that question again.

 2        Q    Do you have any errors or omissions insurance for

 3   your business?

 4        A    Yes.

 5        Q    You do?

 6        A    Mm-hm.

 7        Q    Who is your carrier?

 8        A    I don't know the name of it.

 9        Q    Is there a document that you could review that would

10   tell you the name of it?

11        A    Yes.

12        Q    Will you review that and give it to your attorney?

13        A    Yes.

14             MS. OHIRI:  Are you understanding the question?

15             THE WITNESS:  What's the question again?  Do I

16   have --

17   BY MS. BLAISE:

18        Q    I asked you if you had homeowner's insurance, you

19   said you did.

20        A    Yes.

21        Q    I asked you if you tendered this claim to your

22   homeowner's insurance --

23        A    No.

24        Q    -- you said you did not.  I asked you if you had

25   errors and omissions insurance --
```

                                                  Page 162

```
 1         A    I do not.

 2         Q    Do you have any professional insurance?

 3         A    No.

 4         Q    Do you have a -- any umbrella policies?

 5         A    Of any nature?

 6         Q    Yes.

 7         A    Yes.

 8         Q    Who is the carrier?

 9         A    I think it's Palomar or Palomar, P-A-L-O-M-A-R, I

10    think, I'm not sure.

11         Q    Do you know what your liability limit is?

12         A    No.

13         Q    Do you know what types of claims it covers?

14         A    No.

15         Q    Do you know your policy number?

16         A    No.

17         Q    Can you obtain your policy number and give it to

18    your attorney?

19         A    Yes.

20         Q    Do you have any other insurance besides vehicle

21    insurance and life insurance?  Do you have anything other

22    than life insurance, vehicle insurance, disability

23    insurance?

24         A    I don't know.

25         Q    Who would know?
```

Page 163

```
 1        A    Do I have any other insurance other than the car
 2   insurance?
 3        Q    Life insurance, disability insurance, health
 4   insurance.
 5        A    I would know.
 6        Q    Okay.
 7        A    But I don't.
 8        Q    All right.  And you're certain that you don't have
 9   an errors and omissions policy?
10        A    Yes.
11        Q    Okay.  I think that will be it for today until
12   tomorrow.
13             MR. JACOBSON:  Off the record.
14             (Break in deposition.)
15             (Discussion off the record.)
16             MS. BLAISE:  Okay.  This is Heather Blaise
17   stipulating for plaintiff that the transcript should be held
18   pursuant to the Code.  All other counsel agree.
19             MS. OHIRI:  Yes.
20             MR. JACOBSON:  That's correct.
21             MS. BLAISE:  In addition, we're stipulating that
22   we're going to continue this oral deposition to tomorrow,
23   which is December 3rd, at counsel for defendant Labrador's
24   office, and we're holding open questions until that time.
25   This is a stipulation on the record.
```

Page 164

1            MS. OHIRI:  Should we stipulate to a -- I'm sorry,

2     can we go off the record?

3            (Break in deposition.)

4            (Discussion off the record.)

5            MS. BLAISE:  The continued deposition of Labrador

6     and Mr. Webb will start tomorrow at his counsel's office at

7     11:00 a.m., tomorrow is December 3rd, 2019.

8            MS. OHIRI:  So stipulated.

9            MR. JACOBSON:  So stipulated.

10            (Deposition session concluded at 6:02 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 165

1          I, NOEL WEBB, do hereby declare under

2     penalty of perjury that I have read the foregoing

3     transcript; that I have made any corrections as appear

4     noted, in ink, initialed by me, or attached hereto; that

5     my testimony as contained herein, as corrected, is true

6     and correct.

7          EXECUTED this _____ day of _____, 20__,

8     at _____, _____.

9          (City)        (State)

10

11

12

13

14          _____

15                    NOEL WEBB

16                    VOLUME I

17

18

19

20

21

22

23

24

25

                                        Page 166

1              I, the undersigned, a Certified Shorthand

2      Reporter of the State of California, do hereby certify:

3              That the foregoing proceedings were taken before

4      me at the time and place herein set forth; that any

5      witnesses in the foregoing proceedings, prior to

6      testifying, were administered an oath; that a record of the

7      proceedings was made by me using machine

8      shorthand which was thereafter transcribed under my

9      direction; that the foregoing transcript is a true record of

10     the testimony given.

11             Further, that if the foregoing pertains to the

12     original transcript of a deposition in a Federal Case, before

13     completion of the proceedings, review of the transcript [ ]

14     was [ ] was not requested.

15     transcription thereof.

16             I further certify that I am neither financially

17     interested in the action nor a relative or employee of

18     any attorney or any party to this action.

19             IN WITNESS WHEREOF, I have this date subscribed

20     my name.

21     Dated: December 5, 2019

22

23

24             JENNIFER STANLEY,

25             CSR No. 13740

                                            Page 167

[& - 714-505-4872]

## &

**&**   3:15 4:4,15

## 0

**00**   103:4
**02/14/08**   9:3 10:17 10:24
**039**   66:4

## 1

**1**   123:23
**1.1**   29:1
**1.1e**   32:4,6,13 33:3 33:8 36:1
**1.1e.**   27:13 28:25 31:23
**10**   5:11 25:18 74:5 99:4 103:4
**10.2.**   133:14
**108**   99:5 103:5
**109**   5:20,21
**11.00**   21:5
**115**   90:4 99:5 103:5
**11:00**   165:7
**123**   4:7
**13**   136:4,5,6 137:7
**1352**   2:20 3:18
**13740**   1:24 2:24 167:25
**14**   26:8
**145**   5:22
**14th**   81:15
**15**   150:7,14,21,24 151:1
**15,000**   135:1
**150**   5:23
**154**   5:24
**16**   139:1 140:1 141:19,21 142:13
**17**   137:22

## 2

**170.00**   21:1
**18**   132:15
**19**   14:10 36:17
**1970**   74:16
**1974**   74:16
**1990**   75:17
**1e**   28:25
**1st**   109:5 110:18 110:22

## 2

**2**   1:18 2:22 6:1 145:1
**2,875**   71:20
**2.2**   145:1
**2.3**   144:10 145:1
**2.5.**   41:24
**20**   5:12 111:14 166:7
**200**   153:19
**2000**   3:8
**2003**   94:14 97:11
**2005**   77:7
**2008**   26:9
**2009**   34:7,12 36:2 109:5,5 110:18,18 110:22 111:3,4 118:25 125:14,14
**2012**   125:10,20 126:9,15,21 149:17 154:25 155:4,5,24 156:5 156:19 159:3,11 159:25 160:9,13 161:2
**2013**   159:9
**2014**   82:9 93:16,16 93:19 94:14 123:15,17,19,21 123:22,23 125:10 128:24 149:17 155:10,13,16

## 2014-486-11220

**2014-486-11220**   151:4
**2016**   66:22 73:17 137:22 138:12
**2017**   73:15 138:12
**2018**   73:8,12 81:15 132:16,23 134:21 134:25 135:1
**2019**   1:18 2:22 6:1 60:14,16 62:10 132:13 165:7 167:21
**205**   2:21 3:18
**207**   81:24
**21**   5:13
**213-725-9800**   3:10
**21st**   60:14,16
**22**   99:5 103:4
**222**   145:1
**22400**   69:19
**225**   104:15
**23**   5:14
**231**   153:19
**24**   7:11
**25**   5:15 66:4 104:15
**250**   4:7
**26**   5:16
**29th**   62:10
**2:17**   1:7 2:6

## 3

**3.2**   112:14
**3.2.**   112:18
**30**   13:16 55:15 132:12 136:19,23 137:17
**32**   90:1,7,8
**323-637-3815**   4:9
**33**   99:5 103:5
**3798262**   1:25

## 3

**382**   154:1
**3rd**   164:23 165:7

## 4

**4,000**   131:8,19,19 131:21,24
**4.1**   113:12
**4.2.**   113:17
**4.3**   114:3
**4.3.**   113:23
**4.4**   114:9
**400,000**   71:13
**46**   5:17

## 5

**5**   70:20 77:7 82:9 111:14 167:21
**5/10/52**   69:17
**50**   41:18
**50/50**   96:2
**56**   5:18
**59**   5:19
**5:48**   161:5
**5c**   24:19 81:24 82:4,11

## 6

**6**   77:7 119:13
**600,000**   70:20
**60606**   4:8
**6108**   1:7 2:6
**64**   5:6
**6700**   71:5
**68**   5:5
**69**   5:6
**6:02**   2:22 165:10
**6th**   62:4

## 7

**7**   5:5
**7.1**   120:24
**714-505-4872**   3:20

Page 1

[7990 - american]

| | | | |
|---|---|---|---|
| **7990**  167:23 | **actions**  37:21,22 | **agent**  37:4 50:13 | **allow**  131:24 |
| **8** | 119:18 | **agents**  13:2 | 133:1 |
| **8**  108:22 109:9,11 | **activities**  41:22 | **ago**  67:19 | **allowed**  31:2 |
| **801**  3:8 | 151:14 | **agree**  7:5 27:16 | 97:10 |
| **9** | **acts**  139:8 | 111:23 148:23 | **allows**  27:17 |
| **9**  5:10 | **actual**  154:22 | 164:18 | **ally**  93:24 |
| **90017**  3:9 | **ad**  55:15 | **agreed**  47:8 48:10 | **aloud**  98:18 136:9 |
| **90364**  69:21 | **adapt**  29:19 30:6,8 | 52:1 | **alter**  29:18 30:6,8 |
| **92780**  3:19 | 32:1 34:5 97:24 | **agreeing**  52:8 | 32:1 34:4 97:24 |
| **a** | 121:18 | **agreement**  5:16 | **alteration**  99:6 |
| **a.m.**  2:22 6:2 | **adaptation**  121:9 | 9:2,3 10:16,22 | **altered**  54:15 99:8 |
| 165:7 | 121:16,21 138:23 | 20:12 25:19 27:17 | 99:10 112:23 |
| **ability**  7:12 | **adaptations** | 48:5 49:13 51:22 | 113:1 |
| **able**  7:22 44:1,10 | 118:21,22 | 87:21,23 88:1 | **alternate**  82:19,22 |
| 58:23 61:24 94:22 | **adapted**  54:15 | 89:11 92:15,19 | **alternates**  25:3,6 |
| 95:9,15,17,17 | **add**  118:16 | 96:2 97:22 98:3,7 | 82:14,17,21,24,25 |
| 97:13 129:2 | **addition**  72:11 | 104:22 105:4,5 | 83:3,13 84:1,5,8 |
| 131:23 152:20 | 164:21 | 109:5,5 110:18,18 | 84:15,25 85:11,15 |
| 159:7 | **additional**  72:10 | 110:21,24 111:1,3 | 86:4,7 |
| **absolutely**  160:6 | 150:1 | 111:8,17,23 | **alternatives**  24:20 |
| **abuse**  141:11 | **address**  69:18 | 112:12,25 113:6 | 24:20,25 25:4,7 |
| **accept**  160:7 | 71:4 | 114:12 118:19,24 | **amazing**  153:15 |
| **accepted**  161:2 | **adjudicate**  151:5 | 118:25 119:11 | **ambiguity**  39:1 |
| **accidentally**  129:1 | **administered**  6:5 | 120:1,21 122:4 | 53:23 |
| 129:2,19,20 | 92:17 167:6 | 130:10 135:5,17 | **ambiguous**  33:22 |
| **account**  136:16 | **admission**  150:6 | 135:23 136:1,22 | 38:16 43:7 49:19 |
| 137:4 | **admit**  103:4 | 137:4,10,16,17 | 65:1 90:10 99:25 |
| **accountant**  133:4 | 110:21,24 111:7 | 138:18 139:5,8,11 | 121:6 127:7 |
| **accounted**  137:6 | 112:3,5,6 149:25 | 140:20 142:5,7 | **amcos**  17:8,17,18 |
| **accounting**  112:14 | 150:3 151:1,3 | **agreements**  88:3 | 17:19,19,20 19:25 |
| 112:21 113:10 | 154:2 158:3,9 | **alan**  154:23 | 20:12 21:9,17 |
| **acknowledged** | **admitting**  159:17 | **alarm**  123:24 | 23:16 43:12,12 |
| 159:5 | **adverse**  113:18 | 124:6 | 50:13,18,23 51:9 |
| **acquire**  52:24 | **advertisement** | **album**  160:6 | 53:21 59:1 118:19 |
| **act**  136:25 | 54:9 146:9 | **alerted**  125:6 | 118:24 |
| **action**  119:19 | **advertising**  99:1 | **alike**  100:3,5 | **amend**  108:7 |
| 134:3 138:6 | **advice**  38:9 155:19 | **alikes**  99:23 | **amended**  5:10,11 |
| 147:19 148:10,10 | **advisor**  129:12 | **allegation**  112:8,9 | 5:21 8:14 105:7,8 |
| 151:24 167:17,18 | **affect**  7:12 | **allegations**  109:16 | 108:20 112:2 |
| | **age**  74:4 | 109:18 110:7 | **american**  20:19 |
| | | 112:3,5,6 | |

[amount - attorney]

amount  92:5
amounts  97:11
analyzed  157:18
angeles  3:9 75:4
  153:5
annually  132:9
  134:21,22
answer  5:21 7:18
  13:12 15:22 16:21
  17:17,21,22 19:2
  25:9 35:8,9,15,21
  38:3,10,21 40:6,7
  41:25 44:1,5
  52:23,24 53:25
  64:11 67:20,24
  68:20,22 69:7,8,9
  70:15 79:2 81:7
  86:19 87:6 88:2
  94:22,25 104:2
  105:7,8,13,14
  107:21,22,23,25
  108:4,20,20 109:8
  109:13,15,23
  110:9,10 112:2,2
  119:4 122:13
  124:1 129:17
  132:24 133:1
  135:18 146:15
  147:13 148:9
  150:3 151:10
  152:20,21 156:24
  159:21
answered  13:10
  42:4 56:22,22
  110:13 134:7
answering  43:2
answers  69:1
  103:3 104:17
  130:17
anybody  129:14

anyway  27:9
apollo  124:24
apologize  33:18
  51:16,24 148:20
apparently  159:14
appear  25:21
  166:3
appearances  3:1
  4:1
appears  10:4
  19:25 20:14 21:1
  21:16 23:5 56:2
  61:23 62:11
application  106:19
  106:20
appointment  47:4
appoints  46:19
appreciate  7:23
appreciation
  55:17 56:12
appropriate  45:13
appropriately
  50:6
appropriateness
  39:19
approval  92:10,18
  142:6
approved  26:17
  99:2 159:6
approximate
  75:22
approximately
  99:4,4,5 131:19
  132:11,12,14
april  109:5 110:18
  110:22
area  63:4
arrangements
  98:5
art  15:16 38:17
  53:15

ascap  15:7,11,13
  15:14,18,24 16:4
  17:1,11 18:4,5
  41:20 93:23
  134:15,17 135:6,8
  135:14
asked  54:23 93:4
  100:19 101:3,4,4
  105:17 106:7,12
  115:7 130:25
  131:15 162:18,21
  162:24
asking  32:10
  33:23 37:18,18
  48:24 53:12 54:18
  68:20 78:22 83:3
  83:5,15,17,21,23
  83:25 84:1 85:22
  85:25 86:4 90:21
  91:19 95:12 103:8
  108:1,3 109:22,24
  110:2 116:15,16
  117:6 118:17
  123:17 126:4,21
  127:18,19,24
  145:6,7,21,24
  146:16,24 154:14
aspect  31:15,17
aspects  61:14
asserted  133:18,20
assessed  102:19
  105:17,22
assign  33:7 120:20
assigned  27:17
  29:10 33:2 36:1,1
  38:7,8,14,14,16,24
  56:17
assigning  27:9
  37:24 40:20
assignment  32:5
  35:25 39:18 40:8

  40:10 49:24 50:9
  136:24
assignments
  120:19
assigns  29:9 30:2
  32:3,12 33:1,19
  40:14 111:19
associated  14:8
  36:24 46:5 119:17
associates  3:15
  114:1,3 120:20,23
  133:18 134:1,11
assume  38:24 69:8
  69:10 155:17
assumed  38:6
  98:19
assumes  49:17
  98:2,9
assuming  64:21
assumption  155:7
attached  9:3 10:17
  10:17 11:3 63:25
  109:7 110:20
  154:22 166:4
attachment  62:12
attacked  129:7
attend  74:15
attention  97:19
  108:9 150:6
attorney  3:7,17
  4:6 6:18,19,23 7:4
  7:7 9:11,19 18:13
  21:20 43:2 57:21
  58:5 60:20 62:7
  68:4,5,18 88:14
  95:7 97:25 106:16
  106:17 115:14
  116:2,17,19,22
  117:22 118:1,3,4
  118:15 121:24
  122:10 131:15

[attorney - blaise]

| | | | |
|---|---|---|---|
| 133:10 138:6 | 92:9 94:9 97:11 | 99:20 104:22,24 | **bit** 25:12 |
| 147:14 152:18 | 98:11 100:21 | 118:20 119:1 | **blaise** 4:4,5,15 5:6 |
| 162:12 163:18 | 103:17 106:23,23 | 123:1,6 125:9,11 | 8:3,4 9:19 13:5 |
| 167:18 | 115:12,13 118:17 | 125:16,22 126:15 | 20:2,6 25:3,6 |
| **attorneys** 68:6,12 | 129:10 133:12 | 127:14,24,25 | 27:18,21 28:3,10 |
| 119:20 131:17,17 | 135:4,20 148:16 | 128:5,9 135:5,24 | 32:7 33:22 36:4,6 |
| 131:18 | 148:17,17 150:11 | 137:9 138:14,19 | 36:19 38:15,25 |
| **audible** 69:2 | 150:16 152:17 | 139:15,22 140:2 | 40:4,16,23 43:1,7 |
| **audibly** 53:9 68:22 | 154:2 | 140:16 141:2,4,16 | 43:11 48:14 49:3 |
| **audio** 90:6,7,16,25 | **baker** 4:13,14 | 149:16 151:18 | 49:8,17 50:19,25 |
| 90:25 100:9 | 13:17,20,21 24:11 | 152:3,22 153:4,5 | 53:14,22 54:16 |
| 106:20 | 42:24 43:5 65:24 | 153:10,19 154:1 | 56:4 57:3,12,17,19 |
| **august** 155:16 | 65:24 82:7 84:4 | 155:1,12 159:3,19 | 57:25 59:8 60:3,5 |
| **australia** 13:23 | 125:13 148:20 | **beatbox's** 47:24 | 60:8,11,15,17,23 |
| 17:17,18,23 39:11 | 155:2 | 105:8 155:19 | 60:25 61:2,10,13 |
| 47:7 50:8,12 | **balance** 70:19 | **beatboxmusic.c...** | 61:16,21,24 62:3,5 |
| 123:8 | **bankruptcy** | 19:11 | 62:9,16,19 63:6,11 |
| **australian** 20:18 | 136:25 137:2 | **bed** 82:20 146:8 | 63:20 64:15,17,22 |
| **austria** 124:11,11 | **barbara** 4:14 | 146:19 | 64:24 65:2 66:20 |
| **authority** 114:11 | **barely** 7:21 | **beginning** 2:21 | 67:23 68:10,14,16 |
| **authorized** 156:8 | **base** 34:7,11 | 30:21 83:7 99:18 | 68:17 70:14 77:22 |
| **available** 83:20,22 | **based** 35:22 63:22 | 103:14 104:16 | 78:18,19 80:21 |
| **avenue** 71:5,9 | 63:23 86:2 104:17 | **behalf** 2:20 | 81:6,18 82:3 83:2 |
| **aware** 99:2 102:23 | 118:16 137:7 | **believe** 29:19,20 | 84:14,18,22 86:15 |
| 103:8,19,21 104:9 | 145:24 | 123:24 129:14 | 87:3,18 88:21 |
| 148:9,13 158:16 | **baseline** 80:9,10 | 142:19 | 89:8 90:14 91:9 |
| | **basic** 32:25 | **belongs** 130:8 | 91:13,23 92:13 |
| **b** | **basis** 54:20 | 131:7,20 | 98:14 100:2,20,24 |
| **b** 1:14 2:13 5:11 | **bass** 82:20,22 | **benefit** 111:18 | 100:25 102:7,12 |
| 6:14,14 9:18,21 | **bates** 81:24 153:19 | 136:24,25 | 103:16,20 105:2 |
| 10:2,3,4,4 12:4,10 | **bathroom** 6:24 | **best** 7:8 16:14 | 105:10,15 107:24 |
| 12:17 44:11 72:7 | **bay** 72:17 85:7 | 17:13 23:13,15 | 108:16 110:14 |
| 72:11,14,19,19 | **beatbox** 1:4 2:4 | 30:24 34:6 159:22 | 111:4,6 114:8,21 |
| 74:12 83:11 94:6 | 13:22 33:19,21 | **better** 50:10 54:23 | 115:1,11,18 |
| 94:7 145:12 146:1 | 34:1,4,12 35:5,13 | 90:19 152:20,21 | 116:15,21 117:4,6 |
| **bachelor's** 74:17 | 36:1,2,2,17 45:2,5 | **beyond** 100:17 | 117:11,15,21 |
| 74:19 | 45:24 46:17 50:7 | **bgrfirm.com** 3:11 | 118:13 119:9 |
| **back** 31:23 35:2 | 50:14,17,23 51:9 | **binding** 109:6 | 120:18 121:2,8,13 |
| 35:17 41:3 43:12 | 51:23 53:20 56:8 | 110:19 111:17,23 | 121:14 122:16 |
| 47:6 51:16 59:1 | 58:23 59:1 65:24 | **birth** 69:16 | 127:10,12 129:16 |
| 61:8 68:17 77:16 | 66:4 68:3,18 84:4 | | 129:18 131:5,13 |
| 78:14 80:18 84:20 | | | |

[blaise - challenge]

134:8 138:12,15
139:3,18 140:12
142:12 143:10,17
143:19,24 144:4,9
144:25 145:23
146:7,17 149:18
149:22,25 150:3,5
150:19,21,25
152:16 153:18,21
153:25 155:20,22
157:7 158:8,15,22
159:23 160:25
161:6,13,16
162:17 164:16,16
164:21 165:5
**blaisenitschkela...**
4:10
**blank** 63:3
**bmi** 93:23 134:15
134:17
**book** 59:21
**boston** 72:17 85:7
**bottom** 98:1
**boulevard** 2:21
3:18
**bowdin** 74:12
**box** 18:7,18,19,21
18:25 19:5,7
**breach** 119:22
142:3
**breached** 120:6
**break** 6:22 8:20
13:6 22:1,7 25:14
28:12 34:18,19
46:10 53:17 59:9
68:15 105:11
118:10,11 144:5
152:14 161:7
164:14 165:3
**breakdown** 44:10
86:6 94:13

**bring** 8:24
**bringing** 24:18
63:25
**broad** 99:24
**broadcast** 49:7
54:12
**broadcasting**
15:16
**broadcasts** 17:11
**brought** 9:7 59:12
**browne** 3:5
**business** 12:9 75:5
86:1 134:3 161:23
162:3
**businesses** 91:20
**businessman**
155:18
**butthead** 152:25
**button** 129:6
**buttons** 129:1,2
**buy** 66:21
**bygone** 25:20,20

**c**

**c** 5:12 14:22 17:8
19:10,13,16 44:12
71:5 72:18 77:11
83:11,13 84:6
88:13 124:19
145:12 146:2
**calculate** 94:24
96:19
**california** 1:2,9,14
1:17 2:2,8,14,21
3:9,19 6:1 69:20
71:3 109:7 110:20
111:20 167:2
**call** 22:25 36:12
49:24,24 50:9,9,23
68:1 129:9 161:11
**called** 17:7,16 18:7
19:19 41:14,15,15

47:20 51:9 56:19
75:21 93:5 106:19
112:9 117:9
123:16 147:20
148:15,16,17
149:7
**calling** 50:11
**calls** 27:19 37:15
38:15 39:13,23,24
40:12,13,23,25
47:12 48:14,19
49:1,18 50:1,25
70:12 77:17 81:2
81:3 84:10 86:13
86:24 87:12 90:10
114:6,17 117:5,7
120:2,14,25 121:1
121:5,11 122:12
138:24 139:17
142:8 144:18
145:17,18 157:3,4
158:7,19,25
**camera** 148:1
**campaign** 55:15
**cancel** 136:22
137:4
**cancellation** 137:6
**capable** 113:15
**capacity** 11:11,12
14:17 147:20
**capistrano** 71:5,9
**capital** 18:1,1,1
**caps** 17:8
**car** 164:1
**careful** 18:23
**carrier** 162:7
163:8
**case** 1:6 2:5 6:16
7:7 13:17 30:24
50:6 63:8,15
65:21 85:2 99:3

104:7,8 105:22
106:1,6 109:21
149:1 151:4,15,20
151:22,22,25
152:2,3,4,5,6,8,10
152:22 158:17,17
158:24 167:12
**catalog** 46:23
126:20,23
**catalogs** 72:11
85:2,16 86:5 92:1
125:7
**categories** 86:9
**category** 22:21,24
28:6,8,8
**cause** 41:21
**causes** 119:18
**caution** 155:18
**caveat** 138:22
**cced** 68:11
**cdm** 123:16,24
154:10
**cell** 67:18,21
**central** 1:2 2:2
**ceos** 149:7
**certain** 15:19,25
159:25 160:1
164:8
**certainly** 11:15
16:12 36:17
**certificate** 75:1,10
75:14
**certificates** 74:25
**certification** 74:21
**certified** 2:23
133:4 137:12
167:1
**certify** 167:2,16
**challenge** 151:3
153:1

Page 5

[chance - composers]

chance 7:4 111:22
change 52:12 53:5
  93:4,6,9,12 101:1
  103:15 125:16
changed 87:23,25
  125:12
changes 7:6,6 81:1
  81:1 135:13
changing 127:1
characterization
  79:19
charged 21:9
  23:11,15,16
chart 89:17
check 95:10 122:8
checkbook 95:11
  95:14,15,16
checks 95:1,1,2,4
  95:12
chicago 4:8
choice 110:4
circulation 125:25
  126:7 160:9 161:3
circumstance
  41:20
cited 140:4
city 166:9
civ 151:4
claim 68:11 114:2
  114:23 133:17,24
  133:25 134:3,5
  151:5 153:9,11
  158:3,4,9 161:19
  162:21
claimant 10:5
  57:14
claimed 157:24
  159:7
claims 113:19
  114:15 115:19
  163:13

clarification 38:18
clarify 22:9 31:13
  149:21
classes 75:11,16
clause 41:23,24
  139:19
clear 154:23
client 19:22 60:20
  68:4,5
clients 127:14
  128:6,12
close 73:14,16
code 164:18
cohen 1:11 2:10
  3:14 6:16 9:1
  10:15 19:22 21:19
  23:9 24:24 26:7
  29:3 34:25 41:6
  42:11 43:22 54:20
  56:11,17,25 57:1,2
  58:15 65:24 87:20
  88:14 92:8,9,14,17
  94:14,18 97:20,25
  99:2 102:20
  106:23 114:14,22
  115:7,23 116:2,9
  116:17 119:25
  121:23 122:2,17
  128:14 130:9
  131:7,20 134:4
  138:22,23 142:6
  148:16,23 154:23
cohen's 10:5 55:21
  57:15 94:10 98:5
  102:15,16 142:6
collect 56:20
collected 41:19
  97:11
collects 15:15,15
  16:5 17:1

college 74:6,11,12
colon 29:17
column 20:22
  89:24
combination
  110:8
combine 110:4
combined 110:3,8
combo 124:12
come 106:5,25
  107:5 122:3
  128:16
coming 51:22
comment 7:7
commerce 160:3
  161:3
commercial 53:13
  55:3,8
commissions
  96:20
committee 106:9
common 88:25
  90:6,23 91:6,10
  104:18
communicate
  32:15,16 33:6,9,10
communicated
  121:23
communication
  61:10
company 55:21
  57:6 94:1,3 129:3
  139:7 140:23
compare 100:8
  101:18,20,20
  102:15,16
compared 101:3
  102:15
compares 102:10
comparing 101:9

compensated
  76:10,16
compiling 96:10
complainant 1:12
  2:11,20 3:13
complaint 5:20,21
  105:7,8 108:10,10
  110:16 111:24
  112:1
complete 139:23
completed 7:2
completion 167:13
compliance
  137:18
comply 142:1
complying 97:8
  136:17
component 66:15
components 76:18
  85:9 103:10
  145:13,15 149:14
comport 26:9
composed 76:22
composer 9:3
  10:16,22 14:20
  29:1,2,3,8,25 30:1
  30:7 41:18 49:16
  52:2,9 83:8,19
  88:3 92:15 98:3
  112:11,17 113:6
  113:13,18,24,25
  114:1,10,10
  119:11,16,23
  130:10 133:24,25
  134:4
composer's 5:16
  25:19 89:11 97:22
  113:3
composers 17:6
  83:4,5,16,21,25
  84:1 87:21 132:8

Page 6

[composers - correspondence]

141:25
**composition** 15:3
19:19 29:14,20,23
30:4 34:5 74:7
75:6 77:3 78:10
78:12,21,23 79:7
97:23,25 99:4,8,11
112:22 113:14,19
113:20 133:21
**compositions** 30:6
98:6,20,22,25
112:24 113:25
133:22 139:6
140:23 142:1,16
142:17
**compound** 19:1
28:2,10 36:5
41:12 42:17 78:16
**computer** 62:24
63:7,11,15 64:3,6
64:12,19,20,23
65:4,6,7,12,13,16
65:20 66:15,21,23
66:25 67:5,6,10
**concerns** 151:21
**conclude** 144:23
**concluded** 165:10
**conclusion** 27:20
36:6 37:16 38:16
39:14,24 40:13,23
47:13 48:15,20
49:2,19 50:2 51:1
53:15 54:17 70:13
77:18 81:2 114:18
117:5,7 120:3,15
121:1,12 138:25
139:17 142:9
144:19 145:18
157:4 159:1
**conditions** 136:18
142:2

**confer** 54:23
**conference** 16:19
**configuration**
58:25
**confused** 25:12
**confusing** 146:6
**connection** 98:5
**consider** 62:25
**considered** 79:21
80:2,7,9 85:12
**considering**
121:12
**conspired** 159:15
**construed** 111:19
**consult** 149:2
**consultation** 29:25
30:7 138:23
**consulting** 97:25
**consumer** 9:2
**contain** 85:8
159:25 160:1
**contained** 109:16
109:18 110:7
112:3,8 114:12
145:16 146:2,3
166:5
**contemplates**
112:25
**contend** 119:24
120:4 125:19,20
125:22 145:15
146:2,10,18
156:18,25 157:1
157:13 160:1,3,8
160:13
**contends** 161:2,3
**content** 127:2
**contention** 84:8
87:10 92:7 93:9
99:7 142:5 159:24

**context** 78:9
121:12 137:14
141:9
**continue** 13:16
136:19 159:16
164:22
**continued** 4:1
22:10 122:2 165:5
**contract** 5:17 26:6
28:22 32:18 34:7
34:12 35:5,13
36:3 45:23 47:8
48:11 51:8 52:20
88:9 93:25 118:19
118:22 140:11
141:12 142:20
153:4,10
**contracted** 76:23
**contractor** 73:1
**contracts** 87:19
141:25 142:1
**control** 9:16 11:6
134:2
**controlling** 111:8
**controls** 12:12
**conversation** 7:2
118:16
**conversations**
7:20
**conveying** 83:15
**copied** 30:22
**copies** 19:12
143:14,22 150:1
**copy** 5:13,14 8:2,2
9:19,20,20 19:11
20:1 21:17 57:11
57:22 138:5
143:24 150:4
161:10,13
**copyright** 29:16
30:4 75:19 76:18

76:24 78:20 81:1
87:10 93:10
101:21 113:15
142:17 151:5
**copyrights** 76:25
113:21
**cord** 79:21,22,23
**corporation** 1:9
1:15 2:8,15 12:4
**correct** 12:13 14:5
15:7 18:4,24
22:18,22 23:23
29:21 31:1,11
34:9 36:14 42:9
42:13 45:9,20
46:25 47:1 48:9
49:14,16 53:4,21
54:10 56:24 58:12
72:8,12 79:7,10,17
79:18,19 80:24
82:7 83:4,13,14,16
84:16 85:12 89:14
89:21,24,25 90:3,4
90:5 94:15 96:3,4
105:5 106:14
111:9 112:12
113:1 123:9
125:21 139:12,23
139:24 140:14,17
141:5,17 145:10
145:11,13 147:6
149:11 151:7,7
152:2,9 156:1,5,6
156:10 158:10
164:20 166:6
**corrected** 166:5
**correction** 25:9
**corrections** 166:3
**correctly** 52:3
**correspondence**
92:21

Veritext Legal Solutions
866 299-5127

[costs - defense]

**costs**  119:20
**counsel**  11:2 13:15
  95:16 164:18,23
**counsel's**  165:6
**count**  25:18
**couple**  130:23
**course**  25:24
  52:20 152:13
**courses**  74:7 75:4
  75:7,18,19
**court**  1:1 2:1 7:19
  7:21 8:3,17 9:20
  9:22 19:14 20:2,5
  22:6 24:3 26:1
  35:16 45:15 55:25
  58:3 59:8 68:23
  77:16 99:13
  100:20 103:9
  106:6 107:6,9
  108:13,15 109:21
  142:22 143:2,4,4,5
  143:6,11 144:8,16
  147:11 148:2,4
  149:11,12,12,24
  151:4 153:2,7,24
**covered**  30:10,13
  31:21
**covers**  163:13
**cpa**  133:4
**create**  52:13,13
  54:20 84:9 86:4
  94:4 99:10
**created**  52:19 93:9
**creates**  87:4
**creating**  87:10
  90:25 99:8
**creation**  103:12
**creditors**  136:25
**cross**  1:12,15 2:11
  2:16,20 3:3,13
  10:4,6 57:13,14

**csac**  93:24
**csr**  1:24 167:25
**cue**  14:21,24 15:1
  15:4 22:10 23:1
  24:19 30:21 31:20
  31:21 37:7,7
  40:11,20 44:16
  47:19 48:18,25
  49:7,15,23 50:14
  50:23 51:23 52:2
  52:3,6,9,12,13,13
  52:19,21,25 53:9
  54:19 76:22 78:7
  78:7,9 79:11,21,23
  80:2,7,9,11,12,14
  80:14,16,17,17,20
  80:22,23,25 82:14
  82:15,17,18 84:9
  84:16,21 85:12,15
  86:5,7,11,20,21
  87:4,6,6,9 89:1
  90:17,18 91:1
  92:5,9,24 96:7
  99:8,10,12,14,15
  99:16,17,19
  101:16 102:15,16
  102:17,20 104:12
  104:12,13,14
  105:23 106:23,24
  125:7,10,12,16,20
  125:25 126:7,12
  126:19,22 129:11
  129:15 135:5,8,13
  140:3 145:16
  149:21 154:20,22
  154:24 155:1,5
  156:18 157:11,13
  157:20 159:4,11
  159:20
**cues**  1:8,14 2:7,13
  24:11 30:24 31:2

31:10 44:7,11
  46:23,24 56:13,14
  65:11,13 72:6,11
  79:9 84:24,24
  85:5,8,21 86:6
  89:17 91:2,25
  92:2,7,19,25 93:5
  93:15,17 96:22,23
  99:22 108:2
  123:15 125:14,15
  128:13,17 130:9
  131:20 149:14
  159:25 160:1,2,5,8
  160:13 161:2
**current**  93:19
  131:17
**currently**  88:4
  130:8 132:8
  157:20
**custody**  9:16 11:6
**custom**  86:1
**cutoff**  62:3
**cutting**  53:5 108:2
**cv**  1:7 2:6

## d

**d**  1:14 2:13 5:13
  12:4,10,17 20:4,6
  20:7,7 21:13
  44:12 72:7,11,14
  72:19,19 74:12
  94:6,7 124:19
  145:12 146:2
**damages**  5:20
  119:18 158:23
**dan**  6:15 27:6
**dan's**  68:19
**daniel**  3:16
**data**  130:5
**database**  135:6,9
  135:14

**date**  10:20,23
  60:15 61:1 69:16
  93:16,18,19
  123:25 124:1,2,14
  124:19 167:19
**dated**  9:2,3 10:16
  60:14,25 62:9
  82:9 167:21
**day**  166:7
**days**  136:19,23
  137:17 148:17
**dba**  1:8 2:7
**deal**  145:12
**deals**  145:9
**debt**  15:15
**decades**  36:13,15
**december**  1:18
  2:22 6:1 164:23
  165:7 167:21
**decide**  7:4 157:16
  159:8
**decides**  79:25
**deciding**  52:5
  101:16
**decision**  144:23
  145:22
**declare**  166:1
**deemed**  112:22
**default**  135:25
  136:13,15,19,20
  137:8 138:13
**defend**  115:19,22
  147:14
**defendant**  1:15
  2:16,20 3:3,3,13
  10:6 57:13 147:5
  147:9,12 164:23
**defendants**  1:10
  2:9 109:4 110:17
**defense**  114:23
  134:2

[defenses - download]

**defenses** 133:25
**defensively** 25:13
**define** 159:4
**defined** 12:23
  121:18
**defines** 155:11
**defining** 121:17
  125:14
**definition** 22:10
  30:23 78:1 121:9
  121:16,21 126:17
**definitions** 115:21
**degree** 44:13
  54:24 74:17,19,21
  75:1,2
**delete** 129:6,20
**deleted** 129:19,23
**delineated** 52:20
**delineates** 12:24
**deliver** 133:8
**demand** 114:22
  116:17 122:17
**denied** 110:1,2
**denies** 109:16
**denmark** 124:24
**deny** 109:18 110:6
  111:24 112:1
**department**
  100:13 105:21,22
**depend** 39:8
**depends** 39:3
**deposing** 11:10
**deposition** 1:16
  2:19 5:10,11 6:18
  6:19 8:14,16,20
  9:21 13:6 19:13
  20:4 22:1,5,7 24:2
  25:14,16,25 34:19
  45:14 46:10 55:24
  58:2 59:9 63:9,18
  63:25 64:1 105:11

108:12,14 118:11
  144:5,7 149:23
  152:14 153:23
  161:7 164:14,22
  165:3,5,10 167:12
**derived** 95:23
**derogate** 139:9
  140:11 141:8,15
**describe** 12:9
  22:20 27:25 28:6
  28:7 34:23 55:13
  61:5
**described** 15:24
  21:18 24:16
**description** 5:8
  28:13
**design** 35:4 53:6,8
  54:21 125:12
  155:12 159:4,4
**designated** 14:4
**designed** 69:5
  125:13,15 129:3
  155:3
**designs** 155:10
**desktop** 63:4
**despite** 91:18
**detail** 97:21
**details** 6:17
**determine** 64:9,19
  65:3 94:16 97:11
  100:10
**determined** 145:2
  145:4
**device** 68:1
**dick** 75:8
**difference** 16:15
  16:24 39:10
  126:25 127:4
  132:20
**different** 12:24
  52:14 54:4 79:2

86:7 88:3,6
  104:13 115:8,11
  127:22,22 145:12
  156:8,13
**differently** 86:7
**digital** 156:9
**dining** 16:22,24
**direct** 157:10
**directed** 125:8,11
  125:22 149:16,16
  154:25 155:5
  156:18 159:3
**directing** 156:19
**direction** 167:9
**directive** 159:10
**directly** 57:1
  103:5
**dirty** 161:10
**disability** 163:22
  164:3
**disagree** 143:12
**disagreements**
  153:6
**disc** 161:10
**discovered** 94:2
**discovery** 61:3
  62:3 63:24 64:3
  64:10,20 65:5,17
  67:1,6 95:5 96:10
  97:8,16 100:16
  102:3 108:4 116:4
  130:17 153:18
  160:21
**discuss** 153:6
**discussed** 43:17
**discussion** 8:21
  13:7 22:2,8 25:15
  34:20 46:11 59:10
  105:12 118:12
  144:6 152:15
  161:8 164:15

165:4
**dispose** 134:2
**distributes** 17:5
**district** 1:1,2 2:1,2
**division** 1:2 2:2
**document** 7:25 8:8
  8:13 19:24,25
  21:15 22:3 25:17
  26:3,5 29:3,5 43:8
  44:14,23 45:1,4,11
  46:1,14 48:24
  55:22 57:10 58:6
  59:7 60:19,24
  61:1,22,23 63:11
  63:14 95:15
  132:25 133:3
  150:10 162:9
**documentary** 44:9
  125:24 126:6,11
  126:18
**documents** 8:15
  8:24 9:7,11,12,15
  10:8,9 11:3,6
  42:20 43:15,25
  60:5 62:19 63:17
  63:23,25 64:2,6,10
  64:19,21 65:4,16
  66:11,13,14,15
  67:1,10,14 68:2
  97:17 116:12
  117:6,17,25
  121:24 131:23
  132:1 160:11,17
  160:20,25
**doing** 85:20 97:4
**dollars** 20:18,19
  20:19
**double** 139:1
  150:17
**download** 126:16

Veritext Legal Solutions
866 299-5127

[dozen - esque]

**dozen** 129:8
**draft** 88:8
**drive** 4:7 128:10
**drives** 128:9
**drum** 124:11
**drums** 82:23
 86:12 87:2,6,9
**dub** 98:25
**dubbing** 98:21
**due** 70:19 122:8
**dungeon** 90:8
**duration** 30:25
 90:17 91:15 92:5

**e**

**e** 5:12,14,15,18,24
 6:13,14 9:6,6,6,6
 14:22 19:10 22:4
 22:5 23:4,11 24:5
 24:6,10,16 27:16
 27:25 28:7 29:18
 30:5 32:15 33:9
 42:24 43:5 56:2
 60:2,7,13,17 62:7
 62:12 68:4,5,6,10
 68:12 69:15,19
 81:15 82:6 93:2,5
 105:21 126:15
 136:3 145:2,9,9
 148:16 154:5,15
 155:13,24 156:4,4
 156:17 159:10
**earlier** 16:7 26:20
 57:4 72:6 78:20
 79:9,10 101:1
 102:6 105:3
 121:25 123:2
 139:21 140:1,6
 155:23 158:12
 159:6
**earn** 134:14,16

**eastern** 124:23
**edited** 112:23
 113:1 121:20
**editor** 129:12
**efforts** 64:9,18
 65:3,19 97:21
**eight** 109:17,19,22
 109:23,24 110:1,2
 110:7,15 111:24
 112:1,3,4 151:17
 152:10
**either** 13:21 64:4
 66:6 105:25
 106:12
**elect** 87:9
**election** 106:9
 115:24
**electro** 82:25
**electronic** 67:4
 161:9
**element** 86:12
**elements** 98:5,22
 99:1
**elongate** 89:1 92:9
 92:18
**embodied** 77:1
 78:20 146:11
**eminem** 9:4,5
 10:18 19:17,20
 21:19 22:18,20
 24:24 30:8,10,17
 32:1 35:1 42:9,16
 43:10,18,20,23
 44:4,16,17,17
 50:17 53:10,11,21
 54:5,9,12,13,19
 56:14 58:19 65:25
 66:2,3 97:23
 99:19 100:8
 101:16,22,24
 102:15,24 103:6,9

 104:4,4,15 105:23
 107:15 114:15,16
 115:20 122:20
 125:7,19,25 126:7
 126:12,19,22
 128:14,19,22
 129:19,24 130:2,6
 135:5,8,13 139:23
 140:4 142:23,24
 143:3,11 144:16
 144:17 145:3,16
 145:25 146:3,11
 146:18,22,23,23
 147:3 148:14,14
 148:24,25 149:3
 149:15 153:9,11
 154:20 155:25
 156:3,15 157:1,5,8
 157:11,21 158:9
 158:10,16
**eminem's** 103:10
 115:19 145:4
 157:14
**employee** 167:17
**employment** 72:24
 73:21
**enable** 142:1
**encompass** 91:20
 91:25
**encompasses** 31:6
**encompassing**
 35:7
**enforce** 97:21
**engaged** 18:2
**engineer** 76:1
**english** 25:6,11
**enter** 111:17
 114:11 139:8
**entered** 25:16 26:8
 118:24 141:24

**entering** 135:16
 135:23
**entertainment** 1:7
 1:13 2:6,12 3:4
 5:19,23 10:6,14
 11:18 12:3,10
 26:6 45:23 51:14
 56:18 57:14 71:22
 72:2,7 73:4,7
 125:8
**entertainment's**
 11:25
**entire** 99:14,15,16
**entirely** 52:14
**entirety** 70:11
**entities** 54:4 71:21
 72:22 119:17
**entitled** 16:13,13
 25:19 137:3
**entity** 12:23 54:18
 54:25 72:7 94:4,5
 113:22 133:23
 155:4
**entry** 119:21
**enumerate** 27:24
**enumerated** 27:16
**errors** 161:22,25
 162:2,25 164:9
**esque** 9:4,5 10:18
 19:17,20 21:19
 22:18,20 24:24
 30:8,10,17 32:1
 35:1 42:9,16
 43:10,18,20,23
 44:4,16,17 50:17
 53:10,11,21 54:5,9
 54:12,13,19 56:14
 58:19 65:25 66:2
 66:3 97:23 99:19
 100:8 101:16,24
 102:24 103:6,9

Veritext Legal Solutions
866 299-5127

[esque - fees]

104:4,15 105:23
107:15 114:16
115:20 122:20
125:7,19,25 126:7
126:12,19,22
128:14,19,22
129:19,24 130:2,6
135:5,8,13 139:23
140:4 142:23
143:3,11 144:16
145:3,16,25 146:3
146:11,18,22,23
146:23 147:3
148:14,24 149:3
149:15 154:20
155:25 156:3,15
157:1,5,8,11,21
158:10
**established** 8:10
36:6
**estate** 70:24,25
71:2,7
**estimate** 16:14,15
16:16,18,22,25
17:13 20:22 131:9
131:10
**europe** 124:23
**event** 11:11 137:3
**evidence** 44:10
49:18,18 125:24
126:6,11,19
**exact** 56:21 73:18
74:8
**exactly** 51:9 90:15
90:15,16 91:1
156:14
**examination** 5:2
6:8
**examined** 6:5
**example** 15:1,3
16:17 86:12 96:20

155:15
**excel** 12:23 30:23
84:23 125:13
126:16,16 155:2,2
155:6,11,11 156:7
156:12 159:5,11
159:24 160:15
**exclusive** 29:12
30:2 109:6 110:19
111:20 113:14
114:11
**exclusivity** 139:19
**excuse** 9:2 13:13
24:6 25:5,18 34:8
43:21
**executed** 92:16
108:25 109:4
110:17,21 166:7
**exhibit** 5:8,10,11
5:12,13,14,15,16
5:17,18,19,20,21
5:22,23,24 8:15,16
8:23 9:4,18,21
10:2,3,4,4,17 19:9
19:13,16 20:4,6
21:13 22:3,5 23:4
23:11 24:1,2,8,8,9
24:11,19 25:20,25
30:11,18,21 31:1,3
31:20,21 33:2,7
34:22 45:12,14
51:13,17,18 52:1
55:23,24 56:10
57:25 58:2 81:13
81:23 87:20 88:10
89:9 94:9 104:21
108:12,14 109:7,8
110:20,25 111:2,7
111:7,11 112:11
113:4,4,6 118:25
119:10 130:10

133:12 135:4,17
135:24 136:4
137:10 138:16,18
144:7,10 149:22
149:23 153:13,16
153:22,23 154:3
157:10
**exhibits** 5:7 59:16
81:9,11
**exist** 45:7 113:19
113:19 117:1,20
**exists** 63:6,12
**expand** 29:18 30:6
34:5 97:24
**expenses** 73:25
96:21 119:19
**expensive** 158:2
**experience** 49:6
74:8 86:2,16,18
88:24 121:15
**expert** 39:24 40:13
40:25 81:3 84:11
86:13,24 87:12
90:11 121:1
145:18 157:4
**expiration** 136:23
**explain** 16:12 33:4
76:21 97:21
154:18
**explained** 13:15
37:13 102:14
**explaining** 84:5
**explanation** 37:19
48:7
**explanations** 30:1
**explanatory** 46:13
**explicitly** 37:5,10
37:25,25 38:4,4
126:15 156:2,3
**exploitation** 46:21
48:4,6,11,18 49:14

49:15 51:22 52:2
52:18,22,23
**expressly** 98:19
126:2,6,19,22
155:24
**extent** 11:5 92:8
116:23 117:20
**external** 128:9,10

f

**f** 5:15 24:1,2 44:12
81:13,23
**facade** 129:14
**facilitate** 12:4
47:25
**facilitated** 23:21
23:22
**facilities** 6:25
**facsimile** 100:5
**fact** 10:13 20:21
104:7 125:11
159:18
**facts** 49:17
**factual** 16:16,21
**failure** 137:15
**fair** 12:6 51:5
53:17 68:20 69:2
69:10
**familiar** 17:7,9
18:6 19:19 24:9
24:13
**faster** 146:21
**fax** 136:21 137:8
**february** 26:8
**federal** 167:12
**fee** 21:2,2,4,8,9
23:5,5 96:7
119:20
**feel** 9:13 100:6
**fees** 20:15,16
137:5 160:7 161:1

Veritext Legal Solutions
866 299-5127

**figi**  47:7 50:8
**figueroa**  3:8
**figures**  73:18
  146:8
**file**  12:23 30:23
  125:13 126:16,17
  155:2,2,11 159:5
  159:11
**filed**  148:14
**files**  67:4 72:18,18
  85:7 156:9,10
**film**  82:15,18 99:1
**final**  51:12
**finally**  148:17
**financially**  167:16
**find**  6:23 58:21,22
  84:24 85:6 117:16
  144:16
**finding**  104:3
  143:2
**fine**  7:22 38:10
  71:7 141:7 153:1
**finish**  7:17,18
  68:20 74:17 91:22
  91:24 107:3
  115:10,14 119:8
  123:8
**finished**  118:7
  151:12
**firm**  59:23 60:3,4
  60:6 62:8 113:22
  133:23 139:6
**firm's**  61:13
**first**  6:21 24:6,10
  30:17 31:3,20
  37:4,9 46:14
  57:21 59:13 63:16
  67:17 89:14 90:1
  97:25 100:19
  119:15 129:10
  146:9,10 152:24

**fit**  98:25
**five**  24:8 27:9
  44:11 54:4 74:5
  82:21,24 83:7,18
  93:20 98:2 105:9
  123:2,24 124:6
**folder**  65:11,14
  66:10
**folders**  65:8,9
  66:19
**folks**  45:13
**follow**  126:16
  140:10 155:19
**following**  82:14
  94:17 104:6,8
**follows**  6:6
**foregoing**  166:2
  167:3,5,9,11
**forget**  51:12
**forgetting**  65:25
  88:18
**form**  15:20 19:1
  28:9,18 30:12
  31:4 32:7 33:22
  36:5 38:25 39:3,8
  40:12,22 41:12
  42:17 43:7 44:19
  53:14,22 55:10
  64:25 66:17 78:16
  92:11 121:10
  127:6 134:6
**formal**  74:2,9,10
  75:3
**formally**  76:4
**format**  53:11
  125:14,15 127:1
**forms**  130:14
**forth**  148:16 167:4
**forthwith**  137:5
**found**  98:3,9 99:13
  102:24,24 103:9

107:12 142:22
  153:8 158:1
  159:20
**foundation**  36:19
  40:16,24 50:19
  53:22 54:16 63:16
**four**  54:3 57:16,16
  57:20 58:8 82:20
  82:24 93:18 113:4
  113:8,9 120:10
  141:19 142:13
  146:9,10,19
**france**  123:16,24
  154:10
**franck**  154:9,20
**frank**  154:9
**free**  119:17
**french**  154:12
**friday**  62:5,6,20
**friend**  149:7
**friends**  76:16
**frink**  100:13
  105:20 106:12
**front**  111:12
  150:10
**full**  78:1 114:11
**fully**  51:8 105:13
  107:21,23,25
  108:4 136:17
**function**  66:13
**funk**  55:17 56:11
**funny**  7:8
**further**  167:11,16

### g

**g**  5:16 25:25 30:18
  30:21 31:1,3,20,21
  33:2,7 34:22
  51:17,18 87:20
  88:10 89:9 112:11
  113:4,6 119:10
  130:10 133:12

135:17
**general**  12:16
  14:25 26:9 41:5
  44:7,15
**generally**  34:23
  66:1,11,14 85:22
**george**  3:5
**germany**  124:7,11
**gesturing**  68:25
**getting**  16:20
**give**  8:2,2,2 9:18
  16:17 19:11 23:25
  25:23 33:6 34:4
  38:9 45:11 55:22
  59:6,7 73:18
  87:14 93:15 95:1
  115:14 119:7,8
  124:1 135:1 150:4
  162:12 163:17
**given**  37:5 58:5
  80:17 154:22
  159:18 167:10
**giving**  34:11 37:14
  37:24
**go**  6:21 8:18 21:23
  21:25 24:7 29:18
  31:23 34:16 35:2
  46:7,22 51:16
  64:18 66:2 74:11
  92:17 96:17
  109:10,11 144:1
  152:12,17 161:6
  165:2
**goes**  46:22 48:3
  104:15 127:1
**going**  6:16 8:1
  9:17 13:15 19:9
  19:24 20:6 25:17
  27:13 28:24,25
  31:4,23 37:15
  38:11 45:11,12,17

[going - income]

55:22 57:25 59:5
59:6,7,24 60:8
62:20 69:8,9
75:17 81:23 82:2
83:25 84:10 87:16
98:23 108:19
113:5 116:9
117:16 120:14
127:10 131:8
138:24 139:16
143:14,19 146:25
148:18 150:4
153:21 157:9
164:22
**good**  6:25 7:1,10
12:2 28:19 30:14
93:23,24 116:2
133:11 141:24
**gotten**  23:22
**govern**  31:1,10,14
31:15,15,19 35:6
**governing**  35:13
35:14,14
**graduate**  75:13
**grant**  77:12 139:6
140:22 141:3,14
142:6
**granted**  77:14
78:5 97:2 98:4
139:22
**granting**  78:22,23
78:24,25 79:1,3,4
87:8 114:12 140:3
142:7
**grants**  29:8 30:2
139:9
**great**  11:1 35:18
93:23,24
**groove**  82:22
100:7

**gross**  73:7 132:13
132:18,20,23
**grouping**  85:19
**grove**  75:8
**guess**  16:8,13,15
16:16 24:7 38:3
39:5 88:19 131:8
131:11 135:3
**guessing**  75:17
**guitar**  82:23
**guy**  62:7
**guys**  150:1

## h

**h**  5:17 45:12,14
46:14 51:13 52:1
56:4 72:18 88:13
104:21 111:3,5,7,7
111:11 118:25
135:4,24 136:4
137:10 138:16,18
**half**  10:1 129:8
**hand**  19:24 20:2
59:5 68:1,24
89:23
**hands**  68:25
**handwriting**
26:11
**handwritten**
62:21
**happen**  33:12,16
33:18,21 52:15
91:6 118:21
127:16
**happened**  93:11
**happens**  90:13,15
90:24,24 91:4
127:20,22 128:12
**happy**  143:20
**hardware**  66:25
**harmless**  114:1
119:17

**hblaise**  4:10
**he'll**  158:17
**head**  105:20
130:15
**health**  164:3
**heard**  157:17
**heather**  4:5 68:17
164:16
**held**  159:11
164:17
**help**  43:15 58:23
**helps**  115:15
**hereof**  142:2,4
**hereto**  10:17 11:3
111:18 166:4
**hi**  24:12 154:20
**high**  151:4 153:2,7
**hills**  69:20 71:3,6
**hire**  105:25 106:4
106:12,25 107:5
**history**  37:21,23
74:20
**hit**  129:1,6
**hitting**  129:2
**hm**  8:12 18:8 61:9
74:1 76:3,6,8 80:4
112:10 132:11
162:6
**hold**  13:5 28:13
70:10 71:14 72:24
91:21,21 93:15
115:9 119:16
135:16 136:11
137:20
**holding**  43:12
130:8,12 164:24
**holds**  114:1
**home**  69:18,22
71:3
**homeowner's**
161:17,19 162:18

162:22
**hope**  117:18
**horizontally**  20:25
**host**  129:9
**hours**  7:11
**house**  70:6
**household**  25:11
73:25
**huh**  69:2
**hyphen**  9:6

## i

**idea**  17:15 23:24
**identification**  8:16
9:21 19:13 20:4
22:5 24:2 25:25
45:14 55:24 58:2
108:12,14 144:7
149:23 153:23
**identified**  146:1
**identify**  43:16
44:22
**ii**  140:1
**iii**  141:21
**illinois**  4:8
**important**  7:16
80:13
**inaudible**  91:11
**inc.'s**  5:19,23
57:14
**include**  29:17 30:5
48:18 49:7 56:14
112:22 128:10
156:17
**included**  44:17,17
51:23 52:2
**including**  63:24
95:16 103:9
119:19 125:9
128:14 160:6
**income**  96:17
132:13,18,22,23

[incurred - jacobson]

**incurred**  119:21
  158:24
**indemnification**
  119:13
**indemnify**  114:14
  119:16
**indemnity**  152:22
  153:6
**independent**  73:1
**index**  5:1
**indian**  129:3
**indicate**  60:11
**indications**  68:24
**individual**  1:11
  2:10 147:24
**individually**  73:5
**individuals**  27:1
**induration**  89:3
**industries**  99:2
**industry**  12:5 14:6
  14:12,14,17,21
  15:6 18:2 36:12
  36:13,16 37:2,8,19
  37:20,21,22,24
  38:6,8,13,23 39:11
  39:22 40:9,10,20
  49:6 50:22 74:7
  75:5,5 108:2
  118:18,18
**inform**  32:3,12,14
  32:17 33:1,4
**information**  12:15
**informed**  125:11
**infringe**  113:20
  133:22
**infringed**  143:12
**infringement**
  107:10 147:16,17
  148:4,5,8 151:5,17
  151:19,20,21,22
  152:4,10,23 153:3

153:9,11 158:4,9
  158:18
**infringes**  142:17
  157:14
**infringing**  99:14
  100:10 101:17
  102:20,24,25
  103:2,10 104:4,11
  105:23 107:7,12
  142:23 143:3
  144:24 148:24,25
  149:3,5,8,10,13
  157:1,25 158:1
  159:15
**initial**  53:16
**initialed**  27:1
  166:4
**initially**  126:20
**initials**  18:1 26:16
**ink**  166:4
**insert**  158:17
**instance**  15:19
  21:9 90:1,9
**instruct**  16:7
**instructions**  68:19
  83:8,10,19
**instrument**  82:23
**insurance**  161:17
  161:20,22 162:2
  162:18,22,25
  163:2,20,21,21,22
  163:22,23 164:1,2
  164:3,3,4
**integrity**  37:7
  47:17,18
**intended**  49:13
  52:1
**intent**  47:15 48:4
  51:22
**intention**  84:3

**interest**  29:12 30:3
  57:16 71:21,23,24
  71:25,25 72:3,4
  147:25
**interested**  167:17
**interfere**  133:23
**internet**  55:9,11
  55:13,16
**interrogating**  10:8
**interrogatories**
  57:15 94:10 103:3
  104:18
**interrogatory**
  94:12,23 97:19,20
  98:2,9
**interrogatory's**
  130:20
**interviewed**  148:1
**introduce**  47:16
**introduced**  47:19
**introduction**
  46:21 47:9 48:8
  48:11 49:14,15
  51:21 52:1
**investigates**  14:2
**invoice**  5:13,14
  20:1 21:17
**involved**  77:5 87:2
  147:24
**irs**  96:21
**irvine**  2:20 3:18
**issue**  91:16,17
  92:2 101:21
**issued**  127:3
**issuing**  91:14
**items**  138:4

---
**j**
---

**j**  5:19 57:10,25
  58:1,2 94:9
**jacobson**  3:15,16
  5:5 6:10,15 8:5,7

8:18,22 9:17,23
  11:8,9 13:8 15:21
  16:3,10,11 19:3,15
  20:7,8 22:3,12
  24:4 25:5,8,17
  26:2,23 27:6,22
  28:5,15,19,20
  30:14,16 31:8,16
  32:11,24 33:25
  34:17,21 35:18,23
  35:24 36:8,21
  37:17 38:20 39:7
  39:15,17,21 40:1,5
  40:15,18 41:2,10
  42:3,19 43:4,9,14
  44:21 45:16 46:12
  47:14 48:17,22
  49:5,11,21 50:4,21
  51:4,11 53:17,19
  53:24 54:2,22
  55:12 56:1,5,6
  57:8,13,18,20,24
  58:1,4 59:11,15,19
  59:21 60:1,7 61:5
  61:8,17,20 62:1,14
  62:24 63:3,14
  67:9,25 81:5
  84:12 86:24 87:12
  90:10 91:7,12
  99:25 105:9 111:3
  114:6,17,24 117:2
  117:5,8,13 120:2,5
  121:4,11 122:12
  122:15 127:7
  130:19 131:9
  142:10 143:16,18
  143:22 144:18
  145:19 146:5,14
  150:2,18,20,22
  152:13 157:6
  158:7,11,19,25

Page 14

[jacobson - lawsuit]

161:9 164:13,20
165:9
**january** 81:15
82:9 93:16 123:23
155:13
**japan** 124:13,14
124:17
**jennifer** 1:23 2:23
167:24
**job** 1:25
**join** 40:4 81:5
84:12,18 121:4,11
142:10 145:19
146:5,14 157:6
158:21
**joint** 70:11
**jprx** 1:7 2:6
**judge** 102:23
104:3,10 107:12
**judge's** 104:9
**judgement** 5:22
**judgment** 119:21
143:15 153:14,16
**jurisdiction** 15:18
93:22 109:6,21
110:19 111:20
147:11 148:4,7
151:3 153:2,8
**jurisdictions**
93:21 123:11

**k**

**k** 5:20 72:18
108:10,11,12,19
108:24 124:15
**k1s** 72:21
**keep** 18:11,17 69:1
98:23 101:20
102:14 103:15
108:1 142:25
143:1 157:9

**keeps** 17:4
**kept** 59:1
**key** 65:23 66:6
**know** 6:23 8:1
9:24,25 11:23
12:19 13:3,9,17,24
14:21 15:10,11
16:2,5,9 17:14
19:2,18 20:18,21
21:8,10,14 22:23
23:8,10,24 27:6,24
28:17 31:6,14
33:23 38:9,11
39:6,9,25 40:6,17
41:1 42:18 43:24
43:25 44:14,24
50:15,20 51:3,8
54:11 55:4,5,7,9
55:11,17 56:15
58:20 59:2 65:10
69:4,6 70:10,15,16
71:6,12,16 72:23
73:9,10,11 75:9
79:1,3,8 81:4,8
84:19,19 85:20
87:16 88:2,14,16
88:20,22,23 89:7
91:8,10 92:12,12
93:1,13,22 95:23
96:22 97:1 100:1
100:17 102:9
104:2 110:10,10
110:11,12 111:1,2
114:5,7,20 115:21
116:10,18 120:13
120:16,17 121:7
124:8,14,19
127:21,24 129:12
130:15,20 131:20
131:24 132:24
133:18 134:13

135:10 138:3,10
138:21 143:1
145:20 146:18,23
149:10 151:10,19
151:20 152:5,7
153:12 154:21
158:5,14,20
160:10,12 161:1
162:8 163:11,13
163:15,24,25
164:5
**knowing** 130:1
159:16
**knowledge** 16:14
23:13,15 34:6
36:9 39:15 40:15
54:13 56:7,9
**knowledgeable**
10:13 11:12,21,25
**known** 46:23
147:3
**korea** 124:18,22

**l**

**l** 4:5 5:21 6:13
69:15 88:13,13
105:21,21 108:14
108:19,20 109:8
124:24,24 163:9
**lab** 72:15,16,17
73:21 81:24 85:7
93:24
**label** 104:12
**labeled** 104:11,13
104:14
**labrador** 1:7,13
2:6,12 3:3 5:19,23
8:25 10:6,14,14
11:18,25 12:3,6,9
12:10,12,16 14:5,9
14:11 18:25 19:7
21:12 23:6 26:6

29:6 30:8 31:2
32:1,3,4,12 33:1
34:8,11 35:13
36:2,20,22,24
41:13,17 42:8,12
42:15 43:16,20,22
45:8,23 46:1,15,24
51:13,23 56:18
57:1,2,14 58:17
59:2 68:3 71:22
72:2,7 73:4,7
87:19 92:1 93:22
93:23 94:4 95:3
98:4 104:22,23,24
109:16 114:15
125:8 134:14,19
134:23 135:5
138:18,21 140:13
141:3 142:19
147:8 151:7,18
152:3 155:3 165:5
**labrador's** 94:10
105:7 132:13,23
164:23
**lana** 4:15
**language** 25:6
32:13 33:2,8 50:5
88:6
**laptop** 66:8
**las** 159:9
**law** 3:7,17 4:6
54:23
**laws** 109:6 110:19
111:20
**lawsuit** 43:13
67:12,16 122:7
123:20 125:17
147:5,8,12,15,24
147:25 148:13
151:16,18 152:23
156:22

[lawyer - mail]

lawyer   8:2 20:2
  88:8,12 132:5
  133:6 160:18
lawyers   16:17
lay   63:16
lead   82:23
learns   25:5
lee   3:16
left   23:17
legal   27:19 36:6
  37:16 38:9,15
  39:13,23 40:13,23
  47:12 48:14,19,20
  49:1,18 50:1,25
  53:14 70:12 75:19
  77:17 81:2 114:17
  114:23 117:5,7
  120:2,14,25
  121:11 138:25
  139:17 142:8
  144:18,19 145:17
  157:3 158:7,25
legally   51:10
length   16:18,22
  90:17 91:1
letter   33:8 135:24
  136:2,3,6,8 137:11
  137:14,18,21,23
  138:1,5,10,13,13
letters   9:6 59:23
  60:1,3,6
letting   161:1
liabilities   119:19
liability   163:11
libraries   12:11,13
  85:19 128:11
library   1:8,14 2:7
  2:14 12:7,20,22,25
  13:9,11 30:24
  32:19 91:18 93:15
  93:17 98:24

125:12,14,16
  126:17 154:21
  155:11 156:4
  157:11 159:5
license   20:12 21:2
  41:14,15,16 42:5
  42:15 46:20 47:2
  47:5,24 50:24
  77:12,20,21,23
  78:4,5,23 79:3
  87:8 91:14 94:21
  96:7 97:23,24
licensed   50:17,23
  53:20 66:5 84:20
  97:23 122:21
  129:10,11 159:8
  160:5
licenses   77:14
  91:15,16,17 92:2,4
  97:2
licensing   21:8 23:5
  47:25 50:11 77:5
  85:23 88:24 91:20
  97:4 104:19
  121:15 122:3
  127:3 130:9
  157:20 159:16
  160:7,12 161:1
liens   70:21
life   163:21,22
  164:3
liking   54:21
limit   15:18,23
  98:20 163:11
limitation   119:20
  139:15 140:2,3
  141:16,17
limited   29:17 30:5
  45:24
line   47:5,10 48:3
  91:12 114:24

117:3 146:12,24
list   30:22 58:11,14
  83:10 131:2
listed   30:17,21
  31:3,10 42:12
  46:4 130:13,13,19
  141:11 155:2
listen   99:19
  128:16,18
listening   145:25
listing   31:20
listings   156:8
lists   84:23
literally   52:14
litigation   45:3
  125:18 155:8
  157:24,25 159:13
little   25:12 54:16
live   119:3
llp   3:5
locations   50:13
log   60:12
logistical   7:19
long   14:8,8 30:25
  36:25 136:10
longer   66:3 80:23
  80:23 112:23,25
look   7:8 9:24 20:1
  20:25 21:16 23:4
  25:22 27:7 41:4
  45:17 65:7,9
  81:16,25 83:7
  97:7,13,17 108:19
  142:13 143:24
  150:9,23 154:3
  155:14
looked   65:6,8
  130:13
looking   50:5 57:23
  58:8 109:8 111:11
  111:14 120:19

136:4 141:19,21
  145:1,9 146:8
  148:19
looks   20:25 27:2
lords   90:8
los   3:9 75:4 153:5
lose   101:17,21
  102:16,25 103:10
  104:4 105:23
  106:22,24 142:23
  143:3,12 144:17
  145:4 146:20
  148:25 149:3
  157:1,14
losing   37:7
loss   47:17
losses   119:18
lot   73:18 74:7
  149:14
lots   75:4,10
loud   82:12,13
  109:2
lunch   68:15
lyrics   41:23 77:2
  80:2,7

**m**

m   5:22 6:13 9:6,6
  17:8 69:15 105:23
  124:19,19 144:7
  144:10 153:17,18
  163:9
machine   167:7
mail   5:12,15,18,24
  19:10 24:5,6,10,16
  32:15 33:9 43:5
  56:2 60:13,17
  62:7,12 81:15
  82:6 93:2 126:15
  136:3,21 137:8
  154:5,15 155:13
  155:24 156:4,4,17

[mail - monies]

159:10
**mailed** 93:5
**mails** 42:24 60:2,7
68:4,5,6,10,12
148:16
**main** 74:14
**major** 159:3
**making** 133:10
136:16
**manipulate** 52:13
53:2 129:4
**manipulated** 53:1
**manipulation**
52:12
**manner** 53:5
134:3
**mannerisms** 68:24
**mark** 8:13 9:18
19:9 23:25 26:12
26:12,15,24 55:23
57:10
**marked** 8:16,23
9:21 19:13 20:4
22:5 24:2 25:25
45:11,14 55:24
58:2 108:9,12,14
110:24 111:1
118:25 130:10
135:17,23 137:10
144:7 149:23
153:22,23
**marketing** 73:24
**marketplace**
96:23,24
**markets** 12:25
**marking** 8:4 22:3
45:12
**master** 77:21,21
78:3,4 79:2,3,5
98:21

**material** 119:22
136:17
**materials** 8:25
**matter** 67:23
68:18 116:3
118:21 146:23
157:25 158:1
**mc** 26:11 66:3
101:16 104:14
105:23 149:15
154:20 157:11,20
158:10
**mccartney** 103:13
**mean** 9:10 11:14
11:23 15:23 18:2
25:3 30:13 31:20
32:14 33:4 34:6,8
36:20 37:25 38:4
38:9 47:3,9,18
52:23 53:2,7
54:14 56:16,25
57:6 60:24 68:5
71:23 77:2,3,9
78:9,10,11,13 80:3
82:8 83:18 86:5
87:1,1,24 89:2,18
95:10 106:4
109:20 116:10
120:23 121:18,19
123:1 134:16
141:8 143:4 145:1
147:23 152:3,25
156:2 157:5
161:24
**meaning** 32:13,17
33:3,8 133:21
**means** 15:10 27:24
31:14 48:11 112:6
114:20 136:2,7
140:20 144:15
151:7 156:3 158:5

**meant** 116:10
160:1
**measure** 146:19
**measured** 146:9
146:10
**mechanical** 42:5
42:15 77:20,23
78:5,22
**mechanicals** 41:15
**mechanics** 42:5
**medication** 7:11
**medium** 55:3
**membership**
71:25
**memory** 59:21
73:9
**mentioned** 36:1
37:10 51:21,25
59:11
**met** 159:6,9
**method** 39:18,19
**methods** 40:8,14
40:20
**michael** 1:11 2:10
3:13 6:16 9:1 10:5
10:15 19:22 26:7
29:3 54:19 55:21
56:11,17 57:15
65:24 87:20
114:14 115:7
116:2,9 119:25
134:4 148:16
154:23
**middle** 50:13
69:12
**mile** 151:17
152:10
**mind** 28:1,7 60:21
115:22
**mine** 13:22 54:24
81:16 149:9

**minute** 34:16
87:14 95:1 135:1
**minutes** 104:15
105:9
**mischaracterizes**
26:20 57:4 140:6
158:12
**misspelled** 29:20
**misstates** 102:5
158:6
**mix** 86:11
**mixing** 103:15
**mm** 8:12 18:8 61:9
74:1 76:3,6,8 80:4
112:10 132:11
162:6
**modify** 92:18
**modoocom** 124:19
124:21
**mom** 18:16
**moment** 8:19
25:18 46:8 119:8
134:20
**monday** 1:18 2:22
6:1
**monetary** 21:1,5
**money** 16:4 17:1
20:21 21:12 23:7
23:9,12,23 41:13
42:25 43:6,20
58:25 59:6 73:19
94:21 95:23 97:1
115:22 130:8,12
131:4 134:14
**monies** 15:15
20:14,15 41:14,16
41:19 43:13,22
52:24,24 58:11
59:2,3 94:16
122:2 130:25
134:23 135:19

Veritext Legal Solutions
866 299-5127

[month - number]

month   71:19
morning   7:22
mortgage   70:17
   70:19,21 71:9
   73:20
move   9:18 33:1
   64:15 103:16
   129:5,5,16 149:18
   149:22 155:20
moved   99:12
mp3   154:22
   157:12
music   1:4,8,14 2:4
   2:7,13 12:5,5,6,11
   12:12,19,19,22,24
   12:25,25 13:9,11
   13:22 14:6,12,14
   14:17,21,25 15:3,6
   15:16 18:7,18,19
   18:21,25 19:5,7
   22:15 23:2 24:11
   30:23 37:23 41:22
   46:23,24 47:19
   50:22 52:14 53:1
   54:20 56:18 72:10
   74:7,7,21,24 75:5
   75:5,5 76:1,7,9,12
   76:14 77:6,8,10,10
   77:13,13 78:7
   79:11 85:22 88:24
   89:1 93:4,23,23,24
   93:24 98:24 100:6
   100:13 103:12
   104:10,19,19,22
   105:20,22 121:15
   127:1,14,25 128:5
   129:12 144:22
   145:24 149:13
   157:18
musical   74:2
   78:10,11 79:7,24

79:25
musicologist   100:8
   100:12 149:6
musicologists
   102:19 105:17,25
musicology   74:22
mwf   1:7 2:6
mx   18:7,18

**n**

n   4:7 5:23 9:6
   69:19 71:5 74:12
   77:11 124:8,8
   149:22,23 150:19
   153:16
name   5:3 6:11,12
   6:13,15 27:5
   30:25 68:17 69:12
   69:24 70:1,8 73:5
   73:6 75:8 100:12
   162:8,10 167:20
named   44:11 86:7
   138:3 144:24
   147:5
names   65:10,22
   75:10
nassar   4:15 25:16
national   20:13
   21:10 23:13 54:7
   54:8 55:1 106:11
   106:12 151:17
   152:11 153:3
   159:15,19
nature   66:19
   163:5
necessarily   79:15
   80:14
necessary   142:3
necessity   47:25
need   6:22,22 21:22
   25:24 34:18 35:9
   60:8,9 62:5 63:16

66:18 82:15,18,22
   82:25 88:25 89:7
   90:7,8 111:1
   119:24 138:10
   148:9 150:11
   161:14
needs   24:19 47:19
   82:14,17 90:16
   91:1
negotiator   23:19
neither   18:24
   167:16
nervous   159:14,19
   159:20
net   41:18,18 42:14
   132:21,22,22
never   16:23 41:22
   63:4 104:8 106:23
   111:25 129:3,10
   155:23 156:4
new   13:23 17:8,12
   17:20,22 20:13,19
   23:14 24:11 47:7
   50:8,12 52:13
   54:7,12,19,21,25
   55:16 81:1 84:9
   86:5,20,20 87:4,10
   93:9 94:3,4 98:4
   99:8,10,13 100:9
   102:23 103:8,23
   106:1,6,9,11,16
   107:6,9 109:20
   115:24 116:9,12
   123:8 142:22
   143:6,11,15
   144:15 147:8,14
   147:19 148:10
   151:4,15 152:19
   153:2 156:12
   158:24

nicholson   62:7
nikki   56:2,7
nine   109:17,20,23
   110:1
nitschke   4:4,15
noel   1:16 2:19 5:4
   6:4,13 8:10,14
   11:11,15,24 19:10
   24:12 51:19 56:2
   60:13 62:7 166:1
   166:15
non   34:11 35:25
   36:1 107:7,10
   137:24 138:1,4
   148:24 158:1
nonresponsive
   64:15 103:16
   129:17 155:20
nontaxable   20:16
north   3:8
note   138:9
notebook   7:3
noted   166:4
notes   46:13 59:12
   62:21,21,25 63:7
   64:12 117:14,18
   124:15,15,16
   132:6 133:7,10
notice   5:10,11
   8:14 136:20 137:8
   139:22 140:2
   160:4
notify   133:24
   134:4,9
november   60:14
   60:16 62:10
number   57:23
   58:7,9 82:2 94:12
   94:23 97:19,20
   98:1 109:20
   110:25 111:2

Veritext Legal Solutions
866 299-5127

**[number - okay]**

139:1 150:7,13,18
151:1 152:5,6,24
152:24 159:2
163:15,17
**numbered** 27:8
**numbers** 20:17
94:24 130:19,21
**nw** 27:4

**o**

**o** 5:24 17:8 18:1
71:5 72:18 74:12
124:8,8,8,19,19,19
124:19,24,24
153:22,23 154:3
157:10 163:9
**oath** 6:5 167:6
**object** 31:4 37:15
81:2 84:10 86:24
115:15 120:14
138:24 139:16
147:11 148:7
**objecting** 148:3
**objection** 15:20
16:1 19:1 26:20
27:18,19,21 28:2,3
28:9,10,11,18
30:12 31:12 32:7
32:8 33:22,24
36:4,5,19 38:15,19
39:13,20,23 40:3,4
40:12,16,22 41:9
41:12 42:17 43:7
43:11 44:19 47:12
48:14,16,19 49:1,3
49:8,9,17 50:1,19
50:25 51:2,6
53:14,22 54:16
55:10 57:3,4
64:22,24,25 66:17
70:12 77:17 78:16
84:17 86:13 87:12

87:14 90:10,12
92:11 99:25 102:5
114:6,17,19,24
117:3,4,11 120:2
120:25 121:4,10
122:12 127:6,7
134:6 140:6 142:8
144:18 145:17
146:4,12 157:3
158:6,11,12,19,25
**objections** 38:24
38:25 39:2 87:15
91:7,12 98:1
144:20 151:9
**obligation** 8:25
10:15
**obligations** 48:1
97:17
**obtain** 163:17
**occasionally** 129:6
**occur** 93:12
**offer** 128:13 140:9
**offered** 75:7
**offering** 125:7
**offers** 13:1
**office** 61:2 159:6
164:24 165:6
**oftentimes** 84:20
**oh** 12:18 13:13
17:21 18:11 22:13
37:20 45:25 49:22
59:5 75:15 112:19
131:2 149:20
150:15,21
**ohiri** 3:6 9:15 11:5
15:20 16:1,7 19:1
21:25 26:20 27:19
28:2,9,12,18 30:12
31:4,12 32:8,20
33:24 34:16,18
35:16 36:5 37:15

38:19 39:2,5,13,20
39:23 40:3,12,22
40:25 41:9,12,25
42:17,23 44:19
46:9 47:12 48:16
48:19 49:1,9 50:1
51:2,6 55:10 57:4
57:23 59:13,16,18
59:22,24 60:2,4,9
60:13,14,16,19,24
61:1,3,7,9,12,14
61:19,22,25 62:4,6
62:10,15,18,22
63:16 64:21,23,25
66:17 67:20,24
70:12 77:17 78:16
81:2,16 82:1
84:10,17 86:13
87:14 88:19 90:12
92:11 102:5,9
104:25 107:22
110:9 111:5
114:19 115:10
116:7,12,19 117:1
117:20 119:7
120:14,25 121:10
127:6 130:22,25
131:11 134:6
138:10,24 139:16
140:6 142:8 143:6
143:8 144:3,20
145:17 146:4,12
152:12 153:17,20
157:3 158:6,12,21
159:21 160:24
161:15 162:14
164:19 165:1,8
**okay** 6:21 7:10 8:6
9:10 10:10,25
11:1,17 12:2,18
16:4,9 17:7,25

19:19 21:15 23:25
27:15,25 29:8
32:1 37:9 40:2
43:15 46:13 49:6
49:22 54:7 55:5
56:23 57:9 58:10
59:14,15,18 60:23
61:16,21 62:1,6,16
62:19 64:14 65:11
65:19 69:12 72:2
72:10,21 73:3,7,23
74:2 75:15 77:5,8
77:12 79:2,9,12
81:17,23 84:5
85:14,18,24 86:4
86:11 88:8,24
92:4,7 94:9,11,22
98:8,10,10 101:7
102:23 104:9
105:1,13,19,20
107:17 108:8,9,18
108:21,25 109:8
109:12,25 110:6
110:15 111:11
112:11,13,20
113:11 115:25
116:14 118:6,9,10
119:10,14 123:6
123:11,14 124:5,7
124:18,23 125:5
126:11,18 127:10
128:4,8,13,19
131:6 132:23
133:11,12 135:4
135:23 137:23
138:14,20 139:21
140:19,25 141:6,8
141:19,22 142:19
143:14,17 144:13
146:8 147:22
150:11,13,23

Veritext Legal Solutions
866 299-5127

[okay - payments]

151:9,24 152:8
153:13 154:12,14
156:12,25 157:8
159:21 161:15
164:6,11,16
**olay** 149:7
**omissions** 161:22
161:25 162:2,25
164:9
**once** 49:22,22
**ones** 59:24
**open** 164:24
**opened** 63:1,2,8
**operative** 105:4
**opinion** 16:16,21
22:19 39:24 40:13
40:25 47:12 48:19
81:3 84:11 86:14
86:25 90:11 106:5
120:2 121:1,12
144:19 145:18
157:4 158:7
**opportunity**
118:14 152:18
154:3
**opposed** 25:7
**option** 129:9
**oral** 164:22
**orally** 33:7 38:14
38:24 40:19
**order** 38:7 77:12
94:24 143:2,4,4,5
**organization**
15:14 17:7,14,16
18:3,6 46:5
**original** 25:21
80:23 102:20
104:14 105:23
106:23 113:15
129:9 142:16
167:12

**originally** 41:4
47:20
**outside** 21:24
73:21
**outstanding** 137:5
**owe** 70:17 71:12
**owed** 94:16 97:1
**owned** 46:24 92:8
113:25 124:25
**owner** 13:21,21
29:5,8 30:2
112:17 113:15
114:1,13 119:16
119:17 120:20
133:17,24
**owner's** 29:16
30:5
**owners** 134:1
**ownership** 52:19
71:24
**owns** 76:23

## p

**p** 6:13 18:1 69:15
71:5 124:24 163:9
**p.m.** 2:22 165:10
**page** 5:3,8 19:24
24:8,9,10,18 26:16
26:19 27:7,7
46:14 51:12,18
55:22 57:16,20
58:8 61:6,23
62:11,15 63:3
81:23 89:14 98:1
98:15,15 111:14
143:20,21 150:16
**pages** 21:15 25:18
25:18 26:11 27:8
30:17,21 31:3,20
57:16 62:14
**paid** 34:25 41:6,7
42:11,15 56:12,16

57:1,1,2 58:14
113:25 132:10,10
132:11 134:15,17
134:23
**palmer** 6:13,13
69:15
**palomar** 163:9,9
**paper** 23:25 116:7
**paperwork** 116:3
116:4
**paragraph** 27:9
34:23 41:4,10
45:25 46:19 47:4
47:10 81:24 83:7
83:18 84:6 108:22
109:1,9,11,19,22
109:24 110:1,1,2,7
110:15 111:14,22
111:24 112:1,3,4,9
112:14,16 113:4,8
119:13 120:10,19
120:24 134:5,12
136:4,6,9 137:7
139:14 140:1,4,5
140:19
**paragraphs**
109:17 119:2
**pardon** 81:20
131:3,3
**parenthesis** 29:13
29:21 56:11 82:18
**parenthetical** 9:1
9:1 10:15,15
29:15,15,15,16
**parol** 49:18
**part** 25:21 28:17
30:23 41:22 46:1
63:7 84:15 118:22
119:15 144:17,22
145:20,21 150:9

**partial** 28:4,13,16
28:21 35:7
**participate** 103:23
104:1 133:25
147:19
**participated** 152:2
152:19
**participation**
147:21
**particular** 28:6,8
28:23 91:18
**parties** 106:7,8
111:18 159:2,13
**partnership** 71:25
**parts** 39:11 41:14
**party** 20:13 21:10
23:13,16 45:24
54:7,8 55:1
106:11,12 127:2,3
141:24 142:18
147:22 151:15,17
152:2,11,19 153:3
158:4,17 159:3,16
159:19 160:3
167:18
**pass** 19:12 45:12
**pattern** 155:6
**paul** 103:13
**pay** 41:17,17
43:20,22 57:2
73:20 106:5
112:17 114:22
115:22 122:2,17
132:9
**paying** 59:2 71:19
122:6,9
**payment** 42:1,16
44:7,11,15,15,17
138:3
**payments** 34:23
41:5,16 42:5,6

[payments - production]

43:16,17 58:14
94:17,18 136:16
**pays**  73:25
**peers**  149:9
**pen**  133:8
**penalty**  166:2
**pending**  107:19,20
115:5 149:18
**percent**  41:18
**percentage**  17:5
34:24 41:7 42:11
**percussion**  82:19
82:20,20
**perfectly**  38:10
**performance**
15:14 18:3 41:16
41:19 42:6 46:5
52:25 55:11,14
113:24 134:14,23
135:21,22 137:15
137:24 138:1,4
**performed**  14:19
130:2 136:19
**performing**  96:22
96:23
**period**  29:16 62:1
**perjury**  166:2
**perpetuity**  29:16
30:4
**person**  10:13,19
11:12,21,25 23:19
57:7 73:24 76:22
90:25 97:22
113:22 133:23
139:6 140:23
147:24
**personally**  19:4,4
**pertains**  167:11
**pete**  13:17
**peter**  4:13 13:20
13:21 19:10 24:11

42:24 43:5 65:24
82:6 84:4 125:13
148:15,20 155:2
**petitioned**  137:2
**phone**  67:18,21
106:16
**phrase**  47:6 48:11
83:17
**physical**  156:9
**pianist**  74:5
**piece**  14:25 22:15
23:2,25 52:14
54:20 76:22 79:11
100:5
**pieces**  12:24,24
**place**  167:4
**plaintiff**  1:5 2:5
68:18 109:4
110:17,22 111:8
164:17
**plaintiffs**  4:3
108:25
**play**  72:25
**played**  54:8 99:17
99:17 106:22
129:13 149:13
**player**  128:9 130:2
**players**  103:12
**playing**  103:12
**plays**  53:9
**pleadings**  116:13
116:15
**please**  6:11 8:18
20:7 27:7,12 35:3
51:12 55:13 58:6
59:4,12 61:17
80:18 89:10 98:11
98:18 103:17
107:3 109:3
110:15 112:16
128:2 132:5 139:4

139:14 142:15
154:20
**plenty**  82:21,25
**point**  28:19 30:14
99:10,21 106:21
136:10
**pointed**  43:2
**poland**  124:25
**policies**  163:4
**policy**  163:15,17
164:9
**political**  74:20
**portions**  98:24
99:3 104:18
129:16
**possession**  9:16
11:6 63:19,23
67:5,7,11
**possibilities**  52:18
52:22
**possibility**  159:15
**possible**  44:9
65:21 127:1
159:16
**possibly**  28:12
59:2
**potential**  127:14
128:6
**practice**  86:1
98:24 99:2 104:18
**precaution**  154:25
**precautionary**
155:13
**preceding**  117:10
**prep**  63:17
**prepare**  100:14
133:4
**prepared**  101:2,5
101:7,12,15,18
102:8

**preparing**  96:14
150:7
**present**  4:12 47:23
99:3
**presented**  133:17
**previous**  35:2
131:17,18 156:13
**previously**  110:24
120:8 153:22
**primarily**  73:25
**prior**  123:17 158:6
167:5
**privilege**  60:12,20
68:5
**privileged**  59:25
60:10 68:4,10,11
**probably**  11:1
16:10,19 18:13
82:15,18,22 105:9
117:18 130:18
143:18
**proceeding**  103:23
**proceedings**  25:16
152:19 167:3,5,7
167:13
**process**  6:18,19
**processing**  21:4
23:5
**produce**  60:22
61:15,24 62:13,16
62:20 75:25
**produced**  9:13,16
11:4,7 45:3,8 61:2
61:3 92:24
**producers**  13:1
15:15 47:23
**product**  60:20
61:11,13 62:12
77:11,13 78:8
**production**  8:15
10:5,7,7,9 11:2

[production - real]

12:5 74:24 77:6,8
77:13 85:22 87:9
88:25 91:19
104:19 121:15
154:1
**professional** 163:2
**professionally**
76:5,7,9
**profit** 17:4
**program** 75:16
106:21
**progression** 79:21
79:22,23
**project** 15:17
**prominent** 15:7,8
**proper** 124:1
**properly** 38:7
94:25
**property** 70:22
71:10
**proposition** 83:6
**protection** 113:15
**provide** 83:5 84:1
95:22 107:1
116:22,23 119:1
138:5 152:20
**provided** 24:24
92:24 94:13 99:20
100:16 102:22
116:4,24 117:7
136:17 138:8
152:6
**provider** 75:23
**providing** 138:22
**provision** 142:20
**provisions** 135:25
**pty** 1:4 2:4
**public** 53:11
**publication** 34:25
48:23,25 49:7
53:16

**publicly** 130:2
**published** 53:11
53:15
**publisher** 13:3,4
13:22,24 14:1,2,3
14:3 18:19 29:9
32:18,19,19 37:4
46:1,3,14,17,19,20
46:20 49:22,23
50:6 93:16 96:6
122:25 123:6,16
123:16 124:3,5
136:12,13,15,18
136:20,21,21,24
137:1,3,4,5 139:5
139:7,9,12,15
140:9,9,10,13,16
140:22,24 141:1
141:13,14,17,17
141:24 142:2
154:12 157:10
**publishers** 13:1
17:5 46:4 93:14
122:20 123:3,12
123:14 125:6,9,10
125:23 126:16
127:13,22 132:2
154:11 155:1,5,12
155:16,25 156:10
**publishing** 55:21
56:12,16,17,20
57:6 94:1,3
135:19
**pull** 122:20 125:6
**punctuation** 30:1
**purchased** 76:23
**purpose** 137:1
**purposes** 80:11
112:21
**pursuant** 9:1
10:16 33:2 134:5

164:18
**put** 7:3 55:15
103:14 129:10
139:21 140:1
160:4
**putting** 103:13

**q**

**qualify** 28:23
121:21
**question** 7:17 9:11
11:2,24 24:23
28:10 31:18 32:21
32:23,25 34:15
35:2,10,11,17,20
38:2,3,22 40:2
41:3,25 42:2 44:1
47:11 48:24 51:17
52:20 54:23 56:10
56:21 64:2,16
67:20,24 68:20
69:4,6,7,8,9,9,10
74:8 78:18 86:19
86:22 87:5 89:4,5
90:19,20,21,22
94:22 97:20 98:11
99:24 100:18,19
103:17,17 105:14
105:16 107:3,19
107:19,21,22,23
107:25 110:6,9
115:5 118:7,8,17
119:4,8 123:8
126:4,5,18 127:9
127:11 128:2
129:17 131:15
133:1 134:22
137:7 143:9 145:8
146:6,24 147:13
149:18 150:12,13
150:15 151:13
155:21 159:21

162:1,14,15
**questioning**
146:13
**questions** 10:8
25:23 63:21,21
70:5 115:8,11
117:9 164:24
**quickly** 161:9
**quite** 127:23
**quotations** 9:5
**quote** 9:2,2 10:16
10:18 29:14
**quotes** 24:20

**r**

**r** 6:13 18:1 69:15
69:20 71:5 88:13
105:21 124:15
163:9
**radio** 82:21
**raena** 3:6 60:14
**rates** 135:21,22
**read** 25:5 27:12
31:24,24 35:16,19
41:10 77:16,19
78:13,15 80:18,19
82:11,12,12,13
86:17,22,23 89:5,6
97:23 98:11,12,16
100:20,22 103:17
103:18 109:1,20
110:15 111:22
112:4,16 115:12
115:13,17 118:24
119:15,24 133:16
136:9,11 139:2,14
142:14 151:1,9
154:16,19 166:2
**reading** 83:22
98:8 99:7 112:14
**real** 70:24,25 71:2
71:7

Veritext Legal Solutions
866 299-5127

[really - report]

really  14:2 46:7
  100:1 115:15
  144:23
reason  7:18,19
  24:18 25:21 52:5
  52:8,11 129:13
  156:17,21
reasonable  119:20
  134:3
reasons  57:9
  119:22 145:22
  146:1
recall  52:3 79:10
  93:3
receive  24:15
received  41:13,19
  43:16 96:19
  160:12
recipient  23:18
recognition
  106:20
recognize  26:3
  139:11 140:13,16
  143:2 153:7 154:5
recognized  106:23
recollection  115:7
  148:3 151:11,12
  151:16
reconstruction
  137:1
record  7:14,14,15
  8:18,21 13:5,7
  18:18 21:23,25
  22:2,4,8 25:13,15
  34:16,20 35:19
  43:1 46:7,11
  59:10 60:11 68:17
  75:25 76:12 77:19
  78:15 80:6,19
  86:23 89:6 98:4
  98:12 100:22

103:18 105:12
  115:17 117:16
  118:12,14 119:6
  144:6 152:12,15
  152:17 153:13
  161:6,8 164:13,15
  164:25 165:2,4
  167:6,9
recorded  76:7,9
recording  76:1
  77:3 78:10,11,13
  78:21,24 79:6
recordings  47:16
  47:20,21 56:19
  98:21,25
records  8:24 72:15
  72:17 73:21 85:7
  85:7 94:23
red  72:15,16,17
  73:21 85:7 93:24
redact  61:15,19,24
  62:16,20
redacted  60:21
refer  12:15 23:1
  29:2,2 48:25
  94:21 120:7
  132:25 143:20
reference  21:18
  22:15 37:6 39:16
  43:17 44:15,25
  85:20 109:23
  115:23 146:22,22
  149:20
referenced  20:14
  20:15,22 21:8,13
  23:6 47:2 121:24
references  21:10
referencing  44:6
  157:13
referred  10:20
  47:20 130:24

134:11 149:6
referring  12:16
  34:22 35:12 37:3
  48:23 104:13
  114:4 116:7
  138:11 144:10
  146:21 149:15
refers  14:25 29:3,5
  47:6 153:1
reflective  46:4
reflects  60:20
refresh  115:3,6
refreshes  151:10
regard  43:13
  50:12 141:2
  148:12 152:1
regarding  9:7,13
  37:24
regards  115:23
registered  72:19
  136:20 137:8,11
regularly  66:23
reiterate  68:19
  117:2
reiterating  117:13
relate  8:25 9:4
  10:18 67:11,15
  68:3 153:9
related  92:25
  94:18 153:10
relates  50:14
  63:15 76:19 93:23
  93:24,25 114:15
  115:19 131:21,24
  151:11,14,25
  158:10
relating  43:10
  92:21 148:14
relation  18:1
  116:1

relationship  18:21
  18:25 19:5,7
  65:21 92:14
  117:22 137:9
relative  43:22
  167:17
remain  52:6,9
  86:11 87:6
remainder  117:9
remember  57:10
  73:15 75:22 81:19
  81:21 93:8 117:18
  117:19 125:4
  129:22,25 132:7
  137:14 150:7
remove  125:9,25
  126:7,12,19,22
  128:22,25 129:2,4
  129:7 149:17
  154:20,24 155:1,5
  155:13,25 156:3
  157:11,16 159:3
  159:11
removed  125:11
  125:16,20,20
  129:1 149:15,16
  156:18 159:9
  160:4,8,13 161:3
removing  127:2
render  73:3 106:5
  136:15
rendering  88:4
rent  71:19
repeat  10:23 29:25
  134:22
rephrase  32:21
  69:6 78:18 100:18
  121:13
report  100:14
  101:2,5,7,10,12,15
  101:18 102:1,7,10

Veritext Legal Solutions
866 299-5127

[report - saying]

102:10,11,13,18
102:21
**reported**  1:22
**reporter**  2:23 7:20
8:3,17 9:20,22
19:14 20:3,5 22:6
24:3 26:1 35:16
45:15 55:25 58:3
59:8 68:23 77:16
82:16 91:21
100:20 108:13,15
115:9,13 144:1,8
149:24 153:24
161:5,12,14 167:2
**reporters**  7:21
**reporting**  96:17
**represent**  6:15
128:11
**representation**
119:22
**representations**
113:3 119:25
120:6,7
**representing**
13:22
**represents**  14:3
113:13,18,24
114:10
**reproduce**  144:16
**request**  8:14,24
10:5,7,9 11:2
114:14 117:25
149:25 150:3,6
151:1 154:2
**requested**  92:10
125:8 167:14
**requests**  63:24
64:3,10,20 65:5,17
67:2,6 96:10 97:8
160:21

**require**  52:6 97:17
108:19
**required**  136:18
142:6
**requirement**
97:22 98:2,9
**requires**  40:10
**requiring**  52:8
**respect**  113:19
**respond**  98:2
116:3,11
**responded**  93:5
**response**  5:19
57:14,23 58:8
94:10,12 130:20
150:7 154:1
160:20
**responses**  5:23
96:10 108:7
153:18
**responsibilities**
48:1
**responsible**
158:23 159:13
**responsive**  63:24
64:3,7,10,20,23
65:4,16 67:1,6
**rest**  17:5 61:15
141:9
**restate**  35:9
127:10
**restroom**  34:18
**result**  122:3
**resulting**  119:21
**retitle**  135:11
**retitled**  135:6,8
**return**  72:21
133:3
**returns**  96:15,18
**review**  7:4,5 43:8
63:17 94:23 96:9

131:23 138:16
160:11,20 161:1
162:9,12 167:13
**reviewed**  63:22
88:11 95:12,16
160:25
**reviews**  160:12
**revoke**  160:2
**rider**  63:25
**ridiculous**  11:24
**rigaud**  154:9
**right**  11:22,23
21:12 24:23 26:3
27:12 29:18 30:6
32:4,5,5 33:10,11
34:4,11 35:25
36:18,25 37:2,14
37:24,25 38:5,5,13
38:24 40:10 43:3
48:24 50:8 54:4,5
56:20 57:24 58:5
60:22 61:6 62:5
78:7 83:11,12
86:3 89:23 98:4
104:21 114:11
115:16 117:8
120:20 130:21
134:1 136:12,22
141:3,15 156:7,23
156:24 164:8
**rights**  15:14 18:3
27:17 28:14,17
29:12,17 30:3,5
31:7,9 33:2 37:5
40:20 46:5 49:23
56:17,20 78:4,23
78:24,25 79:4
92:17 113:21
114:12 133:23
134:23 138:22
139:6,9,23 140:3

140:22 141:4,11
142:7,17
**road**  69:19,20
**robert**  65:24
100:13 105:20,21
**roberts**  56:3,7
**rohiri**  3:11
**room**  6:23 16:19
16:23,24
**ross**  3:5
**rough**  161:12,13
161:14
**rows**  85:1
**royalties**  94:13,16
94:19,20 134:15
**royalty**  112:21
**ruled**  104:10
**ruler**  16:20
**rules**  94:1
**ruling**  104:9
**running**  89:13,16
89:23
**runs**  17:15 104:16
**rustle**  7:22

**s**

**s**  9:1,6 10:15 17:8
29:15,21 69:19
71:5 72:18 77:11
88:13 105:21
113:14,20,20
124:8,15
**safe**  119:17
**sakura**  124:15,16
**sales**  23:17,20
**sam**  69:19
**sample**  15:3
**save**  136:25
**saying**  7:15 52:21
61:10 80:22 83:4
84:2,3,25 101:2
104:3 116:16

Veritext Legal Solutions
866 299-5127

[saying - sorry]

119:2,2 137:11
138:12 141:3
142:25 143:1
155:25
**says**  19:25 20:15
20:16 21:4,17
24:12,19 25:13
26:8,25 29:1,13,18
45:25 46:19 47:4
70:15 83:8 120:19
125:24 126:2,7,12
126:22 138:21
140:5,8,19 141:6
143:7,7,11 149:8
156:4
**school**  18:16
**science**  74:20
**score**  82:18
**search**  65:16,19,23
66:6,11,13,14,14
66:15
**searches**  66:8
**searching**  65:21
**second**  10:1 13:5
20:22 24:18 37:6
47:5 55:15 67:19
81:23 115:4,14
118:9 152:12
**seconds**  90:2,4,7,8
103:4,4,5 104:16
**section**  113:10
**sections**  99:12
103:12,12 108:2
**see**  12:12 16:20
17:25 20:14 21:2
21:3,6 22:16
24:21 27:10 47:22
48:9 59:12,13,18
60:8 61:8 82:8
108:10 109:7,13
110:20 143:20

**150**:11,13,23
**seeing**  23:17
**seeks**  49:18
**seen**  8:1,8 10:11
20:9 45:18,20
144:10
**segment**  121:20
**semi**  132:9
**seminar**  75:12
**send**  61:17 96:21
122:17 127:14
128:11 132:5
136:2 137:8,21
154:7
**sending**  60:21
137:18 160:15
**sends**  127:25
128:5
**sense**  79:24,25
82:24 83:17
**sent**  26:18 41:20
68:6,7 95:1,2
116:17 121:24
126:15 135:24
136:6,20 137:11
138:3,12 155:24
156:4,7,9 159:9,24
160:2
**sentar**  69:19
**sentence**  35:4 48:3
53:2,3 56:11
112:8 136:10
141:9
**sentences**  28:23
**separate**  84:24
85:1,8,15 86:6
145:21
**series**  54:3
**served**  116:2,8,8
116:11

**services**  73:3 88:4
**sesac**  134:15,17
**session**  165:10
**set**  57:15 118:20
143:16 167:4
**settle**  134:2
**seven**  120:19
**shake**  59:5
**sharon**  70:9
**shazam**  106:19,22
106:22,25 107:5
149:6
**she'll**  116:23
**sheet**  41:21
**shock**  72:17 85:7
**short**  19:12 112:23
**shorten**  88:25 89:2
92:9,18
**shorter**  80:11,22
81:1 89:3 112:25
**shorthand**  2:23
167:1,8
**show**  7:25 42:20
57:21 91:14
153:21
**side**  154:10
**sided**  150:17
**sign**  26:18 27:5
**signature**  51:13,18
167:23
**signed**  105:3 112:2
153:4
**significance**  30:20
**similar**  22:24
51:17 145:3,4
146:20
**similarity**  146:1
**simple**  7:19 24:23
100:6
**simply**  22:14
119:2

**singing**  103:13
**single**  156:18
**sit**  112:4
**site**  129:3,4,7,10
129:15
**sitting**  43:3
**situation**  59:1
**six**  98:15
**slow**  82:16 136:23
**small**  9:5
**smart**  155:17
**smartphone**  67:15
68:2
**snappers**  161:11
**socan**  93:25 94:1,1
**society**  55:18
56:12
**sole**  46:20 113:14
**solely**  35:21,21
**solicits**  12:25
**somewhat**  6:20
**song**  15:1 21:18
22:10,11,14,16,18
22:21,23,24 76:19
76:22 77:1 78:21
79:13,15 101:22
105:18 144:17
**songs**  101:19
**sonic**  146:8,19
**sonoton**  124:8,10
**soon**  122:7
**sorry**  17:21 18:12
18:23 24:8 33:18
34:18 36:22 44:4
66:12 80:6 81:9
87:17 90:24 93:18
95:14 100:17
104:23 106:4,10
107:4 112:19
115:21 116:7
131:2,3,3 135:7

[sorry - sure]

141:19 145:1
148:5,21 150:2,18
154:2 165:1
**sort** 17:10,10 44:9
50:7
**sorts** 6:25
**sound** 53:5 76:1
77:3 78:10,11,13
78:21,24 79:5
99:23 100:3,5
159:7
**south** 124:22
**speak** 6:22 7:16
12:16 25:11 54:25
118:15
**speaks** 7:16 41:23
**specific** 25:23
101:10
**specifically** 21:18
33:19,21 44:4
50:7 75:18
**specifics** 149:1
**specify** 92:5
**speculate** 16:8
39:5 88:19 131:12
**speculation** 16:13
114:6 121:5
122:12 158:19
**spell** 6:11
**spelled** 9:5 17:17
**spid** 66:4
**spider** 1:8,14 2:7
2:13 24:11 30:24
46:23,24 65:11,13
72:6,11 85:5,21
93:14,17 123:15
125:15
**spoke** 138:2
**spoken** 121:23
**spreadsheet** 84:23
156:7,13 159:25

160:15
**sq** 66:3 101:16
104:14 105:23
149:15 154:20
157:11,20 158:10
**stamp** 153:19
**stamped** 25:19
81:24
**stand** 47:11,16,19
**standard** 32:18
36:12 37:2,8,19,20
38:6,8,13,23 39:10
39:21 40:9,9,19
99:1 108:1 118:17
118:18 155:6
**standards** 37:9
**stanley** 1:23 2:23
167:24
**start** 28:7 29:1
32:25 43:21 74:4
123:21 128:2
136:14 165:6
**started** 7:24 41:4
93:25 122:7 124:9
124:20
**starting** 37:9 74:5
93:19 98:16
123:23
**starts** 81:15
**state** 6:11 33:7
87:15 91:15 109:7
110:20 111:20
166:9 167:2
**stated** 11:13 32:4
32:5 37:6 48:12
103:1
**statement** 45:2,4,7
95:25 96:5 98:7
122:8 136:16
**statements** 28:22
45:4,7 79:17

95:22 96:9,12,14
97:7,9,10,13 132:2
132:3,4
**states** 1:1 2:1 15:7
15:19,25 17:11
18:19 40:2 41:17
108:4 123:25
126:19
**stating** 33:11
42:25 135:25
153:4
**stationary** 19:25
21:17
**steal** 154:2
**step** 21:24
**stipulate** 165:1
**stipulated** 165:8,9
**stipulating** 164:17
164:21
**stipulation** 164:25
**stock** 71:24
**stop** 53:7 122:6,9
**stopped** 104:6,8
**straight** 18:18
**street** 3:8 23:17,20
**strike** 51:24 64:15
103:16 125:5
129:16 137:20
141:19 149:19,22
155:20
**string** 24:6,9
**strings** 82:19 93:7
**structures** 98:4
**stuart** 88:13 116:8
**studios** 23:18
**sub** 13:1,3,4,22,24
14:1,2,3 18:19
29:9 32:19,19
37:4 46:17,20,20
49:22,23 50:6
93:14,16 96:6

122:20,25 123:3,6
123:12,14,16,16
124:3,5 125:6,9,10
125:23 126:16
127:13,22 132:2
136:13,15,18,21
136:24 137:1,4
139:7,9,15 140:9
140:10,16,24
141:1,17 154:12
155:1,5,12,16,25
156:10 157:10
**subject** 92:19 99:3
**sublicenses** 98:16
98:18,19
**sublicensing** 51:7
**submit** 118:3
**subpublishing**
51:7
**subscribed** 167:19
**substantial** 144:17
144:22
**substantially**
145:3,4
**subtract** 96:21
**successfully** 129:4
**successors** 111:18
**sued** 152:22
**suggested** 122:10
**suing** 143:5
**suite** 2:21 3:8,18
4:7
**supervisor** 93:4
**support** 82:15
**supposed** 57:2
**supposedly** 27:4
**sure** 11:23 18:20
27:7 35:8 59:20
62:11 72:23 75:20
94:25 96:13
103:11 104:2

[sure - third]

109:10 112:6
114:25 115:2
123:25 124:1,13
127:23 133:8
136:2 137:12,13
137:22 144:14
147:20 154:17
155:14 163:10
**suspects**   19:12
**sync**   41:14,14,16
42:5,15 77:13,20
77:23 78:5,8,22
98:25
**synced**   77:10
**synchronization**
96:2
**syncing**   94:20,21
98:21

**t**

**t**   69:19 71:5 88:13
88:13 124:8
**table**   16:18,22
**take**   7:20,25 9:12
9:24 20:1 21:16
21:16 24:5 25:22
25:22 27:14 41:10
45:17 58:6 64:12
68:23 69:1 75:18
84:20 87:5,9 97:4
105:9 118:10
136:25 161:13
**taken**   2:19 7:11,15
68:15 167:3
**talk**   6:17 28:25
32:15 115:4 118:9
149:1 152:18
**talked**   6:18 49:13
148:15 149:9
**talking**   23:19 42:4
53:16,16 91:24
95:10 118:22

123:5 128:3
134:20 152:8
**talks**   41:5 83:13
**tax**   5:13,14 20:1
21:17 72:21 73:13
96:14,17 133:3
**taxable**   20:16
**television**   54:9
55:3,8 99:1
106:21
**tell**   7:8,12 23:11
75:9,20 93:1 96:6
110:11,12,25
115:25 122:13
130:18 139:14
142:25 156:14
162:10
**telling**   115:22
141:6 145:6
152:24
**templates**   146:9
146:10,19
**tenants**   71:17
**tendency**   70:10,11
**tender**   161:19
**tendered**   116:16
162:21
**term**   14:25 31:12
32:6 38:16,17
51:8 53:15 92:14
120:23 122:4
134:18 137:9
139:5 140:19
142:4
**terminate**   136:7
136:22 137:3,17
**terminating**
137:15
**termination**
138:13

**terms**   31:1,9,21
50:15 115:22
130:9 136:17
142:2,20
**territories**   13:23
14:3 47:7 123:11
**territory**   15:19,25
29:14 30:3 39:4,8
46:21 47:2,5,24,25
48:2 113:16
124:25 139:7
141:4
**testified**   6:5 72:6
78:20 90:23 105:3
123:2 139:21
140:1 155:23
**testify**   106:1 107:6
107:9
**testifying**   167:6
**testimony**   26:21
36:7 52:3 57:5
79:9,11,19 80:25
85:14,18 90:24
91:4 101:1 102:6
107:1 118:16
121:25 126:20
140:7 158:6,13
166:5 167:10
**text**   33:9
**texts**   67:14 68:2
**thank**   6:15 9:17
10:10,25 11:8
12:1 14:5 17:25
18:6 19:9 25:2
27:2 28:16,24
31:25 34:14 35:23
38:12 41:3 47:8
53:10 55:17 59:4
61:20 68:9 118:6
119:10 135:2
150:22 153:20

154:23
**thanks**   7:1 81:17
133:11 154:2
**thanksgiving**
13:14,14
**thereof**   114:2
167:15
**thing**   17:11 18:11
52:18 101:11
136:11 146:25
155:10
**things**   6:21 11:13
11:21 22:11 24:7
35:7,22 36:11
42:13 55:7 83:10
83:21 98:4 129:4
142:3 146:21
**think**   11:1 14:10
16:6 20:12 22:22
22:24 26:22,25
35:18 39:3 42:4
45:6 46:22 54:6
54:21 55:15 56:22
56:24 66:22 67:5
71:13,20 72:23
74:10 77:7,7 93:7
93:13,25 95:6,8
108:4,6 109:20
111:3 120:11,12
125:4 128:12,24
133:10,21 135:18
136:7 137:22
138:7 144:12
147:10 149:12
151:19 153:16,17
155:12 158:16,23
163:9,10 164:11
**thinks**   149:10,12
**third**   47:10 127:2
127:3 142:18
158:4 160:3

Page 27

[thought - understanding]

thought   59:5,6
149:20

three   7:21 21:15
24:9 61:23,23
72:17 82:19,23
99:3 115:8,11
141:21

time   6:17 7:17,20
8:1 9:24 14:11
21:16 24:5 25:22
25:24 27:14 41:10
43:8 45:17 48:5
48:10 53:15 58:6
62:1 78:17 87:25
89:13,16,23 92:5
92:15,16,16 104:1
119:8 125:5
126:21 128:17
134:20 135:16
137:6,9 148:11
161:4 164:24
167:4

times   129:8
130:23,24

title   29:12 30:3
66:2 69:24 70:1,3
70:5,10,15 71:14
71:15 89:13,16
150:10 154:21
159:18

titled   65:8

titles   159:12

today   7:9,12 11:10
11:11 12:16 63:18
66:16 67:7,11,15
105:3 112:4
164:11

told   18:13 95:12
122:19 131:15
148:18 149:2
155:16

tom   69:19

tomorrow   164:12
164:22 165:6,7

top   23:17 24:7,10
24:10 46:14 98:15
130:15 133:8

total   89:13,16,23

totality   31:15 37:7

totally   91:22

track   82:20 99:19
100:9 102:25
103:1,9 107:6
121:20 122:20
129:19 142:23
146:1,11 147:1,2
148:24,25 149:3
156:8

tracking   130:5

tracks   129:21,23
156:12 161:2

trained   74:3,5
75:25 76:2

training   74:2,4,9
74:10

transcribed   167:8

transcript   164:17
166:3 167:9,12,13

transcription
167:15

transition   49:24

translate   29:19
30:6 97:24

transmit   34:5

transmits   50:7

transmitted   49:23

transpired   148:22

transpires   148:21

trial   116:9 148:8

tried   106:2

trip   69:5

true   107:13 112:7
143:1 145:5 166:5
167:9

truth   7:8,12

try   7:8 18:13 53:7
97:7,15 106:3
132:6

trying   18:17 102:9
119:6 136:10

tune   82:21,25
103:14,15 144:23

turn   51:12 59:8
95:4,15

turned   67:17,18
67:22 102:3 116:6
116:13

turning   82:11 89:9
94:9 97:19 98:15
104:21 107:17
108:9,22 112:11
119:10,13 133:12
133:14 135:4
150:6

tustin   1:17 2:21
3:19 6:1

two   7:20,21 34:23
41:4,11,14 42:6,12
61:23 62:1,11,19
76:25 78:21 82:19
82:23 97:19,20
101:3,9,18 102:10
102:19 104:15
110:8,12 124:15
146:9,10,19
151:21,23

type   39:10 44:10
68:24,25 71:24
72:24 77:14 82:16

typed   51:18

types   43:17 88:3
163:13

typo   133:22

**u**

u   9:6 14:22 88:13
124:15

u.k.   125:3

u.s.   116:2 124:3,5

ucla   73:24 100:13
105:20,21

uh   69:2,2,2

ultimately   53:10
53:10 54:7

umbrella   163:4

unable   68:23 69:1

unaware   104:3,7

underneath   26:12
26:12 113:10

underscore   66:4

undersigned   167:1

understand   11:10
11:16 17:16 27:7
32:9,20,22 38:2
50:16 53:12 56:24
57:9 69:5,7,10
76:18,25 77:9,25
78:6 91:19 97:16
99:13 104:17
118:20 121:3
123:4 126:25
127:4,5,8,13,18,20
128:5 132:20
140:20 144:15,21
153:7 155:4

understanding
15:6 26:5,9 28:1
31:19 34:24 37:20
37:23 41:6 48:5
48:10 49:12 50:17
50:22 51:25 53:24
54:3 76:21 78:2
86:1 87:5 100:3
103:11 128:1,7,8

[understanding - widest]

145:24,25 151:22
152:21 162:14
**understood** 69:8
118:19
**undertake** 64:9,18
65:3,19 66:8,14
148:10 151:24
**undertook** 97:21
151:14
**united** 1:1 2:1 15:7
15:19,25 17:11
18:19 40:2 123:24
**unquote** 10:16,18
29:14
**upper** 4:7
**usa** 111:21
**use** 22:10 35:14
48:18,25 50:5
51:5 52:25 66:23
78:2,4,7 79:2,3,5,5
87:8,21 96:6,14
102:15 114:16
125:13,14 129:9
159:5,11 160:3
**useless** 129:14
**user** 50:14 77:14
80:1,12 87:8
88:25 90:6,16,25
91:14,16 92:8
96:5 128:16
129:12
**users** 13:1 47:23
98:20 127:2,3
156:9 160:3
**uses** 100:5
**usual** 19:12
**usually** 50:11
**utilization** 98:20
**utilize** 15:16,16
**utilized** 155:4

**v**

**vague** 15:20 28:9
28:18 30:12 31:5
32:7 36:5 40:12
40:13,22 44:19
49:19 55:10 64:25
64:25 66:17 92:11
121:10 127:7
134:6
**valid** 141:25
**value** 21:1,5
**various** 46:4
128:11
**vegas** 159:9
**vehicle** 163:20,22
**verbally** 33:7
**verbatim** 7:15
**verse** 103:14
**version** 54:8,13,14
60:21 66:3,4
112:23,23 121:20
**versions** 112:22
113:1,1
**versus** 68:3 156:19
**video** 55:6 98:22
98:25 102:17
103:2 104:10,11
148:1 149:13,13
157:17,18,19
**vietnamese** 25:11
**view** 27:5 44:16
**viewed** 26:25
**violate** 113:21
133:22
**violated** 119:25
142:19
**violin** 72:25
**violinist** 14:19
74:3
**viruses** 129:7

**visited** 130:5
**visual** 77:10,13
78:8 90:6,7,16
91:1 100:9
**voice** 144:21,22
145:2,9 149:14
**volume** 1:19 2:19
166:16
**vs** 1:6,12 2:5,11

**w**

**w** 3:6 6:14 74:12
88:13 105:21
**wacker** 4:7
**wait** 7:17,18 16:7
32:20 91:21,24
102:5 119:7
137:17
**waived** 117:12
**wallach** 88:13
116:8
**wallser** 105:21
106:13
**want** 7:25 8:1 9:12
16:8 23:2 31:23
31:24 35:2 46:7
52:15 59:19 68:19
84:19 121:19
131:11 133:9
139:1 143:22
144:1 146:15,18
147:13 150:9
151:10 154:16,18
**wanted** 22:9 64:13
92:8 118:16
**wanting** 52:5
116:17
**wants** 143:15,24
**warrant** 119:23
**warranties** 113:3
120:1,6,8

**warrants** 113:13
113:18 114:10
**way** 9:12 17:17
24:6 27:2 29:1,9
30:10 41:8 45:25
53:9 58:21,21
61:5 92:18 101:13
101:15 130:1
139:8 141:9 149:8
155:6
**we've** 6:24 8:10,23
40:19 43:17
102:22 108:9
**wealth** 20:16
**webb** 1:16 2:19
5:4 6:4,13 8:11,14
11:12,15,24 18:24
19:5,10 34:22
51:19 56:2 59:11
60:13 62:7 70:9
165:6 166:1,15
**webb's** 9:15
**website** 128:14,16
128:20,23 129:20
129:24 130:3,6
**week** 62:1
**weekend** 13:14
**went** 63:4 74:6
92:9 120:7 130:23
148:16
**west** 71:3,5 154:10
**western** 1:2 2:2
105:22
**whatsoever**
113:21
**whereof** 167:19
**whichever** 9:12
**whipper** 161:11
**wider** 121:18
**widest** 121:17

[wife - zip]

**wife** 70:7 71:15
  73:22
**wise** 41:7
**wish** 73:18 159:17
**withheld** 42:25
**withhold** 59:24
  60:9
**withholding** 43:6
  131:1,4,6,14,20
**witness** 5:3 8:6
  16:2,9 19:2 22:9
  26:22 28:4,13
  30:13 31:6,14
  32:9,22 35:20
  36:20 39:3,6,16,25
  40:17 41:1,13
  42:1,18,24 43:1,12
  44:20 48:21 49:4
  49:10,20 50:3,20
  51:3,7 53:25
  54:18 55:11 57:6
  59:17,20,23 62:23
  63:1,4,10,13,19
  66:18 67:21 68:13
  77:20 78:17 80:20
  81:4,17 82:2,17
  84:13,19 87:1,13
  87:16 88:20 89:7
  90:13 91:8 92:12
  98:13 100:1,23
  103:19 105:1,13
  107:23 110:11
  114:7,20,25
  115:16 116:8,14
  117:14 120:4,16
  121:7 122:13
  127:8 130:23
  131:2,10 134:7
  138:14 139:1
  140:8 142:11
  143:7 144:21

  145:20 146:6,15
  149:20 150:23
  157:5 158:14,20
  159:2,22 162:15
  167:19
**witnesses** 167:5
**woman** 7:22
**wondering** 104:6
**woodland** 69:20
  69:20
**word** 23:1 25:3
  29:19,23 35:5,14
  38:4,4 48:6 50:10
  51:5 53:2,20
  69:20 80:13 97:5
  101:20 102:14,15
  121:17 133:19
**words** 34:6 51:13
  51:18 65:23 66:6
  72:17 90:15
  124:15
**work** 15:24 56:7
  60:20 61:11,13
  62:12 90:7,8 91:1
  100:9 101:21
  113:15 129:5
  142:17 149:8
**worked** 13:13
**working** 89:13,16
**works** 73:22,24
  101:9 102:10
  122:3 154:10
**world** 29:13 30:3
  39:12 93:17
  106:20
**worldwide** 29:12
  30:2
**wow** 153:15
**write** 27:5 33:8,9
**writers** 141:25

**writing** 27:6 37:11
  37:12 38:1,9
  40:19 133:24
  134:5,9
**written** 7:14,15
  19:22 21:19 49:16
  54:19 135:24
  140:11 141:10
  154:23
**wrong** 79:10
**wrote** 52:3,9,21
  119:2

**y**

**y** 77:11
**yeah** 6:20 11:17
  13:10,13 16:2,10
  19:10 21:21,23
  32:22 34:17 38:11
  46:9 55:9 57:19
  61:7,12,14,19 72:5
  73:2,13 75:4
  77:24 78:2 80:17
  81:12 82:1 83:9
  88:10 91:24 94:8
  95:3 98:17 99:21
  100:1 102:22
  105:10 111:7
  117:19 120:16,16
  122:13 123:23
  132:17,19 134:25
  136:5 143:11
  144:3 147:4
  150:10 153:1
**year** 73:13 75:15
  75:15,22 134:24
**years** 13:16 14:10
  36:18 74:15 94:14
**yep** 130:19
**yiddish** 25:12
**young** 161:10

**z**

**z** 27:3
**zealand** 13:23
  17:8,12,20,22
  20:13,19 23:14
  47:7 50:8,12 54:8
  54:12,19,25 55:16
  99:13 100:9
  102:23 103:9,24
  106:1,6,9,11,16
  107:6,9 109:21
  115:24 116:9,12
  123:9 142:22
  143:6,11,15
  144:16 147:8,15
  147:19 148:10
  151:4,15 152:19
  153:2 158:24
**zero** 20:16 73:14
  73:16 99:4 132:14
  132:17
**zion** 129:10
**zip** 71:6

Page 30

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3    _____
                                    )
 4    BEATBOX MUSIC, PTY, LTD.,     )
                                    )
 5            Plaintiff,            )
                                    )
 6        vs.                       )Case No.
                                    )2:17-cv-6108-MWF
 7    LABRADOR ENTERTAINMENT,       )(JPRx)
      INC., DBA SPIDER CUES MUSIC   )
 8    LIBRARY, a California         )
      corporation,                  )
 9                                  )
              Defendants.           )
10    _____)
                                    )
11    SEE NEXT PAGE FOR COMPLETE    )
      CAPTION.                      )
12    _____)
      _____
13
14
15            DEPOSITION OF NOEL WEBB, INDIVIDUALLY,
16         AND AS THE PERSON MOST KNOWLEDGEABLE FOR
17               LABRADOR ENTERTAINMENT, INC.
18               Los Angeles, California
19               Tuesday, December 3, 2019
20                     Volume II
21    Reported by:
      LORI SCINTA, RPR
22    CSR No. 4811
23    Job No. 3620306b
24
25    PAGES 168 - 235
```

Page 168

```
 1                UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3   _____
                                    )
 4   BEATBOX MUSIC, PTY, LTD.,       )
                                    )
 5              Plaintiff,           )
                                    )
 6        vs.                        )Case No.
                                    )2:17-cv-6108-MWF
 7   LABRADOR ENTERTAINMENT,         )(JPRx)
     INC., DBA SPIDER CUES MUSIC     )
 8   LIBRARY, a California           )
     corporation,                    )
 9                                   )
                Defendants.          )
10   _____)
                                    )
11   MICHAEL COHEN, an individual,)
                                    )
12           Cross-Complainant,      )
                                    )
13        vs.                        )
                                    )
14   LABRADOR ENTERTAINMENT INC., )
     D/B/A SPIDER CUES MUSIC         )
15   LIBRARY, a California           )
     Corporation,                    )
16                                   )
             Cross-Defendant.        )
17                                   )
     _____)
18   _____
19
20
21
22
23
24
25

                                          Page 169
```

1

2

3

4          Deposition of NOEL WEBB individually, and as

5    the Person Most Knowledgeable for Labrador

6    Entertainment, Inc., Volume II, taken on behalf of

7    Plaintiff, at 801 South Figueroa Street, Suite 2000,

8    Los Angeles, California, beginning at 11:33 A.M. and

9    ending at 1:08 P.M., Tuesday, December 3, 2019, before

10   LORI SCINTA, RPR, Certified Shorthand Reporter No. 4811.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 170

```
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4        BLAISE & NITSCHKE, P.C.

 5        BY:  HEATHER L. BLAISE

 6             LANA NASSAR

 7        Attorneys at Law

 8        123 North Upper Wacker Drive

 9        Suite 250

10        Chicago, Illinois 60606

11        312.448.6602

12        Email:  hblaise@blaisenitschkelaw.com

13

14   For Defendant and Cross-Defendant Labrador

15   Entertainment, Inc.:

16        BROWNE GEORGE ROSS LLP

17        BY:  RAENA W. OHIRI

18        Attorney at Law

19        801 South Figueroa Street

20        Suite 2000

21        Los Angeles, California 90017

22        213.725.9800

23        Email:  rohiri@bgrfirm.com

24

25
```

Page 171

```
 1   APPEARANCES (Continued):

 2

 3   For Cross-Complainant Michael Cohen:

 4        JACOBSON & ASSOCIATES

 5        BY:  DAN JACOBSON

 6        Attorney at Law

 7        1352 Irvine Boulevard

 8        Suite 205

 9        Tustin, California 92780

10        714.505.4872

11        Email:  dlj@jacobsonlawyers.com

12

13   Also Present:

14        PETER BAKER

15        BARBARA BAKER

16

17

18

19

20

21

22

23

24

25
```

Page 172

```
 1                          INDEX

 2    WITNESS                          EXAMINATION

 3    NOEL WEBB

 4    Volume II

 5

 6                    BY MS. BLAISE (RESUMED)      175

 7                    BY MS. OHIRI                 215

 8                    BY MS. BLAISE (FURTHER)      224

 9

10                      EXHIBITS

11

12    NUMBER              DESCRIPTION          PAGE

13    Exhibit P    Email chain, the top email      178

14                 dated 4 April 2012 from Noel

15                 Webb to Peter Baker, not

16                 Bates-stamped

17

18

19              PREVIOUSLY MARKED EXHIBITS

20    NUMBER                              PAGE

21    Exhibit B                           188

22    Exhibit C                           188

23    Exhibit D                           188

24    Exhibit H                           175

25

                                    Page 173
```

```
 1                    INDEX (Continued):

 2

 3

 4              INFORMATION REQUESTED

 5                     (None)

 6

 7

 8              REFERENCE REQUESTED

 9                     (None)

10

11

12         INSTRUCTION NOT TO ANSWER

13                     (None)

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 174
```

```
 1        Los Angeles, California, Tuesday, December 3, 2019

 2                        11:33 A.M.

 3

 4                     NOEL WEBB,

 5   having been administered an oath, was examined and

 6   testified further as follows:

 7

 8                  EXAMINATION (Resumed)

 9   BY MS. BLAISE:

10        Q   Hi, again.

11        A   Good morning.

12        Q   Heather Blaise on behalf of the plaintiff.  We

13   met yesterday.

14            The same rules apply that we discussed

15   yesterday.  Do you understand that?

16        A   Yes.

17        Q   I'm going to show you what was previously

18   marked yesterday as Exhibit H, which is the -- the

19   April 2009 agreement between Labrador Entertainment,

20   Inc. and Beatbox.

21        A   Uh-huh.

22        Q   Do you remember that agreement?

23        A   Yes.

24        Q   Make sure that that one is not highlighted.

25   I'm sorry.  Just flip the page.
```

Page 175

1          No, I have the highlighted one.

2          Yesterday, towards the end the deposition, I

3    had asked you a question, which was where in this

4    agreement does it state that you as Labrador don't have

5    the full rights to grant to Beatbox everything related

6    to the eminem-esque cue.

7          Do you recall that question?

8    A    Some kind of question like that, yeah.

9    Q    I don't think I gave you a chance to fully

10   answer that question.  I think you answered with one

11   paragraph, which we then later determined was actually

12   an exclusivity clause.

13         So I would like for you to tell me where in

14   this agreement you tell Beatbox that you don't have the

15   full rights to grant to eminem-esque without going back

16   to the composer for any, quote, adaptation.

17         MS. OHIRI:  Objection.  Calls for a legal

18   conclusion.

19         MR. JACOBSON:  I join.

20         THE WITNESS:  You're suggesting that I should

21   have, and it's not here.

22         No, there's no reason for me to put that in

23   here.

24   BY MS. BLAISE:

25   Q    Why is there no reason to put that in this

                                            Page 176

```
1    agreement?

2         A    Because I have full rights to the cue.

3         Q    You have full rights to the cue?

4         A    Yes.

5         Q    So as you sit here today, do you believe that

6    you needed to consult with the composer regarding any

7    synchronization of the cue to any end user?

8         A    No.

9              Say it again?

10             MS. BLAISE:  Can you please read back the

11   question that I just asked, Madam Court Reporter.

12             (Record read as follows:

13                  "So as you sit here today, do you

14             believe that you needed to consult

15             with the composer regarding any

16             synchronization of the cue to any end

17             user?")

18             THE WITNESS:  No --

19             MR. JACOBSON:  I object.  Vague and ambiguous.

20             THE WITNESS:  No.

21             MS. BLAISE:  Thank you.

22             (Discussion off the record.)

23   BY MS. BLAISE:

24        Q    And in my previous question I said "the cue."

25             You understand "the cue" to mean the
```

Page 177

```
 1    eminem-esque cue, correct?

 2         A    Yes.

 3         Q    Okay.  I'm going to show you what we marked

 4    today as Exhibit P.

 5              It's not marked yet, but it will be marked.  It

 6    says "K" at the top, but that is from a prior filing.

 7              This will be Exhibit P for the deposition of

 8    Noel Webb, individually, and as the person most

 9    knowledgeable for Defendant Labrador.

10              (Exhibit P was marked for

11              identification by the court reporter

12              and is attached hereto.)

13    BY MS. BLAISE:

14         Q    This is an email dated April 4th, 2012,

15    correct?

16         A    Yes.

17         Q    Do you remember this email?

18         A    Yes.

19         Q    What was the point of this email when you sent

20    it?

21         A    I, Labrador and Spider Cues, redefined the

22    library of Spider Cues and used the Excel file format

23    that Peter Baker and Beatbox had originally given me to

24    design a library using the most valid and credible

25    document I could find to express that.
```

Page 178

```
 1            And I directed Beatbox to download the Excel

 2   file and refer to it as the changes that are necessary

 3   and are valid in the identification of Spider Cues'

 4   library from that moment on.

 5       Q   Okay.  Is this -- in your testimony yesterday,

 6   you suggested that you told Peter Baker and Beatbox to

 7   remove eminem-esque in 2012.

 8            Is this the email wherein you believe that that

 9   information was conveyed?

10       A   Yes.

11       Q   Okay.  Can you show me on this email where it

12   says to remove eminem-esque from distribution?

13       A   Yes.  It says here is a -- yes?

14            MS. OHIRI:  Objection.  Mischaracterizes

15   earlier testimony.

16            You can go --

17            THE WITNESS:  "Here is a link to..." download

18   our ftp site the Excel file.

19   BY MS. BLAISE:

20       Q   Is there any mention of the cue eminem-esque

21   specifically in this email?

22       A   No.

23       Q   Going to the fifth paragraph of the email

24   starting with Spider Cues, can you read that paragraph,

25   please.
```

Page 179

```
 1        A    If it's the right one, you're referring to,
 2    "Spider Cues has had a great deal of success..."?
 3        Q    Yes, and just go a little bit slower for the
 4    court reporter.
 5        A    "Spider Cues has had a great deal of
 6             success with our cues submitted as
 7             Albums.  We've decided to offer this
 8             format to you.  Do not consider this
 9             new format as being a new set of cues.
10             They are the same cues you now have,
11             but we organized them in order of
12             quality within 75 Albums."
13        Q    What did you mean when you said, "Do not
14    consider this new format as being a new set of cues"?
15        A    Cues and albums were removed from Spider Cues.
16    What was left were not new sets of cues.
17        Q    What did you mean when you said, "They are the
18    same cues you now have, but we organized them in order
19    of quality within 75 Albums"?
20        A    I removed cues and albums.  The cues and albums
21    that remained he already had.  So it was his choice as I
22    gave to him explaining what you just asked me to explain
23    to either download the same cues he already had, again,
24    or use the ones he already had.  He has the same cues.
25    What remained he had.  It remained in the library.
```

Page 180

```
1          Q    Do you see the word "remove" anywhere in this

2     email?

3          A    "Remove"?

4          Q    The word "remove."

5          A    I don't see it.  Unless you do, I don't see it

6     here.  And -- the word -- the concept of remove is

7     implied, but I don't see the word.

8          Q    And then going down to -- going down to the

9     eighth paragraph where you see it starts with, "When you

10     hit the link above..."

11          A    Yes.

12          Q    Could you just read that paragraph, please.

13          A    "When you hit the link above, you will

14               see a folder with 12 of the 75 Albums.

15               All the music files are mp3/320/44.1.

16               If you would like the same Album set

17               up with another format, we could try

18               and" -- "we could try and it to you.

19               Of course you already have these cues

20               in your library, so you can use those.

21               You probably have already renamed

22               them, which is fine."

23          Q    Do you see anything in that paragraph that

24     would alert Peter Baker and Beatbox that you are telling

25     them to remove a cue from the library?
```

Page 181

```
 1        A    Yes.

 2             Let's see.  It's telling him to download that

 3   link.  And in that link is the removal of sound-a-likes

 4   and eminem-esque.

 5        Q    That link was removing all sound-a-likes?

 6        A    Yes.

 7        Q    What do you understand a sound-a-like to be?

 8        A    A piece of music or cue that has a similarity

 9   to another tune or cue.

10        Q    And why were you removing sound-a-likes?

11        A    Because it didn't license well and because I

12   was aware of possible litigation costs.

13        Q    How were you aware of possible litigation

14   costs?

15        A    Common sense.

16        Q    When did you become aware of the possible

17   litigation costs associated with sound-a-likes?

18        A    One of my other sub-publishers suggested it to

19   me.

20        Q    I appreciate your answer, but my question was

21   when.

22        A    When?  I can't tell you the exact time, but

23   before 2012.

24        Q    What do you understand a knockoff to be?

25             MR. JACOBSON:  Objection.  Calls for expert
```

Page 182

1    testimony.

2    BY MS. BLAISE:

3        Q   In your experience in the music publishing

4    business.

5        A   Pretty much the same thing.  It's another term

6    meaning the same thing.

7        Q   Yesterday, you had testified that you have a

8    number of music libraries.

9            Have you removed all sound-a-likes and

10   knockoffs from those libraries?

11       A   Yes.

12       Q   When did you remove them from those libraries?

13       A   2012.

14       Q   But you testified yesterday that you have

15   publishing agreements with the PROs ASCAP, BMI and

16   SESAC.

17           Is that correct?

18       A   Yes.

19       Q   Okay.  Have you ever -- are you familiar with

20   the process of alerting ASCAP, BMI and/or SESAC with a

21   removal of a composition from -- from their licensing

22   repertoire?

23       A   They don't license cues.

24       Q   They collect royalties, correct?

25       A   Yes.

Page 183

1       Q   Have you alerted ASCAP, BMI or SESAC to no

2   longer collect royalties for those cues that you have

3   identified as sound-a-likes and/or knockoffs, ever?

4       A   I don't remember.

5       Q   Is there a document that you could review that

6   would refresh your recollection as to whether or not

7   you've alerted ASCAP, BMI and/or SESAC regarding any

8   sound-a-like and/or knockoff cues that you've asked to

9   no longer collect royalties for?

10      A   Perhaps.

11          You're suggesting that they license, they

12  collect.

13      Q   I understand that they collect royalties.  I'm

14  asking you if you are aware of the procedure by which

15  you let them know that they are no longer to collect

16  royalties for any sound-a-likes and/or knockoffs that

17  you said that you have removed from your cues --

18  your catalog.

19      A   I don't think you can do that.  I don't think

20  that's possible --

21      Q   You don't --

22      A   -- to tell ASCAP or BMI to remove the

23  possibility of recovering royalties for a cue of any

24  nature, ever.

25      Q   Okay.  So is it fair to say that you have not

Page 184

```
 1    told ASCAP, BMI or SESAC to no longer collect royalties

 2    on your behalf --

 3              Let me finish the question, please.

 4        A    Uh-huh.

 5        Q    -- for cues that you have identified and

 6    removed from your catalog as sound-a-likes and/or

 7    knockoffs?

 8        A    I don't know.

 9        Q    You don't know if you've alerted them?

10        A    Yeah.

11        Q    Do you have all your correspondence with ASCAP

12    and BMI and SESAC?

13        A    I may.

14        Q    Okay.  Can you review that correspondence and

15    determine if you've ever alerted them to --

16        A    Yes.

17        Q    Please let me finish my question.

18              -- alerted them to no longer collect royalties

19    on your behalf for songs or cues that you have

20    identified as sound-a-likes and/or knockoffs?

21        A    Yes.

22        Q    Thank you.

23              Have you -- since 2012, have you collected any

24    royalties for songs or cues that you have identified as

25    sound-a-likes and/or knockoffs?
```

Page 185

```
 1        A    I don't know.
 2        Q    Are there any documents that you could review
 3   that would allow you to answer this question?
 4        A    Yes.
 5        Q    What documents would those be?
 6        A    Statements from sub-publishers.
 7        Q    And you also get statements from ASCAP and BMI
 8   and SESAC, correct?
 9        A    Yes.
10        Q    And would reviewing those documents also help
11   you be able to answer this question?
12        A    I think so.  I'm not sure.
13        Q    Will you please get those documents together
14   for your attorney?
15        A    Yes.
16        Q    Have you ever been sued for copyright
17   infringement --
18        A    No.
19        Q    -- prior to this lawsuit --
20        A    No.
21        Q    -- the New Zealand lawsuit?
22             And have you ever received a claim from any
23   third party that any of your compositions or sound
24   recordings infringe the rights of third parties?
25        A    I don't think so, no.
```

Page 186

```
 1        Q    Have you ever received a letter from an

 2   attorney saying to cease and desist your use of this

 3   cue?

 4        A    No.

 5        Q    Have you ever been a party to a lawsuit?

 6        A    Yes.

 7        Q    What was the nature -- how many different

 8   lawsuits and what was the nature of each one?

 9        A    Is small claims court a lawsuit?

10        Q    Yes.

11        A    Rental -- as a renter.

12        Q    Tenant --

13        A    Yeah.

14             And a construction lawsuit with a subcontractor

15   who was working on something I was -- I needed.

16        Q    Were you the homeowner?

17        A    Yes.

18        Q    About how long ago was this case?

19        A    I think 1988.

20        Q    Did it go to trial or resolved out of court?

21        A    Which one?

22        Q    Did it go to trial or did it resolve --

23        A    No.

24        Q    -- was there a settlement?

25        A    I think so, yes.
```

Page 187

```
 1          Q    Any other lawsuits that you've been a party to?

 2          A    No.

 3          Q    I'm going to show you what was marked in

 4    Michael Cohen's deposition held earlier today, exhibits

 5    marked B through D.

 6          A    So in reverse, I guess.

 7               Is there an order that you want me to look at

 8    these?

 9          Q    Oh, no.

10               Just are you familiar with them?  Do you

11    recognize --

12          A    I'd have to know the order to understand what

13    they are.  I don't remember them.

14          Q    They're dated at the top.

15          A    Okay.  All right.

16          Q    Do you see the one marked B, the exhibit marked

17    Cohen Exhibit B?

18          A    Yes.

19          Q    And it appears to be an email response from

20    Cohen to you dated December 3rd, 2006.

21               Can you tell me what your request in the email

22    was?

23          A    You mean why he's responding this way?

24          Q    Yes, what your email to Noel Webb [sic] was.

25               I'm sorry.  Your email to -- strike that --
```

Page 188

```
 1    your email to Michael Cohen.

 2         A    I don't know.

 3         Q    Do you see your signature block?

 4         A    Oh.  I'm sorry.  "Do you have a knock off of

 5    S.O.S. By Rihanna?"

 6              Okay, yes, yes.

 7         Q    So this is in 2006 you're asking for a

 8    knockoff.

 9              So what did you mean by that?

10         A    A music supervisor had asked me, I'm quite

11    sure, if I had a composer who could write a knockoff for

12    SOS by Rihanna, and I related to a composer who was good

13    at that.

14         Q    And you consider Michael Cohen to be good at

15    doing knockoffs?

16         A    Yes.

17         Q    And to be good at doing sound-a-likes?

18         A    Yes.

19         Q    What makes him good at that, in your opinion?

20         A    (Addressing Ms. Ohiri) Objection?

21              I don't know.

22         Q    You don't know what makes him good at doing

23    knockoffs?

24         A    Yeah, I'm not sure how to answer the question.

25         Q    Well, your testimony was that you found him to
```

1    be a composer who was good at knockoffs and

2    sound-a-likes --

3          A    Yeah.

4          Q    -- and I'm asking you what was the basis of

5    your conclusion that he was good at them.

6          A    Because he did them well.

7          Q    What are the elements that lead you to decide

8    that he did them well?

9               MS. OHIRI:  Objection.  Form, vague.

10              MR. JACOBSON:  I join.

11   BY MS. BLAISE:

12         Q    What do you consider when you're -- when you're

13   making the statement that he does knockoffs and

14   sound-a-likes well?

15         A    That he can write a cue that sounds similar to

16   another cue without infringing.

17         Q    How do you know that he is not infringing?

18         A    I don't.

19         Q    What efforts did you undertake to determine

20   whether or not Michael Cohen's sound-a-like and

21   knockoffs were infringing of any third parties' work?

22         A    I would use the -- the critique of myself and

23   my peers to decide that.

24         Q    So I want to just understand your practice

25   generally.

Page 190

1         When a sound-a-like or a knockoff cue would

2    come in from Cohen, you would listen to it, correct?

3         A    Yes.

4         Q    Would you compare it to the work that it was

5    seeking to knock off and/or sound alike?

6         A    No.

7         Q    How -- would you analyze it to determine that

8    it was not infringing?

9         MS. OHIRI:  Objection.  Calls for a legal

10   conclusion, calls for an expert opinion.

11        THE WITNESS:  The music supervisors in

12   companies I worked or submitted music to were very

13   fastidious about this, so I relied on them.

14   BY MS. BLAISE:

15        Q    Your testimony earlier was that when the cue

16   would come in, you would listen to it and you would

17   listen to it with yourself and peers, a critique by

18   yourself and your peers.

19        And I'm asking you how you undertook that

20   critique.

21        MS. OHIRI:  Objection.  Form, vague.

22        THE WITNESS:  I don't have an answer.

23   BY MS. BLAISE:

24        Q    You're not going to answer or you don't

25   remember -- you don't remember how you undertook the

                                          Page 191

```
 1    critique that you testified you did?

 2         A    I don't remember.

 3         Q    Is there anything that would refresh your

 4    recollection as to how you critiqued the sound-a-likes

 5    and knockoffs that you would review for Cohen?

 6         A    Not that I know of.

 7         Q    Do you remember critiquing with yourself and

 8    peers the eminem-esque cue when it came in from Cohen?

 9         A    Yes.

10         Q    And what action did you undertake at that time?

11         A    I listened to it and decided it wasn't

12    infringing.

13         Q    Why did you think it wasn't infringing?

14         A    It didn't have a melody.  It didn't have

15    lyrics.  It had a chord progression that was different

16    than the tune Lose Yourself.  It used different

17    instrumentation.  It did not have any voice on top of it

18    that reflected Lose Yourself.

19              It was simply a groove.

20         Q    Can you -- did you say "chord progression"?

21         A    Yes.

22         Q    All right.  Can you explain to me how the chord

23    progression was different than Lose Yourself?

24         A    Not -- the best I can?

25         Q    The best you can in as most technical terms as
```

Page 192

```
 1   you can.
 2        A    All right.
 3        Q    Pretend like I'm an idiot, because I am.  I
 4   don't know what chord progression is.
 5        A    It also had different chord inversions, chord
 6   voicings.
 7             So, to begin with, chord voicings are if you
 8   have a C-E-G, which is a triad, like a C chord, you can
 9   have a voicing where the C is on the bottom, E is in the
10   middle, G is at the top.
11             If you take the C and put it on top, you've now
12   voiced it differently and it has a completely different
13   sound to it, even though it has the same notes.  So
14   that's called chord voicing.
15             So when you do that, you then are moving to
16   another chord you voice differently, and the progression
17   of the musical experience will now be very, very
18   different as you move from chord to chord because the
19   chord voicings are now different.
20             As well, he used different chords, so you can
21   see how that would then move -- have the musical
22   experience be completely different.  He used different
23   chords as well as different chord voicings.
24        Q    What are the different chords he used?
25             Well, strike that.
```

Page  193

```
 1            Do you know what chords were used in
 2    Lose Yourself?
 3        A    Not as I sit here, no.
 4        Q    Okay.  Do you know what chords he used in
 5    eminem-esque?
 6        A    Not as I sit here.
 7        Q    Do you -- as you sit here, do you know if the
 8    way that the New Zealand political party used
 9    eminem-esque in the advertisement -- did it change the
10    chord inversion from Michael Cohen's version
11    eminem-esque?
12            MR. JACOBSON:  Objection.  Assumes facts not in
13    evidence.
14            MS. OHIRI:  Calls for speculation, calls for an
15    expert opinion.
16    BY MS. BLAISE:
17        Q    Do you know --
18        A    Yes.
19        Q    -- the answer to that?
20            It did change the chord inversion?
21        A    Chord progression.
22        Q    It did change the chord progression?
23        A    Yes.
24        Q    Do you know how it changed it?
25        A    I'm not sure how to explain it here.  But, yes,
```

Page 194

1   they moved chords from one section of the tune to

2   another section of the tune, thus changing the musical

3   experience.  It's a different tune.

4       Q   When you undertook your comparison between

5   eminem-esque and Lose Yourself, how did you go about

6   extrapolating information from the composition

7   Lose Yourself?

8       A   By ear.

9       Q   Okay.  So you orally -- or not "orally."

10          THE REPORTER:  Auditorily?

11          MS. BLAISE:  Auditorily.  Thank you.

12      Q   You auditorily listened to Lose Yourself.

13          Did you review sheet music?

14      A   No.

15      Q   Did you auditorily listen to Lose Yourself and

16   then transpose what you heard to sheet music?

17      A   No.

18      Q   Did you undertake any other comparison besides

19   listening to Lose Yourself?

20      A   Ask that again.

21      Q   Did you undertake any other comparison beyond

22   just listening to Lose Yourself and listening to

23   eminem-esque?

24      A   Playing it for other people.

25      Q   Who all did you play it for?

Page 195

```
 1       A    Rich Webb.

 2            No relation.

 3       Q    No relation to --

 4       A    To me.

 5       Q    -- to you.  Okay.

 6            Who is Rich Webb?

 7       A    Rich Webb runs the audio department for

 8  NBCUniversal Studios where all music played on those

 9  television stations goes through him.

10       Q    When did you play Lose Yourself and

11  eminem-esque for him?

12       A    After I received it.

13       Q    After you received eminem-esque from Cohen?

14       A    Correct.

15       Q    And that would have been approximately 2009?

16       A    I don't know.  I think so.

17       Q    Was that when your agreement with him began,

18  2009 or earlier?

19       A    Yes, I think so.

20       Q    What's Rich Webb's phone number?

21       A    I don't know.

22       Q    Is it still at NBCUniversal?

23       A    He's retired.

24       Q    Do you know what his title was at NBCUniversal?

25       A    Exact status -- title, I don't know.
```

Page 196

1       Q    Does he still live in L.A.?

2       A    I don't know.

3       Q    Do you have his email address?

4       A    I might.

5       Q    Do you have his phone number?

6       A    I might.

7       Q    Can you get it to your attorney?

8       A    Yes.

9       Q    Who else did you play it for?

10      A    The music supervisor who requested it.  His

11   name is Michael Sherwood, I think.

12      Q    Michael Sherwood requested eminem-esque?

13      A    He requested a sound-a-like or knockoff of

14   Lose Yourself.

15      Q    How did he request it?

16      A    In an email, and it may have been verbally, but

17   I'm not sure.

18      Q    Have you tendered that email to your attorney

19   as responsive to --

20      A    Yes.  Yes.

21      Q    Do you have Michael Sherwood's contact

22   information?

23      A    I don't know.

24      Q    Will you review your records and, if you do,

25   provide that information to your counsel?

Page 197

```
 1          A    Yes.

 2          Q    Who else did you have review it?

 3          A    Of course, Michael Cohen himself reviewed it as

 4    he wrote it.

 5          Q    Were you relying on Michael Cohen's analysis?

 6          A    Not entirely.

 7               Okay.

 8          Q    Are you the only owner of Labrador?

 9          A    Yes.

10          Q    Do you have any other directors in the

11    company --

12          A    No.

13          Q    -- any other decision-makers?

14          A    No.

15          Q    Anybody else entitled to a vote under any of

16    your operating agreements?

17          A    I'm not sure.  There's stock.

18          Q    Who else has a stock ownership interest?

19          A    The Webb Family Trust.

20          Q    How much stock does The Webb Family Trust have?

21          A    100 percent.

22          Q    When was Labrador created, what year?

23          A    2000.

24          Q    When were the shares of Labrador put into The

25    Webb Family Trust?
```

Page 198

1        A    I don't know.

2        Q    Was it after finding out about this lawsuit?

3        A    No.  No.

4        Q    It was before this lawsuit?

5        A    I don't know.

6        Q    Is there a document that you can review that

7   would allow you to answer the question about when the

8   stock ownership of Labrador was transferred into The

9   Webb Family Trust?

10       A    Yes.

11       Q    Who are the beneficiaries of The Webb Family

12  Trust?

13       A    Myself and my wife.

14       Q    Have you transferred any assets out of

15  Labrador's name since you found out about the

16  New Zealand lawsuit?

17       A    Say -- ask me that again.

18       Q    Have you transferred any assets out of

19  Labrador's name since you found out about the

20  New Zealand lawsuit?

21       A    I have another -- this is what I wanted to tell

22  you about this particular document here (indicating).

23            When you asked about interests yesterday, I

24  didn't entirely understand the question.

25            I have interests in two other companies.

Page 199

```
1        Q    Okay.  What are those --

2        A    One of them is called Flattop.

3        Q    Inc. or LLC?

4        A    LLC.

5        Q    Is it a California LLC?

6        A    Yes.

7        Q    When was it started?

8        A    2018, I think.

9        Q    What is it in the business of doing?

10       A    Trying to sell a mouse pad component.

11       Q    Does Flattop, LLC own any copyrights in musical

12   compositions or sound recordings?

13       A    No.

14       Q    And what's the other entity?

15       A    Labrador Entertainment, LLC.

16       Q    And when was that started?

17       A    2016, I think.

18       Q    Does Labrador Entertainment, LLC, own any

19   copyrights in musical compositions and/or sound

20   recordings?

21       A    Yes.

22       Q    How many copyrights?

23       A    I don't know.

24       Q    Does it also have music catalogs?

25       A    Yes.
```

Page 200

```
 1        Q    How many music catalogs does it have?

 2        A    What do you mean by "catalog"?

 3        Q    Yesterday, you testified that you understood a

 4   music catalog to be an Excel spreadsheet that then

 5   operated as a dba that contained music cues in it.

 6        A    Yes.

 7        Q    So I'm using your definition.  How many music

 8   catalogs does Labrador Entertainment, LLC have?

 9             You could just give me all the dba's that are

10   operating under --

11        A    Spider Cues, Red Lab Records, Boston Lab

12   Records.

13        Q    Boston?

14        A    Boston -- I've forgotten now.  Boston Labs or

15   Boston Bay Records.

16             Boston Bay Records I think it is.  I'm not

17   sure.  One of the two.

18             And Shock Files.

19        Q    Is it safe to say that you haven't added any

20   new cues to Labrador Entertainment, Inc. since you found

21   out about the New Zealand lawsuit?

22        A    No.

23        Q    You have added new cues?

24        A    Yes.

25        Q    Okay.  Have you added new cues to Labrador
```

```
 1    Entertainment, Inc. since you formed Labrador
 2    Entertainment, LLC in 2016?
 3         A    No.
 4         Q    What was your gross income on Labrador
 5    Entertainment, LLC in 2018?
 6         A    I'd have to look to be sure.  Somewhere
 7    around -- you mean net or gross?
 8         Q    Gross.
 9         A    Gross?  I'd have to look.
10         Q    Okay.  You'll get that information from your
11    CPA and give it to your counsel --
12         A    Yes.
13         Q    -- as you indicated yesterday?  Okay.
14              Have you transferred any assets of Labrador
15    Entertainment, Inc. since you found out about the
16    lawsuit in New Zealand?
17         A    They've been purchased.
18         Q    Who purchased them?
19         A    Labrador Entertainment, LLC.
20         Q    How much were they purchased for?
21         A    $67,000.
22         Q    Do you have the purchase agreement?
23         A    I have it.
24         Q    You had it or you have it?
25         A    I have it.
```

Page 202

```
 1        Q    Can you please provide that to your attorney?

 2        A    Yes.

 3        Q    Where did the $67,000 go that you -- that

 4   Labrador Entertainment, LLC gave to Labrador

 5   Entertainment, Inc.?

 6        A    Are you asking where did it go?

 7        Q    Yeah.  Where is it?

 8        A    It was used by Labrador Entertainment, Inc. to

 9   pay for attorneys.

10        Q    Which attorneys was it used to pay?

11        A    The attorneys in New Zealand and Browne George

12   Ross and Stuart Wallach and Gib Pagter.  P-a-g-t-e-r.

13        Q    Is it all gone, the $67,000?

14        A    Not quite, no.

15        Q    How much is left?

16        A    I think $3,000, I think.

17        Q    Do you currently owe attorneys outstanding fees

18   for any of these matters relating to the infringement?

19        A    Yes.

20        Q    How much money do you owe in lawyer fees?

21        A    I don't know.

22        Q    Have you asked Michael Cohen to indemnify you?

23        A    I don't know what that means.

24        Q    Have you asked Michael Cohen to reimburse you

25   for all the expenses you've suffered as a result of the
```

Page 203

```
 1   eminem-esque track?

 2        A    I'm not sure.

 3        Q    You testified yesterday that you're withholding

 4   royalty payments due to Michael Cohen.

 5             Isn't that correct?

 6        A    Yes.

 7        Q    Do you still have that money?

 8        A    Yes.

 9        Q    Okay.  So you have his -- approximately $4,000

10   is what you testified to yesterday?

11        A    Yes.

12        Q    And you have $3,000 left over from the sale of

13   Labrador Entertainment, Inc. to Labrador Entertainment,

14   LLC, correct?

15        A    No.

16        Q    How much money do you have --

17        A    You reversed the question.  You just reversed

18   the parties.

19        Q    You testified earlier that Labrador

20   Entertainment, LLC purchased Labrador Entertainment,

21   Inc.?

22        A    Yes.

23        Q    You testified that you have $3,000 left from

24   that transaction?

25        A    Yes.
```

Page 204

```
 1        Q   You also testified that you are holding
 2   approximately $4,000 of Michael Cohen's?
 3        A   Yes.
 4        Q   Is that the only money that's sitting in any
 5   bank account owned by Labrador Entertainment, Inc.?
 6        A   Approximately.
 7        Q   Is Labrador Entertainment, Inc. currently in
 8   good standing?
 9        A   What does that mean?
10        Q   With the -- is it registered with the
11   California Secretary of State?  Are you all paid up on
12   all your franchise tax bills?
13        A   Yes.  Yes.
14        Q   And who are the owners of Labrador
15   Entertainment, LLC?
16        A   I think I am.
17        Q   Are the membership interests held by you
18   individually or are they held in trust?
19        A   I think just me.
20        Q   In 2012 when you sent the Excel spreadsheet, at
21   that time did you believe that the eminem-esque track
22   was infringing?
23        A   No.
24        Q   As you sit here today, do you believe that the
25   eminem-esque track is infringing of Lose Yourself?
```

Veritext Legal Solutions
866 299-5127

```
 1        A    No.
 2        Q    Who makes the decision to issue music for the
 3   Spider Cues library?
 4        A    Would you repeat that?
 5             MS. OHIRI:  Objection.  Form, vague.
 6   BY MS. BLAISE:
 7        Q    Who makes the decision to issue music to
 8   third-party users or to your sub-publishers for the
 9   Spider Cues library?
10        A    I do.
11        Q    Can you describe what type of information was
12   in the Excel spreadsheet that would define what the
13   Spider Cues library is.
14        A    Repeat that.
15        Q    Can you describe what information was contained
16   in the Excel spreadsheet that would define what the
17   Spider Cues library is?
18        A    The --
19        Q    The 2012 Excel spreadsheet?
20        A    The album name, the ID given to the album; the
21   library itself; the title of the cue; the ID of the cue
22   itself; the index of it, which is the number it is
23   within the album; the composer or composers, their
24   percentage of ownership; the publisher or publishers,
25   their percentage of ownership.
```

Page 206

1        Q    Who put the information in the Excel

2    spreadsheet in 2012?

3        A    I did.

4        Q    And there's a 2014 Excel spreadsheet also,

5    correct?

6        A    Yes.

7        Q    Who put the information in the 2014 Excel

8    spreadsheet?

9        A    I did.

10       Q    Have you ever received -- have you ever had

11   music -- strike that.

12            Have you ever had any of your content taken

13   down under a DMCA request, if you're aware, a Digital

14   Millennium Copyright Act --

15       A    No.

16       Q    -- notice and takedown request?

17            No, you haven't, or no, you're not -- you're

18   unaware that you ever have?

19       A    No, I haven't.

20       Q    Have you ever expressly removed a cue in your

21   professional history with any sub-publisher or with any

22   of the PROs?

23            MS. OHIRI:  Objection.  Form, vague.

24   BY MS. BLAISE:

25       Q    In your entire professional history licensing

Page 207

```
 1   music, have you ever expressly removed a cue from being
 2   able to be licensed through a sub-publisher or any of
 3   the performance rights organizations?
 4        A   Yes.
 5        Q   Do you remember what cue that was, or cues?
 6        A   I don't remember right now.  But, yes, there
 7   have been cues.
 8        Q   Okay.  Do you have correspondence relating to
 9   the removal of those cues?
10        A   Yes.
11        Q   Can you review those and get them to your
12   lawyer?
13        A   I think that she may have those.
14            (Addressing Ms. Ohiri) You have those,
15   probably.
16            MS. OHIRI:  Uh-huh.
17   BY MS. BLAISE:
18        Q   Have you ever expressly requested the removal
19   of eminem-esque from ASCAP?
20        A   I don't know.
21        Q   Have you changed -- did you ever change the
22   title of eminem-esque in the course of your
23   sub-publishing agreement with Beatbox?
24        A   No.
25        Q   Did you ever change the title of eminem-esque
```

Page 208

```
 1    during the term of your composer agreement with

 2    Michael Cohen?

 3              MR. JACOBSON:  Objection.  Vague and ambiguous.

 4              THE WITNESS:  Yeah.  If changing it from SQ MC

 5    eminem-esque to eminem-esque is a change, then yes.

 6              But the references outside of the title

 7    eminem-esque is part of the ID I was referring to

 8    earlier, so I'm not sure if it's changing the title or

 9    changing the ID is what was going on.

10    BY MS. BLAISE:

11         Q    Have you ever changed the ID?

12         A    Sub-publishers have, but I haven't, no.

13         Q    Okay.  And have you ever changed any type of

14    identifying information of the cue known as eminem-esque

15    with any of the PROs, performance rights organizations?

16         A    I don't know.

17         Q    Okay.

18         A    Can I talk to her for a minute between the

19    questions?

20              MS. BLAISE:  Yes.

21              (Recess taken.)

22              THE WITNESS:  So you asked me a question

23    earlier.  Can I clarify something for you that might be

24    helpful to you?

25    BY MS. BLAISE:
```

Page 209

1        Q    No.  I'll ask -- I'll ask my next question.

2        A    Okay.

3        Q    Thanks.

4             Did you prepare new agreements with any of your

5        sub-publishers once you started rendering services and

6        providing goods under Labrador Entertainment, LLC?

7        A    New contracts were written for new music that

8        came in.

9        Q    And the old music and old cues that were part

10       of the Labrador Entertainment, Inc. category logs, both

11       Spider Cues and the other various catalogs, those are

12       under the same prior agreement that you -- that you held

13       with your sub-publishers between Labrador Entertainment,

14       Inc. and whatever given sub-publisher?

15       A    I think so.

16       Q    So when money comes into Labrador

17       Entertainment, Inc. from those sub-publishers --

18       A    Oh, I'm sorry.  Did you say "sub-publishers" or

19       "composers"?

20       Q    Sub-publishers.

21       A    Oh.  I'm so sorry.  Start over.

22       Q    Do you mean start over with my current pending

23       question?

24       A    Completely, actually, yes.

25       Q    Okay.  Did you do -- do you still have

Page  210

1  outstanding agreements for Labrador Entertainment, Inc.

2  with sub-publishers?

3      A   Yes.

4      Q   Okay.  And pursuant to the terms of those

5  agreements with your sub-publishers, do you have income

6  that comes from those sub-publishers for the copyrights

7  that are embodied in the catalogs owned by Labrador

8  Entertainment, Inc.?

9      A   Yes.

10      Q   Where does that money go?

11      A   It is sometimes wired to the Inc. account and

12  sometimes wired to the LLC account.

13      Q   What determines whether or not it will be wired

14  to the LLC account and what will be wired to the Inc.

15  account?

16      A   The sub-publishers ask me where to wire it, and

17  so I tell them where to wire it.

18      Q   When do you tell them to wire it to the Inc.

19  account and when do you tell them to wire it to the LLC

20  account?

21      A   I don't know the answer to the question, when.

22      Q   How do you determine when to tell them to wire

23  it to the LLC or to wire it to the Inc.?

24      A   The communication is not always as fluent

25  (phonetic) as one would hope, and I do the best I can

Page 211

```
 1   with what I know that they will do for me.
 2        Q   If a sub-publisher says, "You have a payment
 3   coming in and where do you want it," what do you
 4   consider before telling them where to wire it?
 5        A   How good our communication is.
 6        Q   If your communication is good, where do you
 7   have them wire it?
 8        A   That's very -- it's subjective.  I don't know.
 9            Good, good communication.
10        Q   Since the time you found out about the
11   New Zealand lawsuit, how much money have you had wired
12   to the LLC account that should have been wired to the
13   Inc. account under the terms of your sub-publishing
14   agreement with the LLC -- I'm sorry -- with Inc.?
15            Strike LLC.
16        A   I don't know.
17        Q   Who do you bank with for the LLC?
18        A   Wells Fargo and Chase.
19        Q   Who do you bank with for the Inc.?
20        A   Wells Fargo and Chase.
21        Q   How many accounts do you have for the LLC?
22        A   One in Wells Fargo and one in Chase.
23        Q   How many accounts do you have for the Inc.?
24        A   One in Wells Fargo, one in Inc. -- one in
25   Chase.
```

Page 212

1       Q    Since you created the LLC, have you had bank

2    accounts at any other banks?

3       A    No.

4       Q    Does the LLC own any other assets other than

5    copyrights of musical compositions and sound recordings?

6       A    Did you say own or owe?

7       Q    Own.

8       A    Why do you keep saying copyright ownership?

9    Copyright is -- we have publishing rights.

10      Q    Which emanate from copyright ownership.

11      A    Not necessarily.

12      Q    They're assets of your LLC, correct?

13      A    Yes.

14      Q    The assets are traceable to the copyright which

15   is the intellectual property of a composition or a sound

16   recording, correct?

17      A    Yes, yes, traceable.

18      Q    So my question is:  Are there any other assets

19   belonging to the Inc. aside from publishing rights that

20   emanate from a copyright?

21      A    No, no.

22      Q    And what about the Inc., the Labrador

23   Entertainment, Inc.?  What does --

24      A    What did you just ask?

25      Q    I'm asking about whether or not there are any

```
 1    assets in Labrador Entertainment, Inc. besides music

 2    publishing.

 3            Are there?

 4       A    No.

 5       Q    Okay.  Are there any other assets of Labrador

 6    Entertainment, LLC beyond music publishing?

 7       A    No.

 8       Q    Do you have any physical computers or other

 9    hardware that belong to Labrador Entertainment, Inc. or

10    Labrador Entertainment, LLC?

11       A    Yes.

12       Q    What type of physical property do you have?

13       A    Computer, a laptop.  I think that's all.

14       Q    Which entity owns the computer and the laptop?

15       A    I don't know.

16       Q    Is there anything that you could review that

17    would allow you to answer that question?

18       A    Yes.

19       Q    What?

20       A    My -- the purchase agreement.

21       Q    Do you have any office space that you pay rent

22    for for either entity or any other entities?

23       A    No.

24       Q    Do you work out of your home?

25       A    Yes.
```

Page 214

```
 1        Q    Does either entity pay you rent for working out
 2   of your home?
 3        A    I don't know.
 4        Q    Would a review of your tax returns permit you
 5   to answer that question?
 6        A    Yes.
 7        Q    Have you ever met Michael Cohen before today?
 8        A    Before today?
 9        Q    Uh-huh.
10        A    No.
11             MS. BLAISE:  That's all I have for now.
12             MS. OHIRI:  Okay.
13             THE WITNESS:  So I cannot help you --
14             MS. OHIRI:  Wait.  Hold on.  Let's go off the
15   record.
16             (Discussion off the record.)
17
18                         EXAMINATION
19   BY MS. OHIRI:
20        Q    Okay.  Earlier you testified that you
21   redesigned the Spider Cues library in 2012.  Correct?
22        A    Yes.
23        Q    Why did you redesign the library?
24        A    To have a better format and to remove
25   sound-a-like albums; some other individual cues, I
```

Page 215

1    think.

2       Q    What other cues did you remove -- or strike

3    that.

4            What cues did you remove?

5       A    The sound-a-like cues within the sound-a-like

6    album.

7       Q    How many cues are in that sound-a-like album?

8       A    I think 15, but I'm not sure.

9       Q    And it's your testimony that you removed the

10   entire sound-a-like album in 2012, correct?

11      A    As an album, yes.

12      Q    Did you send this newly redesigned Spider Cues

13   album to all of your sub-publishers?

14      A    Yes.

15      Q    Can you provide me a list of all the

16   sub-publishers that you sent the new library to?

17      A    Yes.

18      Q    What's the list?

19      A    It will be a list of emails.

20      Q    Okay.  Who were the sub-publishers that you

21   sent the newly designed library to?

22      A    CDM in France; Music Box in the U.S.; Beatbox

23   in Australia and the other territories; Apollo,

24   A-p-o-l-l-o, in Denmark.  That's their main -- main

25   country where their office is.

Page 216

```
 1              The Greek sub-publisher whose name I don't
 2    remember.  I think it's called Music -- I don't remember
 3    the name of the publishing company.  It's a
 4    sub-publisher in Greece.
 5              An Israeli sub-publisher company called -- I
 6    don't remember that name, either.  It's an Israeli
 7    publishing company.
 8              And I either sent the new design at that time
 9    or soon after to Korea, which is Modoocom,
10    M-o-d-o-o-c-o-m; and the Japanese sub-publisher Sakura
11    Notes.  S-a-k-u-r-a Notes; and, at that time or later,
12    to a German sub-publisher Sonoton.  S-o-n-o-t-o-n.
13         Q   Is that it?
14         A   I think so.
15         Q   Okay.  And did you send the new library to
16    these sub-publishers that you just listed at the same
17    time, around the same time frame?
18         A   Most that I just said, most of them, yes.
19         Q   And what time frame was that?
20         A   Right at the same time I sent it to Beatbox.
21         Q   And when was that?
22         A   2012, April -- or 2012, roundabout.
23         Q   Now, the Exhibit P, the email that was sent
24    from you to Peter Baker on April 4th, 2012, is this the
25    email that included the new designed library to Beatbox?
```

Veritext Legal Solutions
866 299-5127

1        A    Did you say "K" or "P"?

2        Q    "P."  It's --

3        A    At the bottom.  Oh, I'm so sorry.

4             Yes.

5        Q    Did you require that Beatbox download or import

6    the newly designed Spider Cues album in 2012 when you

7    sent this email?

8        A    Yes.

9        Q    And was it your understanding after you sent

10   this email that Beatbox downloaded the newly designed

11   Excel file or library?

12       A    Yes.

13            MS. BLAISE:  Objection.  Foundation.

14            THE WITNESS:  Yes, because he responded that he

15   did.

16   BY MS. OHIRI:

17       Q    How did he respond that he did?

18       A    A follow-up email said something to the --

19   something about, "You've made a lot of changes.  Let's

20   talk about a meet."

21       Q    Did you meet with him?

22       A    Yes.

23       Q    When did you meet with Peter?

24       A    Soon after that.

25       Q    Was it in April of 2012?

```
 1        A    Within that year, soon after that.  I don't
 2   have the date in front of me.
 3        Q    And what did you discuss with Mr. Baker at that
 4   meeting?
 5        A    The changes in the library that he approved.
 6        Q    And what changes, specifically?
 7        A    He appreciated and acknowledged the new library
 8   design without sound-a-likes in it and without
 9   eminem-esque in it, a sound-a-like cue.
10        Q    Did you ever speak with Mr. Baker again about
11   the sound-a-like album?
12        A    Yes.
13        Q    When was that?
14        A    At the NAB, National Association of
15   Broadcasters in 2013 here less than a year later, I
16   think.
17        Q    What was the context of that conversation?
18        A    A kind of light-hearted reference to the
19   removal of the sound-a-likes album.
20        Q    Can you provide a little bit more detail?
21        A    We were to meet in front of what I remember to
22   be a Five Alarm kiosk at the NAB show.
23             He was late.  He apologized.  He came fully
24   loaded with a lot of gear.  I'd been waiting.
25             He came over.  We sat on two cushions.  I think
```

Page 219

1    they were red.

2         Q   Wait.  Let me stop you there.

3         A   Yeah.

4         Q   Can you give me detail about your conversation

5    regarding the sound-a-like album?

6         A   Oh.

7             We talked about the new -- the new format and

8    new definition of Spider Cues, identification of this

9    new library with Spider Cues; and that, in fact, the

10   sound-a-like album was removed.

11        Q   So was it your understanding that Beatbox had

12   removed the sound-a-like album which contained the

13   eminem-esque cue at that time?

14        A   Yes.

15        Q   Okay.  I am going to refer you to Exhibit H,

16   which should be in front of you, the sub-publishing

17   agreement.

18        A   Yes.

19        Q   Paragraph 3, if you can just read over that to

20   yourself and let me know when you're done.

21        A   Okay.

22        Q   What is your understanding of that provision?

23        A   With reference to Beatbox, Beatbox is to import

24   each of the recordings as required issued by the

25   publisher -- that would be me -- and utilize them, the

Page  220

1    recordings that I give him.

2        Q   Based on your understanding, does that include

3    the new Excel file that contained the new Spider Cues

4    library that you sent Beatbox in 2012?

5        A   Absolutely without any question.

6        Q   Did you ever redesign the Spider Cues library

7    after 2012?

8        A   Yes.

9        Q   When was that?

10       A   2014.  It was given to him.

11       Q   And why did you redesign the library at that

12   time?

13       A   I remastered all the audio.  I redesigned the

14   album covers.  And I used Peter Baker's Excel file

15   format that he gave us to define a library in totality

16   in 2009.  I used his format to -- to give him the new

17   design of the new Spider Cues library in 2014.

18           The album covers that I sent him, which they

19   approved, did not have the sound-a-like title on it.

20   All album covers have all titles on them explicitly

21   telling you what they are.

22           The Excel file did not have sound-a-likes in it

23   or the eminem-esque cue not because I had removed it at

24   that point but because it had already been removed in

25   2012, so there was no reason for me to refer to it again

                                        Page 221

```
 1    after 2012 with the complete assumption that it was

 2    removed in 2012.

 3        Q   So the 2014 Spider Cues library did not include

 4    the sound-a-like album?

 5        A   Correct, or the eminem-esque cue.

 6        Q   Do you know whether or not Beatbox downloaded

 7    or imported, or whatever the word is, the Spider Cues

 8    library in 2014?

 9        A   You say do I know?

10            Yes.

11        Q   How do you know that?

12        A   Because he responded right after that saying,

13    "You've made a lot of changes.  Let's talk and have a

14    meeting."

15        Q   Did you meet with him?

16        A   Yes, I did.

17        Q   When did you meet with him?

18        A   In March of 2014.

19        Q   And what was the -- what was that conversation

20    about?

21        A   Almost completely the replacement of the

22    previous Spider Cues identified library with the new

23    identified library, Spider Cues library.

24            We -- we talked about it.  He and Barbara not

25    only said -- accepted the change.  They actually
```

Page  222

1    requested the change.  I have a witness to prove it.

2        Q   Did you ever grant Beatbox the right to alter,

3    expand, adapt and translate any of the compositions that

4    were sublicensed to them?

5        A   No.

6        Q   Yesterday, you testified that you had a

7    website.

8            What was the significance of that website?

9            MS. BLAISE:  Objection.  Vague, ambiguous.

10           THE WITNESS:  To -- in the face of websites

11   being not particularly used or usable in those days, it

12   was just a presence on this web- -- on the Internet.

13   BY MS. OHIRI:

14       Q   Did you ever license any music off of your

15   website?

16       A   No.

17       Q   Did you ever license eminem-esque, in

18   particular, off of your website?

19       A   No.  The website was not really usable.  It

20   was -- it had -- it was attacked a number of times, how

21   many I can't even count, whereby it was pulled off the

22   Internet.

23           And so I would use -- I would go to my host,

24   called OMNIS, O-M-N-I-S, to acquire the original first

25   design, which was -- and had to use that to put it back

Page  223

1    up.  And that's the only way I could do it.

2         Q    Okay.

3         A    Yeah.

4              MS. OHIRI:  That's all I have for now.

5              MR. JACOBSON:  I have nothing.

6              MS. BLAISE:  Okay.

7

8                     FURTHER EXAMINATION

9    BY MS. BLAISE:

10        Q    You testified yesterday that you recognized

11   that the sub-publisher would give to its clients a

12   physical file that would contain all the cues that were

13   available on a catalog.

14             Correct?

15        A    That the who -- what?

16        Q    That your sub-publisher -- in particular,

17   Beatbox -- would give a physical drive to its potential

18   clients, its potential end users, third parties,

19   correct?

20        A    My understanding is that would be -- my

21   understanding is that's what Beatbox did.

22        Q    And, in referencing, your attorney directed you

23   to Paragraph 3 of the document that has been previously

24   marked as Exhibit H, which is the April 2009 agreement

25   between Labrador Entertainment and Beatbox Music, Inc.

                                          Page  224

1           Do you still have that in front of you?

2       A   Yes, I do.  Yep.

3       Q   And do you see anything in this paragraph that

4   requires Beatbox to go to its potential clients and

5   remove cues that you've already agreed to be licensed?

6       A   What paragraph is that?

7       Q   Paragraph 3.

8       A   Oh, I see.

9           The job described in this contract is for the

10  sub-publisher to disseminate what he has as a library to

11  represent.  He cannot receive something and not

12  disseminate it and not stay with the contract.

13          So when he receives recordings or an Excel file

14  his job, per contract, is to disseminate it.

15      Q   All right.  And you agree that you provided

16  Beatbox with eminem-esque, correct, during the term of

17  the contract?

18      A   Yes.

19      Q   And you agree that, then, Beatbox disseminated

20  eminem-esque, correct?

21      A   Yes.

22      Q   And you agree, then, that that is in compliance

23  with the agreement, correct?

24      A   Yes.

25      Q   I want to direct your attention back to

Page  225

```
 1    Exhibit P and directing you to Paragraph -- Paragraph 7.
 2         A    Beginning with what?
 3         Q    It starts with, "When you hit the link
 4    above...."
 5         A    Yes.
 6         Q    And it says, "When you hit the link above, you
 7    will see...12 of the 75 Albums."
 8              Correct?
 9         A    No.
10         Q    It doesn't say that?
11         A    "You will see a folder with 12 of the 75
12    Albums."
13         Q    Right.  That's what it says, correct?
14         A    Yes.
15         Q    Okay.  Is it your contention that you
16    previously had given Beatbox 76 albums?
17         A    I'm not sure.
18         Q    Do you know how many albums you gave Beatbox up
19    until -- up until this email in 2012?
20         A    I can find out.
21         Q    What would you have to review to find out?
22         A    Beatbox's -- Beatbox's catalog at that point
23    before this.
24         Q    Is it your contention that the 75 albums you're
25    referencing here does not include the album that you're
```

Page 226

1    calling a sound-a-like album?

2        A    Yes.

3        Q    Did you have any other cues contained in any

4    other album that would qualify as sound-a-likes?

5        A    No.

6        Q    Do you have any cues in any of the albums that

7    you have -- that you're licensing under either Labrador

8    Entertainment, LLC and/or Labrador Entertainment, Inc.

9    that will qualify as a sound-a-like in the marketplace

10   right now?

11       A    If your question is do I have any albums in

12   Labrador Entertainment, Inc. or Labrador Entertainment,

13   LLC that would qualify as sound-a-likes now, if that was

14   your question, the answer is no.

15       Q    I'm asking you about cues.

16       A    Cues.

17       Q    Do you have any cues in the marketplace that

18   would qualify as a sound-a-like?

19       A    I don't think -- I don't think so.

20       Q    And directing you to the remainder of that

21   paragraph, it also says, "Of course you already have

22   these cues in your library, so you can use those."

23            Correct?

24       A    Yes.

25       Q    And eminem-esque was one of the cues that was

Veritext Legal Solutions
866 299-5127

```
 1    contained in Beatbox's library, correct?

 2              MR. JACOBSON:  Objection.  Calls for

 3    speculation.

 4    BY MS. BLAISE:

 5        Q   At the time that you sent this email,

 6    eminem-esque was contained in the Beatbox library,

 7    correct?

 8              MR. JACOBSON:  Same objection.

 9              MS. OHIRI:  Objection.  Form, vague.

10              THE WITNESS:  Yes.

11    BY MS. BLAISE:

12        Q   Thank you.

13        A   The cues that we're referencing in the --

14        Q   There is no question pending.

15        A   I'm answering your question.  I'm answering

16    your question, though.  You referred to that sentence.

17    I'm responding to that sentence.

18              That sentence refers to -- the first sentence,

19    12 --

20        Q   Please.  There is no question pending.

21              MS. OHIRI:  There is no -- there's not a

22    question.

23              THE WITNESS:  Okay.  I can't answer the

24    question.

25    BY MS. BLAISE:
```

Page 228

1        Q    You already answered the question.

2        A    I was just -- okay.

3        Q    Since the time that you found out about this

4    lawsuit in New Zealand, have you paid yourself

5    individually any money?

6             MS. OHIRI:  Objection.  Form, vague.

7    BY MS. BLAISE:

8        Q    Since the time that you learned of this

9    lawsuit, have you paid yourself -- has Labrador

10   Entertainment, LLC -- wait.  I'm sorry.

11            Has Labrador Entertainment, Inc. paid Noel Webb

12   any money?

13       A    I don't know.

14       Q    Is there a document that you could review that

15   would allow you to answer that question?

16       A    Yes.

17       Q    Will you review those documents, please.

18       A    Yes.

19            MS. BLAISE:  That's all I have.

20            MS. OHIRI:  I just have one more question.

21            Referring you again to Exhibit P, the

22   April 4th, 2012, email, in the eighth paragraph down,

23   where it says, "Of course you already have these cues in

24   your library, so you can use those," what cues were you

25   referencing?

```
 1              THE WITNESS:  Specifically the 12 of the 75

 2    albums.

 3              MS. OHIRI:  Did that include the eminem-esque

 4    cue?

 5              THE WITNESS:  No.

 6              MS. OHIRI:  I don't have any further questions.

 7              MS. BLAISE:  Okay.  I have a question.

 8         Q    So you're saying that when you sent this email,

 9    you only wanted Beatbox to license -- to be able to

10    license 12 albums?

11         A    That's your question?

12         Q    Yes.

13         A    No.

14         Q    Okay.  What albums did you want them to be able

15    to license?

16         A    The 75.

17         Q    And the link only includes 12, though, correct?

18         A    The link, yes, but it also include an Excel

19    file of the entire library.

20         Q    So you thought that Beatbox would compare an

21    Excel spreadsheet to the music that you had already

22    provided them and then determine what should be removed

23    from this email?

24         A    Absolutely not.  The Excel file directs in

25    exactly what the definition of the Spider Cues library
```

Page 230

1    is and you should transfer that information over to

2    AMCOS immediately as per their contract with AMCOS and

3    the responsibility to -- to then use the definition of

4    the library Spider Cues for all licensing and marketing

5    possibilities that you would have and facilitate to his

6    external drives and all this clients everywhere.

7            That's all we could ever use, the Excel file.

8        Q    But this email doesn't say that expressly

9    anywhere, does it?

10       A    An Excel file is following -- giving him the

11   Excel file is following his own directive which he

12   facilitated in 2009 saying this is what a library is,

13   sending that to me in 2009.

14           That definition of a library in 2009 is exactly

15   the format and processing that I used in 2012 to tell

16   him what a library was, what my recordings were per

17   Paragraph 3 of the contract.

18       Q    Do you have --

19       A    And that Excel file is -- needs to be -- needed

20   to have been disseminated by him in all venues and

21   vectors he was facilitating licensing or marketing.

22           That was the directive I gave him, and it was

23   based on his exact design of what a library is and how

24   to change or replace a library.

25       Q    You have a college degree, right?

Page 231

1          A    Yes.

2          Q    And you understand a question that calls for a

3     "yes" or a "no" answer, a question that calls for a

4     narrative?

5          A    No.

6          Q    Okay.

7               I asked you:  Does this email expressly state

8     to remove or revoke previous cues that you had provided

9     to Beatbox?  I asked you:  Does this email expressly

10    state that?

11              That's a question that could be answered with a

12    "yes" or "no" answer.

13              And so I'm going to ask you again.  Does this

14    email state expressly that certain cues should be

15    removed from circulation?

16         A    Yes.

17         Q    Where does it state that expressly?

18         A    Download the link of the Excel file, which is

19    the same file -- same manner that he sent it to me in

20    2009.

21              He sent me an Excel file.  That's how one

22    knows, a sub-publisher or publisher, the definition of

23    "library."  That's exactly how he defined library, by

24    sending me an Excel file.  That's exactly what this

25    explicitly does, explicitly saying, "Download the Excel

Page  232

```
 1   file."

 2           That's exactly what he did in 2009, and I'm

 3   following his directive.  That's what this does,

 4   explicitly.

 5           MS. BLAISE:  I have no other questions.

 6           MS. OHIRI:  I don't have any questions.

 7           MR. JACOBSON:  I'm done.

 8           I would like to order a copy, an electronic

 9   copy, and a rough.

10           MS. BLAISE:  I want to order a rough, as well.

11

12               (TIME NOTED:  1:08 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 233

1

2

3

4

5

6

7

8          I, NOEL WEBB, do hereby declare under penalty

9     of perjury that I have read the foregoing transcript;

10    that I have made any corrections as appear noted, in

11    ink, initialed by me, or attached hereto; that my

12    testimony as contained herein, as corrected, is true and

13    correct.

14

15          EXECUTED this _____ day of _____,

16    20____, at _____, _____.
                          (City)                    (State)

17

18

19

            _____

20                NOEL WEBB

                  Volume II

21

22

23

24

25

                                              Page  234

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; that the

9    foregoing transcript is a true record of the testimony

10   given.

11       Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [ ] was not requested.

15       I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or party to this action.

18       IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20   Dated: December 9, 2019

21

22

23   _____

24        LORI SCINTA, RPR

25        CSR No. 4811

                                        Page 235

[& - alerting]

| & | |
|---|---|
| **&** | 171:4 172:4 |

**1**

**100** 198:21
**11:33** 170:8 175:2
**12** 181:14 226:7,11
  228:19 230:1,10
  230:17
**123** 171:8
**1352** 172:7
**15** 216:8
**168** 168:25
**175** 173:6,24
**178** 173:13
**188** 173:21,22,23
**1988** 187:19
**1:08** 170:9 233:12

**2**

**20** 234:16
**2000** 170:7 171:20
  198:23
**2006** 188:20 189:7
**2009** 175:19
  196:15,18 221:16
  224:24 231:12,13
  231:14 232:20
  233:2
**2012** 173:14
  178:14 179:7
  182:23 183:13
  185:23 205:20
  206:19 207:2
  215:21 216:10
  217:22,22,24
  218:6,25 221:4,7
  221:25 222:1,2
  226:19 229:22
  231:15
**2013** 219:15

**2014** 207:4,7
  221:10,17 222:3,8
  222:18
**2016** 200:17 202:2
**2018** 200:8 202:5
**2019** 168:19 170:9
  175:1 235:20
**205** 172:8
**213.725.9800**
  171:22
**215** 173:7
**224** 173:8
**235** 168:25
**250** 171:9
**2:17** 168:6 169:6

**3**

**3** 168:19 170:9
  175:1 220:19
  224:23 225:7
  231:17
**3,000** 203:16
  204:12,23
**312.448.6602**
  171:11
**3620306b** 168:23
**3rd** 188:20

**4**

**4** 173:14
**4,000** 204:9 205:2
**4811** 168:22
  170:10 235:25
**4th** 178:14 217:24
  229:22

**6**

**60606** 171:10
**6108** 168:6 169:6
**67,000** 202:21
  203:3,13

**7**

**7** 226:1
**7109** 235:23
**714.505.4872**
  172:10
**75** 180:12,19
  181:14 226:7,11
  226:24 230:1,16
**76** 226:16

**8**

**801** 170:7 171:19

**9**

**9** 235:20
**90017** 171:21
**92780** 172:9

**a**

**a.m.** 170:8 175:2
**able** 186:11 208:2
  230:9,14
**absolutely** 221:5
  230:24
**accepted** 222:25
**account** 205:5
  211:11,12,14,15
  211:19,20 212:12
  212:13
**accounts** 212:21
  212:23 213:2
**acknowledged**
  219:7
**acquire** 223:24
**act** 207:14
**action** 192:10
  235:16,17
**adapt** 223:3
**adaptation** 176:16
**added** 201:19,23
  201:25
**address** 197:3

**addressing** 189:20
  208:14
**administered**
  175:5
**advertisement**
  194:9
**ago** 187:18
**agree** 225:15,19
  225:22
**agreed** 225:5
**agreement** 175:19
  175:22 176:4,14
  177:1 196:17
  202:22 208:23
  209:1 210:12
  212:14 214:20
  220:17 224:24
  225:23
**agreements**
  183:15 198:16
  210:4 211:1,5
**alarm** 219:22
**album** 181:16
  206:20,20,23
  216:6,7,10,11,13
  218:6 219:11,19
  220:5,10,12
  221:14,18,20
  222:4 226:25
  227:1,4
**albums** 180:7,12
  180:15,19,20,20
  181:14 215:25
  226:7,12,16,18,24
  227:6,11 230:2,10
  230:14
**alert** 181:24
**alerted** 184:1,7
  185:9,15,18
**alerting** 183:20

Page 1

[alike - bmi]

**alike** 191:5
**allow** 186:3 199:7
   214:17 229:15
**alter** 223:2
**ambiguous** 177:19
   209:3 223:9
**amcos** 231:2,2
**analysis** 198:5
**analyze** 191:7
**angeles** 168:18
   170:8 171:21
   175:1
**answer** 174:12
   176:10 182:20
   186:3,11 189:24
   191:22,24 194:19
   199:7 211:21
   214:17 215:5
   227:14 228:23
   229:15 232:3,12
**answered** 176:10
   229:1 232:11
**answering** 228:15
   228:15
**anybody** 198:15
**apollo** 216:23
**apologized** 219:23
**appear** 234:10
**appearances**
   171:1 172:1
**appears** 188:19
**apply** 175:14
**appreciate** 182:20
**appreciated** 219:7
**approved** 219:5
   221:19
**approximately**
   196:15 204:9
   205:2,6
**april** 173:14
   175:19 178:14

217:22,24 218:25
   224:24 229:22
**ascap** 183:15,20
   184:1,7,22 185:1
   185:11 186:7
   208:19
**aside** 213:19
**asked** 176:3
   177:11 180:22
   184:8 189:10
   199:23 203:22,24
   209:22 232:7,9
**asking** 184:14
   189:7 190:4
   191:19 203:6
   213:25 227:15
**assets** 199:14,18
   202:14 213:4,12
   213:14,18 214:1,5
**associated** 182:17
**associates** 172:4
**association** 219:14
**assumes** 194:12
**assumption** 222:1
**attached** 178:12
   234:11
**attacked** 223:20
**attention** 225:25
**attorney** 171:18
   172:6 186:14
   187:2 197:7,18
   203:1 224:22
   235:17
**attorneys** 171:7
   203:9,10,11,17
**audio** 196:7
   221:13
**auditorily** 195:10
   195:11,12,15
**australia** 216:23

**available** 224:13
**aware** 182:12,13
   182:16 184:14
   207:13

**b**

**b** 169:14 173:21
   188:5,16,17
**back** 176:15
   177:10 223:25
   225:25
**baker** 172:14,15
   173:15 178:23
   179:6 181:24
   217:24 219:3,10
**baker's** 221:14
**bank** 205:5 212:17
   212:19 213:1
**banks** 213:2
**barbara** 172:15
   222:24
**based** 221:2
   231:23
**basis** 190:4
**bates** 173:16
**bay** 201:15,16
**beatbox** 168:4
   169:4 175:20
   176:5,14 178:23
   179:1,6 181:24
   208:23 216:22
   217:20,25 218:5
   218:10 220:11,23
   220:23 221:4
   222:6 223:2
   224:17,21,25
   225:4,16,19
   226:16,18 228:6
   230:9,20 232:9
**beatbox's** 226:22
   226:22 228:1

**began** 196:17
**beginning** 170:8
   226:2
**behalf** 170:6
   175:12 185:2,19
**believe** 177:5,14
   179:8 205:21,24
**belong** 214:9
**belonging** 213:19
**beneficiaries**
   199:11
**best** 192:24,25
   211:25
**better** 215:24
**beyond** 195:21
   214:6
**bgrfirm.com**
   171:23
**bills** 205:12
**bit** 180:3 219:20
**blaise** 171:4,5
   173:6,8 175:9,12
   176:24 177:10,21
   177:23 178:13
   179:19 183:2
   190:11 191:14,23
   194:16 195:11
   206:6 207:24
   208:17 209:10,20
   209:25 215:11
   218:13 223:9
   224:6,9 228:4,11
   228:25 229:7,19
   230:7 233:5,10
**blaisenitschkela...**
   171:12
**block** 189:3
**bmi** 183:15,20
   184:1,7,22 185:1
   185:12 186:7

[boston - conversation]

**boston** 201:11,13
201:14,14,15,16
**bottom** 193:9
218:3
**boulevard** 172:7
**box** 216:22
**broadcasters**
219:15
**browne** 171:16
203:11
**business** 183:4
200:9

**c**

**c** 173:22 193:8,8,9
193:11 217:10
**california** 168:2,8
168:18 169:2,8,15
170:8 171:21
172:9 175:1 200:5
205:11 235:2
**called** 193:14
200:2 217:2,5
223:24
**calling** 227:1
**calls** 176:17
182:25 191:9,10
194:14,14 228:2
232:2,3
**caption** 168:11
**case** 168:6 169:6
187:18 235:13
**catalog** 184:18
185:6 201:2,4
224:13 226:22
**catalogs** 200:24
201:1,8 210:11
211:7
**category** 210:10
**cdm** 216:22
**cease** 187:2

**central** 168:2
169:2
**certain** 232:14
**certified** 170:10
235:1
**certify** 235:2,15
**chain** 173:13
**chance** 176:9
**change** 194:9,20
194:22 208:21,25
209:5 222:25
223:1 231:24
**changed** 194:24
208:21 209:11,13
**changes** 179:2
218:19 219:5,6
222:13
**changing** 195:2
209:4,8,9
**chase** 212:18,20
212:22,25
**chicago** 171:10
**choice** 180:21
**chord** 192:15,20
192:22 193:4,5,5,7
193:8,14,16,18,18
193:19,23 194:10
194:20,21,22
**chords** 193:20,23
193:24 194:1,4
195:1
**circulation** 232:15
**city** 234:16
**claim** 186:22
**claims** 187:9
**clarify** 209:23
**clause** 176:12
**clients** 224:11,18
225:4 231:6
**cohen** 169:11
172:3 188:17,20

189:1,14 191:2
192:5,8 196:13
198:3 203:22,24
204:4 209:2 215:7
**cohen's** 188:4
190:20 194:10
198:5 205:2
**collect** 183:24
184:2,9,12,13,15
185:1,18
**collected** 185:23
**college** 231:25
**come** 191:2,16
**comes** 210:16
211:6
**coming** 212:3
**common** 182:15
**communication**
211:24 212:5,6,9
**companies** 191:12
199:25
**company** 198:11
217:3,5,7
**compare** 191:4
230:20
**comparison** 195:4
195:18,21
**complainant**
169:12 172:3
**complete** 168:11
222:1
**completely** 193:12
193:22 210:24
222:21
**completion** 235:13
**compliance**
225:22
**component** 200:10
**composer** 176:16
177:6,15 189:11
189:12 190:1

206:23 209:1
**composers** 206:23
210:19
**composition**
183:21 195:6
213:15
**compositions**
186:23 200:12,19
213:5 223:3
**computer** 214:13
214:14
**computers** 214:8
**concept** 181:6
**conclusion** 176:18
190:5 191:10
**consider** 180:8,14
189:14 190:12
212:4
**construction**
187:14
**consult** 177:6,14
**contact** 197:21
**contain** 224:12
**contained** 201:5
206:15 220:12
221:3 227:3 228:1
228:6 234:12
**content** 207:12
**contention** 226:15
226:24
**context** 219:17
**continued** 172:1
174:1
**contract** 225:9,12
225:14,17 231:2
231:17
**contracts** 210:7
**conversation**
219:17 220:4
222:19

Veritext Legal Solutions
866 299-5127

[conveyed - directors]

**conveyed** 179:9
**copy** 233:8,9
**copyright** 186:16
  207:14 213:8,9,10
  213:14,20
**copyrights** 200:11
  200:19,22 211:6
  213:5
**corporation** 168:8
  169:8,15
**correct** 178:1,15
  183:17,24 186:8
  191:2 196:14
  204:5,14 207:5
  213:12,16 215:21
  216:10 222:5
  224:14,19 225:16
  225:20,23 226:8
  226:13 227:23
  228:1,7 230:17
  234:13
**corrected** 234:12
**corrections** 234:10
**correspondence**
  185:11,14 208:8
**costs** 182:12,14,17
**counsel** 197:25
  202:11
**count** 223:21
**country** 216:25
**course** 181:19
  198:3 208:22
  227:21 229:23
**court** 168:1 169:1
  177:11 178:11
  180:4 187:9,20
**covers** 221:14,18
  221:20
**cpa** 202:11
**created** 198:22
  213:1

**credible** 178:24
**critique** 190:22
  191:17,20 192:1
**critiqued** 192:4
**critiquing** 192:7
**cross** 169:12,16
  171:14 172:3
**csr** 168:22 235:25
**cue** 176:6 177:2,3
  177:7,16,24,25
  178:1 179:20
  181:25 182:8,9
  184:23 187:3
  190:15,16 191:1
  191:15 192:8
  206:21,21 207:20
  208:1,5 209:14
  219:9 220:13
  221:23 222:5
  230:4
**cues** 168:7 169:7
  169:14 178:21,22
  179:3,24 180:2,5,6
  180:9,10,14,15,15
  180:16,18,20,20
  180:23,24 181:19
  183:23 184:2,8,17
  185:5,19,24 201:5
  201:11,20,23,25
  206:3,9,13,17
  208:5,7,9 210:9,11
  215:21,25 216:2,4
  216:5,7,12 218:6
  220:8,9 221:3,6,17
  222:3,7,22,23
  224:12 225:5
  227:3,6,15,16,17
  227:22,25 228:13
  229:23,24 230:25
  231:4 232:8,14

**current** 210:22
**currently** 203:17
  205:7
**cushions** 219:25
**cv** 168:6 169:6

**d**

**d** 169:14 173:23
  188:5 217:10
**dan** 172:5
**date** 219:2 235:18
**dated** 173:14
  178:14 188:14,20
  235:20
**day** 234:15
**days** 223:11
**dba** 168:7 169:7
  201:5
**dba's** 201:9
**deal** 180:2,5
**december** 168:19
  170:9 175:1
  188:20 235:20
**decide** 190:7,23
**decided** 180:7
  192:11
**decision** 198:13
  206:2,7
**declare** 234:8
**defendant** 169:16
  171:14,14 178:9
**defendants** 168:9
  169:9
**define** 206:12,16
  221:15
**defined** 232:23
**definition** 201:7
  220:8 230:25
  231:3,14 232:22
**degree** 231:25
**denmark** 216:24

**department** 196:7
**deposition** 168:15
  170:4 176:2 178:7
  188:4 235:12
**describe** 206:11
  206:15
**described** 225:9
**description** 173:12
**design** 178:24
  217:8 219:8
  221:17 223:25
  231:23
**designed** 216:21
  217:25 218:6,10
**desist** 187:2
**detail** 219:20
  220:4
**determine** 185:15
  190:19 191:7
  211:22 230:22
**determined**
  176:11
**determines** 211:13
**different** 187:7
  192:15,16,23
  193:5,12,18,19,20
  193:22,22,23,24
  195:3
**differently** 193:12
  193:16
**digital** 207:13
**direct** 225:25
**directed** 179:1
  224:22
**directing** 226:1
  227:20
**direction** 235:8
**directive** 231:11
  231:22 233:3
**directors** 198:10

[directs - extrapolating]

directs  230:24
discuss  219:3
discussed  175:14
discussion  177:22
  215:16
disseminate
  225:10,12,14
disseminated
  225:19 231:20
distribution
  179:12
district  168:1,2
  169:1,2
division  168:2
  169:2
dlj  172:11
dmca  207:13
document  178:25
  184:5 199:6,22
  224:23 229:14
documents  186:2
  186:5,10,13
  229:17
doing  189:15,17
  189:22 200:9
download  179:1
  179:17 180:23
  182:2 218:5
  232:18,25
downloaded
  218:10 222:6
drive  171:8 224:17
drives  231:6
due  204:4
duly  235:6

e

e  193:8,9 203:12
ear  195:8
earlier  179:15
  188:4 191:15
  196:18 204:19

209:8,23 215:20
efforts  190:19
eighth  181:9
  229:22
either  180:23
  214:22 215:1
  217:6,8 227:7
electronic  233:8
elements  190:7
email  171:12,23
  172:11 173:13,13
  178:14,17,19
  179:8,11,21,23
  181:2 188:19,21
  188:24,25 189:1
  197:3,16,18
  217:23,25 218:7
  218:10,18 226:19
  228:5 229:22
  230:8,23 231:8
  232:7,9,14
emails  216:19
emanate  213:10
  213:20
embodied  211:7
eminem  176:6,15
  178:1 179:7,12,20
  182:4 192:8 194:5
  194:9,11 195:5,23
  196:11,13 197:12
  204:1 205:21,25
  208:19,22,25
  209:5,5,7,14 219:9
  220:13 221:23
  222:5 223:17
  225:16,20 227:25
  228:6 230:3
employee  235:16
entertainment
  168:7,17 169:7,14
  170:6 171:15

175:19 200:15,18
201:8,20 202:1,2,5
202:15,19 203:4,5
203:8 204:13,13
204:20,20 205:5,7
205:15 210:6,10
210:13,17 211:1,8
213:23 214:1,6,9
214:10 224:25
227:8,8,12,12
229:10,11
entire  207:25
  216:10 230:19
entirely  198:6
  199:24
entities  214:22
entitled  198:15
entity  200:14
  214:14,22 215:1
esque  176:6,15
  178:1 179:7,12,20
  182:4 192:8 194:5
  194:9,11 195:5,23
  196:11,13 197:12
  204:1 205:21,25
  208:19,22,25
  209:5,5,7,14 219:9
  220:13 221:23
  222:5 223:17
  225:16,20 227:25
  228:6 230:3
evidence  194:13
exact  182:22
  196:25 231:23
exactly  230:25
  231:14 232:23,24
  233:2
examination  173:2
  175:8 215:18
  224:8

examined  175:5
excel  178:22 179:1
  179:18 201:4
  205:20 206:12,16
  206:19 207:1,4,7
  218:11 221:3,14
  221:22 225:13
  230:18,21,24
  231:7,10,11,19
  232:18,21,24,25
exclusivity  176:12
executed  234:15
exhibit  173:13,21
  173:22,23,24
  175:18 178:4,7,10
  188:16,17 217:23
  220:15 224:24
  226:1 229:21
exhibits  173:10,19
  188:4
expand  223:3
expenses  203:25
experience  183:3
  193:17,22 195:3
expert  182:25
  191:10 194:15
explain  180:22
  192:22 194:25
explaining  180:22
explicitly  221:20
  232:25,25 233:4
express  178:25
expressly  207:20
  208:1,18 231:8
  232:7,9,14,17
external  231:6
extrapolating
  195:6

Veritext Legal Solutions
866 299-5127

[face - identified]

| f | | g | guess 188:6 |
|---|---|---|---|

**f**

face 223:10
facilitate 231:5
facilitated 231:12
facilitating 231:21
fact 220:9
facts 194:12
fair 184:25
familiar 183:19
  188:10
family 198:19,20
  198:25 199:9,11
fargo 212:18,20,22
  212:24
fastidious 191:13
federal 235:12
fees 203:17,20
fifth 179:23
figueroa 170:7
  171:19
file 178:22 179:2
  179:18 218:11
  221:3,14,22
  224:12 225:13
  230:19,24 231:7
  231:10,11,19
  232:18,19,21,24
  233:1
files 181:15 201:18
filing 178:6
financially 235:15
find 178:25 226:20
  226:21
finding 199:2
fine 181:22
finish 185:3,17
first 223:24
  228:18
five 219:22
flattop 200:2,11

flip 175:25
fluent 211:24
folder 181:14
  226:11
follow 218:18
following 231:10
  231:11 233:3
follows 175:6
  177:12
foregoing 234:9
  235:3,5,9,11
forgotten 201:14
form 190:9 191:21
  206:5 207:23
  228:9 229:6
format 178:22
  180:8,9,14 181:17
  215:24 220:7
  221:15,16 231:15
formed 202:1
forth 235:4
found 189:25
  199:15,19 201:20
  202:15 212:10
  229:3
foundation 218:13
frame 217:17,19
france 216:22
franchise 205:12
front 219:2,21
  220:16 225:1
ftp 179:18
full 176:5,15 177:2
  177:3
fully 176:9 219:23
further 173:8
  175:6 224:8 230:6
  235:11,15

**g**

g 193:8,10 203:12
gear 219:24
generally 190:25
george 171:16
  203:11
german 217:12
gib 203:12
give 201:9 202:11
  220:4 221:1,16
  224:11,17
given 178:23
  206:20 210:14
  221:10 226:16
  235:10
giving 231:10
go 179:16 180:3
  187:20,22 195:5
  203:3,6 211:10
  215:14 223:23
  225:4
goes 196:9
going 175:17
  176:15 178:3
  179:23 181:8,8
  188:3 191:24
  209:9 220:15
  232:13
good 175:11
  189:12,14,17,19
  189:22 190:1,5
  205:8 212:5,6,9,9
goods 210:6
grant 176:5,15
  223:2
great 180:2,5
greece 217:4
greek 217:1
groove 192:19
gross 202:4,7,8,9

**h**

h 173:24 175:18
  220:15 224:24
hardware 214:9
hblaise 171:12
heard 195:16
hearted 219:18
heather 171:5
  175:12
held 188:4 205:17
  205:18 210:12
help 186:10
  215:13
helpful 209:24
hereto 178:12
  234:11
hi 175:10
highlighted
  175:24 176:1
history 207:21,25
hit 181:10,13
  226:3,6
hold 215:14
holding 205:1
home 214:24
  215:2
homeowner
  187:16
hope 211:25
host 223:23
huh 175:21 185:4
  208:16 215:9

**i**

identification
  178:11 179:3
  220:8
identified 184:3
  185:5,20,24
  222:22,23

Page 6

[identifying - library]

**identifying** 209:14
**idiot** 193:3
**ii** 168:20 170:6
   173:4 234:20
**illinois** 171:10
**immediately** 231:2
**implied** 181:7
**import** 218:5
   220:23
**imported** 222:7
**include** 221:2
   222:3 226:25
   230:3,18
**included** 217:25
**includes** 230:17
**income** 202:4
   211:5
**indemnify** 203:22
**index** 173:1 174:1
   206:22
**indicated** 202:13
**indicating** 199:22
**individual** 169:11
   215:25
**individually**
   168:15 170:4
   178:8 205:18
   229:5
**information** 174:4
   179:9 195:6
   197:22,25 202:10
   206:11,15 207:1,7
   209:14 231:1
**infringe** 186:24
**infringement**
   186:17 203:18
**infringing** 190:16
   190:17,21 191:8
   192:12,13 205:22
   205:25

**initialed** 234:11
**ink** 234:11
**instruction** 174:12
**instrumentation**
   192:17
**intellectual** 213:15
**interest** 198:18
**interested** 235:16
**interests** 199:23
   199:25 205:17
**internet** 223:12,22
**inversion** 194:10
   194:20
**inversions** 193:5
**irvine** 172:7
**israeli** 217:5,6
**issue** 206:2,7
**issued** 220:24

**j**

**jacobson** 172:4,5
   176:19 177:19
   182:25 190:10
   194:12 209:3
   224:5 228:2,8
   233:7
**jacobsonlawyers...**
   172:11
**japanese** 217:10
**job** 168:23 225:9
   225:14
**join** 176:19 190:10
**jprx** 168:7 169:7

**k**

**k** 178:6 217:11
   218:1
**keep** 213:8
**kind** 176:8 219:18
**kiosk** 219:22
**knock** 189:4 191:5

**knockoff** 182:24
   184:8 189:8,11
   191:1 197:13
**knockoffs** 183:10
   184:3,16 185:7,20
   185:25 189:15,23
   190:1,13,21 192:5
**know** 184:15
   185:8,9 186:1
   188:12 189:2,21
   189:22 190:17
   192:6 193:4 194:1
   194:4,7,17,24
   196:16,21,24,25
   197:2,23 199:1,5
   200:23 203:21,23
   208:20 209:16
   211:21 212:1,8,16
   214:15 215:3
   220:20 222:6,9,11
   226:18 229:13
**knowledgeable**
   168:16 170:5
   178:9
**known** 209:14
**knows** 232:22
**korea** 217:9

**l**

**l** 171:5 216:24,24
**l.a.** 197:1
**lab** 201:11,11
**labrador** 168:7,17
   169:7,14 170:5
   171:14 175:19
   176:4 178:9,21
   198:8,22,24 199:8
   200:15,18 201:8
   201:20,25 202:1,4
   202:14,19 203:4,4
   203:8 204:13,13
   204:19,20 205:5,7

205:14 210:6,10
   210:13,16 211:1,7
   213:22 214:1,5,9
   214:10 224:25
   227:7,8,12,12
   229:9,11
**labrador's** 199:15
   199:19
**labs** 201:14
**lana** 171:6
**laptop** 214:13,14
**late** 219:23
**law** 171:7,18
   172:6
**lawsuit** 186:19,21
   187:5,9,14 199:2,4
   199:16,20 201:21
   202:16 212:11
   229:4,9
**lawsuits** 187:8
   188:1
**lawyer** 203:20
   208:12
**lead** 190:7
**learned** 229:8
**left** 180:16 203:15
   204:12,23
**legal** 176:17 191:9
**letter** 187:1
**libraries** 183:8,10
   183:12
**library** 168:8
   169:8,15 178:22
   178:24 179:4
   180:25 181:20,25
   206:3,9,13,17,21
   215:21,23 216:16
   216:21 217:15,25
   218:11 219:5,7
   220:9 221:4,6,11
   221:15,17 222:3,8

Veritext Legal Solutions
866 299-5127

[library - needed]

222:22,23,23
225:10 227:22
228:1,6 229:24
230:19,25 231:4
231:12,14,16,23
231:24 232:23,23
**license**  182:11
183:23 184:11
223:14,17 230:9
230:10,15
**licensed**  208:2
225:5
**licensing**  183:21
207:25 227:7
231:4,21
**light**  219:18
**likes**  182:3,5,10,17
183:9 184:3,16
185:6,20,25
189:17 190:2,14
192:4 219:8,19
221:22 227:4,13
**link**  179:17 181:10
181:13 182:3,3,5
226:3,6 230:17,18
232:18
**list**  216:15,18,19
**listed**  217:16
**listen**  191:2,16,17
195:15
**listened**  192:11
195:12
**listening**  195:19
195:22,22
**litigation**  182:12
182:13,17
**little**  180:3 219:20
**live**  197:1
**llc**  200:3,4,5,11,15
200:18 201:8
202:2,5,19 203:4

204:14,20 205:15
210:6 211:12,14
211:19,23 212:12
212:14,15,17,21
213:1,4,12 214:6
214:10 227:8,13
229:10
**llp**  171:16
**loaded**  219:24
**logs**  210:10
**long**  187:18
**longer**  184:2,9,15
185:1,18
**look**  188:7 202:6,9
**lori**  168:21 170:10
235:24
**los**  168:18 170:8
171:21 175:1
**lose**  192:16,18,23
194:2 195:5,7,12
195:15,19,22
196:10 197:14
205:25
**lot**  218:19 219:24
222:13
**lyrics**  192:15

### m

**m**  217:10,10
223:24
**machine**  235:7
**madam**  177:11
**main**  216:24,24
**makers**  198:13
**making**  190:13
**manner**  232:19
**march**  222:18
**marked**  173:19
175:18 178:3,5,5
178:10 188:3,5,16
188:16 224:24

**marketing**  231:4
231:21
**marketplace**
227:9,17
**matters**  203:18
**mc**  209:4
**mean**  177:25
180:13,17 188:23
189:9 201:2 202:7
205:9 210:22
**meaning**  183:6
**means**  203:23
**meet**  218:20,21,23
219:21 222:15,17
**meeting**  219:4
222:14
**melody**  192:14
**membership**
205:17
**mention**  179:20
**met**  175:13 215:7
**michael**  169:11
172:3 188:4 189:1
189:14 190:20
194:10 197:11,12
197:21 198:3,5
203:22,24 204:4
205:2 209:2 215:7
**middle**  193:10
**millennium**
207:14
**minute**  209:18
**mischaracterizes**
179:14
**modoocom**  217:9
**moment**  179:4
**money**  203:20
204:7,16 205:4
210:16 211:10
212:11 229:5,12

**morning**  175:11
**mouse**  200:10
**move**  193:18,21
**moved**  195:1
**moving**  193:15
**mp3/320/44.1.**
181:15
**music**  168:4,7
169:4,7,14 181:15
182:8 183:3,8
189:10 191:11,12
195:13,16 196:8
197:10 200:24
201:1,4,5,7 206:2
206:7 207:11
208:1 210:7,9
214:1,6 216:22
217:2 223:14
224:25 230:21
**musical**  193:17,21
195:2 200:11,19
213:5
**mwf**  168:6 169:6

### n

**n**  217:12,12
223:24
**nab**  219:14,22
**name**  197:11
199:15,19 206:20
217:1,3,6 235:19
**narrative**  232:4
**nassar**  171:6
**national**  219:14
**nature**  184:24
187:7,8
**nbcuniversal**
196:8,22,24
**necessarily**  213:11
**necessary**  179:2
**needed**  177:6,14
187:15 231:19

[needs - pertains]

needs  231:19
neither  235:15
net  202:7
new  180:9,9,14,14
  180:16 186:21
  194:8 199:16,20
  201:20,21,23,25
  202:16 203:11
  210:4,7,7 212:11
  216:16 217:8,15
  217:25 219:7
  220:7,7,8,9 221:3
  221:3,16,17
  222:22 229:4
newly  216:12,21
  218:6,10
nitschke  171:4
noel  168:15 170:4
  173:3,14 175:4
  178:8 188:24
  229:11 234:8,20
north  171:8
noted  233:12
  234:10
notes  193:13
  217:11,11
notice  207:16
number  173:12,20
  183:8 196:20
  197:5 206:22
  223:20

o

o  216:24,24 217:10
  217:10,10,10,12
  217:12,12 223:24
oath  175:5
object  177:19
objection  176:17
  179:14 182:25
  189:20 190:9
  191:9,21 194:12

206:5 207:23
209:3 218:13
223:9 228:2,8,9
229:6
offer  180:7
office  214:21
  216:25
oh  188:9 189:4
  210:18,21 218:3
  220:6 225:8
ohiri  171:17 173:7
  176:17 179:14
  189:20 190:9
  191:9,21 194:14
  206:5 207:23
  208:14,16 215:12
  215:14,19 218:16
  223:13 224:4
  228:9,21 229:6,20
  230:3,6 233:6
okay  178:3 179:5
  179:11 183:19
  184:25 185:14
  188:15 189:6
  194:4 195:9 196:5
  198:7 200:1
  201:25 202:10,13
  204:9 208:8
  209:13,17 210:2
  210:25 211:4
  214:5 215:12,20
  216:20 217:15
  220:15,21 224:2,6
  226:15 228:23
  229:2 230:7,14
  232:6
old  210:9,9
omnis  223:24
once  210:5
ones  180:24

operated  201:5
operating  198:16
  201:10
opinion  189:19
  191:10 194:15
orally  195:9,9
order  180:11,18
  188:7,12 233:8,10
organizations
  208:3 209:15
organized  180:11
  180:18
original  223:24
  235:12
originally  178:23
outside  209:6
outstanding
  203:17 211:1
owe  203:17,20
  213:6
owned  205:5
  211:7
owner  198:8
owners  205:14
ownership  198:18
  199:8 206:24,25
  213:8,10
owns  214:14

p

p  173:13 178:4,7
  178:10 203:12
  216:24 217:23
  218:1,2 226:1
  229:21
p.c.  171:4
p.m.  170:9 233:12
pad  200:10
page  168:11
  173:12,20 175:25
pages  168:25

pagter  203:12
paid  205:11 229:4
  229:9,11
paragraph  176:11
  179:23,24 181:9
  181:12,23 220:19
  224:23 225:3,6,7
  226:1,1 227:21
  229:22 231:17
part  209:7 210:9
particular  199:22
  223:18 224:16
particularly
  223:11
parties  186:24
  190:21 204:18
  224:18
party  186:23
  187:5 188:1 194:8
  206:8 235:17
pay  203:9,10
  214:21 215:1
payment  212:2
payments  204:4
peers  190:23
  191:17,18 192:8
penalty  234:8
pending  210:22
  228:14,20
people  195:24
percent  198:21
percentage  206:24
  206:25
performance
  208:3 209:15
perjury  234:9
permit  215:4
person  168:16
  170:5 178:8
pertains  235:11

Page 9

[peter - reference]

**peter**  172:14
  173:15 178:23
  179:6 181:24
  217:24 218:23
  221:14
**phone**  196:20
  197:5
**phonetic**  211:25
**physical**  214:8,12
  224:12,17
**piece**  182:8
**place**  235:4
**plaintiff**  168:5
  169:5 170:7 171:3
  175:12
**play**  195:25
  196:10 197:9
**played**  196:8
**playing**  195:24
**please**  177:10
  179:25 181:12
  185:3,17 186:13
  203:1 228:20
  229:17
**point**  178:19
  221:24 226:22
**political**  194:8
**possibilities**  231:5
**possibility**  184:23
**possible**  182:12,13
  182:16 184:20
**potential**  224:17
  224:18 225:4
**practice**  190:24
**prepare**  210:4
**presence**  223:12
**present**  172:13
**pretend**  193:3
**pretty**  183:5
**previous**  177:24
  222:22 232:8

**previously**  173:19
  175:17 224:23
  226:16
**prior**  178:6 186:19
  210:12 235:5
**probably**  181:21
  208:15
**procedure**  184:14
**proceedings**  235:3
  235:5,7,13
**process**  183:20
**processing**  231:15
**professional**
  207:21,25
**progression**
  192:15,20,23
  193:4,16 194:21
  194:22
**property**  213:15
  214:12
**pros**  183:15
  207:22 209:15
**prove**  223:1
**provide**  197:25
  203:1 216:15
  219:20
**provided**  225:15
  230:22 232:8
**providing**  210:6
**provision**  220:22
**pty**  168:4 169:4
**publisher**  206:24
  207:21 208:2
  210:14 212:2
  217:1,4,5,10,12
  220:25 224:11,16
  225:10 232:22,22
**publishers**  182:18
  186:6 206:8,24
  209:12 210:5,13
  210:17,18,20

  211:2,5,6,16
  216:13,16,20
  217:16
**publishing**  183:3
  183:15 208:23
  212:13 213:9,19
  214:2,6 217:3,7
  220:16
**pulled**  223:21
**purchase**  202:22
  214:20
**purchased**  202:17
  202:18,20 204:20
**pursuant**  211:4
**put**  176:22,25
  193:11 198:24
  207:1,7 223:25

**q**

**qualify**  227:4,9,13
  227:18
**quality**  180:12,19
**question**  176:3,7,8
  176:10 177:11,24
  182:20 185:3,17
  186:3,11 189:24
  199:7,24 204:17
  209:22 210:1,23
  211:21 213:18
  214:17 215:5
  221:5 227:11,14
  228:14,15,16,20
  228:22,24 229:1
  229:15,20 230:7
  230:11 232:2,3,11
**questions**  209:19
  230:6 233:5,6
**quite**  189:10
  203:14
**quote**  176:16

**r**

**r**  203:12 217:11
**raena**  171:17
**read**  177:10,12
  179:24 181:12
  220:19 234:9
**really**  223:19
**reason**  176:22,25
  221:25
**recall**  176:7
**receive**  225:11
**received**  186:22
  187:1 196:12,13
  207:10
**receives**  225:13
**recess**  209:21
**recognize**  188:11
**recognized**  224:10
**recollection**  184:6
  192:4
**record**  177:12,22
  215:15,16 235:6,9
**recording**  213:16
**recordings**  186:24
  200:12,20 213:5
  220:24 221:1
  225:13 231:16
**records**  197:24
  201:11,12,15,16
**recovering**  184:23
**red**  201:11 220:1
**redefined**  178:21
**redesign**  215:23
  221:6,11
**redesigned**  215:21
  216:12 221:13
**refer**  179:2 220:15
  221:25
**reference**  174:8
  219:18 220:23

Veritext Legal Solutions
866 299-5127

[references - sense]

**references** 209:6
**referencing**
 224:22 226:25
 228:13 229:25
**referred** 228:16
**referring** 180:1
 209:7 229:21
**refers** 228:18
**reflected** 192:18
**refresh** 184:6
 192:3
**regarding** 177:6
 177:15 184:7
 220:5
**registered** 205:10
**reimburse** 203:24
**related** 176:5
 189:12
**relating** 203:18
 208:8
**relation** 196:2,3
**relative** 235:16
**relied** 191:13
**relying** 198:5
**remainder** 227:20
**remained** 180:21
 180:25,25
**remastered**
 221:13
**remember** 175:22
 178:17 184:4
 188:13 191:25,25
 192:2,7 208:5,6
 217:2,2,6 219:21
**removal** 182:3
 183:21 208:9,18
 219:19
**remove** 179:7,12
 181:1,3,4,6,25
 183:12 184:22
 215:24 216:2,4

225:5 232:8
**removed** 180:15
 180:20 183:9
 184:17 185:6
 207:20 208:1
 216:9 220:10,12
 221:23,24 222:2
 230:22 232:15
**removing** 182:5
 182:10
**renamed** 181:21
**rendering** 210:5
**rent** 214:21 215:1
**rental** 187:11
**renter** 187:11
**repeat** 206:4,14
**repertoire** 183:22
**replace** 231:24
**replacement**
 222:21
**reported** 168:21
**reporter** 170:10
 177:11 178:11
 180:4 195:10
 235:2
**represent** 225:11
**request** 188:21
 197:15 207:13,16
**requested** 174:4,8
 197:10,12,13
 208:18 223:1
 235:14
**require** 218:5
**required** 220:24
**requires** 225:4
**resolve** 187:22
**resolved** 187:20
**respond** 218:17
**responded** 218:14
 222:12

**responding** 188:23
 228:17
**response** 188:19
**responsibility**
 231:3
**responsive** 197:19
**result** 203:25
**resumed** 173:6
 175:8
**retired** 196:23
**returns** 215:4
**reverse** 188:6
**reversed** 204:17
 204:17
**review** 184:5
 185:14 186:2
 192:5 195:13
 197:24 198:2
 199:6 208:11
 214:16 215:4
 226:21 229:14,17
 235:13
**reviewed** 198:3
**reviewing** 186:10
**revoke** 232:8
**rich** 196:1,6,7,20
**right** 180:1 188:15
 192:22 193:2
 208:6 217:20
 222:12 223:2
 225:15 226:13
 227:10 231:25
**rights** 176:5,15
 177:2,3 186:24
 208:3 209:15
 213:9,19
**rihanna** 189:5,12
**rohiri** 171:23
**ross** 171:16 203:12
**rough** 233:9,10

**roundabout**
 217:22
**royalties** 183:24
 184:2,9,13,16,23
 185:1,18,24
**royalty** 204:4
**rpr** 168:21 170:10
 235:24
**rules** 175:14
**runs** 196:7

s

**s** 217:11,12 223:24
**s.o.s.** 189:5
**safe** 201:19
**sakura** 217:10
**sale** 204:12
**sat** 219:25
**saying** 187:2 213:8
 222:12 230:8
 231:12 232:25
**says** 178:6 179:12
 179:13 212:2
 226:6,13 227:21
 229:23
**scinta** 168:21
 170:10 235:24
**secretary** 205:11
**section** 195:1,2
**see** 168:11 181:1,5
 181:5,7,9,14,23
 182:2 188:16
 189:3 193:21
 225:3,8 226:7,11
**seeking** 191:5
**sell** 200:10
**send** 216:12
 217:15
**sending** 231:13
 232:24
**sense** 182:15

Page 11

[sent - talk]

| | | | |
|---|---|---|---|
| **sent** 178:19 205:20 216:16,21 217:8 217:20,23 218:7,9 221:4,18 228:5 230:8 232:19,21 | **songs** 185:19,24 **sonoton** 217:12 **soon** 217:9 218:24 219:1 **sorry** 175:25 | 230:25 231:4 **spreadsheet** 201:4 205:20 206:12,16 206:19 207:2,4,8 230:21 | 220:16 224:11,16 225:10 232:22 **subcontractor** 187:14 **subjective** 212:8 |
| **sentence** 228:16 228:17,18,18 | 188:25 189:4 210:18,21 212:14 218:3 229:10 | **sq** 209:4 **stamped** 173:16 **standing** 205:8 | **sublicensed** 223:4 **submitted** 180:6 191:12 |
| **services** 210:5 **sesac** 183:16,20 184:1,7 185:1,12 186:8 | **sos** 189:12 **sound** 182:3,5,7 182:10,17 183:9 184:3,8,16 185:6 | **start** 210:21,22 **started** 200:7,16 210:5 **starting** 179:24 | **subscribed** 235:19 **success** 180:2,6 **sued** 186:16 **suffered** 203:25 |
| **set** 180:9,14 181:16 235:4 | 185:20,25 186:23 189:17 190:2,14 | **starts** 181:9 226:3 **state** 176:4 205:11 | **suggested** 179:6 182:18 |
| **sets** 180:16 **settlement** 187:24 **shares** 198:24 **sheet** 195:13,16 | 190:20 191:1,5 192:4 193:13 197:13 200:12,19 213:5,15 215:25 | 232:7,10,14,17 234:16 235:2 **statement** 190:13 **statements** 186:6 | **suggesting** 176:20 184:11 **suite** 170:7 171:9 171:20 172:8 |
| **sherwood** 197:11 197:12 | 216:5,5,7,10 219:8 219:9,11,19 220:5 | 186:7 **states** 168:1 169:1 | **supervisor** 189:10 197:10 |
| **sherwood's** 197:21 | 220:10,12 221:19 221:22 222:4 | **stations** 196:9 **status** 196:25 | **supervisors** 191:11 |
| **shock** 201:18 **shorthand** 170:10 235:1,7 | 227:1,4,9,13,18 **sounds** 190:15 **south** 170:7 171:19 | **stay** 225:12 **stock** 198:17,18,20 199:8 | **sure** 175:24 186:12 189:11,24 194:25 197:17 198:17 201:17 |
| **show** 175:17 178:3 179:11 188:3 219:22 | **space** 214:21 **speak** 219:10 | **stop** 220:2 **street** 170:7 171:19 | 202:6 204:2 209:8 216:8 226:17 |
| **sic** 188:24 **signature** 189:3 235:23 | **specifically** 179:21 219:6 230:1 **speculation** | **strike** 188:25 193:25 207:11 212:15 216:2 | **sworn** 235:6 **synchronization** 177:7,16 |
| **significance** 223:8 **similar** 190:15 **similarity** 182:8 | 194:14 228:3 **spider** 168:7 169:7 169:14 178:21,22 | **stuart** 203:12 **studios** 196:8 **sub** 182:18 186:6 | | t | |
| **simply** 192:19 **sit** 177:5,13 194:3 194:6,7 205:24 | 179:3,24 180:2,5 180:15 201:11 206:3,9,13,17 | 206:8 207:21 208:2,23 209:12 210:5,13,14,17,18 | **t** 203:12 217:12 **take** 193:11 **takedown** 207:16 |
| **site** 179:18 **sitting** 205:4 **slower** 180:3 | 210:11 215:21 216:12 218:6 220:8,9 221:3,6,17 | 210:20 211:2,5,6 211:16 212:2,13 216:13,16,20 | **taken** 170:6 207:12 209:21 235:3 |
| **small** 187:9 | 222:3,7,22,23 | 217:1,4,5,10,12,16 | **talk** 209:18 218:20 222:13 |

[talked - waiting]

talked 220:7
  222:24
tax 205:12 215:4
technical 192:25
television 196:9
tell 176:13,14
  182:22 184:22
  188:21 199:21
  211:17,18,19,22
  231:15
telling 181:24
  182:2 212:4
  221:21
tenant 187:12
tendered 197:18
term 183:5 209:1
  225:16
terms 192:25
  211:4 212:13
territories 216:23
testified 175:6
  183:7,14 192:1
  201:3 204:3,10,19
  204:23 205:1
  215:20 223:6
  224:10
testifying 235:6
testimony 179:5
  179:15 183:1
  189:25 191:15
  216:9 234:12
  235:9
thank 177:21
  185:22 195:11
  228:12
thanks 210:3
thing 183:5,6
think 176:9,10
  184:19,19 186:12
  186:25 187:19,25
  192:13 196:16,19

197:11 200:8,17
201:16 203:16,16
205:16,19 208:13
210:15 214:13
216:1,8 217:2,14
219:16,25 227:19
227:19
third 186:23,24
  190:21 206:8
  224:18
thought 230:20
time 182:22
  192:10 205:21
  212:10 217:8,11
  217:17,17,19,20
  220:13 221:12
  228:5 229:3,8
  233:12 235:4
times 223:20
title 196:24,25
  206:21 208:22,25
  209:6,8 221:19
titles 221:20
today 177:5,13
  178:4 188:4
  205:24 215:7,8
told 179:6 185:1
top 173:13 178:6
  188:14 192:17
  193:10,11
totality 221:15
traceable 213:14
  213:17
track 204:1
  205:21,25
transaction
  204:24
transcribed 235:8
transcript 234:9
  235:9,12,14

transfer 231:1
transferred 199:8
  199:14,18 202:14
translate 223:3
transpose 195:16
triad 193:8
trial 187:20,22
true 234:12 235:9
trust 198:19,20,25
  199:9,12 205:18
try 181:17,18
trying 200:10
tuesday 168:19
  170:9 175:1
tune 182:9 192:16
  195:1,2,3
tustin 172:9
two 199:25 201:17
  219:25
type 206:11
  209:13 214:12

**u**

u 217:11
u.s. 216:22
uh 175:21 185:4
  208:16 215:9
unaware 207:18
undersigned 235:1
understand
  175:15 177:25
  182:7,24 184:13
  188:12 190:24
  199:24 232:2
understanding
  218:9 220:11,22
  221:2 224:20,21
understood 201:3
undertake 190:19
  192:10 195:18,21
undertook 191:19
  191:25 195:4

united 168:1 169:1
upper 171:8
usable 223:11,19
use 180:24 181:20
  187:2 190:22
  223:23,25 227:22
  229:24 231:3,7
user 177:7,17
users 206:8 224:18
utilize 220:25

**v**

vague 177:19
  190:9 191:21
  206:5 207:23
  209:3 223:9 228:9
  229:6
valid 178:24 179:3
various 210:11
vectors 231:21
venues 231:20
verbally 197:16
version 194:10
voice 192:17
  193:16
voiced 193:12
voicing 193:9,14
voicings 193:6,7
  193:19,23
volume 168:20
  170:6 173:4
  234:20
vote 198:15
vs 168:6 169:6,13

**w**

w 171:17
wacker 171:8
wait 215:14 220:2
  229:10
waiting 219:24

Veritext Legal Solutions
866 299-5127

[wallach - zealand]

**wallach** 203:12

**want** 188:7 190:24
212:3 225:25
230:14 233:10

**wanted** 199:21
230:9

**way** 188:23 194:8
224:1

**we've** 180:7

**web** 223:12

**webb** 168:15
170:4 173:3,15
175:4 178:8
188:24 196:1,6,7
198:19,20,25
199:9,11 229:11
234:8,20

**webb's** 196:20

**website** 223:7,8,15
223:18,19

**websites** 223:10

**wells** 212:18,20,22
212:24

**western** 168:2
169:2

**whereof** 235:18

**wife** 199:13

**wire** 211:16,17,18
211:19,22,23
212:4,7

**wired** 211:11,12
211:13,14 212:11
212:12

**withholding** 204:3

**witness** 173:2
176:20 177:18,20
179:17 191:11,22
209:4,22 215:13
218:14 223:1,10
228:10,23 230:1,5
235:18

**witnesses** 235:5

**word** 181:1,4,6,7
222:7

**work** 190:21 191:4
214:24

**worked** 191:12

**working** 187:15
215:1

**write** 189:11
190:15

**written** 210:7

**wrote** 198:4

**y**

**yeah** 176:8 185:10
187:13 189:24
190:3 203:7 209:4
220:3 224:3

**year** 198:22 219:1
219:15

**yep** 225:2

**yesterday** 175:13
175:15,18 176:2
179:5 183:7,14
199:23 201:3
202:13 204:3,10
223:6 224:10

**z**

**zealand** 186:21
194:8 199:16,20
201:21 202:16
203:11 212:11
229:4

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.