Douglas J. Rosner, ESQ., SBN 094466
rosnerlaw@earthlink.net
LAW OFFICES OF DOUGLAS JOSEPH ROSNER
2625 Townsgate Road, Suite 330
Westlake Village, California 91361
Telephone No. (818) 501-8400
Facsimile No.: (818) 880-4485

Attorney for Defendant, Labrador Entertainment, Inc.
dba Spider Cues Music Library, Labrador Entertainment,
LLC, Noel Palmer Webb, and Web Family Trusts

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BEATBOX MUSIC, PTY, LTD., | ) Case No. 2:17-cv-06108-MWF (JPRx) |
| | ) Assigned to the Hon. Michael W. |
| Plaintiff, | ) Fitzgerald |
| | ) |
| v. | ) |
| | ) **REBUTTAL EXPERT REPORT OF** |
| LABRADOR ENTERTAINMENT, | ) **ROBERT W. FINK, PhD.** |
| INC., DBA SPIDER CUES MUSIC | ) |
| LIBRARY, a California | ) |
| corporation, et. al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| MICHAEL COHEN, an individual, | ) |
| | ) |
| Cross-Complainant, | ) |
| | ) |
| vs. | ) |
| | ) |
| LABRADOR ENTERTAINMENT INC. | ) |
| DBA SPIDER CUES MUSIC LIBRARY, a | ) |
| California corporation, et al., | ) |
| | ) |
| Cross-Defendants. | ) |
| | ) |
| LABRADOR ENTERTAINMENT INC. | ) |
| DBA SPIDER CUES MUSIC LIBRARY, a | ) |
| California corporation, et al., | ) |
| | ) |
| Counter-Claimant, | ) |

**EXHIBIT A**

1   vs.                                          )
                                                 )
2   BEATBOX MUSIC, PTY, LTD. and                 )
    MICHAEL COHEN, an individual and ROES        )
3   1-20, inclusive,                             )
                                                 )
4                        Counter-Defendants.     )
    _____    )

**EXPERT REPORT OF ROBERT FINK, PHD**

**SUBMITTED JULY 20, 2021**

Robert Fink  Ph.D.
July 20, 2021
Musicology  Report
Re: Alexander Stewart Report on
"Eminem  Esque," "National  Party Election  Ad," and  "Lose  Yourself"

## FACTS CONSIDERED

This report is based on a critical reading of the detailed expert report submitted by Alexander Stewart. I have listened to the same three tracks that Professor Stewart did, in order to form my own opinion of his conclusions, but the primary goal of this report is to engage with Stewart's evidence, reasoning, and conclusions, and to provide, where possible, an alternate reading of the evidence in rebuttal. For reference, I will use Stewart's abbreviations for the three tracks in question: "Eminem Esque" (EE), "National Party  Election Ad" (NP), and "Lose  Yourself" (LY).

## STATEMENT OF OPINION

I have read Professor Stewart's report, listening to the recordings in question, and examined his transcriptions. While I do not find any errors of fact in Stewart's transcriptions or technical analysis, I do question his methodology. In my expert opinion EE, while clearly designed to have what Stewart calls a "sound-alike quality" with respect to Eminem's LY, does *not* infringe on it. Furthermore, NP, although derived from EE, is not identical to it, as Stewart claims, and EE is not necessarily implicated in any infringing relationship asserted to exist between NP and LY.

## PRECIS OF ARGUMENT

1. Stewart's report seeks to manufacture substantial similarity by appealing to an undefined notion of "core expression." His claim appears to be that because EE (and NP) use a number of the same stock musical devices as LY – even though, taken one by one, these devices are either (a) so generic as to be the common coin of the popular musical language or (b) altered so as not to be substantially similar – that the sum total of these *in*-substantial similarities crosses over to be substantial similarity. As a professional musicologist, I recognize the power of a "pattern of similarities" to stimulate academic discourse. But in the forensic analysis of copyright infringement, <u>I disagree that simply adding together multiple instances of non-infringement can create infringement</u>.

2. Furthermore, I disagree with Stewart's implicit claim that evidence of the intention to create a "sound alike" is *prima facie* evidence of infringement. This seems to me a radical claim that would lead to uncontrolled litigation and the closing down of future musical creativity.

3. I disagree that EE and NP equally "evoke the subjectivity and personal artistic expression of Eminem." This claim is based on a false notion of Eminem as the sole creator of the tracks that appear under his name. Marshall Mathers worked with a production team (Bass Brothers) to produce LY, and it is highly unlikely that he personally created the instrumental backing for the rap. I would submit that Eminem's "personal artistic expression" inheres largely in his distinctive personal contribution to LY: the lyrical content and flow of his rapping. Since none of Eminem's lyrics or rapping appear in EE or NP, Stewart's claim seems overstated to me.

4. The absence of *any* vocal track (or tracks) also distinguishes EE from NP, making their relationship more complicated than the simple identity that Stewart claims. Given that LY also contains spoken word performance, the presence of spoken vocal material in NP may well increase its apparent similarity to LY.

In this report, I will first deconstruct Stewart's argument by reconsidering, *on its own terms,* each of the seven "essential elements" he identifies as adding up to substantial similarity. I will argue that none of them, individually, rise to the level of substantial similarity. I will then move on to larger and more abstract claims about "sound-alikes" and "personal expression." I will finish by considering the relationship between EE and NP, the role of vocals, and each track's measure of similarity to LY.

## 1. The Seven "Essential Elements"

Stewart identifies seven "essential elements" in the instrumental accompaniment to LY that he claims also occur in EE and NP. I will consider each in turn, evaluating both the claims of similarity and distinctiveness.

### 1.1. Guitar part.

As Stewart's own transcription shows, there are clear differences between the guitar parts in LY and the corresponding parts in EE and NP. These are minor, but real:  in LY, eight repeated dyads [d-a] are followed by four [d-g] and four [d-b$^b$] dyads; in EE and NP, the opening [d-a] is interspersed with single note [d], there is no [d-g] dyad, and the [d-b$^b$] dyad is both interspersed with single note [d] and decorated by a triplet "tag" at the end of the phrase. (Note this final detail; it will come up in the discussion of element #2.)

These are minor details, to be sure. But unless one works at this level of detail, the first element is just a power chord on D (tonic minor) followed by the minor subdominant (Gm/D). This i-iv progression, where the fifth of the tonic rises to the third of the subdominant [a-b$^b$], is completely normative as a diatonic progression in the minor, and, realized as slightly palm-muted power chords on the electric guitar, appears in dozens, if not hundreds of songs. An obvious piece of prior art here – which is as similar to these tracks as they are to each other – is the opening of the very famous riff from Led Zeppelin's "Kashmir," which begins in precisely the same way. Examples of prior art could be multiplied as necessary to make the point, which is that the guitar part here is a common

idea, with not enough distinctiveness in its realization to be anybody's "personal expression." And if one tries to identify distinctive personal expression by taking it in detail, note for note, it turns out *not* to be that similar, taken note for note.

## 1.2. Bass part

The bass part is a pseudo-similarity that is merely the effect of extreme generic-ness. All three tracks in question use a series of repeated [d]s in the bass, as do literally tens of thousands of other compositions from the 18th century to the present day. As with the guitar part, there are small differences in octave, but the key point is that there is nothing distinctive about this gesture, which is simply the most basic rhythmic activation possible of a single pitch. Unless one accepts that a single bass tone is copyrightable, one must accept that this "essential element" is part of the common coin of music.

Stewart focuses on what he calls a "characteristic flick" at the end of the bassline, in which the last full beat is activated by an "extra" triplet upbeat. Since both LY and EE do this, he points it out. But I'll note that when considering essential element #1, the guitar part (see above), he does *not* point out this "flick," because LY and EE *do not* share it. If the presence of the flick in both tracks is evidence of similarity in the bass part, then surely its presence in one and absence in the other is evidence of dissimilarity in the guitar part?

Another thing left unmentioned is that EE adds two new bass pitches on the flick. Again, a minor difference, but since we are being asked to accept that the regular reiteration of a single note can be "essential," it should be important when that single note is actually changed at the end of the cycle, *which happens only in EE.*

(A methodological observation:  if a musicologist has to crank up the analytical magnification this high to make their case, they need to pay attention to every bump and crevice that shows up when they zoom all the way in. I don't believe you can pick and choose to make your case.)

## 1.3. 16th-note triplet "flicks"

I would argue that the flick *itself* is also generic:  adding an upbeat note to lead back into the repeat of a cycling riff is a simple piece of compositional craft that thousands of popular (and classical) musicians have executed intuitively for hundreds of years. Especially with respect to the drum kit, it would almost be more distinctive if such an upbeat stroke had been left out.

## 1.4. "iconic" piano part

There is no generally accepted musicological definition of "iconic," so it is not clear to me what claim Stewart means to make about the little piano lick that is element #4. This short piano figure is not *quite* as generic as the other elements that Stewart enumerates, but it is still quite simple and common. It is true that the lick's rhythmic profile and

3

metric placement in LY and EE are very similar. As for the pitches, it is true that only a single note is different. But that one note is very important. In LY, the piano lick jumps up from the tonic [d] to the dominant scale degree [a], which is then decorated by upper and lower neighbor notes:  [a (b$^b$) a (g) a]. In EE, the leap up is from the tonic [d] to the flat seventh scale degree [c], a much more uncommon move. The [c] then descends through [b] to the fifth [a], which is decorated by a lower neighbor:  [c (b) a (g) a]. The "sound" of a minor seventh against the tonic is quite distinctive, and appears *only* in EE; also, the piano figure in EE outlines a falling third [c-a], while the figure in LY simply decorates the single pitch [a]. Again, these observations may seem very fine-grained, but given the basic and generic nature of the material we are evaluating, even small differences stand out.

### 1.5. sustained strings

In my discussion of element #2 above, the bass, I noted that the bass part in both LY and EE was little more than a minimally-rhythmized presentation of a single note, and thus very hard to understand as something that could be protected by copyright. In pointing to the sustained string part in LY as something that could be part of an argument for substantial similarity, Stewart approaches the *reductio ad absurdum* of arguing that a single sustained note can be the basis for a similarity claim. If this is accepted, then, in principle, almost any composition can be understood to infringe on any other.

Stewart notes, with no discussion, that "EE eventually contains some different pitches." Yes, it does – and that seems quite significant to me. The idea of "sweetening" a mix with sustained strings cannot be copyrighted, so one's claim about a sustained string line must, I would argue, be based on the actual notes used to sweeten with. Here they are different, and thus the string parts do not support an argument for substantial similarity.

### 1.6. drum part

Stewart admits that "the drum parts used in each of these compositions are not unique to them." In fact, the drum part used in EE/NP is so conventional and basic that it has the character of a drum "rudiment," *i.e.,* the kind of exercise one would assign to a budding percussionist to learn the basic technique of the drumset. This is the rhythmic equivalent of the basic scales that keyboard and melodic instrumentalists practice for hours on end: it is barely music, really more just the precondition for music to happen. Stewart then claims that this drum part is "nearly identical" to the one in EE:  "The only difference is a few extra kick or bass drum notes in LY."

With all respect to my musicological colleague, there is a great difference between "identical" and "nearly identical." (It is like the famous difference between "dead" and "mostly dead" in the classic movie *The Princess Bride.)* To gloss over the difference between the two drumset patterns as a matter of "a few extra kick or bass drum notes" is an analytical choice that raises the question:  *which distinctions are significant, and when?* I'll note again that all the material under consideration is very basic and simple, which means that even slight deviations in the realization of basic ideas *do* matter.

4

*1.7. synthesized brass*

Stewart has little to say about this element, so I will pass over it as well.

## 2. Part *versus* Whole

To summarize my discussion above:  each of Stewart's "essential elements," taken by itself, fails to support a claim of substantial similarity. Either the material is so basic and common as to be part of the general language (1, 2, 3, 5, 6) or, within the very basic nature of the material, there are small but real differences in realization (4, 5, 6); or both (5, 6).

To accept Stewart's conclusion, therefore, requires that the piling up of musical coincidences in various parts of the tracks' textures, none of which rise to the level of substantial similarity, somehow results in substantial similarity. Stewart asks us to focus on the *sum* of the similarity coefficients, when we should be looking at the *average*.

There are two ways Stewart's musicological report tries to "make" this happen, and I take methodological and logical issue with both of them:

2.1. By identifying a fixed number of "essential elements" of LY, and then arguing that "all" of them are present in EE/NP, Stewart implies that the simple fact of having all seven elements is itself a substantial similarity, over and above the similarity of the individual elements. There are two points to make in rebuttal:

(a) both the judgement that these elements are essential and the enumeration of precisely seven elements are Stewart's. Another musicologist might decide that there are five elements, or eight. And another musicologist might decide that not all of these elements are equally "essential." Finally, any musicologist would have to concede that the *most* essential element of LY is the vocal track, which has no analogue at all in EE. Stewart's "essential elements" appear to be an analytical tool used to maximize implications of similarity. Why else would the subtle use of backing strings be considered "essential" to the expression of LY, while the presence of a lead vocal track in the foreground is not?[1]

(b) even if one accepts Stewart's basic parsing of LY into elements, it would be highly unusual for any popular music track in the basic style of EE/NP not to use some of the same elements:  almost every pop-rock recording has a guitar part (1), a bass part (2), and a drum track (6), and most pop recordings use upbeat notes to lead into the downbeats (3). Not every track must have sustained strings (5) or a piano riff (4), but plenty do – and pretty much every track that has 4 or 5 also has 1, 2, 3, and 6.

---

[1] It should be noted that Stewart's somewhat Eurocentric claim that there is "little in terms of definite pitched melodic content" in LY's rap vocal does not accord with contemporary musicological analyses of hip-hop (see below), and leaves out key rhythmic and timbral aspects of vocal performance that are directly related to Eminem's "personal expression" in music.

Thus, to argue that the sheer coincidence of some subset of arbitrarily determined "essential" elements, about half of which appear in almost every piece of popular music, and that are, each taken individually, quite common and generic, constitutes a distinctive and thus substantial similarity, seems methodologically unsound in the context of copyright litigation.

2.2. Stewart's report assumes that the purpose of creating EE (and then the use of pieces of EE in NP) was to create what musicians call a "sound-alike" of LY. He further hypothesizes that any differences in the realization of basic musical ideas from LY in EE was the result of a deliberate attempt to avoid responsibility for copyright infringement:

> As can be seen in the above analysis, though some content has been slightly altered, all the core expression of the musical bed in LY has been replicated in EE. As the title to EE strongly suggests, this has been done in order to evoke the subjectivity and personal artistic expression of Eminem. [6]

> While some [elements] have been slightly altered, most likely in an attempt to avoid a copyright infringement claim, these elements are essential in establishing the "sound alike" quality the creator of Eminem Esque was striving for. [4]

I would not dispute these claims directly, although I would note that, methodologically speaking, objective determination of similarity through musicological analysis (the "extrinsic test") cannot, in itself, prove intent. (It is a long-held position in the aesthetics and criticism of art that to believe otherwise is to commit "the intentional fallacy.")

But there is nothing illegal about making one piece of music sound like another. Stewart's report comes close to arguing that where LY and EE are identical is infringement, and where they are different is – an attempt to *cover up* infringement, evidence of a guilty musical conscience.

As a professional musicologist with 30 years of experience, who has devoted a significant amount of his professional activity to researching the history of popular music, I can attest that the deliberate intention to make one piece of music sound like another is at the root of much original creativity in popular music. The fact that it is indeed possible to make one piece of popular music "sound like" another without infringing on it is due largely to the generic nature of much popular music expression:  many of the most evocative musical devices, like the blues chord progression, the ii-V-I turnaround in jazz and ragtime, the "shuffle" rhythm of boogie-woogie, the minor pentatonic scale, etc., belong to no one in particular. Thus it is possible, by identifying the generic elements at work in a given song, to use those same generic elements in a new song that evokes the earlier song for the listener, while avoiding note-for-note copying and the inherently distinctive and personal expression of original lyrics and (sometimes) vocal melody.

In my opinion, it is correct to note that EE tries to evoke a constellation of expressive elements that also appear in LY. But these elements are not the "personal expression" of the song's writers. What is evoked is a series of elements which are *impersonal.* They are stylistic conventions and musical tricks that have become the common coin of popular music. *And there is nothing wrong with that.* The authors of EE are to be congratulated for avoiding

6

direct copying, and for avoiding entirely the distinctive expression contained in Eminem's lyrics and rapping.

Thus I also disagree with the proposition that, because the underlying set of musical devices in LY, the "bed" upon which Eminem laid his rap, evokes and thus "sounds like" the bed of analogous devices in EE, that Eminem's "personal expression" is thereby infringed. This is effectively to argue that sound-alikes are themselves infringement, an argument that would criminalize one of the most deeply-rooted practices in popular music.

## 3. Are EE and NP 100% Identical? (Presence or Absence of Vocal Tracks)

Stewart considers in his report the relationship between EE, a library production track, and NP, the soundtrack for a political ad which, he argues, is completely built from pieces of EE. He then *goes on* to argue that any judgement that NP infringes on LY *must* also, logically, apply to EE:

> Every one of the 376 notes in NP are found in EE. If NP can be considered to infringe LY, then EE (as the earlier work and as the source for the entirety of NP) must be considered the original infringing work. Nothing in NP was added or changed in any substantive way from EE. The only changes were two short cuts in the first half of EE. [11]

This sounds like ironclad logic, but it obscures a key point. It may be true that every *note* found in NP is also in EE, but it is not true that every *sound* in NP is also found in EE. NP contains an independent vocal track:  a man's voice, speaking over – and in sync with – the beat laid down by the instrumental tracks derived from EE. Only by ignoring this additional speaking voice can Stewart claim that "100% of the musical sounds heard in NP are found in EE."

Stewart might argue that this is why he specified that EE and NP were 100% identical in terms of "*musical* sounds." Just talking over music, as happens in NP, isn't musical, is it?

I suspect that Eminem and his producers would disagree. It is generally accepted in contemporary popular music studies that the pitch and cadence of the speaking voice has an inherently musical character, and that the relationship between the pitch/rhythm of spoken passages in rap and the pitches and rhythms of the instrumental tracks underneath should be considered equivalent in importance to any other musical relationships. A book-length musicological treatment of spoken word performance in rap as a rhythmic musical practice has recently been published to general acclaim; cf. Mitchell Ohriner, *Flow: the Rhythmic Voice in Rap Music* (Oxford University Press, 2019). Ohriner gives Eminem a prominent place in his argument, and the book in fact contains an extended musicological discussion of Eminem's vocal track in LY (*Flow*, pp. 71-74).

Understanding rap vocals as both spoken language *and* a part of rap's musical texture is both responsible and culturally sensitive musicology. It also allows us to understand how EE and NP might differ in their relationship to LY.

Let me present the argument as a syllogism:

> **IF** as Ohriner and other experts argue, the overall expressive effect of LY comes from the synchronized combination of the musical qualities of the vocal track and the backing tracks;
>
> **AND IF** the overall expressive effect of NP comes from the synchronized combination of the musical qualities of the announcer's voice track and the backing tracks (otherwise why use backing tracks at all?);
>
> **AND IF** the absence of *any* vocal track in EE distinguishes it from both NP and LY;
>
> **THEN** it would be logically possible to argue that NP and LY *are* substantially similar (thanks to the effects of their distinct vocal tracks) while EE (which has no vocal track at all) and LY *are not.*

**Therefore, even in the presence of a legal opinion which holds that NP infringes on LY, I would argue that EE's relationship to LY must be considered separately, and that it is not necessarily infringing.** As I have noted above, the vocal track in LY is arguably the most "essential" element in that recording, and there is no corresponding vocal track of any kind in EE. The expressive effect of LY consists of the sum total of its musical elements *including the vocal.* NP *also has a vocal track,* which is part of the sum total of NP's expressive effect. EE has *no* such track, and thus, to a musicological ear, EE's expressive effect is (a) different than NP; (b) further away from LY.[2]

It seems to me that the creators of EE are not liable for the uses to which it is put. Given its new vocal track, NP may infringe on LY independently of EE, not simply by virtue of some prior instrumental similarity between EE and LY.


## EXHIBITS USED

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.


## LIST OF PUBLICATIONS

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.


## QUALIFICATIONS

I am Professor of Musicology and founding Chair of Music Industry Programs, as well as Associate Dean for Academic Affairs, in the UCLA Herb Alpert School of Music. I am a Past President of the US Branch of the International Association for the Study of Popular Music (IASPM-

---

[2] Note that this argument does not depend on the claim that the narration in NP is substantially similar in a musical way to the vocal track in LY. The sheer presence of a vocal track puts NP in a different, arguably closer relation to LY than EE.

US). I am the author of *Repeating Ourselves,* a study of American minimal music as a cultural practice (California, 2005) and lead editor of the award-winning collection *The Relentless Pursuit of Tone:  Timbre in Popular Music* (Oxford, 2018). I have published numerous widely-cited articles on popular music and analysis in prestigious academic journals, including the flagship journals of the American Musicological Society (AMS) and the Society for American Music (SAM). My scholarly work largely focuses on music after 1965, with particular attention to avant-garde music, popular music, and analytical techniques. I have taught at UCLA for over twenty years, and before that at the Eastman School of Music. I earned a Ph.D. in Music History and Literature from the University of California, Berkeley (1994) and an M.A. in Music Theory from the Eastman School of Music (1988). I have been the recipient of the Kurt Weill Prize (best work on musical theater, Weill Foundation), the Ruth Solie Prize (best edited collection, AMS), and a Stanford Humanities Fellowship (1998-99). In 2006 I was Visiting Associate Professor of Music at Yale University, my alma mater (B.A. in Music, 1983). I have provided expert testimony and forensic musicological consultations for almost 20 years, and am currently working with industry professionals on a concentration in forensic musicology for the UCLA Music Industry program.

## COMPENSATION

I  have been engaged for this assignment at a rate of $350 per hour for this report. Moving forward, for any deposition testimony and/or trial testimony, my hourly billing rate will be the same, plus travel expenses and time. The amount of fees is not contingent upon the opinions expressed herein or on the outcome of  this matter.

## LIST OF CASES

*Eight Mile Style LLC v New Zealand National Party* [2017] NZHC 2603

RICKEY ALLEN v. DESTINY'S CHILD, ET. AL. Civil Action No. 06-CV-6606

My report, with supporting exhibits, is contained herein, and presents a summary of my  opinions and the bases and reasons therefore as of this date. To the extent any additional information is produced by either party, I will be prepared to incorporate any such additional information into my report, or otherwise to amend or supplement my report as appropriate. This report is to be used only for the purpose of this litigation and may not be published or used for any other purpose without prior written consent.

Respectfully submitted,

Robert Fink, Ph.D.
rfink@humnet.ucla.edu
310.743.6666

Exhibits Attached Herein:

Exhibit A        CV of Robert Fink, Ph.D.

The undersigned hereby certifies that, on July 23, 2021, I served the     EXPERT REBUTTAL REPORT OF ROBERT W. FINK, PhD. and these related files:

1) 01 Lose Yourself.mp3
2) 100.%20%20Judgment-%2025%20October%202017
3) Dr_Eskelin_Report
4) eminem esque_1
5) EXPERT%20REPORT%20OF%20ALEXANDER%20STEWART%2C%20PH.D.%20LLC
6) Latest Fink CV (06-2021
7) National Party Election Video

on the following parties:

Heather L. Blaise                          Counsel for Plaintiff Beatbox Music Pty,
Blaise & Nitschke, P.C.                    Ltd.
123 N. Wacker, Suite 250
Chicago, IL 60606
E-mail: hblaise@blaisenitschkelaw.com

Daniel L. Jacobson                         Counsel for Defendant Michael Cohen
Ronak Patel
Jacobson & Associates
315 Centennial Way
Tustin, CA 92780
dlj@jacobsonlawyers.com
rp@jacobsonlawyers.com

■       by electronic mail at the address(es) listed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 23rd day of July, 2021, at Hillsboro, Oregon.

/s/ J. Curtis Edmondson
J. Curtis Edmondson