

Planet Depos®
We Make It *Happen*™

# Transcript of Robert W. Fink, Ph.D.

**Date:** August 10, 2021
**Case:** Beatbox Music Pty, LTD. -v- Labrador Entertainment, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT

**B**

**1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE CENTRAL DISTRICT OF CALIFORNIA

3    - - - - - - - - - - - - - -x

4    BEATBOX MUSIC PTY, LTD.,   :

5         Plaintiff,        :

6    -v-                     : Case No.: 2:17-cv-6108

7    LABRADOR ENTERTAINMENT,   :
     INC., d/b/a Spider Cues
8    Music Library, a          :
     California Corporation;
9    NOEL PALMER WEBB, an       :
     individual; MICHAEL
10   COHEN, an individual;      :
     LABRADOR ENTERTAINMENT,
11   LLC; MCPC HOLDINGS, LLC;   :
     WEBB FAMILY TRUST, and
12   DOES 1-20,                 :

13        Defendants.        :

14   - - - - - - - - - - - - - -x

15       Deposition of ROBERT W. FINK, Ph.D.

16            Conducted Virtually

17         Tuesday, August 10, 2021

18             12:14 p.m.

19

20

21

22

23   Job No.: 391251

24   Pages: 1 - 84

25   Reported By: Brooklyn E. Schweitzer

**2**

1       Deposition of ROBERT W. FINK, Ph.D.

2    conducted virtually.

3

4

5       **ALL PARTIES ATTENDED REMOTELY.**

6

7

8       Pursuant to Notice, before Brooklyn E.

9    Schweitzer, Court Reporter and Notary Public in

10   and for the Commonwealth of Pennsylvania.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**3**

1              A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4       HEATHER L. BLAISE, ESQUIRE

5       BLAISE & NITSCHKE, PC

6       123 North Wacker Drive,Suite 250

7       Chicago, Illinois 60606

8       (312) 448-6602

9

10   ON BEHALF OF THE DEFENDANTS:

11      J. CURTIS EDMONDSON, ESQUIRE

12      EDMONDSON IP LAW

13      15490 NW Oakhills Drive

14      Beaverton, Oregon 97006

15      (503) 336-3749

16

17   -and-

18      DOUGLAS J. ROSNER, ESQUIRE

19      LAW OFFICES DOUGLAS JOSEPH ROSNER

20      2625 Townsgate Road, Suite 330

21      Westlake Village, California 91361

22

23   Also Present:   Alexander Stewart

24               Peter Baker

25               Thomas S. Key

**4**

1              C O N T E N T S

2    EXAMINATION                          PAGE

3      By Ms. Blaise                        5

4

5

6              E X H I B I T S

7    EXHIBIT                              PAGE

8    Exhibit A      Report                 12

9    Exhibit B      Memo                   12

10   Exhibit C      Judgment               51

11   Exhibit D      Supplemental Report    65

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**5**

1         P R O C E E D I N G S
2              ROBERT W. FINK, PH.D.,
3         was called, and having been duly sworn,
4              testified as follows:
5              DIRECT EXAMINATION
6   BY MS. BLAISE:
7       Q  Hello, Dr. Fink.  How are you?
8       A  Great.
9       Q  Great.  Can you state and spell your name
10  for the record?
11      A  Sure.  I am Robert Fink, that's
12  R-O-B-E-R-T F-I-N-K.
13      Q  Great.  And you have a PhD; is that
14  correct?
15      A  Yes.
16      Q  And what is that in?
17      A  Technically it's a -- it's a doctor of
18  philosophy and the specialization is music history
19  and literature from the University of California.
20      Q  Great.  And have you provided your
21  deposition testimony before in any case?
22      A  Yes, I have -- I have done a deposition
23  before, yes.
24      Q  Okay.  And has that only been in the
25  context as a retained expert?

**6**

1       A  Yes.
2       Q  Okay.  And so you're familiar with some of
3   the ground rules that --
4       A  It has been a while.
5       Q  Okay.
6       A  I mean, so -- yes, but I have done it
7   before.
8       Q  Okay.  I'll go through them with you, and
9   it's a little bit even different when we're doing
10  it via Zoom.  So we obviously are all in different
11  places, and the court reporter is still taking
12  down everything that we're saying, so I'll ask
13  that you let me finish my question before you
14  begin to answer and that all of your answers be
15  audible rather than head shaking or -- or uh-huh,
16  huh-huh.  So if you can say yes or no; is that
17  fair?
18      A  Yes.
19      Q  Great.  And if there's a question that you
20  don't understand the way that I ask it, I'll be
21  happy to rephrase it for you if you ask;
22  otherwise, I'll you assume that you understood it.
23  Is that fair?
24      A  I understand.
25      Q  Great.  Okay.  When were you retained as

**7**

1   an expert in this case?
2       A  Well, in terms of the current report, that
3   was in July of this year.
4       Q  Okay.  When you say "current report," was
5   there a prior report that you were retained on in
6   this case?
7       A  There was.  There is another short memo, I
8   guess you can call it.  I didn't receive it as a
9   formal report.  That was a number of years ago, I
10  think.
11      Q  And who -- has that memo been turned over?
12  Was that attached to your report in this case?
13      A  I don't know that I physically attached it
14  to the report that I sent it to the lawyers, but
15  it does appear to have been part of the record.
16      Q  In this case?
17      A  In some case.
18      Q  Okay.
19      A  I will admit to you, yeah, I'm not
20  completely familiar with all of the ins and outs
21  of the various litigations.
22      Q  Okay.  So when I say "this case," I'm
23  referring to Beatbox Music Party, LTD, versus
24  Labrador Entertainment, Inc., d/b/a Spider Cues
25  Music, et al., which is pending in the Central

**8**

1   District of California under Case No. 2:17-cv-6108
2   MWF.
3       A  Okay.
4       Q  Have you prepared -- so was that memo
5   prepared in the case that I just mentioned, or was
6   it prepared in another case, if you know?
7       A  Well, let me, if I may, ask a clarifying
8   question.  How old is the case you're referring
9   to?
10      Q  This case was filed in 2017.
11      A  I think this memo was actually previous to
12  that.
13      Q  Okay.  And who -- who hired you to prepare
14  that memo?
15      A  I can -- I can --
16      Q  The previous memo?
17      A  I can look -- I mean, I -- I would have to
18  go look.
19      Q  Okay.
20      A  Which I can.
21      Q  Did you provide any testimony as it
22  related to your previous memo?
23      A  No, I did not.
24      Q  How long have you worked in the context of
25  music copyright?

**9**

1     A  Music copyright, I would say over ten
2  years, off and on.
3     Q  And from your CV, there's -- from your CV,
4  there's a list of cases which include Eight Mile
5  Style, LLC, versus New Zealand National Party,
6  2017 NZH -- of NZHC 2603, and Rickey Allen versus
7  Destiny's Child.  Is that a complete list of the
8  cases that you've provided expert testimony on?
9     A  Yes.  Most of the copyright work that I
10  have done has tended to be more consultive and
11  working with sometimes corporations or musicians.
12  So those are the ones that actually were in the
13  context of a court proceeding, that went --
14     Q  Okay.
15     A  -- to court.
16     Q  So more like clearance issues?
17     A  Yes.  In some cases, evaluating tracks
18  prior to publications.
19     Q  Sure.
20     A  Things like that.
21     Q  So doing kind of like a due diligence
22  musicologist report?
23     A  Yes, and sort of advising people, insofar
24  as you can, their exposure to risk.
25     Q  Sure.

**10**

1     A  And let me just -- you know, I will state
2  my primary employment is as a professor at UCLA,
3  so that's a full-time job.
4     Q  Understood.  Do you recall which side your
5  memo was for in the prior case, your prior memo?
6     A  You mean having to do with this set of
7  material?  What I do immediately remember is that
8  it is substantially the same opinion.  It's
9  unlikely that it was asked for by the opposite
10  side.  So I think I was on the same side.
11     Q  So you think you were on the defense side?
12     A  Mm-hmm.
13     Q  Do you -- do you recall if Labrador was
14  your client at that time?
15     A  I don't really focus on that sort of
16  business names.  You know, I -- I do believe that
17  it was Doug Rosner who contacted me, or somebody
18  working with him, but --
19     Q  Okay.
20     A  Yeah.  I mean, I can go -- I certainly can
21  try to review the invoice to see who got billed.
22     Q  Yeah.  That's -- it's actually super
23  important.  So if you have access to it, we can
24  take a brief break.
25     A  Yeah, let me -- I can pull that up.

**11**

1     Q  Okay.
2     MS. BLAISE:  We can go off the record.
3     (A recess was taken.)
4     MS. BLAISE:  While we were off the record,
5  counsel for Labrador, Douglas Rosner, indicated
6  that he was going to send me the memo.
7     MR. ROSNER:  Yeah, I'm sending it to you.
8  Tell me when you get it.  And by the way, I don't
9  think I was the lawyer at the time, just to be
10  clear.
11     THE WITNESS:  Okay.
12     MR. ROSNER:  It looks like it was
13  prepared, I believe, 10/8/14, and I was not on the
14  case, just to be clear.  Tell me when you get it,
15  Heather.
16     MS. BLAISE:  I've received it.  Was this
17  turned over in discovery?
18     MR. EDMONDSON:  Do you want to mark it as
19  an exhibit, Heather, if we're going to ask
20  questions about it, and share it?
21     MS. BLAISE:  I mean, I haven't even had a
22  chance to review it, but yeah, we should go ahead
23  and mark it as -- I was going to mark the actual
24  complete report, which Madam Court Reporter should
25  have, as Exhibit A, so we could mark this as

**12**

1  Exhibit B.
2     (Exhibits A and B were marked for
3  identification and are attached to the
4  transcript.)
5     (A discussion was held off the record.)
6  BY MS. BLAISE:
7     Q  Okay.  Do you know who the report was
8  prepared for, Dr. Fink?  It is Dr. Fink; right?
9     A  I mean, you can -- you can call me
10  professor.  There's been a certain amount of
11  controversy about whether you should call people
12  like me doctor, but I'm happy to be referred to
13  that way.
14     Q  I won't come to you for a diagnosis, but I
15  don't mind calling you doctor.
16     A  I'm not a real doctor, but that was a lot
17  of years ago.
18     MR. EDMONDSON:  Heather, just for clarity
19  of the record, you've talked about a report.  I
20  don't know if we're referring to Exhibit A or
21  Exhibit B.
22     MS. BLAISE:  Sure.  Let me clarify that.
23  BY MS. BLAISE:
24     Q  Exhibit -- we're actually calling it a
25  memo, so we'll continue -- for consistency's sake,

**13**

1 we'll refer to it as a memo. Do you know who this
2 memo was prepared on behalf of?
3 **A I don't -- you know, I'm not seeing it,**
4 **right, so --**
5 Q Let me -- let me screen share for you.
6 Actually, Thomas will do it, because I will
7 probably crash Zoom if I try to do it myself.
8 Can you all see it?
9 **A Yeah, I can see it. As is obvious, it was**
10 **a somewhat -- it was -- I don't know if I would**
11 **characterize it as informal, but it was not a**
12 **formal sort of legal document, so I didn't call**
13 **out exactly who I wrote it for. So, no, I do not**
14 **remember.**
15 Q Do you have -- so were you paid for this
16 memo?
17 **A Yes.**
18 Q Do you have records that would show you
19 who paid for it?
20 **A Well, that was what I was looking for, and**
21 **now I have been helped to find the exact sort of**
22 **date that this happened. I can -- let me see if I**
23 **can pull up -- have a better job getting the**
24 **invoice.**
25 Q Okay. So then we'll go off the record

**14**

1 again, and you just let us know when you're ready
2 to go back on, when you've found it.
3 **A Okay.**
4 (A discussion was held off the record.)
5 MR. EDMONDSON: So, Heather, I don't think
6 your notice requested any documents in connection
7 with this deposition, and I want to just make it
8 clear that Mr. -- Dr. Fink is searching for these
9 records voluntarily, but he's not under any legal
10 compulsion to provide them to you, so if he's not
11 able to find them, you know, my objection stands.
12 MS. BLAISE: And your objection is as to
13 the notice?
14 MR. EDMONDSON: Well --
15 MS. BLAISE: You didn't actually state the
16 objection.
17 MR. EDMONDSON: But, you know, it is what
18 it is.
19 MS. BLAISE: Okay.
20 MR. EDMONDSON: He wasn't -- he wasn't
21 subpoenaed with a Rule 45 subpoena, so there's
22 nothing -- this is a deposition, not a document
23 inspection request. But, you know, we can move it
24 forward, obviously.
25 MS. BLAISE: I just wanted to clarify what

**15**

1 the objection was, but it's based on the fact that
2 it's not a document request subpoena for the
3 purposes of the record.
4 MR. EDMONDSON: Yeah. Dr. Fink was never
5 served with a Rule 45 subpoena requesting records,
6 but we're here in a depo. He's happy to look for
7 it, I guess. If he can find it, that's fine with
8 us. You're paying for his time.
9 MS. BLAISE: Okay. Thanks.
10 So back off the record.
11 (A discussion was held off the record.)
12 THE WITNESS: I can tell you I do not find
13 an invoice on a preliminary search that would tell
14 me who exactly that was written for, and I'm --
15 you know, rather than speculate who the interested
16 party was, I don't know.
17 BY MS. BLAISE:
18 Q Do you have any personal or professional
19 relationship with Sharon Consulo Web?
20 **A Not to my knowledge, no.**
21 Q Do you know who she is?
22 **A Could you say the name again, please?**
23 Q Sharon Consulo Web? Am I saying it wrong?
24 **A No, I don't immediately recognize the**
25 **name.**

**16**

1 Q I want to go back to your prior testimony
2 a little bit. You had provided the two cases as
3 the list of cases that you've worked on.
4 **A Mm-hmm.**
5 Q And I know you said you do a lot of
6 clearance and due diligence work, but those are
7 definitely the only two cases you've provided an
8 expert opinion on; is that correct? By "cases," I
9 mean actual lawsuits.
10 **A Yes. To the best of my recollection,**
11 **those are the only two cases that ever, you know,**
12 **went to anything like a trial where I did a**
13 **deposition or did a formal report.**
14 Q Are you aware if both of those cases went
15 to trial?
16 **A I am -- I'm pretty sure that neither of**
17 **them went to a trial, that they were settled.**
18 Q Did you provide your deposition testimony
19 in either of those cases?
20 **A Yes, I did. In the -- I guess it's Rickey**
21 **Allen or the Allen case about Cater 2 U, that one**
22 **I did do a deposition.**
23 Q Were you retained by the plaintiff or the
24 defendant in that case?
25 **A The plaintiff.**

17

1     Q  Do you know if there was a motion for
2  summary judgment in that case?
3     A  I do not.  I do not know the details of
4  how the litigation turned out.
5     Q  What percentage of your income is derived
6  from providing testimony?
7     A  Let me do a quick calculation.
8      I would say there have been years in which
9  that percentage is zero, and certainly I don't
10  think it ever rises to 10 percent.  It's usually
11  in the 2 to 3 percent.
12     Q  Are there any cases that you've worked on
13  that have not gone to trial?
14     A  Could you please define a "case"?
15     Q  Yes.  Earlier you testified that these are
16  the only two cases you know of that have gone to
17  trial, so by "case," I mean a case where there's
18  actually a filed lawsuit pending in any
19  jurisdiction where there's a case number.
20     A  I will tell you that that's not usually
21  how I categorize these things.  I have written
22  reports of more or less formality, so I guess in
23  my mind I definitely have done a lot of work where
24  I'm very clear that what I am writing is not --
25  would not be suitable for submission to a court of

18

1  law.  There are a lot of times where I've written
2  a report where I say, okay, this is at that level
3  of formality, but I don't normally keep track of
4  whether that's done.  Do you know what I'm -- does
5  that make sense?
6     Q  Sure, I understand.
7     A  So there may be cases in which I wrote a
8  report that was pretty formal, and then it did get
9  submitted in a proceeding.  They never asked me to
10  come back and testify or do a deposition, and so I
11  might not either have been aware of it or remember
12  it.
13     Q  Sure.  So do you have a recollection of
14  how many, let's say, claims where there's adverse
15  interests, where there's known adverse interests
16  that you've been involved in as opposed to kind of
17  just risk assessment generally?  If you understand
18  my question.  I can try to rephrase it if you
19  don't understand it.
20     A  I think I do get the distinction.  I don't
21  think I'm going to be able to give you a specific
22  number, you know, just off the top of my head.
23  That happens relatively rarely.  I would say the
24  majority of what I've done over the last, you
25  know, 15 or so years, getting closer to 20 years,

19

1  has been this sort of consultive stuff where the
2  reports are what I consider to be preliminary or
3  advisory.
4      There are -- probably five or six
5  occasions would be an approximation where I wrote
6  up something much more formal, which would have
7  been suitable to be submitted as expert testimony.
8     Q  Sure.  What is your understanding of
9  what's embodied in forensic musicology?
10     A  Okay.  The usage that you're making there
11  of "embodied" is a little odd to me.  Are you
12  asking for a definition of the practice of
13  forensic musicology or --
14     Q  What is forensic musicology as you
15  understand it?
16     A  To my mind, forensic musicology is the
17  deployment of music theoretical and musicological
18  expertise in the context of -- of attempting to
19  determine a matter of, I guess, fact or opinion
20  that's relevant to a legal issue.
21     Q  And do you consider yourself a forensic
22  musicologist?
23     A  When I am hired to do that, yes.
24     Q  And in this case, do you consider yourself
25  to be a forensic musicologist?

20

1     A  Yes, I do.  What I did in this report I
2  think would fall under the definition of forensic
3  musicology.
4      If I can also additionally say, I'm not
5  aware that there is any formal definition of
6  forensic musicology or any credentialing body.  It
7  is -- there's really -- there's no -- there's no
8  generally accepted definition of forensic
9  musicology.
10     Q  Can you go through your educational
11  background from your bachelor of arts?  I'm
12  assuming without looking at your CV.
13     A  Yes, it was a bachelor of arts.  I was --
14  I was prepared today go back to my fourth grade
15  teacher, but yes.
16     Q  That won't be necessary.
17     A  I mean, I have a -- I mean, I was pretty
18  good in --
19     Q  Hot Cross Buns on the recorder, is that
20  where it all started?
21     A  Yes, and, you know, the xylophone and
22  things like that.  I have a bachelor's of art in
23  music from Yale University, which I graduated in
24  1983, got summa cum laude from my degree.
25      I then have a master of arts degree in

21

1 music theory from the Eastman School of Music at
2 the University of Rochester, which was awarded in
3 1988, I believe. And then the PhD from the
4 University of California at Berklee, which, as I
5 said, is technically in music history and
6 literature, and I can give you more details about
7 that of who my thesis supervisors were and the
8 like if you want.
9 Q That won't be necessary. And what -- can
10 you give me a history of your professional
11 experience starting from your first music-related
12 position?
13 A Yes. In 1992, I was hired as, I believe,
14 a lecturer and then an assistant professor at the
15 Eastman School of Music in the department of
16 musicology, and I held that position until I
17 applied for and was appointed as an assistant
18 professor at UCLA, where I have been ever since.
19     And at UCLA I achieved tenure, so I became
20 an associate professor and have moved up the
21 ranks. I am now a full professor. I have been
22 chair of the musicology department, and I am
23 currently chair of the programs in music industry
24 at UCLA as well as the associate dean in the
25 school of music for academic affairs.

22

1     Those are my -- those are my teaching
2 positions where they pay me. I've also had some
3 other professional roles within the field of
4 musicology which are more in the nature of service
5 positions, which I can tell you about.
6 Q Please do.
7 A I have -- probably the one most relevant
8 is I served as the president of the United States
9 branch of the International Association for the
10 Study of Popular Music, known as IASPM-US. I was
11 in a leadership position in that organization for
12 a number of years.
13     I have served on the board for various
14 committees for the American Musicological Society,
15 and I am a member of a number of other
16 professional societies. I have published one
17 single automolograph of contemporary music and
18 edited a collection on popular music, tone and
19 timbre on popular music. That collection won a
20 prize from the American Musicological Society.
21     So I've done -- or published numerous
22 articles on a number of topics, including popular
23 music from the 1960s to the present, contemporary
24 art, music, issues of analysis, and more kind of
25 philosophical issues in -- in music.

23

1 Q All the articles that you just mentioned,
2 did you provide citations to --
3 A Yeah. Everything should be listed in my
4 CV.
5 Q Great.
6 A Which provides as complete as I can make
7 listing of all of my published work.
8 Q Is your -- is your background in music
9 performance based or composition based?
10 A No. I would say my background is academic
11 in the sense that it is -- it's based in music
12 analysis and music criticism and music history, as
13 well as actually doing the more esoteric things
14 like symbology of a musical text and archival
15 research. I do perform.
16 Q What do you play?
17 A My main instrument -- and that really does
18 go back to my elementary school years -- is the
19 piano, so -- and I also play, at varying levels of
20 expertise, the guitar, and I will say this on the
21 record, the banjo. I admit to that. So I play a
22 number of popular music instruments.
23     And I also have been a singer, mostly in
24 the classical style -- mostly in choral
25 situations, not a soloist -- for a long time.

24

1 Q Do you write music at all?
2 A Not professionally, no. Or even -- no.
3 I'm not a composer. I would not characterize
4 myself as a composer at all.
5 Q Do you have any professional experience
6 performing? In other words, have you ever been
7 paid to perform?
8 A Yes.
9 Q And is that on the piano or on all of the
10 aforementioned --
11 A Well, I will state on the record no one
12 has ever paid me to play the banjo. But certainly
13 I have played piano in various -- both kind of
14 utilitarian and sometimes for money. I have sung
15 in professional situations. Yeah, I think it's
16 mostly those two.
17 Q Okay.
18 A And as an academic, I may add I performed
19 in a lot of academic situations where one wasn't
20 getting paid, but the context was pretty serious.
21 So, you know, in context of classical or
22 contemporary music where you're in a volunteer
23 group or a UCLA-sponsored thing.
24 Q And the genre of music that you have
25 performed professionally, would that be popular

25

1  music?
2      A  That would have mostly been in the
3  classical style.  I have not -- I would not
4  characterize myself as having had any professional
5  career performing popular music with the one
6  exception of a very small number of occasions
7  where I have been a DJ for various types of dance
8  performances.
9      Q  Got it.  How would you define the
10 term "original" in the context of music copyright?
11     A  In the -- okay.  Original.  Let me say in
12 answer to that that in my professional academic
13 work, I am not hugely involved in the notion of
14 originality, but my understanding of this in the
15 copyright arena is that it is a separate issue
16 from similarity and that originality does not mean
17 necessarily highly distinctive and instantly
18 recognizable as special.  Right?
19 Originality is -- to my understanding of copyright
20 law -- is something that somebody did themselves.
21     Q  And how would you define the
22 term "fragmented literal similarity"?
23     A  I'm sorry.  That got a little garbled.
24 Could you just --
25     Q  Fragmented literal similarity?

26

1      A  Fragmented literal similarity?
2      Q  Mm-hmm.
3      A  I would have a hard time defining that as
4  a singular concept.  I mean, I can certainly
5  define each of the words.
6      Q  In the context of music copyright, if you
7  can do your best at how you would define them.
8      A  Okay.  Like I said, I am -- if that is a
9  generally accepted term, all three of those words
10 used for any single thing, I am not familiar with
11 what it is.  Similarity is a very complex concept
12 in copyright.  I think there are multiple and
13 different tests for attempting to ascertain it,
14 and I think it provides employment for people with
15 musicological training to attempt to use their
16 skill and experience to make a judgment of
17 similarity.
18     Fragment is pretty clear-cut.  In the
19 musicological -- in the world of music,
20 fragmentation usually takes place in time, so
21 you're talking about something which you imagine
22 as having been sequential at one point or in some
23 way of looking at a piece of music which is then
24 presented out of sequence or broken up in time.
25     Literal, if I were to see that in the

27

1  concepts of music copyright, I would assume what
2  that meant is in a more kind of concrete language
3  note for note.  So literal means you can actually
4  draw straight lines between -- it wouldn't only
5  have to be notes insofar as what they are, which
6  is a separate definition, but some sort of musical
7  structure or maybe even you could call it an event
8  that you could draw a one-to-one line between two
9  things.  That would be literal.
10     As I said, let me just reiterate, those
11 three words together don't -- don't seem like a --
12 it's not a term that I have seen a lot, or perhaps
13 ever seen.
14     Q  Does originality, as you understand it,
15 indicate that the work was not copied?
16     A  Well, what I would say as a musicologist
17 is that it is only very rarely -- and there are
18 complex chains of inference that have to be made
19 that are able to actually able to have an opinion
20 as to whether something was actually copied.
21     That's what I understand the concept of
22 similarity to be doing in these cases, is that you
23 can talk about a similarity, whether substantial
24 or some degree of similarity, without making any
25 inference about how that similarity came to be,

28

1  whereas copying is something that someone does
2  where, in most cases, you are not being asked to
3  talk about what we in the business call
4  the "creative process."
5      So it would be conceivable for a
6  musicologist about whether something was copied
7  from one human being to another thing, but we have
8  to have specific evidence that speaks to that.
9      And so I would think that one could -- so
10 I would say that both of those terms are terms
11 that I tend to bracket off, shall we say.
12 Normally I feel I'm being asked about the
13 similarity of two musical texts as opposed to the
14 notion of originality across the world, across the
15 world of musical compositions.  That's a separate
16 question.
17     And as for copying, in general, I don't
18 assume that I know that unless I've specifically
19 attempted to muster either -- either to get
20 information about it, or it is possible sometimes
21 to make a chain of inferences from characteristics
22 of a musical texts to what you hypothesize
23 happened, but whenever I do something like that,
24 if I do, I try to be very clear that it's a
25 musical inference.

29

1    Q  You would agree that originality, as the
2  term is used, in musicology refers to a copying?
3    **A  Can you -- I think I know what you're**
4  **saying there, but can you rephrase that?**
5    Q  Sure.  Do you -- do you agree that the
6  term "originality," as it's used in the forensic
7  musicology industry, refers to a copying of a
8  prior work or the lack thereof?
9    **A  That's what -- thank you.  I don't think**
10  **that those two have any obvious one-to-one**
11  **relation; that it would be possible to have**
12  **someone consciously attempt to avoid copying and**
13  **yet produce something that was not original.**
14    **So I don't think -- to me, those are --**
15  **that's a dangerous area where it's easy to**
16  **assume -- you understand motives or -- or you**
17  **actually understand what happened when all you're**
18  **presented with is musical texts.**
19    Q  Okay.
20    **A  Yes.**
21    Q  So as I understand your testimony, you're
22  saying there's a lot of factors potentially that
23  go into determining originality?
24    **A  Yes.  I guess if I can --**
25    Q  Okay.

30

1    **A  -- say, to me, copying is a thing that**
2  **people might or might not do.  Originality is a**
3  **judgment people make about a work of art.  Those**
4  **two things -- there are many factors which would**
5  **have to be taken into account if you attempted to**
6  **link those things.**
7    **I think at some point in the report that I**
8  **presented I made mention of what's called the**
9  **intentional fallacy that shows up in art and**
10  **literature criticism, that it is -- it is tempting**
11  **a lot of times to believe that you know people's**
12  **intentions or you can infer their intentions or**
13  **what they actually did from the simple evidence of**
14  **the final musical texts.**
15    **People who are musicologists, especially**
16  **historical musicologists -- in other words, people**
17  **who deal with older music -- are trained to be**
18  **very careful about what they can say based on the**
19  **evidence they have about what people do, and we**
20  **learn over and over again that the most logical**
21  **inference, what it seems like based on this final**
22  **product, that this person must have done,**
23  **sometimes that turns out to be wrong.**
24    Q  Are you often retained to provide expert
25  opinion testimony on intent?

31

1    **A  No.**
2    Q  All right.  And were you retained in this
3  case to provide expert testimony on intent?
4    **A  No.  I was retained to -- to -- I mean,**
5  **normally the question is similarity and the level**
6  **of -- and whether it rises to this level that's**
7  **called substantial, and I would -- I would -- I'm**
8  **not saying I would never be willing to try to**
9  **provide an opinion about intent, but there would**
10  **have to be very specific kinds of evidence, and**
11  **that in general has not -- that's very rare, and I**
12  **would say in general I don't do that.**
13    Q  Do you have any opinion as to the
14  relevance of intent in a copyright infringement
15  action as it relates to music copyright?
16    **A  Okay.  I am not a lawyer or judge, but I**
17  **will say that it is useful, if you're a**
18  **musicologist who is going to try to provide**
19  **opinions, to have some sense of the landscape into**
20  **which your opinions go.**
21    **And so my impression of the landscape is**
22  **that -- I qualified that so much.  Can you just**
23  **remind me exactly what you were asking?**
24    MS. BLAISE:  Madam Court Reporter, would
25  you read that question back?

32

1    (Pending question was read back by the
2  court reporter.)
3    THE WITNESS:  Yes, thank you.  I think in
4  many cases, intent can be left out entirely, so
5  it's possible to make many statements which are
6  relevant to a copyright case and specifically not
7  talk about intents -- intent.
8  BY MS. BLAISE:
9    Q  Can you define substantial similarity as
10  you understand it in forensic musicology?
11    **A  You know, I -- I don't think you can.  I**
12  **believe at one level it appears sociologically**
13  **that substantial similarity is what a judge and**
14  **jury say that it is.  So I believe when a**
15  **musicologist writes about that, they are**
16  **identifying similarity, and they are effectively**
17  **making a -- they are -- I don't quite know what**
18  **verb I would use, but they are claiming that it is**
19  **their belief that if there is enough similarity**
20  **there that a judge or a jury would find it**
21  **substantial, but there is no standard.  I'm not**
22  **aware of any generally accepted set of rules that**
23  **you can go by.  Each case is different.**
24    Q  Have you ever been asked to opine as to
25  originality, whether that be in the context of in

33

1 a case, or as you testified earlier, when -- in a
2 consultant-type base, like a forward-looking base
3 with the due diligence?
4     A  Let me just say yes, I think that there is
5 a concept of originality in people's minds that
6 they ask me questions about.  When I write the
7 reports, I tend to appeal to a notion of what
8 sometimes is called common coin or, you know,
9 conventions of the language -- I do believe that
10 there are -- I am being -- I am asked quite often
11 when I do these cases where something is -- and I
12 put it in quotation marks -- quote/unquote
13 original by which I take that to be a question,
14 does -- and let me say -- my explanation of that,
15 when a question of originality wouldn't
16 necessarily always have to do with the piece of --
17 you know, with a piece of music that you're trying
18 to get permission to distribute or feel like you
19 have a legal right to, you know, do stuff with.
20 It could be that the question of originality is
21 actually more relevant to a piece of music then
22 you've already -- then you're infringing on or
23 that someone's claimed you're infringing on.
24     But when I hear "originality," I tend to
25 translate that into, does something that is out of

34

1 the norm of out of the common coin be imagined as
2 the word I sometimes use as "distinctive."
3     Q  So when you're doing an analysis as to
4 originality, do you consider prior art?
5     A  I'm sorry.  You glitched for a second
6 there.
7     Q  When you're doing an analysis as to
8 originality, do you consider prior art?
9     A  Yes, given all of the kind of definitional
10 hedging that I have been making, yes.  When I
11 answer questions about -- when people ask me
12 questions about what they call originality, prior
13 art is relevant.
14     Q  And why is that?
15     A  My understanding or the way I make those
16 arguments is that if it is possible to find one
17 more numerous instances of art -- in this case,
18 music -- that exists prior to the pieces of music
19 that are in question, that display the same
20 musical characteristics that are at issue, that
21 becomes relevant to a discussion of whether they
22 are original and distinctive, or just as I say,
23 distinctive.
24     So prior art is the way that you are able
25 to make arguments about what you might call the

35

1 common coin of the musical language.  That only
2 exists to us as prior art.
3     Q  Also what's known as synofare,
4 essentially, if you're saying the music that's
5 already existed that has not yet become
6 distinctive; is that what you're saying?
7     A  That took an odd jump at the end.  And I
8 have to say, I -- again, you are exposed to a
9 certain subset of terms that people use.  Prior
10 art is a term I'm familiar with.  Synofare sounds
11 like French to me.  Is that -- is that --
12     Q  It is.
13     A  -- an old legal term?  Yeah.  I have not
14 heard that term, but if the concept we are talking
15 about is that there's music out there that exists,
16 that was in the world and there's evidence of that
17 before what's at issue was composed or
18 distributed, yeah, that's where you -- that is --
19 it's not the only way.
20     I realize that it's possible that there's
21 other evidence for what the common language of
22 music is, but that's one of the primary pieces --
23 kinds of evidence, especially in kinds of music
24 which are not formally --
25     Q  In other words, there's particular genres

36

1 that have certain similarities within the genre;
2 is that correct?
3     A  Yeah, I think you could refer to those as
4 conventions, and sometimes if you take the
5 pejorative out, cliches.  So, in fact, it's
6 possible to argue that somebody could sit down to
7 compose music and utilize things that we would
8 identify musicologically or maybe just in common
9 understanding of invention of a particular genre
10 or cliches of a specific style.
11     Q  I think cliche and synofare are
12 synonymous, just for your own --
13     A  I appreciate knowing that.
14     Q  What is your methodology for searching
15 when a client comes to you with a song and says,
16 you know, we want to make sure that this isn't --
17 isn't infringing the work of another --
18     A  Okay.  I will note that I am a strong
19 proponent, I think in my professional life as a
20 musicologist, as well as in my -- just in general,
21 of matching the methodology to the material.
22 Right?  So I don't tend to believe there's only
23 one methodology you should perform for every
24 question.
25     And, also, I believe that methodologies

37

1  can change and shift over time, but I do believe I
2  can answer this question with the proviso that,
3  yeah, the first principle of my methodology is
4  that you need to think about it in relation to a
5  particular musical question you're being asked.
6      But assuming we're talking about the kind
7  of similarity case that involves pieces of popular
8  music in the sort of contemporary style, you're
9  going to -- I would go basically in two
10  directions. It's very simple.
11     On the one hand, you are using your
12  accumulated knowledge of music theory of the way
13  that musical -- use a very generic term like
14  musical events tend to follow each other and the
15  rules that have been codified and discussed within
16  the field of musicology and music theory to -- you
17  run the piece of music through that, should we
18  say, analysis machine, "analysis" being sort of
19  taking apart, to see what is going on.
20     Then you can make certain judgments as to
21  whether that is conventional, typical, or whether
22  there's something that is unusual. To some
23  extent, your judgments of that are expert
24  judgments and you have interest to or experience
25  with lots of music, so you can make intuitive

38

1  judgments about what are objectively statistical
2  norms.
3      The other is that you may note specific
4  require art, so you may -- and also swaths of
5  prior art that you associate with particular
6  genres or styles of music. So it's possible to
7  recognize and then to go do research to solidify
8  your recognition that a certain song or musical
9  composition is -- is using the convention of a
10  style or is actually doing the same thing as a
11  prior piece of music.
12     So those are the -- that is the basic
13  methodology.
14  Q  Okay. And --
15  A  I think that --
16  Q  -- when you do your prior art searches,
17  how do you -- how do you search for them? How do
18  you search for prior art?
19  A  Well, that's an interesting question. I
20  believe that is a matter of art.
21  Q  Well, I'm asking you.
22  A  I was about to answer the question.
23  Q  Okay.
24  A  I think -- to my mind, it is not always
25  necessary to multiply huge amounts of prior art,

39

1  so I suppose I'm not actually normally beginning
2  from a quantitative knowledge -- or I should say
3  quantitative goal that I want to have as many
4  pieces of prior art.
5      By introspect on how I do this, oftentimes
6  what's at stake when things come to copyright
7  dispute is something which you might call an
8  evocative quality, a quality of sounding alike
9  that people recognize, and oftentimes that's based
10  on a relatively small number of quite famous
11  pieces of music that -- that determine people's
12  sense of how music sounds or what sort of music
13  sounds like.
14  Q  So in general, when I -- if I'm
15  considering the question prior art, I will often
16  be very pleased to find a very famous or popular
17  song that -- that you can count as prior art.
18      There are situations where you are
19  attempting to make a case about really sort of
20  tonal functions of music where it is possible to
21  effectively dip your hand into the 18th century
22  into what we call the common practice period --
23  musicologists sometimes call it that because it's
24  the period of time, you know, in the 1700s and
25  1800s, let's say, where the tonal language that we

40

1  in Europe and America think of as our music, the
2  way music sounds, is systematized, and thus the
3  common practice of what we would call the
4  tonalities is established.
5      So sometimes it's very easy to find -- it
6  effectively say this is a piece of prior art,
7  there are thousands of more just like it, which I
8  know because I'm a musicologist and know where to
9  find those, but what you're effectively claiming
10  is based on my expert knowledge of the
11  repertoires, I can attest that this piece is
12  completely typical of hundreds of others, and so
13  you don't have to just list them all.
14  Q  So thank you. My question was a little
15  bit different. It was how do you go about
16  finding -- how do you conduct your search for
17  prior art?
18  A  I mean, some of it is actually scanning my
19  own memory in the sense of, you know, I -- the
20  fundamental task for a forensic musicologist is
21  will you listen to this and tell me what you
22  think? So one of the things that happens is you
23  listen to a piece of music and your brain is
24  actually a kind of archive of songs that you have
25  heard, and I think one of the presumptions of

41

1  being a musicologist is that you have listened to
2  a lot of music and you have spent time and energy
3  categorizing it in your brain so that you perhaps
4  can just use your own memory as an archive of
5  popular music.
6      That is clearly going to be supplemented
7  by searches in various -- nowadays, you don't --
8  you know, we go to streaming services or we go to
9  places where you can look at a lot of music --
10  listen to a lot of music, I should say, and you
11  can follow up on your intuition, listen to the
12  actual pieces of music that are called to your
13  mind.
14      For certain kinds of prior art questions,
15  you can go to notation, go back and look at
16  collections.  But largely it is about your musical
17  memory.
18  Q  Okay.  And how -- how do you define
19  substantial similarity in copyright?
20  A  Sorry.  Again, the little words got lost.
21  How do I define the substantial similarity --
22  Q  In music copyright?
23  A  As I said before, when I allow myself to
24  write in a report, there is substantial similarity
25  or if I say there is not substantial similarity, I

42

1  am making a two-part judgment.  I am making a
2  musicological judgment and then I am actually
3  taking that judgment and applying it to my sense
4  as someone who has done forensic musicology for
5  what can be upheld by people attempting to decide
6  a case.
7      As I've said before, it's not possible for
8  me to define in a rigid, rule-based way what is
9  enough to be similarity, and I'm conscious of the
10  fact, of course, when one has experts on all sides
11  of cases, that there is no simple generally
12  accepted rule for substantial similarity.
13  Q  So when you're hired to perform an
14  analysis as it relates to similarity, substantial
15  similarity and/or originality, is it your
16  testimony that you're not providing an actual
17  answer about that, that you're providing the
18  likelihood of result before a judge and a jury?
19  A  I wouldn't -- okay.  Let me answer that in
20  a very precise way.  When I am acting in a
21  consultive capacity -- in other words, when I'm
22  being asked preproduction by people to listen to
23  the music, I actually do use a predictive model.
24  So this is a -- like I said, that's in the
25  specific case where I am -- someone is effectively

43

1  asking, can we release this music or is there a
2  problem here?
3      What I've taken to saying in those reports
4  is it is impossible to predict -- it is impossible
5  to specify this with 100 percent guarantee.  So I
6  give people an odds.  For example, I might say, in
7  a protective report, I think there's -- I would
8  give this a 7 out of 10, which is my saying -- I
9  forget how the scale goes.  It's been a while
10  since I've done one.  You can imagine a 10 out of
11  10 -- I would never say that, but a 9 out of 10,
12  it seems to be highly unlikely that one would lose
13  a copyright case based on this track.
14      As opposed to in my practice as a
15  consultant, if I said, okay, I think you've got a
16  4 out of 10 here, then I think -- I'm not saying
17  that here is a specific thing that we can point to
18  that all forensic musicologists will agree.  You
19  know, that two oxygen molecules and a hydrogen
20  molecule gets you water.  But I am saying, yeah,
21  there is a pretty good chance that you could end
22  up in litigation.  So that is in my consultative
23  practice.  I do think of it as a prediction of how
24  people will react to something.
25      When I'm asked to write a formal report, I

44

1  do -- at that point you must put yourself on
2  record, and at that point then you are actually --
3  you are identifying a certain amount of evidence
4  of similarity, which we can talk about what is
5  similarity, and then I think you, as a
6  musicologist and as a forensic musicologist, have
7  a -- I guess a professional judgment about whether
8  in the spectrum of the kind of similarities that
9  you've been asked to talk about across your career
10  or that you've thought about in the context of
11  copyright, how substantial is this?
12      So I do think it is fundamentally a
13  relational judgment.
14  Q  Okay.  Was your first memo in this case,
15  which we have marked as Exhibit B, was that
16  predictive in nature?
17  A  Now, I haven't looked at it in probably --
18  in a while.  I mean, I -- I do remember --
19  Q  We'll screen share it.
20  A  Yeah.  Let me just quickly have a look at
21  it, and -- yeah.  So this is exactly what I was
22  talking about.  In fact -- yeah.  This is how I
23  usually tend to respond when people are asking me
24  to sort of function as a -- what I can see as a
25  mitigation of risk.  So, yes, that last paragraph

45

1   is sort of how I do it.
2       And I think it is my response to the
3   reality that there are cases that are decided and
4   there are things that happen in the world of
5   copyright litigation that surprise me, and so I am
6   conscious of a difference between my own personal
7   opinions about what is moral and acceptable and
8   all kinds of things or what would be the best for
9   the world of music in human civilization and what
10  might actually happen during a legal proceeding.
11  So I tend to -- as with everything you do,
12  including walking across the street, think of it
13  as a question of risk.
14      Q   Sure.  And have you read the judgment in
15  the New Zealand case?
16      A   I looked at it.  It's very extensive, so I
17  didn't conceptualize my job in this case to be
18  focusing on previous legal judgments because I'm
19  not a lawyer.
20      Q   What did you conceptualize your job to be
21  in this case?
22      A   To consider the various musical
23  compositions, we'll call them, and to bring my
24  musical -- music theory, music history, and to
25  some extent forensic experience to bear to explore

46

1   the issues around them.
2       I tend -- I'm very realistic and I guess
3   you can say humble -- that's a weird word to use,
4   but I'm very humble about my abilities as a lawyer
5   or as a judge.  So I figure my time is better
6   spent talking and writing about the things that I
7   have a lot of experience with and where I actually
8   do think I know better than the average person,
9   and reading a complex judgment in a copyright
10  case, I have read them, and it's certainly a part
11  of the history of music, especially popular music,
12  but when I'm asked to be an expert, I tend to
13  focus on the things that I feel like I am a
14  genuine expert in.
15      Q   Are you aware that there was a judgment
16  finding liability for copyright infringement
17  between the Eminem Esque cue and Eminem's Lose
18  Yourself in the New Zealand judgment?
19      A   Yes, yes I am.
20      Q   And so based on your judgment earlier that
21  a finding of similarity and/or a finding of
22  originality is left to the judge and the jury, you
23  understand that a finding as to copyright
24  infringement has been had in this case?
25      A   Yes.  Yes, I do.

47

1       Q   And so is your testimony in this case
2   basically that the judge was wrong in that case?
3       A   No.  No, it's not.
4       Q   Is your testimony in this case that the
5   judge was correct in that case?
6       A   I'm going to -- no, it's not, except in
7   the trivial sense that whatever a judge says is
8   the law, then -- as I understand it, and I didn't
9   go to law school, is the law because that's how
10  law gets created.
11      But, no, I understand that a legal
12  judgment was entered about the relationship
13  between two pieces of music, and I -- I'm aware of
14  that, and I'm not -- I'm not questioning -- it
15  wasn't my goal in my report to argue the
16  correctness or incorrectness of that particular
17  judgment.
18      Q   What was the goal of your report?
19      A   In respect to that judgment?
20      Q   Generally, what was the goal of your
21  report?
22      A   It was to assess the similarity
23  relationship between, I guess, three pieces of
24  music, really, if we can kind of go to the ones
25  that are labeled in my report:  the original

48

1   Eminem track, Lose Yourself, the Eminem Esque
2   library track, and what I think what I thought of
3   as the NP, the National Party advertisement.
4       So there are three pieces of music at
5   stake, and to write out and to argue what could be
6   said about the similarities of those tracks in
7   relationship also to the common language of music
8   and prior art.
9       So, yeah.
10      Q   Okay.  I want to go back to that memo
11  that's marked as Exhibit B.
12      A   Mm-hmm.
13      Q   Are you able to see that?
14      A   Yes, I see it.
15      Q   Okay.  Going to the second sentence in
16  that first paragraph, it says, in my opinion, the
17  two tracks are not substantially similar in any
18  way that would support a claim of infringement.
19      Do you see that?
20      A   Yes, yes.
21      Q   Do you know the difference between a claim
22  of infringement and a finding of infringement?
23      A   When my attention is called to it that
24  way, I would agree that there is a difference.  I
25  would imagine that there is a difference.  I could

**49**

1    speculate as to what that was as a layman.
2        Q  Do you -- do you recall whether or not
3    there had already been a lawsuit filed in this
4    case when you were retained to prepare this memo?
5        A  I don't remember specifically.  And I will
6    say -- I will volunteer this information:  When I
7    used the phrase "claim of infringement," I wasn't
8    using it as a technical legal term.  So there are
9    places where I'm talking as a musicologist where I
10   use words and I intend them to be precisely -- or
11   I'm happy to talk in detail about why I chose one
12   word over another.  A claim on infringement was
13   what's in my mind referring to a general sort of
14   bad outcome that somebody might try to avoid.
15       Q  And in going down to the last paragraph,
16   this kind of harkens back to your earlier
17   testimony where you would provide a scale in
18   likelihood of a finding of infringement, and 10
19   out of 10, you testified earlier, would mean very
20   unlikely finding, which I think you also indicate
21   in this letter; is that correct?
22       A  What I said in my testimony, I think, is
23   the way I conceptualized this, and I don't know if
24   I expressed it specifically in this short memo,
25   but yeah, I don't ever give people 10 out of 10,

**50**

1    or I would have -- it would be an extremely
2    unusual situation.  Just like in the Olympics, it
3    would have to be a really, really exceptional
4    situation.
5        I mean, I would give somebody a 10 out of
6    10 if somebody handed me two tracks which had
7    nothing to do with each other, you know, and said,
8    what's the likelihood we would get sued?  Does
9    this Pepsi commercial sound like Beethoven?  No,
10   they're not the same.
11       But in general cases, yeah.  It is -- it's
12   an impossible situation where you can, as a
13   musicologist, guarantee nothing bad will ever
14   happen, and my philosophy of doing these reports
15   is I would never say that because I didn't really
16   want to give the impression to people that I was
17   writing the reports for -- that I could predict
18   how legal cases would come out.
19       Q  Sure.  And in this case, you assigned it
20   as a 9 out of 10; is that correct?
21       A  Yes.
22       Q  But you were wrong, correct, because a
23   finding was entered finding infringement?
24       A  No, I disagree with that.
25       Q  How do you disagree?

**51**

1        A  Because this is about Eminem Esque and
2    Lose Yourself, and the judgment, as I understand
3    it, was about a different piece of music, which is
4    a soundtrack to an advertisement.
5        Q  Okay.  I'm going to show you the judgment.
6        Can everyone see it?  Dr. Fink, can you
7    see this?
8        A  Yes.
9        Q  Okay.  Great.  We're going to scroll down.
10   We'll mark this as Exhibit C.
11       (Exhibit C was marked for identification
12   and is attached to the transcript.)
13       Q  I'll give you one moment to scroll through
14   it, and let us know if you need to scroll down or
15   up.  The relevant portion is the bracket at 462
16   and 463.  So let me know if you need to scroll up.
17       A  So just to clarify for me, who -- who is
18   the -- who is the person speaking in Paragraph
19   462?
20       Q  The judge.
21       A  Okay.
22       MR. EDMONDSON:  Heather, I'm just going to
23   object that the judgment itself in New Zealand
24   refers to a listing of exhibits at the end of the
25   judgment, and to the extent anybody needs to rely

**52**

1    on those exhibits, they're not being presented
2    here in this deposition.
3        MS. BLAISE:  Yet.
4        THE WITNESS:  Okay.  I've read the
5    paragraph in question.
6    BY MS. BLAISE:
7        Q  Does that change your testimony about
8    whether or not the judgment in New Zealand found
9    Eminem Esque and Lose Yourself was substantially
10   similar to --
11       A  Yes, I would agree it was, according to
12   the details of the judgment, getting -- getting to
13   the National Party ad, the judge does -- yeah,
14   that clearly says that.  Yeah, in that case, that
15   is the -- yeah.  That's why I used the 9 out of 10
16   predictive language.
17       Q  So to clarify, you don't disagree -- well,
18   I'm sorry.  Strike that.
19       You don't disagree with the fact that the
20   judge in the New Zealand case found Eminem Esque
21   to be infringing Lose Yourself?
22       MR. EDMONDSON:  Objection.  Heather, the
23   document speaks for itself.
24       THE WITNESS:  That's -- I was about to say
25   that.  The document says that, yes.

---

53

BY MS. BLAISE:

Q And you cannot provide any testimony that would dispute that there's been a finding of infringement in the New Zealand case?

**A I am not qualified to answer the question which comes up in my mind. To me, that imagines that the judgment is a unitary thing in a sense that -- you know, the judge might have subsidiary claims which lead up to the actual judgment, you know, whereas this, whereas that, whereas this, whereas that.**

**So my understanding was that what was at stake in that judgment is the ad that was broadcast in New Zealand and the subsidiary claim. But like I said, I don't actually know how to parse the judgment of a legal structure at that level. Given just that paragraph, it says what it says.**

Q Great. And -- and do you understand from reading that paragraph why the judge concluded that Eminem Esque infringed Lose Yourself?

MR. ROSNER: Objection.

MR. EDMONDSON: Heather, objection. You've pulled out Paragraph 462 --

MS. BLAISE: You can state your objection.

---

54

I asked do you know why? You can state what your objection as opposed to informing the witness --

MR. EDMONDSON: I just -- I'm sorry. I didn't hear what you said, the Zoom.

MS. BLAISE: I think state your objection, whatever the basis of your objection is, without informing the witness how to testify. I asked do you know why? And he either does or he doesn't know why based on reading it. You can certainly make your objection, but it should be one of -- it should be a word or two of what your objection is, not a speaking objection.

MR. EDMONDSON: Well, no. Heather, I'm not attempting to coach the witness. What I'm saying is you've pulled a portion of a document, I believe a 170-something page document, and we haven't reviewed the entire document. So I would say there's -- to ask a broad question like that leads one to assume things that have already been testified as what the expert as said.

So, you know, I do have to lay a proper objection that we haven't reviewed the entire document here, and -- and you're asking for a generalized conclusion. But, you know, to the extent that's an objection or a soliloquy, I'll

---

55

leave it up for you to --

MS. BLAISE: Madam Court Reporter, can you read my question back?

(Pending question was read back by the court reporter.)

BY MS. BLAISE:

Q You can answer it.

**A Based simply on that paragraph, I don't know all the factors that would have gone into the judge's decision. So -- yeah. The thing is written very clearly, and there are a series of enumerated -- you know, this is true -- is a substantial copy because, A, B, C. Right. There's nothing in between there.**

**So there are two questions here. I hate to sound -- this is going to sound somewhat academic, but it's what I do. One question is what does the text say, and the text says, I made this decision for these and these reasons only. Here they are, A, B, C, and then there's what actually happened, in a sense, which I'm not saying I can know, but the question of what actually went into the -- into the thought processes that caused the judge to make that decision --**

---

56

Q You don't know that, but I'm not asking you about that which you don't know, so that's okay.

**A Yes. There's a way in which certainly the -- the judge took three -- actually, it's more of a logical argument, and it's -- I don't know how the judge came to those, decided that those were true. I'm aware, of course, that expert testimony was presented, so I would imagine that it had something to do with the expert testimony.**

Q But as you read this, you understood that Eminem infringes Lose Yourself?

**A Yes, that's what the text says.**

Q One second.

Looking at -- on this same exhibit, Paragraph 462(b) --

**A Mm-hmm.**

Q -- do you see the language "strikingly similar"?

**A Yes.**

Q And -- and how do you understand that term -- what do you understand that term to mean?

MR. EDMONDSON: I'm sorry, Heather. I'm looking at 462, Sub 3.

MS. BLAISE: Yeah.

Page 57

1      MR. EDMONDSON:  Are you referring to
2  something that says -- okay.  Never mind.  Thank
3  you.
4  BY MS. BLAISE:
5      Q  Let me start the question over again.
6         Looking at Paragraph 462(b), and the
7  language "strikingly similar," what does that mean
8  in your experience as a forensic musicologist?
9      A  I will say I don't use that language
10  myself, so I am not entirely clear to what
11  strikingly similar is as opposed to close
12  similarity.  So I don't -- to me that doesn't have
13  a specific meaning.  It's an attempt -- it's
14  strikingly similar.  It intensifies similar.  I
15  can infer why you would say "strikingly," but like
16  I said, it's not language that I drop into reports
17  that I make that are supposed to signify a
18  particular outcome.
19      Q  Strikingly similar doesn't have any --
20  it's not a term of art in musicology; is what
21  you're saying?
22      A  Certainly not.  I mean -- I mean it
23  doesn't mean anything different to me than it
24  would to just an average person who read those
25  words.

Page 58

1      Q  And looking down at 462, what about
2  substantially reproduces?  Does that have any
3  legal meaning -- strike that, legal meaning.  Is
4  that a term of art in forensic musicology?
5      A  Well, I'm familiar with -- yeah.  My use
6  of the word "substantially" is designed to signify
7  a certain level -- yeah, a certain relation that
8  has implications for, you know, the process.
9      Q  So, in other words, a substantial copy?
10      A  Well, what I would say is that having --
11  having read some of the other -- you know, having
12  read the expert's report that Dr. Stewart produced
13  and actually having written reports myself that --
14  if one were to put the word "substantial" in front
15  of a word like "similarity" or, you know, "copy,"
16  "reproduction," whatever, and then that gets
17  picked up in a legal judgment, I would say that
18  has meaning, yes, that you have made some kind of
19  claim which has then been picked up, whereas with
20  "strikingly," I don't know whether I would have
21  that sense.
22      Q  Okay.  And going to the very first
23  sentence, substantially copied, does that -- is
24  that a term of art in the musicology industry?
25      A  Well, I -- as I said before, I don't tend

Page 59

1  to use the word "copied" when I don't have actual
2  knowledge of the creative process by which
3  something was made.
4         So I recognize, again, "substantially" as
5  a kind of judgment.  My understanding of
6  "substantially" is, roughly speaking, rising to
7  the level where it should be taken notice of, if
8  it's something of substance, which we have to deal
9  with.  "Copied," again, I do not know what that
10  judge meant by "copied."
11      Q  Have you ever heard the term "strikingly
12  similar" to be used to say that the similarity is
13  so strong that it can only be a result of copying?
14      A  No, I'm not -- I'm not aware of having
15  heard that before.  I've just heard it, but no,
16  it's --
17      Q  Not previously in your professional --
18      A  Before this conversation, I wouldn't have
19  made that connection, no.
20      Q  Okay.  Hold on one moment.
21         MS. BLAISE:  I need to go to the bathroom,
22  actually.  Can we take, like, a five- or
23  ten-minute break?
24         THE WITNESS:  I'd say there's a 9 out of
25  10 chance that we can take that break.

Page 60

1         (A recess was taken.)
2  BY MS. BLAISE:
3      Q  Doctor, thank you.  You've been doing some
4  investigative research?  It's not related --
5      A  Completely unrelated.
6      Q  Okay.
7      A  Yes.  Better taken off the record.
8      Q  Okay.  Okay.  We're going to go back to
9  Exhibit C, which is the New Zealand judgment.
10         Can you see?
11      A  Yes, I can see it.
12      Q  We're going to scroll down to -- sorry.
13  We're not -- actually, go back to -- we've already
14  covered 462.  Now I'm asking you to look at 463.
15      A  Yes.
16      Q  Let me know when you're ready to scroll
17  up.
18      A  Okay.  I'm ready to look at 463.
19         All right.  That's --
20      Q  Okay.  And then going in to 464.
21         And do you see in 464(b)?
22      A  Yes, I see that.
23      Q  All right.  That the judge finds Eminem to
24  be a copy of Lose Yourself?
25      A  Yeah, I can read -- that's how I read the

61

1  sentence, yes.
2      Q  And so, then, referring back to your memo
3  that we have marked as Exhibit B -- can you see?
4      A  Yes, I see that.
5      Q  And where you opined that there would be a
6  9 out of 10 odds for a finding of infringement
7  with those two tracks.  Do you see that?
8      A  Indeed.
9      Q  Do you understand now that your memo was
10 wrong?
11     A  No, I don't accept that reading of it.  I
12 mean, the whole purpose of using words
13 like "highly unlikely" and to say "I cannot
14 guarantee anything" would be to avoid being
15 so-called wrong, and it occurred to me -- I'm glad
16 we're looking at this again.  It's easy to forget.
17 2014 was a number of years ago, so those odds are
18 based on the situation in 2014, and I would argue
19 as somebody who does some forensic work and who is
20 at least aware of developments that we are in a
21 different situation now.  So I don't think you can
22 actually characterize whether I was right or wrong
23 in 2014 by what happened later.
24     Q  So your testimony is there's a difference
25 between 2014 and now in terms of what was

62

1  happening in copyright infringement litigation; is
2  that what you mean?
3      A  Yeah.  Without going into a lot of detail,
4  what you have there is for the purposes of
5  advising somebody on what they should do is a use
6  of odds, giving odds on something happening.
7  Those odds were calculated as of the moment they
8  were calculated.  I couldn't have any way of
9  knowing whether things would have changed.
10     A, it stands to reason that you would
11 rethink that proposition now and you couldn't
12 expect -- I don't think what that last paragraph
13 of that memo is is not a kind of statement of
14 fact, a law of nature which would be one's -- true
15 in every detail for all time.
16     And, secondly, I would say, although I am
17 not -- I am not a lawyer and I am not a
18 professional legal commentator, that it's my
19 impression that certain aspects of how people
20 evaluate expert testimony and arguments about
21 things like similarity appear different to me now
22 than they might have done in 2014.
23     Q  Is it safe to say that the odds are 9 out
24 of 10, when you made them in 2014, were wrong when
25 the New Zealand judgment came out in 2016 or 2017?

63

1      A  No.  Again, I don't -- I don't -- I don't
2  think -- you'd have to explain to me what you mean
3  by saying "the odds are wrong."
4      Q  So would -- would the testimony be true
5  that based on your memo, the judgment and finding
6  of infringement that occurred in 2017 fell into
7  the 1/10th of a chance that your odds indicated?
8      A  Well, let's -- let's -- let's add some
9  qualification to that.  I mean, I think implicitly
10 there, and I don't add -- I can't remember whether
11 it was ever explicit -- those odds were not for
12 any jurisdiction in the known universe, so I can
13 tell you that I wasn't necessarily asking --
14 thinking about New Zealand.  So -- but if the
15 question is did what I consider to be the more
16 unlikely outcome occur, yes, it appears.  Does
17 that mean I was "wrong" and you should not hire me
18 to do this stuff anymore?  I would not ascend to
19 that.
20     Q  Were you asked to testify in the New
21 Zealand case?
22     A  No.
23     Q  No one ever contacted you to testify in
24 that case?
25     A  No.  Or let's just say I don't remember

64

1  it.
2      Q  You don't remember if anyone ever called
3  you to testify?
4      A  I'm just simply saying that as a -- as an
5  adult human who has forgotten things.  But, yeah.
6      Q  Okay.
7      A  I do not recall being asked to testify in
8  this -- in that case.
9      Q  If not for the New Zealand case, would you
10 give a similar report in 2014 as you've provided
11 today?
12     A  I'm sorry.  Can you -- I don't understand
13 what you're asking.
14     Q  If not for the New Zealand case and the
15 results judgment, would you have provided a
16 similar report today as you would have in 2014?
17     A  Yes.  I -- you know, I had not -- did not
18 have the document at my fingertips, but I had
19 looked at it again as part of, you know, getting
20 back into this issue after a number of years, and
21 it seems to me that the report -- the much more
22 elaborate report and more formal report that I
23 produced more or less now is consonant with that
24 report.  So I think, yes, I would write more or
25 less the same report.

---

**65**

1    Q  And in preparing your report in this case
2  which is marked as Exhibit A, did you review
3  Dr. Stewart's supplemental report, if you recall?
4    A  I don't know what you're referring to as
5  his supplemental report.  Is that the --
6    Q  I'll show it to you.
7    A  Okay.
8    Q  This will be marked as Exhibit D.
9      (Exhibit D was marked for identification
10  and is attached to the transcript.)
11      MR. EDMONDSON:  Heather, can I interrupt
12  for a moment?  We have the next expert scheduled
13  for noon, lunchtime.  Should I kick him out?
14      (A discussion was held off the record.)
15  BY MS. BLAISE:
16    Q  Can you see this?  You're muted.  I like
17  that microphone, by the way.
18    A  Thank you.  It's like an old-age mic, my
19  Zoom voiceover mic.
20    Q  Do you recall reviewing this?
21    A  No, this I have not reviewed.
22    Q  Okay.
23    A  Let me --
24    Q  You don't need to review it right now
25  unless you want to.

---

**66**

1    A  No, that's okay.  I mean, if you ask me
2  to, I will, but I just want to check.
3      I don't recognize it.
4    Q  Okay.  We'll remove it from -- from --
5  okay.
6      What do you understand the
7  term "voiceover" to mean.
8    A  Voiceover, it -- yeah, what it sounds
9  like.  The -- I guess it refers to the actual
10  sound material, like an -- like an audio track
11  where somebody is putting their voice over some
12  other sound material.
13    Q  Is it correct to say that a voiceover is a
14  piece of narration in an audio-visual work not
15  accompanied by the image of the speaker?  Of the
16  speaker, I should say, to make that clear.
17    A  Can you just say the first part of it
18  again?
19    Q  A piece of narration in an audio-visual
20  work not accompanied by the image of the speaker?
21    A  I would -- I would agree with most of
22  that.  Just to me it's not only narration that can
23  be in a voiceover, but the rest of it accords with
24  my understanding.  So as long as you would allow
25  other things to be done in a voiceover.

---

**67**

1    Q  What else could it be besides narration?
2    A  It could --
3    Q  For example -- I don't mean this as an
4  inclusive list of every single thing it should be,
5  but I'm asking for an example.
6    A  It could be -- a voiceover could be
7  reciting a poem, for instance, while images and
8  music is playing.  So that would be narrating
9  without telling a story; right?
10    A  I would argue a voiceover, in principle,
11  could be any use of the voice.  So if, for
12  instance, there was something going on in an -- in
13  an audio-visual thing and somebody was doing like
14  (noise), I would call that voiceover even though
15  it's not spoken words.
16    Q  Okay.
17    A  I'm sorry for the court reporter.  I made
18  rhythmic noises with my mouth.
19    Q  He was beatboxing.
20    A  Yes.  A particularly poor version of it,
21  but yes.
22    Q  What -- strike that.
23      As used in the music industry, is the
24  voice that's contained in the NP a voiceover?
25    A  Yeah.  I'm not -- I'm not an audio

---

**68**

1  production expert, so yeah.  My sense is that,
2  yes, that would be considered voiceover work, the
3  person who -- the voice in NP.
4    Q  And what is your understanding of the term
5  underscore?  What is an underscore?
6    A  That's a technical term within film
7  compensation, and I think in the most generic
8  sense, an underscore is music that plays
9  conceptually underneath visual images and other
10  soundtrack and voices and the like.
11      It's used a little bit imprecisely, I
12  think.  My sense is that for filmmakers,
13  underscore indicates music that you wrote
14  specifically to be underneath something, as
15  opposed to I think people in the world might say,
16  oh, yeah, we used that song as an underscore for
17  this, but that's not correct.  It's a preexisting
18  piece of music.
19      Again, this is not my specialty, and so
20  that's my understanding.
21    Q  The production music is not your
22  specialty; is that what you're saying?
23    A  I do know something about production
24  music.  I would say -- I'm saying that the
25  technical process of creating the soundtrack for

---

**69**

1  multimedia is not something I specifically
2  studied. So what terminology they used for what.
3     Q  Understood. What -- what is your
4  experience on production music?
5     A  Well, I actually wrote a small but
6  relatively early piece about production music
7  libraries as a musicologist, so I am familiar with
8  how they work, especially actually production
9  music in an earlier stage where it was still
10  physically on, you know, groups of CDs or
11  something. So the old notion of a production
12  music library as something you bought as a
13  physical collection of music.
14     Q  And in your experience with production
15  music and I assume, then, production music
16  licensing -- is that an accurate assumption, that
17  you have experience in the licensing?
18     A  I have some knowledge of that. Not that
19  I've ever done it, but it is part of some of the
20  things that I -- yeah, I have some -- I have some
21  knowledge of that, yes.
22     Q  Okay. And are you familiar with how songs
23  or musical compositions or sound recordings are
24  edited to suit the time duration of an
25  audio-visual work?

---

**70**

1     A  Yes, I am familiar with that and the way
2  that normally this music is provided in standard
3  lengths, and it is designed so that it can be, you
4  know -- you can have as much of it as you need.
5     Q  Is it fair to say that it's very common
6  for music to be -- music that's provided in the
7  form of production music to be shortened for
8  audio-visual work synchronization?
9     A  Well, it's one of two things. Either that
10  work will have already been done by the production
11  library, so they will provide a cue or a certain
12  kind of thing in 15 seconds, 30 seconds, 15
13  seconds, and then maybe a full two and a half
14  minutes. But I imagine also, yeah, that it's not
15  unusual for them to be trimmed.
16     Q  Would you conclude that the music
17  contained in the NP is an underscore?
18     A  I hadn't thought about that. Yeah, in
19  the -- in the most technical and generic sense of
20  that, yeah. I mean, I'm -- yes. I guess I would.
21  I wouldn't -- that doesn't mean I would assent to
22  every statement of intent or, you know, kind of
23  practice, but in a sense, yes, I do believe it was
24  in a sense designed to be underneath something
25  else.

---

**71**

1     Q  It is -- is it your contention that any
2  time there's an underscore with a voiceover, that
3  that forms a new musical composition or a new
4  work?
5     A  Yes, but I'm working with a relatively
6  technical and somewhat intellectualized notion of
7  what a musical work is. So I'm not -- not making
8  any statement about what general practice is or
9  about what other people would say, but for me,
10  yes. If -- if you combine some music that -- or
11  some sounds that are labeled as underscoring with
12  something on top of it, say, that is going to
13  create, in the most technical sense, a musical
14  work.
15     Q  Does it create a derivative work?
16     A  That's a technical question. That's a
17  legal question, and I have to say I do not know
18  the answer to that.
19     Q  Okay. Do you have any opinion as to --
20  you testified earlier -- strike that.
21        You testified earlier that the cues that
22  are sent in the context of an audio-visual work
23  are sometimes trimmed to fit the audio-visual
24  work; correct?
25     A  I think I said that.

---

**72**

1     Q  Yeah. Is that trimming different from an
2  alteration as you understand the term "alteration"
3  to be used in copy-written music -- copyrighting?
4     A  I don't think -- I'm sorry.
5     Q  There's an echo.
6     A  Let me try again.
7        MS. BLAISE:  Are Doug and Curt in the same
8  location? No, right? That's weird.
9        THE WITNESS:  I think it's okay now.
10        MS. BLAISE:  Okay.
11        THE WITNESS:  I don't think there's a
12  single answer to that. I mean, I -- it -- I would
13  need a specific case. I can imagine situations
14  where there are different answers.
15        (A discussion was held off the record.)
16  BY MS. BLAISE:
17     Q  Doctor, thank you. You testified earlier
18  that -- to my question about whether or not --
19  whether there's a voiceover in an underscore
20  whether or not it becomes a separate piece of
21  music or a separate composition, and you testified
22  that in a technical sense, you considered it to be
23  the case; is that true?
24     A  That's what I said, yes.
25     Q  Yeah. And would you testify that that's

---

73

1 commonplace, that's commonly understood to be what
2 occurs?
3    A No, I don't know what's commonly
4 understood. A lot of complicated words were in
5 that sentence like "work," and people don't even
6 agree on what a musical work and all of that.
7 If -- what I'm talking about there is that if --
8 when you talk about a musical work you talk about
9 something where you can talk about the
10 relationships among its various parts, then by
11 definition is what I'm sort of saying, yeah, when
12 you do the thing you sort of asked about, you can
13 create something that can be analyzed. But it
14 wasn't -- I don't -- I wasn't making a statement
15 about what people in some social contexts think of
16 as "work" and what that all means.
17    Q Okay. And in looking at the music that's
18 contained in NP and in EE, is there any music in
19 NP that is not contained in EE?
20    A Yeah, that -- that is -- that is an
21 interesting question, and it -- it relies
22 basically on having a definition for what music
23 is, which you would think a musicologist would be
24 really good at, but maybe it won't surprise you to
25 hear that a musicologist has very complex ideas of

74

1 what might be music when. So --
2    Q Can I make the question clearer for you?
3    A I can't guarantee it will make my answer
4 clearer, but yes, please.
5    Q Okay. So if you -- not considering the
6 voiceover -- strike that.
7      You've already testified earlier that the
8 narration part of the NP would be considered a
9 voiceover; correct?
10    A Right, but let me just --
11    Q I'll -- you answered my question, so now
12 I'll ask the next question.
13      When considering NP and not considering
14 the voiceover component of NP, just looking at
15 what remains, which I would call the music, is
16 there anything contained in the NP music that is
17 not contained in the EE music?
18    A Well, let me say that what you would call
19 music is precisely the kind of place where I might
20 actually put on my musicologist hat and refuse to
21 accept that, because I certainly did express that
22 my understanding of voiceover excluded music or
23 musical sound as being something that a voiceover
24 artist, let's call them, could do. So --
25    Q You're saying in a broad sense? You're

75

1 saying in the broad sense, or --
2    A You asked a technical question about
3 excluding the voiceover. I am going to -- in my
4 world, simply stating "let's talk about the music"
5 does not, by definition, exclude the voiceover
6 material, and that I think I very consciously
7 feel.
8    Q Okay. But my question is based on
9 excluding the voiceover work, and if you're just
10 comparing what's left --
11    A Yes, that's --
12    Q -- is -- is there anything that's in NP
13 that isn't in EE musically?
14    A With the stipulation that that's something
15 you're doing; in other words, you're -- I'm not
16 assenting to the idea that that is a musicological
17 distinction, that those are containers that are
18 already prelabeled.
19      But if one makes -- if one makes the
20 exclusion that you are asking me to make, then I
21 don't believe I, in my report -- and I would agree
22 with my own report -- I'm not questioning the
23 comparison of the -- what you might call
24 instrumental, or maybe call it underscore, between
25 the two, between EE and NP. So I'm not -- I

76

1 specifically didn't, in my report, attempt to
2 claim some difference that Alexander didn't spot.
3    Q So is your testimony that there is nothing
4 contained in NP that isn't contained in EE from a
5 musical composition perspective, the notes of the
6 musical composition?
7    A No. That is the philosophical difference.
8 Like I said, you can -- one can point to certain
9 things that go into NP, and maybe you can give
10 them names, and they may have something to do
11 with, like, which track on a multitrack recording
12 you are referring to, because you are effectively
13 saying, well, if you eliminate Tracks 6, 7, and 8
14 from this multitrack recording, is there any
15 deference between Tracks 1 -- whatever, some other
16 set of tracks.
17      I'll answer that question objectively and
18 I'll say, no, there's no difference, but if the --
19 that doesn't have anything to do with one's
20 understanding of what music is or whether it's,
21 you know, from the analytical musicological
22 perspective, could there be musical effects that
23 span the things that one's excluded and not.
24      So, yeah. That to me gets to the crux
25 of -- of one of the things I said in my report.

**77**

1 So obviously -- I should be very clear on this:
2 If you exclude everything that's different between
3 NP and EE, what's left is the same, but that seems
4 to me a trivial point.
5 Q So if you subtract everything that's
6 different, in your mind, what are you subtracting?
7 What is everything that's different? The
8 voiceover, or is there more that's different than
9 just the voiceover?
10 A The voiceover, and to my mind -- and,
11 again, I -- I'll tell you what: To my mind, there
12 is -- I'm attempting to leave the possibility open
13 that the effect, the expression and the effect of
14 NP has to do with the relationships between the
15 voiceover track and the rest of it, which are
16 musical in nature, and that's very carefully
17 chosen to say what I think I want to say.
18 Q Okay. One second.
19 MS. BLAISE: Off the record for a second.
20 (A recess was taken.)
21 BY MS. BLAISE:
22 Q So, Dr. Fink, you know the difference
23 between a question that calls for a yes or no
24 answer versus a question that calls for a
25 (inaudible) --

**78**

1 A Sorry. You trailed off at the end there.
2 Q You know the difference between a question
3 that calls for a yes or no answer and a question
4 that calls for a narrative; correct?
5 A Yes.
6 Q Okay. So I'm looking for a yes or no
7 answer on this: Is all the music, excluding the
8 voiceover or excluding the narration of the NP, is
9 all that is in NP besides that inclusive of music
10 from EE?
11 A I thought so. That is actually hard to
12 understand. Can you have that read back?
13 Q Sure.
14 (Pending question was read back by the
15 court reporter.)
16 Q Sure. Okay. Excluding the voiceover
17 and/or the narration, we've called it, I think,
18 both of those during your testimony -- the
19 voiceover and/or the narration, excluding that,
20 when you're considering just the music left
21 behind, is all the music that's in NP from EE?
22 A I can't give you what you're asking for
23 because you keep throwing in words like "the
24 music," which I don't -- I don't think we have the
25 same notion of what we're talking about there.

**79**

1 If you can find a way to ask that question
2 where you don't presume what is music and what is
3 not and what kind of things are music, it's
4 probably possible to get a yes or no answer about
5 the presence of certain material or something
6 that's characterized neutrally.
7 Q What's your understanding of the elements
8 that go into music?
9 A In principle -- okay. In principle,
10 anything, but that's an extremely avant garde
11 notion. But certainly in much more common sense,
12 any sounds.
13 Q Any sounds. Okay.
14 A There's plenty of pieces of quite popular
15 music which use the sound of a chain saw as part
16 of their musical. I mean, there's people who
17 release popular music where they use the sounds of
18 plastic surgery operations and by using various --
19 Q Got it.
20 A You know, so any sound, in principle, can
21 be musical.
22 Q Great. Okay. So going back to the
23 question. Removing the narration and/or
24 voiceover, are there any sounds in the NP that are
25 not contained in the EE?

**80**

1 A No, there are not.
2 Q Thank you. I have no further questions.
3 A As far as I can tell, I mean -- no, there
4 are not.
5 Q Thank you. I have no further questions.
6 A I would just note that you're very good.
7 It's exactly 12 noon according to my computer.
8 She hit the downbeat right and she's out.
9 MR. EDMONDSON: So I have a few questions,
10 Heather.
11 MS. BLAISE: Okay.
12 BY MR. EDMONDSON:
13 Q Dr. Fink, you are a trained musicologist;
14 correct?
15 A Yes.
16 Q Okay. And it's fair to say you're an
17 expert in this area; correct?
18 A The -- the area -- which area, may I ask?
19 Q Forensic musicology.
20 A Yeah. I -- I have expertise in this area,
21 maybe over and above the standard, average
22 musicologist.
23 Q And you -- you -- as part of being a
24 forensic musicologist, you're aware of your peers
25 in your profession; is that correct?

81

1    A I'm sorry. Did you ask a forensic
2 musicologist?
3    Q Yeah.
4    A Yes, I do know some. I'm aware of some
5 people who do this, and certainly -- especially in
6 famous cases.
7    Q Okay. Have you ever run across any
8 published articles on forensic musicology by Judge
9 Cull? And I'm referring to the Judge Cull who
10 wrote the New Zealand opinion.
11    A Certainly, I have not.
12    Q Okay.
13    MS. BLAISE: Objection; exceeds the scope
14 of direct and exceeds the scope of expert report.
15    MR. EDMONDSON: Objection noted.
16    Q So you've never run across an article
17 written by Judge Cull in the journals -- journals
18 of forensic musicology?
19    MS. BLAISE: Same objection.
20    THE WITNESS: Do you want me to answer the
21 question?
22    Q Please do.
23    A Okay. I will note for the record that I'm
24 not aware of any journals of forensic musicology.
25 I have read -- I have read articles about musical

82

1 copyright in law journals and in musicological
2 journals, and it's a relatively small field. I
3 have not run across anything by that judge.
4    Q Okay.
5    MR. EDMONDSON: No more questions.
6    MS. BLAISE: I don't have any more
7 questions.
8    COURT REPORTER: Attorney Blaise, would
9 you like a copy of this transcript?
10    MS. BLAISE: I would.
11    COURT REPORTER: Thank you. And, Attorney
12 Edmondson, would you like a copy of this
13 transcript?
14    MR. EDMONDSON: Yes, please.
15    (Off the record at 2:12 p.m.)
16
17
18
19
20
21
22
23
24
25

83

1         ACKNOWLEDGMENT OF DEPONENT
2
3         I, ROBERT W. FINK, Ph.D, do hereby
4 acknowledge that I have read and examined the
5 foregoing testimony, and the same is a true,
6 correct and complete transcription of the
7 testimony given by me and any corrections appear
8 on the attached errata sheet signed by me.
9
10
11
12 _____ _____
13 (DATE)         (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24
25

84

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2
3         I, Brooklyn E. Schweitzer, the officer
4 before whom the foregoing deposition was taken, do
5 hereby certify that the foregoing transcript is a
6 true and correct record of the testimony given;
7 that said testimony was taken by me
8 stenographically and thereafter reduced to
9 typewriting under my direction; that reading and
10 signing was requested; and that I am neither
11 counsel for, related to, nor employed by any of
12 the parties to this case and have no interest,
13 financial or otherwise, in its outcome.
14         IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 21st day of
16 August, 2021. My commission expires: May 20th,
17 2022.
18
19
20
21
22 Brooklyn E. Schweitzer
23 Professional Court Reporter
24
25

## A

**abilities**
46:4
**able**
14:11, 18:21,
27:19, 34:24,
48:13
**about**
11:20, 12:11,
12:19, 16:21,
21:6, 22:5,
26:21, 27:23,
27:25, 28:3,
28:6, 28:12,
28:20, 30:3,
30:18, 30:19,
31:9, 32:7,
32:15, 33:6,
34:11, 34:12,
34:25, 35:15,
37:4, 37:6,
38:1, 38:22,
39:19, 40:15,
41:16, 42:17,
44:4, 44:7,
44:9, 44:10,
44:22, 45:7,
46:4, 46:6,
47:12, 48:6,
49:11, 51:1,
51:3, 52:7,
52:24, 56:2,
58:1, 62:20,
63:14, 68:23,
69:6, 70:18,
71:8, 71:9,
72:18, 73:7,
73:8, 73:9,
73:12, 73:15,
75:2, 75:4,
78:25, 79:4,
81:25
**above**
80:21
**academic**
21:25, 23:10,
24:18, 24:19,

25:12, 55:17
**accept**
61:11, 74:21
**acceptable**
45:7
**accepted**
20:8, 26:9,
32:22, 42:12
**access**
10:23
**accompanied**
66:15, 66:20
**according**
52:11, 80:7
**accords**
66:23
**account**
30:5
**accumulated**
37:12
**accurate**
69:16
**achieved**
21:19
**acknowledge**
83:4
**acknowledgment**
83:1
**across**
28:14, 44:9,
45:12, 81:7,
81:16, 82:3
**acting**
42:20
**action**
31:15
**actual**
11:23, 16:9,
41:12, 42:16,
53:9, 59:1, 66:9
**actually**
8:11, 9:12,
10:22, 12:24,
13:6, 14:15,
17:18, 23:13,
27:3, 27:19,
27:20, 29:17,
30:13, 33:21,

38:10, 39:1,
40:18, 40:24,
42:2, 42:23,
44:2, 45:10,
46:7, 53:15,
55:21, 55:23,
56:5, 58:13,
59:22, 60:13,
61:22, 69:5,
69:8, 74:20,
78:11
**ad**
52:13, 53:13
**add**
24:18, 63:8,
63:10
**additionally**
20:4
**admit**
7:19, 23:21
**adult**
64:5
**adverse**
18:14, 18:15
**advertisement**
48:3, 51:4
**advising**
9:23, 62:5
**advisory**
19:3
**affairs**
21:25
**affixed**
84:15
**aforementioned**
24:10
**after**
64:20
**again**
14:1, 15:22,
30:20, 35:8,
41:20, 57:5,
59:4, 59:9,
61:16, 63:1,
64:19, 66:18,
68:19, 72:6,
77:11
**ago**
7:9, 12:17,

61:17
**agree**
29:1, 29:5,
43:18, 48:24,
52:11, 66:21,
73:6, 75:21
**ahead**
11:22
**al**
7:25
**alexander**
3:23, 76:2
**alike**
39:8
**all**
6:10, 6:14,
7:20, 13:8,
20:20, 23:1,
23:7, 24:1,
24:4, 24:9,
26:9, 29:17,
31:2, 34:9,
40:13, 42:10,
43:18, 45:8,
55:9, 60:19,
60:23, 62:15,
73:6, 73:16,
78:7, 78:9,
78:21
**allen**
9:6, 16:21
**allow**
41:23, 66:24
**already**
33:22, 35:5,
49:3, 54:19,
60:13, 70:10,
74:7, 75:18
**also**
3:23, 20:4,
22:2, 23:19,
23:23, 35:3,
36:25, 38:4,
48:7, 49:20,
70:14
**alteration**
72:2
**although**
62:16

always
33:16, 38:24
america
40:1
american
22:14, 22:20
among
73:10
amount
12:10, 44:3
amounts
38:25
analysis
22:24, 23:12,
34:3, 34:7,
37:18, 42:14
analytical
76:21
analyzed
73:13
another
7:7, 8:6, 28:7,
36:17, 49:12
answer
6:14, 25:12,
34:11, 37:2,
38:22, 42:17,
42:19, 53:5,
55:7, 71:18,
72:12, 74:3,
76:17, 77:24,
78:3, 78:7,
79:4, 81:20
answered
74:11
answers
6:14, 72:14
any
5:21, 8:21,
14:6, 14:9,
15:18, 17:12,
17:18, 20:5,
20:6, 24:5,
25:4, 26:10,
27:24, 29:10,
31:13, 32:22,
48:17, 53:2,
57:19, 58:2,

62:8, 63:12,
67:11, 71:1,
71:8, 71:19,
73:18, 76:14,
79:12, 79:13,
79:20, 79:24,
81:7, 81:24,
82:6, 83:7,
84:11
anybody
51:25
anymore
63:18
anyone
64:2
anything
16:12, 57:23,
61:14, 74:16,
75:12, 76:19,
79:10, 82:3
apart
37:19
appeal
33:7
appear
7:15, 62:21,
83:7
appears
32:12, 63:16
applied
21:17
applying
42:3
appointed
21:17
appreciate
36:13
approximation
19:5
archival
23:14
archive
40:24, 41:4
area
29:15, 80:17,
80:18, 80:20
arena
25:15

argue
36:6, 47:15,
48:5, 61:18,
67:10
argument
56:6
arguments
34:16, 34:25,
62:20
around
46:1
art
20:22, 22:24,
30:3, 30:9,
34:4, 34:8,
34:13, 34:17,
34:24, 35:2,
35:10, 38:4,
38:5, 38:16,
38:18, 38:20,
38:25, 39:4,
39:15, 39:17,
40:6, 40:17,
41:14, 48:8,
57:20, 58:4,
58:24
article
81:16
articles
22:22, 23:1,
81:8, 81:25
artist
74:24
arts
20:11, 20:13,
20:25
ascend
63:18
ascertain
26:13
asked
10:9, 18:9,
28:2, 28:12,
32:24, 33:10,
37:5, 42:22,
43:25, 44:9,
46:12, 54:1,
54:7, 63:20,

64:7, 73:12,
75:2
asking
19:12, 31:23,
38:21, 43:1,
44:23, 54:23,
56:1, 60:14,
63:13, 64:13,
67:5, 75:20,
78:22
aspects
62:19
assent
70:21
assenting
75:16
assess
47:22
assessment
18:17
assigned
50:19
assistant
21:14, 21:17
associate
21:20, 21:24,
38:5
association
22:9
assume
6:22, 27:1,
28:18, 29:16,
54:19, 69:15
assuming
20:12, 37:6
assumption
69:16
attached
7:12, 7:13,
12:3, 51:12,
65:10, 83:8
attempt
26:15, 29:12,
57:13, 76:1
attempted
28:19, 30:5
attempting
19:18, 26:13,

39:19, 42:5,
54:14, 77:12

**attended**
2:5

**attention**
48:23

**attest**
40:11

**attorney**
82:8, 82:11

**audible**
6:15

**audio**
66:10, 67:25

**audio-visual**
66:14, 66:19,
67:13, 69:25,
70:8, 71:22,
71:23

**august**
1:22, 84:16

**automolograph**
22:17

**avant**
79:10

**average**
46:8, 57:24,
80:21

**avoid**
29:12, 49:14,
61:14

**awarded**
21:2

**aware**
16:14, 18:11,
20:5, 32:22,
46:15, 47:13,
56:8, 59:14,
61:20, 80:24,
81:4, 81:24

**B**

**b**
56:16, 57:6,
60:21

**bachelor**
20:11, 20:13

**bachelor's**
20:22

**back**
14:2, 15:10,
16:1, 18:10,
20:14, 23:18,
31:25, 32:1,
41:15, 48:10,
49:16, 55:3,
55:4, 60:8,
60:13, 61:2,
64:20, 78:12,
78:14, 79:22

**background**
20:11, 23:8,
23:10

**bad**
49:14, 50:13

**baker**
3:24

**banjo**
23:21, 24:12

**base**
33:2

**based**
15:1, 23:9,
23:11, 30:18,
30:21, 39:9,
40:10, 43:13,
46:20, 54:9,
55:8, 61:18,
63:5, 75:8

**basic**
38:12

**basically**
37:9, 47:2,
73:22

**basis**
54:6

**bathroom**
59:21

**bear**
45:25

**beatbox**
1:4, 7:23

**beatboxing**
67:19

**beaverton**
3:14

**became**
21:19

**because**
13:6, 39:23,
40:8, 45:18,
47:9, 50:15,
50:22, 51:1,
55:13, 74:21,
76:12, 78:23

**become**
35:5

**becomes**
34:21, 72:20

**been**
5:3, 5:24, 6:4,
7:11, 7:15,
12:10, 13:21,
17:8, 18:11,
18:16, 19:1,
19:7, 21:18,
21:21, 23:23,
24:6, 25:2,
25:7, 26:22,
32:24, 34:10,
37:15, 43:9,
44:9, 46:24,
49:3, 53:3,
54:19, 58:19,
60:3, 70:10

**beethoven**
50:9

**before**
2:8, 5:21,
5:23, 6:7, 6:13,
35:17, 41:23,
42:7, 42:18,
58:25, 59:15,
59:18, 84:4

**begin**
6:14

**beginning**
39:1

**behalf**
3:3, 3:10, 13:2

**behind**
78:21

**being**
28:2, 28:7,
28:12, 33:10,
37:5, 37:18,

41:1, 42:22,
52:1, 61:14,
64:7, 74:23,
80:23

**belief**
32:19

**believe**
10:16, 11:13,
21:3, 21:13,
30:11, 32:12,
32:14, 33:9,
36:22, 36:25,
37:1, 38:20,
54:16, 70:23,
75:21

**berklee**
21:4

**besides**
67:1, 78:9

**best**
16:10, 26:7,
45:8

**better**
13:23, 46:5,
46:8, 60:7

**between**
27:4, 27:8,
45:6, 46:17,
47:13, 47:23,
48:21, 55:14,
61:25, 75:24,
75:25, 76:15,
77:2, 77:14,
77:23, 78:2

**billed**
10:21

**bit**
6:9, 16:2,
40:15, 68:11

**blaise**
3:4, 3:5, 4:3,
5:6, 11:2, 11:4,
11:16, 11:21,
12:6, 12:22,
12:23, 14:12,
14:15, 14:19,
14:25, 15:9,
15:17, 31:24,

| | | | |
|---|---|---|---|
| 32:8, 52:3, 52:6, 53:1, 53:25, 54:5, 55:2, 55:6, 56:25, 57:4, 59:21, 60:2, 65:15, 72:7, 72:10, 72:16, 77:19, 77:21, 80:11, 81:13, 81:19, 82:6, 82:8, 82:10 | **C** | 7:6, 7:12, 7:16, 7:17, 7:22, 8:1, 8:5, 8:6, 8:8, 8:10, 10:5, 11:14, 16:21, 16:24, 17:2, 17:14, 17:17, 17:19, 19:24, 31:3, 32:6, 32:23, 33:1, 34:17, 37:7, 39:19, 42:6, 42:25, 43:13, 44:14, 45:15, 45:17, 45:21, 46:10, 46:24, 47:1, 47:2, 47:4, 47:5, 49:4, 50:19, 52:14, 52:20, 53:4, 63:21, 63:24, 64:8, 64:9, 64:14, 65:1, 72:13, 72:23, 84:12 | **century** 39:21 |

**calculated**
62:7, 62:8
**calculation**
17:7
**california**
1:2, 1:10, 3:21, 5:19, 8:1, 21:4
**call**
7:8, 12:9, 12:11, 13:12, 27:7, 28:3, 34:12, 34:25, 39:7, 39:22, 39:23, 40:3, 45:23, 67:14, 74:15, 74:18, 74:24, 75:23, 75:24
**called**
5:3, 30:8, 31:7, 33:8, 41:12, 48:23, 64:2, 78:17
**calling**
12:15, 12:24
**calls**
77:23, 77:24, 78:3, 78:4
**came**
27:25, 56:7, 62:25
**can't**
63:10, 74:3, 78:22
**cannot**
53:2, 61:13
**capacity**
42:21
**career**
25:5, 44:9
**careful**
30:18
**carefully**
77:16
**case**
1:6, 5:21, 7:1,

**board**
22:13
**body**
20:6
**both**
16:14, 24:13, 28:10, 78:18
**bought**
69:12
**bracket**
28:11, 51:15
**brain**
40:23, 41:3
**branch**
22:9
**break**
10:24, 59:23, 59:25
**brief**
10:24
**bring**
45:23
**broad**
54:18, 74:25, 75:1
**broadcast**
53:14
**broken**
26:24
**brooklyn**
1:30, 2:8, 84:3, 84:22
**buns**
20:19
**business**
10:16, 28:3

**cases**
9:4, 9:8, 9:17, 16:2, 16:3, 16:7, 16:8, 16:11, 16:14, 16:19, 17:12, 17:16, 18:7, 27:22, 28:2, 32:4, 33:11, 42:11, 45:3, 50:11, 50:18, 81:6
**categorize**
17:21
**categorizing**
41:3
**cater**
16:21
**caused**
55:24
**cds**
69:10
**central**
1:2, 7:25

**certain**
12:10, 35:9, 36:1, 37:20, 38:8, 41:14, 44:3, 58:7, 62:19, 70:11, 76:8, 79:5
**certainly**
10:20, 17:9, 24:12, 26:4, 46:10, 54:9, 56:4, 57:22, 74:21, 79:11, 81:5, 81:11
**certificate**
84:1
**certify**
84:5
**chain**
28:21, 79:15
**chains**
27:18
**chair**
21:22, 21:23
**chance**
11:22, 43:21, 59:25, 63:7
**change**
37:1, 52:7
**changed**
62:9
**characteristics**
28:21, 34:20
**characterize**
13:11, 24:3, 25:4, 61:22
**characterized**
79:6
**check**
66:2
**chicago**
3:7
**child**
9:7
**choral**
23:24

| | | | |
|---|---|---|---|
| **chose** 49:11 | **close** 57:11 | **compensation** 68:7 | **concluded** 53:20 |
| **chosen** 77:17 | **closer** 18:25 | **complete** 9:7, 11:24, 23:6, 83:6 | **conclusion** 54:24 |
| **citations** 23:2 | **coach** 54:14 | **completely** 7:20, 40:12, 60:5 | **concrete** 27:2 |
| **civilization** 45:9 | **codified** 37:15 | **complex** 26:11, 27:18, 46:9, 73:25 | **conduct** 40:16 |
| **claim** 48:18, 48:21, 49:7, 49:12, 53:14, 58:19, 76:2 | **cohen** 1:13 | **complicated** 73:4 | **conducted** 1:21, 2:2 |
| **claimed** 33:23 | **coin** 33:8, 34:1, 35:1 | **component** 74:14 | **connection** 14:6, 59:19 |
| **claiming** 32:18, 40:9 | **collection** 22:18, 22:19, 69:13 | **compose** 36:7 | **conscious** 42:9, 45:6 |
| **claims** 18:14, 53:9 | **collections** 41:16 | **composed** 35:17 | **consciously** 29:12, 75:6 |
| **clarify** 12:22, 14:25, 51:17, 52:17 | **combine** 71:10 | **composer** 24:3, 24:4 | **consider** 19:2, 19:21, 19:24, 34:4, 34:8, 45:22, 63:15 |
| **clarifying** 8:7 | **come** 12:14, 18:10, 39:6, 50:18 | **composition** 23:9, 38:9, 71:3, 72:21, 76:5, 76:6 | **considered** 68:2, 72:22, 74:8 |
| **clarity** 12:18 | **comes** 36:15, 53:6 | **compositions** 28:15, 45:23, 69:23 | **considering** 39:15, 74:5, 74:13, 78:20 |
| **classical** 23:24, 24:21, 25:3 | **commentator** 62:18 | **compulsion** 14:10 | **consistency's** 12:25 |
| **clear** 11:10, 11:14, 14:8, 17:24, 28:24, 57:10, 66:16, 77:1 | **commercial** 50:9 | **computer** 80:7 | **consonant** 64:23 |
| **clear-cut** 26:18 | **commission** 84:16 | **conceivable** 28:5 | **consulo** 15:19, 15:23 |
| **clearance** 9:16, 16:6 | **committees** 22:14 | **concept** 26:4, 26:11, 27:21, 33:5, 35:14 | **consultant** 43:15 |
| **clearer** 74:2, 74:4 | **common** 33:8, 34:1, 35:1, 35:21, 36:8, 39:22, 40:3, 48:7, 70:5, 79:11 | **concepts** 27:1 | **consultant-type** 33:2 |
| **clearly** 41:6, 52:14, 55:11 | **commonly** 73:1, 73:3 | **conceptualize** 45:17, 45:20 | **consultative** 43:22 |
| **cliche** 36:11 | **commonplace** 73:1 | **conceptualized** 49:23 | **consultive** 9:10, 19:1, 42:21 |
| **cliches** 36:5, 36:10 | **commonwealth** 2:10 | **conceptually** 68:9 | **contacted** 10:17, 63:23 |
| **client** 10:14, 36:15 | **comparing** 75:10 | **conclude** 70:16 | **contained** 67:24, 70:17, 73:18, 73:19, 74:16, 74:17, |
| | **comparison** 75:23 | | |

containers
75:17
contemporary
22:17, 22:23,
24:22, 37:8
contention
71:1
context
5:25, 8:24,
9:13, 19:18,
24:20, 24:21,
25:10, 26:6,
32:25, 44:10,
71:22
contexts
73:15
continue
12:25
controversy
12:11
convention
38:9
conventional
37:21
conventions
33:9, 36:4
conversation
59:18
copied
27:15, 27:20,
28:6, 58:23,
59:1, 59:9,
59:10
copy
55:13, 58:9,
58:15, 60:24,
82:9, 82:12
copy-written
72:3
copying
28:1, 28:17,
29:2, 29:7,
29:12, 30:1,
59:13
copyright
8:25, 9:1, 9:9,
25:10, 25:15,

76:4, 79:25
25:19, 26:6,
26:12, 27:1,
31:14, 31:15,
32:6, 39:6,
41:19, 41:22,
43:13, 44:11,
45:5, 46:9,
46:16, 46:23,
62:1, 82:1
copyrighting
72:3
corporation
1:10
corporations
9:11
correct
5:14, 16:8,
36:2, 47:5,
49:21, 50:20,
50:22, 66:13,
68:17, 71:24,
74:9, 78:4,
80:14, 80:17,
80:25, 83:6,
84:6
corrections
83:7
correctness
47:16
could
11:25, 15:22,
17:14, 25:24,
27:7, 27:8,
28:9, 33:20,
36:3, 36:6,
43:21, 48:5,
48:25, 50:17,
67:1, 67:2,
67:6, 67:11,
74:24, 76:22
couldn't
62:8, 62:11
counsel
11:5, 84:11
count
39:17
course
42:10, 56:8

court
1:1, 2:9, 6:11,
9:13, 9:15,
11:24, 17:25,
31:24, 32:2,
55:2, 55:5,
67:17, 78:15,
82:8, 82:11,
84:23
covered
60:14
crash
13:7
create
71:13, 71:15,
73:13
created
47:10
creating
68:25
creative
28:4, 59:2
credentialing
20:6
criticism
23:12, 30:10
cross
20:19
crux
76:24
cue
46:17, 70:11
cues
1:8, 7:24,
71:21
cull
81:9, 81:17
cum
20:24
current
7:2, 7:4
currently
21:23
curt
72:7
curtis
3:11
cv
9:3, 20:12,

23:4

## D

dance
25:7
dangerous
29:15
date
13:22, 83:13
day
84:15
deal
30:17, 59:8
dean
21:24
decide
42:5
decided
45:3, 56:7
decision
55:10, 55:19,
55:25
defendant
16:24
defendants
1:18, 3:10
defense
10:11
deference
76:15
define
17:14, 25:9,
25:21, 26:5,
26:7, 32:9,
41:18, 41:21,
42:8
defining
26:3
definitely
16:7, 17:23
definition
19:12, 20:2,
20:5, 20:8,
27:6, 73:11,
73:22, 75:5
definitional
34:9
degree
20:24, 20:25,

27:24
**department**
21:15, 21:22
**deployment**
19:17
**depo**
15:6
**deponent**
83:1
**deposition**
1:20, 2:1,
5:21, 5:22,
14:7, 14:22,
16:13, 16:18,
16:22, 18:10,
52:2, 84:4
**derivative**
71:15
**derived**
17:5
**designed**
58:6, 70:3,
70:24
**destiny's**
9:7
**detail**
49:11, 62:3,
62:15
**details**
17:3, 21:6,
52:12
**determine**
19:19, 39:11
**determining**
29:23
**developments**
61:20
**diagnosis**
12:14
**difference**
45:6, 48:21,
48:24, 48:25,
61:24, 76:2,
76:7, 76:18,
77:22, 78:2
**different**
6:9, 6:10,
26:13, 32:23,

40:15, 51:3,
57:23, 61:21,
62:21, 72:1,
72:14, 77:2,
77:6, 77:7, 77:8
**diligence**
9:21, 16:6,
33:3
**dip**
39:21
**direct**
5:5, 81:14
**direction**
84:9
**directions**
37:10
**disagree**
50:24, 50:25,
52:17, 52:19
**discovery**
11:17
**discussed**
37:15
**discussion**
12:5, 14:4,
15:11, 34:21,
65:14, 72:15
**display**
34:19
**dispute**
39:7, 53:3
**distinction**
18:20, 75:17
**distinctive**
25:17, 34:2,
34:22, 34:23,
35:6
**distribute**
33:18
**distributed**
35:18
**district**
1:1, 1:2, 8:1
**dj**
25:7
**doctor**
5:17, 12:12,
12:15, 12:16,

60:3, 72:17
**document**
13:12, 14:22,
15:2, 52:23,
52:25, 54:15,
54:16, 54:17,
54:23, 64:18
**documents**
14:6
**doing**
6:9, 9:21,
23:13, 27:22,
34:3, 34:7,
38:10, 50:14,
60:3, 67:13,
75:15
**done**
5:22, 6:6,
9:10, 17:23,
18:4, 18:24,
22:21, 30:22,
42:4, 43:10,
62:22, 66:25,
69:19, 70:10
**doug**
10:17, 72:7
**douglas**
3:18, 3:19,
11:5
**down**
6:12, 36:6,
49:15, 51:9,
51:14, 58:1,
60:12
**downbeat**
80:8
**dr**
5:7, 12:8,
14:8, 15:4,
51:6, 58:12,
65:3, 77:22,
80:13
**draw**
27:4, 27:8
**drive**
3:6, 3:13
**drop**
57:16

**due**
9:21, 16:6,
33:3
**duly**
5:3
**duration**
69:24
**during**
45:10, 78:18

---
E
---

**each**
26:5, 32:23,
37:14, 50:7
**earlier**
17:15, 33:1,
46:20, 49:16,
49:19, 69:9,
71:20, 71:21,
72:17, 74:7
**early**
69:6
**eastman**
21:1, 21:15
**easy**
29:15, 40:5,
61:16
**echo**
72:5
**edited**
22:18, 69:24
**edmondson**
3:11, 3:12,
11:18, 12:18,
14:5, 14:14,
14:17, 14:20,
15:4, 51:22,
52:22, 53:23,
54:3, 54:13,
56:23, 57:1,
65:11, 80:9,
80:12, 81:15,
82:5, 82:12,
82:14
**educational**
20:10
**ee**
73:18, 73:19,

74:17, 75:13,
75:25, 76:4,
77:3, 78:10,
78:21, 79:25
**effect**
77:13
**effectively**
32:16, 39:21,
40:6, 40:9,
42:25, 76:12
**effects**
76:22
**eight**
9:4
**either**
16:19, 18:11,
28:19, 54:8,
70:9
**elaborate**
64:22
**elementary**
23:18
**elements**
79:7
**eliminate**
76:13
**else**
67:1, 70:25
**embodied**
19:9, 19:11
**eminem**
46:17, 48:1,
51:1, 52:9,
52:20, 53:21,
56:12, 60:23
**eminem's**
46:17
**employed**
84:11
**employment**
10:2, 26:14
**end**
35:7, 43:21,
51:24, 78:1
**energy**
41:2
**enough**
32:19, 42:9

**entered**
47:12, 50:23
**entertainment**
1:7, 1:14, 7:24
**entire**
54:17, 54:22
**entirely**
32:4, 57:10
**enumerated**
55:12
**errata**
83:8
**esoteric**
23:13
**especially**
30:15, 35:23,
46:11, 69:8,
81:5
**esque**
46:17, 48:1,
51:1, 52:9,
52:20, 53:21
**esquire**
3:4, 3:11, 3:18
**essentially**
35:4
**established**
40:4
**et**
7:25
**europe**
40:1
**evaluate**
62:20
**evaluating**
9:17
**even**
6:9, 11:21,
24:2, 27:7,
67:14, 73:5
**event**
27:7
**events**
37:14
**ever**
16:11, 17:10,
21:18, 24:6,
24:12, 27:13,

32:24, 49:25,
50:13, 59:11,
63:11, 63:23,
64:2, 69:19,
81:7
**every**
36:23, 62:15,
67:4, 70:22
**everyone**
51:6
**everything**
6:12, 23:3,
45:11, 77:2,
77:5, 77:7
**evidence**
28:8, 30:13,
30:19, 31:10,
35:16, 35:21,
35:23, 44:3
**evocative**
39:8
**exact**
13:21
**exactly**
13:13, 15:14,
31:23, 44:21,
80:7
**examination**
4:2, 5:5
**examined**
83:4
**example**
43:6, 67:3,
67:5
**exceeds**
81:13, 81:14
**except**
47:6
**exception**
25:6
**exceptional**
50:3
**exclude**
75:5, 77:2
**excluded**
74:22, 76:23
**excluding**
75:3, 75:9,

78:7, 78:8,
78:16, 78:19
**exclusion**
75:20
**exhibit**
4:7, 4:8, 4:9,
4:10, 4:11,
11:19, 11:25,
12:1, 12:20,
12:21, 12:24,
44:15, 48:11,
51:10, 51:11,
56:15, 60:9,
61:3, 65:2,
65:8, 65:9
**exhibits**
12:2, 51:24,
52:1
**existed**
35:5
**exists**
34:18, 35:2,
35:15
**expect**
62:12
**experience**
21:11, 24:5,
26:16, 37:24,
45:25, 46:7,
57:8, 69:4,
69:14, 69:17
**expert**
5:25, 7:1, 9:8,
16:8, 19:7,
30:24, 31:3,
37:23, 40:10,
46:12, 46:14,
54:20, 56:8,
56:10, 62:20,
65:12, 68:1,
80:17, 81:14
**expert's**
58:12
**expertise**
19:18, 23:20,
80:20
**experts**
42:10

expires
84:16
explain
63:2
explanation
33:14
explicit
63:11
explore
45:25
exposed
35:8
exposure
9:24
express
74:21
expressed
49:24
expression
77:13
extensive
45:16
extent
37:23, 45:25,
51:25, 54:25
extremely
50:1, 79:10

**F**

f-i-n-k
5:12
fact
15:1, 19:19,
36:5, 42:10,
44:22, 52:19,
62:14
factors
29:22, 30:4,
55:9
fair
6:17, 6:23,
70:5, 80:16
fall
20:2
fallacy
30:9
familiar
6:2, 7:20,

26:10, 35:10,
58:5, 69:7,
69:22, 70:1
family
1:16
famous
39:10, 39:16,
81:6
far
80:3
feel
28:12, 33:18,
46:13, 75:7
fell
63:6
few
80:9
field
22:3, 37:16,
82:2
figure
46:5
filed
8:10, 17:18,
49:3
film
68:6
filmmakers
68:12
final
30:14, 30:21
financial
84:13
find
13:21, 14:11,
15:7, 15:12,
32:20, 34:16,
39:16, 40:5,
40:9, 79:1
finding
40:16, 46:16,
46:21, 46:23,
48:22, 49:18,
49:20, 50:23,
53:3, 61:6, 63:5
finds
60:23
fine
15:7

fingertips
64:18
finish
6:13
fink
1:20, 2:1, 5:2,
5:7, 5:11, 12:8,
14:8, 15:4,
51:6, 77:22,
80:13, 83:3
first
21:11, 37:3,
44:14, 48:16,
58:22, 66:17
fit
71:23
five
19:4, 59:22
focus
10:15, 46:13
focusing
45:18
follow
37:14, 41:11
follows
5:4
foregoing
83:5, 84:4,
84:5
forensic
19:9, 19:13,
19:14, 19:16,
19:21, 19:25,
20:2, 20:6,
20:8, 29:6,
32:10, 40:20,
42:4, 43:18,
44:6, 45:25,
57:8, 58:4,
61:19, 80:19,
80:24, 81:1,
81:8, 81:18,
81:24
forget
43:9, 61:16
forgotten
64:5
form
70:7

formal
7:9, 13:12,
16:13, 18:8,
19:6, 20:5,
43:25, 64:22
formality
17:22, 18:3
formally
35:24
forms
71:3
forward
14:24
forward-looking
33:2
found
14:2, 52:8,
52:20
fourth
20:14
fragment
26:18
fragmentation
26:20
fragmented
25:22, 25:25,
26:1
french
35:11
front
58:14
full
21:21, 70:13
full-time
10:3
function
44:24
functions
39:20
fundamental
40:20
fundamentally
44:12
further
80:2, 80:5

**G**

garbled
25:23

garde
79:10
general
28:17, 31:11,
31:12, 36:20,
39:14, 49:13,
50:11, 71:8
generalized
54:24
generally
18:17, 20:8,
26:9, 32:22,
42:11, 47:20
generic
37:13, 68:7,
70:19
genre
24:24, 36:1,
36:9
genres
35:25, 38:6
genuine
46:14
getting
13:23, 18:25,
24:20, 52:12,
64:19
give
18:21, 21:6,
21:10, 43:6,
43:8, 49:25,
50:5, 50:16,
51:13, 64:10,
76:9, 78:22
given
34:9, 53:17,
83:7, 84:6
giving
62:6
glad
61:15
glitched
34:5
go
6:8, 8:18,
10:20, 11:2,
11:22, 13:25,
14:2, 16:1,

20:10, 20:14,
23:18, 29:23,
31:20, 32:23,
37:9, 38:7,
40:15, 41:8,
41:15, 47:9,
47:24, 48:10,
59:21, 60:8,
60:13, 76:9,
79:8
goal
39:3, 47:15,
47:18, 47:20
goes
43:9
going
11:6, 11:19,
11:23, 18:21,
31:18, 37:9,
37:19, 41:6,
47:6, 48:15,
49:15, 51:5,
51:9, 51:22,
55:16, 58:22,
60:8, 60:12,
60:20, 62:3,
67:12, 71:12,
75:3, 79:22
gone
17:13, 17:16,
55:9
good
20:18, 43:21,
73:24, 80:6
grade
20:14
graduated
20:23
great
5:8, 5:9, 5:13,
5:20, 6:19,
6:25, 23:5,
51:9, 53:19,
79:22
ground
6:3
group
24:23

groups
69:10
guarantee
43:5, 50:13,
61:14, 74:3
guess
7:8, 15:7,
16:20, 17:22,
19:19, 29:24,
44:7, 46:2,
47:23, 66:9,
70:20
guitar
23:20

**H**

half
70:13
hand
37:11, 39:21,
84:15
handed
50:6
happen
45:4, 45:10,
50:14
happened
13:22, 28:23,
29:17, 55:21,
61:23
happening
62:1, 62:6
happens
18:23, 40:22
happy
6:21, 12:12,
15:6, 49:11
hard
26:3, 78:11
harkens
49:16
hat
74:20
hate
55:15
head
6:15, 18:22
hear
33:24, 54:4,

73:25
heard
35:14, 40:25,
59:11, 59:15
heather
3:4, 11:15,
11:19, 12:18,
14:5, 51:22,
52:22, 53:23,
54:13, 56:23,
65:11, 80:10
hedging
34:10
held
12:5, 14:4,
15:11, 21:16,
65:14, 72:15
hello
5:7
helped
13:21
here
15:6, 43:2,
43:16, 43:17,
52:2, 54:23,
55:15, 55:20
hereby
83:3, 84:5
hereunto
84:14
highly
25:17, 43:12,
61:13
hire
63:17
hired
8:13, 19:23,
21:13, 42:13
historical
30:16
history
5:18, 21:5,
21:10, 23:12,
45:24, 46:11
hit
80:8
hold
59:20

| | | | |
|---|---|---|---|
| **holdings** | **imagines** | **informal** | 70:22 |
| 1:15 | 53:6 | 13:11 | **intentional** |
| **hot** | **immediately** | **information** | 30:9 |
| 20:19 | 10:7, 15:24 | 28:20, 49:6 | **intentions** |
| **huge** | **implications** | **informing** | 30:12 |
| 38:25 | 58:8 | 54:2, 54:7 | **intents** |
| **hugely** | **implicitly** | **infringed** | 32:7 |
| 25:13 | 63:9 | 53:21 | **interest** |
| **huh-huh** | **important** | **infringement** | 37:24, 84:12 |
| 6:16 | 10:23 | 31:14, 46:16, | **interested** |
| **human** | **impossible** | 46:24, 48:18, | 15:15 |
| 28:7, 45:9, | 43:4, 50:12 | 48:22, 49:7, | **interesting** |
| 64:5 | **imprecisely** | 49:12, 49:18, | 38:19, 73:21 |
| **humble** | 68:11 | 50:23, 53:4, | **interests** |
| 46:3, 46:4 | **impression** | 61:6, 62:1, 63:6 | 18:15 |
| **hundreds** | 31:21, 50:16, | **infringes** | **international** |
| 40:12 | 62:19 | 56:12 | 22:9 |
| **hydrogen** | **inc** | **infringing** | **interrupt** |
| 43:19 | 1:8, 7:24 | 33:22, 33:23, | 65:11 |
| **hypothesize** | **include** | 36:17, 52:21 | **introspect** |
| 28:22 | 9:4 | **ins** | 39:5 |
| **I** | **including** | 7:20 | **intuition** |
| **iaspm-us** | 22:22, 45:12 | **insofar** | 41:11 |
| 22:10 | **inclusive** | 9:23, 27:5 | **intuitive** |
| **idea** | 67:4, 78:9 | **inspection** | 37:25 |
| 75:16 | **income** | 14:23 | **invention** |
| **ideas** | 17:5 | **instance** | 36:9 |
| 73:25 | **incorrectness** | 67:7, 67:12 | **investigative** |
| **identification** | 47:16 | **instances** | 60:4 |
| 12:3, 51:11, | **indeed** | 34:17 | **invoice** |
| 65:9 | 61:8 | **instantly** | 10:21, 13:24, |
| **identify** | **indicate** | 25:17 | 15:13 |
| 36:8 | 27:15, 49:20 | **instrument** | **involved** |
| **identifying** | **indicated** | 23:17 | 18:16, 25:13 |
| 32:16, 44:3 | 11:5, 63:7 | **instrumental** | **involves** |
| **illinois** | **indicates** | 75:24 | 37:7 |
| 3:7 | 68:13 | **instruments** | **ip** |
| **image** | **individual** | 23:22 | 3:12 |
| 66:15, 66:20 | 1:12, 1:13 | **intellectualized** | **issue** |
| **images** | **industry** | 71:6 | 19:20, 25:15, |
| 67:7, 68:9 | 21:23, 29:7, | **intend** | 34:20, 35:17, |
| **imagine** | 58:24, 67:23 | 49:10 | 64:20 |
| 26:21, 43:10, | **infer** | **intensifies** | **issues** |
| 48:25, 56:9, | 30:12, 57:15 | 57:14 | 9:16, 22:24, |
| 70:14, 72:13 | **inference** | **intent** | 22:25, 46:1 |
| **imagined** | 27:18, 27:25, | 30:25, 31:3, | **itself** |
| 34:1 | 28:25, 30:21 | 31:9, 31:14, | 51:23, 52:23 |
| | **inferences** | 32:4, 32:7, | **J** |
| | 28:21 | | **job** |
| | | | 1:28, 10:3, |

13:23, 45:17,
45:20
**joseph**
3:19
**journals**
81:17, 81:24,
82:1, 82:2
**judge**
31:16, 32:13,
32:20, 42:18,
46:5, 46:22,
47:2, 47:5,
47:7, 51:20,
52:13, 52:20,
53:8, 53:20,
55:24, 56:5,
56:7, 59:10,
60:23, 81:8,
81:9, 81:17,
82:3
**judge's**
55:10
**judgment**
4:10, 17:2,
26:16, 30:3,
42:1, 42:2,
42:3, 44:7,
44:13, 45:14,
46:9, 46:15,
46:18, 46:20,
47:12, 47:17,
47:19, 51:2,
51:5, 51:23,
51:25, 52:8,
52:12, 53:7,
53:9, 53:13,
53:16, 58:17,
59:5, 60:9,
62:25, 63:5,
64:15
**judgments**
37:20, 37:23,
37:24, 38:1,
45:18
**july**
7:3
**jump**
35:7

**jurisdiction**
17:19, 63:12
**jury**
32:14, 32:20,
42:18, 46:22

**K**

**keep**
18:3, 78:23
**key**
3:25
**kick**
65:13
**kind**
9:21, 18:16,
22:24, 24:13,
27:2, 34:9,
37:6, 40:24,
44:8, 47:24,
49:16, 58:18,
59:5, 62:13,
70:12, 70:22,
74:19, 79:3
**kinds**
31:10, 35:23,
41:14, 45:8
**know**
7:13, 8:6,
10:1, 10:16,
12:7, 12:20,
13:1, 13:3,
13:10, 14:1,
14:11, 14:17,
14:23, 15:15,
15:16, 15:21,
16:5, 16:11,
17:1, 17:3,
17:16, 18:4,
18:22, 18:25,
20:21, 24:21,
28:18, 29:3,
30:11, 32:11,
32:17, 33:8,
33:17, 33:19,
36:16, 39:24,
40:8, 40:19,
41:8, 43:19,
46:8, 48:21,

49:23, 50:7,
51:14, 51:16,
53:8, 53:10,
53:15, 54:1,
54:8, 54:9,
54:21, 54:24,
55:9, 55:12,
55:22, 56:1,
56:2, 56:6,
58:8, 58:11,
58:15, 58:20,
59:9, 60:16,
64:17, 64:19,
65:4, 68:23,
69:10, 70:4,
70:22, 71:17,
73:3, 76:21,
77:22, 78:2,
79:20, 81:4
**knowing**
36:13, 62:9
**knowledge**
15:20, 37:12,
39:2, 40:10,
59:2, 69:18,
69:21
**known**
18:15, 22:10,
35:3, 63:12

**L**

**labeled**
47:25, 71:11
**labrador**
1:7, 1:14,
7:24, 10:13,
11:5
**lack**
29:8
**landscape**
31:19, 31:21
**language**
27:2, 33:9,
35:1, 35:21,
39:25, 48:7,
52:16, 56:18,
57:7, 57:9,
57:16

**largely**
41:16
**last**
18:24, 44:25,
49:15, 62:12
**later**
61:23
**laude**
20:24
**law**
3:12, 3:19,
18:1, 25:20,
47:8, 47:9,
47:10, 62:14,
82:1
**lawsuit**
17:18, 49:3
**lawsuits**
16:9
**lawyer**
11:9, 31:16,
45:19, 46:4,
62:17
**lawyers**
7:14
**lay**
54:21
**layman**
49:1
**lead**
53:9
**leadership**
22:11
**leads**
54:19
**learn**
30:20
**least**
61:20
**leave**
55:1, 77:12
**lecturer**
21:14
**left**
32:4, 46:22,
75:10, 77:3,
78:20
**legal**
13:12, 14:9,

19:20, 33:19,
35:13, 45:10,
45:18, 47:11,
49:8, 50:18,
53:16, 58:3,
58:17, 62:18,
71:17
**lengths**
70:3
**less**
17:22, 64:23,
64:25
**let's**
18:14, 39:25,
63:8, 63:25,
74:24, 75:4
**letter**
49:21
**level**
18:2, 31:5,
31:6, 32:12,
53:17, 58:7,
59:7
**levels**
23:19
**liability**
46:16
**libraries**
69:7
**library**
1:9, 48:2,
69:12, 70:11
**licensing**
69:16, 69:17
**life**
36:19
**likelihood**
42:18, 49:18,
50:8
**line**
27:8
**lines**
27:4
**link**
30:6
**list**
9:4, 9:7, 16:3,
40:13, 67:4

**listed**
23:3
**listen**
40:21, 40:23,
41:10, 41:11,
42:22
**listened**
41:1
**listing**
23:7, 51:24
**literal**
25:22, 25:25,
26:1, 26:25,
27:3, 27:9
**literature**
5:19, 21:6,
30:10
**litigation**
17:4, 43:22,
45:5, 62:1
**litigations**
7:21
**little**
6:9, 16:2,
19:11, 25:23,
40:14, 41:20,
68:11
**llc**
1:15, 9:5
**location**
72:8
**logical**
30:20, 56:6
**long**
8:24, 23:25,
66:24
**look**
8:17, 8:18,
15:6, 41:9,
41:15, 44:20,
60:14, 60:18
**looked**
44:17, 45:16,
64:19
**looking**
13:20, 20:12,
26:23, 56:15,
56:24, 57:6,

58:1, 61:16,
73:17, 74:14,
78:6
**looks**
11:12
**lose**
43:12, 46:17,
48:1, 51:2,
52:9, 52:21,
53:21, 56:12,
60:24
**lost**
41:20
**lot**
12:16, 16:5,
17:23, 18:1,
24:19, 27:12,
29:22, 30:11,
41:2, 41:9,
41:10, 46:7,
62:3, 73:4
**lots**
37:25
**lunchtime**
65:13

**M**

**machine**
37:18
**madam**
11:24, 31:24,
55:2
**made**
27:18, 30:8,
55:18, 58:18,
59:3, 59:19,
62:24, 67:17
**main**
23:17
**majority**
18:24
**make**
14:7, 18:5,
23:6, 26:16,
28:21, 30:3,
32:5, 34:15,
34:25, 36:16,
37:20, 37:25,

39:19, 54:10,
55:24, 57:17,
66:16, 74:2,
74:3, 75:20
**makes**
75:19
**making**
19:10, 27:24,
32:17, 34:10,
42:1, 71:7,
73:14
**many**
18:14, 30:4,
32:4, 32:5, 39:3
**mark**
11:18, 11:23,
11:25, 51:10
**marked**
12:2, 44:15,
48:11, 51:11,
61:3, 65:2,
65:8, 65:9
**marks**
33:12
**master**
20:25
**matching**
36:21
**material**
10:7, 36:21,
66:10, 66:12,
75:6, 79:5
**matter**
19:19, 38:20
**maybe**
27:7, 36:8,
70:13, 73:24,
75:24, 76:9,
80:21
**mcpc**
1:15
**mean**
6:6, 8:17,
10:6, 10:20,
11:21, 12:9,
16:9, 17:17,
20:17, 25:16,
26:4, 31:4,

40:18, 44:18,
49:19, 50:5,
56:22, 57:7,
57:22, 57:23,
61:12, 62:2,
63:2, 63:9,
63:17, 66:1,
66:7, 67:3,
70:20, 70:21,
72:12, 79:16,
80:3
**meaning**
57:13, 58:3,
58:18
**means**
27:3, 73:16
**meant**
27:2, 59:10
**member**
22:15
**memo**
4:9, 7:7, 7:11,
8:4, 8:11, 8:14,
8:16, 8:22,
10:5, 11:6,
12:25, 13:1,
13:2, 13:16,
44:14, 48:10,
49:4, 49:24,
61:2, 61:9,
62:13, 63:5
**memory**
40:19, 41:4,
41:17
**mention**
30:8
**mentioned**
8:5, 23:1
**methodologies**
36:25
**methodology**
36:14, 36:21,
36:23, 37:3,
38:13
**mic**
65:18, 65:19
**michael**
1:12

**microphone**
65:17
**might**
18:11, 30:2,
34:25, 39:7,
43:6, 45:10,
49:14, 53:8,
62:22, 68:15,
74:1, 74:19,
75:23
**mile**
9:4
**mind**
12:15, 17:23,
19:16, 38:24,
41:13, 49:13,
53:6, 57:2,
77:6, 77:10,
77:11
**minds**
33:5
**minutes**
70:14
**mitigator**
44:25
**mm-hmm**
10:12, 16:4,
26:2, 48:12,
56:17
**model**
42:23
**molecule**
43:20
**molecules**
43:19
**moment**
51:13, 59:20,
62:7, 65:12
**money**
24:14
**moral**
45:7
**more**
9:10, 9:16,
17:22, 19:6,
21:6, 22:4,
22:24, 23:13,
27:2, 33:21,

34:17, 40:7,
56:5, 63:15,
64:21, 64:22,
64:23, 64:24,
77:8, 79:11,
82:5, 82:6
**most**
9:9, 22:7,
28:2, 30:20,
66:21, 68:7,
70:19, 71:13
**mostly**
23:23, 23:24,
24:16, 25:2
**motion**
17:1
**motives**
29:16
**mouth**
67:18
**move**
14:23
**moved**
21:20
**much**
19:6, 31:22,
64:21, 70:4,
79:11
**multimedia**
69:1
**multiple**
26:12
**multiply**
38:25
**multitrack**
76:11, 76:14
**music-related**
21:11
**musical**
23:14, 27:6,
28:13, 28:15,
28:22, 28:25,
29:18, 30:14,
34:20, 35:1,
37:5, 37:13,
37:14, 38:8,
41:16, 45:22,
45:24, 69:23,

71:3, 71:7,
71:13, 73:6,
73:8, 74:23,
76:5, 76:6,
76:22, 77:16,
79:16, 79:21,
81:25
**musically**
75:13
**musicians**
9:11
**musicological**
19:17, 22:14,
22:20, 26:15,
26:19, 42:2,
75:16, 76:21,
82:1
**musicologically**
36:8
**musicologist**
9:22, 19:22,
19:25, 27:16,
28:6, 31:18,
32:15, 36:20,
40:8, 40:20,
41:1, 44:6,
49:9, 50:13,
57:8, 69:7,
73:23, 73:25,
74:20, 80:13,
80:22, 80:24,
81:2
**musicologists**
30:15, 30:16,
39:23, 43:18
**musicology**
19:9, 19:13,
19:14, 19:16,
20:3, 20:6,
20:9, 21:16,
21:22, 22:4,
29:2, 29:7,
32:10, 37:16,
42:4, 57:20,
58:4, 58:24,
80:19, 81:8,
81:18, 81:24
**must**
30:22, 44:1

muster
28:19
muted
65:16
mwf
8:2
myself
13:7, 24:4,
25:4, 41:23,
57:10, 58:13

**N**

name
5:9, 15:22,
15:25
names
10:16, 76:10
narrating
67:8
narration
66:14, 66:19,
66:22, 67:1,
74:8, 78:8,
78:17, 78:19,
79:23
narrative
78:4
national
9:5, 48:3,
52:13
nature
22:4, 44:16,
62:14, 77:16
necessarily
25:17, 33:16,
63:13
necessary
20:16, 21:9,
38:25
need
37:4, 51:14,
51:16, 59:21,
65:24, 70:4,
72:13
needs
51:25
neither
16:16, 84:10

neutrally
79:6
never
15:4, 18:9,
31:8, 43:11,
50:15, 57:2,
81:16
new
9:5, 45:15,
46:18, 51:23,
52:8, 52:20,
53:4, 53:14,
60:9, 62:25,
63:14, 63:20,
64:9, 64:14,
71:3, 81:10
next
65:12, 74:12
nitschke
3:5
noel
1:11
noise
67:14
noises
67:18
noon
65:13, 80:7
norm
34:1
normally
18:3, 28:12,
31:5, 39:1, 70:2
norms
38:2
north
3:6
notarial
84:15
notary
2:9
notation
41:15
note
27:3, 36:18,
38:3, 80:6,
81:23
noted
81:15

notes
27:5, 76:5
nothing
14:22, 50:7,
50:13, 55:14,
76:3
notice
2:8, 14:6,
14:13, 59:7
notion
25:13, 28:14,
33:7, 69:11,
71:6, 78:25,
79:11
nowadays
41:7
np
48:3, 67:24,
68:3, 70:17,
73:18, 73:19,
74:8, 74:13,
74:14, 74:16,
75:12, 75:25,
76:4, 76:9,
77:3, 77:14,
78:8, 78:9,
78:21, 79:24
number
7:9, 17:19,
18:22, 22:12,
22:15, 22:22,
23:22, 25:6,
39:10, 61:17,
64:20
numerous
22:21, 34:17
nw
3:13
nzh
9:6
nzhc
9:6

**O**

oakhills
3:13
object
51:23

objection
14:11, 14:12,
14:16, 15:1,
52:22, 53:22,
53:23, 53:25,
54:2, 54:5,
54:6, 54:10,
54:11, 54:12,
54:22, 54:25,
81:13, 81:15,
81:19
objectively
38:1, 76:17
obvious
13:9, 29:10
obviously
6:10, 14:24,
77:1
occasions
19:5, 25:6
occur
63:16
occurred
61:15, 63:6
occurs
73:2
odd
19:11, 35:7
odds
43:6, 61:6,
61:17, 62:6,
62:7, 62:23,
63:3, 63:7,
63:11
officer
84:3
offices
3:19
often
30:24, 33:10,
39:15
oftentimes
39:5, 39:9
oh
68:16
okay
5:24, 6:2, 6:5,
6:8, 6:25, 7:4,

7:18, 7:22, 8:3,
8:13, 8:19,
9:14, 10:19,
11:1, 11:11,
12:7, 13:25,
14:3, 14:19,
15:9, 18:2,
19:10, 24:17,
25:11, 26:8,
29:19, 29:25,
31:16, 36:18,
38:14, 38:23,
41:18, 42:19,
43:15, 44:14,
48:10, 48:15,
51:5, 51:9,
51:21, 52:4,
56:3, 57:2,
58:22, 59:20,
60:6, 60:8,
60:18, 60:20,
64:6, 65:7,
65:22, 66:1,
66:4, 66:5,
67:16, 69:22,
71:19, 72:9,
72:10, 73:17,
74:5, 75:8,
77:18, 78:6,
78:16, 79:9,
79:13, 79:22,
80:11, 80:16,
81:7, 81:12,
81:23, 82:4
**old**
8:8, 35:13,
69:11
**old-age**
65:18
**older**
30:17
**olympics**
50:2
**one**
16:21, 22:7,
22:16, 24:11,
24:19, 25:5,
26:22, 28:7,

28:9, 32:12,
34:16, 35:22,
36:23, 37:11,
40:22, 40:25,
42:10, 43:10,
43:12, 49:11,
51:13, 54:10,
54:19, 55:17,
56:14, 58:14,
59:20, 63:23,
70:9, 75:19,
76:8, 76:25,
77:18
**one's**
62:14, 76:19,
76:23
**one-to-one**
27:8, 29:10
**ones**
9:12, 47:24
**only**
5:24, 16:7,
16:11, 17:16,
27:4, 27:17,
35:1, 35:19,
36:22, 55:19,
59:13, 66:22
**open**
77:12
**operations**
79:18
**opine**
32:24
**opined**
61:5
**opinion**
10:8, 16:8,
19:19, 27:19,
30:25, 31:9,
31:13, 48:16,
71:19, 81:10
**opinions**
31:19, 31:20,
45:7
**opposed**
18:16, 28:13,
43:14, 54:2,
57:11, 68:15

**opposite**
10:9
**oregon**
3:14
**organization**
22:11
**original**
25:10, 25:11,
29:13, 33:13,
34:22, 47:25
**originality**
25:14, 25:16,
25:19, 27:14,
28:14, 29:1,
29:6, 29:23,
30:2, 32:25,
33:5, 33:15,
33:20, 33:24,
34:4, 34:8,
34:12, 42:15,
46:22
**other**
22:3, 22:15,
24:6, 30:16,
35:21, 35:25,
37:14, 38:3,
42:21, 50:7,
58:9, 58:11,
66:12, 66:25,
68:9, 71:9,
75:15, 76:15
**others**
40:12
**otherwise**
6:22, 84:13
**out**
13:13, 17:4,
26:24, 30:23,
32:4, 33:25,
34:1, 35:15,
36:5, 43:8,
43:10, 43:11,
43:16, 48:5,
49:19, 49:25,
50:5, 50:18,
50:20, 52:15,
53:24, 59:24,
61:6, 62:23,

62:25, 65:13,
80:8
**outcome**
49:14, 57:18,
63:16, 84:13
**outs**
7:20
**over**
7:11, 9:1,
11:17, 18:24,
30:20, 37:1,
49:12, 57:5,
66:11, 80:21
**own**
36:12, 40:19,
41:4, 45:6,
75:22
**oxygen**
43:19

**P**

**page**
4:2, 4:7, 54:16
**pages**
1:29
**paid**
13:15, 13:19,
24:7, 24:12,
24:20
**palmer**
1:11
**paragraph**
44:25, 48:16,
49:15, 51:18,
52:5, 53:17,
53:20, 53:24,
55:8, 56:16,
57:6, 62:12
**parse**
53:16
**part**
7:15, 46:10,
64:19, 66:17,
69:19, 74:8,
79:15, 80:23
**particular**
35:25, 36:9,
37:5, 38:5,

47:16, 57:18
**particularly**
67:20
**parties**
2:5, 84:12
**parts**
73:10
**party**
7:23, 9:5,
15:16, 48:3,
52:13
**pay**
22:2
**paying**
15:8
**pc**
3:5
**peers**
80:24
**pejorative**
36:5
**pending**
7:25, 17:18,
32:1, 55:4,
78:14
**pennsylvania**
2:10
**people**
9:23, 12:11,
26:14, 30:2,
30:3, 30:15,
30:16, 30:19,
34:11, 35:9,
39:9, 42:5,
42:22, 43:6,
43:24, 44:23,
49:25, 50:16,
62:19, 68:15,
71:9, 73:5,
73:15, 79:16,
81:5
**people's**
30:11, 33:5,
39:11
**pepsi**
50:9
**percent**
17:10, 17:11,

43:5
**percentage**
17:5, 17:9
**perform**
23:15, 24:7,
36:23, 42:13
**performance**
23:9
**performances**
25:8
**performed**
24:18, 24:25
**performing**
24:6, 25:5
**perhaps**
27:12, 41:3
**period**
39:22, 39:24
**permission**
33:18
**person**
30:22, 46:8,
51:18, 57:24,
68:3
**personal**
15:18, 45:6
**perspective**
76:5, 76:22
**peter**
3:24
**ph**
1:20, 2:1, 5:2,
83:3
**phd**
5:13, 21:3
**philosophical**
22:25, 76:7
**philosophy**
5:18, 50:14
**phrase**
49:7
**physical**
69:13
**physically**
7:13, 69:10
**piano**
23:19, 24:9,
24:13

**picked**
58:17, 58:19
**piece**
26:23, 33:16,
33:17, 33:21,
37:17, 38:11,
40:6, 40:11,
40:23, 51:3,
66:14, 66:19,
68:18, 69:6,
72:20
**pieces**
34:18, 35:22,
37:7, 39:4,
39:11, 41:12,
47:13, 47:23,
48:4, 79:14
**place**
26:20, 74:19
**places**
6:11, 41:9,
49:9
**plaintiff**
1:5, 3:3,
16:23, 16:25
**plastic**
79:18
**play**
23:16, 23:19,
23:21, 24:12
**played**
24:13
**playing**
67:8
**plays**
68:8
**please**
15:22, 17:14,
22:6, 74:4,
81:22, 82:14
**pleased**
39:16
**plenty**
79:14
**poem**
67:7
**point**
26:22, 30:7,

43:17, 44:1,
44:2, 76:8, 77:4
**poor**
67:20
**popular**
22:10, 22:18,
22:19, 22:22,
23:22, 24:25,
25:5, 37:7,
39:16, 41:5,
46:11, 79:14,
79:17
**portion**
51:15, 54:15
**position**
21:12, 21:16,
22:11
**positions**
22:2, 22:5
**possibility**
77:12
**possible**
28:20, 29:11,
32:5, 34:16,
35:20, 36:6,
38:6, 39:20,
42:7, 79:4
**potentially**
29:22
**practice**
19:12, 39:22,
40:3, 43:14,
43:23, 70:23,
71:8
**precise**
42:20
**precisely**
49:10, 74:19
**predict**
43:4, 50:17
**prediction**
43:23
**predictive**
42:23, 44:16,
52:16
**preexisting**
68:17
**prelabeled**
75:18

preliminary
15:13, 19:2
prepare
8:13, 49:4
prepared
8:4, 8:5, 8:6,
11:13, 12:8,
13:2, 20:14
preparing
65:1
preproduction
42:22
presence
79:5
present
3:23, 22:23
presented
26:24, 29:18,
30:8, 52:1, 56:9
president
22:8
presume
79:2
presumptions
40:25
pretty
16:16, 18:8,
20:17, 24:20,
26:18, 43:21
previous
8:11, 8:16,
8:22, 45:18
previously
59:17
primary
10:2, 35:22
principle
37:3, 67:10,
79:9, 79:20
prior
7:5, 9:18,
10:5, 16:1,
29:8, 34:4,
34:8, 34:12,
34:18, 34:24,
35:2, 35:9,
38:5, 38:11,
38:16, 38:18,

38:25, 39:4,
39:15, 39:17,
40:6, 40:17,
41:14, 48:8
prize
22:20
probably
13:7, 19:4,
22:7, 44:17,
79:4
problem
43:2
proceeding
9:13, 18:9,
45:10
process
28:4, 58:8,
59:2, 68:25
processes
55:24
produce
29:13
produced
58:12, 64:23
product
30:22
production
68:1, 68:21,
68:23, 69:4,
69:6, 69:8,
69:11, 69:14,
69:15, 70:7,
70:10
profession
80:25
professional
15:18, 21:10,
22:3, 22:16,
24:5, 24:15,
25:4, 25:12,
36:19, 44:7,
59:17, 62:18,
84:23
professionally
24:2, 24:25
professor
10:2, 12:10,
21:14, 21:18,

21:20, 21:21
programs
21:23
proper
54:21
proponent
36:19
proposition
62:11
protective
43:7
provide
8:21, 14:10,
16:18, 23:2,
30:24, 31:3,
31:9, 31:18,
49:17, 53:2,
70:11
provided
5:20, 9:8,
16:2, 16:7,
64:10, 64:15,
70:2, 70:6
provides
23:6, 26:14
providing
17:6, 42:16,
42:17
proviso
37:2
pty
1:4
public
2:9, 84:1
publications
9:18
published
22:16, 22:21,
23:7, 81:8
pull
10:25, 13:23
pulled
53:24, 54:15
purpose
61:12
purposes
15:3, 62:4
pursuant
2:8

put
33:12, 44:1,
58:14, 74:20
putting
66:11

Q

qualification
63:9
qualified
31:22, 53:5
quality
39:8
quantitative
39:2, 39:3
question
6:13, 6:19,
8:8, 18:18,
28:16, 31:5,
31:25, 32:1,
33:13, 33:15,
33:20, 34:19,
36:24, 37:2,
37:5, 38:19,
38:22, 39:15,
40:14, 45:13,
52:5, 53:5,
54:18, 55:3,
55:4, 55:17,
55:22, 57:5,
63:15, 71:16,
71:17, 72:18,
73:21, 74:2,
74:11, 74:12,
75:2, 75:8,
76:17, 77:23,
77:24, 78:2,
78:3, 78:14,
79:1, 79:23,
81:21
questioning
47:14, 75:22
questions
11:20, 33:6,
34:11, 34:12,
41:14, 55:15,
80:2, 80:5,
80:9, 82:5, 82:7

| | | | |
|---|---|---|---|
| **quick** | **really** | **records** | 51:15 |
| 17:7 | 10:15, 20:7, | 13:18, 14:9, | **relies** |
| **quickly** | 23:17, 39:19, | 15:5 | 73:21 |
| 44:20 | 47:24, 50:3, | **reduced** | **rely** |
| **quite** | 50:15, 73:24 | 84:8 | 51:25 |
| 32:17, 33:10, | **reason** | **refer** | **remains** |
| 39:10, 79:14 | 62:10 | 13:1, 36:3 | 74:15 |
| **quotation** | **reasons** | **referred** | **remember** |
| 33:12 | 55:19 | 12:12 | 10:7, 13:14, |
| **quote** | **recall** | **referring** | 18:11, 44:18, |
| 33:12 | 10:4, 10:13, | 7:23, 8:8, | 49:5, 63:10, |
| **R** | 49:2, 64:7, | 12:20, 49:13, | 63:25, 64:2 |
| **r-o-b-e-r-t** | 65:3, 65:20 | 57:1, 61:2, | **remind** |
| 5:12 | **receive** | 65:4, 76:12, | 31:23 |
| **ranks** | 7:8 | 81:9 | **remotely** |
| 21:21 | **received** | **refers** | 2:5 |
| **rare** | 11:16 | 29:2, 29:7, | **remove** |
| 31:11 | **recess** | 51:24, 66:9 | 66:4 |
| **rarely** | 11:3, 60:1, | **refuse** | **removing** |
| 18:23, 27:17 | 77:20 | 74:20 | 79:23 |
| **rather** | **reciting** | **reiterate** | **repertoires** |
| 6:15, 15:15 | 67:7 | 27:10 | 40:11 |
| **react** | **recognition** | **related** | **rephrase** |
| 43:24 | 38:8 | 8:22, 60:4, | 6:21, 18:18, |
| **read** | **recognizable** | 84:11 | 29:4 |
| 31:25, 32:1, | 25:18 | **relates** | **report** |
| 45:14, 46:10, | **recognize** | 31:15, 42:14 | 4:8, 4:11, 7:2, |
| 52:4, 55:3, | 15:24, 38:7, | **relation** | 7:4, 7:5, 7:9, |
| 55:4, 56:11, | 39:9, 59:4, 66:3 | 29:11, 37:4, | 7:12, 7:14, |
| 57:24, 58:11, | **recollection** | 58:7 | 9:22, 11:24, |
| 58:12, 60:25, | 16:10, 18:13 | **relational** | 12:7, 12:19, |
| 78:12, 78:14, | **record** | 44:13 | 16:13, 18:2, |
| 81:25, 83:4 | 5:10, 7:15, | **relationship** | 18:8, 20:1, |
| **reading** | 11:2, 11:4, | 15:19, 47:12, | 30:7, 41:24, |
| 46:9, 53:20, | 12:5, 12:19, | 47:23, 48:7 | 43:7, 43:25, |
| 54:9, 61:11, | 13:25, 14:4, | **relationships** | 47:15, 47:18, |
| 84:9 | 15:3, 15:10, | 73:10, 77:14 | 47:21, 47:25, |
| **ready** | 15:11, 23:21, | **relatively** | 58:12, 64:10, |
| 14:1, 60:16, | 24:11, 44:2, | 18:23, 39:10, | 64:16, 64:21, |
| 60:18 | 60:7, 65:14, | 69:6, 71:5, 82:2 | 64:22, 64:24, |
| **real** | 72:15, 77:19, | **release** | 64:25, 65:1, |
| 12:16 | 81:23, 82:15, | 43:1, 79:17 | 65:3, 65:5, |
| **realistic** | 84:6 | **relevance** | 75:21, 75:22, |
| 46:2 | **recorder** | 31:14 | 76:1, 76:25, |
| **reality** | 20:19 | **relevant** | 81:14 |
| 45:3 | **recording** | 19:20, 22:7, | **reported** |
| **realize** | 76:11, 76:14 | 32:6, 33:21, | 1:30 |
| 35:20 | **recordings** | 34:13, 34:21, | **reporter** |
| | 69:23 | | 2:9, 6:11, |

11:24, 31:24,
32:2, 55:2,
55:5, 67:17,
78:15, 82:8,
82:11, 84:23
**reporter-notary**
84:1
**reports**
17:22, 19:2,
33:7, 43:3,
50:14, 50:17,
57:16, 58:13
**reproduces**
58:2
**reproduction**
58:16
**request**
14:23, 15:2
**requested**
14:6, 84:10
**requesting**
15:5
**require**
38:4
**research**
23:15, 38:7,
60:4
**respect**
47:19
**respond**
44:23
**response**
45:2
**rest**
66:23, 77:15
**result**
42:18, 59:13
**results**
64:15
**retained**
5:25, 6:25,
7:5, 16:23,
30:24, 31:2,
31:4, 49:4
**rethink**
62:11
**review**
10:21, 11:22,

65:2, 65:24
**reviewed**
54:17, 54:22,
65:21
**reviewing**
65:20
**rhythmic**
67:18
**rickey**
9:6, 16:20
**right**
12:8, 13:4,
25:18, 31:2,
33:19, 36:22,
55:13, 60:19,
60:23, 61:22,
65:24, 67:9,
72:8, 74:10,
80:8
**rigid**
42:8
**rises**
17:10, 31:6
**rising**
59:6
**risk**
9:24, 18:17,
44:25, 45:13
**road**
3:20
**robert**
1:20, 2:1, 5:2,
5:11, 83:3
**rochester**
21:2
**roles**
22:3
**rosner**
3:18, 3:19,
10:17, 11:5,
11:7, 11:12,
53:22
**roughly**
59:6
**rule**
14:21, 15:5,
42:12
**rule-based**
42:8

**rules**
6:3, 32:22,
37:15
**run**
37:17, 81:7,
81:16, 82:3

---
**S**
---

**safe**
62:23
**said**
16:5, 21:5,
26:8, 27:10,
41:23, 42:7,
42:24, 43:15,
48:6, 49:22,
50:7, 53:15,
54:4, 54:20,
57:16, 58:25,
71:25, 72:24,
76:8, 76:25,
84:7
**sake**
12:25
**same**
10:8, 10:10,
34:19, 38:10,
50:10, 56:15,
64:25, 72:7,
77:3, 78:25,
81:19, 83:5
**saw**
79:15
**say**
6:16, 7:4,
7:22, 9:1,
15:22, 17:8,
18:2, 18:14,
18:23, 20:4,
23:10, 23:20,
25:11, 27:16,
28:10, 28:11,
30:1, 30:18,
31:12, 31:17,
32:14, 33:4,
33:14, 34:22,
35:8, 37:18,
39:2, 39:25,

40:6, 41:10,
41:25, 43:6,
43:11, 46:3,
49:6, 50:15,
52:24, 54:18,
55:18, 57:9,
57:15, 58:10,
58:17, 59:12,
59:24, 61:13,
62:16, 62:23,
63:25, 66:13,
66:16, 66:17,
68:15, 68:24,
70:5, 71:9,
71:12, 71:17,
74:18, 76:18,
77:17, 80:16
**saying**
6:12, 15:23,
29:4, 29:22,
31:8, 35:4,
35:6, 43:3,
43:8, 43:16,
43:20, 54:15,
55:22, 57:21,
63:3, 64:4,
68:22, 68:24,
73:11, 74:25,
75:1, 76:13
**says**
36:15, 47:7,
48:16, 52:14,
52:25, 53:17,
53:18, 55:18,
56:13, 57:2
**scale**
43:9, 49:17
**scanning**
40:18
**scheduled**
65:12
**school**
21:1, 21:15,
21:25, 23:18,
47:9
**schweitzer**
1:30, 2:9,
84:3, 84:22

**scope**
81:13, 81:14
**screen**
13:5, 44:19
**scroll**
51:9, 51:13,
51:14, 51:16,
60:12, 60:16
**seal**
84:15
**search**
15:13, 38:17,
38:18, 40:16
**searches**
38:16, 41:7
**searching**
14:8, 36:14
**second**
34:5, 48:15,
56:14, 77:18,
77:19
**secondly**
62:16
**seconds**
70:12, 70:13
**see**
10:21, 13:8,
13:9, 13:22,
26:25, 37:19,
44:24, 48:13,
48:14, 48:19,
51:6, 51:7,
56:18, 60:10,
60:11, 60:21,
60:22, 61:3,
61:4, 61:7,
65:16
**seeing**
13:3
**seem**
27:11
**seems**
30:21, 43:12,
64:21, 77:3
**seen**
27:12, 27:13
**send**
11:6

**sending**
11:7
**sense**
18:5, 23:11,
31:19, 39:12,
40:19, 42:3,
47:7, 53:7,
55:21, 58:21,
68:1, 68:8,
68:12, 70:19,
70:23, 70:24,
71:13, 72:22,
74:25, 75:1,
79:11
**sent**
7:14, 71:22
**sentence**
48:15, 58:23,
61:1, 73:5
**separate**
25:15, 27:6,
28:15, 72:20,
72:21
**sequence**
26:24
**sequential**
26:22
**series**
55:11
**serious**
24:20
**served**
15:5, 22:8,
22:13
**service**
22:4
**services**
41:8
**set**
10:6, 32:22,
76:16, 84:14
**settled**
16:17
**shaking**
6:15
**shall**
28:11
**share**
11:20, 13:5,

44:19
**sharon**
15:19, 15:23
**sheet**
83:8
**shift**
37:1
**short**
7:7, 49:24
**shortened**
70:7
**shorthand**
84:1
**should**
11:22, 11:24,
12:11, 23:3,
36:23, 37:17,
39:2, 41:10,
54:10, 54:11,
59:7, 62:5,
63:17, 65:13,
66:16, 67:4,
77:1
**show**
13:18, 51:5,
65:6
**shows**
30:9
**side**
10:4, 10:10,
10:11
**sides**
42:10
**signature**
83:13
**signature-llc0g**
84:19
**signed**
83:8
**signify**
57:17, 58:6
**signing**
84:10
**similar**
48:17, 52:10,
56:19, 57:7,
57:11, 57:14,
57:19, 59:12,

64:10, 64:16
**similarities**
36:1, 44:8,
48:6
**similarity**
25:16, 25:22,
25:25, 26:1,
26:11, 26:17,
27:22, 27:23,
27:24, 27:25,
28:13, 31:5,
32:9, 32:13,
32:16, 32:19,
37:7, 41:19,
41:21, 41:24,
41:25, 42:9,
42:12, 42:14,
42:15, 44:4,
44:5, 46:21,
47:22, 57:12,
58:15, 59:12,
62:21
**simple**
30:13, 37:10,
42:11
**simply**
55:8, 64:4,
75:4
**since**
21:18, 43:10
**singer**
23:23
**single**
22:17, 26:10,
67:4, 72:12
**singular**
26:4
**sit**
36:6
**situation**
50:2, 50:4,
50:12, 61:18,
61:21
**situations**
23:25, 24:15,
24:19, 39:18,
72:13
**six**
19:4

skill
26:16
small
25:6, 39:10,
69:5, 82:2
so-called
61:15
social
73:15
societies
22:16
society
22:14, 22:20
sociologically
32:12
solidify
38:7
soliloquy
54:25
soloist
23:25
some
6:2, 7:17,
9:17, 22:2,
26:22, 27:6,
27:24, 30:7,
31:19, 37:22,
40:18, 45:25,
58:11, 58:18,
60:3, 61:19,
63:8, 66:11,
69:18, 69:19,
69:20, 71:10,
71:11, 73:15,
76:2, 76:15,
81:4
somebody
10:17, 25:20,
36:6, 49:14,
50:5, 50:6,
61:19, 62:5,
66:11, 67:13
someone
28:1, 29:12,
42:4, 42:25
someone's
33:23
something
19:6, 25:20,

26:21, 27:20,
28:1, 28:6,
28:23, 29:13,
33:11, 33:25,
37:22, 39:7,
43:24, 54:16,
56:10, 57:2,
59:3, 59:8,
62:6, 67:12,
68:14, 68:23,
69:1, 69:11,
69:12, 70:24,
71:12, 73:9,
73:13, 74:23,
75:14, 76:10,
79:5
sometimes
9:11, 24:14,
28:20, 30:23,
33:8, 34:2,
36:4, 39:23,
40:5, 71:23
somewhat
13:10, 55:16,
71:6
song
36:15, 38:8,
39:17, 68:16
songs
40:24, 69:22
sorry
25:23, 34:5,
41:20, 52:18,
54:3, 56:23,
60:12, 64:12,
67:17, 72:4,
78:1, 81:1
sort
9:23, 10:15,
13:12, 13:21,
19:1, 27:6,
37:8, 37:18,
39:12, 39:19,
44:24, 45:1,
49:13, 73:11,
73:12
sound
50:9, 55:16,

66:10, 66:12,
69:23, 74:23,
79:15, 79:20
sounding
39:8
sounds
35:10, 39:12,
39:13, 40:2,
66:8, 71:11,
79:12, 79:13,
79:17, 79:24
soundtrack
51:4, 68:10,
68:25
span
76:23
speaker
66:15, 66:16,
66:20
speaking
51:18, 54:12,
59:6
speaks
28:8, 52:23
special
25:18
specialization
5:18
specialty
68:19, 68:22
specific
18:21, 28:8,
31:10, 36:10,
38:3, 42:25,
43:17, 57:13,
72:13
specifically
28:18, 32:6,
49:5, 49:24,
68:14, 69:1,
76:1
specify
43:5
spectrum
44:8
speculate
15:15, 49:1
spell
5:9

spent
41:2, 46:6
spider
1:8, 7:24
spoken
67:15
spot
76:2
st
84:15
stage
69:9
stake
39:6, 48:5,
53:13
standard
32:21, 70:2,
80:21
stands
14:11, 62:10
start
57:5
started
20:20
starting
21:11
state
5:9, 10:1,
14:15, 24:11,
53:25, 54:1,
54:5
statement
62:13, 70:22,
71:8, 73:14
statements
32:5
states
1:1, 22:8
stating
75:4
statistical
38:1
stenographically
84:8
stewart
3:23, 58:12
stewart's
65:3

**still**
6:11, 69:9

**stipulation**
75:14

**story**
67:9

**straight**
27:4

**streaming**
41:8

**street**
45:12

**strike**
52:18, 58:3,
67:22, 71:20,
74:6

**strikingly**
56:18, 57:7,
57:11, 57:14,
57:15, 57:19,
58:20, 59:11

**strong**
36:18, 59:13

**structure**
27:7, 53:16

**studied**
69:2

**study**
22:10

**stuff**
19:1, 33:19,
63:18

**style**
9:5, 23:24,
25:3, 36:10,
37:8, 38:10

**styles**
38:6

**sub**
56:24

**submission**
17:25

**submitted**
18:9, 19:7

**subpoena**
14:21, 15:2,
15:5

**subpoenaed**
14:21

**subset**
35:9

**subsidiary**
53:8, 53:14

**substance**
59:8

**substantial**
27:23, 31:7,
32:9, 32:13,
32:21, 41:19,
41:21, 41:24,
41:25, 42:12,
42:14, 44:11,
55:13, 58:9,
58:14

**substantially**
10:8, 48:17,
52:9, 58:2,
58:6, 58:23,
59:4, 59:6

**subtract**
77:5

**subtracting**
77:6

**sued**
50:8

**suit**
69:24

**suitable**
17:25, 19:7

**suite**
3:6, 3:20

**summa**
20:24

**summary**
17:2

**sung**
24:14

**super**
10:22

**supervisors**
21:7

**supplemental**
4:11, 65:3,
65:5

**supplemented**
41:6

**support**
48:18

**suppose**
39:1

**supposed**
57:17

**sure**
5:11, 9:19,
9:25, 12:22,
16:16, 18:6,
18:13, 19:8,
29:5, 36:16,
45:14, 50:19,
78:13, 78:16

**surgery**
79:18

**surprise**
45:5, 73:24

**swaths**
38:4

**sworn**
5:3

**symbology**
23:14

**synchronization**
70:8

**synofare**
35:3, 35:10,
36:11

**synonymous**
36:12

**systematized**
40:2

**T**

**take**
10:24, 33:13,
36:4, 59:22,
59:25

**taken**
11:3, 30:5,
43:3, 59:7,
60:1, 60:7,
77:20, 84:4,
84:7

**takes**
26:20

**taking**
6:11, 37:19,
42:3

**talk**
27:23, 28:3,
32:7, 44:4,
44:9, 49:11,
73:8, 73:9, 75:4

**talked**
12:19

**talking**
26:21, 35:14,
37:6, 44:22,
46:6, 49:9,
73:7, 78:25

**task**
40:20

**teacher**
20:15

**teaching**
22:1

**technical**
49:8, 68:6,
68:25, 70:19,
71:6, 71:13,
71:16, 72:22,
75:2

**technically**
5:17, 21:5

**tell**
11:8, 11:14,
15:12, 15:13,
17:20, 22:5,
40:21, 63:13,
77:11, 80:3

**telling**
67:9

**tempting**
30:10

**ten**
9:1

**ten-minute**
59:23

**tend**
28:11, 33:7,
33:24, 36:22,
37:14, 44:23,
45:11, 46:2,
46:12, 58:25

**tended**
9:10

tenure
21:19
term
25:10, 25:22,
26:9, 27:12,
29:2, 29:6,
35:10, 35:13,
35:14, 37:13,
49:8, 56:22,
57:20, 58:4,
58:24, 59:11,
66:7, 68:4,
68:6, 72:2
terminology
69:2
terms
7:2, 28:10,
35:9, 61:25
testified
5:4, 17:15,
33:1, 49:19,
54:20, 71:20,
71:21, 72:17,
72:21, 74:7
testify
18:10, 54:7,
63:20, 63:23,
64:3, 64:7,
72:25
testimony
5:21, 8:21,
9:8, 16:1,
16:18, 17:6,
19:7, 29:21,
30:25, 31:3,
42:16, 47:1,
47:4, 49:17,
49:22, 52:7,
53:2, 56:9,
56:10, 61:24,
62:20, 63:4,
76:3, 78:18,
83:5, 83:7,
84:6, 84:7
tests
26:13
text
23:14, 55:18,

56:13
texts
28:13, 28:22,
29:18, 30:14
th
39:21, 63:7,
84:16
thank
29:9, 32:3,
40:14, 57:2,
60:3, 65:18,
72:17, 80:2,
80:5, 82:11
thanks
15:9
themselves
25:20
theoretical
19:17
theory
21:1, 37:12,
37:16, 45:24
thereafter
84:8
thereof
29:8
thesis
21:7
thing
24:23, 26:10,
28:7, 30:1,
38:10, 43:17,
53:7, 55:10,
67:4, 67:13,
70:12, 73:12
things
9:20, 17:21,
20:22, 23:13,
27:9, 30:4,
30:6, 36:7,
39:6, 40:22,
45:4, 45:8,
46:6, 46:13,
54:19, 62:9,
62:21, 64:5,
66:25, 69:20,
70:9, 76:9,
76:23, 76:25,

79:3
think
7:10, 8:11,
10:10, 10:11,
11:9, 14:5,
17:10, 18:20,
18:21, 20:2,
24:15, 26:12,
26:14, 28:9,
29:3, 29:9,
29:14, 30:7,
32:3, 32:11,
33:4, 36:3,
36:11, 36:19,
37:4, 38:15,
38:24, 40:1,
40:22, 40:25,
43:7, 43:15,
43:16, 43:23,
44:5, 44:12,
45:2, 45:12,
46:8, 48:2,
49:20, 49:22,
54:5, 61:21,
62:12, 63:2,
63:9, 64:24,
68:7, 68:12,
68:15, 71:25,
72:4, 72:9,
72:11, 73:15,
73:23, 75:6,
77:17, 78:17,
78:24
thinking
63:14
thomas
3:25, 13:6
thought
44:10, 48:2,
55:23, 70:18,
78:11
thousands
40:7
three
26:9, 27:11,
47:23, 48:4,
56:5
through
6:8, 20:10,

37:17, 51:13
throwing
78:23
timbre
22:19
time
10:14, 11:9,
15:8, 23:25,
26:3, 26:20,
26:24, 37:1,
39:24, 41:2,
46:5, 62:15,
69:24, 71:2
times
18:1, 30:11
today
20:14, 64:11,
64:16
together
27:11
tonal
39:20, 39:25
tonalities
40:4
tone
22:18
took
35:7, 56:5
top
18:22, 71:12
topics
22:22
townsgate
3:20
track
18:3, 43:13,
48:1, 48:2,
66:10, 76:11,
77:15
tracks
9:17, 48:6,
48:17, 50:6,
61:7, 76:13,
76:15, 76:16
trailed
78:1
trained
30:17, 80:13

**training**
26:15
**transcript**
12:4, 51:12,
65:10, 82:9,
82:13, 84:5
**transcription**
83:6
**translate**
33:25
**trial**
16:12, 16:15,
16:17, 17:13,
17:17
**trimmed**
70:15, 71:23
**trimming**
72:1
**trivial**
47:7, 77:4
**true**
55:12, 56:8,
62:14, 63:4,
72:23, 83:5,
84:6
**trust**
1:16
**try**
10:21, 13:7,
18:18, 28:24,
31:8, 31:18,
49:14, 72:6
**trying**
33:17
**tuesday**
1:22
**turned**
7:11, 11:17,
17:4
**turns**
30:23
**two**
16:2, 16:7,
16:11, 17:16,
24:16, 27:8,
28:13, 29:10,
30:4, 37:9,
43:19, 47:13,

48:17, 50:6,
54:11, 55:15,
61:7, 70:9,
70:13, 75:25
**two-part**
42:1
**types**
25:7
**typewriting**
84:9
**typical**
37:21, 40:12

**U**

**ucla**
10:2, 21:18,
21:19, 21:24
**ucla-sponsored**
24:23
**uh-huh**
6:15
**under**
8:1, 14:9,
20:2, 84:9
**underneath**
68:9, 68:14,
70:24
**underscore**
68:5, 68:8,
68:13, 68:16,
70:17, 71:2,
72:19, 75:24
**underscoring**
71:11
**understand**
6:20, 6:24,
18:6, 18:17,
18:19, 19:15,
27:14, 27:21,
29:16, 29:17,
29:21, 32:10,
46:23, 47:8,
47:11, 51:2,
53:19, 56:21,
56:22, 61:9,
64:12, 66:6,
72:2, 78:12
**understanding**
19:8, 25:14,

25:19, 34:15,
36:9, 53:12,
59:5, 66:24,
68:4, 68:20,
74:22, 76:20,
79:7
**understood**
6:22, 10:4,
56:11, 69:3,
73:1, 73:4
**unitary**
53:7
**united**
1:1, 22:8
**universe**
63:12
**university**
5:19, 20:23,
21:2, 21:4
**unless**
28:18, 65:25
**unlikely**
10:9, 43:12,
49:20, 61:13,
63:16
**unquote**
33:12
**unrelated**
60:5
**until**
21:16
**unusual**
37:22, 50:2,
70:15
**upheld**
42:5
**usage**
19:10
**use**
26:15, 32:18,
34:2, 35:9,
37:13, 41:4,
42:23, 46:3,
49:10, 57:9,
58:5, 59:1,
62:5, 67:11,
79:15, 79:17
**useful**
31:17

**using**
37:11, 38:9,
49:8, 61:12,
79:18
**usually**
17:10, 17:20,
26:20, 44:23
**utilitarian**
24:14
**utilize**
36:7

**V**

**v**
1:6
**various**
7:21, 22:13,
24:13, 25:7,
41:7, 45:22,
73:10, 79:18
**varying**
23:19
**verb**
32:18
**version**
67:20
**versus**
7:23, 9:5, 9:6,
77:24
**via**
6:10
**village**
3:21
**virtually**
1:21, 2:2
**visual**
68:9
**voice**
66:11, 67:11,
67:24, 68:3
**voiceover**
65:19, 66:7,
66:8, 66:13,
66:23, 66:25,
67:6, 67:10,
67:14, 67:24,
68:2, 71:2,
72:19, 74:6,

| | | | |
|---|---|---|---|
| 74:9, 74:14, 74:22, 74:23, 75:3, 75:5, 75:9, 77:8, 77:9, 77:10, 77:15, 78:8, 78:16, 78:19, 79:24 | 11:19, 12:20, 12:24, 15:6, 37:6, 51:9, 60:8, 60:12, 60:13, 61:16, 78:25 | **without** 20:12, 27:24, 54:6, 62:3, 67:9 | **world** 26:19, 28:14, 28:15, 35:16, 45:4, 45:9, 68:15, 75:4 |

**voices**
68:10
**voluntarily**
14:9
**volunteer**
24:22, 49:6

**W**

**wacker**
3:6
**walking**
45:12
**want**
11:18, 14:7,
16:1, 21:8,
36:16, 39:3,
48:10, 50:16,
65:25, 66:2,
77:17, 81:20
**wanted**
14:25
**water**
43:20
**way**
6:20, 11:8,
12:13, 26:23,
34:15, 34:24,
35:19, 37:12,
40:2, 42:8,
42:20, 48:18,
48:24, 49:23,
56:4, 62:8,
65:17, 70:1,
79:1
**we'll**
12:25, 13:1,
13:25, 44:19,
45:23, 51:10,
66:4
**we're**
6:9, 6:12,

**we've**
60:13, 78:17
**web**
15:19, 15:23
**webb**
1:11, 1:16
**weird**
46:3, 72:8
**went**
9:13, 16:12,
16:14, 16:17,
55:23
**westlake**
3:21
**whatever**
47:7, 54:6,
58:16, 76:15
**whenever**
28:23
**whereas**
28:1, 53:10,
53:11, 58:19
**whereof**
84:14
**whether**
12:11, 18:4,
27:20, 27:23,
28:6, 31:6,
32:25, 34:21,
37:21, 44:7,
49:2, 52:8,
58:20, 61:22,
62:9, 63:10,
72:18, 72:19,
72:20, 76:20
**whole**
61:12
**willing**
31:8
**within**
22:3, 36:1,
37:15, 68:6

**witness**
11:11, 15:12,
32:3, 52:4,
52:24, 54:2,
54:7, 54:14,
59:24, 72:9,
72:11, 81:20,
84:14
**won**
22:19
**word**
34:2, 46:3,
49:12, 54:11,
58:6, 58:14,
58:15, 59:1
**words**
24:6, 26:5,
26:9, 27:11,
30:16, 35:25,
41:20, 42:21,
49:10, 57:25,
58:9, 61:12,
67:15, 73:4,
75:15, 78:23
**work**
9:9, 16:6,
17:23, 23:7,
25:13, 27:15,
29:8, 30:3,
36:17, 61:19,
66:14, 66:20,
68:2, 69:8,
69:25, 70:8,
70:10, 71:4,
71:7, 71:14,
71:15, 71:22,
71:24, 73:5,
73:6, 73:8,
73:16, 75:9
**worked**
8:24, 16:3,
17:12
**working**
9:11, 10:18,
71:5

**wouldn't**
27:4, 33:15,
42:19, 59:18,
70:21
**write**
24:1, 33:6,
41:24, 43:25,
48:5, 64:24
**writes**
32:15
**writing**
17:24, 46:6,
50:17
**written**
15:14, 17:21,
18:1, 55:11,
58:13, 81:17
**wrong**
15:23, 30:23,
47:2, 50:22,
61:10, 61:15,
61:22, 62:24,
63:3, 63:17
**wrote**
13:13, 18:7,
19:5, 68:13,
69:5, 81:10

**X**

**x**
1:3, 1:19
**xylophone**
20:21

**Y**

**yale**
20:23
**yeah**
7:19, 10:20,
10:22, 10:25,
11:7, 11:22,
13:9, 15:4,
23:3, 24:15,

35:13, 35:18,
36:3, 37:3,
43:20, 44:20,
44:21, 44:22,
48:9, 49:25,
50:11, 52:13,
52:14, 52:15,
55:10, 56:25,
58:5, 58:7,
60:25, 62:3,
64:5, 66:8,
67:25, 68:1,
68:16, 69:20,
70:14, 70:18,
70:20, 72:1,
72:25, 73:11,
73:20, 76:24,
80:20, 81:3

**year**
7:3

**years**
7:9, 9:2,
12:17, 17:8,
18:25, 22:12,
23:18, 61:17,
64:20

**yourself**
19:21, 19:24,
44:1, 46:18,
48:1, 51:2,
52:9, 52:21,
53:21, 56:12,
60:24

**Z**

**zealand**
9:5, 45:15,
46:18, 51:23,
52:8, 52:20,
53:4, 53:14,
60:9, 62:25,
63:14, 63:21,
64:9, 64:14,
81:10

**zero**
17:9

**zoom**
6:10, 13:7,

54:4, 65:19

**0**

**0/8/14**
11:13

**1**

**1**
1:17

**10**
1:22, 17:10,
43:8, 43:10,
43:11, 43:16,
49:18, 49:19,
49:25, 50:5,
50:6, 50:20,
52:15, 59:25,
61:6, 62:24,
63:7

**100**
43:5

**12**
1:23, 4:8, 4:9,
80:7, 82:15

**123**
3:6

**14**
1:23

**15**
18:25, 70:12

**15490**
3:13

**17**
1:6, 8:1

**170**
54:16

**1700**
39:24

**18**
39:21

**1800**
39:25

**1960**
22:23

**1983**
20:24

**1988**
21:3

**1992**
21:13

**2**

**2**
82:15

**20**
1:17, 18:25,
84:16

**2014**
61:17, 61:18,
61:23, 61:25,
62:22, 62:24,
64:10, 64:16

**2016**
62:25

**2017**
8:10, 9:6,
62:25, 63:6

**2021**
1:22, 84:16

**2022**
84:17

**21**
84:15

**250**
3:6

**2603**
9:6

**2625**
3:20

**2:-cv**
1:6, 8:1

**3**

**30**
70:12

**312**
3:8

**330**
3:20

**336**
3:15

**3749**
3:15

**391251**
1:28

**4**

**448**
3:8

**45**
14:21, 15:5

**462**
51:15, 51:19,
53:24, 56:16,
56:24, 57:6,
58:1, 60:14

**463**
51:16, 60:14,
60:18

**464**
60:20, 60:21

**5**

**503**
3:15

**51**
4:10

**6**

**60606**
3:7

**6108**
1:6, 8:1

**65**
4:11

**6602**
3:8

**8**

**84**
1:29

**9**

**91361**
3:21

**97006**
3:14

Douglas J. Rosner, ESQ., SBN 094466
rosnerlaw@earthlink.net
LAW OFFICES OF DOUGLAS JOSEPH ROSNER
2625 Townsgate Road, Suite 330
Westlake Village, California 91361
Telephone No. (818) 501-8400
Facsimile No.: (818) 880-4485

Attorney for Defendant, Labrador Entertainment, Inc.
dba Spider Cues Music Library, Labrador Entertainment,
LLC, Noel Palmer Webb, and Web Family Trusts

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BEATBOX MUSIC, PTY, LTD., | Case No. 2:17-cv-06108-MWF (JPRx) |
| Plaintiff, | Assigned to the Hon. Michael W. Fitzgerald |
| v. | **REBUTTAL EXPERT REPORT OF ROBERT W. FINK, PhD.** |
| LABRADOR ENTERTAINMENT, INC., DBA SPIDER CUES MUSIC LIBRARY, a California corporation, et. al., | |
| Defendants. | |
| MICHAEL COHEN, an individual, | |
| Cross-Complainant, | |
| vs. | |
| LABRADOR ENTERTAINMENT INC. DBA SPIDER CUES MUSIC LIBRARY, a California corporation, et al., | |
| Cross-Defendants. | |
| LABRADOR ENTERTAINMENT INC. DBA SPIDER CUES MUSIC LIBRARY, a California corporation, et al., | |
| Counter-Claimant, | |

Exhibit #

Fink A

8/10/21

1    vs.                                              )
                                                      )
2    BEATBOX MUSIC, PTY, LTD. and                     )
     MICHAEL COHEN, an individual and ROES            )
3    1-20, inclusive,                                 )
                                                      )
4                          Counter-Defendants.        )
     _____        )

**EXPERT REPORT OF ROBERT FINK, PHD**

**SUBMITTED JULY 20, 2021**

Robert Fink  Ph.D.
July 20, 2021
Musicology  Report
Re: Alexander Stewart Report on
"Eminem  Esque," "National  Party Election  Ad," and  "Lose  Yourself"

FACTS CONSIDERED

This report is based on a critical reading of the detailed expert report submitted by Alexander Stewart. I have listened to the same three tracks that Professor Stewart did, in order to form my own opinion of his conclusions, but the primary goal of this report is to engage with Stewart's evidence, reasoning, and conclusions, and to provide, where possible, an alternate reading of the evidence in rebuttal. For reference, I will use Stewart's abbreviations for the three tracks in question: "Eminem Esque" (EE), "National Party  Election Ad" (NP), and "Lose  Yourself" (LY).

STATEMENT OF OPINION

I have read Professor Stewart's report, listening to the recordings in question, and examined his transcriptions. While I do not find any errors of fact in Stewart's transcriptions or technical analysis, I do question his methodology. In my expert opinion EE, while clearly designed to have what Stewart calls a "sound-alike quality" with respect to Eminem's LY, does *not* infringe on it. Furthermore, NP, although derived from EE, is not identical to it, as Stewart claims, and EE is not necessarily implicated in any infringing relationship asserted to exist between NP and LY.

PRECIS OF ARGUMENT

1. Stewart's report seeks to manufacture substantial similarity by appealing to an undefined notion of "core expression." His claim appears to be that because EE (and NP) use a number of the same stock musical devices as LY – even though, taken one by one, these devices are either (a) so generic as to be the common coin of the popular musical language or (b) altered so as not to be substantially similar – that the sum total of these *in*-substantial similarities crosses over to be substantial similarity. As a professional musicologist, I recognize the power of a "pattern of similarities" to stimulate academic discourse. But in the forensic analysis of copyright infringement, <u>I disagree that simply adding together multiple instances of non-infringement can create infringement.</u>

2. Furthermore, I disagree with Stewart's implicit claim that evidence of the intention to create a "sound alike" is *prima facie* evidence of infringement. This seems to me a radical claim that would lead to uncontrolled litigation and the closing down of future musical creativity.

3. I disagree that EE and NP equally "evoke the subjectivity and personal artistic expression of Eminem." This claim is based on a false notion of Eminem as the sole creator of the tracks that appear under his name. Marshall Mathers worked with a production team (Bass Brothers) to produce LY, and it is highly unlikely that he personally created the instrumental backing for the rap. I would submit that Eminem's "personal artistic expression" inheres largely in his distinctive personal contribution to LY: the lyrical content and flow of his rapping. Since none of Eminem's lyrics or rapping appear in EE or NP, Stewart's claim seems overstated to me.

4. The absence of *any* vocal track (or tracks) also distinguishes EE from NP, making their relationship more complicated than the simple identity that Stewart claims. Given that LY also contains spoken word performance, the presence of spoken vocal material in NP may well increase its apparent similarity to LY.

In this report, I will first deconstruct Stewart's argument by reconsidering, *on its own terms,* each of the seven "essential elements" he identifies as adding up to substantial similarity. I will argue that none of them, individually, rise to the level of substantial similarity. I will then move on to larger and more abstract claims about "sound-alikes" and "personal expression." I will finish by considering the relationship between EE and NP, the role of vocals, and each track's measure of similarity to LY.

## 1. The Seven "Essential Elements"

Stewart identifies seven "essential elements" in the instrumental accompaniment to LY that he claims also occur in EE and NP. I will consider each in turn, evaluating both the claims of similarity and distinctiveness.

### 1.1. Guitar part.

As Stewart's own transcription shows, there are clear differences between the guitar parts in LY and the corresponding parts in EE and NP. These are minor, but real:  in LY, eight repeated dyads [d-a] are followed by four [d-g] and four [d-b$^b$] dyads; in EE and NP, the opening [d-a] is interspersed with single note [d], there is no [d-g] dyad, and the [d-b$^b$] dyad is both interspersed with single note [d] and decorated by a triplet "tag" at the end of the phrase. (Note this final detail; it will come up in the discussion of element #2.)

These are minor details, to be sure. But unless one works at this level of detail, the first element is just a power chord on D (tonic minor) followed by the minor subdominant (Gm/D). This i-iv progression, where the fifth of the tonic rises to the third of the subdominant [a-b$^b$], is completely normative as a diatonic progression in the minor, and, realized as slightly palm-muted power chords on the electric guitar, appears in dozens, if not hundreds of songs. An obvious piece of prior art here – which is as similar to these tracks as they are to each other – is the opening of the very famous riff from Led Zeppelin's "Kashmir," which begins in precisely the same way. Examples of prior art could be multiplied as necessary to make the point, which is that the guitar part here is a common

2

idea, with not enough distinctiveness in its realization to be anybody's "personal expression." And if one tries to identify distinctive personal expression by taking it in detail, note for note, it turns out *not* to be that similar, taken note for note.

## 1.2. Bass part

The bass part is a pseudo-similarity that is merely the effect of extreme generic-ness. All three tracks in question use a series of repeated [d]s in the bass, as do literally tens of thousands of other compositions from the 18th century to the present day. As with the guitar part, there are small differences in octave, but the key point is that there is nothing distinctive about this gesture, which is simply the most basic rhythmic activation possible of a single pitch. Unless one accepts that a single bass tone is copyrightable, one must accept that this "essential element" is part of the common coin of music.

Stewart focuses on what he calls a "characteristic flick" at the end of the bassline, in which the last full beat is activated by an "extra" triplet upbeat. Since both LY and EE do this, he points it out. But I'll note that when considering essential element #1, the guitar part (see above), he does *not* point out this "flick," because LY and EE *do not* share it. If the presence of the flick in both tracks is evidence of similarity in the bass part, then surely its presence in one and absence in the other is evidence of dissimilarity in the guitar part?

Another thing left unmentioned is that EE adds two new bass pitches on the flick. Again, a minor difference, but since we are being asked to accept that the regular reiteration of a single note can be "essential," it should be important when that single note is actually changed at the end of the cycle, *which happens only in EE.*

(A methodological observation:  if a musicologist has to crank up the analytical magnification this high to make their case, they need to pay attention to every bump and crevice that shows up when they zoom all the way in. I don't believe you can pick and choose to make your case.)

## 1.3. 16th-note triplet "flicks"

I would argue that the flick *itself* is also generic:  adding an upbeat note to lead back into the repeat of a cycling riff is a simple piece of compositional craft that thousands of popular (and classical) musicians have executed intuitively for hundreds of years. Especially with respect to the drum kit, it would almost be more distinctive if such an upbeat stroke had been left out.

## 1.4. "iconic" piano part

There is no generally accepted musicological definition of "iconic," so it is not clear to me what claim Stewart means to make about the little piano lick that is element #4. This short piano figure is not *quite* as generic as the other elements that Stewart enumerates, but it is still quite simple and common. It is true that the lick's rhythmic profile and

3

metric placement in LY and EE are very similar. As for the pitches, it is true that only a single note is different. But that one note is very important. In LY, the piano lick jumps up from the tonic [d] to the dominant scale degree [a], which is then decorated by upper and lower neighbor notes:  [a (b^b) a (g) a]. In EE, the leap up is from the tonic [d] to the flat seventh scale degree [c], a much more uncommon move. The [c] then descends through [b] to the fifth [a], which is decorated by a lower neighbor:  [c (b) a (g) a]. The "sound" of a minor seventh against the tonic is quite distinctive, and appears *only* in EE; also, the piano figure in EE outlines a falling third [c-a], while the figure in LY simply decorates the single pitch [a]. Again, these observations may seem very fine-grained, but given the basic and generic nature of the material we are evaluating, even small differences stand out.

*1.5. sustained strings*

In my discussion of element #2 above, the bass, I noted that the bass part in both LY and EE was little more than a minimally-rhythmized presentation of a single note, and thus very hard to understand as something that could be protected by copyright. In pointing to the sustained string part in LY as something that could be part of an argument for substantial similarity, Stewart approaches the *reductio ad absurdum* of arguing that a single sustained note can be the basis for a similarity claim. If this is accepted, then, in principle, almost any composition can be understood to infringe on any other.

Stewart notes, with no discussion, that "EE eventually contains some different pitches." Yes, it does – and that seems quite significant to me. The idea of "sweetening" a mix with sustained strings cannot be copyrighted, so one's claim about a sustained string line must, I would argue, be based on the actual notes used to sweeten with. Here they are different, and thus the string parts do not support an argument for substantial similarity.

*1.6. drum part*

Stewart admits that "the drum parts used in each of these compositions are not unique to them." In fact, the drum part used in EE/NP is so conventional and basic that it has the character of a drum "rudiment," *i.e.,* the kind of exercise one would assign to a budding percussionist to learn the basic technique of the drumset. This is the rhythmic equivalent of the basic scales that keyboard and melodic instrumentalists practice for hours on end: it is barely music, really more just the precondition for music to happen. Stewart then claims that this drum part is "nearly identical" to the one in EE:  "The only difference is a few extra kick or bass drum notes in LY."

With all respect to my musicological colleague, there is a great difference between "identical" and "nearly identical." (It is like the famous difference between "dead" and "mostly dead" in the classic movie *The Princess Bride.)* To gloss over the difference between the two drumset patterns as a matter of "a few extra kick or bass drum notes" is an analytical choice that raises the question:  *which distinctions are significant, and when?* I'll note again that all the material under consideration is very basic and simple, which means that even slight deviations in the realization of basic ideas *do* matter.

4

*1.7. synthesized brass*

Stewart has little to say about this element, so I will pass over it as well.

## 2. Part *versus* Whole

To summarize my discussion above:  <u>each of Stewart's "essential elements," taken by itself, fails to support a claim of substantial similarity</u>. Either the material is so basic and common as to be part of the general language (1, 2, 3, 5, 6) or, within the very basic nature of the material, there are small but real differences in realization (4, 5, 6); or both (5, 6).

To accept Stewart's conclusion, therefore, requires that the piling up of musical coincidences in various parts of the tracks' textures, none of which rise to the level of substantial similarity, somehow results in substantial similarity. Stewart asks us to focus on the *sum* of the similarity coefficients, when we should be looking at the *average*.

There are two ways Stewart's musicological report tries to "make" this happen, and I take methodological and logical issue with both of them:

2.1. By identifying a fixed number of "essential elements" of LY, and then arguing that "all" of them are present in EE/NP, Stewart implies that the simple fact of having all seven elements is itself a substantial similarity, over and above the similarity of the individual elements. There are two points to make in rebuttal:

(a) both the judgement that these elements are essential and the enumeration of precisely seven elements are Stewart's. Another musicologist might decide that there are five elements, or eight. And another musicologist might decide that not all of these elements are equally "essential." Finally, any musicologist would have to concede that the *most* essential element of LY is the vocal track, which has no analogue at all in EE. Stewart's "essential elements" appear to be an analytical tool used to maximize implications of similarity. Why else would the subtle use of backing strings be considered "essential" to the expression of LY, while the presence of a lead vocal track in the foreground is not?[1]

(b) even if one accepts Stewart's basic parsing of LY into elements, it would be highly unusual for any popular music track in the basic style of EE/NP not to use some of the same elements:  almost every pop-rock recording has a guitar part (1), a bass part (2), and a drum track (6), and most pop recordings use upbeat notes to lead into the downbeats (3). Not every track must have sustained strings (5) or a piano riff (4), but plenty do – and pretty much every track that has 4 or 5 also has 1, 2, 3, and 6.

---

[1] It should be noted that Stewart's somewhat Eurocentric claim that there is "little in terms of definite pitched melodic content" in LY's rap vocal does not accord with contemporary musicological analyses of hip-hop (see below), and leaves out key rhythmic and timbral aspects of vocal performance that are directly related to Eminem's "personal expression" in music.

Thus, to argue that the sheer coincidence of some subset of arbitrarily determined "essential" elements, about half of which appear in almost every piece of popular music, and that are, each taken individually, quite common and generic, constitutes a distinctive and thus substantial similarity, seems methodologically unsound in the context of copyright litigation.

2.2. Stewart's report assumes that the purpose of creating EE (and then the use of pieces of EE in NP) was to create what musicians call a "sound-alike" of LY. He further hypothesizes that any differences in the realization of basic musical ideas from LY in EE was the result of a deliberate attempt to avoid responsibility for copyright infringement:

> As can be seen in the above analysis, though some content has been slightly altered, all the core expression of the musical bed in LY has been replicated in EE. As the title to EE strongly suggests, this has been done in order to evoke the subjectivity and personal artistic expression of Eminem. [6]

> While some [elements] have been slightly altered, most likely in an attempt to avoid a copyright infringement claim, these elements are essential in establishing the "sound alike" quality the creator of Eminem Esque was striving for. [4]

I would not dispute these claims directly, although I would note that, methodologically speaking, objective determination of similarity through musicological analysis (the "extrinsic test") cannot, in itself, prove intent. (It is a long-held position in the aesthetics and criticism of art that to believe otherwise is to commit "the intentional fallacy.")

But there is nothing illegal about making one piece of music sound like another. Stewart's report comes close to arguing that where LY and EE are identical is infringement, and where they are different is – an attempt to *cover up* infringement, evidence of a guilty musical conscience.

As a professional musicologist with 30 years of experience, who has devoted a significant amount of his professional activity to researching the history of popular music, I can attest that the deliberate intention to make one piece of music sound like another is at the root of much original creativity in popular music. The fact that it is indeed possible to make one piece of popular music "sound like" another without infringing on it is due largely to the generic nature of much popular music expression:  many of the most evocative musical devices, like the blues chord progression, the ii-V-I turnaround in jazz and ragtime, the "shuffle" rhythm of boogie-woogie, the minor pentatonic scale, etc., belong to no one in particular. Thus it is possible, by identifying the generic elements at work in a given song, to use those same generic elements in a new song that evokes the earlier song for the listener, while avoiding note-for-note copying and the inherently distinctive and personal expression of original lyrics and (sometimes) vocal melody.

In my opinion, it is correct to note that EE tries to evoke a constellation of expressive elements that also appear in LY. But these elements are not the "personal expression" of the song's writers. What is evoked is a series of elements which are *impersonal.* They are stylistic conventions and musical tricks that have become the common coin of popular music. *And there is nothing wrong with that.* The authors of EE are to be congratulated for avoiding

direct copying, and for avoiding entirely the distinctive expression contained in Eminem's lyrics and rapping.

Thus I also disagree with the proposition that, because the underlying set of musical devices in LY, the "bed" upon which Eminem laid his rap, evokes and thus "sounds like" the bed of analogous devices in EE, that Eminem's "personal expression" is thereby infringed. This is effectively to argue that sound-alikes are themselves infringement, an argument that would criminalize one of the most deeply-rooted practices in popular music.

### 3. Are EE and NP 100% Identical? (Presence or Absence of Vocal Tracks)

Stewart considers in his report the relationship between EE, a library production track, and NP, the soundtrack for a political ad which, he argues, is completely built from pieces of EE. He then *goes on* to argue that any judgement that NP infringes on LY *must* also, logically, apply to EE:

> Every one of the 376 notes in NP are found in EE. If NP can be considered to infringe LY, then EE (as the earlier work and as the source for the entirety of NP) must be considered the original infringing work. Nothing in NP was added or changed in any substantive way from EE. The only changes were two short cuts in the first half of EE. [11]

This sounds like ironclad logic, but it obscures a key point. It may be true that every *note* found in NP is also in EE, but it is not true that every *sound* in NP is also found in EE. NP contains an independent vocal track:  a man's voice, speaking over – and in sync with – the beat laid down by the instrumental tracks derived from EE. Only by ignoring this additional speaking voice can Stewart claim that "100% of the musical sounds heard in NP are found in EE."

Stewart might argue that this is why he specified that EE and NP were 100% identical in terms of "*musical* sounds." Just talking over music, as happens in NP, isn't musical, is it?

I suspect that Eminem and his producers would disagree. It is generally accepted in contemporary popular music studies that the pitch and cadence of the speaking voice has an inherently musical character, and that the relationship between the pitch/rhythm of spoken passages in rap and the pitches and rhythms of the instrumental tracks underneath should be considered equivalent in importance to any other musical relationships. A book-length musicological treatment of spoken word performance in rap as a rhythmic musical practice has recently been published to general acclaim; cf. Mitchell Ohriner, *Flow: the Rhythmic Voice in Rap Music* (Oxford University Press, 2019). Ohriner gives Eminem a prominent place in his argument, and the book in fact contains an extended musicological discussion of Eminem's vocal track in LY (*Flow,* pp. 71-74).

Understanding rap vocals as both spoken language *and* a part of rap's musical texture is both responsible and culturally sensitive musicology. It also allows us to understand how EE and NP might differ in their relationship to LY.

Let me present the argument as a syllogism:

> **IF**    as Ohriner and other experts argue, the overall expressive effect of LY comes from the synchronized combination of the musical qualities of the vocal track and the backing tracks;

> **AND IF**    the overall expressive effect of NP comes from the synchronized combination of the musical qualities of the announcer's voice track and the backing tracks (otherwise why use backing tracks at all?);

> **AND IF**    the absence of *any* vocal track in EE distinguishes it from both NP and LY;

> **THEN**    it would be logically possible to argue that NP and LY *are* substantially similar (thanks to the effects of their distinct vocal tracks) while EE (which has no vocal track at all) and LY *are not.*

**Therefore, even in the presence of a legal opinion which holds that NP infringes on LY, I would argue that EE's relationship to LY must be considered separately, and that it is not necessarily infringing.** As I have noted above, the vocal track in LY is arguably the most "essential" element in that recording, and there is no corresponding vocal track of any kind in EE. The expressive effect of LY consists of the sum total of its musical elements *including the vocal.* NP *also has a vocal track,* which is part of the sum total of NP's expressive effect. EE has *no* such track, and thus, to a musicological ear, EE's expressive effect is (a) different than NP; (b) further away from LY.[2]

It seems to me that the creators of EE are not liable for the uses to which it is put. Given its new vocal track, NP may infringe on LY independently of EE, not simply by virtue of some prior instrumental similarity between EE and LY.

## EXHIBITS USED

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.

## LIST OF PUBLICATIONS

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.

## QUALIFICATIONS

I am Professor of Musicology and founding Chair of Music Industry Programs, as well as Associate Dean for Academic Affairs, in the UCLA Herb Alpert School of Music. I am a Past President of the US Branch of the International Association for the Study of Popular Music (IASPM-

---

[2] Note that this argument does not depend on the claim that the narration in NP is substantially similar in a musical way to the vocal track in LY. The sheer presence of a vocal track puts NP in a different, arguably closer relation to LY than EE.

US). I am the author of *Repeating Ourselves,* a study of American minimal music as a cultural practice (California, 2005) and lead editor of the award-winning collection *The Relentless Pursuit of Tone:  Timbre in Popular Music* (Oxford, 2018). I have published numerous widely-cited articles on popular music and analysis in prestigious academic journals, including the flagship journals of the American Musicological Society (AMS) and the Society for American Music (SAM). My scholarly work largely focuses on music after 1965, with particular attention to avant-garde music, popular music, and analytical techniques. I have taught at UCLA for over twenty years, and before that at the Eastman School of Music. I earned a Ph.D. in Music History and Literature from the University of California, Berkeley (1994) and an M.A. in Music Theory from the Eastman School of Music (1988). I have been the recipient of the Kurt Weill Prize (best work on musical theater, Weill Foundation), the Ruth Solie Prize (best edited collection, AMS), and a Stanford Humanities Fellowship (1998-99). In 2006 I was Visiting Associate Professor of Music at Yale University, my alma mater (B.A. in Music, 1983). I have provided expert testimony and forensic musicological consultations for almost 20 years, and am currently working with industry professionals on a concentration in forensic musicology for the UCLA Music Industry program.

## COMPENSATION

I  have been engaged for this assignment at a rate of $350 per hour for this report. Moving forward, for any deposition testimony and/or trial testimony, my hourly billing rate will be the same, plus travel expenses and time. The amount of fees is not contingent upon the opinions expressed herein or on the outcome of  this matter.

## LIST OF CASES

*Eight Mile Style LLC v New Zealand National Party* [2017] NZHC 2603

RICKEY ALLEN v. DESTINY'S CHILD, ET. AL. Civil Action No. 06-CV-6606

My report, with supporting exhibits, is contained herein, and presents a summary of my  opinions and the bases and reasons therefore as of this date. To the extent any additional information is produced by either party, I will be prepared to incorporate any such additional information into my report, or otherwise to amend or supplement my report as appropriate. This report is to be used only for the purpose of this litigation and may not be published or used for any other purpose without prior written consent.

Respectfully submitted,

Robert Fink, Ph.D.
rfink@humnet.ucla.edu
310.743.6666

Exhibits Attached Herein:

Exhibit A        CV of Robert Fink, Ph.D.

The undersigned hereby certifies that, on July 23, 2021, I served the     EXPERT REBUTTAL REPORT OF ROBERT W. FINK, PhD. and these related files:

1) 01 Lose Yourself.mp3
2) 100.%20%20Judgment-%2025%20October%202017
3) Dr_Eskelin_Report
4) eminem esque_1
5) EXPERT%20REPORT%20OF%20ALEXANDER%20STEWART%2C%20PH.D.%20LLC
6) Latest Fink CV (06-2021
7) National Party Election Video

on the following parties:

Heather L. Blaise                            Counsel for Plaintiff Beatbox Music Pty,
Blaise & Nitschke, P.C.                      Ltd.
123 N. Wacker, Suite 250
Chicago, IL 60606
E-mail: hblaise@blaisenitschkelaw.com

Daniel L. Jacobson                           Counsel for Defendant Michael Cohen
Ronak Patel
Jacobson & Associates
315 Centennial Way
Tustin, CA 92780
dlj@jacobsonlawyers.com
rp@jacobsonlawyers.com


■        by electronic mail at the address(es) listed above.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

DATED this 23rd day of July, 2021, at Hillsboro, Oregon.


                                    /s/ J. Curtis Edmondson
                                    J. Curtis Edmondson



UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

DEPARTMENT OF MUSICOLOGY
2443 SCHOENBERG HALL • BOX 951623
LOS ANGELES, CALIFORNIA 90095-1623
TELEPHONE: (310) 206-5187
FAX: (310) 206-9203

Robert Fink
Professor III
Department of Musicology
UCLA Herb Alpert School of Music
Los Angeles, CA 90095-1623
10-08-14

<u>Report on Cohen "SQ mc eminem-esque" *vs* Eminem, "Lose Yourself:</u>

I have listened to the Michael Cohen track "SQ mc eminem-esque" and compared it with the released recording of Eminem's "Lose Yourself." In my opinion, the two tracks are not substantially similar in any way that would support a claim of infringement.

The beat behind Eminem's rapping is a simple guitar riff whose main melodic feature is the alternation of scale degree 5 with scale degree $^{\flat}6$, using a standard short-short-long "chugging" rhythm characteristic of hard rock and heavy metal. "SQ mc eminem-esque" is a distinctively different realization of a basic idea that underlies the two tracks:  the melodic contour is more complex and involves scale degree 4.

In fact, this basic ideas exists in prior art, as evidence of which I would adduce the basic riff of the Led Zeppelin song "Kashmir," which has the same "chugging" rhythm and prominent moves between scale degrees 5 and $^{\flat}6$.

As a way of quantifying the "risk" of an infringement suit (of course I cannot guarantee anything), it is my custom to assign odds of such out of 10, where 10/10 means the least possible grounds. In this case, I'd assign the odds as 9/10; it seems highly unlikely that anyone could make a case for infringement with these two tracks.

Robert Fink

Note:  university letterhead used for professional identification only; UCLA is not responsible for any claims made.



Exhibit #

Fink B

8/10/21

**IN THE HIGH COURT OF NEW ZEALAND**
**WELLINGTON REGISTRY**

**I TE KŌTI MATUA O AOTEAROA**
**TE WHANGANUI-Ā-TARA ROHE**

CIV-2014-485-11220
[2017] NZHC 2603

|            |            |                                          |
|------------|------------|------------------------------------------|
| UNDER      |            | The Copyright Act 1994                   |
| BETWEEN    |            | **EIGHT MILE STYLE, LLC**<br>First Plaintiff |
|            |            | **MARTIN AFFILIATED, LLC**<br>Second Plaintiff |
| AND        |            | **NEW ZEALAND NATIONAL PARTY**<br>First Defendant |
|            |            | **GREG HAMILTON**<br>Second Defendant    |
| AND        |            | **STAN 3 LIMITED**<br>First Third Party  |
|            |            | **SALE STREET STUDIOS LIMITED**<br>Second Third Party |

Continued

|              |                                                        |
|--------------|--------------------------------------------------------|
| Hearing:     | 1–8 May 2017 and 11–12 May 2017                        |
| Appearances: | G C Williams, A M Simpson and C M Young for plaintiffs |
|              | G F Arthur, G M Richards and P T Kiely for defendants  |
|              | A J Holmes for second third party                      |
|              | T P Mullins and C I Hadlee for third and fourth third parties |
|              | L M Kelly for fifth third party                        |
|              | R K P Stewart for fourth party                         |
|              | No appearance for fifth party                          |
| Judgment:    | 25 October 2017                                        |

---

**JUDGMENT OF CULL J**

---

Exhibit #

Fink C

8/10/21

Case 2:17-cv-06108-MWF-JPR   Document 340-3   Filed 03/09/23   Page 2 of 132   Page ID
#:13472

AND                         AMCOS NEW ZEALAND LIMITED
                            Third Third Party

                            AUSTRALASIAN MECHANICAL
                            COPYRIGHT OWNERS SOCIETY
                            LIMITED
                            Fourth Third Party

                            BEATBOX MUSIC PTY LIMITED
                            Fifth Third Party

AND                         LABRADOR ENTERTAINMENT INC
                            Fourth Party

AND                         MICHAEL ALAN COHEN
                            Fifth Party

## INDEX

The musical works ........................................................................................ [8]

    *Lose Yourself* ........................................................................................ [9]

    *Eminem Esque* ...................................................................................... [12]

    *Audio comparison of both works* ......................................................... [14]

**What happened?** ..................................................................................... [17]

**Issues** ....................................................................................................... [28]

**FIRST ISSUE: IS THERE ACTIONABLE COPYRIGHT IN *LOSE YOURSELF*?** ................ [30]

**1.1 Can Eight Mile Style enforce copyright in New Zealand?** ................................. [33]

    *Conclusion 1.1* ..................................................................................... [36]

**1.2 Does copyright subsist in the musical work *Lose Yourself*?** ........................ [37]

    *Conclusion 1.2* ..................................................................................... [45]

**SECOND ISSUE: WAS THERE COPYING OF *LOSE YOURSELF*?** ...................... [46]

**Legal principles on "copying"** ............................................................... [49]

    *Substantiality* ....................................................................................... [50]

    *Objective similarity* ............................................................................. [53]

    *Causal connection* ............................................................................... [60]

    *Musical copyright principles* ............................................................... [63]

**Parties' positions** ................................................................................... [76]

**2.1 How original is *Lose Yourself*?** ................................................................ [84]

    *Is there originality in popular music?* .................................................. [92]

    *Are borrowed musical elements protected by copyright?* ...................... [105]

    *Does an alteration in melody avoid copying?* ....................................... [123]

    *Is* Lose Yourself *original?* ................................................................... [132]

    *Conclusion 2.1* ..................................................................................... [155]

**2.2 Has *Eminem Esque* substantially copied *Lose Yourself*?** ........................ [158]

    *Dr Ford's analysis of* Lose Yourself ..................................................... [160]

    *Dr Zemke's evidence* ............................................................................ [175]

    *Points of difference between the musicologists* .................................... [194]

    *Analysis* ............................................................................................... [198]

    *Conclusion 2.2* ..................................................................................... [218]

**2.3 Do the parts of *Eminem Esque* used in the National Party's election advertisements and conference video reproduce the whole or a substantial part of *Lose Yourself*?** ...... [219]

    *National Party advertisements* ............................................................. [222]

    *Conclusion 2.3* ..................................................................................... [229]

**2.4 Does *Eminem Esque* sound objectively similar to *Lose Yourself*?** .............. [230]

    *Subjective assessment* .......................................................................... [235]

    *Evidence of Drs Ford and Zemke* ......................................................... [237]

    *Replication of the beat in* Lose Yourself ............................................... [241]

    *Recognition of* Lose Yourself ............................................................... [244]

    Eminem Esque *was synchronised as a sound-alike track* ...................... [251]

    *Conclusion 2.4* ..................................................................................... [273]

**2.5 Is there a causal connection between *Lose Yourself* and *Eminem Esque*?** ...... [274]

    *Conclusion 2.5* ..................................................................................... [279]

**Summary of findings on issue two** ........................................................ [280]

**THIRD ISSUE: WAS THERE COPYRIGHT INFRINGEMENT** .................. [281]

**3.1 Have any restricted acts taken place?** ............................................................. [281]

    *Relevant facts* ...................................................................................... [291]

*Analysis* ............................................................................................................ [297]

*Conclusion 3.1* ................................................................................................... [300]

**Positive defence of innocent infringement** ................................................. [301]

**FOURTH ISSUE: WHAT RELIEF, IF ANY, SHOULD BE AWARDED?** ............................... [302]

**4.1    If the National Party has infringed copyright, are Eight Mile Style entitled to relief and if so, what are the damages?** ............................................................................................. [302]

*Legal principles of damages* ........................................................................... [308]

*United Kingdom* ............................................................................................... [313]

*Australia* .......................................................................................................... [331]

*Summary of user principle factors* ................................................................. [336]

*Relevant fact chronology* ................................................................................ [348]

*Evidence on licensing fees* .............................................................................. [349]

*Licensing of* Lose Yourself ............................................................................... [351]

*Licensing experts' evidence* ............................................................................ [371]

*Analysis* ............................................................................................................ [379]

*Value of* Lose Yourself *in New Zealand* ........................................................ [383]

*Use in a political election campaign* .............................................................. [390]

*Rare use* ............................................................................................................ [398]

*Degree of reproduction* ................................................................................... [400]

*Duration* ........................................................................................................... [401]

*New Zealand territory* ..................................................................................... [404]

*Willing licensee* ................................................................................................ [410]

*Quality of product* ...........................................................................................[411]

*Settlement figures* ............................................................................................ [414]

*Target audience* ............................................................................................... [415]

*Analysis* ............................................................................................................ [417]

*Conclusion 4.1* ................................................................................................. [442]

**4.2    Are Eight Mile Style entitled to additional damages?** ................................. [443]

*Analysis* ............................................................................................................ [453]

*Conclusion 4.2* ................................................................................................. [459]

**SUMMARY OF CONCLUSIONS** ....................................................................... [460]

**Costs** ......................................................................................................................... [469]

**APPENDIX I**

You better lose yourself in the music, the moment
You own it, you better never let it go …[1]

[1]     So raps Eminem to the musical work *Lose Yourself*.  The plaintiffs claim their copyright in *Lose Yourself* has been infringed by the New Zealand National Party, by its use of a "sound-alike" track called *Eminem Esque* in its 2014 election campaign advertising and promotion.

[2]     This case concerns the use of production music, sourced from production music libraries, for synchronisation with television or media advertisements.  Such use is subject to a synchronisation licence and fee, which is issued and collected by copyright collecting societies.  Here, the production soundtrack used by the National Party is described as a "sound-alike" and is called *Eminem Esque*, which was composed by Mr Cohen, the fifth party who holds copyright in that work.

[3]     The plaintiffs (whom I will refer to as Eight Mile Style) allege that in the lead up to the 2014 election, the National Party infringed Eight Mile Style's copyright, by using *Lose Yourself* or a substantially similar version or adaptation of it, called *Eminem Esque*, in National Party campaign advertisements on television, the internet and a National Party video.  Eight Mile Style seek damages for the National Party's copyright infringement.

[4]     The National Party and the Party Secretary (both of whom I will refer to as the National Party) deny there has been any copyright infringement because there was no reproduction or copying of *Lose Yourself*; that not every aspect of *Lose Yourself* was original; and the National Party had paid for a synchronisation licence to use the music sound-alike *Eminem Esque*.

[5]     There are three separate copyrights in *Lose Yourself*, namely, the original sound recording, the lyrics and the music.  Copyright is a property right that exists in original works.  This case concerns the copyright in the music only.  The references to *Lose Yourself* in this decision, therefore, are to the musical work of *Lose Yourself*, unless otherwise stated.

---

[1]     An excerpt from the lyrics to *Lose Yourself*.  Marshall Mathers III (Eminem) *Lose Yourself* (composed by Jeffrey Bass, Luis Resto and Marshall Mathers III, ©Kobalt Music Publishing Ltd, 2002).

[6]     This proceeding is being heard in two parts.  The first is a hearing to determine the liability of the National Party and the quantum of damages, if any. The second concerns a separate hearing to determine third party liability, if any.  This decision deals with the first hearing only, namely, the issues of liability and quantum against the National Party as the alleged publisher of the infringing work.  The third party liability hearing awaits the outcome of this trial.  However, three of the third parties adduced evidence and made submissions in this hearing.  Beatbox Music, an Australian based production music library and the fifth third party, adduced evidence on the musical history of "borrowing".  AMCOS New Zealand and AMCOS,[2] the third and fourth third parties, which are the copyright collecting societies providing centralised copyright licensing services, adduced evidence and made submissions on the range of industry licence fees, in the event damages may be awarded.

[7]     During the hearing, a number of witnesses gave evidence on confidential agreements and commercially sensitive information in relation to artist and industry practices and licence fees.  To protect this confidential information, this decision will be delivered with the analysis of the confidential material being released to the parties only.  This will form Appendix II to the decision.

**The musical works**

[8]     The principle focus in this case is to determine whether *Lose Yourself* has been substantially copied or reproduced in *Eminem Esque*.  Each of the respective musical works are described below.  The relevant sound tracks to the works, the 30 second National Party advertisement and the comparative tracks have been made available by hyperlink, to enable public access to the sound tracks that were produced during the hearing.

*Lose Yourself*

[9]     *Lose Yourself* was composed by Marshall Mathers III (Eminem), Jeffrey Bass and Luis Resto in 2002.  The musical work, accompanied by lyrics, was recorded and released as a single in the United States of America in September 2002. Following an exclusive artist recording agreement and an operating agreement, Eight

---

[2]     AMCOS is the Australasian Mechanical Copyright Owners Society Ltd.

Mile Style ultimately became the owner of 50 per cent and exclusive licensee of the other 50 per cent of *Lose Yourself*. This arrangement was finalised on 9 January 2003.

[10]    The original recording of *Lose Yourself*, which includes both the musical work and lyrics can be accessed at the following hyperlink: *Lose Yourself – original recording of music and lyrics*.[3]

[11]    The musical work only, being the original Interscope recording, is the focus of the determination in this decision. The musical work only is available at the following hyperlink: *Lose Yourself – musical work only*.[4]

*Eminem Esque*

[12]    Sometime prior to 8 March 2007, Michael Cohen (the fifth party) produced a track that he called *Eminem_abbr*, which was later renamed *SQ mc Eminem Esque*. Mr Cohen holds copyright in this track. On 14 February 2008, Mr Cohen granted Labrador Entertainment Inc (Labrador), a Californian-based production music library and the fourth party, the rights to licence his work commercially. Labrador in turn licensed Beatbox Music to make the track available in Australia, New Zealand and Fiji. Mr Cohen's track is referred to in this judgment as *Eminem Esque*.

[13]    The sound track of *Eminem Esque* can be accessed at the following hyperlink: *Eminem Esque sound track*.[5]

*Audio comparison of both works*

[14]    Two further sound tracks were produced by the plaintiffs, to assist in comparing the two works. The first comparative track is a sequential playing of an excerpt of *Lose Yourself*, which has a duration of 56 seconds, followed by an excerpt

---

[3]    The hyperlinks, when clicked, will play the identified track. Alternatively, the website addresses are available as follows. *Lose Yourself* original recording and lyrics: <http://www2.justice.govt.nz/website-documents/judicial/lose-yourself-eminem-original-recording.mp3>.

[4]    *Lose Yourself* musical work only: <http://www2.justice.govt.nz/website-documents/judicial/lose-yourself-eminem-musical-work-only.mp3>.

[5]    *Eminem Esque* sound track: <http://www2.justice.govt.nz/website-documents/judicial/eminem-esque.mp3>.

of *Eminem Esque*. *Eminem Esque* then starts at 57 seconds. The tracks can then be compared, one following the other. The sequential track can be accessed at the following hyperlink: *Lose Yourself – Eminem Esque sequential track*.[6]

[15]   The second comparative track is called an overlay track.[7] This track has *Lose Yourself* and *Eminem Esque* overlayed, allowing both tracks to be heard together. Each of those tracks can be heard separately by *Lose Yourself* being channelled through a left headphone or speaker and *Eminem Esque* played through the right headphone or speaker. This track can be accessed at the following hyperlink: *Lose Yourself – Eminem Esque overlay*.[8]

[16]   Finally, the 30 second National Party advertisement can also be accessed at the following hyperlink: 30 second National Party advertisement.[9]

**What happened?**[10]

[17]   Prior to the 2014 New Zealand election, the National Party engaged three experienced advertising and media consultants to provide their expertise and services for the production of broadcast advertisements for the National Party's election campaign. They worked for Stan 3 Ltd (first third party), which was incorporated to develop and produce the National Party's 2014 election campaign advertisements.

[18]   In February 2014, Mr Jameson of Stan 3 prepared animatics, which comprise still photographs to convey "the look and feel" of the advertisement, and incorporated an extract from the music of *Lose Yourself*. The attraction was the steady, syncopated beat and rhythm to *Lose Yourself*, giving a sense of momentum to accompany the rowing strokes in the advertisement. Mr Jameson sought other possible tracks that could be tested for use in the advertisement. Sale Street Studios

---

[6]   *Lose Yourself – Eminem Esque* sequential track: <http://www2.justice.govt.nz/website-documents/judicial/lose-yourself-eminem-esque-sequential1.mp3>.

[7]   *Lose Yourself* has an orchestral introduction of 30 seconds, before the commencement of the main part of the song. *Eminem Esque* is alleged to be a copy of the main part of *Lose Yourself* and does not contain the orchestral introduction.

[8]   *Lose Yourself – Eminem Esque* overlay: <http://www2.justice.govt.nz/website-documents/judiciallose-yourself-eminem-esque-overlay.mp3>.

[9]   Thirty second National Party advertisement: <http://www2.justice.govt.nz/website-documents/judicial/national-party-advertisement.mp4>.

[10]   This section contains an abridged sequence of events, which are more fully detailed in the chronology in Appendix I to this decision.

Ltd (Sale Street Studios), a New Zealand audio production studio and the second third party, located two tracks of music according to Mr Jameson's specification. The first was a classical track. The other was a modern track called *Eminem Esque*.

[19]    In February and March 2014, Sale Street Studios synchronised the two tracks respectively with the animatics and tested them on focus groups. The preference was for the modern track, *Eminem Esque*. Between March 2014 and May 2014 election advertisements were produced.

[20]    In late May 2014, when the proposed election advertisement was shown to the campaign manager and staff, a staff member told the campaign manager that the track sounded like Eminem and Eminem had been accused of using hate speech.

[21]    The campaign manager asked Stan 3 for full details of the musical track, being concerned about the association with Eminem and any copyright issues.

[22]    On or about 13 June 2014, the campaign committee listened to several music options and decided *Eminem Esque* suited the advertisement best, because the track fitted with the visuals of the advertisement. The committee however wanted reassurance that the National Party could safely use *Eminem Esque*.

[23]    In late June 2014, Stan 3 sought reassurance about the track's copyright and obtained it from Sale Street Studios, Beatbox Music, APRA AMCOS,[11] among others. Stan 3 organised through Beatbox Music that an APRA AMCOS licence was paid to use Mr Cohen's track *Eminem Esque*. In particular, Stan 3 received a written assurance on 18 June 2014 from Mr Mackenzie of Beatbox that "[t]he agreement we have with the publisher gives us assurance that the music does not infringe on copyright and is free to be used for production purposes."

[24]    On 28 June 2014, a campaign video with the *Eminem Esque* track synchronised to it was played to the National Party conference.

---

[11]    APRA AMCOS is the Australian Performing Right Association / Australasian Mechanical Copyright Owners Society Ltd.

[25]    On 20 August 2014, the first of the election advertisements was uploaded to YouTube and to the National Party's Facebook page.  Between 20 to 30 August, the advertisements, with the *Eminem Esque* track synchronised to them, were played 186 times on New Zealand television.  *Eminem Esque* was also played eight times for a total period of seven minutes during a 15 minute opening broadcast on TV1, occurring on 23 August 2014.

[26]    Following suggestions in the media that the music sounded like *Lose Yourself*, on 25 August 2014, Eight Mile Style's lawyers wrote to the National Party complaining of the unlicensed use of *Lose Yourself*.

[27]    On or about 27 August 2014, the National Party decided to replace the *Eminem Esque* track on its advertisements with alternative music, which were aired from 30 August 2014.

**Issues**

[28]    The parties have agreed on the following issues for determination in this proceeding.  I have summarised them into four principal issues as follows:

1.     *Is there actionable copyright in* Lose Yourself*?*

    1.1    Can Eight Mile Style enforce the copyright of *Lose Yourself* in New Zealand?

    1.2    Does copyright subsist in the musical work known as *Lose Yourself*?

2.     *Was there copying of* Lose Yourself*?*

    2.1    How original is *Lose Yourself?*

    2.2    Has *Eminem Esque* substantially copied or reproduced *Lose Yourself*?

    2.3    Does *Eminem Esque* sound objectively similar to *Lose Yourself?*

    2.4    Is there a causal connection between *Eminem Esque* and *Lose Yourself?*

3.     *Was there copyright infringement?*

    3.1    Have any restricted acts taken place?

    3.2    Did the National Party infringe the copyright of *Lose Yourself*?

4.    *What relief, if any, should be awarded?*

    4.1    If the National Party has infringed copyright, are Eight Mile Style entitled to relief and if so, what damages should be awarded?

    4.2    Are Eight Mile Style entitled to additional damages?

[29]    In this judgment, I will deal with each of the issues in four sections. Under each of the principal issues, the legal principles, any sub-issues arising, the parties' positions in relation to those issues, and the relevant evidence will be analysed, with my conclusions recorded at the end of each sub-issue. A summary of conclusions appears at the end of the judgment.

## FIRST ISSUE: IS THERE ACTIONABLE COPYRIGHT IN *LOSE YOURSELF*?

[30]    Eight Mile Style claim they are eligible to enforce copyright in New Zealand under ss 18, 230 and 232 of the Copyright Act 1994 (the Act). The composers are United States' citizens.[12]

[31]    Eight Mile Style say that the musical work *Lose Yourself* was an original work composed by Marshall Mathers III, Luis Resto and Jeffrey Bass. They are the exclusive licensee and co-owner of copyright in the musical work.

[32]    The National Party does not substantively challenge determining the first issue in favour of Eight Mile Style. The National Party accepts that *Lose Yourself* is an original musical work in which copyright can subsist under the Act. It also accepts that at least Mr Bass was an author of the musical work and, because he is a United States' citizen, New Zealand copyright subsists in the musical work *Lose Yourself*. It further accepts that Eight Mile Style are exclusive licensees and can enforce copyright in New Zealand.

## 1.1    Can Eight Mile Style enforce copyright in New Zealand?

[33]    To enforce a copyright claim the requirements in either ss 18, 19 or 20 of the Act regarding qualification for copyright must be satisfied.[13]    Eight Mile Style

---

12    Copyright Act 1994, s 18. Under s 18, a work qualifies for copyright if any of the authors satisfy the requirements in subsection (1) or (2). In this case, the authors are the composers of *Lose Yourself*, namely, Mr Mathers, Mr Bass and Mr Resto, as they created the work. See definition of "author" in s 5 of the Act.

satisfies s 18 of the Act, and in particular s 18(2), where a work qualifies for copyright if the author is, at the material time, a citizen or subject of a prescribed foreign country. A prescribed foreign country includes a convention country, to which s 230 applies.[14] A convention country is defined as "an entity that is a party to an international agreement or arrangement relating to copyright."[15]

[34]  The composers of *Lose Yourself* are citizens of the United States. Both New Zealand and the United States are state parties to the Universal Copyright Convention.[16] The United States is therefore a prescribed foreign country (and a convention country) pursuant to ss 18(2) and 230 of the Act.

[35]  Eight Mile Style derive their status as a copyright owner by being the exclusive licensee. Under s 120 of the Act, copyright infringement is actionable by the copyright owner. Section 123 gives an exclusive licensee the same rights and remedies that a copyright owner has within s 120. Therefore, copyright infringement is actionable by both the copyright owner and the exclusive licensee, who own the copyright jointly.

---

*Conclusion 1.1*

[36]  The findings are:

  (a)  Eight Mile Style are the owners of 50 percent and are exclusive licensees of the other 50 per cent of the musical work *Lose Yourself*. They are therefore the exclusive licensees of copyright in the musical work *Lose Yourself*; and

  (b)  Eight Mile Style are entitled to bring this action for copyright infringement in New Zealand as the authors of *Lose Yourself* are citizens of a prescribed foreign country under the Act.

---

13   Copyright Act 1994, s 17.
14   Section 2, definition of "prescribed foreign country".
15   Section 2, definition of "convention country".
16   Universal Copyright Convention 943 UNTS 178 (opened for signature 6 September 1952, entered into force 16 September 1955).

## 1.2    Does copyright subsist in the musical work *Lose Yourself*?

[37]    To bring an action for copyright infringement, Eight Mile Style must accurately identify the copyright work in respect of which they are claiming infringement.

[38]    Section 14 of the Act defines copyright as a property right that exists in original works.  The original work in this case is a musical work.[17]

[39]    Having identified the work for which it is claiming copyright, Eight Mile Style must establish that the work is an original work.  The Act prescribes when a work is not original, under s 14(2), which provides:

> (2)    A work is not original if—
>
>    (a)    it is, or to the extent that it is, a copy of another work; or
>
>    (b)    it infringes the copyright in, or to the extent that it infringes the copyright in, another work.

[40]    However, the Act does not define originality or how the common law principles apply.  The Supreme Court has identified the relevant elements of originality.[18]  First, originality must be carefully distinguished from novelty.  The Court said there "need be nothing novel in a work to qualify it for copyright protection."[19]

[41]    Secondly, the Court emphasised that to be original for copyright purposes, the work must originate from its author.  Section 21(1) of the Act stipulates "the person who is the author of a work is the first owner of any copyright in the work".  Eight Mile Style submit that the composers (and first owners) of any copyright in the work *Lose Yourself* are Marshall Mathers III, Luis Resto and Jeffrey Bass, who created the work through musical composition.[20]

---

17    Copyright Act 1994, s 14(1)(a).
18    *Henkel KGaA v Holdfast New Zealand Ltd* [2006] NZSC 102, [2007] 1 NZLR 577 at [37]–[38].
19    At [37].
20    This satisfies the meaning of "author" pursuant to the Copyright Act 1994, s 5.

[42]    Thirdly, *Lose Yourself* must be "the product of more than minimal skill and labour."[21]    Eight Mile Style adduced evidence about the composition of the work from Mr Jeffrey Bass, one of the composers, who emphasised that *Lose Yourself* was an original composition.

[43]    The National Party accept that the total combination of the introduction, the guitar chord progression (known as the guitar riff), the drum track, bass, keyboard, piano and violin of *Lose Yourself* reflects sufficient skill and labour to meet the low threshold to be an original work under the Act and as identified by the Supreme Court.[22]

[44]    From the evidence of Mr Bass and his demonstration of the guitar riff in *Lose Yourself*, together with the combination of the other instruments and the distinctive rhythm and beat, I am satisfied that the low qualifying threshold under the Act of an "original work" has been met.

---

*Conclusion 1.2*

[45]    Copyright subsists in the musical work *Lose Yourself* as it meets the definition and threshold of being an original musical work under s 14(1)(a) of the Act.

---

[21]    *Henkel KGaA*, above n 18, at [37].
[22]    At [38].  The threshold for originality is a low one and it can be material for other purposes how original the work is; that is, how much skill and labour has gone into its creation.

**SECOND ISSUE: WAS THERE COPYING OF *LOSE YOURSELF*?**

[46]    In order to succeed in their action for breach of copyright, Eight Mile Style must establish two things:

  (a)    that it is the owner of a copyright work; and

  (b)    that the defendant has infringed the plaintiff's copyright in that work.[23]

[47]    Having established that they are the owners of the copyright in *Lose Yourself*, Eight Mile Style must then establish the second element, which requires:

  (a)    proof of copying (which incorporates the common law test regarding how to determine if a work is a copy);[24] and

  (b)    that a restricted act has taken place.[25]

[48]    This section focuses on whether there has been copying of *Lose Yourself*.  I now turn to consider the legal principles applicable to proof of copying.

**Legal principles on "copying"**

[49]    "Copying" is defined in the Act as "reproducing, recording, or storing the work in any material form".[26]  The common law has developed alongside the Act in respect of what qualifies as infringement by copying.   Three elements must be proved:[27]

  (a)    The reproduction must be either of the entire work or of a **substantial part**.

  (b)    There must be **sufficient objective similarity** between the infringing work and the copyright work, or a substantial part thereof.

---

23   *Henkel KGaA*, above n 18, at [34].
24   At [42]–[44]; *Oraka Technologies Ltd v Geostel Vision Ltd* [2013] NZCA 111 at [83]–[88]; and *Fisher & Paykel Financial Services Ltd v Karum Group LLC (No 4)* [2012] NZHC 3314, [2013] 2 NZLR 266 at [145]–[147].
25   Copyright Act 1994, s 29.
26   Section 2(1).
27   These elements were first set out by the Court of Appeal in *Wham-O MFG Co v Lincoln Industries Ltd* [1984] 1 NZLR 641 (CA) at 666 (emphasis added) and confirmed more recently by the Supreme Court in *Napier Tool & Die Ltd v Oraka Technologies Ltd* [2013] NZSC 86, which affirmed *Oraka Technologies*, above n 24.

(c)     There must be some **causal connection** between the copyright work
and the infringing work. The copyright must be the source from
which the infringing work is derived.

*Substantiality*

[50]     The first element, substantiality, does not require the work to be copied in its
entirety.  The Supreme Court has reinforced that it is not necessary for a plaintiff to
show the defendant copied the whole of the copyright work or that the copying was
exact.[28]   It is enough if the plaintiff demonstrates that the defendant copied a
substantial part of the copyright work.  What amounts to a substantial part in an
artistic work depends more on qualitative visual impression rather than on
quantitative analysis.

[51]     Once the act of copying has been established, the issue of substantiality
should be decided "on the basis of what is actually found to have been copied rather
than on what may be wider allegations of copying."[29]   The question of whether a
substantial part has been copied must be decided by its quality rather than its
quantity.  The High Court has held that "[w]hat must have been copied is the essence
of the copyright work.  It is the cumulative effect of the copied features that is
important." [30]

[52]     The House of Lords in *Ladbroke (Football) Ltd v William Hill (Football) Ltd*
focused on whether the original work, the bookmakers coupons, being compilations,
were "original" for copyright purposes.[31]   In canvassing the principles of copyright
infringement, their Lordships approached the issue of substantiality as follows:

(a)     the substantiality depends on quality, not quantity;[32]

(b)     substantiality is a matter of fact and degree;[33]

(c)     where there may be a question of originality, one looks at the
"collocation" of elements taken;[34] and

---

[28]     *Henkel KGaA*, above n 18, at [44].
[29]     *Oraka Technologies*, above n 24, at [87].
[30]     *Fisher & Paykel*, above n 24, at [174] per Rodney Hansen J.
[31]     *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 WLR 273 (HL).
[32]     At 276, 279, 288 and 293 per Lord Reid, Lord Hodson and Lord Pearce.
[33]     At 283 per Lord Evershed.
[34]     At 293 per Lord Pearce.

(d)　the reproduction of a part which by itself has no originality will not normally be copying of a substantial part.[35]

*Objective similarity*

[53]　The second element, objective similarity, requires that the whole or substantial part taken of the original work looks objectively similar to the copy. Whether there is objective similarity is largely a matter of impression for the Court to determine.

[54]　In *Designers Guild Ltd v Russell Williams (Textiles) Ltd*, the House of Lords reinforced the need to compare the two works through the following process:[36]

(a)　identify the features of the infringing work which are alleged to have been copied from the copyright work;

(b)　undertake a comparison of the two works, noting the similarities and differences. Similarities may be disregarded if they are commonplace, unoriginal, or consist of general ideas; and

(c)　finally, determine whether the parts taken constitute a substantial part of the copyright work.

[55]　Under step (b), the House of Lords confirmed the reason for the comparison:[37]

> The purpose of the examination is not to see whether the overall appearance of the two designs is similar, but to judge whether the particular similarities relied on are sufficiently close, numerous or extensive to be more likely to be the result of copying than of coincidence.

[56]　In comparing the similarities, courts have cautioned that the focus in the inquiry into objective similarity is on the number and nature of the similarities, rather than the differences.[38]　There must be a "sufficient degree of resemblance" between the similarities within the two works.[39]

---

[35]　At 293 per Lord Pearce.
[36]　*Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2000] 1 WLR 2416 (HL) at 2425–2426.
[37]　At 2425.
[38]　At 2425; and *Fisher & Paykel*, above n 24, at [173].
[39]　*Fisher & Paykel*, above n 24, at [173].

[57]    In *Thornton Hall Manufacturing Ltd v Shanton Apparel (No 2)*, Hillyer J
identified that the numerous coincidences between the two works were such that it
could not be accidental that the infringing work was a copy of the original.[40]

[58]    The High Court considered the best test was whether the copy brought to
mind the original.[41]  Hillyer J put it succinctly like this:[42]

>    … a copy is a copy if it looks like a copy …

[59]    In a musical copyright case such as the present one, with the authorities
reinforcing that the test is one of hearing and "ear recognition,"[43] the Hillyer J
formulation can more appropriately be adapted to this test:

>    a copy is a copy if it sounds like a copy.

*Causal connection*

[60]    The third element, causal connection, requires proof that the National Party
has directly or indirectly made an unlawful use of Eight Mile Style's copyright work.

[61]    To establish causal connection between the original and copied works, the
Supreme Court in *Henkel KGaA* focused on the close similarity between the two
works and the ability of the alleged infringer to have access to and an opportunity to
copy the original work.[44]  The Supreme Court said:

>    [43] The ultimate issue in a breach of copyright case concerns derivation not
>    similarity, albeit the degree of similarity between the copyright work and the
>    allegedly infringing work has evidentiary significance. Proof of copying will
>    seldom be direct; in most cases the Court will rely on inference. **The closer
>    the similarity between the two works the stronger the inference is likely
>    to be that the one was copied from the other.** If the alleged infringer has
>    had access to, and therefore an opportunity to copy, the copyright work, and
>    the similarity between the works supports an inference of copying, it may
>    well be appropriate for the Court to conclude, on the balance of probabilities,
>    that there was indeed copying …

---

40    *Thornton Hall Manufacturing Ltd v Shanton Apparel Ltd (No 2)* [1989] 1 NZLR 239 (HC) at
      246.
41    *Fisher & Paykel*, above n 24, at [173].
42    *Thornton Hall*, above n 40, at 246.
43    *D'Almaine v Boosey* (1835) 1 Y&C Ex 288 (KB) at 301, 160 ER 117 at 123.
44    *Henkel KGaA*, above n 18, at [43].

[62]    The copying need not be direct copying but what must be shown is that the copier has appropriated the labours of the original creator, either directly or indirectly.  The Court of Appeal formulated this approach in *Wham-O MFG Co v Lincoln Industries Ltd*:[45]

> The copying need not be direct copying. It may be indirect. What must be shown, however, is that either directly or indirectly the alleged defendant copier has in making his copies appropriated the labours of the plaintiff. That copying has taken place is for the plaintiff to establish and prove as a matter of fact. The beginning of the necessary proof normally lies in the establishment of similarity combined with proof of access to the plaintiff's productions …

*Musical copyright principles*

[63]    As this case concerns proof of copying in music, the following principles have been gleaned from the authorities where musical copyright infringement was in issue.[46]   They are condensed from authorities collected primarily from the United Kingdom, Canada and Australia.[47]   There is one reference to the California District Court's decision upholding the jury verdict in the challenge by Marvin Gaye's children to the Robin Thicke and Pharrell Williams song *Blurred Lines*.[48]

*The test is whether the substance of the work is taken, not a note for note comparison*

[64]    Infringement does not depend upon making a note-for-note comparison to determine whether the actual notes have been taken, but rather whether the substance of the work has been taken.[49]

---

[45]   *Wham-O MFG Co*, above n 27, at 668.

[46]   A helpful summary can also be found in Emmett J's decision in *EMI Songs Australia Pty Ltd v Larrikin Music Publishing Pty Ltd* [2011] FCAFC 47, (2011) 191 FCR 444 at [45]–[57]; and *Francis Day & Hunter Ltd v Bron* [1963] Ch 587 (CA) at 609–610.

[47]   Many of the United States' authorities are not included here, because there are jurisdictional differences in the availability of copyright defences, such as fair use, which is not available under the New Zealand legislation.  Further, all first instance copyright cases are conducted by way of jury trial, so the Court's decisions are either pre-trial or post-verdict as in *Williams v Bridgeport Music Inc* USDC CD California LA CV13-6004 JAK (AGRx), 30 October 2014.

[48]   *Williams*, above n 47.  This judgment is under appeal to the Federal Courts of Appeals (9th circuit) and is the subject of considerable criticism by the legal and music communities.  This case is discussed further at [128] of this judgment.

[49]   *Austin v Colombia Graphophone Co Ltd* [1917–1923] Mac CC 398 (Ch) at 408 and 415; and *EMI*, above n 46, at [47].

*The sounds of the works are determinative*

[65]    Determining substantial reproduction does not involve a note-by-note textual comparison of scores, but involves listening to and comparing the sounds of the two works.[50]

[66]    A comparison of musical works is a subjective test of hearing for a judge to determine similarity.[51]

[67]    Copyright infringement is where the appropriated music, though adapted to a different purpose from the original, may still be "**recognised by the ear**."[52]   Adding variations makes no difference to the principle.

[68]    A sufficient test of definite or considerable degree of similarity is "such that an ordinary reasonably experienced listener might think that perhaps one had come from the other".[53]

[69]    Merely changing an air to a dance, or transferring the tune from one instrument to another, does not alter the original subject because "[**t**]**he ear tells you that it is the same**."[54]

*The copying must be substantial*

[70]    If the part that has been taken is so small a part of the original musical work, and it is not a substantial part of the musical copyrighted work it does not constitute an infringement.[55]

*A combination of non-copyright elements can amount to substantial similarity*

[71]    A "constellation" of extrinsic similarities between two works, for example in terms of bass lines, keyboard chords, and vocal contours and hooks, amounts to

---

[50]    *Sawkins v Hyperion Records Ltd* [2005] EWCA Civ 565, [2005] 1 WLR 3281 at [54].
[51]    *Grignon v Roussel* (1991) 38 CPR (3d) 4 (FC) at 20–21.
[52]    *D'Almaine*, above n 43, at 123 (emphasis added).
[53]    *Francis Day*, above n 46, at 596.
[54]    *D'Almaine*, above n 43, at 123 (emphasis added).
[55]    *EMI*, above n 46; and *G Ricordi & Co (London) Ltd v Clayton & Waller Ltd* [1928–1935] MCC 154 (Ch) at 162.

substantial similarity because of the combination of elements, even if those elements are not individually protected.[56]

*The hook of a musical work is protected*

[72]   The "signature" or the "distinctive or important" or "vital and essential" part of an original work is protected.[57]   There will be infringement where a new work is arrived at by way of imitation and appropriation.[58]

*The degree of similarity must be considerable*

[73]   To determine whether one musical work infringes another's copyright, it is necessary to analyse the musical features and structure of each, nothing points of similarity or difference.   The question is whether **the degree of similarity** can be said to be **definite or considerable**.[59]

*There must be causal connection, not just coincidence*

[74]   Causal connection can be inferred where the degree of objective similarity between the works was sufficient, determined by examining factors such as the degree of familiarity, the original work, the character of the work, the probability of coincidence and the existence of other influences upon the defendant.[60]

*Coincidence is not infringement where there is no conscious copying*

[75]   Reproduction by subconscious copying may amount to infringement, provided it is shown the composer of the offending work was familiar with the original and there was a causal connection between the two pieces.[61]

**Parties' positions**

[76]   Before determining whether *Lose Yourself* was copied, I will consider the parties' positions in relation to the claim for breach of copyright.

---

[56]   *Williams*, above n 47, at 21.
[57]   *EMI*, above n 46, at [48], [49] and [85].
[58]   *Austin*, above n 49, at 421.
[59]   *Francis Day*, above n 46, at 610.
[60]   At 614–615.
[61]   At 614.

[77]    Eight Mile Style submit that the elements of copyright infringement have
been met.  Specifically:

(a)    the objective similarity between the relevant parts of *Lose Yourself*
and *Eminem Esque* is obvious;

(b)    *Eminem Esque* and the music synchronised with the relevant
campaign advertisements substantially reproduced *Lose Yourself*;

(c)    there is a causal connection between the two works, indicated by the
names of the copied tracks (*Eminem Esque* and *Eminem_abbr*); and

(d)    restricted acts (including authorisation) have taken place without a
licence.  This allegation will be dealt with under the third issue of
copyright infringement.[62]

[78]    The National Party submits that *Eminem Esque* does not reproduce any
substantial part of *Lose Yourself*.  It submits further that not every aspect of *Lose
Yourself* is original and a number of the aspects of *Lose Yourself* are borrowed.

[79]    The National Party says *Eminem Esque* is not an "adaptation" of *Lose
Yourself* as an adaptation is an arrangement or transcription of the work.  As *Eminem
Esque* is in the same medium as *Lose Yourself*, there has been no adaptation.

[80]    The National Party accepts that it did authorise the television broadcast of the
advertisement and also authorised the synchronising of *Eminem Esque* to the
advertisement.  However, those acts of communicating to the public or publishing
the election advertisements do not constitute copyright infringement if *Eminem
Esque* does not reproduce a substantial part of *Lose Yourself*.

[81]    I now turn to consider whether *Lose Yourself* was copied.  The first part of
that analysis requires a determination of originality.  Although *Lose Yourself* has met
the low threshold of an "original work" under s 14 of the Act, the Court is required
to determine how original the work is and whether there are features in the work that
are not original.  To establish infringement, there must be substantial copying of the

---

62    See [281]–[301] of this judgment.

original parts of the work.  Any copying of a part of the work, which by itself has no originality, will not normally be protected.

[82]   Under the broad heading of "How original is *Lose Yourself*" I will analyse the following matters:

    (1)    Is there originality in popular music?

    (2)    Are borrowed musical elements protected by copyright?

    (3)    Does an alteration in melody avoid copying?

    (4)    Is *Lose Yourself* original?

[83]   I will deal with each in turn.

## 2.1    How original is *Lose Yourself*?

[84]   The National Party relies on the observations and findings of the House of Lords in *Ladbroke* for the general proposition that there is no copyright in some unoriginal part of a whole that has copyright protection.[63]   On that basis, the National Party submits that the correct approach is to determine whether the plaintiffs' work as a whole is original and protected by copyright, and then to enquire whether the part they used was substantial.

[85]   The National Party also relies on the Supreme Court's decision in *Henkel KGaA*, where the Court emphasised that the greater the originality, the wider will be the scope of protection which copyright affords.[64]   This differs from the low threshold test under the Act for an original work.[65]   The Supreme Court said:[66]

> The threshold for originality is a low one and it can be material for other purposes how original the work is; that is, how much skill and labour has gone into its creation. In general terms the greater the originality, the wider will be the scope of the protection which copyright affords and vice versa.

---

[63]   *Ladbroke*, above n 31, at 293.
[64]   *Henkel KGaA*, above n 18.
[65]   Copyright Act 1994, s 14.
[66]   *Henkel KGaA*, above n 18, at [38].

[86]    Both the *Henkel KGaA* and *Ladbroke* decisions involved a collocation or arrangement of features which were not original in themselves.[67]   *Henkel KGaA* involved packaging for an adhesive and was a arrangement or collocation of packaging with graphic work.  The *Ladbroke* decision concerned coupons on which were printed columns of squares for betting customers to complete.  The primary focus of both cases was whether or not the collocation or compilation was original for copyright purposes and whether they were protected by copyright at all.

[87]    In *Henkel KGaA*, the appellant had to prove that the graphic work was original in the sense explained and that it owned the copyright in that work.[68]   In dismissing the appeal, the Supreme Court found that:[69]

> The skill and labour which has given rise to the arrangement is what gives the work its originality, and if that skill and labour is not great, another arrangement of the same unoriginal underlying features may not have to depart greatly from the copyright arrangement in order to avoid infringement.  **If the level of originality in the copyright arrangement is low, the amount of originality required** to qualify another arrangement of the same elements as original **is also likely to be low**.

[88]    Of importance to the present case, the Supreme Court reinforced that:[70]

> Substantial reproduction of those aspects of the work in which the originality lies must be shown to establish infringement.  This is consistent with the purpose of the law of copyright, which is to recognise and protect the skill and labour of the author of the copyright work.

[89]    What the cases all reinforce is that the issue of originality in the context of copyright must be assessed by looking at all those elements together – the "collocation" of the elements, as Lord Pearce said in *Ladbroke*.[71]   In that case, the House of Lords emphasised that it is incorrect to approach originality by subdividing a work into component parts and asking whether copyright attached to the individual parts.

[90]    The National Party called evidence to demonstrate that musical elements in popular music, alone or in combination, are too common place and too commonly

---

[67]    At [40]; and *Ladbroke*, above n 31, at 293.
[68]    *Henkel KGaA*, above n 18, at [38].
[69]    At [41] (emphasis added).
[70]    At [41].
[71]    *Ladbroke*, above n 31, at 293.

combined to be original.  The National Party argues that if the parts comprising *Lose Yourself* have a low level of originality, then *Eminem Esque* does not have to be too different to avoid copyright infringement.  Reproduction of the non-original aspects of those parts, it submits, does not infringe copyright.

[91]    To deal with this submission, I will analyse the evidence provided by the parties on originality in popular music and the originality of *Lose Yourself*.

*Is there originality in popular music?*

[92]    Both expert musicologists who gave evidence at the hearing described and referred to various components of a song, which include timbre, texture, rhythm, metre, time signature, tempo, melody and feel.  As the components are relevant to understanding the respective analyses, their definitions are summarised below.

**Articulation** refers to the manner in which a note or chord is played.  For example, it might be very short, long or accentuated.

**Duple metre** is when the music is felt in groups of two (or multiples of two), as opposed to a triple metre.

**Feel** can be a combination of texture, timbre and rhythm.  These elements are the recognisable characteristics of a genre such as reggae, samba or rock.  There are particular sounds, instruments, textures and rhythm bases which make a song easily placed into its genre.

**Figure** is a sample of notes or a phrase of music.  Here it refers to the recurring six note piano feature.  It was also referred to in the evidence as a piano "doodle".

A **hook** or **riff** is a musical phrase that is repeated and often intended to be memorable and catchy.

A **measure** or **bar** of music refers to the division of the music into segments of time, delineated on a sheet of music by bar lines usually in accord with the musical metre. Dr Ford describes an example where a bar of four beats would tend to have a strong beat followed by three weaker beats.

**Melody** refers to the notes a singer uses for the versus and chorus.  Many backing instruments often play small melodic fragments (usually repeated often), but these are not often distinctive enough to detract from the primary song melody.  Sometimes the backing instruments simple melody can be called the hook if it stands out.

**Metre** is the accent within a rhythmic bar.  In a bar of four beats, the types of metre are very limited and most songs would use the same metre.

**Sonic bed** refers to a combination of chords, tempo, harmony, instrumentation, metre and articulation (for example staccato use of guitar).

**Tempo** is the speed with which one would count out a beat.

**Timbre** is the particular "sound" of an instrument and means tone colour or the quality of sound.  It is more than instrumentation.  When the same note is played on a number of instruments, the difference in the quality of sound is timbre.

[93]     Dr Zemke, an expert musicologist,[72] was called by Beatbox Music to give
evidence on behalf of the National Party on the general concept of originality in
popular music.  Her evidential thesis was that there is a history of borrowing in
Western musical traditions, which has led to the development of musical genres
throughout the ages.

[94]     In particular, Dr Zemke described drum patterns, distinctive timbre and chord
patterns as musical building blocks, which are too universal and simple to be subject
to ownership.  The borrowing, quoting and constant reworking throughout classical
music and other western music traditions, has resulted in the genres of jazz, and rock
and roll.  She describes the development of genres based on universal musical
building blocks as follows:

> A constant amalgam of borrowing, quoting, and re-working is rife
> throughout classical music and other Western music traditions.  For instance,
> the whole style of jazz is based on re-working musical "quotations".

[95]     Dr Zemke pointed to early rock and roll songs, which all used the same
musical elements and were not "owned" by any one:

> Another example would be early rock and roll songs, which all used similar
> beats, bass lines, chord progressions, guitar strums and collections of
> instruments.  This is what created the sound of the genre itself.  No one is
> considered to "own" or have solely invented the rock and roll basslines,
> piano chord styles, timbre collections, or drum patterns.

[96]     The rock and roll musical elements were then adapted, as Dr Zemke
described:

> … rock and roll stylistic "backing" aspects were all in turn used by British
> rockers in the 60's and 70's, becoming the British Rock Tradition (The
> Beatles, The Rolling Stones, Led Zeppelin).  These British bands fully
> acknowledge that they lifted their sounds and musical backing elements
> directly from the American Blues Tradition.

[97]     Dr Zemke gave an example of musical integration and borrowing, where the
Beatles' album *Sergeant Pepper's Lonely Hearts Club Band* used recognised quotes
and borrowing from a number of genres:

---

[72]     Dr Zemke is a Senior Lecturer in ethnomusicology in the Department of Anthropology,
University of Auckland.  Dr Zemke completed her PhD at the University of Auckland in
sociology and ethnomusicology on the topic of rap music in New Zealand.

That album "quoted" from numerous pop, folk and classical sources. Its eclectic mixing is a part of the work's genius, and it is usually considered the greatest and most important rock album of all time. The album simply would not exist if the Beatles had to delete or legally reimburse every recognisable musical influence or pattern on the album.

[98]    In summary, Dr Zemke highlighted:

(a)    numerous examples of tracks that sound like each other;[73]

(b)    that many genres have stereotypical rhythms which characterise the genre;

(c)    the time signatures for pop songs and the metre for most rhythm and blues songs are typically the same for the genre;

(d)    harmonic progressions in pop music are not usually very complex and there are a limited number of patterns used by "a huge majority of the music we hear";

(e)    backing instrumentals are not typically considered part of a song that is owned, namely the drum beats and guitar chord patterns could be recopied, without payment or composition credit; and

(f)    typically it is the melody, melodic components and/or lyrics, which can be considered original in a pop song.

[99]    Dr Zemke explained that she understood only the lyrics and melody can be considered original and are subject to copyright and payment goes to the composer (not the singer or instrumentalists). If, for example, Dr Zemke wanted to record a new version of Bob Marley's *I Love You*, she understood she would only have to pay the composer of the lyrics and melody. If her band musicians copy the base lines, drum patterns, backing vocals and the like, those original performers do not get paid. On that basis, that element of the song is not owned and nor would it be considered to be subject to copyright.

---

[73]    Some of the examples given by Dr Zemke included songs with the same melody: *Twinkle Twinkle Little Star* and *The ABC Song*; songs with a similar bass riff: *What Makes You Beautiful* (One Direction) and *Summer Nights* (Grease); songs with similar piano parts: *Clocks* (Coldplay) and *When Love Takes Over* (David Guetta featuring Kelly Rowland); and songs with the same harmonic structure: *Don't Stop Believing* (Journey), *You're Beautiful* (James Blunt), *Where is the Love* (Black Eyed Peas), *Forever Young* (Alphaville) and *I'm Yours* (Jason Marz) amongst others.

[100]  Dr Zemke observed that Eminem has been inspired by, and has acknowledged, other musicians.  Masta Ace for example, is a big influence.  Dr Zemke described *Lose Yourself* as using similar elements to previous songs.  In oral evidence, she gave an example of a similar guitar chord change and timbre to the song *Kashmir* by Led Zeppelin.  Noting that it is simply a similar timbre and rhythm which are not considered owned and it is too small a musical fragment to be credited as composed, Dr Zemke stated these elements "are generally not considered as important or substantial or original as the song melody and lyrics."

[101]  Thus, Dr Zemke believed that if *Eminem Esque* mimics only some of the instrumental backing of the musical elements of *Lose Yourself,* these are not considered to have been copied, because they form part of the shared use of such features in all music.

[102]  Dr Ford,[74] the musicologist called by Eight Mile Style, acknowledged that it is not impossible for pop songs to have similar tempo, metre, structure and chords.  Examples were played to Dr Ford under cross-examination, including *La Bamba* (Los Lobos) and *Twist and Shout* (the Beatles).  Dr Ford acknowledged that they had the same chords and the same progressions, but noted they did not have the same tempo and the sound of the instruments were not similar.  Dr Ford disagreed that Led Zeppelin's *Kashmir* had the same chords as *Lose Yourself* and they were not staccato equal quavers.  He thought *Kashmir* was different to *Lose Yourself*. He acknowledged that every aspect of chords, beat, tempo and drum patterns have a common function, but when you put them together you get something very distinctive:

> Everything, every aspect of this has a common function as I said and as Dr Zemke says, it's only when you put them all together you get something very distinctive.  If you take them separately then we're back to my analogy of saying that somebody has got big ears which doesn't really narrow it down very much.  You need to put all of the information together before you get something distinctive.

---

[74]     Dr Ford is a composer, writer and broadcaster.  He studied musical composition at the University of Lancaster, United Kingdom and completed a doctorate at the University of Woolongong, Australia.  He was a composer in residence with the Australian Chamber Orchestra and has received multiple fellowships as a resident and visiting composer in Australia and at Yale University.  He appeared as an expert witness in *EMI*, above n 46.

[103]   Mr Bass, one of the composers of *Lose Yourself* and the creator of the guitar riff, acknowledged the influence of other musicians that is reflected in their music. He also agreed under cross-examination that there is a history of borrowing musical building blocks when writing music, including drum patterns, chord patterns, guitar strum techniques and the sounds of an instrument.  Mr Bass rejected, however, that when he was composing *Lose Yourself*, he considered other influences or referenced any particular music.  He also disagreed that Led Zeppelin's *Kashmir* was like his guitar riff in *Lose Yourself*.

[104]   Before analysing the originality of *Lose Yourself* as a musical work, I consider it is important to address two general themes that underpinned the National Party's position during the hearing.  The first is whether musical components that are borrowed from a genre or other musicians can qualify for ownership or engage copyright protection.  The second is whether alterations to a melody in a musical work are sufficient to avoid copyright infringement.  I deal with each in turn.

*Are borrowed musical elements protected by copyright?*

[105]   The House of Lords cautioned that similarities may be disregarded because they are commonplace, unoriginal, or consist of general ideas.[75]  Here, the National Party rely on Dr Zemke's evidence to show that the musical elements in *Lose Yourself* were unoriginal and commonplace because they were borrowed.  Therefore, they say, those elements cannot be protected and nor can they be included in the assessment of what has been substantially copied.

[106]   Eight Mile Style submit that the Court should disregard Dr Zemke's evidence about the practices of borrowing in the music industry and her opinion of what can and cannot be protected by copyright as they are matters outside her expertise (which she has admitted).  Atomising the component parts of *Lose Yourself* into musical elements that were commonplace and not protectable by copyright, Eight Mile Style contend, was contrary to the proper legal test.

---

[75]     *Designers Guild*, above n 36, at 2425.

[107]   In *Austin v Columbia Graphophone Co Ltd*, Astbury J in the English Court of Chancery said it is important to avoid an overly technical analysis and determining infringement is not a question of note for note comparison but whether the substance of the original copyright work has been taken.[76]   The approach in *Austin* was confirmed in *Sawkins v Hyperion Records Ltd*, where the Court of Appeal of England and Wales said the test of substantial reproduction involves listening to and comparing the sounds of the copyright work and of the infringing work.[77]   It is therefore possible to infringe the copyright in a musical work without taking the actual notes.

[108]   However, the issue of borrowing in the music tradition has permeated the evidence in this case, not just from Dr Zemke, but also from the other parties to this litigation who are involved in licensing musical works for reproduction and synchronisation for advertising or film purposes, as well as owning and managing music libraries.   Musical borrowing has also been the subject of much legal and musical analysis.   Far from disregarding the evidence or the issue, I consider this debate is relevant in defining the boundaries of copyright protection and brings the dichotomy of copying versus borrowing into sharp relief.

[109]   The history of musical borrowing has been the subject of many academic treatises, books and articles by musical scholars, legal academics and copyright experts.[78]   As early as 1739, Johan Mattheson wrote on the topics of imitation and borrowing in *The Perfect Chapel Master*:[79]

> Borrowing is permissible; but one must return the thing borrowed with interest, i.e., one must so construct and develop imitations that they are prettier and better than the pieces from which they are derived.

[110]   Music historian J Peter Burkholder characterises musical borrowing, or the uses of existing music, as encompassing everything "from direct quotation to the use

---

[76]   *Austin*, above n 49, at 415.
[77]   *Sawkins*, above n 50, at [54].
[78]   See for example Johann Mattheson *Der Vollkommene Capellmeister* (Ernest C Harriss (trans), UMI Research Press, Michigan, 1981); J Peter Burkholder *All Made of Tunes: Charles Ives and the Uses of Musical Borrowing* (Yale University Press, New Haven, 1995); and J Peter Burkholder, Donald Grout and Claude V Palisca *A History of Western Music* (9th ed, W W Norton, New York, 2014).
[79]   Mattheson, above n 78, at 298.

of an older work as a model without over reference".[80]  The latter form of borrowing, using older musical works as a model, is overtly seen in the recent work of Professors James Boyle and Jennifer Jenkins.[81]  The two copyright professors from Duke University presented their research and thesis in a music/comic, which graphically depicts the dichotomy between borrowing and copying.  They capture the very issues raised by the parties in this hearing and illustrate the current tension in the music industry, namely, the copyright protections to preserve the integrity of an artist's work, as against the creative freedom for artists to develop musical works and genres.[82]

[111]  Most relevantly, one of the examples included by the Professors is an example also referred to by Dr Zemke in her evidence, of the British rock bands borrowing their sounds and musical backing elements directly from the American blues tradition.  They portray Chuck Berry as the forefather of rock and roll, by mixing country, rhythm and blues and inventing a new guitar style, with two famous British musicians acknowledging their debt to Chuck Berry's innovation.[83]

[112]  Professor Boyle reinforces that the history of music is intertwined with borrowing and that history also involves regulation of musical borrowing.  He says:[84]

> You can't tell the history of music without telling the history of musical borrowing.  And you can't tell the history of music without telling the history of attempts to regulate musical borrowing.

[113]  The copying of musical ideas and commonplace building blocks and motifs from a musical work, which are not themselves original, has been considered by the English and Australian courts in determining whether there has been copyright infringement of a musical work.[85]  The use of commonplace elements or clichés has formed part of the determination of the originality of musical works, with an

---

[80]   J Peter Burkholder "The Uses of Existing Music: Musical Borrowing as a Field" (1994) 50 Second Series 851 at 861.

[81]   James Boyle, Jennifer Jenkins and Keith Aoki *Theft: A History of Music* (Duke University Law School: Center for the Study of the Public Domain, Durham, NC, 2017).

[82]   At 111.

[83]   At 135.

[84]   James Boyle as cited in Francis Presma "Remix or Robbery: two copyright scholars present the History of Music as an epic battle between creativity and control" (2017) 36(1) Duke Law Magazine 46 at 48.

[85]   *EMI,* above n 46, at [11]; and *Francis Day*, above n 46, at 594.

acknowledgement that many writers of great music have used clichés to produce masterpieces.[86]

[114]   In *EMI Songs Australia Pty Ltd v Larrikin Music Publishing Pty Ltd*, Emmett J referred to copyright legislation as striking a balance of competing interests and competing policy considerations.[87]   Significantly, his Honour noted that copyright is concerned with rewarding authors of original literary, artistic and musical works with commercial benefits, having regard to the fact that such works, in turn, benefit the public.[88]   In *IceTV Pty Ltd v Nine Network Australia Pty Ltd*, the High Court of Australia observed similar purposes to copyright law, balancing the public interest in promoting the encouragement of musical and other works by providing a just reward for the creator, with the public interest in maintaining a robust public domain in which further works are produced.[89]

[115]   In the present case, the National Party essentially submitted that *Lose Yourself* is not an original work, or has a low level of originality, as it is substantially borrowed from other music and genres.   It submits, therefore, *Eminem Esque* cannot have infringed Eight Mile Style's copyright as the parts copied are too general or non-original to be entitled to copyright protection.

[116]   Unlike the examples involving the use of musical building blocks, or "reference" or "quotes" from other musical works, the present case concerns the sale of production music (sound-alike tracks) for commercial use in advertising.   The tension between illegitimate copying versus permissive borrowing and the resulting copyright consequences, therefore, are at the forefront of this case.

[117]   It is beyond dispute, that musicians are influenced by countless other songs and artists and borrow from them, as Dr Zemke described and the academic works confirm.   It is correct that music history and "musical childhoods", as Dr Zemke

---

[86]   *Francis Day*, above n 46, at 594–595.
[87]   *EMI*, above n 46.
[88]   At [29], with reference to *IceTV Pty Ltd v Nine Network Australia Pty Ltd* [2009] HCA 14, (2009) 239 CLR 458 at [24].
[89]   *IceTV*, above n 88, at [71]. See also Ian Finch *James & Wells Intellectual Property Law in New Zealand* (3rd ed, Thomson Reuters, Wellington, 2017) at [4.1] where it is observed that copyright protection provides "an incentive for authors to create more original works. It also provides them with recognition for their creative efforts."

described, create a platform for any artist to build upon to create his or her own works. Those works often are the legacies of others.

[118]   However, the "borrowed" platforms, genres or chords must create distinctive musical works to obtain copyright protection. On behalf of the defendants, Beatbox Music played a number of tracks during the Court hearing, including *La Bamba* (Los Lobos), *Twist and Shout* (the Beatles), *Total Control* (the Motels) and *Kashmir* (Led Zeppelin), among many others. This served to illustrate that the similarities of sound, when the songs were created from the influence of other artists and used the same chords, which are not in themselves original and are common among many such songs. The chords and musical elements were said to be similar to those used in *Lose Yourself*.

[119]   The musicologists were not in agreement about the similarities of sound in the songs that were played. Dr Ford described the differences in sound and tempo between *La Bamba* and *Twist and Shout*; the different guitar chords and beat between Led Zeppelin's *Kashmir* and *Lose Yourself*; and the different guitar chords in *Total Control* to *Lose Yourself*, even though there was similar staccato articulation in both.

[120]   I agree with Dr Ford's evidence. Although these songs use the same musical elements as each other, to my ear they are distinctly different songs. *La Bamba* and *Twist and Shout* are each original and recognisably distinctive musical works in their own right. They sound different to each other.

[121]   The songs also provide a modern day demonstration of Johann Mattheson's thesis that permissive "borrowing" must return the object borrowed with "interest".[90] They have transformed the "borrowings", the same musical elements, to make something different with them.

[122]   Consistent with the authorities, musical components that are borrowed from a music genre or from other musicians can engage copyright protection, where the compilation of those components produces a distinctive and recognisably different musical work. The evidence above demonstrates this.

---

[90]   Mattheson, above n 78, at 298.

*Does an alteration in melody avoid copying?*

[123]   The second issue permeating Dr Zemke's evidence is whether a change in the "melodic line" alters the copied work sufficiently to avoid a finding of copying.

[124]   In her evidence, Dr Zemke accepted that ordinary listeners who had heard both the National Party advertisement track and *Lose Yourself* more than once and had the resemblance pointed out would likely find resemblance between the two works.  She acknowledged that the similarity seems intentional by the composer of *Eminem Esque*, as if to present an echo of *Lose Yourself*.

[125]   However, Dr Zemke points to an intention to alter the "melodic" elements so as not to infringe copyright.  It is on this basis that she describes the music industry creating derived works quickly for cheaply-made television shows or advertisements, with melodic changes to avoid infringement.  Her evidence was:

> … there has also been an intention to alter any melodic elements so as not to infringe upon what would general[ly] be considered to be the "owned" elements of the "composition".  This is done endlessly in the advertising and television sector.  There is a segment of the music industry which is not about creating original works for sales and popularity, but instead creates simplistic often derived works to quickly fill time for cheaply made television shows, or to use in advertisements.

[126]   In the same way, when Dr Zemke reviewed the piano figure in *Eminem Esque*, she agreed there was a similar use of a high pitched "melodic" line.  In her view, however, it was "altered enough so the melody is not a direct copy."  Dr Zemke said further:

> The pianist on *"Lose Yourself"* did not invent the use of a single piano line running along the top of other instruments.  And "*Eminem Esque*" is not playing the same exact melody.

[127]   The American cases appear to have placed the focus on the melody of the original work as attracting copyright.  In a recent article, an American academic, Joseph Fishman begins by citing French philosopher Jean-Jacques Rousseau:[91]

---

[91]   Joseph Fishman "Music as a Matter of Law" (2018) 131 Harv L Rev (forthcoming) at 3, citing Alfred Richard Oliver *The Encyclopedists as Critics of Music* (Columbia University Press, New York, 1947) at 43.

> Any disinterested judge will have to admit that melody is, after all, the soul of music.

[128]   In his article, Fishman follows a series of cases from as early as 1765 and focuses on the verdict and decision in relation to the song *Blurred Lines* in *Williams v Bridgeport Music*.[92]   He notes that a trend in recent United States District Court cases has emerged, where copyright protection has been extended beyond the melody of a song.[93]   From those recent District Court decisions, he writes that copyright protection in the American courts could extend to a piece's rhythm, percussion, or instrumental riffs,[94] as well as permutations of chord progression, key, tempo and genre.[95]   Of the *Williams* decision, he says *Blurred Lines* is a symptom, not a cause, of confusion over what copyright covers.   He concludes that in the United States "[t]he notion that melody today is the primary locus of music's value, however defined, is a fiction" and that the primacy of melody in infringement cases is weakening.[96]

[129]   As discussed above,[97] the authorities on musical copyright, since at least 1835, have focused on what the ear tells the listener about the similarity of the original song.[98]   The decisions, which have been followed in the United Kingdom and Australia, have applied the principle of aural recognition and upheld that variations or alterations to the original air or tune will not avoid infringement if the two works sound the same.   These decisions have also noted that it is wrong in principle to single out the notes as uniquely significant for copyright purposes.[99]

[130]   However, the distinctive hook of a song or musical riff appearing in the context of another song, as in *EMI v Larrikin*, has attracted copyright protection, because the sound is distinctive and the ear can recognise it from the original.   The

---

92   *Williams*, above n 47.
93   Fishman, above n 91, at 9.
94   See *New Old Music Group Entertainment Inc v Gottwald* 122 F Supp 3d 78 (SD NY 2015) (drumbeat); *BMS v Bridges* 2005 WL 1593013 at 3–5 (SD NY July 7, 2005) (combination of rhythmic elements); and *ZZ Top v Chrysler Corp* 54 F Supp 2d 983 (WD Wash 1999) (guitar riff).
95   *Swirskey v Carey* 376 F 3d 841 (9th Cir 2004) at 848–850.
96   Fishman, above n 91, at 46.
97   See [65]–[69] of this judgment.
98   *D'Almaine*, above n 43.
99   *Sawkins*, above n 50, at [56]; *EMI*, above n 46.

opening two bars copied in the *EMI* case, which were held to be the signature of the original *Kookaburra* work, "sticks in your head."[100]

[131]   As the musical copyright authorities reinforce, it is not sufficient, therefore, to simply alter a melody line, to show that notes have been changed, when the sound remains the same or similar to the original.

*Is* Lose Yourself *original?*

[132]   Eight Mile Style rejects the National Party's submission that *Lose Yourself* has a low level of originality and adduced evidence from Mr Bass about the composition of *Lose Yourself*.

[133]   Mr Bass gave evidence on how the composition of *Lose Yourself* took place over a year and a half.  His evidence described the opening guitar riff of *Lose Yourself* and the steps taken by the composers to finalise the work.  He told the Court that he was one of the people who composed the original musical composition entitled *Lose Yourself*, which was incorporated in a sound recording that was first released as a single in the United States sometime in or around September 2002. This was the original Interscope recording of *Lose Yourself*.

[134]   He described the beginnings of composing *Lose Yourself*:

> The first step was that I composed the opening guitar riff of the composition. This was around the time that Eminem and I were working on his album *The Eminem Show* and we had been working on a track called *Rock City* with Royce da 5'9" for that artist's forthcoming album.
>
> We were in a studio with Royce da 5'9" and I picked up a guitar and started playing that opening guitar chord progression.  At the time, I didn't know if it was a song or not.  A lot of the tunes for *The Eminem Show* started out like that.

[135]   He then provided a description of how the composition was completed, with the gradual development of the backing elements and the writing of the lyrics:

> The composition came together slowly over the following months. Marshall built the drum track using a MPC2000 drum machine.  I composed the bass line, more guitar and some keyboard parts for the composition.

---

[100]     *EMI*, above n 46, at [216].

It developed incrementally. We kept working at it on and off and felt we really ought to finish it but we got stuck.

We were stuck because it took a long time for Marshall to write the lyrics for *Lose Yourself* and this delayed the completion of the musical composition. It took him a number of months to author the perfect lyrics that were just right for the beat. As I recall, Marshall completed the lyrics at around the time he was working on the movie *8 Mile* and we then began working on the musical composition again between his scenes during the movie shoot. It really developed in a little studio we had set up in his trailer.

It was around this time that we approached Luis Resto (who is a Detroit-based musician, producer and keyboardist) to play and develop the composition's piano parts. Luis's keyboard work replaced some of my rock guitar elements initially composed in the hooks.

[136] After a year and a half, the song was recorded. Mr Bass described the process as follows:

After Marshall and I recorded the core elements of the song, we brought Luis in to overdub his piano parts. We felt he would be the one to help us remove some of the rock feel without losing the "hip-hop" tone.

The composition ended up being multi-layered and the recorded musical parts were all captured in a master sound recording, which I understand is in the possession of Interscope Records.

Overall, I estimate that it took about a year and a half to finalise the sound recording which incorporated the musical composition known as *Lose Yourself* and the lyrics for that song that Marshall wrote.

[137] Mr Bass brought his guitar to Court to demonstrate the guitar riff that he had described and he played it to the Court.

[138] In response to questions about the strum of the guitar and its purpose, Mr Bass told the Court that he intended to create a tense, hypnotic feeling with the guitar riff. Mr Bass described it as follows:

Q.     That strum that you did, is that common?

A.     No, I'd never heard it before, your Honour, I've never heard anybody play that line. I've heard chords before played but not in that rhythm.

       …

A.     When I sat down to write that song and put my fingers on the guitar fret board, the intention was to create a tense hypnotic feeling where it starts playing and never goes away and along with that drum beat actually will hypnotise you where you're feeling that something is going to happen as in a movie chase scene and that's what the power of playing it that way does to the psyche.

Q.    And the particular strum that you demonstrated?

A.    Yes, I actually play the guitar part as if I'm playing guitar and drums
at the same time because I accent on a third beat. So if I, if you're
counting one, two, three, four, one, two, three four, I accent on the
three.

[139]   Eight Mile Style, through its witnesses, Mr Bass and Mr Martin emphasised
that *Lose Yourself* won the 2003 Academy Award for Best Original Song.[101]   *Lose
Yourself* also won two Grammy Awards in 2004 for Best Rap Song and Best Rap
Solo Performance.   *Lose Yourself* was a commercial and critical success, reaching
number one on the Billboard Hot 100 (United States charts) and in a number of other
countries.

[140]   Eight Mile Style says further that *Lose Yourself* is the jewel in the crown of
Eminem's catalogue, topping the music charts in numerous countries around the
world, including New Zealand and receiving much critical acclaim.   In 2004, it was
included in *Rolling Stone* magazine's list of the "500 Greatest Songs of All Time."

[141]   I turn then to consider the way in which *Lose Yourself* was created.   I found
the evidence of Mr Bass, in describing the creation of the music of *Lose Yourself*,
compelling.   His intention to create a tense hypnotic feeling by the guitar strum,
chords and drum beat succeeded, through the insistent rhythm and guitar strum.   The
effect of this was amply demonstrated by Mr Bass's playing the guitar riff in Court.
Under cross-examination, Mr Bass accepted that he was quoted as describing the
guitar piece in *Lose Yourself* as "[i]t's not so difficult, it's just two or three chords",
but added the proviso "[f]or a guitar player that's played for 45 years."

[142]   Although there may be two or three well-known chords used in the guitar riff,
I consider the experience of the musician is demonstrated in how those chords are
employed.   Despite the commonality of the chords used by Mr Bass (as both
musicologists agreed) and despite the common use of progression from the fifth to
the sixth chord as "common," the guitar riff is striking in its intensity.   The
accompanying instruments, drums, violin and piano are arranged in such a way that

---

[101]    This being the sound recording, including the lyrics and musical work.

the arrangement gives the music of *Lose Yourself* its own individual and, I consider, distinctive sound.

[143]   The comparisons with the many other songs, which use the same repeated playing of the fifths and sixths of the guitar chord missing the middle note and only playing the "tonic" – the first note of the scale and the fifth note above it – reinforces the unique sound of *Lose Yourself*.

[144]   As noted earlier,[102] the song *Kashmir* may contain a similar chord/interval repeated pattern as *Lose Yourself*, but the sound of each of *Lose Yourself* and *Kashmir* are different.  Similarly, with *La Bamba* and *Twist and Shout*, Dr Ford was unable to accept that the sound was the same, despite the songs having the same chords and the same progressions.  I respectfully agree.

[145]   Both musicologists agreed that the individual component parts of *Lose Yourself*, such as duple metre (or 4/4 metre), the chords of D minor or G minor, the steady beat, the staccato articulation and the sound of an electric guitar, may be borrowed, common or unremarkable, but they disagree about the use of those elements in *Lose Yourself*.

[146]   Dr Ford agreed with Dr Zemke that there was nothing remarkable about the component parts in themselves, except that in his view, Dr Zemke had not joined the dots.  If the elements are put together, the end result, in his view, makes the work distinctive.

[147]   Dr Ford drew a useful analogy with an identikit picture of a person's face.  The individual component parts, such as large ears, are not distinctive in themselves, but once large ears, blue eyes, red hair, freckles and a cap are combined, you have a picture that is more distinctive then its individual parts.

[148]   The issue in this case is whether the combination of the individual elements makes *Lose Yourself* distinctive or original, qualifying for the protection of copyright.

---

[102]    See the evidence on musical borrowing, at [118]–[120] of this judgment.

[149]   I am unable to accept the National Party's submission that when the low level of originality of the guitar section, the piano "doodle" and the string line are considered even in combination the originality only lies in the detail of those parts.   I am also unable to accept the National Party's submission or Dr Zemke's evidence that the instrumental backing and musical elements, other than melodic aspects, cannot be considered original or capable of copyright protection.

[150]   From listening to the tracks of songs using duple metre and the accented rock and roll pattern in the back beat, it is inescapable that numerous songs are played in the chords of D minor or G minor, that a rock and roll beat is common, that the sound of the electric guitar is commonplace and the staccato articulation is not remarkable or unusual.   In that sense, those musical building blocks are the very things upon which the history of music has been built and is clearly demonstrated in the discussion of musical borrowing set out above and as Dr Zemke describes in her evidence.[103]   The individual component parts may be borrowed from other artists or songs and, individually, may be unremarkable.   However, it is the result of the elements being combined to create a new sound or work, which is at issue here.

[151]   I accept Dr Ford's view, that the end result of putting the musical blocks or elements together, whether they are unremarkable or borrowed, is what makes the work distinctive.   His analogy with an identikit picture is appropriate here.   It is the combination of sounds, for instance, the way the staccato guitar and drum beat is combined with the other elements of the song, that makes it distinctive.   I respectively agree with Dr Ford that the musical elements give *Lose Yourself* its distinctive sound.

[152]   I turn then to consider Dr Zemke's evidence that it is only the "melodic" aspects of the guitar part that can be original, but even the top line in *Lose Yourself* which could "possibly be called a 'melody'" was "plain" and had a low level of originality.

[153]   In *Lose Yourself*, the traditional view of a melody line is an awkward description of the staccato guitar chords and string line when the violin, drums,

---

[103]     See [94]–[101] and [108]–[117] of this judgment.

keyboard and piano figure contribute to the song's effect.  I am unable to accept the melody in this work is the dominant feature.  In *Lose Yourself*, as Dr Ford described, the focus is the hypnotic guitar strum, the beat and the sonic bed, with the piano figure and the guitar line giving the work its distinctive sound.  The work is more of an integrated sound of musical elements rather than having a distinctive melody.  A change in melody will not suffice if the overall sound in both works is the same.  I consider this further in the next section.

[154]   The distinctive sound of *Lose Yourself* is not limited by a "melodic" line, but is a combination of the other instruments, particularly the guitar riff, the timbre, the strong hypnotic rhythm and the recurring violin instrumentation and the piano figure. It is no coincidence that *Lose Yourself* received the 2003 Academy Award for Best Original Song.  I find that *Lose Yourself* is a highly original work.

---

*Conclusion 2.1*

[155]   The findings are:

    (a)    *Lose Yourself* is an original musical composition, with a distinctive guitar strum and drum beat, which creates an insistent tense hypnotic rhythm, with a heightened sense of anticipation, as originally created and intended;

    (b)    *Lose Yourself* is a highly original musical work; and

    (c)    the melody in *Lose Yourself* is not the dominant feature.

---

[156]   Having determined *Lose Yourself* is a highly original musical work, I now turn to consider if copying has occurred.  Three elements must be satisfied:

    (a)    Has *Eminem Esque* substantially copied or reproduced *Lose Yourself*?

    (b)    Does *Eminem Esque* sound objectively similar to *Lose Yourself*?

    (c)    Is there a causal connection between *Lose Yourself* and *Eminem Esque*?

[157]   I now address each of these issues in turn.

## 2.2    Has *Eminem Esque* substantially copied *Lose Yourself*?

[158]   As canvassed in the principles on copying,[104] it is not necessary for Eight Mile Style to show that *Eminem Esque* copied the whole of *Lose Yourself* or that the copying was exact.[105] It is enough if Eight Mile Style demonstrates *Eminem Esque* copied a substantial part of *Lose Yourself* or what has been copied contains the essence of the copyright work.[106]

[159]   Both musicologist experts broke down the musical works into their constituent components and compared the similarities and differences between the two works.

*Dr Ford's analysis of* Lose Yourself

[160]   Dr Ford analysed the music in *Lose Yourself*, then contrasted his analysis with the music in *Eminem Esque*, recording the similarities between the works.  In referring to the time points within the musical works, which can be followed in the soundtracks, Dr Ford uses:

(a)    0.30 means 30 seconds into the track;

(b)    1.20 means 1 minute and 20 seconds into the track.

[161]   It is important to note that the music of the main part of *Lose Yourself* begins at 30 seconds into the soundtrack of *Lose Yourself*, whereas in *Eminem Esque* there is no such piano introduction.  I set out Dr Ford's succinct analysis of *Lose Yourself* as follows, under the relevant headings.

*Instrumental introduction*

The introduction to *Lose Yourself* is in D minor and consists of simple drifting chords and descending piano arpeggios morphing into a melodic phrase that will return in the main body of the song.  There is also the hiss and crackle of what is, presumably, intended to be an old record.  The introduction comes to rest on the dominant chord (chord V) of A major.

---

[104]    See [51] of this judgment.
[105]    *Henkel KGaA*, above n 18, at [44].
[106]    At [44]; and *Bleiman v News Media (Auckland) Ltd* [1994] 2 NZLR 673 (CA) at 678 per Gault J.

*The sonic bed of Lose Yourself*

As the A major chord fades, a strongly rhythmic figure in D minor begins
(the tonic D clashing strikingly with the C sharp mediant of the fading A
major).  I consider this section to be the sonic bed of *Lose Yourself*.  It is the
striking feature of *Lose Yourself* against which all of the other musical
elements of the song are set.

[162]   Dr Ford transcribed the sonic bed into musical note form, which is shown in
Example A, and described as follows:

### Example A – the sonic bed of *Lose Yourself*



(1)    An electric guitar plays staccato (short, precisely articulated) chords.

(2)    It plays at a moderate tempo of approximately 84 quarter notes (crotchets) to
the minute.

(3)    There is a steady duple metre.

(4)    A four-measure (four-bar) harmonic template is established that runs
unchangingly throughout the song.  This template consists of two measures
of D minor, followed by two measures of G minor (first inversion).  The
precise notes in the chords vary slightly, but the chords themselves do not –
they are always D minor and G minor – and the note D appears in every
chord, functioning as a sort of pedal point or drone, a constant bass to the
music.

(5)    At the end of each round of four measures, there is a thirty-second note
(demisemiquaver) chord of A7 (in fact D/E/G, the A is not sounded), a flick
of an upbeat propelling the music back to the tonic D minor.

[163]   The other musical aspects of the song are:

(i)    *The violin tone in D*

After eight measures (two rounds of the template), a long, high violin tone
(the tonic D) emerges to hang over this sonic bed.

(ii)    *The harmonic template*

At around 0.54 the violin tone morphs into background chords of D minor
(two measures) and G minor (two measures), reinforcing the existing
harmonic template.

> (iii)   *Drum beat*
>
> From around 1.16, the drums have a 4/4 pattern with a distinctive backbeat
> (emphasising beats 2 and 4).
>
> (iv)   *Piano figure*
>
> At around 1:43 into the song, a six-note piano figure (which operates as a
> subsidiary hook to the sonic bed) appears for the first time.  This is a sped-
> up version of the melodic line heard in the slow introduction.

[164]   Dr Ford transcribed the piano figure in *Lose Yourself* into musical note form,
as Example B, below:

## Example B – piano figure in *Lose Yourself*



> *Lyric/vocal quality*
>
> At the beginning of the song (at 0:32, as the regular pulse of the 'bed'
> commences):
>
> (1)   Eminem speaks with a measured delivery and a few rhetorical pauses.
>
> (2)   He employs a natural, reasonable voice.
>
> (3)   Addressing us directly he proposes a choice:
>
> > "Look, if you had one shot or one opportunity to seize everything
> > you wanted in one moment, would you capture it or just let it slip?"
>
> After this, the reasonable tone of voice gives way to Eminem rapping with
> rhythmic urgency and a more strident tone that sometimes employs
> *sprechgesang* or 'speech-song', the spoken word becoming strongly pitched
> (in this case on the notes D and F) but without ever turning into actual song.

[165]   Dr Ford then addressed the similarities of *Lose Yourself* to *Eminem Esque*.
These are also dealt with under the relevant headings below.

> *Similar piano hook*
>
> In *Eminem Esque*, there is no slow introduction, so the first 30 seconds of
> *Lose Yourself* are only relevant in relation to the melodic riff that will
> develop into the piano hook of the main part of the song (as shown in

Example B).  A very similar, though not identical, hook appears in *Eminem Esque*, as further explained below.

*Similar sonic beds*

Both these pieces of music rely heavily on the use of their sonic bed, indeed there is little else in *Eminem Esque*.  The sonic beds are closely similar in terms of tempo, harmony, instrumentation, articulation and timbre.  The musical effect and the manner of its creation are very similar in all essential features, being:

(1)     The same staccato use of electric guitar.

(2)     Identical tempo (84 beats to the minute).

(3)     Identical duple metre.

(4)     Identical harmonic structure.

(5)     The identical chords of D minor and G minor.

[166]  To demonstrate the similarities between *Lose Yourself* (after the 30 second introduction) and *Eminem Esque* (bars 1–4, being the beginning of the *Eminem Esque* track), Dr Ford transcribed a notation of each of the sonic beds of *Lose Yourself* and *Eminem Esque*, showing the chords, the staccato notation, the duple metre and the harmonic structure.  The comparative notations are set out below:

**Sonic Bed of Lose Yourself from 30 seconds in**



**Sonic Bed of Eminem Esque bars 1–4**



[167]  Dr Ford then draws his conclusion from each of the works' sonic beds:

Taken individually, none of those five elements would be remarkable (though the staccato electric guitar chords are distinctive) but together they create a sonic bed in *Eminem Esque* that is strikingly similar to the one in *Lose Yourself*.

[168]   Dr Ford then assesses the piano figures:

*The piano figures*

In addition to the sonic bed, the piano part of *Eminem Esque* is very similar
to the piano part in *Lose Yourself* in that:

(1)    It is always a six-note figure.

(2)    It appears in the same part of the measure (on the second beat of the fourth
measure, ending on the down beat of the first).

(3)    Its dotted rhythm is identical.

(4)    It is played in the same part of the keyboard.

(5)    Whilst the notes in Eminem Esque are never all identical to the notes in *Lose
Yourself*, in at least two instances (for example at 1.20 and 1.43) five of the six
notes are identical.

[169]   To demonstrate the close similarity in the piano phrases or figures, Dr Ford
transcribed the piano figure from *Eminem Esque*, as Example C below, which
indicates the one note difference when compared to Example B, the piano figure
from *Lose Yourself*.

**Example C – Piano figure in *Eminem Esque***



different note

**Example B – Piano figure in *Lose Yourself***



[170]   Dr Ford said:

> It should be noted that in *Eminem Esque* the piano part is sometimes extended and joined by a few notes to another version of the piano part, but it remains recognisably the same.

[171]   The other close similarities, which Dr Ford drew between *Eminem Esque* and *Lose Yourself* are the drum patterns, the background chords and the high violin tone. He describes them as follows:

(1)   The 4/4 drum patterns in both pieces of music are identical in emphasising the backbeats 2 and 4.

(2)   The background chords at 0.22 in *Eminem Esque* are very similar to the chords in *Lose Yourself* from 2.00.

(3)   The drum pattern in *Eminem Esque* mirrors the upbeat figure found at the end of every fourth bar of *Lose Yourself*.

(4)   The high violin tone in *Eminem Esque* has the same function as that in *Lose Yourself*.

[172]   Dr Ford also analysed the music that was synchronised with the National Party advertisement.  He describes this as a 30 second cut-down version of *Eminem Esque*, comprising 24 measures of music, or six of the four-measure harmonic templates.  In referring to a cut-down version of music, Dr Ford meant that it has been edited from its original form.  The analysis of the parts of *Eminem Esque* which feature in the National Party advertisement is further discussed in the next section.[107]

[173]   In his cross-examination Dr Ford clarified the following matters:

(a)   The back beat used in *Lose Yourself* is a standard common rock and roll pattern, stressing the second and fourth beat.  In that sense it is a common element with other musical works.  The harmonic effect in *Lose Yourself* is distinctive and the drum pattern in *Eminem Esque* mirrors the upbeat figure found in the fourth bar of *Lose Yourself*.

(b)   The staccato guitar is one of the most distinctive features of *Lose Yourself*.  It is a different use to the guitar chords and articulation in *Kashmir* by Led Zeppelin.

---

[107]   See section 2.3 of this judgment at [219]–[229].

(c)     The harmonic device in *Lose Yourself* at the end of each round of four measures, the 30 second note (the demisemiquaver) is mirrored in the drum pattern of *Eminem Esque*, making it the same rhythmic device.

(d)     *Eminem Esque* sounds to Dr Ford like a synthesised version of *Lose Yourself*, in that there is no distortion in the sound, no 30 second note inflections and the drum pattern does not have the accented strums of *Lose Yourself*.

(e)     *Eminem Esque* sounds as though it is produced by a machine, which gives a more standardised sound of the chords.  They are slightly more standardised in *Eminem Esque*, but it is a small difference, as they are the same chords and are staccato.

(f)     The string lines in the two works are not identical.  They have the same function, but they do not use the same notes.

(g)     Dr Ford accepted that the piano part in *Eminem Esque* is used only against the guitar part, whereas in *Lose Yourself* the piano high part is added to the string chords, bass and a drum beat.

(h)     The creators of *Eminem Esque* have gone out of their way to introduce subtle differences so that the two pieces of music are not identical, but Dr Ford concludes that *Eminem Esque* is a "slightly pale imitation.  It's close but pale."  *Eminem Esque* has all of the striking features of *Lose Yourself*, "not just quite as well-achieved."

[174]  Dr Ford concludes that *Eminem Esque* substantially reproduces the essence of *Lose Yourself*.  He found the key elements of *Lose Yourself* that are reproduced in *Eminem Esque* were also present in the National Party advertisement.

*Dr Zemke's evidence*

[175]  The following five factors underlie and summarise Dr Zemke's evidence on whether there was an objective similarity between *Lose Yourself* and *Eminem Esque* (including the portion used in the National Party advertisement) and whether the advertisement was a substantial reproduction of *Lose Yourself*.  They are:[108]

---

[108]     The concepts of borrowing ubiquitous musical building blocks and the focus on altering the

(a)  The musical elements which are generally considered to be distinctive, and therefore a "substantial part of the original work," are the melody and lyrics.   Other musical backing elements are not considered to be "owned" by anyone as they are common or not the core part of the composition of a pop song.

(b)  *Lose Yourself* as a song does not have a sung melody as it is a rap song.   Only some of the backing elements, namely the baseline, string line, piano line, top line of the guitar strum, are "melodic" in nature.

(c)  The creator of *Eminem Esque* "appears to have subtly altered the string line, piano line and top line of the guitar strum so that the track does not copy any "melodic" aspects of *Lose Yourself*."

(d)  The musical elements of *Eminem Esque* "which are overtly similar to *Lose Yourself*", including the timbre collection, beat and rhythmic elements, "are not generally perceived in music to be things anyone can 'own'."

(e)  *Eminem Esque* "is only a vague approximation of the backing music of *Lose Yourself*, created by a music programmer who purposely altered melodic elements to avoid it being a substantial reproduction."

[176]  Dr Zemke also analysed the similarities and differences between *Eminem Esque* and *Lose Yourself*.  Her analysis is set out below.

[177]  Dr Zemke analyses *Eminem Esque* from bars 1–24, being the elements that are used in the National Party advertisement, and compares the elements from *Eminem Esque* with *Lose Yourself*.   After analysing bars 1–24, Dr Zemke then analysed the music track used in the National Party advertisement focusing on the musical elements apparent in each bar.

*Eminem Esque*

Bars 1–4
Guitar – similar to the guitar part in "*Lose Yourself*" but with an altered top line in bars 2 and 4.  The guitar strum itself is not distinctive, but there is a

---

melody line of *Lose Yourself* have been canvassed in the previous section on whether *Lose Yourself* was original.  See [92]–[154] of this judgment.

melodic line which stands out at the top of the chords which could possibly be called "a melody". "*Eminem Esque*" provides a new melody for this part.

Bars 5–8 [12 seconds in]
Guitar, String line – one line doing a simple ascending phrase.

Bars 9–16
Guitar, String line, String chords, Drum Beat, Bass – simple repeated notes.

Bars 17–24 [1 minute 7 seconds in]
Guitars, Drums, Bass, String Chords, Piano line – simple homophonic line, high pitched.

[178]  Dr Zemke observes that the full *Eminem Esque* track goes on much longer, but the elements that are used in the National Party advertisement are from these earlier segments.

[179]  Dr Zemke observed that the music track in the National Party advertisement uses three sets of eight bars from *Eminem Esque*.  She describes them as follows:

Bars 1–4 (from bars 1–4 in *Eminem Esque*)
Guitar.

Bars 5–8 (a segment from bars 9–12 in *Eminem Esque*)
Guitar, Drums, Strings, Bass.

Bars 9–12 (a segment from bars 17–24 in *Eminem Esque*)
Guitar, Drums, Bass, Piano.

[180]  Dr Zemke compared the musical elements used in *Eminem Esque* with those used in *Lose Yourself*.  The following is her analysis:

"*Lose Yourself*" starts with a piano and string intro[duction].

At 32 [seconds] of "*Lose Yourself*" the guitar part starts.[109]  In the first bar the top part of the strum is a repetition of one note, in second bar the melodic line goes one note up, repeating on each beat.  Then this is repeated in bars 3–4 making up a 4 bar repeated riff.

"*Eminem Esque*" uses a similar guitar element.  The guitar strum and top line melody similarly uses a repeated note for bar 1 and 3, but in bars 2 the notes go down for 4 beats, then up.  In bar 3 there is the same repeated note, then in bar 4 the notes go down, and then further down.

---

[109]   32" in Dr Zemke's evidence is described in this judgment as 32 seconds and 1. 7" is described as 1 minute seven seconds.

"*Eminem Esque*" uses a similar strumming pattern and sound to the "*Lose
Yourself*" guitar part but timbrally there are differences – in "*Eminem Esque*"
there is no distortion, no small inflections like "*Lose Yourself*" has and
"*Eminem Esque*" does not have the accented strums that "*Lose Yourself*" has.

[181] Dr Zemke set out chart versions of the comparative guitar lines in *Lose
Yourself* and *Eminem Esque* for bars 1–2 and then bars 3–4. They are produced
below:

**Guitar lines**

[182] Dr Zemke made further comparisons:

At 44 [seconds] of "*Lose Yourself*" a string line (meaning one note played,
not a chord, which is why I am using the word line) joins the guitar strum.

"*Eminem Esque*" has a segment with the same texture (two layers, guitar strum and string line).  However the string line in "*Lose Yourself*" stays on one note (with an octave note at the end of the 8 bar phrase) while the string line in "*Eminem Esque*" is ascending upwards (so same texture and timbres, but different melodic shape).

At 55 [seconds] of "*Lose Yourself*" the texture thickens.  Eminem stops talking and starts rapping.  There is a simple drum part (not the full beat), mostly bass drum.  Soft synth chords.

[183]   To illustrate the string lines, Dr Zemke produced chart versions of the string lines of both *Lose Yourself* and *Eminem Esque*.

### String lines



"Lose Yourself" String Line



"Eminem Esque" String Line

[184]   Dr Zemke further stated:

"*Eminem Esque*" also uses similar synth chords and with the guitar strum in its bars 9–16, but combines this with the full beat and the string line.  After four bars the synth chords get louder and a bass line is added.

At 1 [minute] 38 [seconds] of "*Lose Yourself*" the beat "drops" after tension and anticipation.  "*Eminem Esque*" has no such drop.

In "*Lose Yourself*", the synth chords are full and played rhythmically.  "*Eminem Esque*" does not have this.

In "*Lose Yourself*" a piano high part is added to everything else going on (string chords, bass, drum beat) playing a single melodic line.  "*Eminem Esque*" uses a similar piano sound and range, but it is playing different notes and is used against only the guitar part.

Later in "*Lose Yourself*" full piano chords are added for further texture,
"*Eminem Esque*" does not have these.

"*Eminem Esque*" uses the same general idea of having a guitar strum, joined
by a string line, then joined by a beat, and bass. While this is a similar
gathering of textures and timbre, they are playing different notes.

"*Eminem Esque*" also incorporates the use of a high single piano line added
to these elements, but this piano is playing a variation of the "*Lose Yourself*"
piano tune (not the same notes in the same order) and combines it with a
different selection of the elements.

[185]   Dr Zemke disagreed with Dr Ford on the use of the relevant musical elements
and his conclusions. Dr Zemke expanded on her view that musical elements are
common and cannot be the subject of copyright. Under each of the musical element
respective headings, she said as follows:

(a)   Harmonic structure – it is very common in popular music to reuse
chord patterns (also known as harmonic structure) in countless songs.
The majority of popular music songs would only use a handful of
harmonic progressions. While this may make the two versions sound
similar, this is not considered to be something "owned" by the *Lose
Yourself* composers. Otherwise perhaps 90 [per cent] of pop songs
would be guilty;

(a)   Tempo – no one can "own" a tempo. Hundreds of songs would use the
same tempo. Tempo is just a number on a spectrum. DJ-ing as an art
is built around linking songs with the same tempo together in a mix;

(b)   Metre – only a few permutations are used throughout Western music
history so thousands of songs would use any given metre. Similar to
the situation in poetry;

(c)   Back beats – most rock derived music produced from the 1950's
onwards uses a back beat – so this is irrelevant; and

(d)   Drum Beat – no one can claim ownership of a "beat". Especially
within any given genre drum beats are purposefully mimicked in order
to be recognisable as the same genre.

[186]   Dr Zemke accepted that the musical elements identified directly above were
"strikingly similar" in the two musical works and that the composer of *Eminem
Esque* has purposely echoed some aspects of *Lose Yourself*, such as repeated chords
and comparable beat. But she did not accept that *Eminem Esque* had substantially
reproduced *Lose Yourself*, because the composer had created a newly composed
music bed that sounded like some of the backing elements of *Lose Yourself*.

[187]   Dr Zemke also accepted that *Eminem Esque* uses a similar staccato "ostinato" guitar pattern to *Lose Yourself* and has a similar use of a high pitched "melodic" piano line, but the guitar and piano "melodic" lines were altered enough so the melody was not a direct copy.  She said further that the pianist in *Lose Yourself* did not invent the use of a single piano line running along the top of other instruments and *Eminem Esque* is not playing the same exact melody.  Equally, the guitar pattern cannot be owned or even composed in music terms as it is ubiquitous.  This sort of pattern was not an invention.  Similarly, the string line to which Dr Ford referred, is used in thousands of songs.

[188]   Dr Zemke accepted that the combination of these elements in *Eminem Esque* and the National Party advertisement music sound like *Lose Yourself*, but the melodic aspects of *Lose Yourself* have not been reproduced and the balance of musical elements "would otherwise be considered by the music community to be 'fair-game' for re-versioning."  Although those elements may create a similar "vibe" to *Lose Yourself*, vibe "is something that no one can own" as these elements are used widely, particularly in songs of a similar genre.[110]

[189]   Dr Zemke disagreed with Dr Ford's final conclusion that *Eminem Esque* reproduces the essence of *Lose Yourself*.   Dr Zemke described "essence" as indicating a primary core and that the primary "composed" and "owned" aspects of a pop song are typically the melody and the lyrics.  She disagreed that a music bed could be considered the essence of the piece.

[190]   Dr Zemke emphasised that there is no musical meaning for the term essence. If there was something that could be called an essence in the hip hop genre, in her view it would refer to the flow, lyrics, life, history, imagery, videos, engagement with the hip hop community, fierceness, anger, vulnerability and timbre of Eminem, none of which, she says, is captured or even broached in *Eminem Esque*.

[191]   If Dr Ford, in using the term "essence", meant elements of the backing track, Dr Zemke agrees that this is definitely "imitated to an extent" in *Eminem Esque*. Dr Zemke's evidence was that these are background elements in a pop song and the

---

[110]    This is discussed in more detail at [223] of this judgment.

backing track is not the essence of *Lose Yourself*, but is rather the scenery in front of which the "play" is acted.  Those backing elements or feel, in her view, were shared in the music industry and cannot be owned.  If that were the case, it would disrupt the whole functioning of the music industry.

[192]  Dr Zemke also stressed that any instrumental element reproduced in the National Party advertisement such as the guitar strum, string line and piano "doodlings" are slightly altered.  She said this is "most likely intentionally, and enough for the work not to copy anything that would qualify as 'melodic'."  Dr Zemke also said of the *Eminem Esque* composer, Mr Cohen, that he would have been aware of the need to alter anything that would qualify as "melodic", because such composers have done this countless times in their experience of writing for advertisements or television backing music.

[193]  Dr Zemke concluded that *Eminem Esque* and the National Party advertisement music track do not represent a substantial reproduction, nor the essence, of *Lose Yourself*, because:

  (a)  the tracks are different;

  (b)  *Eminem Esque* only mimics some of the instrumental backing musical elements of *Lose Yourself* and even those are altered in small ways;

  (c)  similar collections of timbre and/or rhythmic patterns as are found in the two tracks may give some familiarity for listeners, but the shared use of such features is how "the musical world usually operates within a general understanding"; and

  (d)  the composer of *Eminem Esque* seems to have purposely altered anything which could be construed as having "melodic" aspects, to ensure they were not copied.

*Points of difference between the musicologists*

[194]  The points of difference between the two experts focus on the use of the sonic beds in both tracks, the high pitched "melodic" line and the essence of the work.

[195]   The differences are:

(a)      whether the sonic beds are closely similar;

(b)      whether the composer of *Emimen Esque* had substantially reproduced *Lose Yourself*;

(c)      whether the high pitched "melodic" line, namely, the piano figure and chords, are similar or altered enough to avoid being a copy; and

(d)      whether *Eminem Esque* substantially reproduces the essence of *Lose Yourself*.

[196]   For the National Party, Mr Arthur reinforced the differences between the two tracks and relied on Dr Zemke's differences in timbre (where there is no distortion and no small inflections as in *Lose Yourself*.)   He also points to the evidence of Mr Bass, where under cross-examination Mr Bass said "the feeling of what this gentleman [Mr Cohen] did does not feel, in my opinion, like me" and acknowledged the rhythms in *Eminem Esque* were not the same.

[197]   Highlighting the difference in the string lines, the piano figure and the absence of the piano figure in the National Party advertisement, Mr Arthur submits that *Eminem Esque* does not reproduce a substantial part of *Lose Yourself*.   He submits the similarities are due to a partially successful attempt to create the same sort of "energies" without using that which is actually original and distinctive of *Lose Yourself*.

*Analysis*

[198]   It is an important start to any analysis of the musicologists' evidence to define what is a musical work.   A musical work means "a work consisting of music, exclusive of any words, intended to be sung or spoken with the music or any actions intended to be performed with the music."[111]

---

[111]      Copyright Act 1994, s 2(1), definition of "musical work".

[199]   The English and Welsh authorities have stressed that for copyright purposes, "music" does not mean simply a tune or harmony.  It is the effect on the ear of the listener, of the combination of sounds:[112]

> The performance of the editions [the printed musical scores] creates **a combination of sounds** available for hearing and appreciation through the ears of the listeners.

[200]   And further:[113]

> **It is wrong in principle to single out the notes as uniquely significant for copyright purposes** and to proceed to deny copyright to the other elements that make some contribution to the sound of the music when performed, such as performing indications, tempo and performance practice indicators, if they are the product of a person's effort, skill and time …

[201]   Expert musicologists, as Drs Ford and Zemke demonstrated, analyse music by breaking down the music into constituent pieces to assess similarities and differences.   However, as the authorities emphasise, it is not a note-for-note comparison that is needed to assess copyright infringement.[114]   It is important to ensure that the collocation or compilation of the whole is not overlooked, in assessing whether a work has a high or low degree of originality.  The whole must be considered.[115]

[202]   In assessing whether *Lose Yourself* was an original work, I have already canvassed the submissions and evidence on the use of borrowed musical blocks and whether those elements in *Lose Yourself* detracted from its originality.[116]   I have concluded that *Lose Yourself* is a highly original musical work and the shared elements comprising the backing elements or sonic bed were not to be considered separately, but in combination, consistent with the authorities already cited.

[203]   In this section, I will analyse the similarities and differences of the two works and determine whether the similarities are substantial.  In relation to the evidence from Dr Zemke that an alteration in the melody line can avoid copying, I have already determined that a change in melody will not suffice if the overall sound in

---

[112]   *Sawkins*, above n 50, at [18] (emphasis added).
[113]   At [56] (emphasis added).
[114]   *Austin*, above n 49, at 408 and 415; *EMI*, above n 46, at [47]; and *Sawkins*, above n 50, at [54].
[115]   *Henkel KGaA*, above n 18, at [44]; and *Ladbroke*, above n 31, at 293.
[116]   See [132]–[155] of this judgment.

both works is the same.[117]  I have also found that the melody in this work is not the dominant feature, because the work is more of an integrated sound of musical elements rather than having a distinctive melody.  The focus therefore is whether the two works sound the same.

[204]  From the analysis of the musicologists' evidence, Dr Zemke agrees with Dr Ford that the features of harmonic structure, tempo, metre, back beats and drum beats are strikingly similar between the two works.  After Mr Bass gave evidence that *Lose Yourself* was played in D minor, the G Minor reference in the notation to *Lose Yourself* was explained, because Mr Bass told the Court he used his little finger on B flat, when playing the chord of D minor in the guitar line.  Dr Zemke agreed that there is very little difference between G minor and D minor, because G minor sounds like D minor when B flat is played and the fifth and sixth notes of the D chord are not.

[205]  As described above, the real point of difference between the experts is Dr Zemke's evidence about the piano figure and the "melodic" line which were used in *Eminem Esque*.  Dr Zemke contends they were altered enough so the melody was not a direct copy.  Further, Dr Zemke stressed throughout her evidence that the elements of the sonic bed and harmonic structure referred to by Dr Ford are things which cannot be owned by the *Lose Yourself* composers, because those features are common in popular music and cannot be the subject of copying.

[206]  In undertaking my analysis of the similarities and differences, I will focus first on the similarities between the two works.  I find *Eminem Esque* uses:

    (a)    the same staccato use of electric guitar, that is, a similar strumming pattern and sound;

    (b)    identical tempo (84 beats to the minute);

    (c)    identical duple metre;

    (d)    identical harmonic structure;

---

[117]    See [131] and [153] of this judgment.

(e)    the piano figure is always a six note figure, it appears at the same beat (on the second beat of the fourth measure) and it is played in the same part of the keyboard;

(f)    the piano's dotted rhythm is identical;

(g)    the piano figure is recognisably the same as the piano figure in *Lose Yourself*, even though there is one different note in the six note piano figure of *Eminem Esque*;

(h)    the 4/4 drum patterns are identical emphasising the back beats two and four;

(i)    the background chords are similar (at 22 seconds in *Eminem Esque* to the chords in *Lose Yourself* from 2.00 minutes onwards);

(j)    the drum pattern mirrors the upbeat figure found at the end of every fourth bar of *Lose Yourself*; and

(k)    the high violin tone in *Eminem Esque* has the same function as that in *Lose Yourself*, although the notes are different.

[207]  In focusing on the differences in *Eminem Esque*, I have already taken into account that *Eminem Esque* does not have the first 30-second piano and orchestral introduction of *Lose Yourself*.  The further differences between the works are:

(a)    the string line differs in *Eminem Esque* as it ascends upwards, whereas in *Lose Yourself* it stays on one note with an octave note at the end of the eight bar phrase;[118]

(b)    there is a more mechanical drum beat in *Eminem Esque* because it is synthesised sound, whereas *Lose Yourself* has a more human quality about it and the strums are not as equal as they are in *Eminem Esque*;

(c)    there is a difference in the timbre of the chords between *Lose Yourself* and *Eminem Esque*, with *Eminem Esque* sounding more standardised;

(d)    *Eminem Esque* has different guitar lines, as set out by Dr Zemke, to that in *Lose Yourself*;[119]

---

[118]  See string line diagrams at [183] of this judgment.
[119]  See guitar line diagrams at [181] of this judgment.

(e)  *Eminem Esque* uses similar synth chords and the guitar strum in its bars 9–16, but there are differences in combining with the full beat and string line and the synth chords get louder and a base line is added after four bars;

(f)  *Eminem Esque* uses a similar piano sound and range to *Lose Yourself*, but plays different notes and is used against only the guitar part;

(g)  *Eminem Esque* does not use the full piano chords which were added in for further texture in *Lose Yourself*; and

(h)  *Eminem Esque* does not use the distortion, small inflections or the accented strum of *Lose Yourself* which differentiates the timbre changes in the two tracks.

[208]  Having listened to all the evidence and compared the similarities and differences, I find that when broken into their musical components, the two tracks appear strikingly similar.  Further, the similarities between the two works are substantial.  In reaching this conclusion, I agree with Dr Ford and Dr Zemke's respective analyses, when they described:

(a)  the elements of *Eminem Esque* and the National Party advertisement are "overtly similar to *Lose Yourself*";

(b)  an ordinary listener who had heard the National Party advertisement track and *Lose Yourself* more than once and had the resemblance pointed out, would likely find resemblance between the two works;

(c)  the similarity seems intentional by the composer of *Eminem Esque*, as if to present an echo of *Lose Yourself*; and

(d)  the features of harmonic structure, tempo, metre, back beats and drum beats are strikingly similar.

[209]  I have carefully considered the differences as set out above and in particular the "melodic" line of *Eminem Esque* with its alteration to the notes, both in the music figure and in the string line, but I can discern no real aural difference.  The string line has the differences demonstrated by Dr Zemke, but they appear minimal, compared to the close similarities of the use of instruments and the musical elements as described.  I bear in mind the warning that it is wrong to single out the notes as

uniquely significant and deny the other elements that make some contribution to the sound of the music when performed, if they are the product of effort, skill and time.[120]

[210]  In *Lose Yourself*, it is the musical elements that contribute to the sound, not just the "melodic" line, which is normally the defining sound in traditional or most musical works.  The elements of *Lose Yourself* were the produce of effort, skill and time over 18 months as Mr Bass described, with the composers working to achieve a particular, and distinctive, sound and effect.

[211]  I agree with Dr Ford's view that the main feature of *Lose Yourself* is the sonic bed.  The "melodic" line is but one part of the composition.  The defining sound to my ear is the guitar riff in *Lose Yourself*, which forms part of the sonic bed and is the main hook of the work.  Its distinctive and dominating rhythm almost subsumes the sound of the string line, such that any differences between the string lines of *Eminem Esque* and *Lose Yourself* are barely discernible.  The subsidiary hook, the repeating piano figure, which is also distinctive in *Lose Yourself*, occurs at the same intervals in *Eminem Esque* as in *Lose Yourself*.  The one different note in the *Eminem Esque* piano piece is imperceptible to my ear.

[212]  There is a more human quality about *Lose Yourself*, as Dr Ford described, in that the guitar strums are not as equal as they are in *Eminem Esque*.  The drum beats are more standardised in *Eminem Esque* and to my ear sound more mechanical, but those differences are barely discernible when considering the track of *Eminem Esque* as a whole.  *Eminem Esque*'s mechanical beat and sound make it a "slightly pale imitation" of *Lose Yourself*, as Dr Ford described it, but an imitation nonetheless.

[213]  Having listened to all the evidence, examined the notation examples and replayed the advertisements and track exhibits, with the close similarities and the indiscernible differences between *Lose Yourself* and *Eminem Esque*, I am in agreement with Dr Ford's conclusion when he said: "Put simply, *Eminem Esque* is strikingly similar to *Lose Yourself* in all of its major features."

---

[120]    *Sawkins*, above n 50, at [56].

[214]   When the two tracks are deconstructed into their musical elements, including tempo, duple metre, harmonic structure, piano parts, drum patterns and background chords, it is clear that *Eminem Esque* incorporates the essential features of *Lose Yourself*.

[215]   For copyright purposes, I do not accept the submission that production music and hits like *Lose Yourself* are in totally different worlds.   If production music infringes the copyright of any song, whether it be a popular or famous hit or otherwise, the principles of music copyright still apply.

[216]   The very title suggests *Eminem Esque* is a copy of *Lose Yourself* and a sound-alike track in this context, means what it says.   *Eminem Esque* sounds like *Lose Yourself*.   The sound-alike copy of *Lose Yourself* mimics the musical elements of *Lose Yourself*, as set out above, producing a copy of *Lose Yourself*.

[217]   I find the number of close similarities between the two tracks leads inevitably to the same conclusion reached by Dr Ford.   I accept Dr Ford's evidence that *Eminem Esque* substantially reproduces the essence of *Lose Yourself* and I find that *Eminem Esque* is a substantial copy of *Lose Yourself*.

---

*Conclusion 2.2*

[218]   The findings are:

    (a)    the differences between *Eminem Esque* and *Lose Yourself* are minimal;

    (b)    the close similarities and the indiscernible differences in drum beat, the "melodic" line and the piano figures between *Lose Yourself* and *Eminem Esque* make *Eminem Esque* strikingly similar to *Lose Yourself*;

    (c)    *Eminem Esque* substantially reproduces the essence of *Lose Yourself*; and

    (d)    *Eminem Esque* has substantially copied *Lose Yourself* and is a substantial copy of *Lose Yourself*.

---

### 2.3    Do the parts of *Eminem Esque* used in the National Party's election advertisements and conference video reproduce the whole or a substantial part of *Lose Yourself*?

[219]   Having found that *Eminem Esque* substantially reproduces *Lose Yourself*, the next question is whether the parts of *Eminem Esque* used in the National Party's election advertisements and conference video also reproduce the whole or a substantial part of *Lose Yourself*.

[220]   To consider this issue, I have taken the points of comparison from the relevant parts of *Lose Yourself* in the audio files described at [9]–[16].

[221]   The track of *Eminem Esque* can then be compared with copies of the National Party advertisements, which, in the absence of discovering a copy of the conference video, are as follows:

(a)    the 30 second advertisement; and

(b)    the opening broadcast advertisement of 15 minutes.

*National Party advertisements*

[222]   In addition to having the relevant tracks available for listening, I also heard evidence from Dr Ford on the synchronised version of *Eminem Esque* with the National Party advertisements.   Dr Ford, in reaching his view that the music synchronised with the National Party advertisements reproduces *Lose Yourself*, describes the parts of *Eminem Esque* which feature in the advertisements.  They are:

(a)    the sonic bed, which features in the first two four-measure templates of the advertisement;

(b)    the 4/4 drum pattern and the chords, which feature in the third and fourth four-measure templates;

(c)    the sixth note piano figure, which features in the fifth template for the advertisement;

(d)    the background chords, the high violin tone and two instances of the upbeat drum pattern at the end of the fourth bar; and

(e)    the sound and use of the voice over resemble Eminem's delivery from *Lose Yourself* (at 32 seconds) and the measured rhetorical pauses, the

tone of the voice and the choice proposed in the advertisement, reproduces the essence of *Lose Yourself*.

[223]   Dr Zemke contested Dr Ford's observations about the sound and use of the voice over in the National Party advertisements, as reproducing the essence of *Lose Yourself*.  She contends there is no mistaking that this is not Eminem speaking; there is no similar delivery and there is no copyright on the use of rhetorical pauses or a tone of reasonableness.  The use of those elements may create a similar vibe to *Lose Yourself*, but vibe cannot be owned by anyone.  The lyrics of *Lose Yourself* and their delivery are not in contention here, because the issue is whether the musical work has been copied.  Nevertheless, in their analysis, the musicologists have considered the components of both tracks and given their views on the differences and similarities.

[224]   I have listened carefully to the sound track and videos of the advertisements, both the 30 second advertisement and the 15 minute National Party opening broadcast.  *Eminem Esque* has been synchronised with the advertisements, using three sets of the eight bars from *Eminem Esque*, which are respectively described by the musicologists.

[225]   In the 15 minute advertisement, there are eight edits of *Eminem Esque* being synchronised to parts of the advertisement throughout the 15 minutes.  These include the piano figure being played at least five times in the 15 minute track.

[226]   The 30 second advertisement is an edited version of *Eminem Esque*, being 24 measures of music or six of the four-measure harmonic templates, which Dr Ford provided in Example C,[121] or three sets of eight bars as Dr Zemke describes it.  The 30 second advertisement also contains the six note piano figure, which features in the fifth template and is heard in the final template of the advertisement before it fades out.  It appears on listening to both advertisements that the 30 second advertisement is an edit of the last part of the 15 minute National Party opening broadcast.

---

[121]   See [169] of this judgment.

[227]   The National Party did not contest that the relevant parts of *Eminem Esque* were used in the National Party's election advertisements.  It was submitted that the six note piano figure is not included in the National Party advertisements, but that does not appear to be correct, as the piano figure is clearly heard as I have described above.   Not only do I hear it in playing the advertisements, but I also accept Dr Ford's evidence as correct.

[228]   There is little contest in the evidence (apart from the alleged omission of the piano figure in the advertisements) that the key elements of *Lose Yourself* that are reproduced in *Eminem Esque* are also present in the National Party advertisements.

---

*Conclusion 2.3*

[229]   I find that the parts of *Eminem Esque* used in the National Party's election advertisements substantially reproduce *Lose Yourself*.

---

## 2.4     Does *Eminem Esque* sound objectively similar to *Lose Yourself*?

[230]   The inquiry into objective similarity requires that the whole or substantial part taken of the original is objectively similar to the copy and it is largely a matter of impression for the Court to determine.   This is a test of hearing and ear recognition.[122]

[231]   Although stated to be an objective test, the importance of the aural impression is ultimately with the Judge.   The trial Judge in *Grignon v Roussel* found that the defendant's work had such a striking resemblance that one could only be a copy of the other, even with minor differences resulting from arrangements or substitution of chords.[123]   His approach was to listen to the works several times during the trial and in his deliberation he said:[124]

> This was a test of hearing.   Certainly it is a subjective test, but it is the one that must ultimately be used in such a matter, just as and still more in "trade mark" cases, to determine the similarity of works after expert evidence has established an objective resemblance.   Writing imposes natural limits on the

---

[122]     *D'Almaine*, above n 43, at 123.
[123]     *Grignon*, above n 51.
[124]     At 20–21.

reproduction of what is perceived on hearing a musical work; it is not possible to accurately reproduce by words the impression made on the ear by hearing alternately the first measures of the refrain of these two works: it is striking.

[232]   Of relevance to this case, the trial Judge in *Grignon* considered that the resemblance between the two works applied to a significant part of the work, not in quantitative but in qualitative terms, in that it concerned the first measures of the refrain, which is the "hook" that the ear retains for the purpose of identifying a piece.

[233]   Counsel for the National Party accepted that if I determine that *Eminem Esque* reproduces a substantial part of *Lose Yourself*, then the National Party concedes there is objective similarity between *Eminem Esque* and *Lose Yourself*.

[234]   In addition to my finding that *Eminem Esque* reproduces a substantial part of *Lose Yourself*, there are five reasons for my finding that *Eminem Esque* sounds objectively similar to *Lose Yourself*.  They are:

 (a)   my assessment from listening to the tracks of the works;

 (b)   Drs Ford and Zemke agree that the sonic bed is strikingly similar;

 (c)   the beat of *Lose Yourself* was intended to be replicated;

 (d)   others recognised *Eminem Esque* as sounding like *Lose Yourself*; and

 (e)   *Eminem Esque* was synchronised as a sound-alike track.

*Subjective assessment*

[235]   I have watched the National Party's advertisements and all of the music tracks produced.  I have compared the tracks of *Eminem Esque* and *Lose Yourself* separately, sequentially and listened to the tracks overlaid one on the other.

[236]   The guitar riff of *Lose Yourself* is the hook that identifies *Lose Yourself* to my ear.  This is reproduced in *Eminem Esque*, in such a way that it sounds like a copy of the guitar riff in *Lose Yourself*.  However, the drum beat sounds more mechanised and pedestrian in *Eminem Esque* and, when overlaid with *Lose Yourself*, is

fractionally later in timing.  However, as discussed previously,[125] the tracks sound so strikingly similar, they are almost indistinguishable.

*Evidence of Drs Ford and Zemke*

[237]  I have canvassed fully the evidence of the experts.  Both experts are in agreement that the sonic beds of *Lose Yourself* and *Eminem Esque* are strikingly similar.  Dr Zemke said it "appears that the composer of *Eminem Esque* has purposefully echoed some aspects of *Lose Yourself* – such as repeated chords, comparable beat and the like."

[238]  Further, Dr Zemke describes *Eminem Esque* as using a:

> … similar strumming pattern and sound to the *Lose Yourself* guitar part but timbrally there are differences – in *Eminem Esque* there is no distortion, no small inflections, like *Lose Yourself* has and *Eminem Esque* does not have the accented strums that *Lose Yourself* has.

[239]  In Dr Zemke's evidence she accepts that the musical elements are "overtly similar" and the listener would likely find resemblance between *Lose Yourself* and the National Party advertisements when heard more than once and with the resemblance pointed out.

[240]  Dr Ford, whose evidence I accept, concluded that *Eminem Esque* is strikingly similar to *Lose Yourself* in all of its major features.  Specifically, he gave evidence that "[n]ot only do the two tracks sound very similar, when they are deconstructed into their musical elements … it is clear that *Eminem Esque* incorporates the essential features of *Lose Yourself*."

*Replication of the beat in* Lose Yourself

[241]  Mr Jameson worked for the company Stan 3 Ltd, which was engaged by the National Party to provide creative services for their 2014 election campaign. Mr Jameson, on behalf of Stan 3, obtained approval from the Electoral Committee of the National Party to source a modern track which sounded like the clippings of *Lose Yourself* in the animatics that Mr Jameson created for the National Party's approval.

---

125    See [208][206]–[217] of this judgment.

[242]   Mr Jameson approached Mr Foster at Sale Street Studios to provide the sound production for the National Party's advertisements.  This will be dealt with in greater detail under the third issue of copyright infringement.[126]   For present purposes however, Mr Jameson described why he used *Lose Yourself* in the animatics and why he wanted tracks with the same type of beat as *Lose Yourself* for the contemporary track for his animatic.  Mr Jameson explained:

> The reason I used this track was because the opening rhythm to "Lose Yourself" had the steady, syncopated beat, which would give a sense of momentum, and would be a good beat to create a dynamic edit.  It was something I considered a famous beat that I recognised from a number of tracks, for example, the Motels used it on "Total Control" and Led Zeppelin used it for "Kashmir".  "Lose Yourself" was an example that came to mind as something I could use as a prompt to [Mr Foster] to find me tracks with this type of beat to test as the contemporary track for the animatic.

[243]   The ultimate sourcing and use of *Eminem Esque* achieved his aim: to provide the same opening rhythm to *Lose Yourself* with the steady syncopated beat.  On an objective assessment, there is little doubt that the final sound track used in the National Party advertisements was used to sound like the beat and rhythm in *Lose Yourself*.  The result was a sound so similar to *Lose Yourself* that *Eminem Esque* sounds like a copy.

*Recognition of* Lose Yourself

[244]   There are three items of evidence from people who recognised the sound of *Lose Yourself* in the National Party election campaign advertisements.

[245]   In late May 2014, Mr Jameson showed the National Party's campaign office a version of the proposed election advertisement.  Ms de Joux was the campaign manager for the National Party's 2014 general election campaign.  She gave evidence that a staff member, employed by the National Party at the time, heard the *Eminem Esque* track and said it sounded like Eminem.  This was an obvious reference to *Lose Yourself*.

[246]   I acknowledge the National Party's submission that no-one including the media present, recognised it at the National Party's conference opening when the

---

[126]   See [291]–[296] of this judgment.

video was first played.  Nevertheless, it was recognised by a staff member, who obviously had a familiarity with Eminem's music.  He then raised the issue of the appropriateness of the association of the National Party with Eminem.

[247]  The second item of relevant evidence is a post dated 20 August 2014 on the TVNZ OneNews website which reads:

> The music on the National Party's new ad has been compared to a track by Eminem.
>
> The National Party released the ad on You-Tube and on its Facebook page today sparking reaction on social media.
>
> Journalist Russell Brown tweated "Yup. You can pretty much play Eminem's *Lose Yourself* right over National's campaign ad".
>
> Sarah McMullan posted "Because nothing speaks to the National Party more than an 8 Mile Detroit vibe #TeamKey."
>
> Tina Ng said the party was "totally ripping off Eminem."
>
> Others posted on the National Party Facebook page saying that it was an "excellent" and "impressive" ad.

[248]  The third item of evidence is an email exchange on 20 August 2014 between a staff member at Parliament to Ms de Joux drawing her attention to Mr Rutherford's online feed called "Rutherford Beehive Live: Has National been inspired by Eminem?"  Mr Rutherford, a parliamentary journalist, signalled that "[w]e have a story coming soon, but if you're interested, you decide?"  Mr Rutherford then asked whether two tracks on YouTube comparing the National Party advertisement with Eminem's *Lose Yourself* sound alike.  He further said "[a]t least one former Beehive staffer thought so, as has a music critic."

[249]  In closing, the National Party submitted that the music identifier cell-phone application called "Shazam" did not detect that *Eminem Esque* sounded like *Lose Yourself*.  Neither of the expert musicologists were questioned about the reliability of Shazam and nor was there any evidence adduced about the accuracy or otherwise of the cell-phone application.  I am unable to give any weight to the submission, not only because of the lack of evidence surrounding Shazam and its aural reliability, but also the weight of evidence and my own aural impression, that *Eminem Esque* sounds like *Lose Yourself*.

[250]   Leaving aside the submissions about Shazam, the three pieces of evidence, whilst not conclusive in themselves, indicate that others had recognised the close similarity and the same sound of the two works.

Eminem Esque *was synchronised as a sound-alike track*

[251]   Where an artist holds copyright in a musical work, that musical work can be used for commercial purposes, provided that the consent of the artist is obtained.  In the music industry, this is achieved by way of a music synchronisation licence.  A music synchronisation licence is a type of licence that may be granted by the holder of copyright in a particular composition that allows the licensee to synchronise music with visual media (for example, film, television shows, advertisements or video games).  In this case Mr Cohen, as the copyright holder of *Eminem Esque*, would have been paid a fee.

[252]   As Ms Zamoyska, an expert in commercial licensing of music, told the Court, the higher the value of the musical work and the greater the success of the artist and performers, generally the higher the value is of the licence fees and more control over the use of the music that is exercised by the copyright holder or controller.

[253]   As an alternative to acquiring a higher value work, some companies offer production music for licensing.  Ms Zamoyska described production music as referring to music which can be obtained off the shelf for use in synchronisation, including advertisements.  Ms Zamoyska also described production music as tending to be music by unknown performers and artists.  It is often music that is generic in nature or of a particular style of genre of music, but is not known by the public and is rarely particularly original or memorable.

[254]   On 14 February 2008, it appears Mr Cohen entered into an agreement with Labrador Entertainment for it to use his work for recording, licensing, publishing or performing worldwide in exchange for an agreed percentage of payments.

[255]   These rights were then licensed to Beatbox Music which in turn licensed to AMCOS, which ultimately licensed to the National Party.  It should be noted that AMCOS receives licences from third parties for over 2.5 million songs, but does not

assess songs for potential copyright infringement.  Therefore, the fact that *Eminem Esque* was the subject of a synchronisation licence did not mean that it had been assessed for copyright infringement, as that is not a function of AMCOS.

[256]  The National Party rely on the AMCOS licence that was obtained for their use of *Eminem Esque* in their election campaign advertising.  They point to the National Party campaign committee's meeting with Stan 3, where the National Party specifically sought assurances that it was safe to use *Eminem Esque* and that there were no legal complications.  Stan 3 then sought assurances from Sale Street Studios, Mr Collins, former head of production of a number of large international advertising agencies, Mike Chunn, former head of APRA, Ms Benoit at APRA/AMCOS and Mr Mackenzie at Beatbox Music.  Mr Mackenzie specifically advised Stan 3 in writing:

> The agreement we have with the publisher gives us assurance that the music does not infringe on copyright and is free to be used for production purposes.

[257]  The issues around licensing are likely to be issues that arise in the next stage of the hearing and are not ones I can presently determine.  However, in terms of copyright infringement, the licensing arrangement is relevant to assessing the purpose for which *Eminem Esque* was intended, namely, as a sound-alike track to be synchronised to an advertisement.

[258]  Eight Mile Style submits that sound-alike tracks are in a different or sub-category to production music, because they are tracks that are made and sold to sound like a particular song.  It further submits that sound-alikes intentionally seek to appropriate skill, effort and time of the original artists and seek to sound sufficiently similar to the original track so that it comes to mind.

[259]  Mr Martin, the manager of Eight Mile Style, said in his experience it was not common to have sound-alikes that refer to the original artist that are essentially the same as the original track.  He accepted that while it was common to have production music that evokes the feel or type of genre, *Eminem Esque* was just a poor attempt to disguise the actual nature of the true authors.

[260]  *Eminem Esque* was produced before 8 March 2007 by Michael Cohen.  The initial track was called *Eminem_abbr*.  Eight Mile Style submit that this name indicates the intention of Mr Cohen to substantially reproduce *Lose Yourself* by abbreviating or shortening it.  The track was renamed *Eminem Esque*, in which Mr Cohen has copyright.

[261]  Mr Cohen did not participate in the hearing, following legal advice, so no evidence has been provided by him as to how he produced *Eminem Esque*.  In the absence of any explanation for the original title of *Eminem_abbr* and its subsequent renaming, I accept Eight Mile Style's submission that the naming revealed that the composition was an abbreviated reproduction of *Lose Yourself* and the change of name was an attempt to disguise the nature of the reproduction.

[262]   Having explained to the Court that he was introduced to the concept of sound-alikes by a music coordinator at NBC/Universal Studios in 2006, Mr Webb of Labrador Entertainment explained that a film or television show director uses a "temp track" to give a composer a specific directional sound that the director wants in each section of his or her production.

[263]  Mr Webb gave evidence explaining the concept of sound-alikes, being tracks that are designed to sound like other artists.  Mr Webb told the Court that:

> The music composer composes a music piece that has a similar feel, groove, and/or similar sound to the well-known music.  This new composition is called a sound-a-like.  I[t] is expected to be composed such that it does not infringe the well-known composition.  The sound-a-like is used in the published version of the film or TV show.

[264]  Mr Webb explained how the tracks were named after the well-known music.

> With constant requests by music supervisors and production companies for sound-a-likes Labrador would purposely title the cue with the name of the famous artist the music "sounded like".  This was done to make the end user (and all parties in the chain towards the end user) aware of the composer's objective of having a similar feel, groove or sound without infringing the well-known composition.

[265]  Mr Webb told the Court that to his knowledge, no sound-alike in the music library industry had ever been successfully identified as infringing copyright.

[266]   In an assessment of originality and substantial copying, the "sound-alike" is almost self explanatory.  The name of the track alone suggests that it is a copy of Eminem.  In the same way, the Court heard that music libraries contain works of famous artists as sound-alikes, with the artist's name appearing in the title.   For example, *Beatles Esque* in the same way as *Eminem Esque* was named.

[267]   Further, in the absence of evidence from Mr Cohen, there is an obvious inference that Mr Cohen, when he was writing *Eminem Esque*, had *Lose Yourself* in front of him.  This proposition was put to both the musicologists.  Dr Zemke agreed that the inference could be drawn.  She acknowledged that *Eminem Esque* has been subtly and purposely altered as it shows an intent to "present an echo of *Lose Yourself*."

[268]   Dr Ford, when asked whether he believed Mr Cohen put his own effort into composing something that sounded like *Lose Yourself*, concluded that he could not conceive of any way in which *Eminem Esque* was created "without close recourse to *Lose Yourself*."

[269]   The point of difference in this case, from Dr Zemke's evidence about musical building blocks and a lack of originality generally, is that *Eminem Esque* was intended to sound like and is a copy of *Lose Yourself*.

[270]   Applying all the principles from the musical copyright cases, alteration of an original work constitutes infringement if "[t]he ear tells you that it is the same".[127] Equally "an ordinary reasonably experienced listener might think that perhaps one had come from the other", such that the threshold of objective similarity has been reached.[128]

[271]   In addition to my aural assessment, in combination with the evidence outlined above, I am satisfied that on an objective assessment, *Eminem Esque* sounds like a copy of *Lose Yourself*.  The ear tells you *Eminem Esque* sounds the same and the listener is left thinking one has come from the other.  I also find it telling that

---

[127]     *D'Almaine*, above n 43, at 123.
[128]     *Francis Day*, above n 46, at 610.

Dr Zemke accepts that an ordinary listener who had heard *Lose Yourself* and the National Party advertisement more than once would likely find resemblance between the two works.  She considered it was intentional that *Eminem Esque* sounded like an echo of *Lose Yourself*.

[272]   *Eminem Esque* is strikingly similar to *Lose Yourself* with minimal discernible differences and objectively, it was designed to "sound like" Eminem and *Lose Yourself* as it was production music and a sound-alike track.  Adapting Hillyer J's formulation, *Eminem Esque* sounds like a copy of *Lose Yourself* and I find it is a copy of *Lose Yourself*.[129]

---

*Conclusion 2.4*

[273]   The findings are:

(a)   *Eminem Esque* is objectively similar to *Lose Yourself*, with minimal discernible differences;

(b)   *Eminem Esque* sounds like a copy; and I find it is a copy of *Lose Yourself*; and

(c)   *Eminem Esque* was designed to "sound like" *Lose Yourself* as production music and a sound-alike track.

---

## 2.5   Is there a causal connection between *Lose Yourself* and *Eminem Esque*?

[274]   There is no contest in this case that Mr Cohen, the composer of *Eminem Esque*, had access to *Lose Yourself*.  As Dr Zemke acknowledged, it was an obvious inference to be drawn that Mr Cohen had a copy of *Lose Yourself* before him when creating *Eminem Esque*.  She admitted that *Eminem Esque* was "subtly" and "purposely" altered.  Tellingly, Dr Zemke said:

> The similarity seems intentional by the composer of *Eminem Esque*, as if to present an echo of *Lose Yourself*.  But then there has also been an intention to alter any melodic elements so as not to infringe upon what would general[ly] be considered to be the "owned" elements of the "composition".

---

[129]   *Thornton Hall*, above n 40, at 246.

[275]   Similarly, Dr Ford said that he could not conceive of any way in which *Eminem Esque* was created "without close recourse to *Lose Yourself*."  Although there is no direct evidence from Mr Cohen that he copied *Lose Yourself*, it is clearly evident, as Lord Scott said in *Designers Guild*, that the copier has produced his "copy" with the original at his elbow.[130]

[276]   The National Party accepts there is a causal connection between *Lose Yourself* and *Eminem Esque*, as *Eminem Esque* was not coincidently similar to *Lose Yourself*.  This distinguishes these facts from those in *Francis Day*, where there had been no conscious or subconscious copying and therefore no infringement, even though the works in question were objectively similar.[131]

[277]   The similarities between the two works are extensive.  The initial title of *Eminem Esque* named it as *Eminem_abbr*.  *Eminem Esque* was created as a sound-alike track and is called *Eminem Esque*.  It is clearly evident that *Lose Yourself* was copied in the production of *Eminem Esque*.  Overwhelmingly, the causal connection between *Lose Yourself* and *Eminem Esque* was not coincidental and the threshold is met.

[278]   The lyrics to *Lose Yourself* have a heightened irony in the context of these proceedings.  The words of Peterson J in *University of London Press Ltd v University Tutorial Press Ltd* are apt:[132]

> … what is worth copying is prima facie worth protecting.

And prophetically so rapped Eminem:

> You better lose yourself in the music, the moment
> You own it, you better never let it go …

---

130   *Designers Guild*, above n 36, at 2432.
131   *Francis Day*, above n 46, at 614.
132   *University of London Press Ltd v University Tutorial Press Ltd* [1916] 2 Ch 601 (Ch) at 610.

*Conclusion 2.5*

[279]   The findings are:

    (a)   there is a causal connection between *Lose Yourself* and *Eminem Esque*, as it was no coincidence that the works sounded the same;

    (b)   the undeniable inference to be drawn from the evidence is that the composer of *Eminem Esque* had *Lose Yourself* in front of him at the time of composition; and

    (c)   the original title *Eminem_abbr*, the title of *Eminem Esque*, and the fact that *Eminem Esque* is a sound-alike track reinforces the finding that there is a causal connection between the two works, supporting a finding of copying.

**Summary of findings on issue two**

[280]   In summary, there was copying of *Lose Yourself* and the findings for issue two are:

    (a)   *Lose Yourself* is a highly original musical work;

    (b)   *Eminem Esque* has substantially copied *Lose Yourself* and is a substantial copy of *Lose Yourself*;

    (c)   the parts of *Eminem Esque* used in the National Party's election advertisements also substantially reproduce *Lose Yourself*;

    (d)   *Eminem Esque* is objectively similar to *Lose Yourself*; and

    (e)   there is a causal connection between *Lose Yourself* and *Eminem Esque*, as it was no coincidence that the works sounded the same.

## THIRD ISSUE: WAS THERE COPYRIGHT INFRINGEMENT

### 3.1    Have any restricted acts taken place?

[281]   Eight Mile Style allege that the National Party infringed copyright in *Lose Yourself*, without licence, by:

> (a)    communicating *Lose Yourself*, or a reproduction of a substantial part of it, to the public; and/or
>
> (b)    communicating to the public an adaptation of *Lose Yourself*; and/or
>
> (c)    authorising (a) and (b) above; and/or
>
> (d)    authorising the copying of *Lose Yourself*, or a substantial part of *Lose Yourself*, by authorising the synchronisation of *Eminem Esque* (or parts of *Eminem Esque*) with election campaign advertisements and the deployment of those advertisements to television broadcasters, YouTube and other social media outlets.

[282]   Copyright in a work is infringed if a person does any restricted act.  Section 29 sets out what constitutes copyright infringement.  It provides:

> **29    Infringement of copyright**
>
> (1)    Copyright in a work is infringed by a person who, other than pursuant to a copyright licence, does any restricted act.
>
> (2)    References in this Act to the doing of a restricted act are to the doing of that act—
>
>> (a)    in relation to the work as a whole or any substantial part of it; and
>>
>> (b)    either directly or indirectly;—
>
> and it is immaterial whether any intervening acts themselves infringe copyright.
>
> (3)    This Part is subject to Parts 3 and 8.

[283]   A "restricted act" is defined as any of the acts listed in s 16 of the Act, which the owner of the copyright in a work has the exclusive right to do.[133]  Of relevance to this proceeding, a "restricted act" includes:[134]

---

[133]    Copyright Act 1994, ss 2(1) and 16(1).

(a)    issuing copies of the work to the public, whether by sale or otherwise;[135]

(b)    communicating the work to the public;[136]

(c)    making an adaptation of the work;[137] and

(d)    authorising another person to do any of these acts.

[284]   The Court must determine as a matter of fact, whether the National Party has undertaken any of the restricted acts either directly or indirectly, and in relation to the work either as a whole or a substantial part of it.

[285]   The requirements of the restricted acts are relatively self-explanatory from the wording of s 16 above.  The terms "adaptation" and "authorise" do warrant some further discussion, however.

[286]   "Adaptation" in relation to a musical work is defined in s 2(1) of the Act as follows:

(1)    In this Act, unless the context otherwise requires,–
**adaptation,–**
…
(c)    in relation to a musical work, means an arrangement or transcription of the work.

[287]   The act of authorising another person to do a restricted act is not defined in the Act.  However, the meaning of "authorised" was discussed by the House of Lords in *CBS Songs Ltd v Amstrad Consumer Electronics Plc*, where the Court stated:[138]

… an authorisation means a grant or purported grant, which may be express or implied, of the right to do the act complained of.

[288]   An equivalent expression to the word "authorise", which has been used in the authorities is "sanction, approve and countenance".[139]

---

134    Section 16(1).
135    Also constitutes primary infringement of copyright under s 31.
136    Also constitutes primary infringement of copyright under s 33.
137    Also constitutes primary infringement of copyright under s 34.
138    *CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] AC 1013 (HL) at 1054.
139    At 1054, citing *Falcon v Famous Players Film Co* [1926] 2 KB 474 (CA) at 491.

[289]   As the authors of *Copinger and Skone James on Copyright* note, clearly a person will have authorised an act if he or she formally grants the right to do the act in contemplation that it will in fact be done, or simply gives permission for it to be done.[140]

[290]   In this proceeding, the Court is also required to determine whether the National Party authorised infringement.  If copyright infringement was found, it was accepted by the National Party:

> (a)     the National Party authorised the television broadcast of the National Party advertisement;
>
> (b)     the National Party authorised the synchronising of *Eminem Esque* to the advertisement; and
>
> (c)     Mr Hamilton, the second defendant, authorised the publication of the National Party advertisement, pursuant to s 204H of the Electoral Act 1993, because it is unlawful to publish a party advertisement without the authority of the Party secretary.

*Relevant facts*

[291]   The facts surrounding the engagement of Stan 3 Ltd to provide the National Party with creative services to produce election campaign advertising and the sequence of events which followed, are hardly in contention.

[292]   As already traversed in this judgment,[141] Stan 3 proposed an advertising concept of a rowing crew and developed this idea into a concept for election advertisements.  Stan 3 produced animatics for testing with focus groups in early March 2014 and one animatic had music named "modern" which included the music of *Lose Yourself*.  The results of the focus group showed a preference for the modern track.

---

[140]     Gillian Davies, Nicholas Caddick and Gwilym Harbottle *Copinger and Skone James on Copyright: Volume 1* (17th ed, Thomson Reuters, London, 2016) at [7-248], citing *Evans v E Huton & Co Ltd* (1924) 131 LT 534 (Ch); and *ABKCO Music & Records Inc v Music Collection International Ltd* [1995] RPC 657 (CA).
[141]     See [17]–[27] of this judgment.

[293]   It was not until late May 2014 that the National Party first became aware that the music track it knew as "modern" sounded like Eminem, after a staff member heard the music and commented on this.  The National Party was informed it was called *Eminem Esque*.  The steps the National Party took following this revelation are canvassed more fully in the next section, in relation to the fourth issue of relief.  For present purposes, following the Party's enquiries as to the use of *Eminem Esque*, the Party sought assurances that it was safe to use *Eminem Esque*, without fear of a challenge over its use.

[294]   Having received reassurances, the National Party used *Eminem Esque* in its conference video, authorised the synchronising of *Eminem Esque* to the advertisements and authorised the television broadcast of the advertisements.

[295]   The following were the times and dates the video and advertisements were authorised and played:

**28 June 2014**      Conference video played at the National Party conference.

**5 August 2014**     Ms Worthington on behalf of Stan 3 emailed Sale Street Studios, setting out the following uses to which the *Eminem Esque* track was to be put:

(a)   synchronising with the video shown at the National Party conference;

(b)   the broadcasting opening address and closing address;

(c)   30 second television advertisements;

(d)   15 second cut-down advertisements;

(e)   radio advertisements; and

(f)   various other cuts of footage to go online.

The requested advertisements had the track *Eminem Esque* synchronised to them and copies were provided to T-Cab and the broadcasters so they could be aired.

**20 August 2014**    National Party advertisement with *Eminem Esque* synchronised to it was uploaded to YouTube and the National Party's Facebook

page and was viewed by members of the public.

The 15 minute long opening broadcast was also uploaded to YouTube and social media.

| | |
|---|---|
| **20 August–30 August 2014** | National Party advertisements with the *Eminem Esque* track were played at least 186 times on New Zealand television. |
| **23 August 2014** | The 15 minute opening broadcast was aired on TV1. |

[296]   Between 26 and 27 August, after Eight Mile Style's United States attorneys had written to the National Party, the National Party decided to replace the *Eminem Esque* track on its advertisements with alternative music.

*Analysis*

[297]   On the issue of whether any restricted acts have taken place, I find that the National Party infringed the copyright in *Lose Yourself* by:

(a)   communicating a copy, or a reproduction of a substantial part, of *Lose Yourself* to the public without licence;

(b)   authorising the copying of *Lose Yourself* by authorising the synchronisation of *Eminem Esque* with the National Party election campaign advertisements; and

(c)   authorising the use and/or deploying of the relevant advertisements, the opening conference video and broadcast.

[298]   Eight Mile Style also pleaded that *Eminem Esque* was an adaptation of *Lose Yourself*.  The authorities consider adaptation to be the act of producing a different version of the work, not just copying or reproducing a substantial part.[142]   For musical works, this includes adapting the musical work for a different instrument or an arrangement of a piano work for a full orchestra.  In *Mitre 10 (New Zealand) Ltd v Benchmark Building Supplies Ltd*, the Court of Appeal, referring to previous

---

[142]   See, for example, how adaptation is considered in *EMI*, above n 46, at [46]; and *D'Almaine*, above n 43, at 123.

authorities, said that making an adaptation of a work involves producing a different version of the work incorporating the same product, but expressing it in a manner which cannot be characterised as copying or reproduction.[143]

[299]   In this case, *Eminem Esque* copies and/or reproduces a substantial part of *Lose Yourself*.  It is not an adaptation of *Lose Yourself* as they are still in the same musical form.  There has been no adaptation for use from one medium to another.

---

*Conclusion 3.1*

[300]   The findings are:

    (a)    the National Party has carried out the following restricted acts which amount to copyright infringement:

        (i)    communicating a copy, or a reproduction of a substantial part, of *Lose Yourself* to the public without licence;

        (ii)    authorising the copying of *Lose Yourself* by authorising the synchronisation of *Eminem Esque* with the National Party election campaign advertisements; and

        (iii)    authorising the use and/or deployment of the relevant advertisements, the conference video and opening broadcast.

    (b)    *Eminem Esque* is not an adaptation of *Lose Yourself*, as there has been no adaptation for use from one medium to another.

---

**Positive defence of innocent infringement**

[301]   Although the National Party pleaded the positive defence of innocent infringement under s 121(1) of the Act, at the close of trial the National Party did not pursue or rely on that defence.

---

[143]   *Mitre 10 (New Zealand) Ltd v Benchmark Building Supplies Ltd* [2004] 1 NZLR 26 (CA) at [38]–[40].

**FOURTH ISSUE: WHAT RELIEF, IF ANY, SHOULD BE AWARDED?**

**4.1    If the National Party has infringed copyright, are Eight Mile Style
entitled to relief and if so, what are the damages?**

[302]   Eight Mile Style seek damages of two kinds:

(1)    substantial  compensatory  damages  for  the  National  Party's
infringements, to be assessed under the user principle; and

(2)    additional damages under s 121(2) of the Act, because the National
Party acted in flagrant disregard of Eight Mile Style's rights.

[303]   Eight Mile Style also seek interest on these damages.

[304]   Having found copyright infringement occurred, both parties agreed that
damages should be assessed on the basis of the user principle, namely the license fee
that *would have* been negotiated between a willing licensor and a willing licensee.

[305]   In this case, the National Party paid a licence fee in respect of the
synchronisation licence of *Eminem Esque* to its advertisement.   If, despite the
licensing fee, an infringement is found, the National Party says additional damages
should not be awarded because its conduct falls well short of what is required for
such an award.

[306]   The Act provides for a range of remedies for copyright infringement.   Section
120 specifies:

(1)    An infringement of copyright is actionable by the copyright owner.

(2)    In proceedings for infringement of copyright, all such relief by way
of damages, injunctions, accounts, or otherwise is available to the
plaintiff as is available in respect of the infringement of any other
property right.

…

[307]   An exclusive licensee has the same rights and remedies for infringement as the copyright owner.[144]  This is relevant as Eight Mile Style is the exclusive licensee of *Lose Yourself*.

*Legal principles of damages*

[308]   In general, damages for copyright infringement are compensatory in nature and are intended to put the plaintiff in the position he or she would have been in "but for" the infringement of his or her rights.  Thus, the focus is on the plaintiff's loss and not the defendant's gain.

[309]   This was confirmed in the leading New Zealand case on assessing the quantum of compensatory damages for copyright infringement, *Electroquip Ltd v Craigco Ltd (No 2)*.[145]  That case assessed the recovery of profits lost on sales of their own products, as a result of the defendant's infringement.  There, Rodney Hansen J stated:[146]

> The object of damages is to compensate the plaintiffs for their loss. They are entitled to be put in the position they would have been in had the infringements not occurred.

[310]   However, the Judge imposed a notional royalty fee for each infringing article, based on what has been referred to as the "user principle".  The rationale for this approach is not to compensate for loss, but to recognise that the infringement invaded the rights of the copyright owner:[147]

> Although damages for infringement of copyright in New Zealand have previously been determined by reference to the loss suffered, I see no reason to confine an award to the straitjacket of compensatory damages. An award which includes royalties on the additional infringing articles sold will ensure that the plaintiffs are fairly compensated for the use of their property as well as for the losses they have incurred.

---

[144]   Copyright Act 1994, s 123(1).
[145]   *Electroquip Ltd v Craigco Ltd (No 2)* HC Auckland CIV-2006-404-6719, 29 April 2010.
[146]   At [4].
[147]   At [28]–[29] (footnote omitted).  See also *Attorney-General v Blake* [2001] 1 AC 268 (HL).

[311]   In *Napier Tool & Die Ltd v Oraka Technologies Ltd*, the Court of Appeal
described the user principle as a "notional licence fee or royalty", where the
copyright owner:[148]

> … is entitled to receive from the infringers the price that would reasonably
> have been charged for permission or authorisation to carry out each
> infringing act.  This approach, called the "user principle", is used when it is
> not possible to establish a normal royalty fee because the claimant is not in
> the practice of licensing their property.

[312]   The user principle has been applied in other jurisdictions, particularly the
United Kingdom and Australia.  The relevant principles that have emerged in these
cases are discussed below.

*United Kingdom*

[313]   The user principle has been used in patent cases in the United Kingdom since
the early twentieth century.  The cases provide background as to the purpose of the
user principle and the type of remedy it is trying to provide.

[314]   The principle has its origins in the judgment of Fletcher Moulton LJ in
*Meters Ltd v Metropolitan Gas Meters Ltd*.[149]  The Court of Appeal of England and
Wales considered a patent infringement in relation to improvements in prepayment
gas meters.  The Court held that as well as recovery for lost profits, a plaintiff could
also be granted damages on the basis of a licence fee, by multiplying each infringing
article by the sum that would have been paid in order to make the manufacture
lawful.  In recognising this method of damages, Fletcher Moulton LJ commented:[150]

> The existence of such a rule shows that the Courts consider that every single
> one of the infringements was a wrong, and that it is fair – where the facts of
> the case allow the Court to get at the damages in that way – to allow
> pecuniary damages in respect of every one of them.  I am inclined to think
> that the Court might in some cases, where there did not exist a quoted figure
> for a licence, estimate the damages in a way closely analogous to this.  **It is
> the duty of the defendant to respect the monopoly rights of the plaintiff.**
> The reward to a patentee for his invention is that he shall have the exclusive
> right to use the invention, and if you want to use it your duty is to obtain his
> permission … it would be right for the Court to consider what would have
> been the price which – although no price was actually quoted – could have

---

148   *Napier Tool & Die v Oraka Technologies Ltd* [2016] NZCA 544, [2017] 2 NZLR 611 at [74].
149   *Meters Ltd v Metropolitan Gas Meters Ltd* (1911) 28 RPC 157 (CA).
150   At 164–165.

reasonably been charged for that permission, and estimate the damage in that way.

[315]   In *General Tire & Rubber Co v Firestone Tyre & Rubber Co Ltd*, the House of Lords assessed damages for patent infringement in relation to synthetic rubber compounds suitable for tyre treads.[151]   Lord Wilberforce, with whom the majority agreed, reviewed the authorities and identified three main categories of reported patent infringement cases which exemplify the approaches of courts:[152]

> (a)   manufacturers who exploit an invention to make articles or products which they sell at a profit: the effect of infringement will be to divert sales from the patent owner and, therefore, the remedy is the profit that would have been realised by the patent owner if the sales had been made by them;
>
> (b)   patents that are exploited through the granting of licences for royalty payments: if an infringer uses the invention without a licence, the measure of damages to be paid will be the sum the infringer would have paid by way of royalty if they had acted legally; and
>
> (c)   where it is not possible to prove a normal rate of profit, or a normal or established licence royalty (through comparable cases), yet infringement has still occurred.

[316]   The third type of case is most applicable to the present case, as there is no normal rate of profit and no established licence royalty.   In relation to this third group, Lord Wilberforce provided assistance on the type of evidence, which should be adduced, on relevant royalty practices, for the guidance of the Court.   Ultimately, his Lordship cautioned, the relevant analysis is one of judicial estimation of the available indicators.   His Lordship said:[153]

> In such cases it is for the plaintiff to adduce evidence which will guide the court.  This evidence may consist of the practice, as regards royalty, in the relevant trade or in analogous trades; perhaps of expert opinion expressed in publications or in the witness box; possibly of the profitability of the invention; and of any other factor on which the judge can decide the measure of loss.  **Since evidence of this kind is in its nature general and also probably hypothetical, it is unlikely to be of relevance, or if relevant of**

---

151   *General Tire & Rubber Co v Firestone Tyre & Rubber Co Ltd* [1975] 1 WLR 819 (HL).
152   At 824–826.
153   At 826 (emphasis added).

> weight … But there is no rule of law which prevents the court, even
> when it has evidence of licensing practice, from taking these more
> general considerations into account. The ultimate process is one of
> judicial estimation of the available indications.

[317]   His Lordship identified relevant factors to be taken into account by a judge
assessing damages in this situation:[154]

(a)      any licences actually granted;

(b)      the rates of royalty fixed by them;

(c)      estimates of their **relevance** and **comparability**, to apply them so far
as one can to the bargain hypothetically made between the patentee
and the infringer; and

(d)      where a figure is not provided on which the damage can be measured,
to consider any other evidence, according to its relevance and weight,
upon which a judge can fix a rate of royalty which would have been
agreed.

[318]   Lump sum settlement agreements with other companies who had infringed
the patent and paid money sums to prevent litigation with the owner are to be
approached with caution.  The figures paid in settlement agreements were recognised
by the Court as distinct from valid patent agreements fixing a royalty rate.[155]
Settlement agreements could not be used to fix the measure of damages.[156]

[319]   His Lordship also discussed whether the bargaining positions of the parties
and their willingness to licence could be taken into account when assessing
damages:[157]

> The "willing licensor" and "willing licensee" to which reference is often
> made … is always the actual licensor and the actual licensee who, one
> assumes, are each willing to negotiate with the other – they bargain as
> they are, with their strengths and weaknesses, in the market as it exists.

---

[154]    At 827.
[155]    At 831.
[156]    At 832.
[157]    At 833 (emphasis added).

It is one thing (and legitimate) to say of a particular bargain that it was not comparable or made in comparable circumstances with the bargain which the court is endeavouring to assume, so as, for example, to reject as comparable a bargain made in settlement of litigation. **It is quite another thing to reject matters** (other than any doubt as to the validity of the patent itself) **of which either side, or both sides, would necessarily and relevantly take account when seeking agreement**.

[320] More recently, the High Court of England and Wales applied the user principle in a copyright infringement claim for a musical work. In *Ludlow Music Inc v Williams*, the claimant owned the copyright in lyrics from the song *I am the way (New York Town)* by Loudon Wainwright III that were infringed by the artist Robbie Williams in the lyrics of his song *Jesus in a Camper Van*.[158] The issue was what quantum of damages should be awarded for a derivative musical work, that is, a work which is itself entitled to copyright but which infringes another.[159]

[321] As there was no going rate for the original work, Pumfrey J determined that the case would be decided on relevant evidence of the type of rates that appear in other similar transactions and the approach which is taken to the negotiation of such agreements.[160] Importantly, the Judge held that the **degree of borrowing** from the original work was material to the royalty rate to be charged and that while a substantial part of the original work was borrowed, the message of both works was different.[161] The Judge assessed damages for infringement as a percentage of the royalty share.

[322] Pumfrey J further stated that "precision is not attainable" and one should err on the side of generosity to the claimant.[162] However, five months later, without referring to this proposition in *Ludlow Music*, the Court of Appeal of England and Wales decided the reverse proposition, that one should err on the side of under-compensation.[163]

[323] In *Blayney v Clogau St David's Gold Mines Ltd*, the Court of Appeal of England and Wales applied the notional royalty approach to award damages for

---

[158]    *Ludlow Music Inc v Williams* [2002] EWHC 638 (Ch).
[159]    At [39].
[160]    At [48].
[161]    At [51].
[162]    At [48].
[163]    *Blayney v Clogau St David's Gold Mines Ltd* [2002] EWCA Civ 1007, [2003] FSR 19 (CA).

infringement of copyright in a jewellery design. The Court applied the above patent infringement cases to copyright infringement, confirming that the same rules applied in this context.[164] The Court outlined that damages are recoverable for all copyright infringements, whether the infringement has resulted in lost sales or not, and noted:[165]

> The fact that the claimant may not be able to prove the application of one measure of damages, namely lost sales, does not mean that he has suffered no damage at all, rather some other measure by which to assess the compensation for that interference must be sought.

[324] The Court also found that it would be a denial of justice to refuse any compensation at all simply because there was no evidence as to what the notional royalty rate should be.[166] The Court should assess compensation by reference to a notional royalty rate payable under a notional licence agreement. Yet, in the absence of evidence enabling it to make a precise calculation, a court should err on the side of under-compensation.[167]

[325] *Blayney* was decided by the Court of Appeal, as noted above, five months after *Ludlow Music* was decided in the High Court and the latter was not considered by the Court of Appeal.[168] Both cases concerned a notional royalty rate payable under a notional licence agreement and in *Ludlow Music*, the case was decided on the type of rates that appear in other similar agreements and the approach which is taken to the negotiation of them. *Blayney*, however, is the authoritative English approach to the application of the user principle in damages on this point.

[326] More recently, the High Court of England and Wales has considered the applicability of the user principle in two relevant intellectual property cases. The first, *Force India Formula One Team Ltd v 1 Malaysia Racing Team SDN BHD*, concerned Malaysia's misuse of confidential information and copyright infringement in relation to the design of a half-size wind tunnel model of a Formula One race car.[169] Arnold J confirmed that the invasion of a proprietary right may not cause the

---

164 At [13]–[20].
165 At [20].
166 At [32].
167 At [33]–[34] and [55].
168 See [322] of this judgment.
169 *Force India Formula One Team Ltd v 1 Malaysia Racing Team SDN BHD* [2012] EWHC 616,

owner financial loss, but that damages could still be claimed in accordance with the user principle.[170]  The Judge applied the principles established in *General Tire* and *Blake* in the context of damages for breach of a contractual obligation of confidentiality.[171]  The Judge outlined the relevant principles to take into account when assessing damages under the user principle:[172]

    (a)    the overriding principle is that the damages are compensatory;

    (b)    the primary basis for assessing damages is to consider what sum would have been arrived at in negotiations between the parties, had each been making reasonable use of their respective bargaining positions, bearing in mind the information available and the commercial context at the time negotiation should have taken place;

    (c)    the fact that one or both parties would not in practice have agreed to make a deal is irrelevant;

    (d)    the assessment is to be made as at the date of the breach;

    (e)    where there has not been an actual negotiation between the parties, it is reasonable to look at the eventual outcome and consider whether or not that is a useful guide to what the parties would have thought at the time of their hypothetical bargain; and

    (f)    the court can take into account other relevant factors, and any delay on the part of the claimant in asserting its rights.

[327]  Arnold J determined that, in this case, a willing licensor and licensee acting reasonably would have negotiated a licence fee of €25,000.  The Judge identified that this was at the top end of the range calculated by the defendant's expert witness and reflected that a modest premium would have been negotiated to reflect the fact that the plaintiff would not want to assist a potential new competitor in the market.

---

[2012] RPC 757 (Ch).  On appeal, the Court of Appeal did not dissent from Arnold J's analysis.  See *Force India Formula One Team Ltd v Aerolab SRL* [2013] EWCA Civ 780, [2013] RPC 947.

[170]    At [375].
[171]    At [379]–[386]; *General Tire*, above n 151; and *Blake*, above n 147.
[172]    *Force India*, above n 169, at [386].

[328]   In the second case, *32Red Plc v WHG (International) Ltd*, Newey J assessed damages for trade mark infringement of the brand "32Red".[173]   Damages were calculated in accordance with the user principle and the Judge endorsed the aforementioned authorities.[174]   For the purpose of assessing damages, the parties are presumed to act reasonably and be willing to make a deal, even if one or both of them would not in reality have been prepared to do so.[175]   The Judge also concluded that the Court could take into account any alternative course of action that was available to the parties at the time of the hypothetical negotiation.[176]

[329]   Newey J held that the "hypothetical licence should, so far as possible, be assumed to accord with the reality."[177]   While the hypothetical licence could be determined by reference to comparable licences granted, Newey J demonstrated caution when examining these to ensure that evidence of comparable licences was relevant and similar so that meaningful comparisons were made.[178]

[330]   In awarding damages under the user principle for £150,000, the Judge took into account the following factors:[179]

(a)      the subject matter of the hypothetical licence will be what the infringer actually used;

(b)      the hypothetical licence must reflect what was done and must be for the period of infringement;

(c)      the exclusivity of the licence and the exclusive practice of the trade mark owner; and

(d)      the hypothetical licence will reflect the terms and conditions in fact used, therefore, the royalty might be more expensive to compensate for the greater risk to the licensor in licensing without quality control provisions commonly found in actual licences.

---

[173]   *32Red Plc v WHG (International) Ltd* [2013] EWHC 815, [2013] CN 544 (Ch).
[174]   At [23]–[25].
[175]   At [29].
[176]   At [42].
[177]   At [54].
[178]   At [64], [68], [72] and [82]–[83].
[179]   At [49]–[58].

*Australia*

[331]  In *Winnebago Industries Inc v Knott Investments Pty Ltd (No 4)* the Federal Court of Australia recently addressed the user principle and its origins in detail, in the context of damages for a trade mark claim.[180]  Yates J highlighted the purpose of this type of damages by saying of the user principle, that:[181]

> … a plaintiff is entitled to recover, by way of damages, a reasonable sum from a defendant who has wrongfully used the plaintiff's property.

[332]  His Honour cautioned that the plaintiff may not have suffered actual loss from the use, and the wrongdoer may not have derived actual benefit.  Nevertheless, under the principle:[182]

> the defendant is obliged to pay a reasonable sum for the wrongful use.  The reasonable sum is sometimes described as a reasonable … licence fee or royalty (amongst other expressions), depending on the property involved and the nature of the wrongful use.

[333]  The Judge observed that damages under the user principle have a restitutionary aspect to them, in the sense that they can be seen to reverse the "use value" of the property in question, as well as a compensatory nature and endorsed the principles in the United Kingdom cases.[183]

[334]  The user principle had been previously endorsed by the Federal Court of Australia in the case of *Larrikin Music*.[184]  Damages were assessed by Jacobson J in accordance with the user principle and he awarded five per cent of the APRA/AMCOS licence income to *Larrikin* during the relevant period of the *Down Under* use.[185]

[335]  Relevantly, in that case, Jacobsen J held that the following factors informed the hypothetical bargain and its outcome:[186]

---

[180]  *Winnebago Industries Inc v Knott Investments Pty Ltd (No 4)* [2015] FCA 1327.
[181]  At [13].
[182]  At [13].
[183]  At [14].
[184]  *Larrikin Music Publishing Pty Ltd v EMI Songs Australia Pty Ltd (No 2)* [2010] FCA 698, [2010] 188 FCR 321.  Jacobson J's decision as to damages was not disturbed on appeal to a full court of the Federal Court of Australia in *EMI*, above n 46.
[185]  At [222].
[186]  At [10]–[22].

(a) the musical significance of the bars of the original work *Kookaburra* that were reproduced played an important and essential function in the flute riff of the infringing work, but not in the song as a whole;

(b) the thematic significance of the works and their link with Australian culture, although the two bars only had a low significance to the theme of the infringing work;

(c) comparable arrangements negotiated in the music industry for the sampling of works, where a part of a copyright work is "sampled" in a later work; and

(d) the time at which the bargain was taken to have been reached, when the first misleading representations were made and Men at Work, the artists of the infringing song, was a relatively unknown band.

*Summary of user principle factors*

[336]  From the relevant New Zealand and international authorities, the following nine principles have emerged in relation to the user principle.

*The hypothetical bargain*

[337]  Where the copyright owner cannot establish lost profit or a normal royalty fee, damages are assessed under the user principle.  This principle proceeds on the basis of a **hypothetical bargain** where damages are assessed on the basis of what would have reasonably been charged at the time of infringement had the defendant acted lawfully and obtained permission.

*Compensatory and restitutionary damages*

[338]  The user principle is not strictly compensatory in nature as it is not remedying the plaintiff's financial loss.  Rather, the user principle recognises the infringement that has invaded the monopoly a plaintiff has on their intellectual property rights and the defendant's gain in this infringement.  It is therefore **both compensatory and restitutionary in nature**.

*Willing parties*

[339]   The exercise of determining the hypothetical bargain assumes that the parties are a **willing licensor and licensee**, with their respective strengths and weaknesses within the commercial context that existed at the time.   It is irrelevant in assessing quantum that the parties would not have in fact agreed to make a deal.

*Extent of copying*

[340]   The subject matter of the hypothetical licence will be what the defendant actually used, including the **extent of copying** and its relationship with the copyrighted work.

*Lack of quality control*

[341]   The bargain can take into account that the licensor did not have the opportunity to include terms related to **quality control**, if those are commonly included provisions.

*Evidence is a guide only*

[342]   It is for the plaintiff to adduce evidence which will guide the Court on a **reasonable** charge or licence.   That evidence may include the practice in the relevant trade, expert opinion, the profitability of the invention, licence competition in the market, the exclusivity of the licence of practice of the plaintiff, and any other factor which assists the Judge.   However, **evidence is a guide only** and the ultimate process in determining quantum is one of judicial estimation.

*Caution with comparable licences*

[343]   Comparable licences and the rates of royalty can assist in the assessment of quantum.   However, **comparable licences must be approached with caution** and be relevant to the hypothetical bargain in question.

*Settlement agreements are irrelevant*

[344]  **Settlement agreements are irrelevant** when making comparisons, as they are designed to prevent litigation rather than fixing a royalty rate.

*Level of compensation*

[345]  The English and Welsh authorities show a divergence of views between erring on the side of generosity to the claimant (*Ludlow Music*),[187] or erring on the side of under-compensation (*Blayney*), the latter of which is the authoritative approach in England and Wales.[188]

[346]  Having considered the user principle factors, I am of the view that the focus on under or over-compensation in the authorities from England and Wales is unhelpful.  If the factors are applied to an assessment of a hypothetical licence fee, the determination should be based on the application of these principles, not on whether the court should favour under or over-compensation to a claimant.  I do not propose to factor in those concepts, because such an assessment is vague and uncertain.  The focus must be on striking a reasonable fee for the hypothetical licence.  That must be based on the relevant factors employed in a hypothetical licence fee negotiation, without subjectively favouring either side.

[347]  In terms of calculating appropriate compensatory damages, damages are usually assessed as at the date of the wrong, when the damage was caused or the property was interfered with.[189]  Inflation and delay in payment must be adjusted for, usually in the form of interest.[190]

*Relevant fact chronology*

[348]  The sequence of events leading to the making and release of the National Party advertisements is relevant in the consideration of the relief sought by Eight Mile Style.  In summary form, the sequence of events are:

---

187  *Ludlow*, above n 158.
188  *Blayney*, above n 163.
189  Peter Blanchard *Civil Remedies in New Zealand* (2nd ed, Thomson Reuters, Wellington, 2011) at [2.9.1].
190  At [2.9.3].

| | |
|---|---|
| **Late February 2014** | Mr Jameson of Stan 3 Ltd prepared animatics that were synchronised with two musical tracks: the classical track and the modern track (*Eminem Esque*), provided by Sale Street Studios Ltd. |
| **March 2014** | The animatics were tested by the focus group for the National Party campaign committee.  The group showed a preference for the modern track, being the animatic with *Eminem Esque* synchronised to it. |
| **March 2014–late May 2014** | The National Party election advertisements were produced by Stan 3 and its sub-contractors. |
| **Late May 2014** | Mr Jameson showed the proposed election advertisement to Ms de Joux, campaign manager for the National Party.  The proposed election advertisement used *Eminem Esque* and a staff member of the National Party heard the track and said it sounded like Eminem.  He also said Eminem is perceived to be into hate speech.  Mr Jameson advised Ms de Joux that the music was production music named something like *Eminem Esque*. |
| **27 May 2014** | Ms Worthington of Stan 3 emailed Mr Foster of Sale Street Studios asking him for a copy of the *Eminem Esque* track and forwarded the file to Ms de Joux. |
| | Ms de Joux asked for full details of the musical track, which were supplied by Stan 3.  She was concerned about the National Party being associated with Eminem and copyright issues so asked Stan 3 to locate other music for consideration. |
| **Late May 2014** | Mr Jameson was instructed to find alternative music choices and he contacted Mr Foster to do so. |
| **2 June 2014** | Mr Foster provided alternative tracks by WeTransfer. |
| **3 June 2014** | Mr Foster emailed Extreme Music indicating they had wanted to use Eminem's *Lose Yourself* because it was something harder and more edgy.  Mr Foster provided an alternative track to Mr Jameson. |
| **13 June 2014** | The National Party campaign committee listened to several music options and decided that the advertisement with *Eminem Esque* synchronised to it was the best option because the track clearly fitted best with the visuals of the advertisement, particularly the rowing strokes.  However, the committee wanted detailed reassurance that the National Party could safely use *Eminem Esque*. |

| 13–18 June 2014 | Stan 3 was asked to obtain reassurances that *Eminem Esque* could be used in the National Party's advertisement.  Stan 3 obtained reassurance from: |
| | (a)  Mr Collins, a freelance experienced television advertising producer; |
| | (b)  Mr Foster at Sale Street Studios; |
| | (c)  Mr Mackenzie of Beatbox Music; |
| | (d)  Mr Chunn, former head of APRA; and |
| | (e)  Ms Benoit at APRA/AMCOS. |
| 18 June 2014 | Stan 3 reassured the National Party that *Eminem Esque* could be used.  A written assurance from Mr Mackenzie of Beatbox Music was obtained, stating that the "agreement we have with the publisher gives us assurance that the music does not infringe on copyright and is free to be used for production purposes." |
| 18–23 June 2014 | The National Party confirmed that it would proceed to use the *Eminem Esque* track, as the use of *Eminem Esque* in its campaign advertisements and other materials had been cleared "by the Party or members of its Campaign Committee." |
| 23 June–5 August 2014 | Stan 3 confirmed to Mr Foster of Sale Street Studios that *Eminem Esque* was to be synchronised with the National Party election materials, including the opening broadcast, a video that was to be shown at the National Party's conference and television advertisements. |

*Evidence on licensing fees*

[349]   The parties called four experts, who gave evidence as to the range of licence fees to use music in advertising in New Zealand, Australia and worldwide.   In addition, Eight Mile Style called Mr Martin, the person who is responsible for the approval of the use of *Lose Yourself* in any production advertising.

[350]   In this section I am going to:

(a)   canvass the evidence of Mr Martin on licensing agreements by Eight Mile Style for *Lose Yourself*;

(b)   canvass the four experts' evidence on negotiating licence fees for the use of music in advertising and film; and

(c)   apply the user principle factors to the assessment of a hypothetical licence fee for the use of *Lose Yourself*.

*Licensing of* Lose Yourself

[351]   Mr Martin gave evidence of the few licence agreements for the use of *Lose Yourself*.  Mr Martin emphasised that Eight Mile Style and the composers value *Lose Yourself* very highly, because it is the most valuable work in Eminem's catalogue. He described *Lose Yourself* as being synonymous with Eminem and his "story".  It epitomises "victory", which is why it is a sought-after song.  To maintain its high commercial value and its integrity, Eight Mile Style are very cautious in any licensing activities.

[352]   After detailing the successes of *Lose Yourself* and Eminem's Award as Artist of the Decade by *Billboard Magazine* in 2009, Mr Martin emphasised that Eight Mile Style have rarely granted permission to use *Lose Yourself* in advertising.  He explained that they are extremely selective and deliberate in the way that they have licensed *Lose Yourself* and gave the reasons for the plaintiffs being selective and deliberate when considering whether or not to licence *Lose Yourself*.  Those reasons were that *Lose Yourself* is an iconic song, performed by an iconic artist.  Selective and infrequent licensing of iconic songs enhances the value that can be demanded for their use.

[353]   Since the release of *Lose Yourself* in 2002, Eight Mile Style has licensed it for use only three times voluntarily and once as part of a settlement for copyright infringement.

[354]   The first licence was for a Chrysler advertising campaign, which Eight Mile Style believed was consistent with the messaging of *Lose Yourself*, and would not damage its reputation or commercial value.  It was something that they wanted to support.  Mr Martin describes how he and Eminem were particularly drawn to the Chrysler campaign, which was run under the slogan "Imported from Detroit", because it would show the viewer the real city of Detroit, where Eminem grew up. In addition, Eight Mile Style wanted to publicly support Chrysler, which would in turn support the city of Detroit, as Chrysler was and still is a major employer in that city.

[355]   Eminem specifically agreed to appear in the Chrysler advertisement.   The overall concept of the advertisement focused on Detroit, rather than a particular car within Chrysler's range, which "sat well with *Lose Yourself*".   In addition, Eight Mile Style had a right of approval over the final edit.   They insisted on creating a new recording of the music of *Lose Yourself*, because they wanted to ensure that the music was synchronised appropriately with the images.   The advertisement, which was played during the hearing, showed how *Lose Yourself* had been changed, to fit in with the closing scenes of a gospel choir.

[356]   The licence fees Chrysler paid are confidential but were substantial.

[357]   The second licence to use *Lose Yourself* was granted in respect of a Castle Lager promotion in South Africa.   The promotion was to provide Castle Lager sponsorship of a soccer development programme, to encourage South African football stars of the future, by setting up an academy to mentor and train young men to hopefully play for the South African national team.   Eminem, the other composers and Mr Martin considered that there was a synergy between *Lose Yourself* and the resilience and determination needed for young men to get into the programme and ultimately the national soccer team.

[358]   Mr Martin told the Court that had this been an advertisement for beer only, they would not have licensed *Lose Yourself*.   It was a collective desire to support the cause, along with the "creative fit" between the music and the programme that led them to agree to the licence.   Again, they retained complete creative control, as a new recording was created for the advertisement and Eight Mile Style had right of approval over the final edit.   Mr Martin emphasised that the concept behind the promotion was consistent with the messaging of the song and would not damage the song's reputation or commercial value.   It was also something they wanted to support.

[359]   Because Eight Mile Style loved the concept of the soccer academy and of supporting the Bafana Bafana team in South Africa, they reduced the licensing fee to reflect the fact that they felt a moral alignment with the aim of the promotion.

[360]  The third licence was for the use of *Lose Yourself* in the *8 Mile* film.  This was part of a wider commercial arrangement, which involved Eminem starring in the film.  There was a close personal connection between Eminem and the film.  The trailer synchronisation licence with Universal Pictures was not considered to be indicative of the value of *Lose Yourself*, given that the use of *Lose Yourself* was to advertise the motion picture.

[361]  The fourth licence occurred as part of a settlement of copyright infringement by a company, which had unlawfully used *Lose Yourself* in its advertising.  An initial request by that company had been rejected by Eight Mile Style and as part of a wider settlement, a reduced licence fee was negotiated.  However, the reduced fee did not reflect the true value of the settlement for the use of *Lose Yourself* as there were substantial commercial benefits to Eight Mile Style secured as part of the settlement.

[362]  Mr Martin then detailed the requests for the use of *Lose Yourself* that had been declined.  On one particular occasion, despite being offered a significant sum for the use of the musical work of *Lose Yourself* and an even more significant sum for the use of the music and vocals of *Lose Yourself*, by a large corporate for advertising purposes, this was declined.  Mr Martin, the composers, and Eminem in particular felt that the proposed advertisement, when it was shown to them, did not tell any story that aligned with their interests or with the focus of *Lose Yourself*.  It focused on a product which had no synergy with the ideology of *Lose Yourself*.  Notwithstanding the significant sums offered, Eight Mile Style declined to licence *Lose Yourself* for that purpose.

[363]  Over the years, Mr Martin described being approached on numerous occasions for permission to use *Lose Yourself* in advertising.  Eight Mile Style had also been approached by a presidential candidate in the United States to use *Lose Yourself* as part of his political campaign.  On each occasion, the request was turned down.  Mr Martin explained the reason for not licensing *Lose Yourself* for any political advertising.  Political advertising falls in a special category of its own, because political advertisements often contain divisive messages or ideological messaging that have the potential to alienate future licensees.  There is the additional risk of a perception that the artists are endorsing the political party.

[364]   In the event that Eight Mile Style had licensed *Lose Yourself* for this political campaign, Mr Martin said a significant premium would have been justified for the licence, because the messages of the relevant political advertisements were not ones with which the creators of the work would have wanted to be associated.   In his view, the importance of political advertising itself justifies a significant premium. Mr Martin described the reason for declining the use of *Lose Yourself* for the United States presidential campaign was because "we did not consider it to be an acceptable use".

[365]   Mr Martin is the person responsible on behalf of Eight Mile Style for retaining the control of the use of *Lose Yourself* and its approval for licensing.   He explained that licence fees for synchronisation with advertising are almost always significantly higher than those charged for synchronisation with other uses such as background music in a television show.   The difference is that music as incidental background to the dialogue and drama of a television song may be used very briefly and constitutes a minor part of a 30 minute, 60 minute or two hour television show and/or theatrical motion picture.   However, advertisements generally involve "spots which are themselves no more than 30 seconds long", where the music is featured much more prominently and there is a direct association with a product, service or ideology and the implied endorsement.   His view was that such advertising synchronisation warrants licence fees of a much higher order.

[366]   Mr Martin detailed the factors he takes into account in considering whether to approve the grant of a synchronisation licence.[191]   Those factors included the

---

[191]   The full list of factors considered by Mr Martin is:
  (a)   the message that the prospective licensee is seeking to convey, and whether it is consistent with the music and lyrics and the likely views of the writers;

  (b)   the quality and integrity of the particular product, service or production;

  (c)   the identity, reputation and financial condition of the prospective licensee;

  (d)   the media on which the copyright work is to be used – such as television, film, radio and/or the internet;

  (e)   how long the work is to be used for;

  (f)   the extent to which, if a synchronisation licence were to be granted, that might affect future licensing activities;

  (g)   the control Eight Mile Style will have over the production, quality and message of the advertisement;

message that the licensee is seeking to convey and whether it is consistent with the music and lyrics of the song sought; the control Eight Mile Style would have over the production, quality and message of the advertisement; the risk of a synchronisation licence affecting future licensing activities or sending an adverse message about the endorsement by or direct association with Eight Mile Style; and the proposed end use of the licence.

[367]  Mr Martin emphasised that before Eight Mile Style agrees to grant any licence to use *Lose Yourself*, it assures itselves that there is a right creative fit between the advertisement and *Lose Yourself*.  He was adamant that neither the 30 second or 15 minute National Party advertisements would have been approved by Eight Mile Style.

[368]  He considered that the 30 second advertisement was bland and perfunctory, it was not inspiring, and employs scare tactics to persuade voters to stick with what they know, rather than take a chance on another party.  In his view, the advertisement messaging did not fit creatively with the message of *Lose Yourself*, which exudes the concepts of backing yourself and resilience.  *Eminem Esque*, in his view, was a weak and bland copy of *Lose Yourself* and Eight Mile Style would not have licensed such a re-recording of *Lose Yourself*.

[369]  In relation to the 15 minute National Party campaign advertisement video, also featuring *Eminem Esque*, he observed that *Eminem Esque* is played "ad nauseam" through the video and Eight Mile Style would never have licensed an advertisement to play *Lose Yourself* on repeat for such a long period.

---

(h)  the importance of the music to the advertisement or purpose (including the role that the music or writers'/performers' reputation plays in supplementing the advertising);

(i)  the prominence and duration of the proposed use within the audio/visual production;

(j)  whether it would or might risk setting a bad precedent for other requests of a similar nature in the future;

(k)  whether the proposed use reflects or might imply a direct association with or endorsement by the relevant artist or artists; and

(l)  the relative importance the prospective user attaches to the selection of the particular song, so much so that they would likely pay a premium for the particular song.

[370]   For the above reasons, Mr Martin said the licence fee for use by the National Party, assuming that it would have been granted, would be a figure representing the "absolute minimum license fee for *Lose Yourself* anywhere in the world for this type of use" and gave a range of fees for potential negotiation.  For larger markets, such as the United States, the minimum fee would be considerably higher.

*Licensing experts' evidence*

[371]   Eight Mile Style called two expert witnesses, Ms Zamoyska and Mr Donlevy. Ms Zamoyska is an international, independent music consultant, with an extensive background in music entertainment, film, television and advertising since 1987.[192] Mr Donlevy has had over 30 years of music licensing experience in Australia, New Zealand, and South-East Asia.[193]

[372]   The third parties, AMCOS New Zealand and AMCOS also called two experts:  Mr Gough and Ms Hellriegel.   AMCOS took no position on the infringement claims by Eight Mile Style, because AMCOS is a not-for-profit collecting society for arrangements reached in respect of licensing agreements. AMCOS issued the licence to use Mr Cohen's *Eminem Esque* to the National Party.

[373]   Mr Gough is a director, founder and chairman of the New Zealand company Native Tongue Music Publishing Ltd and its Australian counterpart.  He undertakes negotiation for all synchronisation licences for the companies of local New Zealand and Australian writers, composers and a number of overseas catalogues, through which his company represents a wide variety of international songwriters.[194]

---

[192]   Ms Zamoyska has held various roles within MCA Music Entertainment Group, Polygram Music (both now part of Universal Music) and Universal Music, including as Head of Film, Television and Media for 16 years.   In this role Ms Zamoyska was responsible for large licensing negotiations for international artists and overseeing global commercial licensing for all writers, artists and catalogues signed to Universal Music in the United Kingdom.  She now has her own business as an independent music consultant for use of music in advertising, file, television and media.

[193]   Mr Donlevy has held numerous roles with Peermusic Pty Ltd, including General Manager, Managing Director and Regional Director (Australia, New Zealand and South-East Asia).  For 14 years he was a director of AMCOS and has had involvement in a number of other music related companies, now holding the position of Managing Director of Cooking Vinyl Publishing Australia Pty Ltd.

[194]   Mr Gough has had an extensive career in the music industry as a music supervisor and negotiator for publishing and master rights with the major record companies and independent rights holders.  He has worked with Mana Music (both the Australian and New Zealand companies), Mana Music Publishing and Native Tongue.  Throughout his career, Mr Gough has

[374]  Ms Hellriegel is a singer, songwriter, director of Aeroplane Music Services (a music licensing publicity and project management company) and Songbroker (a music publishing company) with 33 years of experience and involvement in the New Zealand music industry.[195]

[375]  All four licensing experts broadly agreed on the factors that are relevant to the commercial negotiation of a licence to use music in advertising and synchronisation deals.  Those factors include:

    (a)    the value of the music;

    (b)    the purpose for which the music is to be used for and who wants to use it;

    (c)    the views/sensibilities of the artists and controllers of the copyright;

    (d)    the media in which the advertising would be used;

    (e)    size of the territory;

    (f)    the creative control or right of approval over the proposed use;

    (g)    the terms and duration of use as well as which part of the music is used (that is, the hook, the chorus or a less prominent part of the music); and

    (h)    the territory of use.

[376]  All four experts agreed that *Lose Yourself* was an iconic high value legacy artist work, that Eminem is a highly respected artist in New Zealand and that hip hop is a popular genre in New Zealand.

[377]  However, the experts were not in agreement about the likely hypothetical licence fee for the use of *Lose Yourself* in the election advertising material for the National Party.  The experts gave their ranges of fees for synchronisation licenses of songs for both high value and lesser known artists, in international territories,

---

        supervised the music for approximately 90 feature films, 20 television series and a large number of commercials across Australia and New Zealand.

[195]  Ms Hellriegal has written, registered and released more than 150 songs and continues to produce music on a regular basis as well as negotiating synchronisation licenses for commercial clients. Ms Hellriegel was also involved in Native Tongue Music Publishing as General Manager.  She has also sat on the board of Independent Music New Zealand and been a director of Recorded Music New Zealand, which is an association of recording artists and record labels who own or control the rights to sound recordings of musical works in New Zealand.

New Zealand and Australia. The details of those licensing fees are subject to confidential agreements, which are unavailable for publication. Nevertheless, there is a differential between the licence fees negotiated for use in Australia and New Zealand compared to licence fees negotiated for larger territories such as the United States, United Kingdom and/or European countries.

[378] The range of estimates is considered in detail in a confidential appendix, which can be released only to the parties because it contains confidential licence fee information concerning other artists.[196] However, the general basis of the experts' respective approaches to the factors to be applied is considered below and under the factors which I analyse.

*Analysis*

[379] It is plain from the authorities and the parties' positions that the user principle is the approach to be adopted in determining relief when it is not possible to establish a normal synchronisation licence fee.[197] The threshold has been met for the user principle to apply, because Eight Mile Style would not have licensed *Lose Yourself* for use in the National Party's election advertising and the National Party was unlikely to have negotiated a licence with Eight Mile Style.

[380] The Court must therefore assess the hypothetical bargain that would have been reached between a willing Eight Mile Style as licensor and a willing National Party as licensee.

[381] As Pumfrey J stated in *Ludlow Music*,[198] "precision is not attainable" and while evidence of practice in the industry may "guide the Court", the ultimate process "is one of judicial estimation of the available indications."[199]

[382] On the available indications from the evidence in the present case, the factors which I consider are relevant to a notional licence fee specific to *Lose Yourself* are

---

[196] Appendix II.
[197] See [304]–[345] of this judgment
[198] *Ludlow Music*, above n 158, at [48].
[199] *General Tire*, above n 151, at 826.

set out below, under each of the relevant headings, with my assessment of the evidence adduced in relation to them.

*Value of* Lose Yourself *in New Zealand*

[383]   The experts did not agree on the value of *Lose Yourself* in the New Zealand market.   Mr Martin reminded the Court that Eminem had a successful sell out concert in New Zealand in 2014, where the last song he played was *Lose Yourself*. This concert took place, just a few months before the 2014 election campaign advertising in August 2014.   Eminem was the headline act for Rapture, New Zealand's largest outdoor hip-hop concert, which was held in Auckland.   In Mr Martin's view, the National Party wanted to capitalise on the popularity of Eminem and the recency and success of his tour.

[384]   Mr Gough and Ms Hellriegel differ in their views from Mr Martin and Eight Mile Style's experts about the appeal of *Lose Yourself*.   They believe advertisers in New Zealand want to appeal to the widest possible audience and consequently will only pay the highest licensing fees for a safe option.   *Lose Yourself* does not fit into those categories, in their view.

[385]   Although Mr Gough agreed that *Lose Yourself* was an iconic work, he did not rate it as high value because it did not have the broad appeal to all ages that works with other songs.   If priced as a high value work, he said, it would need to be wanted by a comparable high value client, as a brand or service which is aimed at a younger demographic and the client must be prepared to pay the kind of fee such an iconic work would attract.

[386]   Ms Hellriegel, in agreeing that Eminem is a highly respected artist in New Zealand and that hip hop is indeed a popular genre in New Zealand, questioned whether a political party, which is considered "centre right", would have hinged their election campaign on the music of an American hip hop artist, just because he had recently performed in New Zealand.   She raised the question as to whether Eminem, as an artist who can be polarising, would have negated any gains that having a well-known legacy song in a political campaign might have had.

[387]   Mr Donlevy considered *Lose Yourself* was a very well-known and popular piece of music and he would place *Lose Yourself* in the same category as the most valuable works of certain famous and popular artists.

[388]   I am unable to accept the misgivings of Mr Gough or Ms Hellriegel. *Lose Yourself* is highly successful, recognised professionally and commercially as original and iconic.  This is demonstrated by its awards and Eminem's popular following, including his recent tour in New Zealand just prior to the 2014 election.  The work was acquired for the National Party's election advertisements, despite any polarising effect such association with Eminem may have had and despite the other options available to the National Party to choose alternative music.  As the National Party submits, the people creating the National Party's advertisements "wanted the feel of *Lose Yourself*".  They had already settled on the rowing metaphor.  Mr Jameson of Stan 3 said they particularly wanted a steady syncopated beat that could accompany the rowing strokes.

[389]   In my view, the high licensing value placed on *Lose Yourself* by Eight Mile Style for their "jewel in the crown" justifies a willing licensor to demand a high fee for its use.  The National Party was also a very willing licensee, because they specifically wanted the *Lose Yourself* sound.

*Use in a political election campaign*

[390]   The next significant factor in which there was disagreement among the experts was the proposed use for a national election campaign.  There was general agreement that the chances of a major international artist agreeing to their work being used in a local political campaign, anywhere outside their home territory, were very remote.  It was much more risky than product or service advertising.

[391]   Where the experts differ is the effect on a synchronisation licence fee if the use was for an election campaign.  Mr Donlevy and Ms Zamoyska both said that if the artist or copyright controller does not agree with "the message" that their music is to be used for, the artist's reluctance can generally be overcome by an appropriate uplift to the synchronisation fee.  Ms Zamoyska also observed that there is often a very fast social media sharing through Twitter or Facebook with political campaigns

and advertising.  Ms Hellriegel acknowledged a substantial fee would be justified for a political use, particularly where the artist had no affiliation with the political party and there was no control over the re-record.

[392]   Mr Gough confirmed that the chances of a major international artist agreeing to a work being used in a local political campaign outside their home territory were very remote.  In his experience, the artist will either refuse completely or if they are willing to agree, their representative will quote a fee based on the value of the work in the territory, the term, the media and the extent of rights to be licensed.  Mr Gough then said that whether the relevant client would be willing to pay the sum quoted would depend on their budget and whether it was worth it to the client when compared with its other licensing alternatives.

[393]   Where he differed from the other experts is that he did not think that licensing songs for a political campaign would affect the fee.  He gave two examples of an artist agreeing to a song being licensed for a political campaign.  The first involved the use of an artist's song in a mayoral campaign, where the artist supported that particular candidate.  The second was an approach from a political party who wanted to use one of the company's artist's songs and because the artist was a party supporter, a nominal fee was agreed for what was an internet campaign.  Mr Gough referred to a long history of artists supporting political candidates or parties by making appearances at concerts but artists would have opinions and preferences in relation to political use.

[394]   Mr Donlevy considered the key factor in the licence negotiations was the proposed use by the licensee in a national election campaign.  He agreed, as Mr Martin had told the Court, that political advertising can be divisive and copyright controllers and artists would generally be reluctant to associate themselves with a political party or candidate.  He had examples of several artists complaining publically about the use of their music during the recent United States presidential election campaign.

[395]   None of the experts had experience of negotiating a licence for political use where the artist was not endorsing the political party or the issue.

[396]  Mr Martin was adamant that *Lose Yourself* would not be licensed for a political use and gave examples of previous requests which had been declined, including a request from a presidential candidate.  On a hypothetical licence, Mr Martin said the fee would be higher.  Both Mr Gough and Mr Donlevy agreed that artists would not want their music associated with a political party, because it can be divisive and there would be a reluctance to associate with a particular political party or candidate.

[397]  In the context of a hypothetical licence fee I do not find Mr Gough's evidence particularly helpful.  I prefer the evidence of Ms Zamoyska, who factored into her assessment of a hypothetical licensing fee, the particular nature of political advertising and the significant risk to the future commercial value of this high value song.  I consider the political use to which the song was used significantly increases any minimum licence fee.

*Rare use*

[398]  From the evidence of Mr Martin, which I accept, Eight Mile Style retain control over the licensing of *Lose Yourself*, to preserve the integrity of the work and its use.  *Lose Yourself* has been used three times only voluntarily.  It was accepted by all experts that the less a work is used, the greater the value it retains.  Mr Martin's evidence that numerous and valuable requests for *Lose Yourself* have been declined, also points to a licensor being able to command a higher fee.

[399]  By way of comparison, there was one example given of a song, which was released 32 years previously and had not been licensed, but was licensed for the first time in Australia 15 years ago.  The fee commanded was comparatively high at the time because of the rarity of its use.

*Degree of reproduction*

[400]  The degree of copying in *Eminem Esque* from *Lose Yourself* was almost entire.  The orchestral introduction of the first 30 seconds is absent as previously

described.[200]   In comparison with *Larrikin*, the entire copying of *Lose Yourself* (absent the first 30 seconds) was highly significant, as the works were strikingly similar and the advertisements contain substantial reproductions of *Lose Yourself*, including the recognisable hooks of the sonic bed and piano figure in *Lose Yourself*.[201]  This adds to the high value of the hypothetical licence.

*Duration*

[401]   Although I have heard expert evidence on duration of licenses, being for six weeks, six months, one year or more, I cannot overlook the intensity of a political election campaign advertisement, which is focused for a prescribed and short period of time.  In New Zealand, that period is one month, prior to the election.[202]  Further, the advertisement was available widely on the internet, without restriction.[203]

[402]   Within the prescribed statutory time, the National Party's 30 second advertisement was played 186 times on television over a period of 11 days, consistent with obtaining maximum use of advertising and resources pre-election. Further, the 15 minute advertisement was aired on TV1 as an opening broadcast for the National Party campaign.

[403]   The duration of 11 days viewing, on balance, justifies a reduction to the hypothetical licence fee despite the intensity of coverage, both in New Zealand media and on the internet.

*New Zealand territory*

[404]   The size of the territory has been the subject of disagreement amongst the experts.

[405]   Both Mr Gough and Ms Hellriegel gave evidence that the smaller the territory, such as licensed use for New Zealand only, the lower the fee.  If it is

---

[200]   See [207] of this judgment.
[201]   *EMI*, above n 46.
[202]   Broadcasting Act 1989, ss 69 and 70 enables political parties to advertise four weeks from writ day to the close of the day before election day.
[203]   Some experts briefly referred to the non-use of Geonet, which is designed to restrict interest access from other than the licensed territory.  Its effectiveness however was uncertain and the matter was not pursued by either party.

unlikely that a commercial will be seen or have any interest elsewhere than in New Zealand territory, Ms Hellriegel said an artist is usually prepared to negotiate a competitive fee in this country.

[406]   Mr Gough explained that the lower fees for Australia and New Zealand relate to the size of the markets.   A larger market makes higher fees viable, although New Zealand fees on a per capita basis are high compared with other more populated countries in the same markets.   Mr Gough also noted that advertisers in New Zealand and to some extent Australia, who can afford a high value song are few and far between and less likely to take risks than their European or American counterparts.

[407]   Ms Zamoyska disagreed.   Even though New Zealand is a relatively small market, compared to other markets such as the United States and the United Kingdom, the availability of the advertisement over the internet meant that it would be seen by audiences outside of New Zealand.   She considered the "extra-territorial leakage is a risk to the global commercial value of the music".   In her experience, the copyright controllers would have been unlikely to endanger a high value work like *Lose Yourself* in return for a low figure, even if the use had been targeted at New Zealand audiences.   She considered it would not have been worthwhile to do so, given the significant potential commercial risks in licensing it.

[408]   It is obvious that New Zealand is a small territory, compared to Australia, the United States or United Kingdom.   However, the advertisements were not viewed just in New Zealand.   They were distributed on the internet for wider viewing.   The 30 second advertisement and 15 minute video were uploaded to YouTube and placed on the National Party's Facebook page.   On New Zealand television, over a period of 11 days, the 30 second advertisement was shown at least 186 times.   Both advertisements had *Eminem Esque* synchronised to them.

[409]   With the YouTube and website access, the relevance of New Zealand being a small territory and therefore lower in value, is diminished.   While a licence for New Zealand territory only would normally attract a lesser fee, that factor must be balanced with the wide territorial internet access to the advertisements and their purpose.     Further,   Ms Zamoyska   highlighted   that   an   advertisement   with

synchronised music which is published online can go "viral … simply because fans of certain performers consume and share anything and everything that relates to that performer."

*Willing licensee*

[410]   As noted above, the National Party campaign committee sought the *Lose Yourself* sound specifically for its syncopated and hypnotic beat, which was an ideal accompaniment to the rowing strokes in the National Party advertisement.   The willingness of the National Party to acquire the sound of *Lose Yourself* is a relevant factor in my assessment of a notional licence fee, justifying a higher starting point for the fee.

*Quality of product*

[411]   Eight Mile Style's restrictive approach to licensing *Lose Yourself* reinforces the protection Eight Mile Style placed on the value of *Lose Yourself*.   Despite valuable potential advertising fees, Eight Mile Style declined such use because the proposed advertising did not fit with the music or what *Lose Yourself* and Eminem stood for.

[412]   The control and exercise of choice accompanies the monopoly that Eight Mile Style holds and is entitled to exercise as a result of its copyright over *Lose Yourself*.

[413]   Ms Zamoyska and Mr Donlevy in their evidence considered that the fact the Eight Mile Style artists were given no opportunity to re-record or ensure good quality of the advertisement should be a factor which increases the fee.   I accept this evidence in that regard.   Eight Mile Style, having retained tight control over the work, have no opportunity to ensure its quality.   Indeed, Mr Martin for Eight Mile Style highlighted that *Eminem Esque* "is a weak and bland copy of *Lose Yourself*" which they would not have licensed.

*Settlement figures*

[414]   As the authorities reinforce, any evidence on settlement figures that were reached in respect of copyright infringement are not relevant for the purposes of identifying a notional licence fee where they are not comparable.[204]  The evidence on settlement agreements therefore do not form part of my assessment.

*Target audience*

[415]   The evidence on the use of *Lose Yourself* reaching a smaller audience as it does not have wider audience appeal has been raised in the context of a notional licence fee.  The target audience is irrelevant to the copyright holder.  I consider there is a distinction to be drawn between the sound of *Lose Yourself* and whether Eminem had a wide audience appeal.  It was the musical work of *Lose Yourself* which made the election advertising so compelling, in my view.  The musical work was specifically sought for its arresting sound, to accompany the rowing strokes of the election advertisement.

[416]   Despite the caution from its staff member of potential adverse association with Eminem, the National Party sought the sound of *Lose Yourself*.  I accept Mr Donlevy's evidence that whether an advertisement was trying to appeal to a wide or "narrow" audience does not define a licence or the licence fee.  Ms Zamoyska also confirmed that the target audience was a consideration for the advertiser, but is not relevant to the copyright owner in relation to a fee.  In the context of these National Party advertisements, the likely target audience for an Eminem hit is not the relevant consideration.

*Analysis*

[417]   Taking into account the above factors, I consider that *Lose Yourself* is a high value work, which has been licensed rarely to preserve and increase its rarity and value.  Eight Mile Style has imposed strict creative controls on any licence to maintain the integrity of the work and the personal interests of the authors.

---

[204]   *General Tire*, above n 151, at 831–832.

[418]   I accept the evidence given by Ms Zamoyska that *Lose Yourself* was a unique track and Eminem was a unique artist and that a substantial starting fee is in the discretion of the copyright holder.  I also accept that the copyright controller would be seeking to maximise the licence fee and that it would have been reasonable for the licensor, Eight Mile Style, to seek a considerably higher figure in the circumstances. Of her range of estimates for that fee, Ms Zamoyska started at a minimum baseline for a song of the calibre of *Lose Yourself*, to which she then factored in the following matters:

(a)     the use for political advertising;

(b)     the significant risk to the future commercial value of the song; and

(c)     the lack of creative control and opportunity to re-record, along with the other factors outlined in her evidence.

[419]   I found Ms Zamoyska's evidence compelling and of considerable assistance to reaching a reasonable fee because of her direct negotiating experience with international high value musical works and iconic artists.  Although Ms Zamoyska accepted she had limited experience negotiating high value songs in New Zealand, she did have some past experience of doing so.  I am persuaded by her evidence that, for a song like *Lose Yourself*, her starting point for the licence of *Lose Yourself* was appropriate.   Ms Zamoyska's evidence was compatible with the credible and persuasive evidence from Mr Martin about Eight Mile Style's practice and concern to preserve the integrity and value of *Lose Yourself*.

[420]   Although Mr Donlevy gave a lower licensing fee, he concluded by saying there can be a significant variation in the fees negotiated for different works and different uses.  In relation to *Lose Yourself*, the high profile nature of the work, the political nature of the advertisement and the views of the owner artists are significant variables in trying to determine a licence fee.  He said "it would not surprise [him] for a work of this calib[re] if the fees required by the head publisher were significantly higher."

[421]   From the starting point therefore of a high value work, I consider that it is appropriate to apply an uplift to the starting point for a licence fee to reflect the above factors outlined by Ms Zamoyska.

[422]   There was no example given of an artist being persuaded to allow their works to be used for a political purpose which they did not either endorse or support.  Apart from Mr Gough, the other experts agreed that there would be a higher licence fee. Two of the experts referred to a "heavy reluctance" to grant a licence in this case, justifying a higher fee.  The authorities caution that a hypothetical licensor cannot be heard to say that he would have refused to grant a licence at all.[205]  If one increases the licence fee on the grounds that the licensor would be reluctant to grant a licence, that appears to be reintroducing the element of unwillingness by the back door.[206]

[423]   I consider there is a distinction to be drawn between an increase in the fee because of a licensor's reluctance, compared to a higher fee for the type of use to which the licence is to be put.  Here, the licensor is saying that if *Lose Yourself* were to be licensed for a political campaign, the price must be higher, which is a position that I consider to be reasonable in a hypothetical licence negotiation.  It reflects the rare occasions in which the artist would agree to have their work associated with politics and the high fees that need to be paid to have a recognisable song in a political campaign.

[424]   The second matter which I consider properly increases a licence fee is the lack of control by the artist to either re-record or oversee the use of their high value songs in an advertisement.  The clear example was given by Mr Martin of Eight Mile Style's exercise of control over the re-record of *Lose Yourself* for the Chrysler advertisement.  The type of control exercised by Eight Mile Style shows what Ms Zamoyska described as ensuring the artistic integrity of the music: that the value of the composition would not be compromised by the use of a low quality recording; the advertisement is produced to a high standard; and the "messaging" in the advertisement is acceptable.  This would normally mean a right of final approval over the advertisement.   This was of course absent in the National Party advertisement and I accept from Ms Zamoyska's and Mr Donlevy's evidence that absence of control justifies a higher fee.

---

[205]   *32Red*, above n 173, at [29].
[206]   *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2014] EWHC 3159 (Ch) at [94].

[425]   A further factor which I consider relevant to this hypothetical bargain is the willing licensee.  The National Party campaign committee approved the use of *Lose Yourself* and, despite the options of other musical works available to them, sought to have the sound of *Lose Yourself* accompany its election advertising and video provided it had no legal impediment.  At the time of the hypothetical negotiation, Mr Foster from Sale Street Studios sent an email to Extreme Music on 3 June 2014, saying "They wanted to use Eminem's *Lose Yourself*."

[426]   Mr Jameson described the "steady beat" of the music, which was the preferred accompaniment to the rowing advertisement.  The evidence demonstrates that the National Party was a willing licensee and the wish to procure the *Lose Yourself* sound is a factor that would lead the parties to have agreed on a higher figure for the hypothetical fee.

[427]   Against the factors that support a higher fee is the evidence on duration and the territory of use.  It is plain that in a larger territory such as the United States, a licensing fee for *Lose Yourself* would be higher.  I consider that Mr Martin's view of a starting point, which is reflected in United States currency, would apply to the use in the United States.  Generally, the experts were in agreement that the larger the territory, the higher the fee, but both Mr Donlevy and Ms Zamoyska were of the view that the territory does not matter where a song like *Lose Yourself*, being a high value but rarely used work, is licensed.  Further, it is being licensed for an election campaign in a territory unassociated with the artist and is available on the internet through a website and YouTube.

[428]   As Ms Zamoyska accepted, the media on which the song will be used, the duration of use and the territory of use are normally relevant factors to the negotiation of the fee.  In this case, however, she considered those details would have limited impact because of the availability of the advertisement over the internet. It would be seen by audiences outside of New Zealand and such extra-territorial leakage is a risk to the global commercial value of the music.  There is also a fast social media sharing on political campaigns, through Twitter and Facebook for example, and this emphasises the significant potential commercial risks in licensing a high value work like *Lose Yourself* in return for a low figure.  I consider the

evidence of Eminem's following, the reaction of an artist's fan base and the wide reach of the internet distribution.  I accept Ms Zamoyska's evidence on this issue.

[429]   The duration or period of use was 11 days, although it was an intensive use.  The 30 second National Party advertisement was screened 186 times and in the opening broadcast *Eminem Esque* was played eight times.  That is less than the duration of other licence fees adduced in evidence before the Court.   The advertisements were also widely available on the internet.  The experts agreed that the longer the period of use of a song in an advertisement, the higher the licence fee.  However, I acknowledge Ms Zamoyska's evidence that it is not a linear relationship and that most of the value of using a song is in the first short period of use.  Although I accept her evidence that territory and duration would have a limited impact on the fee, in my view there must be some discount for the duration in this case.

[430]   I have taken into account that Australian and New Zealand licences have included some legacy artists, for licensing in Australia and/or New Zealand but prefer Ms Zamoyska's expert evidence.  Although each of the other experts had legacy artists and high value works in their repertoire, Ms Zamoyska considered the factors relevant to Eight Mile Style, Eminem's reputation and works.   She acknowledges the significance of *Lose Yourself* as a high value work, its rarity of use, and the fact that Eight Mile Style retains control directly over licensing and any re-recording of the song.

[431]   A number of the New Zealand/Australian licences given were not comparable for a number of factors.  In some instances, artists were licensing their songs for products which they endorsed.  In others, songs which had been rarely used were licensed some considerable years before.  No evidence was adduced that the songs in the instances given were "the jewel in the crown" of an artist's repertoire (apart from one artist's song, which was used to advertise products the artists endorsed).  Finally, none of the licence fees for New Zealand, Australia or international use had involved a licence for political use.

[432]   As the authorities warn, caution should be exercised in looking at other comparable rates or licence fees, because they must be relevant.[207]   For reasons set out above,[208] I do not take into account the evidence on settlement agreements for infringement, as they are different in character and have different considerations to the determination of a hypothetical licence.

[433]   Fletcher Moulton LJ in *Meters Ltd* said it "is the duty of the defendant to respect the monopoly rights of the plaintiff" and believed it was right for the Court to consider "what would have been the price which – although no price was actually quoted – could have reasonably been charged for that permission, and estimate the damage in that way."[209]   This is consistent with Pumfrey J in *Ludlow Music*, who said the true measure of damages "is either a rate that represents the going rate or a rate that it would be reasonable to demand in all the circumstances."[210]

[434]   In summary, the factors which I consider relevant to this case, therefore are:

(a)   Eight Mile Style have retained exclusive control of licensing, with Mr Martin responsible for negotiating the use of *Lose Yourself*;

(b)   *Lose Yourself* has been rarely licenced: three times willingly and many requests have been denied;

(c)   the purpose for the use was a political use in an unassociated country to Eminem;

(d)   the nature of the use is not what Eminem or Eight Mile Style would endorse;

(e)   the use was political advertising over 11 days and the advertisements were placed on YouTube, the National Party website and Facebook page;

(f)   despite the availability of other music, and the potential association with Eminem, the National Party wanted the sound of *Lose Yourself* or an equivalent;

---

[207]   *32 Red*, above n 173, at [64], [68], [72] and [82]–[83].
[208]   At [318], [344] and [361] of this judgment.
[209]   *Meters*, above n 149, at 164–165.
[210]   *Ludlow*, above n 158, at [53].

(g)    if an artist wishes to retain control and rarely entertains licenses, the price for a hypothetical licence fee is higher rather than lower, despite the territory or the duration; and

(h)    the musical significance of copying the musical work was significant.

[435]   In my view, balancing all of the factors, I consider that, of the range of potential licence fees adduced in evidence and submitted to the Court, I am guided most by the suggested licence fee proposed by Ms Zamoyska.

[436]   I consider that Ms Zamoyska's minimum baseline fee for a high value work such as *Lose Yourself* is appropriate.  I also consider her uplift reasonable for the factors she identifies, particularly political use, no opportunity to re-record and loss of control for a high value work.

[437]   However, I have discounted this fee for the duration of use in the circumstances.  I accept Ms Zamoyska's view that uplifting political advertisements onto websites and YouTube takes the publication beyond the territory of New Zealand and makes the factor of "territory" of limited impact on the fee.  The political campaign with all its attendant publicity and high focus, particularly in the lead up to an election, is also relevant to "duration."  I have given a discount for the 11 day use nevertheless.

[438]   In doing so, I have adjusted Ms Zamoyska's proposed figure, which was given in another currency, by discounting for the short duration of use.  It is less than the minimum fee proposed by Mr Martin and more than the fee range suggested by the other experts, although Mr Donlevy considered that a significantly higher figure here would likely be required.  There has been no premium given for unwillingness or reluctance by either party.

[439]   I find that a reasonable licence fee for the use of *Lose Yourself* by the National Party in its election campaign is NZ$600,000.

[440]   This licence fee is an award of damages against the National Party for copyright infringement.   The ultimate liability for damages, however, is to be

determined among the third parties, who have been joined to this proceeding. This will be the subject of a further hearing.

[441] The award of NZ$600,000 is dated from the first copyright breach on 28 June 2014. To that figure, I award three years interest at five per cent to the date of payment, under s 87 of the Judicature Act 1908.[211]

---

*Conclusion 4.1*

[442] The findings are:

    (a)    Eight Mile Style is entitled to damages on a user principle basis in the sum of NZ$600,000 for copyright infringement; and

    (b)    interest is payable at the Judicature Act rate of five per cent from 28 June 2014 to date of payment.

---

## 4.2    Are Eight Mile Style entitled to additional damages?

[443] Section 121 of the Act makes provision for additional damages in infringement proceedings and, of relevance, states:

    (1)    Where, in proceedings for infringement of copyright, it is proved or admitted that at the time of the infringement the defendant did not know, and had no reason to believe, that copyright existed in the work to which the proceedings relate, the plaintiff is not entitled to damages but, without prejudice to the award of any other remedy, is entitled to an account of profits.

    (2)    In proceedings for infringement of copyright, the court may, having regard to all the circumstances and in particular to—

        (a)    the flagrancy of the infringement; and

        (b)    any benefit accruing to the defendant by reason of the infringement,—

    award such additional damages as the justice of the case may require.

---

[211]    From 1 January 2018, the Interest on Money Claims Act 2016 will enter into force. However, until that time s 87(3) of the Judicature Act 1908 and cl 4 of the Judicature (Prescribed Rate of Interest) Order 2011 continue to apply here. See Interest on Money Claims Act, s 2 and sch 1, cl 1.

[444]   In relation to the predecessor of s 121, s 24 of the Copyright Act 1962, the Court of Appeal in *Wellington Newspapers Ltd v Dealers Guide Ltd* observed:[212]

> The ordinary dictionary meaning of flagrant is "glaring, scandalous, or outrageous". Flagrancy was described by Brightman J in *Ravenscroft v Herbert* [1980] RPC 193, 208 as:
>
>> Flagrancy in my view implies the existence of scandalous conduct, deceit and such like; it includes deliberate and calculated copyright infringements.
>
> ...
>
> The additional damages referred to in s 24(3) are to be awarded where the Court is satisfied that the remedies otherwise provided by the section for an action brought under it do not provide effective relief. This would suggest that there may be some damage or loss suffered by a plaintiff which compensatory damages, injunction, the taking of accounts or other remedy would not assuage. It is difficult to see what is contemplated by the additional damages unless it is something in the nature of punishment to the defendant for the hurt done to the plaintiff which the conventional remedies would not provide.

[445]   In that case an additional sum of $7,500 damages was upheld to reflect that the infringement was deliberate, calculated, done for commercial advantage, and accompanied by attempts at concealment.[213]

[446]   The Court of Appeal in *Feltex Furnishings of New Zealand Ltd v Brintons Ltd* further noted that damages for flagrancy are in the nature of aggravated or punitive damages to be fixed, if at all, after compensatory damages have been determined.[214]

[447]   Endorsing the approach in *Feltex*, Rodney Hansen J in *Electroquip Ltd* highlighted that:[215]

> Flagrancy, accordingly, goes beyond mere awareness. It is not to be found simply because the defendants have been unable to prove that they did not know or had no reason to believe that copyright existed in the works.

[448]   The Court of Appeal recently confirmed the high standard required for an award of additional damages to be made in the case of *Skids Programme*

---

[212]   *Wellington Newspapers Ltd v Dealers Guide Ltd* [1984] 2 NZLR 66 (CA) at 69–70.
[213]   At 76 per Somers J.
[214]   *Feltex Furnishings of New Zealand Ltd v Brintons Ltd* (1992) 4 NZBLC 102,913 at 102,921.
[215]   *Electroquip*, above n 145, at [56].

*Management Ltd v McNeill*.[216]  The Court endorsed the discussion in *Wellington Newspapers* and confirmed the following principles apply in relation to additional damages:[217]

(a)  section 121(2) gives the Court the power to award additional damages, not linked to compensation damages, which is exercised by applying principles that govern exemplary damages at common law;

(b)  there is no temporal limitation as to what is relevant in making this assessment and all of the parties' conduct at the time of judgment can be considered;

(c)  it must be shown that the claimant was the victim of punishable behaviour;

(d)  there should be moderation in additional damage awards given, taking into account the nature of the claimant's business; and

(e)  the means of the parties should be considered.

[449]  In that case, the Court awarded additional damages of $20,000 for the copyright infringement to reflect "outrageous behaviour".[218]  The Court considered that the defendant was involved in extensive and deliberate copying, had repeatedly denied her conduct, that the only penalty available was an award of additional damages, and the claimant's business was modest.[219]

[450]  As the Court of Appeal confirmed in *Skids Programme*, common law principles that govern exemplary damages generally are relevant here.[220]

[451]  The Supreme Court in *Couch v Attorney-General* held that the primary purpose of exemplary damages is to punish a defendant for wrongful conduct and there must be conscious wrongdoing and not merely inadvertence.[221]  The majority of the Court reaffirmed that the test for whether an award of exemplary damages should be granted is whether the defendant acted outrageously, either intentionally or

---

[216]  *Skids Programme Management Ltd v McNeill* [2012] NZCA 314, [2013] 1 NZLR 1.
[217]  At [102]–[110].
[218]  At [119].
[219]  At [118].
[220]  At [102]–[110].
[221]  *Couch v Attorney-General (No 2)* [2010] NZSC 27, [2010] 3 NZLR 149 at [117] and [238].

with subjective recklessness.[222]  This test applies across all causes of action for which exemplary damages are sought.  Tipping J also confirmed that the consequences of the defendant's actions are not the primary assessment of blameworthiness.  Rather, the defendant's state of mind is the focus.

[452]  In *Jeans West Corp (New Zealand) Ltd v G-Star Raw CV*, the Court of Appeal awarded additional damages of $50,000, which is understood to be the highest award in New Zealand.[223]   The relevant factors included flagrant infringement by blatant copying by the infringer, significant but unquantified financial benefit to the infringer, the actions of the infringer were very damaging to the business of the copyright owner, and the infringement was to test the market with a view to further importation of infringing material for sale.  The conduct of Jeans West, in defending the claim, by late discovery of a critical document and failure to call evidence from relevant witnesses, was also relevant.

*Analysis*

[453]  The above authorities clearly indicate that there is a high threshold for the award of additional damages for copyright infringement.  Here, the National Party sought the copyright work, *Eminem Esque*, from a professional company specialising in production music for sale.  The National Party obtained advice from experienced professionals within the advertising and music licensing industries, in relation to the use of the track.

[454]  Eight Mile Style allege that the National Party should have sought legal advice to determine whether there was a risk of copyright infringement.

[455]  I do not accept Eight Mile Style's submission.  The National Party took appropriate steps in seeking professional and industry advice from experienced music licensing companies and obtained a synchronisation licence to use *Eminem Esque* in their advertising.  The extent to which the National Party was entitled to rely on that advice and the liability of the third parties for the award of damages is a matter for the second hearing.

---

[222]   At [178]–[179], per Tipping J.
[223]   *Jeans West Corp (New Zealand) Ltd v G-Star Raw CV* [2015] NZCA 14, (2015) 13 TCLR 787.

[456]   While copyright infringement of *Lose Yourself* did occur, the National Party's actions do not demonstrate:

    (a)    flagrant or intentional infringement;

    (b)    contumelious or total disregard for the plaintiffs' rights; or

    (c)    conduct that is so bad that it should be punished.

[457]   The compensatory and restitutionary damages awarded are appropriate in this case.

[458]   Although the National Party, in communicating and/or reproducing a copy of *Lose Yourself*, is responsible for the actual copyright infringement, in doing so, the National Party was acting on industry advice and was not acting in flagrant disregard of Eight Mile Style's rights nor, as the authorities describe, acting in an outrageous manner.  An award of additional damages against the National Party is not justified in these circumstances.

---

*Conclusion 4.2*

[459]   The findings are:

    (a)    although copyright infringement did occur, the National Party's actions were taken after receiving professional, commercial and media advice and were not reckless or contumelious of the rights of the copyright owner; and

    (b)    no additional damages are awarded.

---

**SUMMARY OF CONCLUSIONS**

[460]   There is actionable copyright in *Lose Yourself* because:

    (a)    Eight Mile Style are the owners of 50 percent and are exclusive licensees of the other 50 per cent of the musical work *Lose Yourself*. They are therefore the exclusive licensees of copyright in the musical work *Lose Yourself*;

(b)     Eight Mile Style are entitled to bring this action for copyright infringement in New Zealand as the authors of *Lose Yourself* are citizens of a prescribed foreign country; and

(c)     copyright subsists in the musical work *Lose Yourself* as it meets the definition and threshold of being an original musical work under s 14(1)(a) of the Act.

[461]   *Lose Yourself* is a highly original musical work, for the following reasons:

(a)     *Lose Yourself* is an original musical composition, with a distinctive guitar strum and drum beat, which creates an insistent tense hypnotic rhythm, with a heightened sense of anticipation, as originally created and intended;

(b)     *Lose Yourself* is a highly original musical work; and

(c)     the melody in *Lose Yourself* is not the dominant feature.

[462]   *Eminem Esque* has substantially copied *Lose Yourself* and is a substantial copy of *Lose Yourself* because:

(a)     the differences between *Eminem Esque* and *Lose Yourself* are minimal;

(b)     the close similarities and the indiscernible differences in drum beat, the "melodic" line and the piano figures between *Lose Yourself* and *Eminem Esque* make *Eminem Esque* strikingly similar to *Lose Yourself*; and

(c)     *Eminem Esque* substantially reproduces the essence of *Lose Yourself*.

[463]   The parts of *Eminem Esque* used in the National Party's election advertisements also substantially reproduce *Lose Yourself*.

[464]   *Eminem Esque* is objectively similar to *Lose Yourself* because:

    (a)   *Eminem Esque* is objectively similar to *Lose Yourself*, with minimal discernible differences;

    (b)   *Eminem Esque* sounds like a copy and I find it is a copy of *Lose Yourself*; and

    (c)   *Eminem Esque* was designed to "sound like" *Lose Yourself* as production music and a sound-alike track.

[465]   There is a causal connection between *Lose Yourself* and *Eminem Esque*:

    (a)   it was no coincidence that the works sounded the same;

    (b)   the undeniable inference to be drawn from the evidence is that the composer of *Eminem Esque* had *Lose Yourself* in front of him at the time of composition; and

    (c)   the original title *Eminem_abbr*; the title of *Eminem Esque*, and the fact that *Eminem Esque* is a sound-alike track reinforces the finding that there is a causal connection between the two works, supporting a finding of copying.

[466]   In terms of copyright infringement:

    (a)   The National Party carried out the following restricted acts which amount to copyright infringement:

        (i)   communicating a copy, or a reproduction of a substantial part, of *Lose Yourself* to the public without licence;

        (ii)   authorising the copying of *Lose Yourself* by authorising the synchronisation of *Eminem Esque* with the National Party election campaign advertisements; and

        (iii)    authorising the use and/or deployment of the relevant advertisements, the conference video and opening broadcast.

    (b)    *Eminem Esque* is not an adaptation of *Lose Yourself*, as there has been no adaptation for use from one medium to another.

[467]  Eight Mile Style is entitled to damages on a "user principle" basis in the sum of NZ$600,000, from 28 June 2014. Interest is payable at the Judicature Act rate of five per cent from 28 June 2014 to date of payment.

[468]  Although copyright infringement did occur, the National Party's actions were taken after receiving professional, commercial and media advice and were not reckless or contumelious of the rights of the copyright owner. No additional damages are awarded.

**Costs**

[469]  Counsel are to file memoranda on costs.

                                                                        **Cull J**

Solicitors:
Lindsay Litigation and Arbitration Ltd, Auckland
Kiely Thompson Caisley, Auckland
Dominion Law, Auckland
LeeSalmonLong, Auckland
Rennie Cox, Auckland
Izard Weston, Wellington

## APPENDIX I

*Chronology of events*

| | |
|---|---|
| **November 1995** | FBT Productions and Marshall Mathers III entered into an Exclusive Artist Recording Agreement (the Recording Agreement). |
| **22 February 1999** | The Recording Agreement was subsequently amended by an Amendment Agreement. |
| **19 April 2000** | The Bass brothers entered into the Eight Mile Style Operating Agreement (the Operating Agreement) |
| **18 July 2001** | Mr Jeffrey Bass entered into a Writer Co-Publisher Agreement with Eight Mile Style. |
| **2001–2002** | The musical work *Lose Yourself* was composed. |
| **September 2002** | A sound recording featuring the musical work was first released as a single in the United States of America. |
| **9 January 2003** | Mr Resto assigned to Eight Mile Style an undivided 50 per cent interest in his share of the copyright and all other rights, title and interest, in and to a number of compositions, including the musical work known as *Lose Yourself*. |
| **9 January 2003** | Mr Resto entered into a Writer-Co-publisher Agreement with Eight Mile Style. |
| | Eight Mile Style and Martin Affiliated entered into a copyright assignment by which Eight Mile Style assigned to Martin Affiliated an undivided 33 per cent interest in Eight Mile Style's share of the copyright and all other rights, title and interest, in and to the musical compositions acquired, owned, controlled or administered by Eight Mile Style. The assignment expressly recorded that the musical work *Lose Yourself* was one of the compositions covered by it. |
| **Prior to 8 March 2007** | Mr Cohen produced a track that he called *Eminem_abbr*. The work was renamed *SQ mc Eminem Esque* at around this time. |
| **14 February 2008** | Mr Cohen entered into an arrangement whereby he purported to grant Labrador Entertainment Inc the rights listed in cl 1.1 of the Composer's Agreement bearing that date. |

| | |
|---|---|
| **Late 2013** | Stan 3 Ltd pitched to the National Party and its campaign committee members the idea of using a rowing crew as a visual representation of the National Party and its record as a governing party. Stan 3 Ltd was directed to develop this idea into a fully thought through concept for advertisements. |
| **Late February 2014** | Mr Jameson of Stan 3 Ltd prepared animatics that were synchronised with two musical tracks: the classical track and the modern track (*Eminem Esque*), provided by Sale Street Studios Ltd. |
| **28 February 2014** | These animatics were sent to Ms Worthington. They were then forwarded to Mr Foster at Sale Street Studios Ltd. |
| | Mr Foster located the track called *Eminem Esque* after conducting a search of production music libraries. |
| | The *Eminem Esque* track was then synchronised with certain animatics that were to be tested with a focus group. |
| **March 2014** | The animatics were tested by the focus group for the National Party campaign committee. The group showed a preference for the modern track, being the animatic with *Eminem Esque* synchronised to it. |
| **27 March 2014** | Mr Jameson needed to make another animatic, and requests *Lose Yourself* sound-alike from Mr Foster. |
| | Mr Foster provides Mr Jameson the relevant music file. |
| **March 2014–May 2014** | The National Party election advertisements were produced by Stan 3 and its sub-contractors. |
| **Late May 2014** | Mr Jameson showed the proposed election advertisement to Ms de Joux, campaign manager for the National Party. The proposed election advertisement used *Eminem Esque* and a staff member of the National Party heard the track and said it sounded like Eminem. He also said Eminem is perceived to be into hate speech. Mr Jameson advised Ms de Joux that the music was production music named something like *Eminem Esque*. |
| **27 May 2014** | Ms Worthington of Stan 3 emailed Mr Foster of Sale Street Studios asking him for a copy of the *Eminem Esque* track and forwarded the file to Ms de Joux. |
| | Ms de Joux asked for full details of the musical track, which were supplied by Stan 3. She was concerned about the National Party being associated with Eminem and copyright issues so asked Stan 3 to locate other music for consideration. |

Ms Worthington sends correcting email indicating "Eminem" not "eminent".

Mr Foster provides the file.

Ms Worthington forwards the file to Ms de Joux.

**29 May 2014**     Mr Jameson was instructed to find alternative music choices and contacted Mr Foster to do so.

**2 June 2014**     Mr Foster provided alternative tracks by WeTransfer.

**3 June**     Mr Foster emailed Extreme Music indicating they had wanted to use Eminem's *Lose Yourself* because it was something harder and more edgy.   Mr Foster provided an alternative track to Mr Jameson.

**13 June 2014**     The National Party campaign committee listened to several music options and decided that the advertisement with *Eminem Esque* synchronised to it was the best option because the track clearly fitted best with the visuals of the advertisement, particularly the rowing strokes.   However, the committee wanted detailed reassurance that the National Party could safely use *Eminem Esque*.

**13–18 June 2014**     Stan 3 was asked to obtain reassurances that *Eminem Esque* could be used in the National Party's advertisement.   Stan 3 obtained reassurance from:

     (a)     Mr Collins, a freelance experienced television advertising producer;

     (b)     Mr Foster at Sale Street Studios;

     (c)     Mr Mackenzie of Beatbox Music;

     (d)     Mr Chunn, former head of APRA; and

     (e)     Ms Benoit at APRA/AMCOS.

**18 June 2014**     Stan 3 reassured the National Party that *Eminem Esque* could be used.  A written assurance from Mr Mackenzie of Beatbox Music was obtained, stating that the "agreement we have with the publisher gives us assurance that the music does not infringe on copyright and is free to be used for production purposes."

**18–23 June 2014**     The National Party confirmed that it would proceed to use the *Eminem Esque* track, as the use of *Eminem Esque* in its campaign advertisements and other materials had been cleared "by the Party or members of its Campaign Committee."

| | |
|---|---|
| **23 June 2014** | That the use of *Eminem Esque* in its campaign advertisements and other materials had been cleared by the National Party or members of its campaign committee was communicated to Sale Street Studios Ltd by Ms Worthington by email.  That email outlined the uses to which the track would be put. |
| | Ms Worthington confirmed to Mr Foster by email that the *Eminem Esque* track was to be synchronised with the National Party's broadcast opening address – a 15 minute political party advertisement. |
| | Ms Worthington confirmed that the *Eminem Esque* track was to be synchronised with a 2.5 minute video that was to be shown at the National Party's conference that was taking place that weekend. |
| **25 June 2014** | Ms Worthington emailed Sale Street Studios Ltd asking whether they had done the final mix and purchased the *Eminem Esque* track for use with the video that was to be shown at that weekend's conference. |
| **28 June 2014** | The video that had been produced which had the *Eminem Esque* track synchronised to it was played to those in attendance at the National Party conference. |
| **5 August 2014** | Ms Worthington sent another email to Mr Foster which set out details on the use to which the *Eminem Esque* track was to be put.  Those uses included synchronisation with the video shown at the National Party conference, the broadcasting opening address, six 30 second TVC's (including the framing TVC), and three 15 second cutdown TVCs. |
| | The requested advertisements had the track *Eminem Esque* (or parts of it) synchronised to them, were finalised and copies of them were provided to T-Cab and then the broadcasters so that they could be aired. |
| **20 August 2014** | The first of the advertisements that had *Eminem Esque* synchronised to it (the Framing Advertisement) was uploaded to YouTube and the National Party's Facebook page.  The 15 minute long opening address advertisement was also uploaded to YouTube and social media. |
| **20–30 August 2014** | Advertisements which had the *Eminem Esque* track synchronised to them were played at least 186 times on New Zealand television. |
| **23 August 2014** | The 15 minute opening broadcast aired on TV1. |
| | The media in New Zealand began to run stories suggesting that the music used in the relevant advertisements sounded like the musical work. |

| | |
|---|---|
| **25 August 2014** | Eight Mile Style's United States attorneys formally wrote to the National Party complaining of the unlicensed use of the musical work. |
| **26–27 August 2014** | The National Party seeks to replace the *Eminem Esque* track on its advertisements with alternative music. |
| **27–30 August 2014** | The National Party, Stan 3 Ltd and subcontractors commission and approve alternative music, apply the alternative music to the advertisement and submit the advertisement to broadcasters for approval. |
| **30 August 2014** | The National Party ceased airing or otherwise publicising advertisements with the *Eminem Esque* track |
| **17 September 2014** | Mr Baker of Beatbox Music sent an email to APRA saying:<br><br>"Please note that today we have emailed our clients requesting them to delete the Spider Cues album SPID039 which contains the work *Eminem Esque* by Mr Cohen from their hard drive storage devices and that the music can no longer be licensed." |

### Alexander Stewart, Ph.D. LLC
### June 26, 2021
### Amended Supplemental Musicology Report

**Re: "Eminem Esque," "National Party Election Ad," and "Lose Yourself"**

1. I have been asked to provide a response and supplemental analysis regarding the three works discussed in my report of 12/9/2019: "Eminem Esque," (EE) "National Party Election Ad" (NP), and "Lose Yourself" (LY)

2. This report will clarify several terms that came up in my deposition of 1/2/2020 and will provide further evidence supporting my conclusion that NP is simply a compressed version of EE and is actually ***much less*** infringing of LY than EE is.

3. As noted in my prior report and illustrated in its attached transcriptions, 100% of the notes and musical expression found in NP are derived from EE, ***376 notes out of 376***. Because EE is the earlier work and was acquired by the producers of NP for their 30-second commercial or "spot," any infringement of LY pre-existed the creation of NP.

4. EE is a track created for a Production Music Library. These libraries offer prerecorded music collections in a broad range of styles for purchase for post-production use in movies, TV, and commercials. In standard industry practice, these prerecorded tracks are edited and/or adapted to make "cues"or underscores of suitable length for audio-visual works.

5. The length of EE is 2:22 (two minutes and 22 seconds). The chance that any user of this track would need exactly that length of music for synchronization with a visual work is almost nil.

6. Since most broadcasters sell time for commercials in 15-, 30-, and 60-second lengths (with 15 and 30 being far more common), it would be expected that the producers of NP would be unable to use the entire 2:22 recording.

7. In the natural course of editing EE in order to make it fit the 30-second National Party commercial, repetition was eliminated from the opening half (approximately one minute and twelve seconds) of EE.

8. The first edit involved cutting measures 5-8 of the eight-measure intro to EE. These four measures (lasting approximately 11 seconds) repeat the first four measures (or 11 seconds) with only an additional ascending string line added. Nothing is lost from this cut because this ascending string line (D-E-F-G) continues during the next section of EE after the drums enter.



Exhibit #

Fink D

8/10/21

9. The next section of the NP cue picks up at this point when the drums enter (0:22 in EE) by using the next three and one-half measures of EE (approximately 9 seconds), measures 9-12.2.[1] In EE this section is repeated three times with essentially no variation. The NP spot avoids this repetition by jumping to the next important section of EE, the entry of the iconic piano part in measure 25 (1:07 in EE) for the NP spot's third and concluding section.

10. In EE the 4-measure sections containing this piano part and related passages repeat an additional five times until the end of the track. Once again, for the NP spot, this repetition was eliminated.

11. In my deposition I used the term "compression" to describe this process. Though not a strictly musical term, it seems apt given the result. No musical content is changed, the piece is abbreviated by eliminating repetition. All the important compositional elements of EE are retained, only repeating sections are excised. My use of "compression" is similar to the sense of the term as used in technology. Merriam-Webster defines "compression" as "conversion (as of data, a data file, or a communications signal) in order to reduce the space occupied or bandwidth required." When a computer file is compressed, the integrity of the original file is not lost; in much the same way, the eliminating of repetition in EE did nothing to change the underlying composition of EE.

12. In the course of my deposition I was asked whether this process could be considered a "modification" of EE (Deposition 1/2/2020, p. 24). According to Merriam-Webster, "modify" has various definitions and I have no way of knowing how Mr. Jacobson intended it. I am clear in my answer that the only sense in which NP could have been considered "modified" was through "shortening the length" or duration of the piece. My response states unequivocally that it "remains the same piece of music" (25:3).

13. Indeed, the shortening the overall duration of a work by not repeating sections has a long history in music. In classical music, for example, since at least the 18th century, repeats have not been strictly observed.[2]

14. The sparse report submitted by Gerald Eskelin dated November 25, 2019 mentions the modification of a "few melodic pitches." Nowhere in his report does he identify any of the alleged pitches that have been "altered" or their location in the recording. In my view his omission is a result of the fact that no changed pitches exist anywhere in NP. My conclusion is supported by my investigation and careful transcription of both works (EE and NP). Mr. Eskelin has not provided a single note of transcription.

15. Mr. Eskelin also mentions the "silencing" of a "crashing brass" motive. The term "silencing" is not a musicological term, so it is difficult to know exactly what he means. Again, he provides absolutely no specific information about the notes and timing of where this supposed silencing of a brass sound has occurred. As can be seen in my transcriptions, nowhere in NP has an instrumental sound been altered or removed. The three sections of EE that were used in NP are

---

[1] "12.2" indicates measure twelve, beat 2).

[2] "Repeats," *Grove Music Online https://doi-org.ezproxy.uvm.edu/10.1093/gmo/9781561592630.article.23214*

complete and consistent with the original composition and recording.

16. The Eskelin "report" is deficient to the point of being derelict. I have never seen a musicological statement in a copyright matter that is so vague, utterly lacking in detail, and devoid of any specific evidence to support its conclusions.

17. Any suggestion that somehow the infringement of LY came from alleged changes to EE made by the producers of NP is complete nonsense. If anything, NP infringes much less of the composition of LY than EE does. My previous report mentioned that the drum part of EE used in the last third of NP appears nowhere in LY. Furthermore, as I touched on in my deposition, the six-note piano part used in NP also appears nowhere in LY. Five of the six notes are identical in EE and LY. The example below illustrates this point. In order to show similarity, notes that are the same are rendered in red. *Not a single pitch* of this six-note piano figure in NP is heard in LY.



Piano pitch sequences

NP   A D E F D E
EE   **D** A **Bb A G A**
LY   **D** C **Bb A G A**

18. The six-note piano figure appears 12 times in LY (including a closely related iteration in the intro). The same figure containing five of the six pitches in LY is heard six times in EE. Six-note piano figures taken from measures 25-26 of EE are heard twice in NP, but as shown above, *none of the pitches* are the same as the six-note figure in LY.

19. To summarize, 100% of NP is found in EE. No musical content was altered. The process of compressing the portion of EE used in NP involved only eliminating repetition so that the 30-second spot was able to include the main three musical segments of EE: 1) the intro, 2) the main body after the entrance of the drums, and 3) a section containing a version of the iconic piano part.

20. Ironically, because this third section features a sparser drum part and the pitches of this version of six-note piano phrase are entirely different,  the NP advertisement is actually much less infringing of LY than EE.

21. Adapting the length of a track purchased from a production music library is standard practice in the industry. Moreover, shortening a performance of a work by eliminating repeated sections has a documented history going back hundreds of years.

22. In short, any claim that the infringement of LY is due to changes in EE made by the producers of NP seems nothing less than a desperate attempt to divert responsibility.

Respectfully submitted,

Alexander Stewart, Ph.D. LLC