1   Douglas J. Rosner, ESQ., SBN 094466
    rosnerlaw@earthlink.net
2   LAW OFFICES OF DOUGLAS JOSEPH ROSNER
    2625 Townsgate Road, Suite 330
3   Westlake Village, California 91361
    Telephone No. (818) 501-8400
4   Facsimile No.: (818) 880-4485

5   Attorney for Defendant/Cross-Complainant,
    Labrador Entertainment, Inc. dba Spider Cues Music Library,
6   Labrador Entertainment, LLC, Noel Palmer Webb,
    an individual and Webb Family Trusts

7

8

9               UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  BEATBOX MUSIC, PTY, LTD.,          )  Case No. 2:17-cv-6108-MWF (JPRx)
                                       )  *Assigned to the Hon. Michael W.*
13              Plaintiff,             )  *Fitzgerald*
            vs.                        )
14                                     )  LABRADOR ENTERTAINMENT,
    LABRADOR ENTERTAINMENT,            )  INC. DBA SPIDER CUES MUSIC
15  INC., DBA SPIDER CUES MUSIC        )  LIBRARY, LABRADOR
    LIBRARY, a California corporation, )  ENTERTAINMENT, LLC, NOEL
16                                     )  PALMER WEBB, AN
                Defendants.            )  INDIVIDUAL AND WEBB
17  _____)  FAMILY TRUSTS
                                       )  SUPPLEMENTAL EXPERT
18  AND ALL RELATED ACTIONS            )  REPORT OF ROBERT FINK
                                       )  SUBMITTED SEPTEMBER 6, 2022
19

20

21

22

23

24

25

26

27  LABRADOR'S SUPPLEMENTAL EXPERT REPORT OF ROBERT FINK SUBMITTED

28  SEPTEMBER 6, 2022                                    Page 1 of 4

EXHIBIT

C

Defendant/Cross-Complainant, Labrador Entertainment, Inc. dba Spider Cues Music Library, Labrador Entertainment, LLC, Noel Palmer Webb, an individual and Webb Family Trusts supplements its Expert Report of Robert Fink, PHD dated July 20, 2021 with the attached Expert Report of Robert Fink, PHD dated September 6, 2022. Inter PPLbmit their objections to Defendants Rule 26 Disclosure submitted on October 12, 2022.  Defendant/Cross-Complainant object to Defendants' Fed. R. Civ. P. 26(a)(3) disclosure as follows:

DATED: November 17, 2022

Law Offices of  Douglas Joseph Rosner

/s/ Douglas J. Rosner

By: Douglas J. Rosner
Attorney for Defendant/Cross-Complainant,
Labrador Entertainment, Inc. dba Spider Cues
Music Library, Labrador Entertainment, LLC,
Noel Palmer Webb, an individual and
Webb Family Trusts

LABRADOR'S SUPPLEMENTAL EXPERT REPORT OF ROBERT FINK SUBMITTED SEPTEMBER 6, 2022

**PROOF OF SERVICE**

**USDC, CENTRAL DISTRICT, WESTERN DIVISION**

**Case No. 2:17-cv-6108-MWF (JPRx)**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 2625 Townsgate Road, Suite 330, Westlake Village, CA, 91361.

On November 17, 2022, I served true copies of the following document(s) described as Labrador Entertainment, Inc. DBA Spider Cues Music Library, Labrador Entertainment, LLC, Noel Palmer Webb, an Individual and Webb Family Trusts Labrador Entertainment, Inc. Dba Spider Cues Music Library, Labrador Entertainment, Llc, Noel Palmer Webb, an Individual and Webb Family Trusts Supplemental Expert Report of Robert Fink Submitted September 6, 2022 on the interested parties in this action as follows:

See Service List

BY EMAIL OR ELECTRONIC TRANSMISSION: By transmitting a true copy of the foregoing document(s) to the email addresses set forth on the attached service list.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of November, 2022 in Los Angeles, California.

/s/ Douglas J. Rosner

_____
Douglas J. Rosner

LABRADOR'S SUPPLEMENTAL EXPERT REPORT OF ROBERT FINK SUBMITTED
SEPTEMBER 6, 2022                                                      Page 3 of 4

1

## SERVICE LIST

2

### USDC, CENTRAL DISTRICT, WESTERN DIVISION

3

### Case No. 2:17-cv-6108-MWF (JPRx)

4

5

Heather Lea Blaise, Esq.                                    Counsel for Plaintiff
6    Blaise and Nitschke PC                                     Beatbox Music Pty, Ltd.
123 North Wacker Drive, Suite 250
7    Chicago, IL 60606
hblaise@blaisenitschkelaw.com
8

9

10   Daniel Jacobson, Esq.                                       Counsel for Defendant and   Cross-
Jacobson & Associates                                      Claimant
11   1352 Irvine Boulevard, Suite 205                           Michael Cohen
Tustin, CA 92780
12   rp@jacobsonlawyers.com
dlj@jacobsonlawyers.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   LABRADOR'S SUPPLEMENTAL EXPERT REPORT OF ROBERT FINK SUBMITTED

28   SEPTEMBER 6, 2022                                                      Page 4 of 4

**EXPERT REPORT OF ROBERT FINK, PHD**

**SUBMITTED SEPT 6, 2022**

Robert Fink  Ph.D.
Sept 6, 2022
Musicology  Report
Re: Spider Music Cues, "Eminem Esque" and Eminem, "Lose  Yourself"

FACTS CONSIDERED

This report is based on (1) repeated listening to and detailed analysis of both the Spider Music Cues production library track "Eminem Esque" (EE) and the Eminem track "Lose Yourself"; (2) previous reports on these two tracks by myself and other musicologists including Alexander Stewart and Gerald Eskelin; (3) information contained in journalistic interviews and legal depositions by Jeff Bass, producer and co-author of "Lose Yourself"; (4) a systematic survey of prior art supported by my knowledge of rock guitar technique; (5) published, peer-reviewed musicological scholarship on the tonal and melodic language of American popular music in the rock era by Christopher Doll. Given the parameters of the case, this report does not deal with the distinctive vocal track ("rap") created by Marshall Mathers (Eminem), focusing rather on the instrumental accompaniment, composed by Jeff Bass (the "bed"), over which Eminem's rap takes place.

STATEMENT OF OPINION

It is undeniable that the authors of "Eminem Esque" openly sought to create an instrumental track which would evoke the general sound and feel of the instrumental bed for Eminem's "Lose Yourself." This is not, in itself, evidence of infringement, which requires *substantial similarity* in the actual musical expression. Recent case law implies that, when determining whether similarity is substantial, the generic nature of the musical material should be taken into account:  in effect, where copyrighted musical expressions are *commonplace*, *cliched*, *trite*, or *conventional*, their protection is "thin," requiring a very high level of similarity, approaching direct copying, for similarity to be considered substantial. In my expert opinion, the repeating guitar ostinato, or "riff," at the heart of Eminem's "Lose Yourself" is just such a commonplace expression of a well-used musical idea, and the corresponding guitar riff in "Eminem Esque," although based on a similar musical idea, is not similar *enough* in its details to sustain a judgement of infringement.

PRECIS OF ARGUMENT

1. At the heart of this case is a repeating guitar riff, composed by producer Jeff Bass as part of the instrumental bed for Eminem's "Lose Yourself." By Bass's own account, this riff was created independently by him prior to any collaboration with Eminem. Since there is no rap vocal in "Eminem Esque," any similarity between the two tracks must be based on the similarity of the two instrumental beds. The overall level of similarity will be determined by

similarity between the most distinctive part of the two instrumental beds, which is, in each case, a repeating riff played on electric guitar.

2.  My argument proceeds in two stages. In the first, I will provide a detailed analysis of the repeating riff from "Lose Yourself," breaking it down into its constituent parts:  first the opening two notes, the fulcrum of the riff; then a third note, which decorates the first two; and finally a fourth, higher note, added later, that gives the riff a traveling, cyclic feel that I will call a melodic *scheme*. I will show that *all* the melodic and harmonic expression contained in the "Lose Yourself" scheme is extremely basic and commonplace, even when all its notes and rhythms are taken into account. Where I can, I will adduce prior art that demonstrates a clear pattern or lineage of expression using this scheme, a lineage accessible to Bass when he created his version of it. I will also discuss the way this scheme is conventionally realized on the guitar, showing that when Bass first played his riff, he was participating in a tradition on the instrument, a scheme of simple moves on the fretboard, that can be traced back through generations of rock and blues guitarists.

3.  Having established that the riff in "Lose Yourself" is a schematic set of harmonic, melodic, and technical commonplaces for guitar with a clear lineage of prior art, I will then compare this riff in detail to the corresponding guitar riff in "Eminem Esque." Given the conventionality of the "Lose Yourself" riff, a very high degree of similarity will be required for the similarity to be substantial and thus actionable. Thus it is striking how *un*-similar the two riffs are, when considered at the level of magnification that the "thin" copyright protection proffered to a conventional musical expression demands. Crucial melodic differences make it clear that at every level – whether one considers the crucial first two notes, the decorating third note, or the entire four note riff – the guitar part in "Eminem Esque" deliberately avoids direct copying, and, in so doing, relates much less clearly to the tradition of riff schemes and playing techniques that make the riff in "Lose Yourself" so conventional. This is not to say that the riff in "Eminem Esque" is more creative or original. But it is *differently conventional,* and thus, not substantially similar enough to fit within the limits of the "thin" copyright protection available to this type of musical material.

## I.  THE "LOSE YOURSELF" RIFF AS COMMONPLACE EXPRESSION

### I.I  Basic tonal framework of the "Lose Yourself" riff (the first two notes)

Like all music written in a tonal system, the guitar riff in LY is built around a sequence of *scale degrees.* Almost all Western popular music is structured around a pitch center, or *tonic,* which is conventionally represented as the lowest note of a rising scale (*scala* = staircase in Italian) containing seven notes. These notes are labeled with sequential letters of the Roman alphabet, as in Figure I.

```
Pitch center:  D

Scale:         D E F G A B C

Degrees:       1 2 3 4 5 6 7
```

Figure 1:  Scale degrees in Western Music

The essence of Western tonal music is the tension and resolution relationships between the tonic note and other notes in its associated scale. Music theorists have, for convenience, numbered the notes sequentially, and, when referred to by their number, these notes are called *degrees* of a given scale. (In the text, I will use the symbol "^" before a numeral to make clear I am referring to a scale degree.) The combination of the tonic note, ^1, with any of the other scale degrees above it forms an *interval,* a conceptual distance expressed by ordinal numbers. For instance, the interval between the tonic (^1) and the fifth degree of the scale (^5) is conventionally called a "fifth."

In practice, the degrees of a given scale are not all equally spaced. The larger interval between scale degrees is simply called a *step* (remember the staircase metaphor), while the smaller interval, approximately half its size, is called a *half-step.* In Western music, multiple scales can be constructed above a given tonic, each characterized by a distinctive progression of steps and half-steps. It is often convenient to use the smaller half-step as a kind of measuring stick to quantify the size of intervals between non-adjacent scale degrees. It will be useful to visualize these relationships with respect to the guitar, where each fret that crosses the fingerboard allows the guitarist to play a note one half-step higher than the one before it. Figure 2 uses standard guitar notation to show where to play two notes a fifth apart. We may not know which notes these are (it depends on how the strings are tuned), but we can be sure that stopping the string at fret 4 and then at fret 11 would produce the melodic interval of a fifth; that the dot to the left would be ^1, the tonic, and the dot to the right would be ^5; and that the distance in half-steps between the two scale degrees would be 11 – 4, or 7 half-steps.



Figure 2. Scale degrees ^1 and ^5 on the guitar fretboard.

Some relationships are easier to visualize on the guitar fretboard than to describe using Western music terminology. If we imagine moving the rightmost dot (*aka* fingertip) one fret to the left, we would create a slightly larger interval spanning 12 – 4, or 8 half-steps (see Figure 3).



Figure 3.  Scale degree ^1 and a *raised* ^5 on the guitar fretboard.

For the purpose of the current argument it suffices to see that this new note at fret 12 is "next-door" to the one at fret 11 – in musical terms, it is a *neighbor* note, and since its pitch is higher, we would call it an upper neighbor note. This succession – tonic, fifth, tonic, fifth's half-step upper neighbor – is a recognizable cliché in contemporary pop music. Not often played on guitar, it often appears as a synthesizer ostinato over mid-tempo hip-hop beats; a particularly blatant example, using a distinctive short-long, upbeat-downbeat rhythm, anchors Lil' Jon's production on Usher's 2004 hit, "Yeah."

If we were to try to represent this relationship, in which one note moves while the other stays in place, we might write it using scale degrees as in Figure 4. Let us assume that the upper neighbor to ^5 should be notated as a lowered ^6.[1]

5  (b)6
1  —

Figure 4. Scale degree five (^5) moving to its upper neighbor note, over scale degree ^1.

Now let us imagine a guitarist-composer deciding to do something basic:  they find a place on the strings of the guitar where they can play both ^1 and ^5 at the same time, then move the ^5 up one half-step by moving the relevant finger up one fret. Perhaps, while repeating this move, they then start to create a rhythmic pulse in the simplest possible way, playing each pair of notes with

---

[1] The question of how to "spell" the half-step above ^5 – should it be ^#5 or ^b6? – is complex within Western music theory, since there are twelve chromatic pitches in the tonal system, but only seven diatonic scale degrees. In a given scale, half steps that fall between the diatonic degrees of the scale are notated with "accidentals," conventional signs that tell a player either to sharpen (#) or flatten (b) the degree. Which scale step and accidental to use depends on the situation, with the basic rule being that you use a flat to signal that note is going to descend, and a sharp if it is going to ascend. Since the application of this rule is not directly germane to the case at hand, I will not dwell on it in this opinion. Suffice to say that, insofar as we hear the note a half-step above ^5 as a neighbor note, we expect it to fall back to its neighbor, and thus it should be written as ^b6.

detached, simultaneous downstrokes of the pick, in an even rhythm, in repeating groups of eight pairs each. We could represent the tonal result of that set of choices as Figure 5.

```
5 5 5 5 5 5 5 5 (b)6 6  6 6 6 6 6 6
1 1 1 1 1 1 1 1    1 1 1 1 1 1 1 1   and repeat
```

Figure 5. Scale degree five (^5) moving to its upper neighbor note (^b6), over scale degree ^1, with basic rhythmic activation.

**Figure 5 also represents the tonal content of the guitar riff at the heart of "Lose Yourself."** To play the "Lose Yourself" riff on guitar, you finger scale degrees ^1 and ^5 with the index and pinky (call that "Chord 1"), and, while keeping the index finger stationary, then move the pinky up one fret to play Chord 2. This minimal move creates a very simple melodic line in the upper voice. (The lower voice does not move at all.) When Eminem's producer and co-writer Jeff Bass was asked to demonstrate the "Lose Yourself" riff on the witness stand during copyright litigation in New Zealand, this is what he played.[2] Figure 6 diagrams his performance of the riff in the courtroom that day; the hands fingering the chords are his, taken directly from the video.



Figure 6. Jeff Bass guitar performance of "Lose Yourself" riff. (https://www.newshub.co.nz/home/politics/2017/05/watch-lose-yourself-co-writer-plays-tune-in-court.html)

Bass himself, interviewed fifteen later, did not shy away from the harmonic simplicity of this riff: "It's not that it's so difficult; it's just two, three chords that just kind of grab your soul and

---

[2] Https://www.newshub.co.nz/home/politics/2017/05/watch-lose-yourself-co-writer-plays-tune-in-court.html, accessed August 28, 2022.

don't let go."[3] Indeed, playing this riff is not difficult at all, because it takes advantage of basic techniques of electric guitar. Chord 1, containing just the ^1 and the ^5, is called a "power" chord by guitarists, because, when played through an overdriven amplifier, the overtones of the two notes mesh into a ringing, powerful fullness. The distinctive sound of the power chord is fundamental to rock guitar, and, especially in heavier genres like metal and punk, an entire song can be played using nothing but grips like the ones illustrated in Figure 6. Starting with a power chord grip and then moving one finger to create a second (and then maybe a third) chord is elementary rock guitar technique, and the source of many a riff-based rock cliché.

### 1.2 Upper and lower neighbor notes (third note of the riff)

The tonal cliché at the heart of "Lose Yourself" has a long history. The ^5 - ^6 - ^5 melodic contour outlined by Chords 1 and 2 of the riff is deeply woven into the fabric of tonal music. As an accompanimental figure, it occurs in literally countless pieces of music, both classical and popular, whenever a chord progression in the minor key moves from the tonic to a chord based on scale degree ^4.

The *neighbor note* progression ^5-^6-^5 is thus akin to the "trite" melodic progressions discussed in Gray v. Hudson, the 2022 case in which the notion of a "thin" copyright claim is defined. In particular, Gray v. Hudson held that "copyright could not be allowed over two-note pitch sequences in eight-note repeated musical figure in view of limited number of expressive choices available."[4]

The melodic progressions at issue in Gray v. Hudson sometimes contain more than two notes, and the judgement in that case turns on a melodic passing figure that includes three scale degrees (^3-^2-^1). So even if the basic riff of "Lose Yourself" were to use more than just two scale degrees, it might still be considered as too basic or conventional to receive anything but the thinnest copyright protection.

Let us consider the *third* note used in the "Lose Yourself riff." In his performed testimony before the New Zealand court, Bass consistently adds a small decoration to his very simple riff. After sixteen downstrokes outlining the basic neighboring motion <5 5 5 5 5 5 5 5 ♭6 6 6 6 6 6 6 6>, he inserts a quick upstroke strum before the pattern repeat, simultaneously lifting his pinky finger so that the index finger, flattened across the fretboard in what is known as a "barre," can fret scale degree ^4. This is a very idiomatic, almost automatic thing to do on the guitar. (See Figure 7.)

---

[3] Producer Jeff Bass as interviewed by J'na Jefferson in "'Lose Yourself' Writer Jeff Bass Reflects On Oscar-Winning Eminem Track 15 Years Later," *billboard.com,* February 26, 2017, https://www.billboard.com/music/rb-hip-hop/eminem-lose-yourself-writer-jeff-bass-oscar-win-8-mile-7702146/, accessed August 21, 2022.
[4] Gray v. Hudson, 28 F.4th 87 (2022).



Figure 7. Jeff Bass guitar performance of "Lose Yourself" riff, con't. (https://www.news-hub.co.nz/home/politics/2017/05/watch-lose-yourself-co-writer-plays-tune-in-court.html)

In adding this quick flick on scale degree ^4, Bass has added a *lower neighbor note* to scale degree ^5, a gesture that he goes on to repeat twice with increasing vehemence as the riff continues to repeat. The resulting *double neighbor note* motion, <5-ᵇ6-4-5>, is *also* a commonplace of tonal music, of which examples could be multiplied almost without limit. A particularly famous example from European classical music comes from the 19th century: Franz Schubert's 1817 art song "Death and the Maiden," which begins, in the very same key, with precisely this 5-ᵇ6-4-5 melodic figure as the only moving part above the bass:



Figure 8. Double neighbor note melodic figure (5-ᵇ6-4-5) around the note "A" as the fifth of D minor in Schubert, "Der Tod und das Mädchen," D. 531 (1817).

It is worth noting that, when asked to demonstrate the guitar riff that is at the heart of the copyright dispute around "Lose Yourself," Jeff Bass played *only* these three melodic notes over a repeated tonic (^1): ^5, ^ᵇ6, and (eventually) ^4. Evidently these three degrees were enough to define the riff for Bass and for the court. These three notes are also, when presented in the order ^5-^ᵇ6-^4-^5, a melodic figure so common that it appears in 18th-century composition manuals as a basic building block of melody, equivalent in its ubiquity to the passing note figure (^3-^2-^1) at issue in Gray v. Hudson.



Figure 9. Basic melodic progressions, after Fux, *Gradus ad Parnassum* (1725).

Figure 9 is taken from perhaps the most well-known instructional text in the study of Western art music, Johan Joseph Fux's 1725 counterpoint text, *Gradus ad Parnassum.* The pedagogical path outlined by Fux's "steps to Parnassus" was followed by thousands of Western composers, including Mozart and Beethoven, and is still used in music schools today, under the rubric "species counterpoint," as a basic introduction to the structure of grammatically correct melodic progression for aspiring composers and performers. Here we can see labeled the *double neighbor* progression, along with the closely related *single neighbor* progression, and the even more basic *passing* progression. In Western music, it would be almost impossible to write a correct melodic progression without using one or more of these melodic figures. These are the "go to" patterns that all composers use, deliberately or instinctively, when putting fluent melodies together over tonal chords.

**As a musicologist, I would assert that if a melodic progression at issue in a copyright case appears in a famous counterpoint textbook and is given its own name therein, it is basic enough to the grammar of Western music that it can only achieve the thinnest of copyright protections.** Just as the two melodic passages at issue in Gray v. Hudson both share Fux's passing progression (321), which, it was decided, was too basic and "trite" a melodic idea to be the basis of a copyright claim, one need not levy any negative value judgment to see that the "Lose Yourself" riff is in exactly the same legal situation: it begins by using two adjacent pitches to trace out a generic neighbor note progression, and when another note is added, it turns the *single* neighbor progression into an equally generic *double* neighbor progression.

## 2. The rising and falling "tease" scheme (fourth note of the riff)

Expanding the analysis of "Lose Yourself" presented above, we note that, although the double neighbor note progression is what Jeff Bass played to demonstrate his riff in a New Zealand courtroom, in the actual track he produced, the riff gains one more important scale degree, the

natural ^7 a minor seventh above the tonic, a note which first appears at 1:17. Figure 10 transcribes the full riff with this additional fourth note, as it settles into a cyclic pattern after 1:17.

```
5 5 5 5 5 5 5 5 ♭6 6 6 6 6 6 645|5 5 5 5 5 5 5 5 5 ♭6 6 6 6 7 7 6 6
1 1 1 1 1 1 1 1  1 1 1 1 1 1 1 1|1 1 1 1 1 1 1 1 1  1 1 1 1 1 1 1 1
```

Figure 10. Full riff of "Lose Yourself," with "touring" ^5-^6-^7-^6 progression.

In this larger context, the double neighbor note progression around ^5 is subsumed in a larger stepwise rise and fall. The full LY riff establishes scale degree ^5, embellishes it with the double neighbor note motion, and then takes a little tour, rising to the seventh scale degree and falling back to the opening fifth. In calling this rise and fall pattern a "tour," I am following music theorist Christopher Doll, who devotes an entire section of his 2017 study, *Hearing Harmony: Toward a Tonal Theory for the Rock Era,* to the analysis of harmonic-melodic "schemes" like this one. In Doll's analysis, many common popular music chord progressions use a simple stepwise melodic progression in one voice – a "scheme" – to tie together a short series of chords. The scheme may give rise to the actual melody of a song, organize the accompanying harmonies underneath or, as here, generate a repeating ostinato or riff. Doll identifies a class of schemes that, like the LY riff, start on the fifth scale degree, rise up through either the flat or the natural sixth scale degree (or both) to the flat seventh scale degree, and then fall back to the fifth.[5] In *Hearing Harmony,* he discusses dozens of well-known songs that fit into one of these closely related schemes, all of which predate the production of "Lose Yourself" – and of course there are many more: it is in the very nature of "schemes" like this to be conventional, for they are the modern harmonic equivalent of the voiceleading patterns codified in earlier counterpoint treatises, the "common practice" of jazz and pop musicians as they have written songs over the last hundred years.

Once Doll points out the widespread use of this type of scheme, a musicologist can trace the conventional expressive context it often provides. Doll notes that the melodic-harmonic scheme where root and fifth of a minor triad are decorated by a progression up by half-steps from the fifth came into popular music through jazz, often bringing with it a sense of suspenseful dread. One of the earliest examples is Artie Shaw's 1938 instrumental recording, "Nightmare," but the one most people know is John Barry's theme for the James Bond films (Figure 11):

---

[5] Christopher Doll, *Hearing Harmony: Toward a Tonal Theory of the Rock Era* (University of Michigan Press, 2017), pp. 137-45. Doll himself calls these patterns "meta-schemas," but "schemes" captures the essence of his concept while lowering the level of jargon.



Figure 11. John Barry, "James Bond Theme," *Dr. No,* 1962.

The opening move from ^5 to ^b6 over a tonic pedal is shared by Barry's theme and Bass's riff, and the dark expressive content matches as well. (Bass notes that, since Eminem was not a trained musician, he would provide him with clear emotional cues when playing him in-progress backing tracks like those for "Lose Yourself," explaining to him that a given track was "happy," or "sad," or "angry.")[6]

Any musician alive would know this famous movie theme; thus there is no reason to doubt that guitarist Jimmie Page, who was actually working as a studio musician on the London scene in 1962, would have been well aware of it when he created the tense guitar riff that underpins Led Zeppelin's 1975 megahit "Kashmir." Page himself traced the root of this ingenious piece of guitar composition to his experimentation with open tunings and fingerstyle acoustic blues; in his mind, it linked up with the darker side of the blues, the work of Delta blues legends like Skip James (who played in open D minor tuning) or Robert Johnson (who favored open D major). Both these guitarists from the 1930s had a favorite "trick" or scheme for executing the turnaround at the end of a blues stanza:  while playing a repeated note on one or more open strings, usually the tonic or the fifth, they would "walk" chromatically up or down an adjacent string or strings, creating a strong directional drive into the next verse. (Figure 12 provides a characteristic example from Robert Johnson.)

---

[6] "I couldn't explain to him in musical terms at that time what we were gonna write, but he seemed to understand me when I said that we would be doing a happy song or a sad song or an angry song. He can understand those emotions, so that's how he was able to communicate with me on musical terms." Jeff Bass interview, *billboard.com,* February 26, 2017.



Figure 12. Chromatic descending blues turnaround in the style of Robert Johnson, 1930s.

Page's riff for "Kashmir" turns this blues progression around, walking the fingers *up* one string while hitting notes on the open string(s) around it; it sets the prototype for an entire class of "heavy" guitar riffs that rise from the fifth scale degree and circle back to it. Like the riff in "Lose Yourself," the "Kashmir" riff (Figure 13) begins with the guitarist fingering a power chord made up of the tonic (^1) and fifth (^5) scale degrees of D. (In this case, the pinky plays the ^1, while the index plays the ^5.) As in "Lose Yourself," the next chord moves the ^5 to ^b6 by sliding its finger one fret up the fretboard. "Kashmir" continues the motion chromatically, moving past the lowered sixth (^b6) to the raised sixth (^6) and the minor seventh (^7). Figure 13 shows the progression as it would be played on a guitar in Page's favored DADGAD tuning;[7] this set of moves is more challenging for the fingers than the very basic "Lose Yourself" riff, but, crucially, the basic move from the "Lose Yourself" riff is already there in "Kashmir" – and even in the same key.

---

[7] "DADGAD" tuning was a non-standard tuning favored by British folk musicians, and close to the open tunings used by Delta blues musicians. Its name simply lists the notes to which the guitar strings should be tuned, from lowest to highest. To put a guitar in standard EADGBE tuning into DADGAD, one tunes the B string down to A, and both the low and the high E strings down to D. DADGAD is thus one of a number of "drop D" tunings commonly used in blues and rock.





Figure 13.  The four power chords used in the riff for Led Zeppelin, "Kashmir" (1975). Compare with "Lose Yourself," in Figures 7-8 above.

The suggestion here is not that the authors of "Kashmir" have a copyright claim against the authors of "Lose Yourself." (Although, given that the two tracks are in the same key, use the same basic melodic and harmonic progression, feature a large orchestra punctuating and doubling the riff, and have a similarly dark, portentous expressive tone, an ambitious musicologist could try to argue that there is an actionable "pattern of similarities," as has been adduced in some recent high-profile copyright cases.) *Page's "Kashmir" riff simply serves as a reminder that there is a set of conventional progressions in guitar-based rock music, derived from fundamental acoustic and technical properties of the instrument and a set of grips and finger movements that create coherent, easily understood melodic lines.*

"Kashmir" is deservedly famous because it so perfectly embodies the particular scheme that starts by rising by half step from the open fifth of a power chord, but its version of the scheme is not precisely identical to "Lose Yourself": Page's riff never uses ^4, the lower neighbor of scale degree ^5, while "Lose Yourself" moves directly from its ^b6 to ^7, not stopping, as Page's riff does, on the natural ^6 in between. Convenient for a musicologist trying to make the case that "Lose Yourself" is a guitar cliché would be at least one other riff, ideally composed after "Kashmir" but before "Lose Yourself," which splits the difference between them. Does this "missing link" riff exist?

Consider Tool's 1995 track, "Sober." Its riff is written to be played, like "Kashmir," in a drop D tuning, moving a power chord shape across the upper strings while using the low D as a pedal tone. The rat-tat-tat strumming pattern and overall melodic scheme is the same as "Kashmir," but Tool guitarist Adam Jones transforms Page's riff in ways that make the result closer melodically to "Lose Yourself," and allows us to hear all three tracks as substantially similar expressions of the same guitar rock convention. Figure 14 provides a concordance of melodic motion in these three riffs, eliminating repeated notes and motions to focus on lining up the "moves" that all three riffs share.

```
Kashmir:         5    b6                 6 7      5

Sober:           5    b6  4 b6 5 4 b6    7        5

Lose Yourself: 5      b6  4    5    b6   7 b6  5
```

Figure 14. Melodic reduction of three power chord riffs moving between ^5 and ^7.

As Figure 14 shows, all three riffs begin by moving back and forth between ^5 as the top note of a power chord and the upper neighbor ^b6. And they all reach one scale degree higher to ^7, before falling back to the ^5. "Sober" and "Lose Yourself" both add ^4 as a lower neighbor note to ^5. (Tool's riff winds around ^5 more times, but the basic move is the same.) "Kashmir" uses the raised sixth scale degree ^6 as a passing tone to ^7, while "Lose Yourself" adds the downward passing motion ^7 ^b6 ^5 as it returns to the opening power chord.

Let me be clear:  the point here is not to argue that any of these riffs should be considered to infringe on each other because they fail the extrinsic musicological test of substantial similarity. Tool has often, to its fans' delight, played "Sober" live in concert as a medley with "Kashmir," openly drawing attention to the lineage of heavy riffs they partake in – and no one from Led Zeppelin has ever threatened litigation. Jeff Bass's riff for "Lose Yourself" was clearly written from within this lineage, and no one from either Tool or Led Zeppelin has taken him to task for "copying their unique expression." Although there is no evidence that any of these riffs was intentionally designed as a "sound-alike," *all three riffs do sound alike.* They sound alike because they take advantage of (1) the common expressive possibilities enabled by our shared Western tonal language (2) the common techniques of working with guitars under heavy amplification; and (3) a common lineage of dark, heavy riffage in blues-rock music.

## 2.   COMPARISON OF "LOSE YOURSELF" and "EMINEM ESQUE"

### 2.1. Implications of "thin" copyright protection

The purpose of my detailed, exhaustive analysis of the structure and historical antecedents of the "Lose Yourself" guitar riff above should now become clear. Insofar as it is established that a musical expression is purely generic, the bar for substantial similarity rises. The existence of "prior art" is not simply a defense against the assertion of copying. Detailed description and analysis of prior art defines the "space" within which a claim of copyright infringement can work:  *if large portions of a given piece of music are generic and commonplace, then another piece of music can both work and sound very much like it without infringing.* In effect, two pieces may sound "the same" based entirely on the generic, non-copyrightable features they share, especially if those generic features represent a large percentage of the total musical expression.

Imagine an extreme case in which a composer invents an entire musical language, or a customized tuning system that creates a completely new set of musical intervals. In principle, even a piece of music that was at no point identical to one of this composer's own works could be argued as derivative of it. (This may seem far-fetched, but avant-garde composers like Arnold

Schoenberg, Harry Partch, and La Monte Young have thought this way.) On the other hand, if a piece of music uses many generic elements, if it "takes the path of least resistance," given the existing tonal and instrumental languages of its genre, it may be very effective as music, and become very popular, but still create only a thin copyright space within which subsequent works could be judged to be derivative of it. In that narrow space, it would require an extraordinarily strong degree of similarity to be "substantial"; in some cases, one might deem that only exact, note-for-note copying would rise to the level of substantiality required for a copyright claim.

My detailed deconstruction of the "Lose Yourself" riff is designed to make this case. It is my opinion that this riff is largely generic, based on conventional moves on the guitar and easily subsumable into a lineage of similar riffs that use the same moves and share the same expressive choices. Thus, when comparing a potentially infringing work, the musicologist will need to consider the two pieces of musical expression at very close range, because even small differences can puncture the paper-thin copyright such generic musical expressions can enjoy. In the discussion that follows, I will therefore place the guitar parts of "Lose Yourself" (LY) and "Eminem Esque" (EE) under my musicological microscope, where they will disclose more than enough differences in detail to make clear that they are too far apart to squeeze together into the thin space of copyright around "Lose Yourself." My exposition will follow the same course as my analysis of LY alone, discussing (2.2) the first two notes, then (2.3) a third, and finally (2.4) all the notes of the two riffs.

## 2.2. The first two notes.

Hopefully, if the reader has retained one fact from the analytical discussion above, it is that LY is built around two chords *that outline a rising melodic line.* The first chord of LY is a power chord with ^5 on top, and the second retains the bass but moves the melodic note upwards by half-step (one finger up one fret) to create an upper neighbor figure. This half-step rising motion gives the riff a menacing rise in tension, akin to the first two notes of Shaw's "Nightmare" or the "James Bond Theme." It also begins an eventual rise that will reach one more step to ^7, and in this, resembles the famous riff from Led Zeppelin's Kashmir.

Thus it is striking that as soon as the second note of their riffs sounds, LY and EE diverge on this crucial expressive gesture. Figure 15 reproduces my analytical reduction of the opening of LY (Figure 5), and compares it with the analogous opening of EE.

```
LY:  5 5 5 5 5 5 5 5  (b)6 6 6 6
     1 1 1 1 1 1 1 1    1 1 1 1 ...

EE:  5 5 5 5 5 5 5 5    4 4 4 4 ...
     1 1 1 1 1 1 1 1    1 1 1 1
```

Figure 15. Comparison of LY and EE riffs:  opening gesture

The two riffs immediately diverge, with EE *falling* from ^5 to ^4. From the very first melodic gesture, they differ in the most basic way a melody can:  one goes up, while the other goes down.

## 2.3. The third note (initial divergence)

It will be noted that I did not transcribe the entirety of the opening loop in LY or EE. In fact, LY does not immediately present another note, so I could have added in four more ^b6's on that line. But EE *does* change notes, introducing its third note right away. Let us compare, then, the two riffs in their three-note forms (Figure 16).

```
LY:   5 5 5 5 5 5 5 5  ⁽ᵇ⁾6 6 6 6 6 6 6 645
      1 1 1 1 1 1 1 1     1 1 1 1 1 1 1 1

EE:   5 5 5 5 5 5 5 5     4 4 4 4 6 6 6 6
      1 1 1 1 1 1 1 1     1 1 1 1 1 1 1 1
```

Figure 16. Comparison of LY and EE riffs:  the first three notes

Our previous analysis of LY primes us to recognize that its third note is ^4, the lower neighbor. This is the note that EE introduced immediately, followed, as we now see, by the logical upper neighbor, ^6. At one level, the two riffs have converged – *but,* I would argue, not closely enough, given the extreme basicness of this musical material. Let us set aside the very different rhythmic profiles:  whereas EE presents its three notes in equally spaced groups of four, LY "sneaks in" its lower neighbor as an unaccented upstroke in between the regular beats. More importantly, even though both riffs present a double neighbor note motion, they are, depending on how you imagine the transformation, either *mirror inversions* or *retrogrades* of each other. Where LY moves *up,* then *down* (5-6-4-5), EE moves *down,* then *up* (5-4-6-5). This may seem like a small point, but it is the difference between "To be, or not to be" and "To be, or to be not." A minor change in word order, yes – but only one of them is Shakespeare.

## 2.4. The fourth note (further divergences)

It is, of course, a matter of expert opinion whether the generic nature of this double neighbor note riff is so pronounced that simply turning it upside down or running it backwards suffices to remove enough derivative nature to deny that there is a legally substantial similarity. I believe it does, and I think that the common practice of Western music supports me. In music theory, we recognize a limited number of ways that a melodic line can be systematically *transformed* by some operation:  one can change its reference pitch level (transposition); one can change its speed by a fixed ratio (augmentation or diminution); one can reverse the up/down direction of its intervals (inversion); or one can reverse the order of its notes in time (retrograde). In our musical culture, there is a very strong consensus – a consensus reflected in copyright law – that some of these transformations are more disruptive to melodic identity than others. It is generally accepted, for instance, that transposing a melody to a different key does not change its identity, and would be no defense against infringement. The same is true for playing a melody twice as fast or slow. But inversion? Would it still be "My Country 'Tis of Thee" if the first melodic interval went down, instead of up? (I.e., 1 1 2 7 1 2 ≠ 1 1 7 2 1 7)? Imagine singing the first phrase of "Joy to the World" starting from the bottom (last) note and rising to the (first) top!

Thus I submit that inverting the first three notes of LY into EE (or retrograding them, which would give the same result) *changes its identity enough to make it a different melody,* especially within the narrow, strict parameters of a very thin copyright protection for something so basic.

But even if one were to stretch the common practice of Western music so far as to argue that we perceive inverted/retrograde versions of the same melodic contour as intrinsically "the same" (and my appeal above to the speed with which familiar tunes become unfamiliar when you do this argues the average man on the street would not), if we zoom out to encompass all the notes involved in the LY and EE riffs, thus taking in more of the musical works in which they appear, it becomes increasingly difficult to argue that they are "the same" in any meaningful way, over and above their common adherence to a well-worn melodic scheme and a familiar set of playing techniques for guitar.

```
LY:

5 5 5 5 5 5 5 5 6 6 6 6 6 6 6 4 5 | 5 5 5 5 5 5 5 5 6 6 6 6 7 7 6 6
1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 | 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1


EE:

5 5 5 5 5 5 5 5 4 4 4 4 6 6 6 6 5 5 5 5 5 5 5 5 4 4 4 4 2 2 2 2
1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 | 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1 1

                                                      7 7 7 7
                                           (2nd time) 1 1 1 1
```

Figure 17. Comparison of LY and EE riffs: full cycle.

Figure 17 shows one full cycle of both LY and EE. (Both patterns are to be understood to repeat internally, with EE changing its last four notes as shown.) We have already noted that there is an important divergence in the first half of the pattern: although the notes are the same, they appear in a different order, which changes the melodic contour. In Figure 17, I have highlighted the location and number of the resulting different notes, roughly, 11 out of 33, or about 33%. In the second half of the riff, the first time through, fully half the notes (50%) are different, with a slight convergence the second time through, where about 38% (12 out of 32) are different.

Academically trained musicologists are uncomfortable with this type of note counting, associating it with an overly mechanistic or pseudo-scientific way of analyzing music. And in this case, just pointing out the number of notes that fail to line up between LY and EE actually *understates* the difference between them. It does not highlight, for instance, how unusual the second half of the EE riff is. As I argued in detail above, the basic "rule" of the melodic scheme that LY shares with a number of predecessors is that, for it to work, it has to start from scale degree ^5, the fifth above the tonic, use that note as a lower boundary or "anchor" note, and then go up, by half or whole steps, from there. A preponderance of rising motion is important because it gives the line suspense and drive. A preponderance of stepwise motion is important, because it forges the rising line into a single span that leads the ear through any complex intervals it might use.

The first half of EE already breaks this rule (it moves down from $\hat{5}$), but somewhat retrieves the situation by treating $\hat{4}$ as the lower item in a double neighbor note motion that eventually gets to $\hat{}^\flat 6$. The second half of the riff drops from $\hat{5}$ to $\hat{4}$ again, and then does something so disruptive to the melodic scheme that it cannot be salvaged:  it jumps down again, landing on $\hat{2}$. The use of what music theory would call the *supertonic* is unprecedented in this expressive context. The LY guitar riff *never* touches $\hat{2}$, nor does scale degree $\hat{2}$ appear in any of the examples of prior art, from the James Bond Theme to Tool's "Sober," that I have used to define the sound world of LY. This move is so strange that it has to be "erased" for the EE riff to function at all; every second time through the riff, the offending $\hat{2}$ is replaced by $\hat{7}$, which allows a semblance of the "rising line from $\hat{5}$" scheme to coalesce, however briefly.


### 2.5. On the pragmatics and ethics of creating a "sound-alike" track

Let me finish by providing a musicological perspective on the "sound-alike" character of "Eminem Esque." In recent high-profile cases of musical copyright litigation, the belief that a composer had deliberately tried to make their composition "sound like" a famous original has been pivotal. In some cases, defendants seemed to damage their own credibility by denying obvious attempts to invoke an earlier musical work. But, as I have tried to show above, a large percentage of even the most famous popular songs consists of commonplace or conventional elements, and a constant process of reworking and reviving harmonic-melodic schemes means that many songs sound to some degree like each other. A skilled artist can intuitively hear how to capture the sound of a previous track by imitating just those aspects of its expression which are the common coin of music, and altering the distinctive and original aspects enough so that they do not infringe. Of course, this can be a delicate dance, and it is possible to imagine the creator of a particular sound-alike track stepping over the line into actionable direct copying. But the simple fact that one track sounds like another is not *by itself* evidence of infringement. By carefully outlining the exact amount of commonplace expression in the original riff, musicology can clarify where to draw the line, and whether a given sound-alike has crossed it. Let me add two further observations to support my opinion that the authors of "Eminem Esque" did not.

1.  First, there was no attempt to hide their tracks. By calling their track "Eminem Esque," the authors tell any potential listener that they are trying to evoke a track associated with Eminem, and, once having listened, anyone familiar with Eminem's oeuvre would know that the track was "Lose Yourself." By inviting this scrutiny, the authors betray not the intention to steal and get away with it, but the confidence that they had created something different enough from "Lose Yourself" to pass the intrinsic test.

2.   Second – and this is a crucial point – as a piece of music, the riff in "Eminem Esque" is objectively "worse" than the one in "Lose Yourself." *In order not to copy the original too closely, the authors of EE accepted that they would have to write something less idiomatic, less structurally coherent, and less effective than the original.* Once you are committed to the specific melodic progression implied by LY, a "limited number of expressive choices [are] available," to paraphrase and repurpose a formulation from the discussion of Gray v. Hudson above. As a musicologist, I would submit that LY had already made all the best expressive choices, and in order to stay far enough away from it, the

authors of EE had to make a series of choices which are aesthetically less successful. Here is what they sacrificed:

a. The initial move down from $\hat{5}$ to $\hat{4}$ in EE is less expressive than the immediate move up in LY. Not only is this a lowering of melodic tension (falling rather than rising), but the move in EE does not result in a significant increase in harmonic tension either. The move from a perfect fifth ($\hat{1}$-$\hat{5}$) to a perfect fourth ($\hat{1}$-$\hat{4}$) is from one perfect consonance to another, providing little change in harmonic color, while the move from a perfect fifth to a minor sixth ($\hat{1}$-$^{\flat}\hat{6}$) is much more dramatic. Many memorable guitar riffs move from $\hat{5}$ to $^{\flat}\hat{6}$ over a sustained bass note; the move from $\hat{5}$ to $\hat{4}$ over that same bass is much less common, because it is much less interesting.

b. The fact that the second half of the riff *continues* to descend, returning to $\hat{4}$ and then leaping down to $\hat{2}$, means that it continues to lose energy. Even worse, there is no stepwise connection either in or out of this energy-sapping $\hat{2}$, so the riff as a whole lacks melodic coherence. Even bringing in $\hat{7}$ at the end cannot save it: yes, the $\hat{7}$ does, abstractly, connect up with the $^{\flat}\hat{6}$ earlier in the riff, but not tightly enough to rationalize the zig-zag progression of the riff as a whole. The clear rising profile of the LY riff is much simpler and stronger.

The authors of "Eminem Esque" knew they were playing pretty close to the line in their evocation of Eminem and "Lose Yourself" – thus their title. So they were willing to settle for a clearly inferior version of its generic James Bond/Kashmir/Sober rising riff – one that uses the wrong scale degrees, that fails to marshal harmonic tension effectively, that doesn't even *rise* consistently – in order to stay far enough away from the original to be responsible. Given the narrow space within which they were working, a space narrowed by the generic and commonplace nature of this kind of riff, a space within which there were already not many choices, they made choices that were not only different, but *deliberately* different. They deliberately marred their own work, to make sure that no listener would mistake it for the original.

## EXHIBITS USED

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.

## LIST OF PUBLICATIONS

See CV of Robert Fink, Ph.D., attached hereto as Exhibit A.

## QUALIFICATIONS

I am Professor of Musicology, Professor of Humanities, and founding Chair of the Interdisciplinary Program in Music Industry, as well as Associate Dean for Academic Affairs, in the UCLA Herb Alpert School of Music. I am a Past President of the US Branch of the International Association for the Study of Popular Music (IASPM-US). I am the author of *Repeating Ourselves,* a study of American minimal music as a cultural practice (California, 2005) and lead editor of the award-winning collection *The Relentless Pursuit of Tone: Timbre in Popular Music* (Oxford, 2018). I have published numerous widely-cited articles on popular music and analysis in prestigious academic journals, including the flagship journals of the American Musicological Society (AMS) and the Society for American Music (SAM). My scholarly work largely focuses on music after 1965, with particular attention to avant-garde music, popular music, and analytical techniques. I have taught at UCLA for over twenty years, and before that at the Eastman School of Music. I earned a Ph.D. in Music History and Literature from the University of California, Berkeley (1994), an M.A. in Music Theory from the Eastman School of Music (1988), and a B.A. in Music from Yale University (1983). I have been the recipient of the Kurt Weill Prize (best work on musical theater, Weill Foundation), the Ruth Solie Prize (best edited collection, AMS), and a Stanford Humanities Fellowship (1998-99). In 2006 I was Visiting Associate Professor of Music at Yale University, my alma mater (B.A. in Music, 1983). I have provided expert testimony and forensic musicological consultations for almost 20 years, and am currently working with industry professionals on a concentration in forensic musicology for the UCLA Music Industry IDP.


## COMPENSATION


I have been engaged for this assignment at a rate of $350 per hour for this report. Moving forward, for any deposition testimony and/or trial testimony, my hourly billing rate will be the same, plus travel expenses and time. The amount of fees is not contingent upon the opinions expressed herein or on the outcome of this matter.


## LIST OF CASES

*Eight Mile Style LLC v New Zealand National Party* [2017] NZHC 2603

RICKEY ALLEN v. DESTINY'S CHILD, ET. AL. Civil Action No. 06-CV-6606


My report, with supporting exhibits, is contained herein, and presents a summary of my opinions and the bases and reasons therefore as of this date. To the extent any additional information is produced by either party, I will be prepared to incorporate any such additional information into my report, or otherwise to amend or supplement my report as appropriate. This report is to be used only for the purpose of this litigation and may not be published or used for any other purpose without prior written consent.

Respectfully submitted,

Robert Fink, Ph.D.
rfink@humnet.ucla.edu
310.743.6666

Exhibits Attached Herein:

Exhibit A       CV of Robert Fink, Ph.D.