

# Transcript of Eric Fruits, Ph.D.

**Date:** August 11, 2021
**Case:** Beatbox Music Pty, LTD. -v- Labrador Entertainment, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT
B

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3   ----------------------------x

4   BEATBOX MUSIC PTY, LTD.,        :

5                  Plaintiff,       :

6      v.                           :   Case No.

7   LABRADOR ENTERTAINMENT, INC. :   2:17-cv-6108

8   D/B/A SPIDER CUES MUSIC         :   MWF (JPRx)

9   LIBRARY, a California           :

10  corporation; NOEL PALMER        :

11  WEBB, an individual; MICHAEL :

12  COHEN, an individual;           :

13  LABRADOR ENTERTAINMENT,         :

14  LLC; MCPC HOLDINGS, LLC;        :

15  WEBB FAMILY TRUST and DOES      :

16  1-20, inclusive,

17                  Defendants.     :

18  ----------------------------x

19           Deposition of ERIC FRUITS, PH.D.

20                Conducted Virtually

21             Wednesday, August 11, 2021

22                   1:03 p.m. CT

23  Job No.:  391257

24  Pages: 1 - 60

25  Reported by: Joanne E. Ely, CSR, RPR

1    Deposition of ERIC FRUITS, PH.D., conducted

2  virtually.

3

4

5

6

7

8    Pursuant to notice, before Joanne E. Ely, a

9  Certified Shorthand Reporter, and a Notary Public

10  in and for the State of Illinois.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3         HEATHER L. BLAISE, ESQUIRE

4         THOMAS S. KEY, ESQUIRE

5         BLAISE & NITSCHKE, PC

6         123 North Wacker Drive

7         Suite 250

8         Chicago, Illinois 60606

9         312.448.6602

10

11   ON BEHALF OF DEFENDANTS LABRADOR, NOEL WEBB,

12   and WEBB FAMILY TRUST:

13        DOUGLAS J. ROSNER, ESQUIRE

14        LAW OFFICE OF DOUGLAS J. ROSNER

15        2625 Townsgate Road

16        Suite 330

17        Westlake Village, California 91302

18        818.501.8400

19

20

21

22

23

24

25
```

1                      C O N T E N T S

2       EXAMINATION OF ERIC FRUITS, PH.D.              PAGE

3            By Ms. Blaise                              5

4

5                      E X H I B I T S

6                 (Attached to transcript.)

7

8       FRUITS DEPOSITION EXHIBIT                      PAGE

9

10       Exhibit A  Expert Report                       15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                 ERIC FRUITS, PH.D.,

3    having been duly sworn, testified as follows:

4        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5    BY MS. BLAISE:

6        Q  Hello, Mr. Fruits.  How are you today?

7        A  Good.  How about you?

8        Q  I'm well.  Thank you.

9           Is it Dr. Fruits or Mr. Fruits?

10       A  I don't care.  I have a Ph.D.  I'm past

11   that.  I guess doctor for the record.

12       Q  Okay.

13       A  But I will not hold it against you if

14   you slip.

15       Q  Okay.  Thank you.

16          Dr. Fruits, can you please state and spell

17   your full name for the record.

18       A  Sure.  My name is Eric Fruits, E-r-i-c

19   F-r-u-i-t-s.

20       Q  Great.  Thank you.

21          Have you sat for a deposition before?

22       A  Yes.

23       Q  How many depositions have you sat for

24   approximately?

25       A  Probably 15 to 20.

1      Q   And all of those cases where you sat for

2   depositions, were you a retained expert in all of

3   those cases?

4      A   Yes.

5      Q   Have you ever been -- any of those as a

6   party or all of them as a retained expert?

7      A   All of them as an expert.

8      Q   And are all of those cases --

9      A   Wait one moment.  My phone is ringing.

10   I've got to disconnect it here --

11      Q   Sure.

12      A   -- so I don't get any more interruptions.

13         I apologize.  Can you repeat that?

14      Q   Are all of those cases identified in your

15   report every case that you've been retained as an

16   expert?

17      A   Not every case I've been retained as an

18   expert, but every case in which I have testified.

19      Q   Okay.  And so I'm sure you're familiar

20   with the ground rules --

21      A   Yes.

22      Q   -- but I'll go over them just for the

23   benefit of the court reporter.

24         As you know, there's a court reporter

25   here, and she's taking down everything that we

1  say.  So it's best that you wait until my question

2  is complete before you begin to answer; and

3  likewise, I'll try to do the same.  I'll wait to

4  speak again until you're done speaking; is that

5  fair?

6      A  Yes.

7      Q  And I'd ask that your answers be audible

8  and not head shaking or head nodding so that the

9  court reporter can take down your actual

10  answers --

11      A  Yes.

12      Q  -- fair?

13          And if I ask you a question that you don't

14  understand or that's confusing, I'd simply ask you

15  to ask me to restate the question.  Otherwise, if

16  you answer the question, I'll assume that you

17  understood it; is that fair?

18      A  Okay.

19      Q  Okay.  I want to go back to your education

20  starting post high school graduation.

21      A  Okay.  I did my undergraduate work.  I got

22  a business degree, bachelor of science in business

23  at Indiana University.  Then from there I went

24  to -- I worked for about a year and a half, two

25  years at Andersen Consulting, and then went to

1    graduate school where I got both a master's and a

2    Ph.D. in economics at Claremont Graduate

3    University.

4         Q   Is that the final level of formal

5    education?

6         A   Yes.

7         Q   Do you have any certificates?

8         A   No.

9         Q   Any additional training as it relates to

10   royalty calculations?

11        A   No.

12        Q   Have you ever provided expert testimony in

13   a music royalty case?

14        A   I don't believe so.

15        Q   And can you go -- was that including your

16   job history or just your educational history?

17        A   That's my education.

18        Q   Okay.

19        A   Were you asking for more?

20        Q   No, no.  That was correct.  I just thought

21   I heard a position in there too.

22            Can you go through --

23        A   Well, there was a small gap between my

24   undergrad and my graduate work.

25        Q   Okay.  Got it.

1        So starting with your first employment

2   post the age of 18, can you give me your

3   employment history?

4        A  Oh, my gosh.  After the age of 18?  Oh,

5   boy.  That's -- I haven't had to do this in a long

6   time.  Let's see.

7        Q  How about -- strike that.

8        Let's ask after your bachelor of science

9   degree.

10       A  Very good.  That's a little bit easier.

11       Q  Okay.

12       A  Because I had a lot of odd jobs after 18.

13       Q  Okay.  I'm sorry.

14       I assume nothing in the music industry.

15  None of those jobs were in the music industry --

16       A  No.

17       Q  -- correct?

18       A  No.  Do you still want me to give the

19  history or is that --

20       Q  Yes, please.

21       A  I was trying to avoid that.

22       Q  Sorry.  No, no.  You don't have to do the

23  post 18, just post your BS.

24       A  Okay.  Post BS I went to -- I worked at

25  Andersen Consulting for about two years or so and

1   then went to graduate school.  I did some teaching

2   while I was in graduate school at Pamona College,

3   Scripps College, at Claremont.

4         Then after that I was a -- after I

5   graduated with my Ph.D., I was a visiting

6   professor at Indiana University and University of

7   Southern California.

8         From there I began consulting with a firm

9   called Econ One in Los Angeles.  From there I

10  joined a firm called LECG, Law and Economics

11  Consulting Group, and then moved up to Portland

12  where I joined a firm called ECONorthwest or

13  ECONorthwest.

14        Then in around 2006, I started my own

15  firm, Economics International Corporation.

16  Throughout that time, ever since about 2002 or so,

17  I've been teaching at Portland State University.

18        And so currently, I have my own firm,

19  Economics International Corporation.  I also work

20  at Cascade Policy Institute and another think tank

21  called the International Center for Law and

22  Economics, and I also teach part-time at Portland

23  State University.

24     Q  Okay.  What's your title at Portland State

25  University?

1      A   Adjunct professor.

2      Q   Okay.  And what do you teach?

3      A   I teach courses in regulation, antitrust,

4   urban economics, industrial organization, and real

5   estate finance.

6      Q   Okay.  And in your capacity at your

7   current firm, what is your role?

8      A   Well, my main job right now that takes

9   probably about three-quarters to 80 percent of my

10  time is the vice president of research at Cascade

11  Policy Institute, which is a state-based think

12  tank that focuses on policy issues.

13          I also work part-time at International

14  Center for Law and Economics where my title is

15  chief economist, and I provide them economics

16  services and advice.

17          And then, you know, with my -- then the

18  other job I have is also as president of Economics

19  International Corporation.  I'm the owner and the

20  sole employee of that and that focuses mostly on

21  litigation consulting.

22      Q   Okay.  How much of your personal income

23  makes up your expert -- expert witness?

24      A   It varies from year to year, but now over

25  the past few years since I began working almost

1    full-time at Cascade, it's probably anywhere from,

2    say, 5 to 10 percent.

3        Q  Okay.  And are you familiar with the

4    income streams that emanate from music royalties,

5    the different kinds of income streams?

6        A  I'm somewhat familiar.

7        Q  Can you tell me your general understanding

8    of the different income streams that come from

9    music royalties?

10       A  Are you talking about with respect to this

11   case?  My knowledge is mostly limited to what's

12   described in my report in this case.

13       Q  I'm speaking generally, but if your

14   knowledge is limited to only what you know in this

15   case and that's your general understanding, then

16   that's fine as well.

17           So the income streams that emanate from

18   the exploitation of music rights.

19       A  I wouldn't say it's much greater than

20   what's -- than what's in my report.

21       Q  Okay.  So I'm asking you to tell me what

22   your understanding is.  As you're sitting here

23   today, what your understanding is of the different

24   types of income streams that emanate from the

25   exploitation of music.

1    A   Well, my understanding is that the main

2    source is through royalty payments.

3    Q   Okay.  And do you understand that there's

4    royalties that emanate from the exploitation of a

5    sound recording that is different from the

6    exploitation of the musical composition?

7    A   That sounds about right.

8    Q   Do you know the difference between a sound

9    recording and a musical composition?

10   A   Only in layman's terms.

11   Q   What's your understanding of the

12   difference between a sound recording and a musical

13   composition?

14   A   Well, a sound recording is just the

15   actual, for lack of a better term, the physical

16   sounds or the -- you know, the product itself.

17       The musical composition is the, you

18   know -- using lay terms, you know, the notes and

19   voices, you know, the artistic input that creates

20   that, that sound.

21   Q   Okay.  And do you know -- what's your

22   understanding of which royalties relate to the

23   exploitation of each of those components that go

24   into music?

25   A   I'm not sure I understand your question.

1      Q  Do you understand what kind of royalties

2  flow from the exploitation of each of those

3  components of music?

4      A  I don't think I -- I would say no, but

5  simply because I don't understand your question.

6      Q  Okay.  What's your understanding of what

7  royalties emanate from the exploitation of sound

8  recordings?

9      A  Again, I'm not sure what you're asking.

10  I'm -- you know, I would like to -- I think it

11  would be easier if we just stick to what's in my

12  report; and my report reflects probably, you know,

13  most of what I understand about what's relevant

14  from my report, so.

15      Q  Yeah.  But I'm allowed to ask you about

16  the basis of your report and the background of

17  your understanding in order to form the opinions

18  contained in your report and so that's what I'm

19  trying to do is --

20      A  Right.  So if that's what you're asking, I

21  think I describe in my report what the basis is.

22          It's based on the information that was

23  provided to me by counsel for Labrador and that

24  includes what's known as the Labrador agreement.

25      Q  Does the Labrador agreement provide you --

1      A  I'm sorry.  The Beatbox agreement.  I

2   apologize.

3      Q  Okay.  Does the Beatbox agreement provide

4   you with any understanding of what kinds of

5   royalties emanate from the exploitation of a sound

6   recording versus the exploitation of a musical

7   composition?

8      A  I don't recall right now.

9      Q  Okay.  What other documents did you review

10   in forming your opinions?

11      A  Each of the documents I reviewed in

12   forming my opinions are cited throughout my report

13   in the footnotes.  If you'd like me to read

14   through the footnotes, I could do that for you.

15      Q  Yes, that's fine, if that's what you need

16   to refer to.  Are you looking at your expert

17   report right now?

18      A  I'm looking at my expert report.

19      MS. BLAISE:  For the record, his expert

20   report will be marked as Exhibit A.

21      (Fruits Deposition Exhibit A marked for

22   identification and attached to the transcript.)

23      Q  Is the witness able to screen share?

24      A  Am I?  Yes.

25      Q  Okay.  So maybe let me screen share, and

1    then you can direct me.

2        A   Okay.  I think that would probably be more

3    appropriate.

4        Q   Yeah.  One second.

5            In the meantime -- we'll come back to

6    that.  We'll come back to that.

7            What's your understanding of net income?

8        A   In general or --

9        Q   In general.

10       A   In general, that is usually some measure

11   of revenues less some other measure of cost.  It

12   depends on what -- you know, what you're -- what

13   we're talking about, what type of product or what

14   type of accounting sheet you're looking at.

15           For example, in some cases, some people

16   consider net income to be simply revenues less

17   cost of goods sold.  Sometimes it could also

18   include returns and allowances.

19           Another measure of net income could be

20   subtracting out what's known as operating costs,

21   and then another measure of net income would also

22   include not just the operating costs but would

23   also include amortization, depreciation, taxes.

24       Q   Would third-party charges usually be a

25   reduction --

1          MR. ROSNER:  Objection.

2      Q  -- from a gross number --

3          MR. ROSNER:  Objection; the question is

4   vague.  It's ambiguous.

5          MS. BLAISE:  I haven't finished my

6   question yet.

7          MR. ROSNER:  Oh, I'm sorry.

8      Q  Would third-party expenses typically be a

9   deduction from gross income to arrive at a net

10  income figure?

11         MR. ROSNER:  Objection.  The question is

12  vague.  It's overbroad, and it is assuming a

13  conclusion.

14         MS. BLAISE:  Madam Court Reporter, are you

15  able to hear Mr. Rosner?

16         THE REPORTER:  Yes.  Did you say assuming

17  a conclusion?

18         MR. ROSNER:  Assuming a conclusion.

19         THE REPORTER:  If you could just speak up

20  a little bit.

21     A  I think it depends on what the -- on the

22  specifics.

23     Q  The specifics of what?

24     A  Well, for example, I'm working on a matter

25  right now where there is an issue of, you know,

1    where third-party costs would come from relative

2    to someone who is making the product themselves

3    versus buying the inputs from a third party and so

4    that depends on -- where that appears on the

5    income statement may depend on how those -- where

6    those costs come from.

7            So, for example, the product I'm thinking

8    of right now, because it's another matter I'm

9    working on, involves fish.  Some fish processors

10   actually catch the fish themselves and process it

11   themselves.  Other fish processors also buy fish

12   products that are preprocessed and then package

13   them themselves.

14           Those third-party costs would -- even if

15   they had identical costs and identical incomes,

16   those costs would appear in different places on

17   their income statement.  In the first one, it

18   would appear in the operating costs.  In the

19   second one, it may appear in the cost of goods

20   sold.

21           The total number you get for the net

22   income, and net income meaning net income less

23   cost of goods sold, less operating costs could be

24   identical, but the gross margin versus the net

25   margin could be very different.

1    Q  Sure.  But the example that you just
2  provided gave an example of third-party costs,
3  where it would be a third-party cost.  In other
4  words the company -- the secondary company, who is
5  fishing and repackaging versus a capital
6  expenditure operating cost because they're doing
7  the work internally, that wouldn't be a
8  third-party cost, right, because it's not a third
9  party.
10       It's internally; is that correct?
11    A  Right.  But what I'm saying is that
12  that -- although you may end up with the absolute
13  bottom line being the same in both of those cases,
14  if you were comparing, say, the gross margin of
15  those two companies, you'd have very different
16  gross margins.
17    Q  Sure.
18    A  And you'd also have totally different
19  operating costs between those two companies even
20  though the bottom-line income for each of those
21  companies were identical.
22    Q  Understood.
23       But is there a time when third-party costs
24  go into the operating expenses as opposed to a
25  third-party cost on -- as a deduction from gross

1   to net?

2          MR. ROSNER:  Objection; vague, overbroad.

3      A  Well, I'll have to give you my

4   understanding as an economist because I'm not an

5   accountant, and I'm not going to pretend to be

6   one.

7   BY MS. BLAISE:

8      Q  Okay.

9      A  What I'm describing from my experience is

10  that it really depends on a case-by-case basis on

11  how those -- how the firm treats those costs.

12     Q  Okay.  I'm going to go back to showing you

13  your expert report, which is marked as Exhibit A,

14  and you indicated that if we go to the footnotes,

15  we'll be able to determine --

16     A  Yeah.

17     Q  -- the document --

18     A  I think you'll have to start on -- I'm

19  sorry.  I didn't mean to interrupt you there.

20     Q  That's okay.  Go ahead.

21     A  So if you start in the first paragraph of

22  page 4, under assignment and background, one of

23  the sources I rely on is the agreement dated April

24  1, 2009, between Labrador and Beatbox, and that's

25  what's been referred to in the complaint as the

1  Beatbox agreement.

2       Q   Okay.  Let's just take it one-by-one.

3           So what within the Labrador-Beatbox

4  agreement, also known as the Beatbox agreement,

5  did you review in order to form the opinions

6  contained in your expert report?  And I can put up

7  the Labrador-Beatbox agreement too if you --

8       A   Well, I reviewed most of it, but I focused

9  on the two items that I block quote, which are

10 section 5 and section 9, which are, again, block

11 quoted on pages 4 and 5 of my expert report.

12      Q   Okay.  We'll go to that.

13          Directing your attention to I think what

14 you --

15      A   Oh, okay.  Yeah.  I didn't know if you had

16 a question.

17      Q   That's okay.

18          So you're talking about paragraph 5 that

19 you've block quoted here, and we'll go to 6 in a

20 second.  So you reviewed paragraph 5 in forming

21 your opinions.

22          I note that this is a block quote, but

23 you've added emphasis to the 50 percent of all

24 fees accruing?

25      A   Yes.

1       Q   And then going to the next section, that's
2   the other paragraph that you relied upon,
3   paragraph 9?
4       A   Yes.
5       Q   Okay.  And I note that you've emphasized
6   50 percent of all monies received.
7       A   Yes.
8       Q   Did you review any royalty statements?
9       A   I think, yes.  At least it's my
10  understanding that they are royalty statements
11  and so -- and if you want me to go through the
12  rest of the footnotes, I can do that too.  The
13  royalty statements, I believe, are cited in
14  footnote 3.
15      Q   Okay.  We'll get to that.
16          Okay.  Did you have a chance to review
17  footnote 3 so far?  I think it continues on to the
18  next page, so.
19      A   Yes.  Do you want me to read all those
20  file names?
21      Q   No, no, no.  I just want to make sure that
22  this is the extent of what you reviewed.
23          Is that correct, everything that's
24  identified in footnote 3?
25      A   That's my understanding, yes.

1     Q   Okay.  And then going back up to footnote

2  2, what is this that you reviewed in footnote 2?

3     A   Footnote 2 is a FAQ from APRA AMCOS.  FAQ,

4  meaning frequently asked questions.

5     Q   And what was the relevance of this FAQ in

6  your analysis?

7     A   The FAQ was to get the information on what

8  APRA AMCOS charges as an administration -- as an

9  administrative fee, which I believe is 15 percent.

10     Q   And where did you get the 15 percent

11  number from?

12     A   That is from the document itself, and I

13  quoted it in the footnote.  It says for every --

14  it says, quote, "For every dollar we collect,

15  about 85 cents goes straight back to songwriters,

16  composers, and publishers as royalties.  The

17  remainder is used to administer these royalties."

18     Q   Do you consider the word "about" to mean

19  exactly -- sorry.  Do you consider the word

20  "about" to mean exactly 15 percent?

21     MR. ROSNER:  Objection; vague and

22  ambiguous, and it asks for a legal conclusion.

23     A   I'm sorry.  Does that --

24     Q   Dr. Fruits, do you understand my question?

25     A   You're asking if I know what the word --

1    my meaning of the word "about" is; is that

2    correct?

3         Q  I'm asking you, yes, if you consider the

4    word "about" in forming your opinion to mean

5    exactly?

6         A  I do not.

7         Q  What do you consider the word "about" to

8    mean?

9         A  It means -- it means -- my -- as an

10   economist, I would guess that -- or I wouldn't

11   guess.  I would expect it to mean that that is,

12   say, an average, and that there is probably some

13   range around that average.  It can also reflect a

14   rounding.  It could be, say, for example, 84.9

15   percent or 85.1 percent.

16        Q  Would it be safe to say about might mean

17   approximate?

18        A  I think it could be used in that way.

19        Q  And so your analysis basing AMCOS' charges

20   on 15 percent, are you exactly stating that it's

21   exactly 15 percent or that it's some range around

22   15 percent?

23        A  I'm sorry.  Can you repeat that?

24        Q  Yeah.  Let me do a better job.

25           Earlier you testified that you believed

1  that AMCOS expenses -- what they charge is 15

2  percent.

3       Now that we've gone through what the word

4  "about" means, is your testimony still that they

5  charge exactly 15 percent?

6    A  I think my testimony would be that it's

7  about 15 percent.  If I had any other additional

8  information that showed otherwise, I could

9  incorporate that into my analysis.

10    Q  In all of the documents that you reviewed

11  at footnote 3, the royalty statements, was there

12  anything indicated in those documents that showed

13  what AMCOS is charging as an administration fee?

14    A  I don't think so.

15    Q  And in reviewing the documents that you

16  identified in footnote 3, was there anything in

17  those documents that indicated that Labrador was

18  not paid 50 percent of the monies received by

19  Beatbox based on those royalty statements?

20       MR. ROSNER:  Objection; vague, ambiguous,

21  overbroad.

22    Q  Dr. Fruits, do you understand my question?

23    A  Actually, I don't, no.

24    Q  Okay.  So you reviewed all of these

25  royalty statements; correct?

1    A  Right.  Yes.

2    Q  Was there anything in the royalty

3  statements that indicated to you that Beatbox did

4  not pay Labrador 50 percent of the money it

5  received based on those royalty statements?

6    A  Well it -- in the sense it -- plaintiffs

7  allege that they didn't receive the full royalty

8  payment because it should have been gross.  It

9  should have been before the administrative fee is

10  charged by APRA and AMCOS; and it should have not

11  been reduced by the amount of taxes that were

12  paid, that that would have been Labrador's

13  obligation to pay those taxes rather than to have

14  them taken out of the royalty payment.

15         To the extent that these documents

16  indicate that the payment to Labrador was net of

17  those tax payments, then it could be construed

18  that that's an indication of an underpayment under

19  the plaintiff's theory or under the Labrador

20  theory.

21    Q  By plaintiff, in your explanation, you

22  mean Labrador.

23    A  I mean Labrador, yes.

24    Q  Okay.

25    A  I apologize.

1      Q   Beatbox is the plaintiff in this case.

2      A   I know, and I realize I need to be more

3   clear about Labrador versus Beatbox, other than

4   plaintiff versus defendant.  I apologize.

5      Q   Okay.  So I want to go back up to

6   paragraph 9 that you block quoted from the

7   Labrador-Beatbox agreement.

8          This says, Sub-publisher, which is

9   Beatbox, shall remit to publisher, which is

10  Labrador, 50 percent of all monies received for

11  the exploitation of the library.

12         What's your understanding of the word

13  "received"?

14         MR. ROSNER:  Objection; vague, ambiguous,

15  overbroad, calls for a legal conclusion, fails to

16  include the context of this paragraph --

17         THE REPORTER:  I'm sorry.  I lost you.

18         MR. ROSNER:  I'm going to go ahead and

19  start over.

20         Objection; vague, ambiguous, overbroad,

21  calls for a legal conclusion, and fails to include

22  all provisions in this agreement in context.

23     Q   Dr. Fruits, did you understand my

24  question?

25     A   I forgot your question now.

1          MS. BLAISE:  Madam Court Reporter, could

2     you please read back my question.

3          (The Reporter read the record as follows:

4     What's your understanding of the word "received"?)

5      A  Well, my understanding is again -- my

6     understanding is based upon plaintiff's theory of

7     damages here, which is that the money that was

8     paid by -- by the people using the works.

9          And so I wasn't asked to make any sort of

10    contractual interpretations or legal conclusions.

11    I was simply retained to calculate the damages

12    based upon the plaintiff's theory of damages.

13    BY MS. BLAISE:

14     Q  Right.  But earlier in your testimony, you

15    said you relied on these two provisions in forming

16    your opinions in this report.

17         Is that not true?

18     A  That is true.

19     Q  Okay.  And so when you relied on paragraph

20    9 in forming your opinion, did you consider the

21    word "received"?

22         MR. ROSNER:  Again, calls for a legal

23    conclusion.

24     A  Did you say did I consider the meaning of

25    the word "received"?

1    BY MS. BLAISE:

2       Q   Correct.

3       A   I did, and again I was asked by counsel

4    for Labrador to interpret that as the payments

5    made by the -- by the individuals or organizations

6    using the work.  I was not asked to draw any

7    conclusions on what the meaning of received was.

8       Q   Okay.  So let me ask you this question.

9           If Beatbox received $85 from AMCOS for the

10   exploitation of a work, how much money would

11   Labrador be entitled to?

12          MR. ROSNER:  Objection; calls for

13   speculation, vague, ambiguous, calls for a legal

14   conclusion, and misstates the facts.

15      A   I don't think I can answer that question

16   with the information you provided.

17      Q   What other information would you need to

18   answer the question?

19      A   I would need to know to what extent there

20   were taxes taken out of it, for example.

21      Q   Is it your expert opinion that taxes

22   should be taken out of the $85 that comes into

23   Beatbox?

24      A   Well my --

25          MR. ROSNER:  Objection; vague, ambiguous,

1  overbroad, calls for a legal conclusion, and

2  assumes facts that have not been stated.

3  BY MS. BLAISE:

4      Q  Dr. Fruits, do you understand my question?

5      A  Yeah.  I think you're asking me to make,

6  in some cases, legal or factual conclusions that I

7  wasn't asked to do; and some of these issues I

8  think are not -- not within my scope, that these

9  are things that are to be determined by the finder

10  of fact.

11        My analysis was based upon plaintiff's

12  claim that --

13     Q  I want to correct you.  It's not

14  plaintiff.  It's --

15     A  I'm sorry.

16     Q  -- Labrador, the defendant.

17     A  Labrador's claim that they should have

18  received their royalty payment based upon the

19  amount paid by the users of the works rather than

20  the net amount received by Beatbox.

21     Q  But you'll agree that the contract says

22  received, the word "received"?

23        MR. ROSNER:  Objection to the question,

24  calls for legal conclusion, states facts not in

25  context.  There were many different clauses in the

1    contract.  You're asking him to interpret a

2    written agreement.  Objection; legal conclusion.

3         MS. BLAISE:  Are you finished with your

4    objection?

5         MR. ROSNER:  I am finished with my

6    objection.

7    BY MS. BLAISE:

8       Q  Dr. Fruits, did you understand my

9    question?

10      A  If the question is do I notice that that

11   part that I block quoted says the word "received,"

12   yes, I notice that.

13        And my understanding is that there is

14   some -- that one of the facts at issue is what the

15   meaning of that word "received" is.  I'm not going

16   to offer any conclusions on what that means.

17        My calculations were based upon the

18   assumption that Labrador's interpretation is the

19   correct one but I don't have -- I'm not concluding

20   whether that was the correct interpretation.

21      Q  Okay.  Let's go down to the next footnote.

22   We've already done 2.  We've already done 3.

23        What did you review as it relates to

24   footnote 4 in forming your opinion?

25      A  Footnote 4 is actually two sources.  They

1    both come from the Board of Governors of the

2    Federal Reserve.  One is the U.S./Australia

3    exchange rate, and the other one is the U.S./New

4    Zealand exchange rate.  That was used to convert

5    the amounts that were in Australian and New

6    Zealand dollars into U.S. dollars.

7        Q  Okay.  Going to footnote 5.

8            And what did you review at footnote 5?

9        A  Footnote 5 was a document provided by

10   Labrador indicating how many cues that Labrador

11   had that they claimed were to be exploited by

12   Beatbox and how many actually were.  I don't have

13   the document in front of me, so I can't tell you

14   much more.

15       Q  Okay.  Do you have any understanding about

16   production music licensing in Australia and

17   whether or not cues need to be registered with

18   AMCOS or not to be exploited?

19           MR. ROSNER:  Objection; vague, ambiguous,

20   overbroad, calls for a legal conclusion.

21       A  Not off the top of my head.

22       Q  Is there some document that you could

23   review that would allow you to answer that

24   question?

25       A  There might be, but I don't know as I'm

1    sitting here.

2        Q   Are you aware of any document that you

3    could review that would allow you to answer that

4    question?

5        A   I don't recall.

6        Q   Did you review any document that would

7    support the conclusion that Beatbox provided --

8    I'm sorry -- that Labrador provided Beatbox with

9    632 -- I'm sorry -- 6,321 cues?

10       A   If you take a look at my report, I am not

11   offering any conclusions.  In fact, it clearly

12   says that Labrador alleges this.  Again, this is a

13   factual issue that I think is better left to a

14   Judge or a jury.  I am just offering under the

15   assumption that Labrador's claims are factually

16   correct.

17       Q   So your analysis on the assumption that

18   there would have been lost income had Beatbox

19   registered the alleged 6,321 cues, do you have any

20   basis to state that those cues would have been

21   licensed?

22       MR. ROSNER:  Objection; calls for

23   speculation, ambiguous, overbroad.

24       A   Again, for purposes of my analysis, this

25   was -- these were facts I was asked to assume and

1    to base my calculation on those facts, which would

2    then be determined whether those facts are

3    accurate or not by the finder of fact.

4          If it turns out that those cues either

5    could not be exploited or for some other reason,

6    then I can adjust my numbers, if I had different

7    information.

8    BY MS. BLAISE:

9      Q   Well, my question is a little different.

10         Can you say that had those cues been

11   registered, they would have been licensed?

12         MR. ROSNER:  Objection to the question.

13   Objection; speculation, speculative, vague, and

14   it's overbroad.

15     A   I think I answered that question.

16     Q   I don't think you have.  My question is --

17         MR. ROSNER:  Objection to -- objection;

18   argumentative.

19     Q   I'm entitled to an answer.

20         So can you say that had the 6,321 alleged

21   cues been registered, that they would have been

22   licensed?

23         MR. ROSNER:  Objection; vague, ambiguous,

24   overbroad, and speculative, and includes facts

25   that have not been established.

1      MS. BLAISE:  I agree.  These are all

2  exactly the point.  This was based on an

3  assumption, and so I'm asking him to flesh out his

4  assumption and how he arrived at his calculations.

5      MR. ROSNER:  Let me respond.  Those

6  matters will be brought in front of a jury along

7  with his opinion, and it will be up to them to

8  make that determination.

9      MS. BLAISE:  Make your objection, Doug.

10  Make your objection, and let me ask my question.

11      MR. ROSNER:  Well, you're arguing with me

12  on the record.  I'm going to make my record

13  as well.  And I did make my objection, calls for

14  speculation.  He's given you his answer.

15    A  My answer was that was something that I

16  was asked to assume and that my calculations were

17  based on that assumption.  Because it was an

18  assumption that I used, I don't have any

19  information other than what was presented in this

20  footnote to support that.

21      And so if there is other information that

22  either supports that, I would probably incorporate

23  that at trial.  If there's new information that

24  rebuts that, then I'm prepared to readjust my

25  calculations.

1      Q  Dr. Fruits, is an assumption based on a

2  speculation?

3      A  I don't understand that question at all.

4      Q  Do you understand what an assumption is?

5      A  I do.

6      Q  Okay.  Can you tell me what an assumption

7  is?

8      A  An assumption is just a state of the world

9  that you are acting as if it is true.

10      Q  Okay.  And can you tell me what a

11  speculation is?

12      A  A speculation would be more or less just a

13  wild guess.

14      Q  What's the difference between an

15  assumption and a speculation, in your opinion?

16      A  This is kind of a silly question but an

17  assumption -- an assumption is a state of the

18  world that may or may not be true but you are --

19  you have some expectation that it's accurate.

20          A speculation -- what I think of as

21  speculation, as an expert, is a conclusion that is

22  based upon no foundation.

23          Now you can have -- and a conclusion is

24  something that is based upon some sort of

25  analysis, and that conclusion can be based on

1   assumptions.  As assumptions change, then your

2   conclusions can change too.

3       Q  Do you understand that music licensing

4   requires someone to want to license the work?

5           MR. ROSNER:  The question is vague,

6   ambiguous, overbroad, and speculative.

7       A  I'm sorry.  What was the question again?

8       Q  Do you understand in music licensing that

9   you need to have a person who wants to license

10  the music?

11      A  I think that would be an acceptable

12  assumption.

13      Q  And so would you agree that just by

14  putting a certain number of cues into the

15  universe, into exploitation, into distribution,

16  that that doesn't mean that you have an end user

17  who wants to license those cues?

18          MR. ROSNER:  Objection; vague, ambiguous,

19  and overbroad, and calls for speculation.

20      A  I think, broadly speaking, that's probably

21  an accurate assumption.

22      Q  Do you contend that musical cues are

23  commodities?

24      A  I have no opinion on that.

25      Q  Did you make any type of assumption

1    relating to cues being treated as commodities in

2    forming your opinion?

3        A  Not that I'm aware of.

4        Q  In forming your opinions, did you consider

5    that all cues are equally valuable and marketable?

6        A  I'm sorry.  What was that again?

7        Q  In forming your opinion, did you consider

8    that all cues are equally valuable and marketable?

9        A  I didn't offer any -- I have no opinion on

10   that.

11       Q  Okay.  Do you have a list of all the

12   assumptions that Labrador's counsel provided you

13   with?

14       A  They should be embodied in my report.

15       Q  Can you direct me where they are in your

16   report?  I can scroll up or scroll down as you

17   direct.

18       A  If we go to page 2, first paragraph, it

19   states, Assuming Beatbox Music is liable for

20   damages.  So that's one assumption.

21       Q  So you're --

22       A  I'm not finished.

23       Q  Okay.

24       A  Well, you asked for all the assumptions;

25   am I correct?

1      Q  I did.  Go ahead.

2      A  I guess implicit in page 4 under

3  assignment and background, another assumption

4  would be Labrador's counterclaims of, among other

5  things, breach of contract, breach of fiduciary

6  duty, and negligence that was arising out of the

7  agreement, which we call the Beatbox agreement.

8      I was asked to assume, I guess, more or

9  less that Beatbox -- under the Beatbox agreement,

10  Labrador appointed Beatbox as the exclusive

11  sub-publisher of the compositions known as the

12  Spider Cues, the territories of Australia, New

13  Zealand, and Fiji.

14      I was asked to assume that the Beatbox

15  agreement specifies that Beatbox is to pay

16  Labrador 50 percent of all fees accruing from the

17  licensing of the recordings used for motion

18  pictures, television, videotapes, as well as

19  recordings used in radio and other sound carriers.

20      I was also asked to assume that the

21  Beatbox agreement specifies Beatbox is to pay

22  Labrador 50 percent of all monies received for

23  exploitation of the library.

24      I was asked to assume that rather than

25  providing payment on all fees accrued and monies

1  received, that Labrador alleges Beatbox payments

2  were based on the net revenue or revenues less

3  payments to APRA and AMCOS and on tax payments.

4       I was asked to assume that this amounts to

5  an underpayment of the contractually specified

6  fees.

7       I was asked to assume that Beatbox

8  provided 6,200 -- 6,321 cues to be exploited.  I

9  was also asked to assume that Beatbox only

10  registered 4,222 cues.

11      I was asked to assume that the failure to

12  register those cues deprived Labrador of revenue

13  from the exploitation of the cues.

14      I was also asked to assume that Beatbox

15  failed to adequately manage the library cues

16  resulting in litigation in New Zealand and

17  California regarding the Eminem Esque cue.

18      I was -- I offered no opinions on

19  liability.  I was asked to assume that the

20  information provided in footnote 3 was accurate.

21      I was asked to assume that the information

22  described in footnote 5 is accurate, and I was

23  asked to assume that the information provided in

24  footnote 7 related to the litigation costs were

25  accurate.

1    Q   What opinions did you provide that were

2    not based on an assumption provided by Labrador's

3    counsel?

4    A   Well, in the sense that all of the

5    calculations were based upon an assumption of

6    Beatbox liability, then I would say that all of

7    them are.

8    Q   On page 2 of your report, you list

9    litigation costs of $871,704.

10       What did you review to arrive at that

11   number?

12   A   That is the information that is provided

13   in footnote 7, which is an Excel spreadsheet

14   called "Costs to Defend LabEntInc," et cetera.

15   Q   All right.  Let's go to that.

16       MS. BLAISE:  Can you pull up the

17   spreadsheet.

18   Q   Is that document attached in your

19   appendix?

20   A   It was my understanding that that was

21   provided to you by counsel.

22   Q   That's okay.  I have another question.

23       We have an appendix A as well, but I don't

24   see that referenced in your report at all.

25       Did you rely on appendix A?

1      A   I -- I don't have a copy of appendix A.

2  Can you describe appendix A for me?

3      Q   Sure.  We'll show it to you in a second.

4          This is appendix A.

5          Did you rely on this document in forming

6  any of the opinions identified in your report?

7      A   One moment.  For some reason you just

8  disappeared.  I think it's --

9      Q   I did or the document did?

10     A   No, you did.  It was my fault.

11     Q   Okay.

12     A   I put something in.

13         It's hard to see what you've got there.

14  It's, what, 450 pages long it says?

15     Q   Uh-huh.

16     A   Those look like -- what you're hovering on

17  right now looks like the documents that were cited

18  in footnote 3.  There's approximately 65 or 70

19  Excel spreadsheets.

20     Q   Footnote 3.

21     A   If you're looking for the information in

22  footnote 7 if you --

23     Q   No.  I'm just trying to figure out if this

24  is a document that you relied upon in forming your

25  opinion right now.  If this appendix -- because

1    it's not referenced in your opinion, but it is

2    attached to it, and so.

3        A   Yeah.  I did not prepare appendix A but

4    my -- just looking at some of the names on here I

5    would -- I'm fairly confident that that is the

6    information I relied upon, except the information

7    I relied upon was in Excel format rather than PDF

8    format.

9        Q   Okay.  And that's the information that

10   you're saying was in footnote 3?

11       A   What you're on right now is.

12       Q   Well, I think we have separate information

13   that's -- that's footnote 3.  Let's see.

14           This looks like it is footnote 2; is that

15   correct?

16       A   It looks like footnote 2.

17           MS. BLAISE:  Can you scroll up.

18       A   Now, it looks like footnote 3 again.

19       Q   Okay.  Scrolling down, this looks like

20   footnote 3?

21       A   Yes.

22       Q   Okay.  We're going to keep going.

23       A   That's footnote 7 right there.

24       Q   This is footnote 7 which is your -- which

25   is what you relied upon in forming which

1    analysis -- which --

2        A  The last paragraph in the report that

3    says, "Labrador alleges Beatbox failed to

4    adequately manage library cues.  This resulted in

5    litigation in New Zealand and California regarding

6    the Eminem Esque cue, resulting in legal fees

7    amounting to $871,704."

8        Q  Okay.  How did you rely on this document

9    in forming that opinion?

10       A  That information was provided by Labrador,

11   and it was just an itemization of the legal fees

12   that were incurred since 2014.

13       Q  Okay.  So let me -- what is the Bates

14   stamp number of this?

15       Okay.  So this is appendix A to what we've

16   marked as Exhibit A, the Fruits report, Bates

17   stamped 16076.

18       MS. BLAISE:  Now going back up.

19       Q  So you were told that in 2014, Labrador

20   incurred attorneys' fees in the amount of

21   13,431.83.

22       A  I think they're characterized as legal

23   fees, so I don't know if that includes anything --

24       Q  Okay.

25       A  -- outside of attorneys.

1      Q   Okay.  Legal fees.

2          Was there any other supporting

3   documentation, or were you only provided with this

4   documentation?

5      A   That was all I was provided with.

6      Q   Okay.  And so you have no way of knowing

7   whether these legal fees were incurred in defense

8   of the New Zealand action or in defense of this

9   action or in prosecution of Labrador's

10  counterclaims and cross claims; is that true?

11     A   My understanding is it was related to the

12  litigation in New Zealand and California.  I don't

13  have any of the other details.

14         MS. BLAISE:  Okay.  Scrolling down.  So go

15  back up.

16     Q   So as it relates to the claim of damages

17  for attorneys' fees or legal fees, the extent of

18  your expert opinion, as it relates to those

19  alleged damages, is the addition of these numbers

20  from 2014 through 2020?

21     A   I'm sorry.  Can you restate that.

22     Q   Sure.  As it relates to your expert

23  opinion for Labrador's damages as it relates to

24  legal fees in both the New Zealand action and in

25  the California action, the extent of your expert

1    opinion is the addition of the numbers provided

2    from 2014 to 2020 and then -- I'm sorry -- also

3    through June 23rd of 2021; is that correct?

4        A   Yeah.   I'm still not quite sure, but I

5    think I know what you're asking.

6            My -- my understanding is that Labrador

7    alleges that Beatbox failed to adequately manage

8    the library cues.   Because of that alleged

9    mismanagement, that resulted in the legal fees;

10   and so those legal fees were provided to me by

11   Labrador, and that's what we're looking at now,

12   which is cited in footnote 7 in my report.

13       Q   Okay.   Your expert opinion doesn't relate

14   to whether or not Beatbox was negligent in any

15   way; correct?

16       A   No.   My opinion in this -- for this part

17   of it amounts to simply adding up the columns of

18   dollar amounts.

19       Q   Okay.   So your expert opinion, as it

20   relates to Labrador's alleged losses for

21   attorneys' fees and legal fees, is an addition of

22   those numbers provided to you from 2014 through

23   June 23rd, 2021; is that correct?

24       A   Yes.

25       Q   Okay.   And you offer no further expert

1  opinion as it relates to those alleged damages of

2  Labrador relating to attorneys' fees?

3       MR. ROSNER:  Objection; vague.  It's

4  ambiguous, overbroad, calls for a legal

5  conclusion.

6  BY MS. BLAISE:

7       Q  Dr. Fruits, do you understand my question?

8       A  If you're asking if I have any conclusions

9  regarding the factual basis or the legal basis for

10 these claims, I have no conclusion on that.

11      Q  Yes.  I'm asking if you have any further

12 opinion other than when you add the numbers that

13 are provided from 2014 to June 23rd, 2021.  If you

14 have any other opinions besides what that number

15 equals when you add all of those numbers.

16      A  No.  My opinion is merely that if you add

17 that column of numbers, you will have 871,704.

18      Q  Great.  Thank you.

19         Okay.  Now, this document you relied on in

20 which footnote?

21      A  I believe that's footnote 5.

22      Q  Do you know who created this document?

23      A  I believe it was the principal, Labrador.

24      MR. ROSNER:  All I'm seeing on my screen

25 is paragraph 1, 2, and 3.  Is that what you want

1   him to see?

2          THE WITNESS:  Yes.

3   BY MS. BLAISE:

4      Q  Yes.  For the record, it's a document

5   that's included in appendix A to the Fruits expert

6   report, which is Bates stamped Fruits report

7   16077, and entitled "Losses for LabEntLLC and

8   LabEntINC - Spider Cues."  And it says, "You asked

9   me fo #4."

10         Dr. Fruits, do you know who the you is in

11  this document?

12     A  I don't.  It's not me.

13     Q  Okay.  One second.

14         What did you rely on from this document in

15  forming the opinions identified in your report?

16     A  Can you tab down to Item No. 4 on there.

17         I believe it's the information in Item

18  No. 4, where my report says that Labrador alleges

19  it provided Beatbox 6,321 cues to be exploited;

20  however, Beatbox only registered 4,222 cues and

21  that 2,099 were not registered.

22     Q  Okay.  And it further says, "You can use

23  this ratio of cues to measure how much money

24  Beatbox neglected to earn for Labrador, basically,

25  another third."

1          Did you use that mathematical calculation
2    in determining that Labrador was damaged in the
3    amount of -- one second.  Here.
4          Yeah.  Damaged in the amount of $34,960?
5       A  I don't see the whole thing there.
6       Q  Okay.  Do you want us to scroll down.
7    Yeah.
8       A  I'm sorry.  I don't know what your
9    question was.
10      Q  Did you use the calculation that
11   Labrador's principal, Noel Webb, provided you in
12   appendix A?
13      A  I used the methodology that I provided in
14   table 3.
15      Q  Okay.  Let's go back up to the
16   methodology.
17         So your methodology -- yes or no, your
18   methodology assumes that the cues would need to be
19   registered in order to be licensed in New Zealand,
20   Australia, and Fiji; correct?
21      A  That wasn't -- that may be an implicit
22   assumption I made.
23      Q  Okay.  And it also presumes that had
24   they -- had the alleged unregistered cues been
25   registered, that they would have been licensed at

1  a rate of what percent?

2      A  I'm sorry?

3      Q  Your assumption is that had the cues, the

4  cues that were allegedly unregistered been

5  registered, that they also would have been

6  licensed; correct?

7      A  I think I answered that.

8      Q  Yes.  And how did you determine the rate

9  at which they would be licensed?

10     A  I think implicit in my assumption would be

11  that if they were registered, they would have been

12  licensed.

13     Q  And they would have been licensed 100

14  percent of the time?  They would have been

15  licensed -- what percentage of them would have

16  been licensed?

17     A  What's in table 3 is an assumption it

18  would be 100 percent.  If there's any information

19  we have that's different, again, I can update my

20  analysis based on that new information.

21     Q  What information would be required for you

22  to make that analysis?

23     A  Well, if we had information regarding the

24  registration and licensing of cues.  You know, to

25  what extent are there cues that have been

1   registered but not licensed.

2       Q   Okay.  But earlier in your testimony, you

3   acknowledged that in order for a cue to be

4   licensed, there has to be someone on the end who

5   wants to license; correct?

6       A   I don't think that was the question you

7   asked.

8       Q   Okay.  Would you agree that in order for a

9   cue to be licensed, there has to be someone who

10  wants to pay for and license it?

11      A   I'm trying to think here.  I think,

12  broadly speaking, that's probably correct.

13      Q   So wouldn't any assumption about what

14  these allegedly unregistered cues would have been

15  licensed for is based on a pure speculation?

16      A   It's based on what I would call a

17  fair-share calculation, based upon the information

18  that was provided in footnote 3, and that provides

19  you the top line of the reported revenues for

20  Australia and New Zealand, and that was based upon

21  the cues that were licensed.

22          And so then if you make the assumption

23  that the cues that weren't registered would have

24  been licensed at -- at the same rate, then this

25  would provide you with an estimate of what the

1    value of those nonregistered cues would be.

2        Q  But you would agree that this is an

3    estimate and not based upon the fact that you can

4    quantifiably say that there was an end user who

5    wanted to purchase these allegedly unregistered

6    cues; correct?

7        A  It necessarily has to be an estimate

8    because it's a calculation of some things that are

9    just simply not knowable, and so they have to be

10   estimated.

11       Q  So it is speculative?

12       A  I would --

13          MR. ROSNER:  Objection.  I'm sorry.

14       A  I'm sorry.  I would not call it

15   speculative.

16       Q  What would you call it?

17       A  I would call it an estimate based upon

18   available information.

19       Q  From the information that you reviewed,

20   were you able to tell that the registered cues

21   that had been licensed were licensed at the same

22   rate of each other across the board?

23          MR. ROSNER:  Objection to the question as

24   being vague and ambiguous and overbroad.

25       A  I'm sorry.  What was that again?

1    BY MS. BLAISE:

2        Q   From the information you reviewed in

3    forming your opinion, based on the cues that were

4    registered and licensed for which you based these

5    numbers on, were you able to see that those cues

6    that were registered and licensed were licensed at

7    the same exact rate as each other?

8        MR. ROSNER:   Same objection.

9        A   I did not make that assumption.

10       Q   Is it safe to say that cues are licensed

11   at different rates?  Some cues are more popular

12   than others, based on the information you reviewed

13   in forming your opinions?

14       A   The information provided in footnote 3

15   indicates that some cues generate more revenues

16   than other cues, and so that's why the analysis in

17   my table 3 provides an average per cue.

18           So that would -- if you apply that average

19   across a large number of cues, that should capture

20   the fact that some cues might generate a lot of

21   revenues.  Some might generate very few.  But on

22   average, according to table 3, it would be close

23   to $33 per cue.

24       Q   Did you review any document that

25   identified the alleged unregistered cues?

1      A  I did not.

2      Q  Did you review any document that

3   identified all of the registered cues -- all of

4   the alleged registered cues?

5      A  No.

6         MS. BLAISE:  I just need to run to the

7   restroom.  Can we take about -- come back in eight

8   minutes?

9         MR. ROSNER:  How long do you think you'll

10  be -- how much further do you think you're going

11  to go?

12        MS. BLAISE:  I'm almost finished.

13        MR. ROSNER:  Okay.

14        MS. BLAISE:  Does that work for everybody?

15        THE WITNESS:  Yes.

16        MS. BLAISE:  Off the record.

17        (A recess was taken from 2:23 p.m. to

18  2:33 p.m.)

19  BY MS. BLAISE:

20     Q  Dr. Fruits, I'm going to show you what I

21  think was your footnote 1 on your expert report,

22  which is the Labrador Beatbox agreement.  One

23  second.  Okay.  And I want to direct your

24  attention to paragraph 17.

25        Can you see that?

1       A   Yes.

2       Q   And can you read that, what it says --

3       A   Yes.

4       Q   -- into the record, please.

5       A   Which one, 17 or 18?

6       Q   17.

7       A   "Sub-publisher shall deduct or shall

8   authorize the deduction from royalty payments of

9   any sums which may be demanded from sub-publisher

10  in respect of the remittance of such payments by

11  the governments or other fiscal authorities of the

12  licensed territory.  In such event, sub-publisher

13  shall supply the publisher such information or

14  documentation as may be available to sub-publisher

15  together with confirmation as to the sums so

16  demanded and paid."

17      Q   Did you consider this paragraph in forming

18  any of your opinions relating to what Beatbox's

19  sub-publisher was permitted to deduct from any

20  royalty payments to Labrador?

21      A   I don't recall.

22          MR. ROSNER:  Objection to the question.

23  It's calling for a legal conclusion, vague,

24  ambiguous, and overbroad.

25

1    BY MS. BLAISE:

2        Q  Dr. Fruits, did you understand my

3    question?

4        A  I did.  I don't recall.

5        Q  If you had considered it, would it have

6    been included in your report?

7        A  I don't know as I'm sitting right here.

8        Q  In reading this paragraph now, does it

9    change any of the opinions identified in your

10   report?

11       A  I would probably have to review the entire

12   agreement.

13       Q  Earlier you testified that you reviewed

14   the entire agreement in forming your opinions.

15          Do you recall that?

16       A  I did.

17       Q  You did review the entire agreement in

18   forming your opinion?

19       A  I do recall saying that and I did;

20   however, that was approximately two months ago.

21   So I don't recall other than what's in front of me

22   right now.

23       Q  Okay.  And in reviewing paragraph 17 now,

24   you don't believe that it would change any of your

25   opinions contained in your report.

1      A   I didn't say that.

2          MR. ROSNER:  Objection to the question.

3   BY MS. BLAISE:

4      Q   Okay.  So would you like to take a moment

5   to review paragraph 17 in your report and tell me

6   how it would change any of the opinions in your

7   report?

8      A   I don't think that would be an appropriate

9   thing to do right now.

10     Q   When do you think it would be an

11  appropriate time to do it?

12     A   Oh, I'd probably need a couple days to

13  review it and review my report.

14     Q   Have you prepared any supplemental reports

15  at this time?

16     A   I have not.

17         MS. BLAISE:  I have no further questions.

18         MR. ROSNER:  I don't have any questions.

19         MS. BLAISE:  So, Doug, do you want to

20  stipulate that he can review his transcript for

21  errata errors via e-mail?

22         MR. ROSNER:  So stipulated.

23         MS. BLAISE:  We'll stipulate it.

24         THE REPORTER:  Do you want to order the

25  transcript?

1    MS. BLAISE:  Yes, please.

2    MR. ROSNER:  Yes, please.

3    (Off the record at 2:36 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3        I, ERIC FRUITS, PH.D., do hereby

 4   acknowledge that I have read and examined the

 5   foregoing testimony, and the same is a true,

 6   correct, and complete transcription of the

 7   testimony given by me and any corrections appear

 8   on the attached errata sheet signed by me.

 9

10

11

12   _____    _____

13        (DATE)                      (SIGNATURE)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

 2

 3        I, Joanne Ely, Certified Shorthand

 4   Reporter No. 84-4169, CSR, RPR, and a Notary

 5   Public in and for the County of Kane, State of

 6   Illinois, the officer before whom the foregoing

 7   deposition was taken, do hereby certify that the

 8   foregoing transcript is a true and correct record

 9   of the testimony given; that said testimony was

10   taken by me stenographically and thereafter

11   reduced to typewriting under my direction; that

12   review was requested; and that I am neither

13   counsel for, related to, nor employed by any of

14   the parties to this case and have no interest,

15   financial or otherwise, in its outcome.

16        IN WITNESS WHEREOF I have hereunto set my

17   hand and affixed my notarial seal this 24th day of

18   August, 2021.

19

20   My commission expires:  May 16, 2024

21

22

23   _____

24   Notary Public in and for the

25   State of Illinois
```

| **A** |
|---|

**able**
15:23, 17:15,
20:15, 52:20,
53:5
**about**
5:7, 7:24, 9:7,
9:25, 10:16,
11:9, 12:10,
13:7, 14:13,
14:15, 16:13,
21:18, 23:15,
23:18, 23:20,
24:1, 24:4,
24:7, 24:16,
25:4, 25:7,
27:3, 32:15,
51:13, 54:7
**absolute**
19:12
**acceptable**
37:11
**according**
53:22
**accountant**
20:5
**accounting**
16:14
**accrued**
39:25
**accruing**
21:24, 39:16
**accurate**
34:3, 36:19,
37:21, 40:20,
40:22, 40:25
**acknowledge**
59:4
**acknowledged**
51:3
**acknowledgment**
59:1
**across**
52:22, 53:19
**acting**
36:9
**action**
45:8, 45:9,

45:24, 45:25
**actual**
7:9, 13:15
**actually**
18:10, 25:23,
31:25, 32:12
**add**
47:12, 47:15,
47:16
**added**
21:23
**adding**
46:17
**addition**
45:19, 46:1,
46:21
**additional**
8:9, 25:7
**adequately**
40:15, 44:4,
46:7
**adjunct**
11:1
**adjust**
34:6
**administer**
23:17
**administration**
23:8, 25:13
**administrative**
23:9, 26:9
**advice**
11:16
**affixed**
60:17
**after**
9:4, 9:8, 9:12,
10:4
**again**
7:4, 14:9,
21:10, 28:5,
28:22, 29:3,
33:12, 33:24,
37:7, 38:6,
43:18, 50:19,
52:25
**against**
5:13

**age**
9:2, 9:4
**ago**
56:20
**agree**
30:21, 35:1,
37:13, 51:8,
52:2
**agreement**
14:24, 14:25,
15:1, 15:3,
20:23, 21:1,
21:4, 21:7,
27:7, 27:22,
31:2, 39:7,
39:9, 39:15,
39:21, 54:22,
56:12, 56:14,
56:17
**ahead**
20:20, 27:18,
39:1
**all**
6:1, 6:2, 6:6,
6:7, 6:8, 6:14,
21:23, 22:6,
22:19, 25:10,
25:24, 27:10,
27:22, 35:1,
36:3, 38:5,
38:8, 38:11,
38:24, 39:16,
39:22, 39:25,
41:4, 41:6,
41:15, 41:24,
45:5, 47:15,
47:24, 54:3
**allege**
26:7
**alleged**
33:19, 34:20,
45:19, 46:8,
46:20, 47:1,
49:24, 53:25,
54:4
**allegedly**
50:4, 51:14,
52:5

**alleges**
33:12, 40:1,
44:3, 46:7,
48:18
**allow**
32:23, 33:3
**allowances**
16:18
**allowed**
14:15
**almost**
11:25, 54:12
**along**
35:6
**already**
31:22
**also**
10:19, 10:22,
11:13, 11:18,
16:17, 16:21,
16:23, 18:11,
19:18, 21:4,
24:13, 39:20,
40:9, 40:14,
46:2, 49:23,
50:5
**although**
19:12
**ambiguous**
17:4, 23:22,
25:20, 27:14,
27:20, 29:13,
29:25, 32:19,
33:23, 34:23,
37:6, 37:18,
47:4, 52:24,
55:24
**amcos**
23:3, 23:8,
24:19, 25:1,
25:13, 26:10,
29:9, 32:18,
40:3
**among**
39:4
**amortization**
16:23
**amount**
26:11, 30:19,

30:20, 44:20,
49:3, 49:4
**amounting**
44:7
**amounts**
32:5, 40:4,
46:17, 46:18
**analysis**
23:6, 24:19,
25:9, 30:11,
33:17, 33:24,
36:25, 44:1,
50:20, 50:22,
53:16
**andersen**
7:25, 9:25
**angeles**
10:9
**another**
10:20, 16:19,
16:21, 18:8,
39:3, 41:22,
48:25
**answer**
7:2, 7:16,
29:15, 29:18,
32:23, 33:3,
34:19, 35:14,
35:15
**answered**
34:15, 50:7
**answers**
7:7, 7:10
**antitrust**
11:3
**any**
6:5, 6:12, 8:7,
8:9, 15:4, 22:8,
25:7, 28:9,
29:6, 31:16,
32:15, 33:2,
33:6, 33:11,
33:19, 35:18,
37:25, 38:9,
42:6, 45:2,
45:13, 46:14,
47:8, 47:11,
47:14, 50:18,

51:13, 53:24,
54:2, 55:9,
55:18, 55:19,
56:9, 56:24,
57:6, 57:14,
57:18, 59:7,
60:13
**anything**
25:12, 25:16,
26:2, 44:23
**anywhere**
12:1
**apologize**
6:13, 15:2,
26:25, 27:4
**appear**
18:16, 18:18,
18:19, 59:7
**appears**
18:4
**appendix**
41:19, 41:23,
41:25, 42:1,
42:2, 42:4,
42:25, 43:3,
44:15, 48:5,
49:12
**apply**
53:18
**appointed**
39:10
**appropriate**
16:3, 57:8,
57:11
**approximate**
24:17
**approximately**
5:24, 42:18,
56:20
**apra**
23:3, 23:8,
26:10, 40:3
**april**
20:23
**arguing**
35:11
**argumentative**
34:18

**arising**
39:6
**around**
10:14, 24:13,
24:21
**arrive**
17:9, 41:10
**arrived**
35:4
**artistic**
13:19
**asked**
23:4, 28:9,
29:3, 29:6,
30:7, 33:25,
35:16, 38:24,
39:8, 39:14,
39:20, 39:24,
40:4, 40:7,
40:9, 40:11,
40:14, 40:19,
40:21, 40:23,
48:8, 51:7
**asking**
8:19, 12:21,
14:9, 14:20,
23:25, 24:3,
30:5, 31:1,
35:3, 46:5,
47:8, 47:11
**asks**
23:22
**assignment**
20:22, 39:3
**assume**
7:16, 9:14,
33:25, 35:16,
39:8, 39:14,
39:20, 39:24,
40:4, 40:7,
40:9, 40:11,
40:14, 40:19,
40:21, 40:23
**assumes**
30:2, 49:18
**assuming**
17:12, 17:16,
17:18, 38:19

**assumption**
31:18, 33:15,
33:17, 35:3,
35:4, 35:17,
35:18, 36:1,
36:4, 36:6,
36:8, 36:15,
36:17, 37:12,
37:21, 37:25,
38:20, 39:3,
41:2, 41:5,
49:22, 50:3,
50:10, 50:17,
51:13, 51:22,
53:9
**assumptions**
37:1, 38:12,
38:24
**attached**
4:6, 15:22,
41:18, 43:2,
59:8
**attention**
21:13, 54:24
**attorneys**
44:20, 44:25,
45:17, 46:21,
47:2
**audible**
7:7
**august**
1:21, 60:18
**australia**
32:2, 32:16,
39:12, 49:20,
51:20
**australian**
32:5
**authorities**
55:11
**authorize**
55:8
**available**
52:18, 55:14
**average**
24:12, 24:13,
53:17, 53:18,
53:22

avoid
9:21
aware
33:2, 38:3

**B**

bachelor
7:22, 9:8
back
7:19, 16:5,
16:6, 20:12,
23:1, 23:15,
27:5, 28:2,
44:18, 45:15,
49:15, 54:7
background
14:16, 20:22,
39:3
base
34:1
based
14:22, 25:19,
26:5, 28:6,
28:12, 30:11,
30:18, 31:17,
35:2, 35:17,
36:1, 36:22,
36:24, 36:25,
40:2, 41:2,
41:5, 50:20,
51:15, 51:16,
51:17, 51:20,
52:3, 52:17,
53:3, 53:4,
53:12
basically
48:24
basing
24:19
basis
14:16, 14:21,
20:10, 33:20,
47:9
bates
44:13, 44:16,
48:6
beatbox
1:4, 15:1,

15:3, 20:24,
21:1, 21:4,
25:19, 26:3,
27:1, 27:3,
27:9, 29:9,
29:23, 30:20,
32:12, 33:7,
33:8, 33:18,
38:19, 39:7,
39:9, 39:10,
39:14, 39:15,
39:21, 40:1,
40:7, 40:9,
40:14, 41:6,
44:3, 46:7,
46:14, 48:19,
48:20, 48:24,
54:22
beatbox's
55:18
because
9:12, 14:5,
18:8, 19:6,
19:8, 20:4,
26:8, 35:17,
42:25, 46:8,
52:8
been
5:3, 6:5, 6:15,
6:17, 10:17,
20:25, 26:8,
26:9, 26:11,
26:12, 30:2,
33:18, 33:20,
34:10, 34:11,
34:21, 34:25,
49:24, 49:25,
50:4, 50:5,
50:11, 50:13,
50:14, 50:16,
50:25, 51:14,
51:24, 52:21,
56:6
before
2:8, 5:21, 7:2,
26:9, 60:6
began
10:8, 11:25

begin
7:2
behalf
3:2, 3:11
being
19:13, 38:1,
52:24
believe
8:14, 22:13,
23:9, 47:21,
47:23, 48:17,
56:24
believed
24:25
benefit
6:23
besides
47:14
best
7:1
better
13:15, 24:24,
33:13
between
8:23, 13:8,
13:12, 19:19,
20:24, 36:14
bit
9:10, 17:20
blaise
3:3, 3:5, 4:3,
5:5, 15:19,
17:5, 17:14,
20:7, 28:1,
28:13, 29:1,
30:3, 31:3,
31:7, 34:8,
35:1, 35:9,
41:16, 43:17,
44:18, 45:14,
47:6, 48:3,
53:1, 54:6,
54:12, 54:14,
54:16, 54:19,
56:1, 57:3,
57:17, 57:19,
57:23, 58:1
block
21:9, 21:10,

21:19, 21:22,
27:6, 31:11
board
32:1, 52:22
both
8:1, 19:13,
32:1, 45:24
bottom
19:13
bottom-line
19:20
boy
9:5
breach
39:5
broadly
37:20, 51:12
brought
35:6
bs
9:23, 9:24
business
7:22
buy
18:11
buying
18:3

**C**

calculate
28:11
calculation
34:1, 49:1,
49:10, 51:17,
52:8
calculations
8:10, 31:17,
35:4, 35:16,
35:25, 41:5
california
1:2, 1:9, 3:17,
10:7, 40:17,
44:5, 45:12,
45:25
call
39:7, 51:16,
52:14, 52:16,
52:17

called
10:9, 10:10,
10:12, 10:21,
41:14
calling
55:23
calls
27:15, 27:21,
28:22, 29:12,
29:13, 30:1,
30:24, 32:20,
33:22, 35:13,
37:19, 47:4
can't
32:13
capacity
11:6
capital
19:5
capture
53:19
care
5:10
carriers
39:19
cascade
10:20, 11:10,
12:1
case
1:6, 6:15,
6:17, 6:18,
8:13, 12:11,
12:12, 12:15,
27:1, 60:14
case-by-case
20:10
cases
6:1, 6:3, 6:8,
6:14, 16:15,
19:13, 30:6
catch
18:10
center
10:21, 11:14
central
1:2
cents
23:15

certain
37:14
certificate
60:1
certificates
8:7
certified
2:9, 60:3
certify
60:7
cetera
41:14
chance
22:16
change
37:1, 37:2,
56:9, 56:24,
57:6
characterized
44:22
charge
25:1, 25:5
charged
26:10
charges
16:24, 23:8,
24:19
charging
25:13
chicago
3:8
chief
11:15
cited
15:12, 22:13,
42:17, 46:12
claim
30:12, 30:17,
45:16
claimed
32:11
claims
33:15, 45:10,
47:10
claremont
8:2, 10:3
clauses
30:25

clear
27:3
clearly
33:11
close
53:22
cohen
1:12
collect
23:14
college
10:2, 10:3
column
47:17
columns
46:17
come
12:8, 16:5,
16:6, 18:1,
18:6, 32:1, 54:7
comes
29:22
commission
60:20
commodities
37:23, 38:1
companies
19:15, 19:19,
19:21
company
19:4
comparing
19:14
complaint
20:25
complete
7:2, 59:6
components
13:23, 14:3
composers
23:16
composition
13:6, 13:9,
13:13, 13:17,
15:7
compositions
39:11
concluding
31:19

conclusion
17:13, 17:17,
17:18, 23:22,
27:15, 27:21,
28:23, 29:14,
30:1, 30:24,
33:7, 36:21,
36:23, 36:25,
47:5, 47:10,
55:23
conclusions
28:10, 29:7,
30:6, 31:16,
33:11, 37:2,
47:8
conducted
1:20, 2:1
confident
43:5
confirmation
55:15
confusing
7:14
consider
16:16, 23:18,
23:19, 24:3,
24:7, 28:20,
28:24, 38:4,
38:7, 55:17
considered
56:5
construed
26:17
consulting
7:25, 9:25,
10:8, 10:11,
11:21
contained
14:18, 21:6,
56:25
contend
37:22
context
27:16, 27:22,
30:25
continues
22:17

contract
30:21, 31:1,
39:5
contractual
28:10
contractually
40:5
convert
32:4
copy
42:1
corporation
1:10, 10:15,
10:19, 11:19
correct
8:20, 9:17,
19:10, 22:23,
24:2, 25:25,
29:2, 30:13,
31:19, 31:20,
33:16, 38:25,
43:15, 46:3,
46:15, 46:23,
49:20, 50:6,
51:5, 51:12,
52:6, 59:6, 60:8
corrections
59:7
cost
16:11, 16:17,
18:19, 18:23,
19:3, 19:6,
19:8, 19:25
costs
16:20, 16:22,
18:1, 18:6,
18:14, 18:15,
18:16, 18:18,
18:23, 19:2,
19:19, 19:23,
20:11, 40:24,
41:9, 41:14
could
15:14, 16:17,
16:19, 17:19,
18:23, 18:25,
24:14, 24:18,
25:8, 26:17,

28:1, 32:22,
33:3, 34:5
counsel
5:4, 14:23,
29:3, 38:12,
41:3, 41:21,
60:13
counterclaims
39:4, 45:10
county
60:5
couple
57:12
courses
11:3
court
1:1, 6:23,
6:24, 7:9,
17:14, 28:1,
60:1
created
47:22
creates
13:19
cross
45:10
csr
1:25, 60:4
ct
1:22
cue
40:17, 44:6,
51:3, 51:9,
53:17, 53:23
cues
1:8, 32:10,
32:17, 33:9,
33:19, 33:20,
34:4, 34:10,
34:21, 37:14,
37:17, 37:22,
38:1, 38:5,
38:8, 39:12,
40:8, 40:10,
40:12, 40:13,
40:15, 44:4,
46:8, 48:8,
48:19, 48:20,

48:23, 49:18,
49:24, 50:3,
50:4, 50:24,
50:25, 51:14,
51:21, 51:23,
52:1, 52:6,
52:20, 53:3,
53:5, 53:10,
53:11, 53:15,
53:16, 53:19,
53:20, 53:25,
54:3, 54:4
current
11:7
currently
10:18

**D**

damaged
49:2, 49:4
damages
28:7, 28:11,
28:12, 38:20,
45:16, 45:19,
45:23, 47:1
date
59:13
dated
20:23
day
60:17
days
57:12
deduct
55:7, 55:19
deduction
17:9, 19:25,
55:8
defend
41:14
defendant
27:4, 30:16
defendants
1:17, 3:11
defense
45:7, 45:8
degree
7:22, 9:9

demanded
55:9, 55:16
depend
18:5
depends
16:12, 17:21,
18:4, 20:10
deponent
59:1
deposition
1:19, 2:1, 4:8,
5:21, 15:21,
60:7
depositions
5:23, 6:2
depreciation
16:23
deprived
40:12
describe
14:21, 42:2
described
12:12, 40:22
describing
20:9
details
45:13
determination
35:8
determine
20:15, 50:8
determined
30:9, 34:2
determining
49:2
difference
13:8, 13:12,
36:14
different
12:5, 12:8,
12:23, 13:5,
18:16, 18:25,
19:15, 19:18,
30:25, 34:6,
34:9, 50:19,
53:11
direct
16:1, 38:15,

38:17, 54:23
**directing**
21:13
**direction**
60:11
**disappeared**
42:8
**disconnect**
6:10
**distribution**
37:15
**district**
1:1, 1:2
**doctor**
5:11
**document**
20:17, 23:12,
32:9, 32:13,
32:22, 33:2,
33:6, 41:18,
42:5, 42:9,
42:24, 44:8,
47:19, 47:22,
48:4, 48:11,
48:14, 53:24,
54:2
**documentation**
45:3, 45:4,
55:14
**documents**
15:9, 15:11,
25:10, 25:12,
25:15, 25:17,
26:15, 42:17
**doing**
19:6
**dollar**
23:14, 46:18
**dollars**
32:6
**done**
7:4, 31:22
**doug**
35:9, 57:19
**douglas**
3:13, 3:14
**down**
6:25, 7:9,

31:21, 38:16,
43:19, 45:14,
48:16, 49:6
**dr**
5:9, 5:16,
23:24, 25:22,
27:23, 30:4,
31:8, 36:1,
47:7, 48:10,
54:20, 56:2
**draw**
29:6
**drive**
3:6
**duly**
5:3
**duty**
39:6

**E**

**e-mail**
57:21
**e-r-i-c**
5:18
**each**
13:23, 14:2,
15:11, 19:20,
52:22, 53:7
**earlier**
24:25, 28:14,
51:2, 56:13
**earn**
48:24
**easier**
9:10, 14:11
**econ**
10:9
**economics**
8:2, 10:10,
10:15, 10:19,
10:22, 11:4,
11:14, 11:15,
11:18
**economist**
11:15, 20:4,
24:10
**econorthwest**
10:12, 10:13

**education**
7:19, 8:5, 8:17
**educational**
8:16
**eight**
54:7
**either**
34:4, 35:22
**ely**
1:25, 2:8, 60:3
**emanate**
12:4, 12:17,
12:24, 13:4,
14:7, 15:5
**embodied**
38:14
**eminem**
40:17, 44:6
**emphasis**
21:23
**emphasized**
22:5
**employed**
60:13
**employee**
11:20
**employment**
9:1, 9:3
**end**
19:12, 37:16,
51:4, 52:4
**entertainment**
1:7, 1:13
**entire**
56:11, 56:14,
56:17
**entitled**
29:11, 34:19,
48:7
**equally**
38:5, 38:8
**equals**
47:15
**eric**
1:19, 2:1, 4:2,
5:2, 5:18, 59:3
**errata**
57:21, 59:8

**errors**
57:21
**esque**
40:17, 44:6
**esquire**
3:3, 3:4, 3:13
**established**
34:25
**estate**
11:5
**estimate**
51:25, 52:3,
52:7, 52:17
**estimated**
52:10
**et**
41:14
**even**
18:14, 19:19
**event**
55:12
**ever**
6:5, 8:12,
10:16
**every**
6:15, 6:17,
6:18, 23:13,
23:14
**everybody**
54:14
**everything**
6:25, 22:23
**exact**
53:7
**exactly**
23:19, 23:20,
24:5, 24:20,
24:21, 25:5,
35:2
**examination**
4:2, 5:4
**examined**
59:4
**example**
16:15, 17:24,
18:7, 19:1,
19:2, 24:14,
29:20

**excel**
41:13, 42:19,
43:7
**except**
43:6
**exchange**
32:3, 32:4
**exclusive**
39:10
**exhibit**
4:8, 4:10,
15:20, 15:21,
20:13, 44:16
**expect**
24:11
**expectation**
36:19
**expenditure**
19:6
**expenses**
17:8, 19:24,
25:1
**experience**
20:9
**expert**
4:10, 6:2, 6:6,
6:7, 6:16, 6:18,
8:12, 11:23,
15:16, 15:18,
15:19, 20:13,
21:6, 21:11,
29:21, 36:21,
45:18, 45:22,
45:25, 46:13,
46:19, 46:25,
48:5, 54:21
**expires**
60:20
**explanation**
26:21
**exploitation**
12:18, 12:25,
13:4, 13:6,
13:23, 14:2,
14:7, 15:5,
15:6, 27:11,
29:10, 37:15,
39:23, 40:13

**exploited**
32:11, 32:18,
34:5, 40:8,
48:19
**extent**
22:22, 26:15,
29:19, 45:17,
45:25, 50:25

---
**F**
---
**f-r-u-i-t-s**
5:19
**fact**
30:10, 33:11,
34:3, 52:3,
53:20
**facts**
29:14, 30:2,
30:24, 31:14,
33:25, 34:1,
34:2, 34:24
**factual**
30:6, 33:13,
47:9
**factually**
33:15
**failed**
40:15, 44:3,
46:7
**fails**
27:15, 27:21
**failure**
40:11
**fair**
7:5, 7:12, 7:17
**fair-share**
51:17
**fairly**
43:5
**familiar**
6:19, 12:3,
12:6
**family**
1:15, 3:12
**faq**
23:3, 23:5,
23:7
**far**
22:17

**fault**
42:10
**federal**
32:2
**fee**
23:9, 25:13,
26:9
**fees**
21:24, 39:16,
39:25, 40:6,
44:6, 44:11,
44:20, 44:23,
45:1, 45:7,
45:17, 45:24,
46:9, 46:10,
46:21, 47:2
**few**
11:25, 53:21
**fiduciary**
39:5
**figure**
17:10, 42:23
**fiji**
39:13, 49:20
**file**
22:20
**final**
8:4
**finance**
11:5
**financial**
60:15
**finder**
30:9, 34:3
**fine**
12:16, 15:15
**finished**
17:5, 31:3,
31:5, 38:22,
54:12
**firm**
10:8, 10:10,
10:12, 10:15,
10:18, 11:7,
20:11
**first**
9:1, 18:17,
20:21, 38:18

**fiscal**
55:11
**fish**
18:9, 18:10,
18:11
**fishing**
19:5
**flesh**
35:3
**flow**
14:2
**fo**
48:9
**focused**
21:8
**focuses**
11:12, 11:20
**follows**
5:3, 28:3
**footnote**
22:14, 22:17,
22:24, 23:1,
23:2, 23:3,
23:13, 25:11,
25:16, 31:21,
31:24, 31:25,
32:7, 32:8,
32:9, 35:20,
40:20, 40:22,
40:24, 41:13,
42:18, 42:20,
42:22, 43:10,
43:13, 43:14,
43:16, 43:18,
43:20, 43:23,
43:24, 46:12,
47:20, 47:21,
51:18, 53:14,
54:21
**footnotes**
15:13, 15:14,
20:14, 22:12
**foregoing**
59:5, 60:6,
60:8
**forgot**
27:25
**form**
14:17, 21:5

**formal**
8:4
**format**
43:7, 43:8
**forming**
15:10, 15:12,
21:20, 24:4,
28:15, 28:20,
31:24, 38:2,
38:4, 38:7,
42:5, 42:24,
43:25, 44:9,
48:15, 53:3,
53:13, 55:17,
56:14, 56:18
**foundation**
36:22
**frequently**
23:4
**front**
32:13, 35:6,
56:21
**fruits**
1:19, 2:1, 4:2,
4:8, 5:2, 5:6,
5:9, 5:16, 5:18,
15:21, 23:24,
25:22, 27:23,
30:4, 31:8,
36:1, 44:16,
47:7, 48:5,
48:6, 48:10,
54:20, 56:2,
59:3
**full**
5:17, 26:7
**full-time**
12:1
**further**
46:25, 47:11,
48:22, 54:10,
57:17

**G**

**gap**
8:23
**gave**
19:2

**general**
12:7, 12:15,
16:8, 16:9,
16:10
**generally**
12:13
**generate**
53:15, 53:20,
53:21
**give**
9:2, 9:18, 20:3
**given**
35:14, 59:7,
60:9
**go**
6:22, 7:19,
8:15, 8:22,
13:23, 19:24,
20:12, 20:14,
20:20, 21:12,
21:19, 22:11,
27:5, 27:18,
31:21, 38:18,
39:1, 41:15,
45:14, 49:15,
54:11
**goes**
23:15
**going**
20:5, 20:12,
22:1, 23:1,
27:18, 31:15,
32:7, 35:12,
43:22, 44:18,
54:10, 54:20
**gone**
25:3
**good**
5:7, 9:10
**goods**
16:17, 18:19,
18:23
**gosh**
9:4
**governments**
55:11
**governors**
32:1

**graduate**
8:1, 8:2, 8:24,
10:1, 10:2
**graduated**
10:5
**graduation**
7:20
**great**
5:20, 47:18
**greater**
12:19
**gross**
17:2, 17:9,
18:24, 19:14,
19:16, 19:25,
26:8
**ground**
6:20
**group**
10:11
**guess**
5:11, 24:10,
24:11, 36:13,
39:2, 39:8

**H**

**half**
7:24
**hand**
60:17
**hard**
42:13
**head**
7:8, 32:21
**hear**
17:15
**heard**
8:21
**heather**
3:3
**hello**
5:6
**here**
6:10, 6:25,
12:22, 21:19,
28:7, 33:1,
43:4, 49:3,
51:11, 56:7

**hereby**
59:3, 60:7
**hereunto**
60:16
**high**
7:20
**history**
8:16, 9:3, 9:19
**hold**
5:13
**holdings**
1:14
**hovering**
42:16
**however**
48:20, 56:20

**I**

**identical**
18:15, 18:24,
19:21
**identification**
15:22
**identified**
6:14, 22:24,
25:16, 42:6,
48:15, 53:25,
54:3, 56:9
**illinois**
2:10, 3:8,
60:6, 60:25
**implicit**
39:2, 49:21,
50:10
**inc**
1:7
**include**
16:18, 16:22,
16:23, 27:16,
27:21
**included**
48:5, 56:6
**includes**
14:24, 34:24,
44:23
**including**
8:15
**inclusive**
1:16

income
11:22, 12:4,
12:5, 12:8,
12:17, 12:24,
16:7, 16:16,
16:19, 16:21,
17:9, 17:10,
18:5, 18:17,
18:22, 19:20,
33:18
incomes
18:15
incorporate
25:9, 35:22
incurred
44:12, 44:20,
45:7
indiana
7:23, 10:6
indicate
26:16
indicated
20:14, 25:12,
25:17, 26:3
indicates
53:15
indicating
32:10
indication
26:18
individual
1:11, 1:12
individuals
29:5
industrial
11:4
industry
9:14, 9:15
information
14:22, 23:7,
25:8, 29:16,
29:17, 34:7,
35:19, 35:21,
35:23, 40:20,
40:21, 40:23,
41:12, 42:21,
43:6, 43:9,
43:12, 44:10,

48:17, 50:18,
50:20, 50:21,
50:23, 51:17,
52:18, 52:19,
53:2, 53:12,
53:14, 55:13
input
13:19
inputs
18:3
institute
10:20, 11:11
interest
60:14
internally
19:7, 19:10
international
10:15, 10:19,
10:21, 11:13,
11:19
interpret
29:4, 31:1
interpretation
31:18, 31:20
interpretations
28:10
interrupt
20:19
interruptions
6:12
involves
18:9
issue
17:25, 31:14,
33:13
issues
11:12, 30:7
item
48:16, 48:17
itemization
44:11
items
21:9
itself
13:16, 23:12

**J**

joanne
1:25, 2:8, 60:3

job
1:23, 8:16,
11:8, 11:18,
24:24
jobs
9:12, 9:15
joined
10:10, 10:12
jprx
1:8
judge
33:14
june
46:3, 46:23,
47:13
jury
33:14, 35:6

**K**

kane
60:5
keep
43:22
key
3:4
kind
14:1, 36:16
kinds
12:5, 15:4
know
6:24, 11:17,
12:14, 13:8,
13:16, 13:18,
13:19, 13:21,
14:10, 14:12,
16:12, 17:25,
21:15, 23:25,
27:2, 29:19,
32:25, 44:23,
46:5, 47:22,
48:10, 49:8,
50:24, 56:7
knowable
52:9
knowing
45:6
knowledge
12:11, 12:14

known
14:24, 16:20,
21:4, 39:11

**L**

labentinc
41:14, 48:8
labentllc
48:7
labrador
1:7, 1:13,
3:11, 14:23,
14:24, 14:25,
20:24, 25:17,
26:4, 26:16,
26:19, 26:22,
26:23, 27:3,
27:10, 29:4,
29:11, 30:16,
32:10, 33:8,
33:12, 39:10,
39:16, 39:22,
40:1, 40:12,
44:3, 44:10,
44:19, 44:6,
46:11, 47:2,
47:23, 48:18,
48:24, 49:2,
54:22, 55:20
labrador's
26:12, 30:17,
31:18, 33:15,
38:12, 39:4,
41:2, 45:9,
45:23, 46:20,
49:11
labrador-beatbox
21:3, 21:7,
27:7
lack
13:15
large
53:19
last
44:2
law
3:14, 10:10,
10:21, 11:14

lay
13:18
layman's
13:10
least
22:9
lecg
10:10
left
33:13
legal
23:22, 27:15,
27:21, 28:10,
28:22, 29:13,
30:1, 30:6,
30:24, 31:2,
32:20, 44:6,
44:11, 44:22,
45:1, 45:7,
45:17, 45:24,
46:9, 46:10,
46:21, 47:4,
47:9, 55:23
less
16:11, 16:16,
18:22, 18:23,
36:12, 39:9,
40:2
let's
9:6, 9:8, 21:2,
31:21, 41:15,
43:13, 49:15
level
8:4
liability
40:19, 41:6
liable
38:19
library
1:9, 27:11,
39:23, 40:15,
44:4, 46:8
license
37:4, 37:9,
37:17, 51:5,
51:10
licensed
33:21, 34:11,

34:22, 49:19,
49:25, 50:6,
50:9, 50:12,
50:13, 50:15,
50:16, 51:1,
51:4, 51:9,
51:15, 51:21,
51:24, 52:21,
53:4, 53:6,
53:10, 55:12
licensing
32:16, 37:3,
37:8, 39:17,
50:24
likewise
7:3
limited
12:11, 12:14
line
19:13, 51:19
list
38:11, 41:8
litigation
11:21, 40:16,
40:24, 41:9,
44:5, 45:12
little
9:10, 17:20,
34:9
llc
1:14
long
9:5, 42:14,
54:9
look
33:10, 42:16
looking
15:16, 15:18,
16:14, 42:21,
43:4, 46:11
looks
42:17, 43:14,
43:16, 43:18,
43:19
los
10:9
losses
46:20, 48:7

lost
27:17, 33:18
lot
9:12, 53:20

**M**

madam
17:14, 28:1
made
29:5, 49:22
main
11:8, 13:1
make
22:21, 28:9,
30:5, 35:8,
35:9, 35:10,
35:12, 35:13,
37:25, 50:22,
51:22, 53:9
makes
11:23
making
18:2
manage
40:15, 44:4,
46:7
many
5:23, 30:25,
32:10, 32:12
margin
18:24, 18:25,
19:14
margins
19:16
marked
15:20, 15:21,
20:13, 44:16
marketable
38:5, 38:8
master's
8:1
mathematical
49:1
matter
17:24, 18:8
matters
35:6
maybe
15:25

mcpc
1:14
mean
20:19, 23:18,
23:20, 24:4,
24:8, 24:11,
24:16, 26:22,
26:23, 37:16
meaning
18:22, 23:4,
24:1, 28:24,
29:7, 31:15
means
24:9, 25:4,
31:16
meantime
16:5
measure
16:10, 16:11,
16:19, 16:21,
48:23
merely
47:16
methodology
49:13, 49:16,
49:17, 49:18
michael
1:11
might
24:16, 32:25,
53:20, 53:21
minutes
54:8
mismanagement
46:9
misstates
29:14
moment
6:9, 42:7, 57:4
money
26:4, 28:7,
29:10, 48:23
monies
22:6, 25:18,
27:10, 39:22,
39:25
months
56:20

**more**
6:12, 8:19,
16:2, 27:2,
32:14, 36:12,
39:8, 53:11,
53:15
**most**
14:13, 21:8
**mostly**
11:20, 12:11
**motion**
39:17
**moved**
10:11
**much**
11:22, 12:19,
29:10, 32:14,
48:23, 54:10
**music**
1:4, 1:8, 8:13,
9:14, 9:15,
12:4, 12:9,
12:18, 12:25,
13:24, 14:3,
32:16, 37:3,
37:8, 37:10,
38:19
**musical**
13:6, 13:9,
13:12, 13:17,
15:6, 37:22
**mwf**
1:8

**N**

**name**
5:17, 5:18
**names**
22:20, 43:4
**necessarily**
52:7
**need**
15:15, 27:2,
29:17, 29:19,
32:17, 37:9,
49:18, 54:6,
57:12
**neglected**
48:24

**negligence**
39:6
**negligent**
46:14
**neither**
60:12
**net**
16:7, 16:16,
16:19, 16:21,
17:9, 18:21,
18:22, 18:24,
20:1, 26:16,
30:20, 40:2
**new**
32:3, 32:5,
35:23, 39:12,
40:16, 44:5,
45:8, 45:12,
45:24, 49:19,
50:20, 51:20
**next**
22:1, 22:18,
31:21
**nitschke**
3:5
**nodding**
7:8
**noel**
1:10, 3:11,
49:11
**none**
9:15
**nonregistered**
52:1
**north**
3:6
**notarial**
60:17
**notary**
2:9, 60:1,
60:4, 60:24
**note**
21:22, 22:5
**notes**
13:18
**nothing**
9:14
**notice**
2:8, 31:10,

31:12
**number**
17:2, 18:21,
23:11, 37:14,
41:11, 44:14,
47:14, 53:19
**numbers**
34:6, 45:19,
46:1, 46:22,
47:12, 47:15,
47:17, 53:5

**O**

**objection**
17:1, 17:3,
17:11, 20:2,
23:21, 25:20,
27:14, 27:20,
29:12, 29:25,
30:23, 31:2,
31:4, 31:6,
32:19, 33:22,
34:12, 34:13,
34:17, 34:23,
35:9, 35:10,
35:13, 37:18,
47:3, 52:13,
52:23, 53:8,
55:22, 57:2
**obligation**
26:13
**odd**
9:12
**offer**
31:16, 38:9,
46:25
**offered**
40:18
**offering**
33:11, 33:14
**office**
3:14
**officer**
60:6
**oh**
9:4, 17:7,
21:15, 57:12
**okay**
5:12, 5:15,

6:19, 7:18,
7:19, 7:21,
8:18, 8:25,
9:11, 9:13,
9:24, 10:24,
11:2, 11:6,
11:22, 12:3,
12:21, 13:3,
13:21, 14:6,
15:3, 15:9,
15:25, 16:2,
20:8, 20:12,
20:20, 21:2,
21:12, 21:15,
21:17, 22:5,
22:15, 22:16,
23:1, 25:24,
26:24, 27:5,
28:19, 29:8,
31:21, 32:7,
32:15, 36:6,
36:10, 38:11,
38:23, 41:22,
42:11, 43:9,
43:19, 43:22,
44:8, 44:13,
44:15, 44:24,
45:1, 45:6,
45:14, 46:13,
46:19, 46:25,
47:19, 48:13,
48:22, 49:6,
49:15, 49:23,
51:2, 51:8,
54:13, 54:23,
56:23, 57:4
**one**
6:9, 10:9,
16:4, 18:17,
18:19, 20:6,
20:22, 31:14,
31:19, 32:2,
32:3, 38:20,
42:7, 48:13,
49:3, 54:22,
55:5
**one-by-one**
21:2

only
12:14, 13:10,
40:9, 45:3,
48:20
operating
16:20, 16:22,
18:18, 18:23,
19:6, 19:19,
19:24
opinion
24:4, 28:20,
29:21, 31:24,
35:7, 36:15,
37:24, 38:2,
38:7, 38:9,
42:25, 43:1,
44:9, 45:18,
45:23, 46:1,
46:13, 46:16,
46:19, 47:1,
47:12, 47:16,
53:3, 56:18
opinions
14:17, 15:10,
15:12, 21:5,
21:21, 28:16,
38:4, 40:18,
41:1, 42:6,
47:14, 48:15,
53:13, 55:18,
56:9, 56:14,
56:25, 57:6
opposed
19:24
order
14:17, 21:5,
49:19, 51:3,
51:8, 57:24
organization
11:4
organizations
29:5
other
11:18, 15:9,
16:11, 18:11,
19:3, 22:2,
25:7, 27:3,
29:17, 32:3,

34:5, 35:19,
35:21, 39:4,
39:19, 45:2,
45:13, 47:12,
47:14, 52:22,
53:7, 53:16,
55:11, 56:21
others
53:12
otherwise
7:15, 25:8,
60:15
out
16:20, 26:14,
29:20, 29:22,
34:4, 35:3,
39:6, 42:23
outcome
60:15
outside
44:25
over
6:22, 11:24,
27:19
overbroad
17:12, 20:2,
25:21, 27:15,
27:20, 30:1,
32:20, 33:23,
34:14, 34:24,
37:6, 37:19,
47:4, 52:24,
55:24
own
10:14, 10:18
owner
11:19

## P

package
18:12
page
4:2, 4:8,
20:22, 22:18,
38:18, 39:2,
41:8
pages
1:24, 21:11,

42:14
paid
25:18, 26:12,
28:8, 30:19,
55:16
palmer
1:10
pamona
10:2
paragraph
20:21, 21:18,
21:20, 22:2,
22:3, 27:6,
27:16, 28:19,
38:18, 44:2,
47:25, 54:24,
55:17, 56:8,
56:23, 57:5
part
31:11, 46:16
part-time
10:22, 11:13
parties
60:14
party
6:6, 18:3, 19:9
past
5:10, 11:25
pay
26:4, 26:13,
39:15, 39:21,
51:10
payment
26:8, 26:14,
26:16, 30:18,
39:25
payments
13:2, 26:17,
29:4, 40:1,
40:3, 55:8,
55:10, 55:20
pc
3:5
pdf
43:7
people
16:15, 28:8
percent
11:9, 12:2,

21:23, 22:6,
23:9, 23:10,
23:20, 24:15,
24:20, 24:21,
24:22, 25:2,
25:5, 25:7,
25:18, 26:4,
27:10, 39:16,
39:22, 50:1,
50:14, 50:18
percentage
50:15
permitted
55:19
person
37:9
personal
11:22
ph
1:19, 2:1, 4:2,
5:2, 5:10, 8:2,
10:5, 59:3
phone
6:9
physical
13:15
pictures
39:18
places
18:16
plaintiff
1:5, 3:2, 5:4,
26:21, 27:1,
27:4, 30:14
plaintiff's
26:19, 28:6,
28:12, 30:11
plaintiffs
26:6
please
5:16, 9:20,
28:2, 55:4,
58:1, 58:2
point
35:2
policy
10:20, 11:11,
11:12

popular
53:11
portland
10:11, 10:17,
10:22, 10:24
position
8:21
post
7:20, 9:2,
9:23, 9:24
prepare
43:3
prepared
35:24, 57:14
preprocessed
18:12
presented
35:19
president
11:10, 11:18
presumes
49:23
pretend
20:5
principal
47:23, 49:11
probably
5:25, 11:9,
12:1, 14:12,
16:2, 24:12,
35:22, 37:20,
51:12, 56:11,
57:12
process
18:10
processors
18:9, 18:11
product
13:16, 16:13,
18:2, 18:7
production
32:16
products
18:12
professor
10:6, 11:1
prosecution
45:9

provide
11:15, 14:25,
15:3, 41:1,
51:25
provided
8:12, 14:23,
19:2, 29:16,
32:9, 33:7,
33:8, 38:12,
40:8, 40:20,
40:23, 41:2,
41:12, 41:21,
44:10, 45:3,
45:5, 46:1,
46:10, 46:22,
47:13, 48:19,
49:11, 49:13,
51:18, 53:14
provides
51:18, 53:17
providing
39:25
provisions
27:22, 28:15
pty
1:4
public
2:9, 60:1,
60:5, 60:24
publisher
27:9, 55:13
publishers
23:16
pull
41:16
purchase
52:5
pure
51:15
purposes
33:24
pursuant
2:8
put
21:6, 42:12
putting
37:14

---
Q
---
quantifiably
52:4

question
7:1, 7:13,
7:15, 7:16,
13:25, 14:5,
17:3, 17:6,
17:11, 21:16,
23:24, 25:22,
27:24, 27:25,
28:2, 29:8,
29:15, 29:18,
30:4, 30:23,
31:9, 31:10,
32:24, 33:4,
34:9, 34:12,
34:15, 34:16,
35:10, 36:3,
36:16, 37:5,
37:7, 41:22,
47:7, 49:9,
51:6, 52:23,
55:22, 56:3,
57:2
questions
23:4, 57:17,
57:18
quite
46:4
quote
21:9, 21:22,
23:14
quoted
21:11, 21:19,
23:13, 27:6,
31:11

---
R
---
radio
39:19
range
24:13, 24:21
rate
32:3, 32:4,
50:1, 50:8,
51:24, 52:22,
53:7
rates
53:11
rather
26:13, 30:19,

39:24, 43:7
ratio
48:23
rd
46:3, 46:23,
47:13
read
15:13, 22:19,
28:2, 28:3,
55:2, 59:4
reading
56:8
readjust
35:24
real
11:4
realize
27:2
really
20:10
reason
34:5, 42:7
rebuts
35:24
recall
15:8, 33:5,
55:21, 56:4,
56:15, 56:19,
56:21
receive
26:7
received
22:6, 25:18,
26:5, 27:10,
27:13, 28:4,
28:21, 28:25,
29:7, 29:9,
30:18, 30:20,
30:22, 31:11,
31:15, 39:22,
40:1
recess
54:17
record
5:11, 5:17,
15:19, 28:3,
35:12, 48:4,
54:16, 55:4,

58:3, 60:8
**recording**
13:5, 13:9,
13:12, 13:14,
15:6
**recordings**
14:8, 39:17,
39:19
**reduced**
26:11, 60:11
**reduction**
16:25
**refer**
15:16
**referenced**
41:24, 43:1
**referred**
20:25
**reflect**
24:13
**reflects**
14:12
**regarding**
40:17, 44:5,
47:9, 50:23
**register**
40:12
**registered**
32:17, 33:19,
34:11, 34:21,
40:10, 48:20,
48:21, 49:19,
49:25, 50:5,
50:11, 51:1,
51:23, 52:20,
53:4, 53:6,
54:3, 54:4
**registration**
50:24
**regulation**
11:3
**relate**
13:22, 46:13
**related**
40:24, 45:11,
60:13
**relates**
8:9, 31:23,

45:16, 45:18,
45:22, 45:23,
46:20, 47:1
**relating**
38:1, 47:2,
55:18
**relative**
18:1
**relevance**
23:5
**relevant**
14:13
**relied**
22:2, 28:15,
28:19, 42:24,
43:6, 43:7,
43:25, 47:19
**rely**
20:23, 41:25,
42:5, 44:8,
48:14
**remainder**
23:17
**remit**
27:9
**remittance**
55:10
**repackaging**
19:5
**repeat**
6:13, 24:23
**report**
4:10, 6:15,
12:12, 12:20,
14:12, 14:14,
14:16, 14:18,
14:21, 15:12,
15:17, 15:18,
15:20, 20:13,
21:6, 21:11,
28:16, 33:10,
38:14, 38:16,
41:8, 41:24,
42:6, 44:2,
44:16, 46:12,
48:6, 48:15,
48:18, 54:21,
56:6, 56:10,

56:25, 57:5,
57:7, 57:13
**reported**
1:25, 51:19
**reporter**
2:9, 6:23,
6:24, 7:9,
17:14, 17:16,
17:19, 27:17,
28:1, 28:3,
57:24, 60:1,
60:4
**reports**
57:14
**requested**
60:12
**required**
50:21
**requires**
37:4
**research**
11:10
**reserve**
32:2
**respect**
12:10, 55:10
**respond**
35:5
**rest**
22:12
**restate**
7:15, 45:21
**restroom**
54:7
**resulted**
44:4, 46:9
**resulting**
40:16, 44:6
**retained**
6:2, 6:6, 6:15,
6:17, 28:11
**returns**
16:18
**revenue**
40:2, 40:12
**revenues**
16:11, 16:16,
40:2, 51:19,

53:15, 53:21
**review**
15:9, 21:5,
22:8, 22:16,
31:23, 32:8,
32:23, 33:3,
33:6, 41:10,
53:24, 54:2,
56:11, 56:17,
57:5, 57:13,
57:20, 60:12
**reviewed**
15:11, 21:8,
21:20, 22:22,
23:2, 25:10,
25:24, 52:19,
53:2, 53:12,
56:13
**reviewing**
25:15, 56:23
**right**
11:8, 13:7,
14:20, 15:8,
15:17, 17:25,
18:8, 19:8,
19:11, 26:1,
28:14, 41:15,
42:17, 42:25,
43:11, 43:23,
56:7, 56:22,
57:9
**rights**
12:18
**ringing**
6:9
**road**
3:15
**role**
11:7
**rosner**
3:13, 3:14,
17:1, 17:3,
17:7, 17:11,
17:15, 17:18,
20:2, 23:21,
25:20, 27:14,
27:18, 28:22,
29:12, 29:25,

30:23, 31:5,
32:19, 33:22,
34:12, 34:17,
34:23, 35:5,
35:11, 37:5,
37:18, 47:3,
47:24, 52:13,
52:23, 53:8,
54:9, 54:13,
55:22, 57:2,
57:18, 57:22,
58:2
**rounding**
24:14
**royalties**
12:4, 12:9,
13:4, 13:22,
14:1, 14:7,
15:5, 23:16,
23:17
**royalty**
8:10, 8:13,
13:2, 22:8,
22:10, 22:13,
25:11, 25:19,
25:25, 26:2,
26:5, 26:7,
26:14, 30:18,
55:8, 55:20
**rpr**
1:25, 60:4
**rules**
6:20
**run**
54:6

**S**

**safe**
24:16, 53:10
**said**
28:15, 60:9
**same**
7:3, 19:13,
51:24, 52:21,
53:7, 53:8, 59:5
**sat**
5:21, 5:23, 6:1
**say**
7:1, 12:2,

12:19, 14:4,
17:16, 19:14,
24:12, 24:14,
24:16, 28:24,
34:10, 34:20,
41:6, 52:4,
53:10, 57:1
**saying**
19:11, 43:10,
56:19
**says**
23:13, 23:14,
27:8, 30:21,
31:11, 33:12,
42:14, 44:3,
48:8, 48:18,
48:22, 55:2
**school**
7:20, 8:1,
10:1, 10:2
**science**
7:22, 9:8
**scope**
30:8
**screen**
15:23, 15:25,
47:24
**scripps**
10:3
**scroll**
38:16, 43:17,
49:6
**scrolling**
43:19, 45:14
**seal**
60:17
**second**
16:4, 18:19,
21:20, 42:3,
48:13, 49:3,
54:23
**secondary**
19:4
**section**
21:10, 22:1
**see**
9:6, 41:24,
42:13, 43:13,

48:1, 49:5,
53:5, 54:25
**seeing**
47:24
**sense**
26:6, 41:4
**separate**
43:12
**services**
11:16
**set**
60:16
**shaking**
7:8
**shall**
27:9, 55:7,
55:13
**share**
15:23, 15:25
**sheet**
16:14, 59:8
**shorthand**
2:9, 60:3
**should**
26:8, 26:9,
26:10, 29:22,
30:17, 38:14,
53:19
**show**
42:3, 54:20
**showed**
25:8, 25:12
**showing**
20:12
**signature**
59:13
**signature-5tm1q**
60:22
**signed**
59:8
**silly**
36:16
**simply**
7:14, 14:5,
16:16, 28:11,
46:17, 52:9
**since**
10:16, 11:25,

44:12
**sitting**
12:22, 33:1,
56:7
**slip**
5:14
**small**
8:23
**sold**
16:17, 18:20,
18:23
**sole**
11:20
**some**
10:1, 16:10,
16:11, 16:15,
18:9, 24:12,
24:21, 30:6,
30:7, 31:14,
32:22, 34:5,
36:19, 36:24,
42:7, 43:4,
52:8, 53:11,
53:15, 53:20,
53:21
**someone**
18:2, 37:4,
51:4, 51:9
**something**
35:15, 36:24,
42:12
**sometimes**
16:17
**somewhat**
12:6
**songwriters**
23:15
**sorry**
9:13, 9:22,
15:1, 17:7,
20:19, 23:19,
23:23, 24:23,
27:17, 30:15,
33:8, 33:9,
37:7, 38:6,
45:21, 46:2,
49:8, 50:2,
52:13, 52:14,

52:25
**sort**
28:9, 36:24
**sound**
13:5, 13:8,
13:12, 13:14,
13:20, 14:7,
15:5, 39:19
**sounds**
13:7, 13:16
**source**
13:2
**sources**
20:23, 31:25
**southern**
10:7
**speak**
7:4, 17:19
**speaking**
7:4, 12:13,
37:20, 51:12
**specifics**
17:22, 17:23
**specified**
40:5
**specifies**
39:15, 39:21
**speculation**
29:13, 33:23,
34:13, 35:14,
36:2, 36:11,
36:12, 36:15,
36:20, 36:21,
37:19, 51:15
**speculative**
34:13, 34:24,
37:6, 52:11,
52:15
**spell**
5:16
**spider**
1:8, 39:12,
48:8
**spreadsheet**
41:13, 41:17
**spreadsheets**
42:19
**stamp**
44:14

**stamped**
44:17, 48:6
**start**
20:18, 20:21,
27:19
**started**
10:14
**starting**
7:20, 9:1
**state**
2:10, 5:16,
10:17, 10:23,
10:24, 33:20,
36:8, 36:17,
60:5, 60:25
**state-based**
11:11
**stated**
30:2
**statement**
18:5, 18:17
**statements**
22:8, 22:10,
22:13, 25:11,
25:19, 25:25,
26:3, 26:5
**states**
1:1, 30:24,
38:19
**stating**
24:20
**stenographically**
60:10
**stick**
14:11
**still**
9:18, 25:4,
46:4
**stipulate**
57:20, 57:23
**stipulated**
57:22
**straight**
23:15
**streams**
12:4, 12:5,
12:8, 12:17,
12:24

**strike**
9:7
**sub-publisher**
27:8, 39:11,
55:7, 55:9,
55:12, 55:14,
55:19
**subtracting**
16:20
**suite**
3:7, 3:16
**sums**
55:9, 55:15
**supplemental**
57:14
**supply**
55:13
**support**
33:7, 35:20
**supporting**
45:2
**supports**
35:22
**sure**
5:18, 6:11,
6:19, 13:25,
14:9, 19:1,
19:17, 22:21,
42:3, 45:22,
46:4
**sworn**
5:3

| **T** |
|---|

**tab**
48:16
**table**
49:14, 50:17,
53:17, 53:22
**take**
7:9, 21:2,
33:10, 54:7,
57:4
**taken**
26:14, 29:20,
29:22, 54:17,
60:7, 60:10
**takes**
11:8

**taking**
6:25
**talking**
12:10, 16:13,
21:18
**tank**
10:20, 11:12
**tax**
26:17, 40:3
**taxes**
16:23, 26:11,
26:13, 29:20,
29:21
**teach**
10:22, 11:2,
11:3
**teaching**
10:1, 10:17
**television**
39:18
**tell**
12:7, 12:21,
32:13, 36:6,
36:10, 52:20,
57:5
**term**
13:15
**terms**
13:10, 13:18
**territories**
39:12
**territory**
55:12
**testified**
5:3, 6:18,
24:25, 56:13
**testimony**
8:12, 25:4,
25:6, 28:14,
51:2, 59:5,
59:7, 60:9
**th**
60:17
**thank**
5:8, 5:15,
5:20, 47:18
**themselves**
18:2, 18:10,

18:11, 18:13
**theory**
26:19, 26:20,
28:6, 28:12
**thereafter**
60:10
**thing**
49:5, 57:9
**things**
30:9, 39:5,
52:8
**think**
10:20, 11:11,
14:4, 14:10,
14:21, 16:2,
17:21, 20:18,
21:13, 22:9,
22:17, 24:18,
25:6, 25:14,
29:15, 30:5,
30:8, 33:13,
34:15, 34:16,
36:20, 37:11,
37:20, 42:8,
43:12, 44:22,
46:5, 50:7,
50:10, 51:6,
51:11, 54:9,
54:10, 54:21,
57:8, 57:10
**thinking**
18:7
**third**
18:3, 19:8,
48:25
**third-party**
16:24, 17:8,
18:1, 18:14,
19:2, 19:3,
19:8, 19:23,
19:25
**thomas**
3:4
**thought**
8:20
**three-quarters**
11:9
**through**
8:22, 13:2,

15:14, 22:11,
25:3, 45:20,
46:3, 46:22
**throughout**
10:16, 15:12
**time**
9:6, 10:16,
11:10, 19:23,
50:14, 57:11,
57:15
**title**
10:24, 11:14
**today**
5:6, 12:23
**together**
55:15
**told**
44:19
**top**
32:21, 51:19
**total**
18:21
**totally**
19:18
**townsgate**
3:15
**training**
8:9
**transcript**
4:6, 15:22,
57:20, 57:25,
60:8
**transcription**
59:6
**treated**
38:1
**treats**
20:11
**trial**
35:23
**true**
28:17, 28:18,
36:9, 36:18,
45:10, 59:5,
60:8
**trust**
1:15, 3:12
**try**
7:3

**trying**
9:21, 14:19,
42:23, 51:11
**turns**
34:4
**two**
7:24, 9:25,
19:15, 19:19,
21:9, 28:15,
31:25, 56:20
**type**
16:13, 16:14,
37:25
**types**
12:24
**typewriting**
60:11
**typically**
17:8

## U

**uh-huh**
42:15
**under**
20:22, 26:18,
26:19, 33:14,
39:2, 39:9,
60:11
**undergrad**
8:24
**undergraduate**
7:21
**underpayment**
26:18, 40:5
**understand**
7:14, 13:3,
13:25, 14:1,
14:5, 14:13,
23:24, 25:22,
27:23, 30:4,
31:8, 36:3,
36:4, 37:3,
37:8, 47:7, 56:2
**understanding**
12:7, 12:15,
12:22, 12:23,
13:1, 13:11,
13:22, 14:6,

14:17, 15:4,
16:7, 20:4,
22:10, 22:25,
27:12, 28:4,
28:5, 28:6,
31:13, 32:15,
41:20, 45:11,
46:6
**understood**
7:17, 19:22
**united**
1:1
**universe**
37:15
**university**
7:23, 8:3,
10:6, 10:17,
10:23, 10:25
**unregistered**
49:24, 50:4,
51:14, 52:5,
53:25
**until**
7:1, 7:4
**update**
50:19
**urban**
11:4
**use**
48:22, 49:1,
49:10
**user**
37:16, 52:4
**users**
30:19
**using**
13:18, 28:8,
29:6
**usually**
16:10, 16:24

## V

**vague**
17:4, 17:12,
20:2, 23:21,
25:20, 27:14,
27:20, 29:13,
29:25, 32:19,

34:13, 34:23,
37:5, 37:18,
47:3, 52:24,
55:23
**valuable**
38:5, 38:8
**value**
52:1
**varies**
11:24
**versus**
15:6, 18:3,
18:24, 19:5,
27:3, 27:4
**via**
57:21
**vice**
11:10
**videotapes**
39:18
**village**
3:17
**virtually**
1:20, 2:2
**visiting**
10:5
**voices**
13:19

| W |
|---|

**wacker**
3:6
**wait**
6:9, 7:1, 7:3
**want**
7:19, 9:18,
22:11, 22:19,
22:21, 27:5,
30:13, 37:4,
47:25, 49:6,
54:23, 57:19,
57:24
**wanted**
52:5
**wants**
37:9, 37:17,
51:5, 51:10
**way**
24:18, 45:6,

46:15
**we'll**
16:5, 16:6,
20:15, 21:12,
21:19, 22:15,
42:3, 57:23
**we're**
16:13, 43:22,
46:11
**we've**
25:3, 31:22,
44:15
**webb**
1:11, 1:15,
3:11, 3:12,
49:11
**wednesday**
1:21
**went**
7:23, 7:25,
9:24, 10:1
**weren't**
51:23
**westlake**
3:17
**whereof**
60:16
**whether**
31:20, 32:17,
34:2, 45:7,
46:14
**whole**
49:5
**wild**
36:13
**within**
21:3, 30:8
**witness**
11:23, 15:23,
48:2, 54:15,
60:16
**word**
23:18, 23:19,
23:25, 24:1,
24:4, 24:7,
25:3, 27:12,
28:4, 28:21,
28:25, 30:22,

31:11, 31:15
**words**
19:4
**work**
7:21, 8:24,
10:19, 11:13,
19:7, 29:6,
29:10, 37:4,
54:14
**worked**
7:24, 9:24
**working**
11:25, 17:24,
18:9
**works**
28:8, 30:19
**world**
36:8, 36:18
**wouldn't**
12:19, 19:7,
24:10, 51:13
**written**
31:2

| Y |
|---|

**yeah**
14:15, 16:4,
20:16, 21:15,
24:24, 30:5,
43:3, 46:4,
49:4, 49:7
**year**
7:24, 11:24
**years**
7:25, 9:25,
11:25

| Z |
|---|

**zealand**
32:4, 32:6,
39:13, 40:16,
44:5, 45:8,
45:12, 45:24,
49:19, 51:20

| $ |
|---|

**$33**
53:23

**$34,960**
49:4
**$85**
29:9, 29:22
**$871,704**
41:9, 44:7

| . |
|---|

**.6602**
3:9
**.8400**
3:18

| 0 |
|---|

**03**
1:22

| 1 |
|---|

**1**
1:16, 1:22
**10**
12:2
**100**
50:13, 50:18
**11**
1:21
**123**
3:6
**13,431.83**
44:21
**15**
4:10, 5:25,
23:9, 23:10,
23:20, 24:20,
24:21, 24:22,
25:1, 25:5, 25:7
**16**
60:20
**16076**
44:17
**16077**
48:7
**17**
1:7, 54:24,
55:5, 55:6,
56:23, 57:5
**18**
9:2, 9:4, 9:12,

9:23, 55:5

**2**

**2**
43:14, 54:17,
54:18, 58:3
**2,099**
48:21
**20**
1:16, 5:25
**2002**
10:16
**2006**
10:14
**2009**
20:24
**2014**
44:12, 44:19,
45:20, 46:2,
46:22, 47:13
**2020**
45:20, 46:2
**2021**
1:21, 46:3,
46:23, 47:13,
60:18
**2024**
60:20
**23**
46:3, 46:23,
47:13, 54:17
**24**
60:17
**250**
3:7
**2625**
3:15
**2:-cv**
1:7

**3**

**312.448**
3:9
**33**
54:18
**330**
3:16
**36**
58:3

**391257**
1:23

**4**

**4,222**
40:10, 48:20
**4169**
60:4
**450**
42:14

**5**

**50**
21:23, 22:6,
25:18, 26:4,
27:10, 39:16,
39:22

**6**

**6,200**
40:8
**6,321**
33:9, 33:19,
34:20, 40:8,
48:19
**60**
1:24
**60606**
3:8
**6108**
1:7
**632**
33:9
**65**
42:18

**7**

**70**
42:18

**8**

**80**
11:9
**818.501**
3:18
**84**
60:4
**84.9**
24:14

**85**
23:15
**85.1**
24:15
**871,704**
47:17

**9**

**91302**
3:17